UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

In re:                                                    Chapter 11

      K-V DISCOVERY SOLUTIONS,                 Case No. 12-13346 (ALG)
      *et al.*,

          Debtors.

-------------------------------------------------------x

## MEMORANDUM OF DECISION

A P P E A R A N C E S

CURTIS, MALLET-PREVOST,
COLT & MOSLE, LLP
*Conflict Counsel for the Official*
*Committee of Unsecured Creditors*
  By:   Steven J. Reisman
        Turner P. Smith
101 Park Avenue
New York, New York 10178

WEIL, GOTSHAL & MANGES LLP
*Counsel for the Ad Hoc Senior*
*Noteholders Group*
  By:   Lori R. Fife
        Robert J. Lemons
        Robert S. Berezin
        Yehudah Buchweitz
767 Fifth Avenue
New York, New York 10153

ALSTON & BIRD LLP
*Counsel for Wilmington Trust National*
*Association, as Senior Indenture Trustee*
*and Collateral Agent*
  By:   David A. Wender
        Jack W. Spears
1201 West Peachtree Street
Atlanta, Georgia 30309

1

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion (the "Motion") of the Official Committee of Unsecured

Creditors (the "Committee") for a declaration that the prepetition senior noteholders (the

"Secured Noteholders") were not granted a lien on certain assets of Debtor K-V Discovery

Solutions, Inc.[1]  The present dispute involves the rights that the Secured Noteholders have under

$225 million in Senior Secured Notes (the "Notes").  The Secured Noteholders claim (A) that

they have a security interest in all rights relating to the drug known as Makena other than (i) the

Makena trademark and (ii) the Debtors' executory rights as of the petition date arising under the

agreement for the purchase of the drug, or (B) at least that the underlying documents are

ambiguous and the rights of the parties cannot be established without a full trial.  The

Committee, asserting the interests of the Debtors' estate, claims that the Secured Noteholders do

not have a prepetition security interest in the Debtors' right, title, and interest in Makena.  For the

reasons stated hereafter, the Court finds that the documents are clear, and that they do not

provide the Notes with a prepetition security interest in the Debtors' right, title, and interest in

the drug Makena.[2]

## **Background**

K-V Discovery Solutions, Inc. and several affiliates (the "Debtors") filed for Chapter 11

relief on August 4, 2012.  As of the Petition Date and since then, their principal business has

---

[1]  Pursuant to an order entered December 27, 2012, the Committee was permitted to bring this action by motion rather than by adversary proceeding.  (*See* Docket No. 497 ("[T]he Creditors' Committee may, and shall have standing to, commence a declaratory action by motion to challenge the validity, enforceability, priority or status of the Prepetition Liens on the Makena Assets, and the Prepetition Secured Parties shall not challenge the Creditors' Committee's standing to commence such action or the ability to do so by motion rather than by adversary proceeding.").)

[2]  Nothing in this Decision bears on the question whether the holders of the Notes, or some of them, have a lien on the drug Makena by virtue of a grant of adequate protection to secure them against a diminution in the value of their collateral during the course of the chapter 11 cases, or whether they have a lien as security for a DIP Loan made during the course of the chapter 11 cases.  The only question raised is the extent of the prepetition security interest held by the Secured Noteholders.

been the manufacture and distribution of a drug called Makena used to prevent premature births – a product previously known as Gestiva or, chemically, as 17 α-hydroxyprogesterone caproate. The Debtors' rights in Makena derive from a contract with the original developer of the drug, Hologic, Inc. and a Hologic affiliate (collectively, "Hologic"). The history of this contract, as detailed by the Secured Noteholders in their Objection to the Motion, is useful in understanding the parties' respective interests.[3] In the contract, dated January 16, 2008 (the "Hologic Contract"), Hologic agreed to assign to the Debtors all of its "right, title and interest" in and to the pharmaceutical product Gestiva (defined in the contract as the "Purchased Assets"). (*See* Hologic Contract, Docket No. 563, at Exh. C, § 2.2.) In turn, the Debtors agreed to pay Hologic an Initial Purchase Price Amount of $7 million, an Additional Purchase Price Amount of $72.5 million, a NDA Milestone Payment of $2 million, and any Reimbursable Expenses of Hologic, all of which was to be paid on or before the final consummation of the transaction on the "Final Payment Date." (*See id.* at Exh. C, §§ 4.1, 4.2, 5.4(b).) Not long after the contract was executed, however, the Debtors entered into nationwide voluntary recalls affecting most of their then-existing products and agreed to cease drug manufacture and distribution until they had satisfied certain requirements imposed by the U.S. Food and Drug Administration (the "FDA"). Eventually, their former chief executive pleaded guilty to two felony counts for failure to report the discovery of non-compliant products to the FDA. The Debtors' revenues declined dramatically, from $207.8 million in 2008 to $9.1 million in 2010. (*See* Objection of the Secured Noteholders, Docket No. 562 at ¶¶ 9-12.)

The effect on the Hologic Contract was as dramatic as the Debtors' financial collapse. The Debtors were unable to make payment of the purchase price due under the Contract, and in

---

[3] The background facts for this Memorandum of Decision are drawn from the Objection of the Secured Noteholders (Docket No. 562) and the First Day Declaration of Thomas McHugh dated August 4, 2012 (Docket No. 2), which the Objection cites at length.

an agreement dated January 8, 2010,[4] Hologic agreed to an amendment that had the following

material terms: (i) the purchase price was increased by approximately $108.5 million (First

Amendment, Docket No. 22 at Exh. B, ¶ 9, amending § 4.2(b)); (ii) a new schedule of payments

was agreed to, providing that the Debtors would make the payments over the course of 21

months (*id.*); (iii) Hologic was granted a security interest in the "Purchased Assets" to secure

payment of the Purchase Price (*id.* at ¶ 18, providing for a new § 8.12); (iv) the Debtors agreed to

retransfer the Purchased Assets to Hologic if they defaulted under the Contract (*id.* at ¶ 30,

providing for a new § 12.4); and (v) Hologic agreed to release its security interest no later than

120 days after the "Final Payment Date" (*id.* at ¶ 18, providing for a new § 8.12).  The Hologic

security interest was granted pursuant to the following provision:

> To secure the payment of any remaining unpaid Additional Purchase Price
> Amount, on or after the Amendment Date, the Seller may file such Uniform
> Commercial Code financing statements as are necessary to evidence a first
> priority security interest . . . in the Purchased Assets (other than the Gestiva
> Inventory, any Receivables and the proceeds of the Gestiva Inventory or the
> Receivables). . . . [T]he Seller agrees that it shall not have, and hereby disclaims
> and/or releases, any interest, right, lien or security interest of any kind whatsoever
> in the Gestiva Inventory, the Receivables and the proceeds of the Gestiva
> Inventory or Receivables.

(*Id.*)  New definitions were agreed to, including definitions for "Gestiva Inventory" and

"Receivables."  (*Id.* at ¶ 4, amending § 1.1.)[5]  The Contract was again amended on February 3,

2011 to allow the Debtors to choose between two different payment schedules.  (*See* Second

Amendment, Docket No. 22 at Exh. C, ¶ 2, amending § 4.2(b).)

---

[4]  While the parties did not provide the Court with a copy of the First and Second Amendments to the Hologic
Contract in connection with the instant Motion, Hologic submitted them with its objection to the Debtors' cash
management procedures motion.  (*See* Docket No. 22 at Exhs. B, C.)  The parties agreed at oral argument on
February 5, 2013 that the Court could take judicial notice of these documents.
[5]  The Gestiva Inventory was defined as all inventories of Gestiva, including component parts, works in progress,
and raw materials relating to Gestiva.  (*See* First Amendment, Docket No. 22 at Exh. B, ¶ 4, amending § 1.1.)  The
Receivables were any amounts owed to the Debtors arising in connection with the sale of Gestiva Inventory.  (*See
id.*)

On February 10, 2011, the Hologic Contract was again amended pursuant to the Third

Amendment.  (*See* Docket No. 563 at Exh. D.)  The Third Amendment confirmed Hologic's

security interest and lien in and to the Purchased Assets, again excluding the Gestiva Inventory,

the Receivables, and the proceeds of the Gestiva Inventory and the Receivables.  (*Id.* at ¶ 17,

amending § 8.12.)  The Amendment provided that Hologic could protect its security interest with

a UCC-1 filing and that the UCC-1 would be released on the Lien Release Date when the Final

Payment was made.  (*Id.*)  It was agreed that if the Debtors breached their payment obligations

prior to the Final Payment Date, then Hologic could elect either (i) to sell the Purchased Assets

pursuant to its rights as a secured party under the Contract and the Uniform Commercial Code or

(ii) to require the Debtors to retransfer the assets to Hologic.  (*Id.* at ¶ 18, amending § 12.4(a)-

(b).)  Under that latter election, the Debtors would be required to "convey and assign to the

Seller . . . all of the Acquiror's and its Affiliates' right, title and interest in and to the following

assets . . . **free and clear of all Encumbrances** . . . : (13) any other assets constituting Gestiva

Collateral."  (*Id.*) (emphasis added).  "Encumbrance" includes any "claim, mortgage, pledge, . . .

security interest, . . . lease, lien, . . . [or] license. . . ."  (Hologic Contract, Docket No. 563 at Exh.

C, § 1.1.)

The Debtors' financial condition and prospects improved by early 2011, when the FDA

approved Makena and granted the drug an orphan drug marketing designation for a period of

seven years.[6]  This apparently gave the Debtors access to the capital markets, and on March 7,

2011, less than a month after the Third Amendment to the Hologic Agreement, the Debtors

issued the Senior Notes.

---

[6]  The orphan drug designation is intended to entice companies to develop drugs for rare conditions by granting them certain marketing exclusivity.  (*See* First Day Declaration of Thomas Hugh dated August 4, 2012, Docket No. 2 at ¶¶ 14, 17.)

The Senior Notes were secured pursuant to a Pledge and Security Agreement dated

March 17, 2011 (the "PSA").  The PSA details a broad and comprehensive list of the Debtors'

assets that were secured, but for purposes of this dispute the question is the construction of the

exclusions specified in the PSA in two subparagraphs.  Section 2.2(a) of the PSA provided that:

> (a) . . .  Notwithstanding anything herein or the Indenture to the contrary, the
> security interest created by this Agreement shall not extend to, and the term
> Collateral shall not include, any Excluded Assets.[7]

"Excluded Assets" are defined in the Indenture under which the Notes were issued, also dated

March 17, 2012, as any "lease, license, contract or other property as to which the grant of a

security interest is (A) prohibited by the applicable governing agreement, or would give any

other party thereto a right to consent or terminate its obligations thereunder, or would otherwise

result in a default, breach or violation thereof, [or] (B) would constitute or result in the

abandonment, invalidation or unenforceability of any rights, title or interest of any obligor

thereunder. . . ."  (Indenture, Docket No. 563 at Exh. I, § 1.01.)   The definition of Excluded

Assets goes on to state, "For the avoidance of doubt, Makena and the Company's rights therein

shall not be Collateral until such time as the Lien on such assets in favor of Hologic, Inc. granted

pursuant to the Makena Agreement is terminated."  (*Id.*)  "Makena" in turn is defined in the

Indenture as "Makena™ (hydroxyprogesterone caproate injection)."  (*Id.*)  "Makena Agreement"

is defined as that certain asset purchase agreement, dated as of January 16, 2008, as amended,

"providing for the Company's acquisition of Makena."  (*Id.*)

The identification of the exclusions from the security interest granted in the PSA then has

a second subparagraph that does not incorporate the definition of "Excluded Assets" from the

Indenture.  Section 2.2(b) of the PSA provides:

---

[7]  The PSA provides that the term "Excluded Assets" is defined by reference to the Indenture and that other
capitalized terms in the PSA not otherwise defined therein are defined as in the Indenture or the Uniform
Commercial Code.  (PSA, Docket No. 514 at Exh. 4, §§ 1.1, 1.2.)

(b) For the avoidance of doubt, notwithstanding anything herein or in the Indenture to the contrary, in no event shall the Collateral include, and no Grantor shall be deemed to have granted a security interest in, any of its right, title or interest in Makena or the Makena Agreement until such time as specified in Section 9.04(c) of the Indenture, and then only upon compliance with the requirements of such Section 9.04(c).

(PSA, Docket No. 514 at Exh. 4, § 2.2.)  Section 9.04(C) of the Indenture, in turn, provides that once Hologic has been fully paid, the Secured Note Holders will receive a security interest in "all of the Company's interests in Makena."  It reads:

Upon payment of the Company's final payment under the Makena Agreement, the Company shall promptly (and in any event within 15 days following termination or expiration of the Makena Agreement) grant to the Collateral Agent, for the benefit of the Secured Parties, a first priority security interest (subject to Permitted Liens) in all of the Company's interests in Makena.

(Indenture, Docket No. 563 at Exh. I, § 9.04(C).)

## Discussion

In order to decide this dispute involving the extent of the Secured Noteholders' security interest, we need only apply the plain and unambiguous language of the PSA, the document that granted them the security interest that they assert.  *See* N.Y. U.C.C. 9-203(b)(3)(A);[8] *see also In re Modaferri*, 45 B.R. 370, 372 (Bankr. S.D.N.Y. 1985), where the court said, "[u]nless the grant of a security interest is contained in the security agreement, there is no security interest."  *Id.*

---

[8]  New York law is applicable.  The Committee's Reply to the Opposition of the Secured Noteholders (Reply, Docket No. 577 at n.8) states that the Indenture and PSA contain conflicting choice of law provisions, with § 13.9 of the PSA providing for Delaware law and § 12.09 of the Indenture providing for New York law.  However, there is no § 13.9 of the PSA.  The PSA only has a solitary § 13, which does not contain any choice of law provision.  (*See* PSA, Docket No. 514 at Exh. 4, § 13.)  Further, the PSA defines "UCC" as meaning the version of the Uniform Commercial Code in effect in New York, save for where the law of another state applies by statute to issues of perfection, priority, and remedies.  In any event, the Opposition of the Secured Noteholders also cites to New York contract law.  Section 14 of the PSA provides that the Indenture controls if there is any inconsistency between the PSA and the Indenture, and the Indenture states that New York law governs the Notes.  (*See* Indenture, Docket No. 563 at Exh. I, § 12.09.)  On this record, and given that the law of New York and Delaware are substantially similar with regard to the pertinent issues, the Court will apply New York law rather than the law of Delaware or any other state.

(quotation and citation omitted).[9]    As quoted above, § 2.2(b) of the PSA applies

"notwithstanding anything herein or in the Indenture to the contrary. . . ."  It then excludes from

the Noteholders' lien "any of the Company's right, title or interest in Makena or the Makena

Agreement" until such time as Hologic shall have been fully paid.  Neither "Makena" nor

"Makena Agreement" is defined in the PSA, but the words "any of the Company's right, title or

interest in Makena or the Makena Agreement" and the provision that a lien on such property

would be provided once Hologic was fully paid make it plain that the parties intended that the

exclusion should be read as encompassing all rights in Makena – rights in which Hologic already

had a security interest.[10]

    In their objection to the Creditors Committee's motion, the Secured Noteholders contend

nevertheless that the exclusion in the PSA was limited and that the exclusion in the PSA

excludes "only K-V's executory rights as of the petition date arising under the Hologic

Agreement, as amended, and the Makena trademark or trade name for the pharmaceutical

product hydroxyprogesterone caproate injection."  (Objection, Docket No. at 562, ¶ 79.)  The

first of these two propositions, that the exclusion relating to the Hologic Agreement extends only

to the Debtors' "executory rights as of the petition date arising under the Hologic Agreement, as

amended," makes no sense whatsoever.  Sections 2.2(b) of the PSA and 9.04(C) of the Indenture

provide that once Hologic is fully paid, the Noteholders will receive a lien on the "Excluded

Assets."  Once Hologic was paid off, the Hologic Agreement would be fully performed and no

longer executory, and there would be no "executory rights in the Agreement" available to

---

[9]  While the UCC-1 Financing Statement provides that it "covers all assets of the Debtor" (*see* Docket No. 563 at Exh. F), a financing statement cannot expand a security interest beyond that which is granted in the security agreement.  *See Gen. Ins. Co. of America v. Mezzacappa Bros., Inc.*, 110 Fed. Appx. 183, 185 (2d Cir. 2004) (summary order) ("Under New York law a [financing statement] filing does not, in itself, bespeak the intent required to form a security agreement within the meaning of the UCC.").

[10]  The parties do not dispute that Hologic never had a security interest in the Gestiva Inventory and Receivables, or that the Secured Noteholders, on the petition date, held a lien on such assets and the proceeds thereof.  (*See* Hologic Contract, Docket No. 563 at Exh. D, ¶ 17, amending § 8.12.)

8

transfer to the Noteholders.  Limitation of the security interest to executory rights conflicts with

and renders ineffectual the provision of the PSA requiring the transfer of rights after Hologic has

been paid in full, contrary to the well-established rule that the provisions of a contract must be

read so as to give effect to all of them.  As the Second Circuit said just last week:

> Under New York law, . . . 'the words and phrases [in a contract] should be given
> their plain meanings, and the contract should be construed so as to give full
> meaning and effect to all of its provisions.'  *LaSalle Bank Nat'l Ass'n v. Nomura
> Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (alteration and quotation
> marks omitted).  Moreover, 'all provisions of a contract [should] be read together
> as a harmonious whole, if possible.'  *Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir.
> 2002) (quotation marks omitted).

*Weeks Marine, Inc. v. American S.S. Steamship Owners Mut. Protection and Indem. Assoc., Inc.*,

No. 12-1752-cv, 2013 WL 466271, *2 (2d Cir. Feb. 8, 2013) (summary order).

The second contention of the Secured Noteholders is that the reference to Makena in the

Indenture is limited in all respects to the trademark or trade name Makena because the word is

defined as Makena™ in the Indenture.  They cite no support for the proposition that the insertion

of a "trademark" sign next to a word somehow limits construction of that word to its trademark

and not to its ordinary meaning. Nor can the proposition be sustained.  If a cautious supplier

offers to sell a customer a Coca Cola™, the customer can reasonably expect to receive a Coca

Cola and not a trademark.  A court must "ascertain [the intent of the parties] from the plain

meaning of the language employed in the agreements. . . ."  *Crane Co. v. Coltec Indus., Inc.*, 171

F.3d 733, 737 (2d Cir. 1999) (quotation and citation omitted) (applying New York law).

In any event, the definition of Makena™ in the Indenture cannot be imported into the

PSA and reconciled with the plain and unambiguous statement in § 2.2(b) that the Company does

not grant a security interest in "any of its right, title or interest in Makena or the Makena

Agreement until such time as specified in § 9.04(c) of the Indenture. . . ."  Section 2.2(b) applies

12-13346-alg    Doc 596    Filed 02/11/13    Entered 02/11/13 16:28:10    Main Document
Pg 10 of 12
"[n]otwithstanding anything herein or in the Indenture to the contrary. . . ."  Even if the Noteholders' implausible contention that the use of the [TM] sign in the definition of Makena somehow limited the use of the term "Makena" in the Indenture to the trademark, it cannot be imported into the plain exclusion of "Makena" in the PSA that prevails "notwithstanding anything in the Indenture to the contrary."[11]

The Noteholders observe that the assets pledged to them were described in 27 categories and that when Hologic sold Gestiva to the Debtors, they used 24 categories of property to describe every possible aspect of the drug.  There is no rule, however, that documents have to be drafted with 24 or 27 subdivisions, categories, or repetitive provisions.  The exclusion of "any of its right, title or interest in Makena or the Makena Agreement" adequately describes the parties' intent.  The Secured Noteholders also argue that the heading of § 2.2(b) of the PSA describes the exclusion as "limited."  It was limited; it would last only until Hologic was paid off, which at the time the Notes were issued was only about 16 to 28 months in the future.  (*See* Second Amendment, Docket No. 22 at Exh. C, ¶ 2, amending § 4.2(b).)

Indeed, the limited nature of the exclusion confirms that the exclusion of Makena from the Noteholders' lien should be read as coextensive with the security interest granted to Hologic. It will be recalled that the definition of "Excluded Assets" was not limited to Makena but included any "contract or other property" as to which the grant of a security interest would "result in the abandonment, invalidation, or unenforceability of any rights, title or interest of any obligor thereunder."   The sentence that mentioned "Makena and the Company's rights therein" followed this more general language and was included "for the avoidance of doubt."  (Indenture,

---

[11]  The Noteholders' limitation does not fit well with § 2.2(a) of the Indenture, either.  The first sentence of that section provides that trademark applications are not Collateral.  (*See* PSA, Docket No. 514 at Exh. 4, § 2.2(a).)  The second sentence of § 2.2(a) then states that the security interest does not reach Excluded Assets, which is a much broader concept than if the Makena trademark were the sole Excluded Asset.

10

Docket No. 563 at Exh. I, § 1.01.) It will also be recalled that the Hologic Agreement not only

gave Hologic a security interest on the entire panoply of rights and interests in Gestiva/Makena

that it had sold to the Debtors, except for Gestiva Inventory and Receivables. It also provided

that if the Debtors defaulted under the contract, Hologic could demand that the Debtors

retransfer all of the interests in Makena free and clear of all Encumbrances. Obviously, the

Debtors could not grant liens in the Purchased Assets – which would include Makena and the

assets relating thereto – to the Noteholders while the Hologic Contract was outstanding without

risking a claim by Hologic that the Debtors had breached the agreement by impeding its

obligation to retransfer the assets, if Hologic demanded it, free and clear of Encumbrances. On

the other hand, once Hologic had been paid off, and its lien terminated, the impediment to a grant

of a lien to the Noteholders would be removed, and the Indenture and Pledge and Security

Agreement thus provide explicitly that then "Makena and the Company's rights therein" shall be

considered Collateral. (*See id.*; *see also id.* at § 9.04(C).) The existence of the Hologic Lien and

Hologic's rights under the Hologic Agreement to have assets retransferred without

Encumbrances also explain why the Secured Noteholders did not receive a second lien on

Makena or the Makena Agreement, which would have put them in a better position because it

would have been valid once Hologic was repaid even in the event of an intervening bankruptcy

filing by the Debtors.[12]

Notably, the provisions in the Hologic Agreement on Encumbrances do not appear to

extend to the Gestiva Inventory, providing additional support for the proposition that the liens of

---

[12] Although the matter is not decided here, it would appear that the absence of a second lien on Makena as of the
petition date would make it far more difficult for the Secured Noteholders to contend that they can improve their
position and step into Hologic's lien after the filing. *See* 11 U.S.C. §§ 362, 552; *Lehman Bros. Special Financing
Inc. v. BNY Corporate Trustee Servs. Ltd. (In re Lehman Bros. Holdings Inc.)*, 422 B.R. 407, 420-21 (Bankr.
S.D.N.Y. 2010). If they had held a second lien on the same assets, they would have been in a better position to step
up.

Hologic and the Secured Creditors were intended to be complementary.  Section 12.4(d) of the

First Amendment to the Hologic Contract states that Hologic could purchase the Gestiva

Inventory as part of a retransfer, and recognizes that the Debtors may have granted a security

interest in the Gestiva Inventory: "Notwithstanding anything herein to the contrary, the Seller

will take all actions necessary to assure that any Lien on the Gestiva Inventory arising on or after

the Transfer Date will not prohibit the Acquiror's compliance with the provisions of this Section

[providing Hologic with the opportunity to purchase the Gestiva Inventory]."  (*See* Docket No.

22 at Exh. B, ¶ 30, providing for a new § 12.4(d).)

### Conclusion

In conclusion, it is evident that the documents did not provide the Secured Noteholders

with a prepetition lien on the Debtors' right, title, or interest in Makena and the Makena

Agreement, other than the Makena Inventory and Receivables.  The documents contain no

ambiguities that either require or permit the consideration of parole evidence.  *See W.W.W.*

*Assocs. v. Giancontieri*, 77 N.Y.2d 157, 163, 565 N.Y.S.2d 440, 443 (1990) ("[E]xtrinsic and

parol evidence is not admissible to create an ambiguity in a written agreement which is complete

and clear and unambiguous on its face.") (citation and quotation omitted).  The Unsecured

Creditors Committee is directed to settle an order on three business days' notice to counsel for

the Secured Noteholders, the Indenture Trustee, and the Debtors.


Dated: New York, New York
       February 11, 2013


                              **s/Allan L. Gropper**
                              UNITED STATES BANKRUPTCY JUDGE