*Hearing Date: April 23, 2013 at 11:00 a.m. (E.T.)*
*Objection Deadline: April 12, 2013 (with consent of the Debtors)*

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen
Erez E. Gilad
Matthew G. Garofalo
Gabriel E. Sasson
180 Maiden Lane
New York, New York 10038-4982
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*Counsel for the Official*
*Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

In re                                                        :        Chapter 11
                                                             :
K-V Discovery Solutions, Inc., et al.,[1]                    :        Case No. 12-13346 (ALG)
                                                             :
                                    Debtors.                 :        (Jointly Administered)
                                                             :

------------------------------------------------------------ x

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' DISCLOSURE STATEMENT MOTION

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby objects (this "Objection") to the *Debtors' Motion for Order: (I) Approving Disclosure Statement; (II) Establishing Date of Confirmation Hearing; (III) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan, Including (A) Approving Form and Manner of Solicitation Packages, (B) Approving Form and Manner of Notice of Confirmation Hearing, (C) Establishing Record Date and Approving Procedures for Distribution of Solicitation*

---

[1] The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) K-V Discovery Solutions, Inc. (7982); (ii) DrugTech Corporation (3690); (iii) FP1096, Inc. (3119); (iv) K-V Generic Pharmaceuticals, Inc. (7844); (v) K-V Pharmaceutical Company (8919); (vi) K-V Solutions USA, Inc. (4772); (vii) Ther-Rx Corporation (3624); and (viii) Zeratech Technologies USA, Inc. (6911). The Debtors' executive headquarters are located at 16640 Chesterfield Grove, Suite 200, Chesterfield, MO 63005.

*Packages, (D) Approving Forms of Ballots, (E) Establishing Deadline for Receipt of Ballots, and (F) Approving Procedures for Vote Tabulations; (IV) Establishing Deadline and Procedures for Filing Objections to Confirmation of Plan; (V) Approving Rights Offering Procedures; and (VI) Granting Related Relief* (the "Disclosure Statement Motion") [Dkt. No. 516].[2]  In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.       Among other infirmities, the Debtors' Plan has not been proposed in good faith, substantially under-values the Debtors' assets, unfairly discriminates in its treatment of general unsecured creditors and fails to provide value to general unsecured creditors that they are otherwise entitled to receive.  The Committee recognizes, however, that those plan issues are more appropriately addressed in connection with confirmation, and will limit this Objection to the informational deficiencies of the Debtors' Disclosure Statement.

2.       From a disclosure perspective, the Debtors' Disclosure Statement fails to include information concerning, among other things, total enterprise valuation, management's projections and assumptions, the Debtors' performance during the chapter 11 cases, the value of the Makena and non-Makena assets and other information that is material in determining whether creditors should vote to accept or reject the Debtors' Plan.

3.       Such information is all the more critical given the proposed treatment and plan currency offered to general unsecured creditors under the Debtors' Plan.  Specifically, under the Debtors' Plan, non-subordinate general unsecured creditors are being asked to share in a $1.5 million pot of cash for a recovery of $0.09 on the dollar (assuming the Debtors' claim and

---

[2]       Each capitalized term not otherwise defined herein shall have the meaning ascribed to such term in the *First Amended Joint Chapter 11 Plan of Reorganization for K-V Discovery Solutions, Inc. and its Affiliated Debtors* [Dkt. No. 669] (the "Plan") or the *Disclosure Statement for First Amended Joint Chapter 11 Plan of Reorganization for K-V Discovery Solutions, Inc. and its Affiliated Debtors* [Dkt. No. 670] (the "Disclosure Statement"), as applicable.

valuation estimates are accurate).   Holders of the Convertible Subordinated Notes (the "Convertible Noteholders") are proposed to receive (i) a *de minimis* distribution in the form of an illiquid and likely non-transferable 3% equity stake in the Reorganized Debtors, which will be privately-held and controlled by Silver Point, and (ii) the ability to invest up to $20 million in new money (if such holder votes to accept the Debtors' Plan) to acquire a minority equity stake at a massive 91% premium to the Debtors' asserted plan value.   Thus, to the extent the Debtors' Plan calls for the significant impairment of trade claims and purports to offer an equity-based recovery and new money investment right to Convertible Noteholders, then the Disclosure Statement must contain additional information before such creditors can evaluate the basis for their heavily discounted treatment, the value of their proposed recovery and the risks associated with a new money investment.[3]

4.       In addition to inadequately disclosing material information with regards to the Debtors' Plan, the Disclosure Statement should also be revised to accurately reflect the current state of play with respect to alternative plan proposals.  As a result of extensive efforts by the Committee and its professionals, and following in-person meetings and discussions with management, an investor group comprised largely of incumbent creditors has indicated to the Committee (as well as to the Debtors) that they are prepared to commit to provide equity financing to fund an alternative plan that would pay the holders of the Senior Secured Notes (the "Senior Noteholders") in full and drive significantly higher recoveries to trade creditors and Convertible Noteholders.  The Committee is informed that the investors are in the process of preparing definitive documentation for execution and delivery to the Debtors in the coming days. Thus, the Disclosure Statement will need to be adjusted to reflect the terms and status of that

---

[3]        The Committee's impending objection to the Debtors' Plan and its recommendation to general unsecured creditors not to vote to accept the Debtors' Plan does not in any way mitigate the Debtors' burden to satisfy the informational requirements of the Bankruptcy Code.

alternative plan proposal as of the Disclosure Statement hearing date.  The Committee is hopeful

that, prior to any such hearing, the Committee and the Debtors will have worked out the terms of

a consensual plan of reorganization that offers greater recoveries to all creditors.[4]

## OBJECTION

5.    The Disclosure Statement lacks adequate information and fails to meet the

requirements of section 1125(b) of the Bankruptcy Code, which prohibits the solicitation of votes

in respect of a plan of reorganization "unless, at the time of or before such solicitation, there is

transmitted . . . a written disclosure statement . . . containing adequate information."  11 U.S.C. §

1125(b).  Adequate information is defined in section 1125(a) of the Bankruptcy Code as

"information of a kind, and in sufficient detail . . . that would enable a hypothetical reasonable

investor . . . to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).

6.    The primary purpose of a disclosure statement is to give creditors

adequate information necessary to make an informed decision about whether to accept or reject

the proposed plan of reorganization.  *See* 11 U.S.C. § 1125(a)(1); *In re Momentum Mfg. Corp.*,

25 F.3d 1132, 1136 (2d Cir. 1994) ("Of prime importance in the reorganization process is the

principle of disclosure.").  Courts have held that the "purpose of a disclosure statement is to

inform equity holders and claimants, *as fully as possible*, about the probable financial results of

acceptance or rejection of a particular plan." *In re City of Colo. Springs Spring Creek Gen.*

*Improvement Dist.*, 177 B.R. 684, 689 (Bankr. D. Colo. 1995) (citing *In re Stanely Hotel, Inc.*,

13 B.R. 926, 929 (Bankr. D. Colo. 1981)) (emphasis added);  *see also In re McLean Indus., Inc.*,

87 B.R. 830 (Bankr. S.D.N.Y. 1987).  A disclosure statement should also include "all those

factors presently known to the plan proponent that bear upon the success or failure of the

---

[4]    If the parties are unable to reach consensual resolution, the Committee may seek to terminate exclusivity, which in turn may engender a request for a modest adjournment of the Disclosure Statement hearing.

proposals contained in the plan." *In re The Stanley Hotel, Inc*., 13 B.R. 926, 929 (Bankr. D.

Colo. 1981). As one bankruptcy court stated:

> The requirement that a disclosure statement contain adequate
> information serves to present the parties entitled to vote on the plan
> with an opportunity to independently evaluate the merits of the
> proposed plan. The Code requires that adequate information be
> present in the disclosure statement and be of such a nature that
> parties be able to reach an informed judgment about the plan.
> Without information sufficient to allow parties voting on the plan
> the opportunity to arrive at an independent and informed judgment,
> the disclosure statement cannot be approved.

*In re East Redley Corp.*, 16 B.R. 429, 430 (Bankr. E.D. Pa. 1982).

7.      Thus, several courts have developed extensive, but non-exhaustive, lists of

information that should be included in a disclosure statement. *See, e.g.*, *In re Ferretti*, 128 B.R.

16, 18-19 (Bankr. D. N.H. 1991); *In re U.S. Brass Corp.*, 194 B.R. 420, 424-25 (Bankr. E.D.

Tex. 1996). These requirements vary according to the facts and circumstances of each case,

including "the nature of the plan, the needs of claim and interest holders, and the availability of

information." *In re V & M Mgmt., Inc.*, 215 B.R. 895, 902 (Bankr. D. Mass. 1997); *see also In*

*re Ionosphere Clubs, Inc.*, 179 B.R. 24, 29 (S.D.N.Y. 1995).

8.      As demonstrated below, the Debtors' Disclosure Statement fails to meet

the adequacy requirements of the Bankruptcy Code and cannot be approved in its current form.

## I.      The Disclosure Statement Fails to Describe Alternative Plan Efforts

9.      A disclosure statement must delineate the consequences of the proposed

plan and the possible alternatives to the proposed plan. *See In re Copy Crafters Quickprint, Inc.*,

92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988). Consequently, the Debtors' Disclosure Statement

should contain additional disclosure with respect to the plan process and alternative plan efforts.

10.     Currently, the Debtors devote two sentences to a description of their

financing and plan process, as follows:

> In formulating and developing the Plan, the Debtors have explored numerous other alternatives and engaged in an extensive negotiating process with the Ad Hoc Senior Noteholders Group. The Debtors also have engaged in discussions with certain holders of Convertible Subordinated Notes as well as the Creditors' Committee in respect of restructuring alternatives.

Disclosure Statement § 8.1.

11.     This description is insufficient.  The Debtors should be required to provide a reasonable description of the efforts, if any, the Debtors and their advisors undertook (i) to seek or solicit alternatives to the current Debtors' Plan, (ii) to shop the DIP Facility post-funding after alternative DIP financings became available, (iii) to shop the New First Lien Term Loan contemplated in the Debtors' current Plan (and determine the reasonableness of the exorbitant 15% equity kicker proposed as part of the New First Lien Term Loan or the prospect of alternative exit financing) and (iv) to assist the Committee with regards to the alternative plan proposal formulated by the Committee (the "Committee Plan").

12.     The Debtors' Disclosure Statement should also be updated to reflect the then-current status of the Committee Plan, which will pay the Senior Noteholders in full and provide greater recoveries to general unsecured creditors relative to the Debtors' Plan.[5]

## II.     Deficiencies in Valuation and Financial Disclosure

13.     Valuation is a vital component of a disclosure statement, and represents a key factor that courts consider in determining whether to approve a disclosure statement.  *See In re Radco Props., Inc.*, 402 B.R. 666, 682 (Bankr. E.D.N.C. 2009) (citing *Copy Crafters Quickprint*, 92 B.R. at 981 (rejecting debtor's disclosure statement "[a]bsent a more recent valuation of the property by a qualified individual," and finding that the valuation in the

---

[5]     In their Disclosure Statement, the Debtors include a two-sentence reference to the Committee's alternative financing efforts, *see* Disclosure Statement § 11.1(e), which would need to be corrected and amplified as of the Disclosure Statement hearing date.

disclosure statement was "unsupported" and "self-serving")).  Indeed, bankruptcy courts have recognized that a current and independent valuation of a debtor's business is crucial to a disclosure statement.  *See In re Ferguson*, 474 B.R. 466, 474-75 (Bankr. D.S.C. 2012) (noting that a disclosure statement should provide the basis for the value assigned to property addressed in a plan of reorganization); *In re Feldman*, 53 B.R. 355, 358 (Bankr. S.D.N.Y. 1985) (refusing to approve a disclosure statement proposed by a nondebtor because such plan contained insufficient information to evaluate key issues, including how proponent intended to make payments called for by the plan); *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 569-70 (Bankr. N.D. Ga. 1984) (refusing to approve a disclosure statement that failed to adequately provide actual or projected realizable value for assets of the debtor).

14.    Here, the Debtors' Disclosure Statement fails to provide adequate information related to (i) the value of the Debtors' assets (including the value of the Makena and the non-Makena assets), (ii) the inputs employed by Jefferies in connection with the cursory enterprise valuation conclusion set forth in the Disclosure Statement, and (iii) management's projections and certain key assumptions underlying those projections.

### A.    Jefferies' Valuation Analysis is Deficient

15.    In their Disclosure Statement, the Debtors set forth Jefferies' conclusion, "solely for purposes of the Plan," that the Reorganization Value of the Debtors is estimated to be approximately $264 million to $282 million (with a midpoint of $273 million) as of an assumed effective date of July 1, 2013, and that the Equity Value of the Reorganized Debtors is estimated to be approximately $127 to $145 million (with a midpoint of $135 million).  *See* Disclosure Statement § 7.2(b)(i).  The Disclosure Statement further states that Jefferies determined to apply only a discounted cash flow ("DCF") analysis approach.  *Id.* § 7.2(b)(ii).  No other meaningful information is provided with respect to Jefferies' estimate.

7

16.     As is standard market practice, the Debtors should be required to explain why only the DCF approach was utilized and why a precedent transaction and/or comparable company analysis was not undertaken or utilized.  In addition, the Debtors should be required to disclose the discount rate utilized by Jefferies and the basis for choosing that discount rate.  The Debtors should also explain how Jefferies calculated terminal value in connection with its DCF analysis.  Such information is necessary to, among other things, properly evaluate the projected recoveries and the viability of a potential equity investment under the Debtors' Plan.

**B.     *Absence of Financial Detail and Assumptions Underlying Projections***

17.     In Exhibit 3 to the Disclosure Statement, an exhibit that barely spans a quarter of a single page, the Debtors purport to disclose management's projections.  Those projections are, in fact, limited to five line items of financial data (net revenues, COGS, gross profit, SG&A and EBITDA) for each fiscal year through fiscal year 2019.  No other financial data, notes or assumptions are provided.

18.     As is consistent with market practice, and in order to provide creditors with the necessary financial information they need to meaningfully evaluate the Plan, the Disclosure Statement should include projected consolidated results of operations of, and consolidated balance sheet and statement of cash flows for, the Reorganized Debtors for the projection years, broken out by each drug product.  In addition, the Disclosure Statement should include a summary of the key assumptions utilized by management in formulating the projections, including, most notably, assumptions made regarding Makena market share.  For example, in their latest business model, management assumes that ████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ .

Because Makena is the largest revenue driver in these cases, the Disclosure Statement should

describe and explain the basis for that and any other significant assumption underlying the projections.

### C. *Inadequate Disclosure of the Impact of the Meningitis Outbreak and Changed Legislative and Regulatory Landscape and the Prospect of Significantly Higher Market Share*

19. Currently, the Disclosure Statement contains a single paragraph regarding the potentially positive outlook facing the Debtors (compared with the multitude of risk factors that portray a parade of horribles). The Debtors perfunctorily state that "the outlook for Makena® is improving" and that "total Medicaid patient enrollments have increased" based on agreements reached with various state agencies and targeted litigation. Disclosure Statement § 3.1(d). That paragraph devotes only one sentence to the meningitis outbreak, and generally describes an apparent "shift" by customers to using Makena® resulting in "increased revenues." *Id.* The Debtors then disclaim that "[it] remains to be seen if these shifts are temporary or will continue." *Id.* No further disclosure regarding the nature or extent of that shift or the impact of the meningitis outbreak is provided.

20. The occurrence of the meningitis outbreak and its historical, as well as projected, impact upon the Debtors' estates, coupled with the positive change in the regulatory, legislative and political crack-down on compounders, is unquestionably the most significant value driver in these cases. These watershed facts are buried within (if not completely absent from) the Disclosure Statement. As noted above, the meningitis outbreak seems more like an afterthought. In addition, little to no information is provided to inform creditors of (i) federal legislation introduced in 2012 aimed increasing federal regulation of compounding, (ii) recent efforts in support of that legislation, including recent statements made by Margaret Hamburg, commissioner of the FDA, and the recent announcement by the International Academy of Compounding Pharmacists, the nation's largest trade group for compounders, in support of

9

stricter enforcement against compounders, and (iii) renewed activities on state legislative and

regulatory levels to introduce legislation governing compounders and undertake (in the case of

state boards of pharmacy) inspections and closer examinations of compounding facilities.

21.     Just as the Debtors include a litany of risk factors associated with the

Debtors' businesses, the Debtors should similarly describe a number of positive factors that

could (and likely would) substantially improve revenue.  Indeed, through prior discovery, the

Committee has learned that, as of December 2012, management suggested that ██% market

share for Makena could be achieved if "███████████████," and that ██% market

share for Makena could be achieved if the "████████████████████████

████████████"  Presentation of Jefferies and Willkie Farr & Gallagher to the K-

V Board of Directors, dated December 5, 2012.  If those events were to occur, the impact on

enterprise value would be massive.  Sensitivity analyses of the total enterprise value of the

Debtors' businesses were provided to the Debtors' board of directors, incorporating those

scenarios.  Those analyses should be incorporated into the Disclosure Statement to enable

creditors to properly evaluate the Plan.

22.     Also important to creditors and potential equity investors is the fact that,

over the course of seven months, the Debtors' business plan and projections have been materially

modified on several occasions, presumably as a result of the dramatic increase in financial

performance attributable to the meningitis outbreak and the ensuing regulatory and legislative

crack-down on compounders.  The Disclosure Statement should therefore include a reasonable

description of the Debtors' substantially improved financial performance since the Petition Date

(particularly since the meningitis outbreak) and an explanation of the nature of the changes in the

Debtors' business plan.  Such information would provide the much-needed context particular to

10

this debtor, which in turn would enable creditors to independently assess the reliability of management's projections and the Debtors' estimate of enterprise value.

### III. Inadequate Disclosure Regarding Classification and Treatment of Senior Note Deficiency Claims

23.    In light of this Court's ruling that the Senior Noteholders do not have a lien on the Makena assets, the Senior Noteholders are unquestionably under-secured. *See In re K-V Discovery Solutions*, Case No. 12-13346, 2013 Bankr. LEXIS 565 (Bankr. S.D.N.Y. Feb. 11, 2013). Conversely, the Debtors' general unsecured creditors are unquestionably *in the money* and would share *pari passu* with the deficiency claims of the Senior Noteholders (subject, *only in the case of the Convertible Noteholders*, to the subordination provisions contained in the Convertible Notes Indenture).

24.    The Debtors' Plan, however, fails to separately classify the secured and unsecured deficiency claims of the Senior Noteholders. In order to satisfy the classification and treatment requirements of the Bankruptcy Code, the Debtors should be required to provide an analysis that sets forth (i) the Debtors' estimate of the value of the Makena assets and the non-Makena assets, (ii) the Debtors' estimate of the value of the collateral securing the Senior Noteholders' claims, and (iii) the basis for the implications under the Debtors' Plan that general unsecured claims are entitled to a 9.05% recovery and that the Senior Noteholders' deficiency claims are not afforded preferential treatment relative to other general unsecured claims.[6]

### IV. Inaccurate Disclosure of the Potential Impact of Recharacterization

25.    As mandated by this Court in connection with its approval of the cash collateral stipulation with the Senior Noteholders, the Final DIP Order effectively requires adequate protection payments made during the pendency of these cases to the Senior

---

[6]    The Debtors' financial advisor has indeed prepared such an analysis, so including such information in the Debtors' Disclosure Statement should not engender substantial time or effort.

Noteholders to be "recharacterized" as a payment on principal in the event the Senior

Noteholders are determined to be under-secured. *See* Final DIP Order ¶ 12(a)(iii).[7]  Given that

the Senior Noteholders are unquestionably under-secured, it is a forgone conclusion that the fees

and expenses paid to the Senior Noteholders during the pendency of these cases should, by the

express terms of the Final DIP Order, be subject to recharacterization.

          26.    The impact of recharacterization upon trade recoveries could be

significant.  Through the week ending April 7, 2013, the Debtors reported having made

approximately $4.2 million in payments to the Ad Hoc Group's and Senior Secured Notes

Indenture Trustee's professionals, including approximately (a) $██ million to Weil Gotshal &

Manges LLP, (b) $██ million to Houlihan Lokey LLP, and (c) $████ to Alston & Bird LLP.

These amounts do not include amounts payable to Fortgang Consulting (entitled to receive

$25,000 per month), Houlihan's $1.5 million deferred fee, or the fees to be charged going

forward, which could prove to be significant in the event of a contested confirmation hearing.  If

those amounts are applied to principal, then the dilutive impact of the Senior Noteholders'

deficiency claims upon general unsecured trade recoveries would be reduced.  Conversely, the

---

[7]      The Court's Final DIP Order provides as follows:

> All Adequate Protection Payments shall be paid regardless of whether such amounts accrued prior to or after the Petition Date, and shall be paid without further motion, fee application, or order of the Court.  Further, the Adequate Protection Payments must be indefeasibly paid in full in cash and satisfied on or before the effective date of any chapter 11 plan; provided, however, that in the event this Court determines that the Prepetition Secured Parties are not entitled to such Adequate Protection Payments on account of their secured claims or as adequate protection for the diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral, any such Adequate Protection Payments shall (x) be applied as a payment made to the principal amount of the Prepetition Debt or (y) be disgorged to the extent that such Adequate Protection Payments exceed the amount of the secured claim in respect of the Senior Notes.

Final DIP Order ¶ 12(a)(iii).

failure to account for recharacterization would result in disparate treatment under the Debtors'
Plan.

27.    Notwithstanding the foregoing, the Debtors declare that recharacterization
is irrelevant because all professional fees and expenses paid to the Senior Noteholders as
adequate protection payments are subject to subordination under the Convertible Notes
Indenture.[8]  As a threshold matter, this statement ignores the fact trade creditors are not subject
to subordination.   In any event, the Committee believes that the Ad Hoc Senior Secured
Noteholders Group Fee Claims—which comprise the overwhelming portion of the Senior
Noteholder's professional fees incurred—would not be eligible for payover from the Convertible
Subordinated Notes.   Under the express terms of the Convertible Subordinated Notes Indenture,
the Convertible Subordinated Notes are subordinated in right of payment to "Senior
Indebtedness," which includes fees, costs, expenses that are "due" in connection with the Senior
Secured Notes Indenture.   Convertible Subordinated Notes Indenture § 1.01.[9]  The Senior
Secured Notes Indenture, in turn, provides for the reimbursement of the Senior Secured Notes
Trustee's "reasonable out-of-pocket expenses incurred by it," including "the reasonable

---

[8]        In their Disclosure Statement, the Debtors state as follows:

> Notwithstanding such provisions of the Final DIP Order, because the Senior
> Secured Notes Indenture Trustee Claims and Ad Hoc Senior Noteholders Group
> Fee Claims constitute "Senior Indebtedness" as defined in the Convertible Notes
> Indenture, subject to the terms of the Convertible Subordinated Notes Indenture,
> the holders of Senior Secured Notes Claims are entitled to be paid in full prior to
> the holders of Convertible Subordinated Notes Claims receiving a distribution.
> Accordingly, subject to the terms of the Convertible Subordinated Notes
> Indenture, until the holders of Senior Secured Notes Claims are paid in full, to
> the extent any Adequate Protection Payments relating to Senior Secured Notes
> Indenture Trustee Claims and Ad Hoc Senior Noteholders Group Fee Claims are
> recharacterized as payments of principal, the holders of Senior Secured Notes
> Claims are entitled to receive the distributions to the holders of Convertible
> Subordinated Notes Claims on account of such recharacterized claims.

Disclosure Statement § 6.3(a)(ii).

[9]        Relevant excerpts of the Convertible Subordinated Notes Indenture are attached hereto as **Exhibit A**.

compensation and out-of-pocket expenses of the [Senior Secured Notes] Trustee's agents, advisors and counsel." Senior Secured Notes Indenture § 7.07.[10] There is no basis offered in the Disclosure Statement to explain how an ad hoc committee's professional fees and expenses would be reimbursable under the Senior Secured Notes Indenture and therefore would benefit from subordination.[11] The Disclosure Statement must therefore be revised to clarify that, consistent with the plain terms of the Senior Secured Notes Indenture and the Convertible Subordinated Notes Indenture, the Convertible Notes are not subordinated to the Ad Hoc Senior Secured Noteholders Group Fee Claims.

## V.   Incomplete and Misleading Disclosure Regarding Subordination With Respect to Post-Petition Interest

28.   In their Disclosure Statement, the Debtors include the following assertion by the Senior Noteholders:

> The Ad Hoc Senior Secured Noteholders Group asserts that "payment in full" under the Convertible Subordinated Notes Indenture includes, among other things, the payment of principal, prepetition interest, and postpetition interest (whether or not allowed against the Debtors) on the Senior Secured Notes together with any applicable premium, fees, costs, expenses, and other amounts accrued or due on or in connection with the Senior Secured Notes, whenever arising and whether absolute or contingent

Disclosure Statement § 6.3(a)(ii).

29.   The Disclosure Statement neglects to point out that the Senior Noteholders' assertion that they are senior in right of payment with respect to any post-petition interest arising under the Senior Secured Notes Indenture is not grounded in either fact or law.

---

[10]   Relevant excerpts of the Senior Secured Notes Indenture are attached hereto as **Exhibit B**.

[11]   The Ad Hoc Senior Secured Noteholders Group determined to appear as an ad hoc committee, rather than act through their indenture trustee, presumably so that they could pursue their own parochial interests as distinct from the interests of the class (as reflected in the 15% equity kicker that they negotiated in their favor in connection with the New First Lien Term Loan).

As noted above, the Convertible Subordinated Notes are subordinated to "Senior Indebtedness," which, as defined in the Convertible Subordinated Notes Indenture, includes "interest, including, with respect to the Credit Facility, all interest accrued subsequent to the commencement of any bankruptcy or similar proceeding, whether or not a claim for post-petition interest is allowable as a claim in any such proceeding . . . ." Convertible Subordinated Notes Indenture § 1.01. In other words, the Convertible Subordinated Notes Indenture makes specific reference to post-petition interest, but only as it relates to post-petition interest arising under a "Credit Facility." Based on public filings made by the Debtors with the Securities and Exchange Commission, it is apparent that the Senior Secured Notes would not constitute a "Credit Facility" for purposes of subordination.

30.     The Convertible Notes Indenture defines "Credit Facility" as follows:

> that certain Loan Agreement dated as of June 18, 1997, as amended, among the Company, certain subsidiaries of the Company and LaSalle Bank National Association, including all related notes, guarantees, collateral documents, instruments and agreements executed in connection therewith, as each may be amended, modified, restated, renewed, replaced, refinanced or restructured (including, without limitation, any amendment increasing the amount of available borrowing) from time to time.

Convertible Notes Indenture § 1.01.

31.     Thus, in order to fall within the definition of "Credit Facility," the Senior Noteholders would have to demonstrate that the term contemplated (i) all future or subsequent refinancings or restructurings of the LaSalle Bank credit agreement and (ii) that high-yield fixed income public debt, which represents a completely different type of financing structure relative to a bank-provided loan with a revolving credit feature, constitutes a "Credit Facility." Public filings made by the Debtors demonstrate that the LaSalle Bank credit agreement was amended and restated on or around January 11, 2005, and was then refinanced by a new credit agreement

on or around June 9, 2006. However, the Form 10-K for the fiscal year 2009 states that the

Debtors repaid and terminated that new credit agreement on or about February 2009. There is no

indication in the Debtors' public filings that any new loan or funded debt facility was put in

place until 2010, when the Debtors entered into loans with affiliates of Centerbridge Partners

L.P.[12] The Senior Notes, in turn, were not issued until on or around March 17, 2011. Thus, the

Senior Noteholders are unlikely to demonstrate as a matter of fact that the Senior Secured Notes

constitute a "Credit Facility" and that they are entitled to subordination with respect to post-

petition interest (without even having to get into the question of whether as a legal matter the

subordination provisions were sufficiently explicit for purposes of the Rule of Explicitness in

light of *First Fid. Bank, N.A. vs Midlantic Nat'l. Bank (In re Ionosphere Clubs, Inc.)*, 134 B.R.

528, 535-36 (Bankr. S.D.N.Y. 1991)).[13]

## VI.  Inadequate Disclosure Regarding Other Factors that Could Potentially Impact Creditor Recoveries

32.    The Disclosure Statement also lacks information on several significant

factors that could directly impact creditor recoveries. *First*, the Disclosure Statement projects a

1.9% recovery to Convertible Noteholders. As a threshold matter, the Disclosure Statement fails

to note that the Debtors' Plan does not provide for the payment of the fees and expenses of the

Convertible Subordinated Notes Indenture Trustee, who, in turn, may exercise its charging lien

with respect to the equity distribution to the Convertible Noteholders. Thus, there stands a real

possibility that the beneficial holders of the Convertible Subordinated Notes will, contrary to the

recovery chart contained in the Debtors' Disclosure Statement, receive nothing in these chapter

---

[12]    Relevant excerpts from the Debtors' Form 8-K, dated January 11, 2005 and Form 10-K for the fiscal years, 2006, 2009 and 2010 are attached hereto as **Exhibit C**.

[13]    In addition, any suggestion by the Senior Noteholders that a redemption premium is due or should be payable under the Senior Secured Notes Indenture and is subject to payover from the Convertible Noteholders is wholly without merit.

11 cases.   The Disclosure Statement should be modified accordingly.   In addition to the foregoing, the Debtors should explain how they valued the recovery for the Convertible Noteholders in the first instance, including whether any minority and/or liquidity discounts were applied.

33.     *Second*, the Disclosure Statement contains inadequate disclosure with respect to the proposed Management Incentive Plan.   The Disclosure Statement should indicate the maximum effect and extent of dilution on creditor recoveries resulting from the proposed Management Incentive Plan (the 10% figure utilized in the chart on page 14 of the Disclosure Statement is strictly illustrative).

34.     *Third*, the Disclosure Statement should provide more detail with respect to the Debtors' estimate of general unsecured claims, including whether such estimate represents the maximum amount allowable, a litigation-probability adjusted estimate or otherwise.   The Debtors should also indicate whether such estimate includes an estimate of rejection damages that may be asserted post-confirmation.

## VII.    Insufficient Information Regarding New Common Stock, Rights Offering and Pro Forma Stock Ownership

35.     The Disclosure Statement contains inadequate information with respect to the equity being issued under the Plan.   The Disclosure Statement provides that the New Common Stock to be issued under the Plan may be subject to transfer restrictions under the New Stockholder Agreement or charter documents.   The Disclosure Statement should describe any such transfer restrictions.   Such restrictions will impact liquidity, which is a key consideration for any creditor receiving equity or any new money investor.

36.     In addition, the Disclosure Statement should highlight, in plain English, that the implied value per share of the New Common Stock under the Debtors' Plan is

17

approximately $13.54, while the Exercise Price per share imposed in connection with the Rights Offering under the Debtors' Plan is approximately $25.90, *representing a 91% premium to the Debtors' plan equity value*.

37.    Also, the Disclosure Statement should include pro forma equity ownership (as well as anticipated board positions, new debt holdings or other connections) of any individual creditor that is expected to become a substantial holder of the New Common Stock and new debt.  Based upon information available to the Committee, it appears that Silver Point, after giving effect to the Debtors' Plan, will hold a controlling interest in, and would be in a position to single-handedly exert significant influence upon, the Reorganized Debtors.  The existence of a single dominant stakeholder would be material to any reasonable investor considering a minority equity investment in a privately-held company.

## VIII.    Committee Recommendation

38.    In addition to addressing the foregoing infirmities, the Disclosure Statement and related solicitation materials should include the Committee's views on the Debtors' Plan.  Given the treatment proposed under the Debtors' Plan and the number of creditors that will have the opportunity to vote, understanding the views of the Committee is essential for creditors and a reasonable investor to determine whether to vote to accept or the Plan and/or make an equity investment.  In particular, the Disclosure Statement should provide, in substance, that the Committee believes the Debtors' Plan is not confirmable, disagrees with the Debtors' total enterprise valuation and believes that alternative proposals may exist that would generate higher recoveries to all creditors.  In addition, the Debtors should be directed to include in the solicitation materials a recommendation letter prepared by the Committee.  The Committee will provide the Debtors with a recommendation letter prior to the date on which the Debtors commence solicitation.

18

## **CONCLUSION**

39.    Based on the foregoing, the Committee respectfully submits that the Debtors' Disclosure Statement cannot be approved in its current form.    The Committee will endeavor to prepare and circulate to the Debtors proposed language (to the extent practicable) to address some or all of the issues described above (as well as to address certain miscellaneous comments to the Plan, Disclosure Statement and related materials).[14]    The Committee reserves the right to raise any and all objections to the Disclosure Statement currently on file or as may be modified, and further reserves the right to raise any and all objections to confirmation of the Debtors' Plan currently on file or as may be amended.

---

[14]    In addition to the foregoing, the nature, basis and scope of the third-party releases contemplated in the Debtors' Plan raises several concerns, *see In re Johns-Manville Corp.*, 517 F.3d 52, 66 (2d Cir. 2008) (finding that a bankruptcy court "only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate"); *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network)*, 416 F.3d 136, 142 (2d. Cir. 2005) (finding that third-party non-debtor releases may be granted when "circumstances [exist] that may be characterized as unique"), and the Committee expects to raise those issues in connection with the confirmation proceedings.

WHEREFORE, the Committee respectfully requests that this Court deny approval of the Debtors' Disclosure Statement and grant the Committee such other and further relief as this Court deems just and proper.

Dated:        April 12, 2013
              New York, New York

Respectfully submitted,

**STROOCK & STROOCK & LAVAN LLP**

/s/ Erez E. Gilad
_____
Kristopher M. Hansen
Erez E. Gilad
Matthew G. Garofalo
Gabriel E. Sasson
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*Counsel for the Official*
*Committee of Unsecured Creditors*

**EXHIBIT A**

EXHIBIT 4.1

EXECUTION COPY

K-V PHARMACEUTICAL COMPANY

2.5% Contingent Convertible Subordinated Notes Due 2033

------------------------------

INDENTURE

Dated as of May 16, 2003

------------------------------

Deutsche Bank Trust Company Americas

TRUSTEE

INDENTURE dated as of May 16, 2003 between K-V
PHARMACEUTICAL COMPANY, a Delaware corporation (the "Company"), and Deutsche
Bank Trust Company Americas, a New York banking corporation duly organized
and existing under the laws of the State of New York (the "Trustee").

Each party agrees as follows for the benefit of the other
party and for the equal and ratable benefit of the Holders of the Company's
2.5% Contingent Convertible Subordinated Notes Due 2033 ("Notes"):

ARTICLE I

DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01.    Definitions.

"144A Global Security" means a Global Security in the form
of the Security attached hereto as Exhibit A-1 that is deposited with and
registered in the name of the Depositary, representing Securities sold in
reliance on Rule 144A under the Securities Act.

"Affiliate" of any specified person means any other person
directly or indirectly controlling or controlled by or under direct or
indirect common control with such specified person. For the purposes of this
definition, "Control" when used with respect to any specified person means
the power to direct or cause the direction of the management and policies of
such person, directly or indirectly, whether through the ownership of voting
securities, by contract or otherwise; and the terms "Controlling" and
"Controlled" have meanings correlative to the foregoing.

"Applicable Procedures" means, with respect to any
transfer or transaction involving a Global Security or beneficial interest
therein, the rules and procedures of the Depositary for such Security, in
each case to the extent applicable to such transaction and as in effect from
time to time.

"Board of Directors" means either the board of directors
of the Company or any duly authorized committee of such board.

"Board Resolution" means a copy of one or more
resolutions, certified by an Officer of the Company to have been duly
adopted or consented to by the applicable Board of Directors and to be in
full force and effect, and delivered to the Trustee.

"Business Day" means, with respect to any Security, a day
that in the City of New York is not a day on which banking institutions are
authorized by law or regulation to close.

"Capital Stock" for any corporation means any and all
shares, interests, rights to purchase, warrants, options, participations or
other equivalents of or interests in (however designated) stock issued by
that corporation.

1

"Certificated Securities" means Securities that are in the
form of the Securities attached hereto as Exhibit A-2.

"Class A Common Stock" shall mean shares of the Company's
Class A Common Stock, $0.01 par value per share, as they exist on the date
of this Indenture or any other shares of Capital Stock of the Company into
which the Class A Common Stock shall be reclassified or changed.

"Class B Common Stock" shall mean shares of the Company's
Class B Common Stock, $0.01 par value per share, as they exist on the date
of this Indenture or any other shares of Capital Stock of the Company into
which the Class B Common Stock shall be reclassified or changed.

"Common Stock" shall mean shares of the Company's Class A
Common Stock and Class B Common Stock.

"Company" means the party named as the "Company" in the
first paragraph of this Indenture until a successor replaces it pursuant to
the applicable provisions of this Indenture and, thereafter, shall mean such
successor. The foregoing sentence shall likewise apply to any subsequent
such successor or successors.

"Company Order" means a written request or order signed in
the name of the Company by any two Officers and delivered to the Trustee.

"Corporate Trust Office" means the office of the Trustee
at which at any time the trust created by this Indenture shall be
administered, which office at the date hereof is located at 60 Wall Street,
New York, New York 10005, Attention: Corporate Trust and Agency Services, or
such other address as the Trustee may designate from time to time by notice
to the Holders and the Company, or the principal corporate trust office of
any successor Trustee (or such other address as a successor Trustee may
designate from time to time by notice to the Holders and the Company).

"Credit Facility" means that certain Loan Agreement dated
as of June 18, 1997, as amended, among the Company, certain subsidiaries of
the Company and LaSalle Bank National Association, including all related
notes, guarantees, collateral documents, instruments and agreements executed
in connection therewith, as each may be amended, modified, restated,
renewed, replaced, refinanced or restructured (including, without
limitation, any amendment increasing the amount of available borrowing) from
time to time.

"Default" means any event which is, or after notice or
passage of time or both would be, an Event of Default.

"Designated Senior Indebtedness" means the Credit Facility
and any other Senior Indebtedness in which the instrument creating or
evidencing the Indebtedness, or any related agreements or documents to which
the Company is a party, expressly provides that such Indebtedness is
"Designated Senior Indebtedness" for purposes of this Indenture, provided
that the instrument, agreement or other document may place limitations and
conditions on the right of the Senior Indebtedness to exercise the rights of
Designated Senior Indebtedness.

2

"Exchange Act" means the Securities Exchange Act of 1934,
------------
as amended, and the rules and regulations promulgated thereunder, as in
effect from time to time.

"Global Securities" means Securities that are in the form
-----------------
of the Securities attached hereto as Exhibit A-1, and to the extent that
such Securities are required to bear the Legend required by Section 2.06
such Securities will be in the form of a 144A Global Security.

"Holder" or "Securityholder" means a person in whose name
------   --------------
a Security is registered on the Registrar's books.

"Indebtedness" means, without duplication,:
------------

(1) all of the Company's indebtedness, obligations and
other liabilities (A) for borrowed money, including overdrafts,
foreign exchange contracts, currency exchange agreements, interest
rate protection agreements, and any loans or advances from banks,
whether or not evidenced by notes or similar instruments, or (B)
evidenced by credit or loan, agreements, bonds, debentures, notes
or similar instruments, whether or not the recourse of the lender
is to the whole of the Company's assets or to only a portion
thereof, other than any account payable or other accrued current
liability or obligation incurred in the ordinary course of business
in connection with the obtaining of materials or services;

(2) all of the Company's reimbursement obligations and
other liabilities with respect to letters of credit, bank
guarantees or bankers' acceptances;

(3) all of the Company's obligations and liabilities in
respect of leases required, in conformity with generally accepted
accounting principles, to be accounted for as capitalized lease
obligations on its balance sheet;

(4) all of the Company's obligations and other liabilities
under any lease or related document, including a purchase
agreement, conditional sale or other title retention agreement, in
connection with the lease of real property or improvements thereon
(or any personal property included as part of any such lease) which
provides that the Company is contractually obligated to purchase or
cause a third party to purchase the leased property or pay an
agreed upon residual value of the leased property, including the
Company's obligations under such lease or related document to
purchase or cause a third party to purchase such leased property or
pay an agreed upon residual value of the leased property to the
lessor (whether or not such lease transaction is characterized as
an operating lease or a capitalized lease in accordance with
generally accepted accounting principles);

(5) all of the Company's obligations with respect to an
interest rate or other swap, cap, floor or collar agreement or
hedge agreement, forward contract or other similar instrument or
agreement or foreign currency hedge, exchange, purchase or similar
instrument or agreement;

(6) all of the Company's direct or indirect guaranties or
similar agreements by the Company in respect of,

3

and all of the Company's obligations or liabilities to purchase or otherwise acquire or otherwise assure a creditor against loss in respect of, indebtedness, obligations or liabilities of another person of the kinds described in clauses (1) through (5); and

(7) any and all deferrals, renewals, extensions, refinancings and refundings of, or amendments, modifications or supplements to, any indebtedness, obligation or liability of the kinds described in clauses (1) through (6); provided, however, Indebtedness shall not include obligations of any person (A) arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business, provided that such obligations are extinguished within two business days of their incurrence, (B) resulting from the endorsement of negotiable instruments for collection in the ordinary course of business and consistent with past business practices and (C) in respect of stand-by letters of credit to the extent collateralized by cash or cash equivalents.

"Indenture" means this Indenture, as amended or
supplemented from time to time in accordance with the terms hereof, including the provisions of the TIA that are deemed to be a part hereof.

"Initial Purchasers" shall mean Deutsche Bank Securities
Inc., Banc of America Securities LLC, Credit Suisse First Boston LLC, CIBC World Markets Corp., Citigroup Global Markets Inc. and LaSalle Debt Capital Markets, a division of ABN AMRO Financial Services, Inc.

"Issue Date" of any Security means the date on which the
Security was originally issued or deemed issued as set forth on the face of the Security.

"Liquidated Damages" has the meaning set forth in the
Registration Rights Agreement dated as of May 16, 2003 between the Company and the Initial Purchasers.

"Officer" means the Vice Chairman and Chief Executive
Officer, any Executive Vice President, any Senior Vice President, any Vice President, the Chief Financial Officer, the Treasurer, the Secretary or any Assistant Secretary of the Company.

"Officers' Certificate" means a written certificate
containing the information specified in Sections 12.04 and 12.05, signed in the name of the Company by any two Officers, and delivered to the Trustee. An Officers' Certificate given pursuant to Section 4.03 shall be signed by the Treasurer or Chief Financial Officer of the Company but need not contain the information specified in Sections 12.04 and 12.05.

"Opinion of Counsel" means a written opinion containing
the information specified in Section 12.04 and 12.05, from legal counsel who is acceptable to the Trustee in its reasonable discretion. The counsel may be an employee of, or counsel to, the Company or the Trustee.

"Person" or "person" means any individual, corporation,
limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or other entity.

4

"Principal Amount" or "principal amount" of a Security
----------------    ----------------
means the Principal Amount as set forth on the face of the Security.

"Redemption Date" shall mean the date specified for
---------------
redemption of the Securities in accordance with the terms of the Securities
and this Indenture.

"Redemption Price" shall have the meaning set forth in
----------------
paragraph 5 of the Securities.

"Responsible Officer" means, when used with respect to the
-------------------
Trustee, any managing director, director, vice president, assistant vice
president, assistant treasurer, assistant secretary, associate or any other
officer within the corporate trust department of the Trustee customarily
performing functions similar to those performed by any of the above
designated officers and also shall mean, with respect to a particular
corporate trust matter, any other officer to whom such matter is referred
because of his knowledge and familiarity with the particular subject.

"Restricted Security" means a Security required to bear
-------------------
the restrictive legend set forth in the form of Security set forth in
Exhibits A-1 and A-2 of this Indenture.

"Rule 144A" means Rule 144A under the Securities Act (or
---------
any successor provision), as it may be amended from time to time.

"SEC" means the Securities and Exchange Commission.
---

"Security" or "Securities" means any of the Company's 2.5%
--------    ----------
Contingent Convertible Subordinated Notes Due 2033, as amended or
supplemented from time to time, issued under this Indenture.

"Securities Act" means the Securities Act of 1933, as
--------------
amended, and the rules and regulations promulgated thereunder, as in effect
from time to time.

"Securityholder" or "Holder" means a person in whose name
--------------    ------
a Security is registered on the Registrar's books.

"Senior Indebtedness" means the principal of, premium, if
-------------------
any, interest, including, with respect to the Credit Facility, all interest
accrued subsequent to the commencement of any bankruptcy or similar
proceeding, whether or not a claim for post-petition interest is allowable
as a claim in any such proceeding, and rent payable on or in connection
with, and all fees, costs, expenses and other amounts accrued or due on or
in connection with, the Company's Indebtedness whether secured or unsecured,
absolute or contingent, due or to become due, outstanding on the date of
this Indenture or thereafter created, incurred, assumed, guaranteed or in
effect guaranteed by the Company, including all deferrals, renewals,
extensions or refundings of, or amendments, modifications or supplements to,
the foregoing other than:

(1) any Indebtedness or obligation whose terms expressly
provide that such Indebtedness or obligation shall not be senior in
right of payment to the Securities or expressly provides that such
Indebtedness is on the same basis or junior to the Securities;

5

(2) the Company's Indebtedness to an Affiliate; and

(3) the Notes.

"Stated Maturity" when used with respect to any Security,
---------------
means the date specified in such Security as the fixed date on which an
amount equal to the Principal Amount of such Security is due and payable.

"Subsidiary" means any person of which at least a majority
----------
of the outstanding Voting Stock shall at the time directly or indirectly be
owned or controlled by the Company or by one or more Subsidiaries or by the
Company and one or more Subsidiaries.

"TIA" means the Trust Indenture Act of 1939 as in effect
---
on the date of this Indenture, provided, however, that in the event the TIA
is amended after such date, TIA means, to the extent required by any such
amendment, the TIA as so amended.

"Trading Day" means a day during which trading in
-----------
securities generally occurs on the New York Stock Exchange or, if the Class
A Common Stock is not listed on the New York Stock Exchange, on the
principal other national or regional securities exchange on which the Class
A Common Stock is then listed or, if the Class A Common Stock is not listed
on a national or regional securities exchange, on the National Association
of Securities Dealers Automated Quotation System or, if the Class A Common
Stock is not quoted on the National Association of Securities Dealers
Automated Quotation System, on the principal other market on which the Class
A Common Stock is then traded.

"Trustee" means the party named as the "Trustee" in the
-------                                    -------
first paragraph of this Indenture until a successor replaces it pursuant to
the applicable provisions of this Indenture and, thereafter, shall mean such
successor. The foregoing sentence shall likewise apply to any subsequent
such successor or successors.

"Voting Stock" of a person means Capital Stock of such
------------
person of the class or classes pursuant to which the holders thereof have
the general voting power under ordinary circumstances to elect at least a
majority of the board of directors, managers or trustees of such person
(irrespective of whether or not at the time Capital Stock of any other class
or classes shall have or might have voting power by reason of the happening
of any contingency).

SECTION 1.02.    Other Definitions.
-----------------

| Term: | Defined in Section: |
| --- | --- |
| 95% Trading Condition.................................................................................. | 10.01(c) |
| Act.................................................................................................... | 1.05(a) |
| Agent Members.......................................................................................... | 2.12(e)(v) |
| Aggregate Market Premium............................................................................... | 10.06(d) |
| Beneficial owner....................................................................................... | 3.09(a) |
| Cash................................................................................................... | 3.08(b) |

6

```
Change in Control.............................................................  3.09(a)
Change in Control Purchase Date...............................................  3.09(a)
Change in Control Purchase Notice.............................................  3.09(c)
Change in Control Purchase Price..............................................  3.09(a)
Class A Market Capitalization.................................................  10.06(e)
Closing Price.................................................................  10.06(e)
Company Notice................................................................  3.08(c)
Company Notice Date...........................................................  3.08(c)
Continuing Directors..........................................................  3.09(a)
Conversion Agent..............................................................  2.03
Conversion Date...............................................................  10.02
Conversion Price..............................................................  10.06
Conversion Shares.............................................................  10.01
Depositary....................................................................  2.01(a)
DTC...........................................................................  2.01(a)
Event of Default..............................................................  6.01
Ex-Dividend Date..............................................................  10.01
Group......................................................................... 3.09(a)(i)
Legal Holiday.................................................................  12.08
Legend........................................................................  2.06(f)
Nonpayment Default............................................................  11.01(b)
Notice of Default.............................................................  6.01
Paying Agent..................................................................  2.03
Payment Blockage Period.......................................................  11.01(b)
Payment Blockage Notice.......................................................  11.01(b)
Payment Default...............................................................  11.01(b)
Principal Value Conversion....................................................  10.02
Principal Value Conversion Notice.............................................  10.02
Purchase Date.................................................................  3.08(a)
Purchase Notice...............................................................  3.08(a)
Purchase Price................................................................  3.08(a)
QIBS..........................................................................  2.01(a)
Quarter.......................................................................  10.01(a)
Registrar.....................................................................  2.03
Rule 144A Information.........................................................  4.06
Security Trading Price........................................................  10.01
```

SECTION 1.03.    Incorporation by Reference of Trust
                 ------------------------------------
Indenture Act. Whenever this Indenture refers to a provision of the TIA, the
- ------------
provision is incorporated by reference in and made a part of this Indenture.
The following TIA terms used in this Indenture have the following meanings:

"Commission" means the SEC.
 ----------

"indenture securities" means the Securities.
 --------------------

"indenture security holder" means a Securityholder.
 -------------------------

7

"indenture to be qualified" means this Indenture.
-------------------------

"indenture trustee" or "institutional trustee" means the
-----------------        --------------------
Trustee.

"obligor" on the indenture securities means the Company.
-------

All other TIA terms used in this Indenture that are defined by the TIA, defined by a TIA reference to another statute or defined by an SEC rule have the meanings assigned to them by such definitions.

SECTION 1.04.   Rules of Construction. Unless the context
---------------------
otherwise requires:

(a) a term has the meaning assigned to it;

(b) an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect from time to time;

(c) "or" is not exclusive;
--

(d) "including" means including, without limitation; and
---------

(e) words in the singular include the plural, and words in the plural include the singular.

SECTION 1.05.   Acts of Holders. (a) Any request, demand,
---------------
authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Company. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of Holders signing such instrument
---
or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section.

(b) The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to such officer the execution thereof. Where such execution is by a signer acting in a capacity other than such signer's individual capacity, such certificate or affidavit shall also constitute sufficient proof of such signer's authority.

The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner which the Trustee deems sufficient.

8

(c) The ownership of Registered Securities shall be proved by the register maintained by the Registrar.

(d) Any request, demand, authorization, direction, notice, consent, waiver or other Act of the Holder of any Security shall bind every future Holder of the same Security and the Holder of every Security issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Company in reliance thereon, whether or not notation of such action is made upon such Security.

(e) If the Company shall solicit from the Holders any request, demand, authorization, direction, notice, consent, waiver or other Act, the Company may, at its option, by or pursuant to a Board Resolution, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other Act, but the Company shall have no obligation to do so. If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other Act may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of outstanding Securities have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other Act, and for that purpose the outstanding Securities shall be computed as of such record date; provided that no such authorization, agreement or consent by the Holders on such record date shall be deemed effective unless it shall become effective pursuant to the provisions of this Indenture not later than six months after the record date.

ARTICLE II

THE SECURITIES

SECTION 2.01.    Form and Dating. The Securities and the Trustee's certificate of authentication shall be substantially in the forms set forth on Exhibits A-1 and A-2, which are a part of this Indenture and incorporated by reference herein. The Securities may have notations, legends or endorsements required by law, stock exchange rule or usage; provided that any such notation, legend or endorsement required by usage is in a form acceptable to the Company. The Company shall provide any such notations, legends or endorsements to the Trustee in a Company Order. Each Security shall be dated the date of its authentication.

(a) 144A Global Securities. Securities offered and sold to qualified institutional buyers as defined in Rule 144A ("QIBs") in reliance on Rule 144A shall be issued, initially in the form of a 144A Global Security, which shall be deposited with the Trustee at its Corporate Trust Office, as custodian for the Depositary and registered in the name of The Depository Trust Company ("DTC") or the nominee thereof (such depositary, or any successor thereto, and any such nominee being hereinafter referred to as the "Depositary"), duly executed by the Company and authenticated by the Trustee as hereinafter provided. The aggregate principal amount of the 144A Global Securities may

9

SECTION 10.15.    Simultaneous Adjustments.
                  ------------------------

        In the event that this Article X requires adjustments to
the Conversion Price under more than one of Sections 10.06(c), (d) and (e),
and the record dates for the distributions giving rise to such adjustments
shall occur on the same date, then such adjustments shall be made by
applying, first, the provisions of Section 10.06(d) or (e), as applicable,
and, second, the provisions of Section 10.06(c). If more than one event
requiring adjustment pursuant to Section 10.06 shall occur before completing
the determination of the Conversion Price for the first event requiring such
adjustment, then the Board of Directors (whose determination shall, if made
in good faith, be conclusive) shall make such adjustments to the Conversion
Price (and the calculation thereof) after giving effect to all such events
as shall preserve for Securityholders the Conversion Price protection
provided in Section 10.06.

                           ARTICLE XI

                          SUBORDINATION

        SECTION 11.01.    Terms and Conditions of Subordination. The
                          -------------------------------------
Company, for itself and its successors, and each Holder, by its acceptance
of Securities, agree that the payment of the principal of or interest on or
any other amounts due on the Securities is subordinated in right of payment,
in cash or cash equivalent, to the extent and in the manner stated in this
Article XI, to the prior payment in full when due of all existing and future
Senior Indebtedness of the Company. The Securities shall rank pari passu
with, and shall not be senior in right of payment to such other Indebtedness
of the Company whether outstanding on the date of this Indenture or
hereafter created, incurred, issued or guaranteed by the Company, where the
instrument creating or evidencing such Indebtedness expressly provides that
such Indebtedness ranks pari passu with, or junior to, the Securities.

        The Securities shall be subordinate in right of payment to all
existing and future Senior Indebtedness of the Company. The payment of the
principal of, interest on or any other amounts due on the Securities is
subordinated in right of payment to the prior payment in full of all
existing and future Senior Indebtedness when due. No payment on account of
principal of, redemption of, interest on or any other amounts due on the
Securities, and no redemption, purchase or other acquisition of the
Securities may be made, including a purchase on a Purchase Date pursuant to
Article III hereof, if:

            (a) a default in the payment of any Designated Senior
        Indebtedness occurs and is continuing beyond any applicable period
        of grace (for purposes of this Article XI, "Payment Default"); or
                                                    ---------------

            (b) any other default on any Designated Senior
        Indebtedness occurs and is continuing that permits the holders of
        Designated Senior Indebtedness to accelerate its maturity, and the
        Trustee receives a notice of such default (a "Payment Blockage
                                                      ----------------
        Notice") from the Company or from any holder of Designated Senior
        ------
        Indebtedness or such holder's representative (a "Nonpayment
                                                         ----------
        Default"), but only for the period (the "Payment Blockage Period")
        -------                                  -----------------------
        commencing on the date of receipt by the Trustee of the Payment
        Blockage Notice and ending (unless earlier terminated by notice
        given to the

                              60

Trustee by the holders of such Designated Senior Indebtedness) (a) in the case of a Payment Default, upon the date on which such Payment Default is cured or waived or ceases to exist, and (b) in the case of a Nonpayment Default, upon the earlier of the date on which such Nonpayment Default is cured or waived or ceases to exist or 179 days after the date on which the Payment Blockage Notice is received. Upon termination of the Payment Blockage Period, payments on account of principal of or interest on the Securities (other than, subject to Section 11.2 hereof, amounts due and payable by reason of the acceleration of the maturity of the Securities) and redemptions, purchases or other acquisitions shall be made by or on behalf of the Company.

Notwithstanding the foregoing, only one Payment Blockage Notice with respect to a Nonpayment Default may be given and no new Payment Blockage Period may be commenced for a default unless at least 365 consecutive days have elapsed since the effectiveness of the immediately prior Payment Blockage Notice and all scheduled payments of the Securities that have come due have been paid in full in cash. No Nonpayment Default that existed or was continuing on the date of delivery of any Payment Blockage Notice shall be the basis for a subsequent Payment Blockage notice. For the avoidance of doubt, any Default that occurs after the date of delivery of a Payment Blockage Notice may be the basis for a subsequent Payment Blockage Notice, if such Default exists or is continuing on the date of delivery of the subsequent Payment Blockage Notice.

If the Trustee or any Holder of Securities receives any payment or distribution of the Company's assets of any kind in contravention of any of the terms hereof, whether in cash, property or securities, in respect of the Securities before all Senior Indebtedness is paid in full in cash or cash equivalent, then the payment or distribution will be held by the recipient in trust for the benefit of holders of Senior Indebtedness, and will be immediately paid over or delivered to the holders of Senior Indebtedness or their representative or representatives to the extent necessary to make payment in full of all Senior Indebtedness remaining unpaid, after giving effect to any concurrent payment or distribution, or provision therefor, to or for the holders of Senior Indebtedness.

SECTION 11.02.   Distribution on Acceleration of Securities; Dissolution and Reorganization.

(a) If the Securities are declared due and payable because of the occurrence of an Event of Default, the Company or the Trustee shall give prompt written notice to the holders of all Senior Indebtedness or to the trustee(s) for such Senior Indebtedness of such acceleration.

(b) Upon (i) any acceleration of the principal amount due on the Securities because of an Event of Default or (ii) any distribution of assets of the Company upon any dissolution, winding up, liquidation or reorganization of the Company (whether in bankruptcy, insolvency or receivership proceedings or upon an assignment for the benefit of creditors or any other dissolution, winding up, liquidation or reorganization of the Company):

(i) the holders of all Senior Indebtedness shall first be entitled to receive payment in full, in cash or cash equivalent, of the principal thereof, the interest thereon and any other amounts then due thereon before the Holders are entitled to receive

payment on account of the principal of or interest on or any other
amounts due on the Securities;

        (ii) any payment or distribution of assets of the Company
of any kind or character, whether in cash, property or securities,
to which the Holders or the Trustee would be entitled except for
the provisions of this Article XI, shall be paid by the liquidating
trustee or agent or other person making such a payment or
distribution, directly to the holders of Senior Indebtedness (or
their representatives(s) or trustee(s) acting on their behalf),
ratably according to the aggregate amounts remaining unpaid on
account of the principal of or interest on and other amounts due on
the Senior Indebtedness held or represented by each, to the extent
necessary to make payment in full, in cash or cash equivalent, of
all Senior Indebtedness remaining unpaid, after giving effect to
any concurrent payment or distribution to the holders of such
Senior Indebtedness, provided, however, the Trustee's rights to
compensation, reimbursement of expenses and indemnification under
Sections 6.10 and 7.07 are not subordinated;

        (iii) in the event that, notwithstanding the foregoing,
any payment or distribution of assets of the Company of any kind or
character, whether in cash, property or securities, shall be
received by the Trustee or the Holders before all Senior
Indebtedness is paid in full, such payment or distribution shall be
held in trust for the benefit of, and be paid over to upon request
by a holder of the Senior Indebtedness, the holders of the Senior
Indebtedness remaining unpaid (or their representatives) or
trustee(s) acting on their behalf, ratably as aforesaid, for
application to the payment of such Senior Indebtedness until all
such Senior Indebtedness shall have been paid in full, after giving
effect to any concurrent payment or distribution to the holders of
such Senior Indebtedness; and

        (iv) to the extent any payment of Senior Indebtedness
(whether by or on behalf of the Company, as proceeds of security or
enforcement of any right of setoff or otherwise) is declared to be
fraudulent or preferential set aside or required to be paid to any
receiver, trustee in bankruptcy, liquidating trustee, agent or
other similar person under any bankruptcy, insolvency,
receivership, fraudulent conveyance or similar law, then if such
payment is recovered by, or paid over to, such receiver, trustee in
bankruptcy, liquidation trustee, agent or other similar person, the
Senior Indebtedness or part thereof originally intended to be
satisfied shall be deemed to be reinstated and outstanding as if
such payment had not occurred.

Subject to the payment in full, in cash or cash equivalent, of all
Senior Indebtedness, the Holders shall be subrogated to the rights of the
holders of Senior Indebtedness to receive payments or distributions of cash,
property or securities of the Company applicable to the Senior Indebtedness
until the principal of and interest on the Securities shall be paid in full
and, for purposes of such subrogation, no such payments or distributions to
the holders of Senior Indebtedness of cash, property or securities which
otherwise would have been payable or distributable to Holders shall, as
between the Company, its creditors other than the holders of Senior
Indebtedness, and the Holders, be deemed to be a payment by the Company to
or on account of the Senior Indebtedness, it being understood that the
provisions of this Article XI are

and are intended solely for the purpose of defining the relative rights of
the Holders, on the one hand, and the holders of Senior Indebtedness, on the
other hand.

Nothing contained in this Article XI or elsewhere in this Indenture
or in the Securities is intended to or shall (i) impair, as between the
Company and its creditors other than the holders of Senior Indebtedness, the
obligation of the Company, which is absolute and unconditional, to pay to
the Holders the principal of and interest on the Securities as and when the
same shall become due and payable in accordance with the terms of the
Securities or (ii) affect the relative rights of the Holders and creditors
of the Company other than holders of Senior Indebtedness or, as between the
Company and the Trustee, the obligations of the Company to the Trustee, or
(iii) prevent the Trustee or the Holders from exercising all remedies
otherwise permitted by applicable law upon default under this Indenture,
subject to the rights, if any, under this Article XI of the holders of
Senior Indebtedness in respect of cash, property and securities of the
Company received upon the exercise of any such remedy.

Upon distribution of assets of the Company referred to in this
Article XI, the Trustee and the Holders shall be entitled to rely upon a
certificate of the liquidating trustee or agent or other person making any
distribution to the Trustee or to the Holders for the purpose of
ascertaining the persons entitled to participate in such distribution, the
holders of the Senior Indebtedness and other indebtedness of the Company,
the amount thereof or payable thereon, the amount or amounts paid or
distributed thereon and all other facts pertinent thereto or to this Article
XI. The Trustee, however, shall not be deemed to owe any fiduciary duty to
the holders of Senior Indebtedness. Nothing contained in this Article XI or
elsewhere in this Indenture or in any of the Securities shall prevent the
good faith application by the Trustee of any moneys which were deposited
with it hereunder, prior to its receipt of written notice of facts which
would prohibit such application, for the purpose of the payment of or on
account of the principal of or interest on, the Securities unless, prior to
the date on which such application is made by the Trustee, the Trustee shall
be charged with notice under Section 11.02(d) hereof of the facts which
would prohibit the making of such application.

(c) The provisions of this Article XI shall not be applicable to
any cash, properties or securities received by the Trustee or by any Holder
when received as a holder of Senior Indebtedness and nothing in the
Indenture or this Indenture shall deprive the Trustee or such Holder of any
of its rights as such holder.

(d) The Company shall give prompt written notice to the Trustee of
any fact known to the Company which would prohibit the making of any payment
of money to or by the Trustee in respect of the Securities pursuant to the
provisions of this Article XI. The Trustee shall be entitled to assume that
no such fact exists unless the Company or any holder of Senior Indebtedness
or any trustee therefor has given such notice to the Trustee.
Notwithstanding the provisions of this Article XI or any other provisions of
this Indenture, the Trustee shall not be charged with knowledge of the
existence of any fact which would prohibit the making of any payment of
monies to or by the Trustee in respect of the Securities pursuant to the
provisions in this Article XI, unless, and until three Business Days after,
the Trustee shall have received written notice thereof from the Company or
any holder or holders of Senior Indebtedness or from any trustee therefor;
and, prior to the receipt of any such written notice, the Trustee shall be
entitled in all respects conclusively to assume that no such facts exist;
provided that if on a date

63

not less than three Business Days immediately preceding the date upon which
by the terms hereof any such monies may become payable for any purpose
(including, without limitation, the principal of or interest on any
Security), the Trustee shall not have received with respect to such monies
the notice provided for in this Section 11.02(d), then anything herein
contained to the contrary notwithstanding, the Trustee shall have full power
and authority to receive such monies and to apply the same to the purpose
for which they were received, and shall not be affected by any notice to the
contrary which may be received by it on or after such prior date.

The Trustee shall be entitled to rely on the delivery to it of a
written notice by a person representing himself to be a holder of Senior
Indebtedness (or a trustee on behalf of such holder) to establish that such
notice has been given by a holder of Senior Indebtedness (or a trustee on
behalf of any such holder or holders). In the event that the Trustee
determines in good faith that further evidence is required with respect to
the right of any person as a holder of Senior Indebtedness to participate in
any payment or distribution pursuant to this Article XI, the Trustee may
request such person to furnish evidence to the reasonable satisfaction of
the Trustee as to the amount of Senior Indebtedness held by such person, the
extent to which such person is entitled to participate in such payment or
distribution and any other facts pertinent to the rights of such person
under this Article XI, and, if such evidence is not furnished, the Trustee
may defer any payment to such person pending judicial determination as to
the right of such person to receive such payment; nor shall the Trustee be
charged with knowledge of the curing or waiving of any default of the
character specified in Section 11.01 or that any event or any condition
preventing any payment in respect of the Securities shall have ceased to
exist, unless and until the Trustee shall have received an Officers'
Certificate to such effect.

(e) The provisions of this Section 11.02 applicable to the
Trustee shall also apply to any Paying Agent for the Company.

(f) Each Holder of a Security, by its acceptance thereof,
authorizes and directs the Trustee on its behalf to take such
action as may be necessary or appropriate to effectuate the
subordination provided in this Article XI and appoints the Trustee
its attorney-in-fact for any and all such purposes, including, in
the event of any dissolution, winding up or liquidation or
reorganization under any applicable bankruptcy law of the Company
(whether in bankruptcy, insolvency or receivership proceedings or
otherwise), the timely filing of a claim for the unpaid balance of
such Holder's Securities in the form required in such proceedings
and the causing of such claim to be approved. If the Trustee does
not file a claim or proof of debt in the form required in such
proceedings prior to 30 days before the expiration of the time to
file such claims or proofs, then any holder or holders of Senior
Indebtedness or their representative or representatives shall have
the right to demand, sue for, collect, receive and receipt for the
payments and distributions in respect of the Securities which are
required to be paid or delivered to the holders of Senior
Indebtedness as provided in this Article XI and to file and prove
all claims therefor and to take all such other action in the name
of the holders or otherwise, as such holders of Senior Indebtedness
or representative thereof may determine to be necessary or
appropriate for the enforcement of the provisions of this Article
XI.

64

        SECTION 11.03.    Notice to Lender Under the Credit Facility.
                          ------------------------------------------

The Company and the Trustee shall promptly notify the lender under the
Credit Facility upon any amendment to the provisions of this Article XI.


            ARTICLE XII

            MISCELLANEOUS

        SECTION 12.01.    Trust Indenture Act Controls.
                          -----------------------------

        If any provision of this Indenture limits, qualifies, or
conflicts with another provision which is required to be included in this
Indenture by the TIA, the required provision shall control.

        SECTION 12.02.    Notices.
                          -------

        Any request, demand, authorization, notice, waiver,
consent or communication shall be in writing and delivered in person or
mailed by first-class mail, postage prepaid, addressed as follows, or
transmitted by facsimile transmission (confirmed orally) to the following
facsimile numbers:

        if to the Company, to:

        2503 South Hanley Road
        St. Louis, Missouri  63144
        Attention: Chief Executive Officer
        Facsimile No.: (314) 770-0203

        in either case, with a copy to:

        Thompson Coburn LLP
        One U.S. Bank Plaza
        St. Louis, Missouri  63101
        Attention: Thomas A. Litz
        Facsimile No.: (314) 552-7000

        if to the Trustee, to:

        Deutsche Bank Trust Company Americas
        Corporate Trust and Agency Services
        60 Wall Street
        MS NYC 60-2515
        New York, New York 10005
        Attention: Dorothy Robinson
        Facsimile No.: (212) 454-4274

            65

**EXHIBIT B**

Exhibit 4.1

**EXECUTION VERSION**

**K-V PHARMACEUTICAL COMPANY**

and

**EACH OF THE GUARANTORS NAMED HEREIN**

and

**WILMINGTON TRUST FSB,**

as Trustee

INDENTURE

Dated as of March 17, 2011

$ 225,000,000 Principal Amount
12% Senior Secured Notes due 2015

**INDENTURE**, dated as of March 17, 2011, between K-V Pharmaceutical Company, a Delaware corporation (the "**Company**"), and Wilmington Trust FSB, as trustee (the "**Trustee**").

Each party agrees as follows for the benefit of the other party and for the equal and ratable benefit of the Holders of the Company's 12% Senior Secured Notes due 2015 (the "**Securities**, which term shall include, without duplication, Pre-Exchange Securities and Post-Exchange Securities, each as defined herein).

## I. DEFINITIONS AND INCORPORATION BY REFERENCE

1.01 **DEFINITIONS.**

"**Acquired Indebtedness**" means Indebtedness of a Person or any of its Subsidiaries that either (i) exists at the time such Person becomes a Restricted Subsidiary of the Company or at the time it merges or consolidates with or into the Company or any of its Restricted Subsidiaries or (ii) is assumed in connection with the acquisition, by the Company, of assets from such Person; *provided*, *however*, that "Acquired Indebtedness" shall not include any Indebtedness incurred by such Person in connection with, or in anticipation or contemplation of, such Person becoming a Restricted Subsidiary of the Company or such acquisition, merger or consolidation.

"**Affiliate**" means any person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company. For this purpose, "control" shall mean the power to direct the management and policies of a person through the ownership of securities, by contract or otherwise.

"**Asset Acquisition**" means: (i) an Investment by the Company or any of its Restricted Subsidiaries in any other Person, pursuant to which investment such Person shall become a Restricted Subsidiary of the Company or shall be merged with or into the Company or any of its Restricted Subsidiaries; or (ii) the acquisition, by the Company or any of its Restricted Subsidiaries, of the assets of any Person (other than a Restricted Subsidiary of the Company) which constitute all or substantially all of the assets of such Person or comprise any division or line of business of such Person or any other properties or assets of such Person, other than in the ordinary course of business, including in each case, acquisitions of licenses, patents and other rights (including new drug applications and abbreviated new drug applications) related to pharmaceuticals.

"**Asset Sale**" means any sale, issuance, conveyance, transfer, lease (other than operating leases), assignment or other transfer (collectively, a "sale") for value by the Company or any of its Restricted Subsidiaries to any Person (other than the Company or a Restricted Subsidiary) of (i) any Capital Stock of any Restricted Subsidiary of the Company; or (ii) any other property or assets of the Company or any Restricted Subsidiary of the Company, in each case other than in the ordinary course of business; *provided*, *however*, that "Asset Sale" shall not include (1) a transaction or series of related transactions for which the Company or its Restricted Subsidiaries receive aggregate consideration of less than $1,000,000; (2) the sale, lease, conveyance,

-1-

disposition or other transfer of all or substantially all of the assets of the Company as permitted under **Section 5.01**; (3) any Permitted Investment or any Restricted Payment permitted under **Section 4.11**; (4) the sale or disposition of cash or Cash Equivalents; (5) the grant of Liens not prohibited by this Indenture; (6) a sale of license rights, patents, or trademarks for use in any country other than the United States where sales under such license, patent, or trademark do not represent more than 2% of the consolidated sales of the Company and its Restricted Subsidiaries for the four most recent fiscal quarters for which financial statements are available as of the date of such sale; (7) the sale or transfer of Capital Stock of an Unrestricted Subsidiary; (8) any release of intangible claims or rights in connection with the loss or settlement of a *bona fide* lawsuit, dispute or controversy; (9) the replacement, sale or other disposition of used, worn out, obsolete or surplus equipment or inventory or equipment or inventory no longer used or useful in the business of such Person; (10) granting non-exclusive outbound licenses of intellectual property granted by the Company or any of its Restricted Subsidiaries in the ordinary course of business; (11) the sale of the Citibank Auction Rate Securities; and (12) the dissolution or winding up of any Subsidiary of the Company that accounts for less than 1% of the Company's total assets and conducts no material operations on the Issue Date.

"**Attributable Debt**" means, with respect to a Sale and Leaseback Transaction, the present value (discounted at the rate of interest implicit in such transaction, determined in accordance with GAAP) of the total obligations of the lessee for net rental payments during the remaining term of the lease included in such Sale and Leaseback Transaction (including any period for which such lease has been extended or may, at the option of the lessor, be extended); *provided*, *however*, that if such Sale and Leaseback Transaction results in a Capitalized Lease Obligation, then the amount of Indebtedness represented thereby will be determined in accordance with the definition of Capitalized Lease Obligation.

"**Board of Directors**" means the Board of Directors of the Company or any committee thereof authorized to act for it hereunder.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"**Capital Stock**" of any Person means any and all shares, interests, participations or other equivalents (however designated) of capital stock of such Person and all warrants or options to acquire such capital stock.

"**Capitalized Lease Obligation**" means, as to any Person, the obligations of such Person under a lease, which obligations are required, under GAAP, to be classified and accounted for as capital lease obligations. For purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date, determined in accordance with GAAP. For the avoidance of doubt, in determining whether a lease is a capitalized lease or an operating lease and whether interest expense

-2-

exists, such determination shall be made in accordance with GAAP as in existence on the Issue Date.

"**Cash Equivalents**" means:

(1) marketable direct obligations issued by, or unconditionally guaranteed by, the U.S. government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof;

(2) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Moody's;

(3) commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's;

(4) certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof and issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any U.S. branch of a foreign bank having at the date of acquisition thereof combined net capital and surplus of not less than $250,000,000;

(5) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (1) above entered into with any bank meeting the qualifications specified in clause (4) above;

(6) investments in money market funds which invest substantially all their assets in securities of the types described in clauses (1) through (5) above; and

(7) Canadian dollars, Japanese yen, pounds sterling, Euros or, in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by it from time to time in the ordinary course of business.

"**Citibank Auction Rate Securities**" means the auction rate securities that the Company has the option to purchase from Citibank, N.A. and affiliated entities as of the Issue Date for an aggregate purchase price not to exceed $72,200,000.

"**Collateral**" means all of the "Collateral" referred to in the Collateral Documents and all of the other property and assets that are or are required under the terms of this Indenture and the Collateral Documents to be subject to Liens in favor of the Collateral Agent for the benefit of the Secured Parties. Notwithstanding the foregoing, "Collateral" shall not include the Excluded Assets.

"**Collateral Agent**" means the Trustee, in its capacity as collateral agent for the Secured Parties.

"**Collateral Documents**" means, collectively, (a) the Pledge and Security Agreement, (b) the Mortgages, (c) the Intellectual Property Security Agreements, (d) the Controlled Account Agreements, (e) the Interest Reserve Account Control Agreement and (f) any other documents providing for any Lien, pledge, encumbrance, mortgage or security interest on any or all of the Obligors' assets or the ownership interests thereof in favor of the Collateral Agent for the benefit of the Secured Parties, in each case, as amended, restated, supplemented, replaced or otherwise modified from time to time in accordance with the terms thereof.

"**Common Stock**" of any Person means any class of common stock or an equivalent interest (including, but not limited to, a unit of beneficial interest in a trust or a limited partnership interest) of such Person.

"**Company**" means the party named as such above until a successor replaces it pursuant to Article V hereof and thereafter means the successor. The foregoing sentence shall likewise apply to any such successor or subsequent successor.

"**Company Order**" or "**Company Request**" means a written request or order signed on behalf of the Company by its Chairman of the Board, its Chief Executive Officer, its President, its Chief Operating Officer, its Chief Financial Officer, any Executive Vice President or any Senior Vice President and by its Treasurer or an Assistant Treasurer or its Secretary or an Assistant Secretary, and delivered to the Trustee.

"**Confidential Information Memorandum**" means the Company's certain confidential memorandum, dated as of March 2, 2011, related to the offering of the Securities.

"**Consolidated EBITDA**" means, for any period, the sum, without duplication, and determined on a consolidated basis for the Company and its Restricted Subsidiaries in accordance with GAAP, of (i) Consolidated Net Income and (ii) to the extent such Consolidated Net Income has been reduced thereby, (a) all income taxes of the Company and its Restricted Subsidiaries paid or accrued in accordance with GAAP for such period; (b) Consolidated Interest Expense; (c) Consolidated Non-Cash Charges net of any non-cash items increasing such Consolidated Net Income for such period and (d) non-recurring losses net of any non-recurring gains.

"**Consolidated Fixed Charge Coverage Ratio**" means, as of any date (the "**Transaction Date**"), the ratio of (i) Consolidated EBITDA of the Company during the four consecutive full fiscal quarters (the "**Four Quarter Period**") most recently ending on or prior to such Transaction Date and for which internal financial statements are available to (ii) Consolidated Fixed Charges of the Company for such Four Quarter Period; *provided*, *however*, that, for purposes of this definition of "Consolidated Fixed Charge Coverage Ratio":

-4-

(A) "Consolidated EBITDA" and "Consolidated Fixed Charges" shall be calculated after giving effect to each of the following events on a pro forma basis: (1) the incurrence or repayment, on or after the beginning of such Four Quarter Period and on or before such Transaction Date, of other Indebtedness of the Company or any of its Restricted Subsidiaries (and the application of the proceeds thereof) (excluding, for purposes of this clause (1) any such incurrence or repayment pursuant to revolving credit facilities), as if such incurrence or repayment (and the application of the proceeds thereof) occurred on the first day of such Four Quarter Period; and (2) any asset sale or other disposition or Asset Acquisition occurring on or after the beginning of such Four Quarter Period and on or before such Transaction Date, as if such asset sale or other disposition or Asset Acquisition (including the incurrence or assumption of, or liability for, any such Indebtedness or Acquired Indebtedness and also including any Consolidated EBITDA associated with such Asset Acquisition) occurred on the first day of such Four Quarter Period;

(B) if the Company or any of its Restricted Subsidiaries directly or indirectly guarantees Indebtedness of another Person, then, for purposes of clause (A) above, the Company will be deemed to have directly incurred or otherwise assumed such guaranteed Indebtedness;

(C) in calculating "Consolidated Fixed Charges" for purposes of determining the value of clause (ii) (but not for purposes of calculating the value of clause (i)) of this definition of "Consolidated Fixed Charge Coverage Ratio": (1) interest on outstanding Indebtedness that is determined on a fluctuating basis as of the Transaction Date (including Indebtedness actually incurred on the Transaction Date) and that will continue to be so determined thereafter shall be deemed to have accrued at a fixed rate per annum equal to the rate of interest on such Indebtedness in effect on the Transaction Date; and (2) notwithstanding anything to the contrary in the immediately preceding clause (1), interest on Indebtedness determined on a fluctuating basis, to the extent such interest is covered by agreements relating to Interest Swap Obligations, shall be deemed to accrue at the rate per annum to be paid in cash resulting after giving effect to the operation of such agreements; and

(D) whenever *pro forma* effect is to be given to a transaction, the *pro forma* calculations shall be made in good faith and certified by the chief financial officer of the Company, and any such pro forma calculation may include, without duplication, adjustments appropriate to reflect operating expense reductions and other operating improvements or synergies that are based upon readily identifiable measures and are reasonably expected to be realized within 12 months following the date of determination.

"**Consolidated Fixed Charges**" means, for any period, the sum, without duplication, of (i) Consolidated Interest Expense; and (ii) the product of (x) the amount of all dividend payments on any series of Preferred Stock of the Company (other than dividends paid in Qualified Capital Stock) paid, accrued or scheduled to be paid or accrued during such period and (y) a fraction whose numerator is one and whose denominator is the excess of one over the then-current effective consolidated federal, state and local tax rate of such Person.

-5-

"**Consolidated Interest Expense**" means, for any period, the aggregate (without duplication) of the interest expense of the Company and its Restricted Subsidiaries for such period, on a consolidated basis, as determined in accordance with GAAP, and including (i) all amortization or accretion of original issue discount; (ii) the interest component of Capitalized Lease Obligations paid, accrued or scheduled to be paid or accrued by the Company and its Restricted Subsidiaries during such period; and (iii) net cash costs under all Interest Swap Obligations (including, without limitation, amortization of fees); *provided*, *however*, that Consolidated Interest Expense shall not include (w) the amortization or write-off during such period of capitalized financing or debt issuance costs, (x) the payment of any penalty or premium associated with the early retirement, repayment or prepayment of Indebtedness in connection with the initial issuance of the Securities, (y) non-cash costs under any hedging arrangements or (z) interest expense recognized under GAAP in respect of obligations that are not Indebtedness under this Indenture solely pursuant to the last parenthetical in clause (b) of the definition of Indebtedness.

"**Consolidated Net Income**" means, for any period, the aggregate net income (or loss) of the Company and its Restricted Subsidiaries for such period on a consolidated basis, determined in accordance with GAAP; *provided*, *however*, that the following shall be excluded from Consolidated Net Income: (i) after-tax gains and losses from asset sales or abandonments or reserves relating thereto; (ii) after-tax items classified as extraordinary gains or losses; (iii) the net income (but not loss) of any Restricted Subsidiary of the Company to the extent that the declaration of dividends or similar distributions by such Restricted Subsidiary on such income is restricted by a contract, operation of law or otherwise; (iv) the net income of any Person, other than the Company or a Restricted Subsidiary of the Company, except to the extent of cash dividends or distributions paid to the Company or to a Restricted Subsidiary of the Company by such Person; (v) any restoration to income of any material contingency reserve, except to the extent that provision for such reserve was made out of Consolidated Net Income accrued at any time following the Issue Date; (vi) income or loss attributable to discontinued operations (including operations disposed of during such period whether or not such operations were classified as discontinued); (vii) the cumulative effect of a change in accounting principles; (viii) interest expense attributable to dividends on Qualified Capital Stock pursuant to GAAP; (ix) non-cash charges resulting from the impairment of intangible assets; (x) with respect to **Section 4.11** only, in the case of a successor to the Company by consolidation or merger or as a transferee of the Company's assets, any earnings of such successor prior to such consolidation, merger or transfer of assets; and (xi) non-cash compensation charges or other non-cash expenses or charges arising from the grant of or issuance or re-pricing of stock, stock options or other equity-based awards or any amendment, modification, substitution or change of any such stock, stock options or other equity-based awards.

"**Consolidated Non-Cash Charges**" means, for any period, the aggregate depreciation, amortization and other non-cash items and expenses (including asset impairments) of the Company and its Restricted Subsidiaries to the extent they reduce the Consolidated Net Income of the Company and its Restricted Subsidiaries for such period,

-6-

determined on a consolidated basis in accordance with GAAP (excluding any such charge which requires an accrual of or a reserve for cash charges for any future period).

"**Controlled Account Agreements**" means those certain deposit and securities account control agreements executed and delivered pursuant to the Pledge and Security Agreement.

"**Corporate Trust Office of the Trustee**" shall be at the address of the Trustee specified in **Section 12.02** or such other address as the Trustee may give notice of to the Company.

"**Currency Agreement**" means any foreign exchange contract, currency swap agreement or other similar agreement or arrangement designed to protect the Company or any of its Restricted Subsidiaries against fluctuations in currency values.

"**Default**" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"**Depositary**" means The Depository Trust Company, its nominees and successors.

"**Designated Assets**" means the Company's (1) generic pharmaceutical business, the assets of which are held within the Company's wholly owned subsidiary, Nesher Pharmaceuticals, Inc. as well as in the Company and in its wholly owned subsidiary, DrugTech Corporation, and (2) branded prescription nutritional products.

"**Designated Non-Cash Consideration**" means non-cash consideration received by the Company or any of its Restricted Subsidiaries in connection with an Asset Sale as designated pursuant to an Officers' Certificate. The aggregate fair market value of all Designated Non-Cash Consideration received by the Company after the Issue Date and then outstanding may not exceed $10,000,000.

"**Disqualified Capital Stock**" means that portion of any Capital Stock that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event (other than an event that would constitute a Fundamental Change), (i) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (except in each case, upon the occurrence of a Fundamental Change), on or prior to 91 days after the final maturity date of the Securities for cash or (ii) is convertible into or exchangeable for debt securities of the Company or its Subsidiaries at any time prior to such maturity.

"**Domestic Restricted Subsidiary**" means, with respect to any Person, a Domestic Subsidiary of such Person that is a Restricted Subsidiary of such Person.

"**Domestic Subsidiary**" means, with respect to any Person, a Subsidiary of such Person that is not a Foreign Subsidiary of such Person.

-7-

"**Equity Offering**" means (i) any underwritten public offering, for cash, of Common Stock of the Company pursuant to a registration statement filed under the Securities Act with the SEC (other than on Form S-8); or (ii) any private placement, for cash, of Common Stock of the Company to any Person; *provided, however*, that "Equity Offering" shall not include issuances of Common Stock upon exercise of options by employees of the Company or any of its Affiliates.

"**Equity Offering Redemption Price**" means, with respect to a Security to be redeemed by the Company in accordance with **Section 3.01(F)** and **Article III**, a cash amount equal to the product of (A) the Equity Offering Redemption Premium and (B) the principal amount of such Security.

"**Equity Offering Redemption Premium**" means an amount equal to the sum of (i) 100% and (ii) the Stated Interest Rate.

"**Event of Loss**" means, with respect to any property or asset (tangible or intangible, real or personal) constituting Collateral, any of the following:

(i) any loss, destruction or damage of such property or asset;

(ii) any institution of any proceeding for the condemnation or seizure of such property or asset or for the exercise of any right of eminent domain;

(iii) any actual condemnation, seizure or taking by exercise of the power of eminent domain or otherwise of such property or asset, or confiscation of such property or asset or the requisition of the use of such property or asset; or

(iv) any settlement in lieu of clauses (ii) or (iii) above.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC thereunder.

"**Excluded Assets**" means (i) the Company's Disbursement Deposit Account (so long as no more than $5,000,000 in the aggregate is on deposit in such Disbursement Deposit Account (as defined below) at the close of each business day) or other deposit and/or securities accounts the balance of which consists exclusively of (A) withheld income taxes and federal, state or local employment taxes, (B) amounts required to be paid over in respect of employee benefits or payroll and (C) accounts where the maximum daily balance does not exceed $100,000 individually, or $500,000 in the aggregate for all deposit and/or securities accounts excluded from the Collateral pursuant to this clause (i) (C), (ii) real estate mortgaged in favor of Persons other than the Trustee or Collateral Agent on the Issue Date, but only for so long as such Liens (or Liens permitted under this Indenture to replace such initial Liens) remain outstanding, (iii) leasehold interests in real property, (iv) general intangibles or any lease, license, contract or other property as to which the grant of a security interest is (A) prohibited by the applicable governing agreement, or would give any other party thereto a right to consent or terminate its obligations thereunder, or would otherwise result in a default, breach or violation thereof, (B) would constitute or result in the abandonment, invalidation or

-8-

unenforceability of any rights, title or interest of any obligor thereunder or (C) would constitute or result in the violation of any law, regulation permit, order or decree of any applicable governmental authority, (v) Capital Stock or other equity interests of any Foreign Subsidiary, so long as the aggregate of such Foreign Subsidiary's and its Subsidiaries' (x) consolidated income from operations (for the most recent fiscal year) and (y) consolidated total assets (as of the most recent balance sheet for the most recently completed fiscal quarter) are less than $1,000,000 and $3,000,000, respectively; *provided that* if consolidated income from operations or consolidated total assets are equal to or exceed $1,000,000 or $3,000,000, respectively, as aforesaid, no more than 65% of the Capital Stock or other equity interests of the applicable first-tier Foreign Subsidiary shall be pledged (to the extent such pledge is otherwise in compliance with the terms of the Collateral Documents), (vi) motor vehicles (where perfection is required by means of notation on certificates of title, or similar actions), (vii) equipment subject to, or secured by, a purchase money debt obligation and (viii) deposit and/or securities accounts of the Company established for the purpose of cash collateralizing letters of credits, so long as (x) the aggregate amount of cash or securities held in all such accounts is less than $2,500,000 and (y) a lien on such accounts is permitted pursuant to clause (16) of the definition of "Permitted Liens." For the avoidance of doubt, Makena and the Company's rights therein shall not be Collateral until such time as the Lien on such assets in favor of Hologic, Inc. granted pursuant to the Makena Agreement is terminated. As used in this definition, the term "Disbursement Deposit Account" means the Company's "DDA" or disbursement account and all related lockbox, overnight and similar expense accounts that are linked to or feed to or are swept into the DDA account automatically or at regular times.

"**Fair Market Value**" means, with respect to any asset or property, the price which could be negotiated in an arm's length, free market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction. With respect to determinations above $25,000,000, Fair Market Value shall be determined by the Board of Directors acting in good faith and shall be evidenced by a Board Resolution delivered to the Trustee; *provided, however*, that, except in the case of determining the Fair Market Value of assets in connection with an Asset Sale not involving the sale of assets to an Affiliate, with respect to determinations above $50,000,000, the Board of Directors' determination must be based upon an opinion or appraisal issued by an accounting, appraisal or investment banking firm of national standing. For the purposes of **Section 4.20**, Fair Market Value should be determined in the context of a Sale and Leaseback Transaction, including any customary discount in the purchase price established in such transactions.

"**Foreign Subsidiary**" means, with respect to any Person, any Subsidiary of such Person that is organized under the laws of any jurisdiction other than the United States, any state thereof or the District of Columbia.

"**GAAP**" means accounting principles generally accepted in the United States as in effect on the Issue Date.

-9-

"**Guarantors**" means each of (1) the Domestic Restricted Subsidiaries of the Company as of the Issue Date (other than MECW); (2) any other Subsidiary of the Company that becomes a Guarantor pursuant to this Indenture; and (3) the respective successors and assigns of the foregoing; *provided, however*, that upon the release and discharge of any Person from its Subsidiary Guarantee in accordance with this Indenture, such Person shall cease to be a Guarantor.

"**Holder**" or "**Securityholder**" means a person in whose name a Security is registered on the Registrar's books.

"**Indebtedness**" of a person means the principal of, premium, if any, and interest on, and all other obligations in respect of (a) all indebtedness of such person for borrowed money (including all indebtedness evidenced by notes, bonds, debentures or other securities), (b) all obligations (other than trade payables) incurred by such person in the acquisition (whether by way of purchase, merger, consolidation or otherwise and whether by such person or another person) of any business, real property or other assets to the extent such obligations would appear as a liability of such person on its financial statements prepared in accordance with GAAP (but not to the extent that such person has the right to settle any such obligation by issuing Capital Stock rather than making payments in cash), (c) all reimbursement obligations of such person with respect to letters of credit, bankers' acceptances or similar facilities issued for the account of such person, (d) all Capitalized Lease Obligations of such person, (e) all net obligations of such person under interest rate swap, currency exchange or similar agreements, (f) all obligations and other liabilities, contingent or otherwise, under any capital lease or related document, including a purchase agreement, conditional sale or other title retention agreement, in connection with the lease of real property or improvements thereon (or any personal property included as part of any such capital lease) which provides that such person is contractually obligated to purchase or cause a third party to purchase the leased property or pay an agreed-upon residual value of the leased property, including such person's obligations under such lease or related document to purchase or cause a third party to purchase such leased property or pay an agreed-upon residual value of the leased property to the lessor, (g) guarantees by such person of indebtedness described in **clauses (a) through (f)** of another person, and (h) all renewals, extensions, refundings, deferrals, restructurings, amendments and modifications of any indebtedness, obligation, guarantee or liability of the kind described in **clauses (a) through (g)**.

"**Indenture**" means this Indenture as amended or supplemented from time to time.

"**Independent Financial Advisor**" means a nationally-recognized accounting, appraisal or investment banking firm that (1) does not, and whose directors, officers and employees or Affiliates do not, have a direct or indirect material financial interest in the Company or the transaction to which their opinion relates and (2) is otherwise independent and qualified to perform the task for which it is to be engaged in the judgment of the Board of Directors.

-10-

"**Intellectual Property Security Agreements**" has the meaning defined in the Pledge and Security Agreement.

"**Intercompany Indebtedness**" means (i) any Indebtedness of the Company to any of its Subsidiaries and (ii) any Indebtedness of a Subsidiary of the Company to the Company or to another Subsidiary of the Company.

"**Interest Reserve Account**" means the Company's securities account established on or prior to the Issue Date with Wilmington Trust FSB, as securities intermediary, in which the Company will deposit cash and Cash Equivalents in an amount sufficient to pay the first two scheduled payments of interest on the Securities.

"**Interest Reserve Account Control Agreement**" means that account control agreement, dated as of the Issue Date, between the Company, the Collateral Agent, and Wilmington Trust FSB, as securities intermediary, providing for the Collateral Agent's Control (as defined in the Pledge and Security Agreement) over the Interest Reserve Account.

"**Interest Swap Obligations**" means the obligations of any reference Person pursuant to any arrangement with any other Person, whereby such reference Person is directly or indirectly entitled to receive, from time to time, periodic payments calculated by applying either a floating or a fixed rate of interest on a stated notional amount in exchange for periodic payments to such other Person calculated by applying a fixed or a floating rate of interest on the same notional amount. "Interest Swap Obligations" shall include, without limitation, interest rate swaps, caps, floors, collars and similar agreements.

"**Investment**" in any Person means any advance, loan (other than advances to customers in the ordinary course of business that are recorded as accounts receivable on the balance sheet of the lender) or other extensions of credit (including, without limitation, by way of guarantee or similar arrangement) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others, and excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), or any purchase or acquisition for value of Capital Stock, Indebtedness or other similar instruments issued by such Person, in each case, in any other Person. If the Company or any of its Restricted Subsidiaries issues, sells or otherwise disposes of any Capital Stock of a Person that is a Restricted Subsidiary such that, after giving effect thereto, such Person is no longer a Restricted Subsidiary or otherwise such entity ceases to be a Restricted Subsidiary, then any Investment by the Company or any of its Restricted Subsidiaries in such Person remaining after giving effect thereto will be deemed to be a new Investment at such time. The acquisition by the Company or any of its Restricted Subsidiaries of a Person that holds an Investment in a third Person will be deemed to be an Investment by the Company or such Restricted Subsidiary in such third Person at such time. Except as otherwise provided for herein, the amount of an Investment shall be its Fair Market Value at the time the Investment is made and without giving effect to subsequent changes in value. For purposes of the definition of "Unrestricted Subsidiary,"

-11-

the definition of "Restricted Payment" and **Section 4.11**: (i) "Investment" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of any Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided, however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to the excess, if any, of (A) the Company's "Investment" in such Subsidiary at the time of such redesignation over (B) the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of such Subsidiary at the time of such redesignation; and (ii) any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer.

"**Issue Date**" means March 17, 2011.

"**IRB Financing**" means the obligations of the Borrower in connection with the Trust Indenture, dated as of December 1, 2005, by and among St. Louis County, Missouri and UMB Bank, N.A., as Trustee.

"**Lien**" means any lien, mortgage, deed of trust, pledge, security interest, charge or encumbrance of any kind (including, without limitation, any conditional sale or other title retention agreement, any lease in the nature thereof and any agreement to give any security interest).

"**Makena**" means Makena™ (hydroxyprogesterone caproate injection).

"**Makena Agreement**" means that certain asset purchase agreement, dated as of January 16, 2008, between the Company and Hologic, Inc., providing for the Company's acquisition of Makena, as amended by the first amendment, dated as of January 8, 2010 and the second amendment, dated of February 4, 2011.

"**Makena NDA Approval Date**" means February 4, 2011.

"**Maturity Date**" means March 15, 2015.

"**MECW**" means MECW, LLC, a limited liability company formed and existing under the laws of the State of Delaware.

"**MECW Mortgage Financing**" means the obligations of MECW in connection with the Deed of Trust, Leasehold Deed of Trust, Security Agreement and Fixture Filing, dated as of March 23, 2006, by MECW as grantor to Steve Dieckmann, as Trustee for the benefit of LaSalle Bank National Association, as Beneficiary.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgages**" means the mortgages, deeds of trust, deeds to secure Indebtedness or other similar documents granting Liens on real property owned by the Company or any

-12-

Pledgor, as well as the other Collateral secured by and described in the mortgages, deeds of trust, deeds to secure Indebtedness or other similar documents.

"**Net Cash Proceeds**" means, with respect to any Asset Sale, the proceeds in the form of cash or Cash Equivalents (including, without limitation, payments in respect of deferred payment obligations, if received in the form of cash or Cash Equivalents (other than the portion of any such deferred payment constituting interest)) received by the Company or any of its Restricted Subsidiaries from such Asset Sale, net of: (1) reasonable out-of-pocket expenses and fees relating to such Asset Sale (including legal, accounting and investment banking fees and sales commissions); (2) all taxes and other costs and expenses actually paid or reasonably estimated in good faith by the Company to be payable in cash in connection with such Asset Sale; (3) repayment of Indebtedness that is secured by the property or assets that are the subject of such Asset Sale (other than property or assets constituting Collateral) and is required to be repaid in connection with such Asset Sale; and (4) appropriate amounts to be provided by the Company or any of its Restricted Subsidiaries, as the case may be, as a reserve, in accordance with GAAP, against any liabilities associated with such Asset Sale and retained by the Company or any of its Restricted Subsidiaries, as the case may be, after such Asset Sale (including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale).

"**Net Loss Proceeds**" means the aggregate cash proceeds received by the Company or any Guarantor, and not required to be paid over by the Company or any Guarantor, in respect of any Event of Loss, including, without limitation, insurance proceeds, condemnation awards or damages awarded by any judgment, net of the direct cost in recovery of such Net Loss Proceeds (including, without limitation, legal, accounting, appraisal and insurance adjuster fees and any relocation expenses incurred as a result thereof) and any taxes paid or payable as a result thereof.

"**Obligations**" means all obligations for principal, premium, interest (including, with respect to the Securities, interest accruing thereon after the commencement of an insolvency, bankruptcy or similar proceeding, whether or not a claim for post-filing or post-petition interest is allowed in any such proceeding), penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"**Obligors**" means the Company and the Guarantors.

"**Officer**" means the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the General Counsel, any Executive Vice President, any Senior Vice President, the Treasurer or the Secretary of the Company.

"**Officers' Certificate**" means a certificate signed by two Officers or by an Officer and an Assistant Treasurer or an Assistant Secretary of the Company.

"**Opinion of Counsel**" means a written opinion from legal counsel reasonably acceptable to the Trustee who may be an employee of or counsel for the Company, or other counsel.

"**Optional Redemption Premium**" means an amount equal to the sum of (i) 100% and (ii) the product of (A) 75% and (B) the Stated Interest Rate.

"**Optional Redemption Price**" has the following meaning with respect to a Security to be redeemed by the Company in accordance with **Section 3.01(D)** and **Article III**: (i) if such Redemption Date is on or after March 15, 2013 and before March 15, 2014, a cash amount equal to the product of (A) the Optional Redemption Premium and (B) the principal amount of such Security; and (ii) if such Redemption Date is on or after March 15, 2014, an amount equal to 100% of the principal amount of such Security.

"**Permitted Business**" means any business that is reasonably related, complementary or incidental to the business in which the Company and its Restricted Subsidiaries are engaged on the Issue Date.

"**Permitted Holders**" means the lineal descendants of Victor M. Hermelin and their immediate families.

"**Permitted Indebtedness**" means, without duplication, each of the following:

(1) Indebtedness under the Securities issued on the Issue Date or in the Exchange Offer with respect to such Securities in an aggregate outstanding principal amount not to exceed $225,000,000 and the related Subsidiary Guarantees;

(2) [reserved];

(3) Indebtedness of the Company (other than Indebtedness described under clause (1) above) and its Restricted Subsidiaries outstanding on the Issue Date, after giving effect to the use of proceeds from the Securities;

(4) any Interest Swap Obligation of the Company or any Restricted Subsidiary of the Company covering Indebtedness of the Company or any of its Restricted Subsidiaries, provided that (x) such Interest Swap Obligation is entered into for the purpose of fixing or hedging interest rates with respect to any fixed or variable rate Indebtedness that is permitted by this Indenture to be outstanding and (y) the notional amount of such Interest Swap Obligation does not exceed the principal amount of Indebtedness to which such Interest Swap Obligation relates;

(5) Indebtedness under any Currency Agreement, provided that such Currency Agreement is not entered into for speculative purposes and, in the event such Currency Agreement relates to Indebtedness, such Currency Agreement does not increase the outstanding Indebtedness of the Company and its Restricted Subsidiaries other than as a result of fluctuations in foreign currency exchange rates or by reason of fees, indemnities and compensation payable thereunder;

-14-

(6) Intercompany Indebtedness of the Company or a Guarantor for so long as such Indebtedness is held by the Company or a Guarantor; *provided*, *however*, that if, as of any date, any Person other than the Company or a Guarantor owns or holds any such Indebtedness or holds a Lien in respect of any such Indebtedness, then, on such date, such Indebtedness shall cease to constitute Permitted Indebtedness pursuant to this clause (6);

(7) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business, provided that such Indebtedness is extinguished within five business days of incurrence;

(8) Indebtedness of the Company or any of its Restricted Subsidiaries in order to provide security for workers' compensation claims, payment obligations in connection with self-insurance, deferred compensation or similar requirements in the ordinary course of business;

(9) obligations in respect of performance, bid, appeal and surety bonds, bankers' acceptances, bank overdrafts (and letters of credit in respect thereof) and completion guarantees provided by the Company or any Restricted Subsidiary in the ordinary course of business;

(10) Indebtedness represented by Capitalized Lease Obligations and Purchase Money Indebtedness of the Company and its Restricted Subsidiaries and Refinancings thereof; *provided*, *however*, that the maximum amount that may be deemed to be Permitted Indebtedness pursuant to this clause (10) at any time shall not exceed $5,000,000;

(11) Refinancing Indebtedness;

(12) Indebtedness represented by guarantees, by any Restricted Subsidiary of the Company, of Indebtedness incurred by the Company or a Guarantor, provided the incurrence of such Indebtedness by the Company or such Guarantor is otherwise permitted by the terms of this Indenture;

(13) Indebtedness arising from agreements of the Company or a Restricted Subsidiary of the Company providing for indemnification, "earn-out" obligations, guarantees, adjustment of purchase price or similar obligations, in each case, incurred in connection with the disposition of any business, assets, rights or capital stock, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or capital stock for the purpose of financing such acquisition; *provided*, *however*, such Indebtedness shall be deemed not to be Permitted Indebtedness pursuant to this clause (13) to the extent the maximum aggregate liability in respect of such Indebtedness exceeds the gross proceeds actually received by the Company or such Restricted Subsidiary in connection with such disposition;

-15-

(14) Indebtedness in the form of contingent milestone liabilities incurred in connection with the acquisition of a product or product right so long as the Company's pro forma Total Leverage Ratio is less than or equal to 3.0 to 1.0;

(15) Indebtedness of Foreign Subsidiaries in an amount not to exceed $2,500,000 in the aggregate at any time outstanding under this clause (15);

(16) additional Indebtedness of the Company or any Restricted Subsidiary not to exceed $500,000 in the aggregate at any time outstanding under this clause (16);

(17) Indebtedness in connection with the dissolution of Ethex Corporation in an amount not to exceed $1,000,000 in the aggregate; and

(18) Indebtedness consisting of financing premiums with respect to insurance policies of the Company and its Restricted Subsidiaries.

For purposes of determining compliance with **Section 4.13**, (a) the outstanding principal amount of any item of Indebtedness shall be counted only once; and (b) in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Indebtedness described in clauses (1) through (18) above or is entitled to be incurred pursuant to the proviso to **Section 4.13(A)**, the Company shall, in its sole discretion, classify (or later reclassify) such item of Indebtedness in any manner in one or more categories that complies with **Section 4.13**. Accrual of interest, accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, and the payment of dividends on Disqualified Capital Stock in the form of additional shares of the same class of Disqualified Capital Stock or changes in the amount of Indebtedness under GAAP with respect to an acquisition of rights covered by clause (14), will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Capital Stock for purposes of **Section 4.13**.

"**Permitted Investments**" means:

(1) Investments by the Company or any of its Restricted Subsidiaries in any Person that is or will become, immediately after such Investment, a Guarantor or that will merge or consolidate with or into the Company or a Guarantor, or that transfers or conveys all or substantially all of its assets to the Company or a Guarantor;

(2) Investments in the Company by any of its Restricted Subsidiaries, provided that any Indebtedness evidencing such Investment is unsecured and subordinated to the Company's Obligations under the Notes and this Indenture;

(3) Investments in cash and Cash Equivalents;

-16-

(4) Currency Agreements and Interest Swap Obligations, in each case, entered into not for speculative purposes and otherwise in compliance with this Indenture;

(5) Investments in the Securities;

(6) Investments in securities of trade creditors or customers received pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers in exchange for claims against such trade creditors or customers;

(7) Investments made by the Company or its Restricted Subsidiaries as a result of consideration received in connection with an asset sale made in compliance with **Section 4.15**;

(8) Investments in existence on the Issue Date and any renewals, replacements, refinancings or refundings thereof that do not increase the amount of such Investments;

(9) loans and advances (including, without limitation, advances for travel and moving expenses) to employees, officers and directors of the Company and its Restricted Subsidiaries in the ordinary course of business for *bona fide* business purposes not in excess of $2,500,000 at any one time outstanding;

(10) advances to suppliers and customers in the ordinary course of business;

(11) Investments in Subsidiaries that are not Guarantors in an amount not to exceed $2,500,000 in the aggregate at any time;

(12) Investments constituting the Citibank Auction Rate Securities, so long as (A) prior to the purchase of such Investments, the Company has received a binding commitment from a willing purchaser to purchase such Investments at a price higher than the purchase price paid by the Company or its Restricted Subsidiaries for such Investments and (B) such Investments are sold substantially concurrently with the purchase thereof; and

(13) Investments of a Restricted Subsidiary that was acquired after the Issue Date or of any entity merged with or into the Company or a Restricted Subsidiary, so long as the Investment was not made in anticipation of the acquisition or merger and such Investment does not constitute a majority of the assets acquired.

"**Permitted Liens**" means the following:

(1) Liens for taxes, assessments or governmental charges or claims that either are not delinquent or are contested in good faith by appropriate proceedings, provided that the Company or its Restricted Subsidiaries shall have

-17-

set aside on its books such reserves, as to such taxes, assessments or governmental charges or claims, as may be required pursuant to GAAP;

(2) Liens of landlords, banks (and rights of set-off), carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law or pursuant to customary reservations or retentions of title incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by GAAP, shall have been made in respect thereof;

(3) Liens incurred or pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or Liens to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(4) any judgment Lien not giving rise to an Event of Default;

(5) easements, rights-of-way, zoning restrictions and other similar charges or encumbrances and other minor defects or irregularities in title in respect of real property not interfering in any material respect with the ordinary conduct of the business of the Company or any of its Restricted Subsidiaries;

(6) any interest or title of a lessor under any Capitalized Lease Obligation permitted pursuant to clause (10) of the definition of "Permitted Indebtedness," provided that such Liens do not extend to any property or assets which is not leased property subject to such Capitalized Lease Obligation (other than other property that is subject to a separate Capitalized Lease Obligation with the same lessor or any of its affiliates pursuant to clause (10) of the definition of "Permitted Indebtedness");

(7) Liens securing Purchase Money Indebtedness permitted pursuant to clause (10) of the definition of "Permitted Indebtedness," provided that (i) such Indebtedness does not exceed the cost of the property or assets acquired, together, in the case of real property, with the cost of the construction thereof and improvements thereto, and is not secured by a Lien on any property or assets of the Company or any Restricted Subsidiary of the Company other than such property or assets so acquired or constructed and improvements thereto and (ii) the Lien securing such Indebtedness is created within 180 days of such acquisition or construction or, in the case of a refinancing of any Purchase Money Indebtedness, within 180 days of such refinancing;

(8) Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers'

-18-

acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(9) Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(10) Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Company or any of its Restricted Subsidiaries, including rights of offset and set-off;

(11) Liens securing Interest Swap Obligations that relate to Indebtedness that is otherwise permitted under this Indenture;

(12) Liens securing Indebtedness under Currency Agreements that are permitted under this Indenture;

(13) Liens securing Acquired Indebtedness incurred in accordance with **Section 4.13**, provided that (i) such Liens secured such Acquired Indebtedness at the time of and prior to the incurrence of such Acquired Indebtedness by the Company or a Restricted Subsidiary of the Company and were not granted in connection with, or in anticipation of, the incurrence of such Acquired Indebtedness by the Company or a Restricted Subsidiary of the Company; and (ii) such Liens do not extend to or cover any property or assets of the Company or any of its Restricted Subsidiaries other than the property or assets that secured the Acquired Indebtedness prior to the time such Indebtedness became Acquired Indebtedness of the Company or any of its a Restricted Subsidiaries and are no more favorable to the lienholders than those securing the Acquired Indebtedness prior to the incurrence of such Acquired Indebtedness by the Company or such Restricted Subsidiary;

(14) Liens existing as of the Issue Date and securing Indebtedness permitted to be outstanding under clause (3) of the definition of the term "Permitted Indebtedness," to the extent and in the manner such Liens are in effect on the Issue Date and any renewals and extensions thereof so long as the aggregate principal amount of the Indebtedness being secured does not increase (plus accrued interest and premium in respect thereof) and the Lien does not extend to any additional assets;

(15) Liens securing the Securities and all other Obligations under this Indenture, the Collateral Documents and the Subsidiary Guarantees;

(16) Liens on up to $2,500,000 of cash in deposit accounts with financial institutions established for the purpose of cash collateralizing letters of credit;

(17) any Lien that (i) secures Refinancing Indebtedness that is incurred to Refinance any Indebtedness that is secured by a Lien that is a Permitted Lien

-19-

and that was incurred in accordance with **Section 4.13**; (ii) is no less favorable to the Holders and is not more favorable to the lienholders with respect to such Lien than the Liens in respect of the Indebtedness being Refinanced; and (iii) does not extend to or cover any property or assets of the Company or any of its Restricted Subsidiaries not securing the Indebtedness so Refinanced;

(18) Liens on property of a Person existing at the time such Person is merged with or into or consolidated with the Company or any of its Restricted Subsidiaries, provided that such Liens were not incurred in contemplation of such merger or consolidation and do not extend to any assets other than those of the Person merged into or consolidated with the Company or such Restricted Subsidiary;

(19) Liens on assets of a Restricted Subsidiary of the Company that is not a Guarantor to secure Indebtedness of such Restricted Subsidiary that is otherwise permitted under this Indenture;

(20) Liens arising from filing UCC financing statements regarding leases;

(21) Liens securing Indebtedness incurred pursuant to clause (14) of the definition of Permitted Indebtedness (including related Indebtedness permitted by the last sentence of the definition of "Indebtedness"); *provided* that any Lien granted pursuant to this clause (21) shall be permitted (i) only on the acquired asset that is subject to future milestone payments and (ii) only during such time as there remains a potential obligation to make one or more such milestone payments;

(22) Liens on insurance policies and the proceeds thereof securing the financing of premiums with respect thereto;

(23) non-exclusive Licenses of intellectual property granted by the Company or any Restricted Subsidiary in the ordinary course of business;

(24) interests of title of lessor or sublessor under any lease of real property;

(25) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(26) Liens in respect of any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property; and

(27) other Liens securing Indebtedness in an aggregate amount not exceeding $1,000,000 outstanding at any time.

-20-

"**Person**" or "**person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or other agency or political subdivision thereof.

"**Pledge and Security Agreement**" means the Pledge and Security Agreement in between the Pledgors and the Collateral Agent dated as of the Issue Date, as amended, restated, modified or supplemented from time to time in accordance with this Indenture.

"**Pledgors**" has the meaning defined in the Pledge and Security Agreement.

"**Post-Exchange Securities**" means Securities issued pursuant to **Sections 2.20** and **4.22**, which Post-Exchange Securities shall (1) be substantially in the form set forth in **Exhibit A** but which shall (a) not bear the Private Placement Legend and (b) have appropriate changes made to the "Form of Assignment" on the reverse thereof; and (2) bear interest in the same manner as, and at the same rate and on the same dates (and with the same record dates) as that under, the Pre-Exchange Securities, except that, for purposes of determining the amount of the first interest payment on each Post-Exchange Security, and the Person to whom it must be paid, such Post-Exchange Security and the Pre-Exchange Security exchanged for such Post Exchange Security shall be deemed to be one and the same Security.

"**Pre-Exchange Securities**" means Securities issued on the Issue Date, which Securities shall, as provided in **Section 2.01**, be substantially in the form set forth in **Exhibit A** and which shall initially bear the Private Placement Legend, except to the extent otherwise provided herein.

"**Preferred Stock**" means, with respect to any Person, any Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends or distributions, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over the Capital Stock of any other class in such Person.

"**Provisional Redemption Discount Rate**" means a rate, per annum, equal to the sum of the Treasury Rate and 50 basis points.

"**Provisional Redemption Make-Whole Amount**" means, with respect to a Security to be redeemed by the Company on a Redemption Date in accordance with **Section 3.01(E)**, a cash amount equal to sum of the present value, discounted to such Redemption Date using an annual discount rate equal to the Provisional Redemption Discount Rate, of each the following: (i) a cash payment to be made on March 15, 2013 in amount equal to the product of (A) the Optional Redemption Premium and (B) the principal amount of such Security; and (ii) each interest payment on such Security that is scheduled to be made on or after such Redemption Date and on or before March 15, 2013; *provided, however*, that (1) if such Redemption Date is after a record date for the payment of an installment of interest and on or before the related interest payment date, then the first scheduled interest payment on such Security on or after such Redemption Date shall be deemed, for purposes of clause (ii) above, to be zero (it being understood

-21-

that such scheduled interest payment shall be made in accordance with **Section 3.01(G)**); and (2) if such Redemption Date does not occur during the period that begins on the day immediately following a record date for the payment of an installment of interest and ends on, and includes, the related interest payment date, then the amount of the first scheduled interest payment on such Security on or after such Redemption Date shall be deemed, for purposes of clause (ii) above, to be a cash amount equal to the excess of the actual scheduled interest payment over the amount of unpaid interest that has accrued to, but excluding, such Redemption Date (it being understood that such amount of accrued and unpaid interest shall be paid, pursuant to **Section 3.01(E)**, to the Holder submitting such Security for Redemption).

"**Provisional Redemption Price**" means, with respect to a Security to be redeemed by the Company in accordance with **Section 3.01(E)**, a cash amount equal to the greater of (i) 101% of the principal amount of such Security; and (ii) the Provisional Redemption Make-Whole Amount for such Security.

"**Purchase Money Indebtedness**" means Indebtedness of the Company and its Restricted Subsidiaries incurred for the purpose of financing all or any part of the purchase price, or the cost of installation, construction or improvement, of property or equipment, provided, that the aggregate principal amount of such Indebtedness does not exceed the lesser of (i) the Fair Market Value of such property or equipment and (ii) such purchase price or cost.

"**Purchase Notice**" means a Purchase Notice in the form set forth in the Securities.

"**QIB**" means a "qualified institutional buyer" (as defined in Rule 144A).

"**QIB Global Security**" means a Global Security in registered form representing a Security sold pursuant to Rule 144A.

"**Qualified Capital Stock**" means any Capital Stock that is not Disqualified Capital Stock.

"**Redemption Date**" means the date specified for Redemption of the Securities in accordance with the terms of the Securities and this Indenture.

"**Redemption Price**" means, (i) with respect to a Security to be redeemed by the Company pursuant to **Section 3.01(D)**, the Optional Redemption Price for such Security; (ii) with respect to a Security to be redeemed by the Company pursuant to **Section 3.01(E)**, the Provisional Redemption Price for such Security; and (iii) with respect to a Security to be redeemed by the Company pursuant to **Section 3.01(F)**, the Equity Offering Redemption Price for such Security.

"**Refinance**" means, in respect of any security or Indebtedness, to refinance, extend, renew, refund, repay, prepay, redeem, defease or retire, or to issue a security or Indebtedness in exchange or replacement for, such security or Indebtedness in whole or in part. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

-22-

"**Refinancing Indebtedness**" means Indebtedness that (i) is incurred by the Company or any Restricted Subsidiary to Refinance Indebtedness incurred in accordance with **Section 4.13** (other than Permitted Indebtedness) or clause (1), (3) or (11) of the definition of Permitted Indebtedness; (ii) does not have an aggregate principal amount (or, if such Indebtedness is issued with original issue discount, an aggregate offering price) that is greater than the sum of (x) the aggregate principal amount of such Indebtedness being Refinanced (or, if such Indebtedness being Refinanced is issued with original issue discount, the aggregate accreted value) as of the date of such Refinancing plus (y) the amount of fees, expenses, premiums, defeasance costs and accrued and unpaid interest relating to the Refinancing of such Indebtedness being Refinanced; (iii) does not have (x) a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is incurred that is less than the Weighted Average Life to Maturity of such Indebtedness being Refinanced or (y) a stated final maturity that is earlier than the final maturity of such Indebtedness being Refinanced; (iv) is not secured by any Lien that that did not, immediately prior to such Refinancing, secure such Indebtedness being Refinanced; (v) (in the event the Indebtedness being Refinanced is subordinate or junior by its terms to the Securities) is, by its terms, subordinate to the Securities at least to the same extent and in the same manner as such Indebtedness being Refinanced; and (vi) (in the event the Indebtedness being Refinanced was incurred by a Restricted Subsidiary that is not a Guarantor) is incurred by a Restricted Subsidiary that is not a Guarantor.

"**Regulation D**" means Regulation D under the Securities Act.

"**Regulation S**" means Regulation S under the Securities Act.

"**Regulation S Global Security**" means a Global Security in registered form representing a Security sold in reliance on Regulation S under the Securities Act.

"**Responsible Officer**" shall mean, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"**Restricted Payment**" means each of the following:

(1) the payment of any dividend or making of any distribution (other than dividends or distributions payable in Qualified Capital Stock of the Company and dividends and distributions payable to the Company or any of its Restricted Subsidiaries) on or in respect of shares of Capital Stock of the Company or its Restricted Subsidiaries;

(2) the purchase, redemption or other acquisition or retirement, for value, of any Capital Stock issued by the Company or any of its Restricted

-23-

Subsidiaries (other than dividends paid by a Restricted Subsidiary on a pro rata basis);

(3) the making of any principal payment on, or the purchase, defeasance, redemption, prepayment, decrease or other acquisition or retirement, for value, more than one year prior to any scheduled final maturity, scheduled repayment or scheduled sinking fund payment, of any Indebtedness of the Company or any Guarantor that (i) is senior unsecured Indebtedness or Indebtedness secured by a Lien on the Collateral that is junior to the Lien securing the Obligations or (ii) is subordinate or junior in right of payment to the Securities or a Subsidiary Guarantee; and

(4) the making of any Investment (other than a Permitted Investment).

"**Restricted Security**" means a Security that constitutes a "restricted security" within the meaning of Rule 144(a)(3) under the Securities Act; *provided*, *however*, that the Trustee shall be entitled to request and conclusively rely on an Opinion of Counsel with respect to whether any Security constitutes a Restricted Security.

"**Restricted Subsidiary**" of any Person means any Subsidiary of such Person which, at the time of determination, is not an Unrestricted Subsidiary.

"**Rule 144A**" means Rule 144A under the Securities Act.

"**Sale and Leaseback Transaction**" means any direct or indirect arrangement with any Person or to which any such Person is a party, providing for the leasing to the Company or any of its Restricted Subsidiaries of any property, whether owned by the Company or any of its Restricted Subsidiaries on the Issue Date or later acquired, which has been or is to be sold or transferred by the Company or such Restricted Subsidiary to such Person or to any other Person from whom funds have been or are to be advanced by such Person on the security of such Property other than (i) the obligations of the Company under the IRB Financing and (ii) the obligations of MECW under the MECW Mortgage Financing.

"**S&P**" means Standard & Poor's Ratings Group.

"**SEC**" means the Securities and Exchange Commission.

"**Secured Parties**" means each Securityholder, the Trustee and the Collateral Agent.

"**Securities**" means the 12% Senior Secured Notes due 2015 issued by the Company pursuant to this Indenture.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC thereunder.

-24-

"**Securities Agent**" means any Registrar, Paying Agent or co-Registrar or co-agent.

"**Significant Subsidiary**" with respect to any person means any subsidiary of such person that constitutes a "significant subsidiary" within the meaning of Rule 1-02(w) of Regulation S-X under the Securities Act, as such regulation is in effect on the Issue Date.

"**Stated Interest Rate**" means a rate, per annum, equal to 12%.

"**Subsidiary**" means, with respect to a reference Person, (i) a corporation a majority of whose Capital Stock with voting power, under ordinary circumstances, to elect directors is at the time, directly or indirectly, owned by such reference Person, by one or more subsidiaries of such reference Person or by such reference Person and one or more of its subsidiaries or (ii) any other person (other than a corporation) in which such reference Person, one or more of its subsidiaries, or such reference Person and one or more of its subsidiaries, directly or indirectly, at the date of determination thereof, own at least a majority ownership interest.

"**TIA**" means the Trust Indenture Act of 1939 (15 U.S. Code §§ 77aaa-77bbbb) as amended and in effect from time to time.

"**Total Leverage Ratio**" means, with respect to any Person, at any date the ratio of (i) Indebtedness of such Person and its Restricted Subsidiaries as of the last day of the fiscal quarter for which internal financial statements are available immediately preceding the date of calculation, determined on a consolidated basis in accordance with GAAP to (ii) Consolidated EBITDA of such Person for the four full fiscal quarters for which internal financial statements are available immediately preceding the date of calculation. For purposes of calculating the Total Leverage Ratio for any period, the amount of Indebtedness of any Person represented by outstanding letters of credit shall be excluded from the amount of Debt except to the extent such letter of credit has been drawn and not reimbursed by such Person. The Total Leverage Ratio shall be calculated in a manner consistent with the pro forma provisions (to the extent applicable) of the definition of "Fixed Charge Coverage Ratio."

"**Treasury Rate**" means, as of any Redemption Date on or before March 15, 2013, the yield to maturity, as of such Redemption Date, of U.S. Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days before such redemption date (or, if such statistical release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from, and including, such Redemption Date to, but excluding, March 15, 2013; *provided*, *however*, that if such period is not equal to the constant maturity of the U.S. Treasury security for which a weekly average yield is given, then the Treasury Rate shall be obtained by linear interpolation (calculated to one-twelfth of a year) from the weekly average yields of U.S. Treasury securities for which such yields are given, except that if

-25-

such period is less than one year, then the weekly average yield on actually traded U.S. Treasury securities adjusted to a constant maturity of one year shall be used.

"**Trustee**" means the party named as such in this Indenture until a successor replaces it in accordance with the provisions hereof and thereafter means the successor.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than that of the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"**Unrestricted Subsidiary**" of any Person means (1) any Subsidiary of such Person that at the time of determination shall be or continue to be designated an Unrestricted Subsidiary by the board of directors of such Person in the manner provided below, (2) any Subsidiary of an Unrestricted Subsidiary, and (3) Ethex Corporation. The Board of Directors may designate any Subsidiary (including any Restricted Subsidiary or newly acquired or newly formed Subsidiary) of the Company to be an Unrestricted Subsidiary, unless such Subsidiary owns any Capital Stock of, or owns or holds any Lien on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the Subsidiary to be so designated; *provided*, *however*, that the Company shall not be permitted to make any such designation unless (i) the Company provides the Trustee with a copy of the Board Resolution giving effect to such designation and an Officers' Certificate certifying that such designation complied with this sentence and with **Section 4.11**; (ii) none of the Subsidiaries to be so designated or any of their respective Subsidiaries has, at the time of designation, and none will thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender of such Indebtedness has recourse to any of the assets of the Company or any of its Restricted Subsidiaries; (iii) immediately after giving effect to such designation, the Company is able to incur at least one dollar of additional Indebtedness (other than Permitted Indebtedness) in compliance with the proviso to **Section 4.13(A)**; and (iv) immediately before and immediately after giving effect to such designation, no Default or Event of Default shall have occurred and be continuing (including as a result of the Company's deemed Investment in such Unrestricted Subsidiary in accordance with the definition of "Investment").

"**U.S. Government Obligations**" means non-callable direct obligations of, and non-callable obligations guaranteed by, the United States for the payment of which the full faith and credit of the United States is pledged.

"**U.S. Legal Tender**" means such coin or currency of the United States which, as at the time of payment, shall be immediately available legal tender for the payment of public and private debts.

-26-

"**Weighted Average Life to Maturity**" means, with respect to any Indebtedness at any date, a number of years equal to a fraction (i) whose numerator is the sum, for each then-remaining installment, sinking fund, serial maturity or other required payment of principal (including, without limitation, payment at final maturity) in respect of such Indebtedness, of the product of (x) the amount of such installment or payment and (y) the number of years (calculated to the nearest one-twelfth) between such date and the due date of such installment or payment; and (ii) whose denominator is the aggregate principal amount of such Indebtedness outstanding as of such date.

"**Voting Stock**" of any Person means the total voting power of all classes of the Capital Stock of such Person entitled to vote generally in the election of directors of such Person.

1.02 **OTHER DEFINITIONS.**

| Term | Defined in Section |
|---|---|
| "**Affiliate Transaction**" | 4.12 |
| "**Asset Sale Notice**" | 3.09 |
| "**Asset Sale Repurchase Date**" | 3.09 |
| "**Asset Sale Repurchase Price**" | 3.09 |
| "**Asset Sale Repurchase Right**" | 3.09 |
| "**Automatic Exchange**" | 2.18 |
| "**Automatic Exchange Notice**" | 2.18 |
| "**Bankruptcy Law**" | 6.01 |
| "**Business Day**" | 12.07 |
| "**Covenant Defeasance**" | 10.01 |
| "**Custodian**" | 6.01 |
| "**Event of Default**" | 6.01 |
| "**Exchange Offer**" | 4.22 |
| "**Exchange Offer Registration Statement**" | 4.22 |
| "**Fundamental Change**" | 3.08 |
| "**Fundamental Change Notice**" | 3.08 |
| "**Fundamental Change Repurchase Date**" | 3.08 |
| "**Fundamental Change Repurchase Price**" | 3.08 |
| "**Fundamental Change Repurchase Right**" | 3.08 |
| "**Global Security**" | 2.01 |
| "**Legal Defeasance**" | 10.01 |
| "**Legal Holiday**" | 12.07 |
| "**Maximum Dollar Amount for Repurchase Upon Asset Sale**" | 3.09 |
| "**Notice of Default**" | 6.01 |
| "**Participants**" | 2.15 |
| "**Paying Agent**" | 2.03 |
| "**Physical Securities**" | 2.01 |
| "**Premises**" | 9.03 |
| "**Private Placement Legend**" | 2.17 |

-27-

| | |
|---|---|
| **"Redemption"** | 3.01 |
| **"Reference Date"** | 4.11 |
| **"Registrar"** | 2.03 |
| **"Registration Default"** | 4.22 |
| **"Repurchase Upon Asset Sale"** | 3.01 |
| **"Repurchase Upon Fundamental Change"** | 3.01 |
| **"Required Offer Amount"** | 4.15 |
| **"Resale Restriction Termination Date"** | 2.17 |
| **"Restricted Global Security"** | 2.18 |
| **"Special Interest"** | 4.22 |
| **"Subsidiary Guarantee"** | 8.01 |
| **"Trust Funds"** | 10.01 |
| **"Unrestricted Global Security"** | 2.18 |

1.03 INCORPORATION BY REFERENCE OF TRUST INDENTURE ACT.

Only at all times after the effectiveness of the Exchange Offer Registration Statement, will this Indenture be subject to the mandatory provisions of the TIA, which are incorporated by reference in and made a part of this Indenture. At all times, whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture.

The following TIA terms used in this Indenture have the following meanings:

"**indenture securities**" means the Securities;

"**indenture security holder**" means a Securityholder or a Holder;

"**indenture to be qualified**" means this Indenture;

"**indenture trustee**" or "**institutional trustee**" means the Trustee; and

"**obligor**" on the indenture securities means the Company and each Guarantor, or any successor thereto.

All other terms used in this Indenture that are defined by the TIA, defined by the TIA by reference to another statute or defined by SEC rule under the TIA and not otherwise defined herein have the meanings so assigned to them.

1.04 RULES OF CONSTRUCTION.

Unless the context otherwise requires:

(i) a term has the meaning assigned to it;

(ii) an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(iii) "including" means "including without limitation";

(iv) words in the singular include the plural and in the plural include the singular;

-28-

III. **REDEMPTION AND REPURCHASE**

3.01 **RIGHT OF REDEMPTION AND REPURCHASE.**

(A) A redemption or repurchase of the Securities by the Company, as permitted by any provision of this Indenture, shall be made:

(i) with respect to a repurchase at the Company's option, in accordance with **Section 3.01(D), Section 3.01(E)** or **Section 3.01(F)** (a "**Redemption**"); or

(ii) with respect to any repurchase in accordance with **Section 3.08** (a "**Repurchase Upon Fundamental Change**"); or

(iii) with respect to any repurchase in accordance with **Section 3.09** (a "**Repurchase Upon Asset Sale**"),

in each case in accordance with the applicable provisions of this **Article III**.

(B) The Company will comply with all federal and state securities laws, and the applicable laws of any foreign jurisdiction, in connection with any offer to sell or solicitations of offers to buy Securities pursuant to this **Article III** and if such securities laws conflict with the provisions of this **Article III**, the securities law provisions shall apply.

(C) The Company shall not have the right to redeem any Securities except pursuant to **Section 3.01(D)**, **Section 3.01(E)** or **Section 3.01(F)**.

(D) The Company shall have the right, at the Company's option, at any time, and from time to time, on a Redemption Date on or after March 15, 2013, to redeem all or any part of the Securities at a price payable in cash equal to the Optional Redemption Price plus (subject to **Section 3.01(G)**) accrued and unpaid interest, if any, to, but excluding, the Redemption Date.

(E) The Company shall have the right, at the Company's option, at any time, and from time to time, on a Redemption Date before March 15, 2013, to redeem all or any part of the Securities at a price payable in cash equal to the Provisional Redemption Price plus (subject to **Section 3.01 (G)**) accrued and unpaid interest, if any, to, but excluding, the Redemption Date.

(F) The Company shall have the right, at the Company's option, at any time, and from time to time, on a Redemption Date before March 15, 2013, to redeem Securities at a price payable in cash equal to the Equity Offering Redemption Price plus (subject to **Section 3.01(G)**) accrued and unpaid interest, if any, to, but excluding, the Redemption Date; *provided*, *however*, that no such Redemption shall be made pursuant to this **Section 3.01(F)** unless:

-39-

(i) such Equity Offering Redemption Price is paid solely from the proceeds of one or more Equity Offerings;

(ii) the aggregate principal amount of Securities to be redeemed pursuant to such Redemption, when taken together with the aggregate principal amount of Securities theretofore redeemed pursuant to this **Section 3.01(F)**, may in no event exceed 35% of the principal amount of the Securities initially issued pursuant hereto on the Issue Date;

(iii) at least 65% of the Securities outstanding immediately prior to such Redemption will remain outstanding immediately after giving effect to such Redemption; and

(iv) such Redemption Date cannot occur on a date that is more than 90 days after the date of closing of the earliest Equity Offering the proceeds of which are to be used to pay such Equity Offering Redemption Price and accrued and unpaid interest.

(G) Notwithstanding anything herein to the contrary, (i) in no event shall any Redemption Date be a Legal Holiday; and (ii) the Redemption Price, plus accrued interest up to but excluding the Redemption Date shall be owing to the Holder upon surrender of such Security.

(H) Securities in denominations larger than $2,000 principal amount may be redeemed in part but only in integral multiples of $1,000 principal amount.

## 3.02 NOTICES TO TRUSTEE.

If the Company elects to redeem Securities pursuant to **Sections 3.01(D), (E)** or **(F)**, it shall notify the Trustee of the Redemption Date, the applicable provision of this Indenture pursuant to which the Redemption is to be made and the aggregate principal amount of Securities to be redeemed, which notice shall be provided to the Trustee by the Company at least 15 days prior to the delivery, in accordance with **Section 3.04**, of the notice of Redemption (unless a shorter notice period shall be satisfactory to the Trustee).

## 3.03 SELECTION OF SECURITIES TO BE REDEEMED.

If the Company has elected to redeem less than all the Securities pursuant to **Sections 3.01(D), (E)** or **(F)**, the Trustee shall, within five Business Days after receiving the notice specified in **Section 3.02**, select the Securities to be redeemed by lot, on a *pro rata* basis or in accordance with any other method the Trustee considers fair and appropriate or is required by the Depositary for the Securities. The Trustee shall make such selection from Securities then outstanding and not already to be redeemed by virtue of having been previously called for Redemption. Securities and portions of them the Trustee selects for Redemption shall be in a minimum amount of $2,000 or integral multiples of $1,000 in excess thereof; *provided* that the principal amount of any remaining Security is at least $2,000. The Trustee shall promptly notify the Company in

-40-

writing of the Securities selected for Redemption and the principal amount thereof to be redeemed.

The Registrar need not register the transfer of or exchange any Securities that have been selected for Redemption, except the unredeemed portion of the Securities being redeemed in part.

3.04 **NOTICE OF REDEMPTION.**

At least 30 days but not more than 60 days before a Redemption Date, the Company shall mail, or cause to be mailed, by first-class mail a notice of Redemption to each Holder whose Securities are to be redeemed, at the address of such Holder appearing in the security register.

The notice shall identify the Securities and the aggregate principal amount thereof to be redeemed pursuant to the Redemption and shall state:

(i) the Redemption Date;

(ii) the Redemption Price plus accrued and unpaid interest, if any, to, but excluding, the Redemption Date;

(iii) the name and address of the Paying Agent;

(iv) the Section of the Indenture pursuant to which the Securities are to be redeemed;

(v) that Securities called for Redemption must be surrendered to the Paying Agent to collect the Redemption Price plus accrued and unpaid interest, if any, payable as herein provided upon Redemption;

(vi) that, unless there shall be a Default in the payment of the Redemption Price or accrued and unpaid interest, if any, payable as herein provided upon Redemption, interest on Securities called for Redemption ceases to accrue on and after the applicable Redemption Date and all rights of the Holders with respect to such Securities shall terminate on and after such Redemption Date, other than the right to receive, upon surrender of such Securities and in accordance with this Indenture, the amounts due hereunder on such Securities upon Redemption (and the rights of the Holder(s) of record of such Securities to receive, on the applicable interest payment date, accrued and unpaid interest on such Securities in accordance herewith in the event such Redemption Date is after a record date for the payment of an installment of interest and on or before the related interest payment date);

(vii) the CUSIP number or numbers, as the case may be, of the Securities; and

-41-

(viii) in the case of a redemption of Notes pursuant to **Section 3.01(F)**, whether the redemption is subject to any conditions precedent (it being understood that only redemptions under **Section 3.01(F)** may be subject to any conditions precedent), and if so, that in the event that any or all conditions are not satisfied by the redemption date, the Company will have the discretion to delay the redemption date until such time as any or all the conditions are satisfied, so long as the redemption occurs within 60 days of such notice, or to rescind the notice and cancel the redemption.

At the Company's request, upon 45 days written notice prior to the Redemption Date (or such shorter period that is acceptable to the Trustee), the Trustee shall mail the notice of Redemption in the Company's name and at the Company's expense; *provided*, *however*, that the form and content of such notice shall be prepared by the Company.

3.05 **EFFECT OF NOTICE OF REDEMPTION.**

Once notice of Redemption is mailed, subject to clause (viii) of **Section 3.04**, Securities called for Redemption become due and payable on the Redemption Date at the consideration set forth herein, and, on and after such Redemption Date (unless there shall be a Default in the payment of such consideration), except as otherwise provided herein, such Securities shall cease to bear interest, and all rights of the Holders with respect to such Securities shall terminate, other than the right to receive such consideration upon surrender of such Securities to the Paying Agent (except that, if the Redemption Date is after a record date for the payment of an installment of interest and on or before the related interest payment date, then accrued and unpaid interest on such Securities to, but excluding, such interest payment date will be paid, on such interest payment date, to the Holder(s) of record of such Securities at the close of business on such record date without any requirement to surrender such Securities to the Paying Agent).

If any Security shall not be fully and duly paid in accordance herewith upon Redemption, the principal of, and accrued and unpaid interest on, such Security shall, until paid, bear interest at the rate borne by such Security on the principal amount of such Security.

Notwithstanding anything herein to the contrary, there shall be no purchase of any Securities pursuant to a Redemption if the principal amount of the Securities has been accelerated pursuant to **Section 6.02** and such acceleration shall not have been rescinded on or before the applicable Redemption Date. The Paying Agent will promptly return to the respective Holders thereof any Securities tendered to it for Redemption during the continuance of such an acceleration.

3.06 **DEPOSIT OF REDEMPTION PRICE.**

Prior to 11:00 A.M., New York City time on the Redemption Date, the Company shall deposit with a Paying Agent (or, if the Company is acting as its own Paying Agent, segregate and hold in trust in accordance with **Section 2.04**) money, in funds immediately available on the Redemption Date, sufficient to pay the consideration

-42-

payable as herein provided upon Redemption on all Securities to be redeemed on that date. The Paying Agent shall return to the Company, as soon as practicable, any excess money not required for that purpose.

3.07 SECURITIES REDEEMED IN PART.

Any Security to be submitted for Redemption only in part shall be delivered pursuant to **Section 3.05** (with, if the Company or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly executed by, the Holder thereof or its attorney duly authorized in writing), and the Company shall execute, and the Trustee shall authenticate and make available for delivery to the Holder of such Security without service charge, a new Security or Securities, of any authorized denomination as requested by such Holder, of the same tenor and in aggregate principal amount equal to the portion of such Security not submitted for Redemption.

3.08 REPURCHASE AT OPTION OF HOLDER UPON A FUNDAMENTAL CHANGE.

(A) In the event any Fundamental Change (as defined below) shall occur, each Holder of Securities shall have the right (the "**Fundamental Change Repurchase Right**"), at such Holder's option, to require the Company to repurchase all of such Holder's Securities (or portions thereof that are integral multiples of $1,000 in principal amount, subject to a minimum of $2,000), on a date selected by the Company (the "**Fundamental Change Repurchase Date**"), which Fundamental Change Repurchase Date shall be no later than 35 days, nor earlier than 20 days, after the date the Fundamental Change Notice (as defined below) is mailed in accordance with **Section 3.08(B)**, at a price, payable in cash, equal to 101% of the principal amount of the Securities (or portions thereof) to be so repurchased (the "**Fundamental Change Repurchase Price**"), plus accrued and unpaid interest, if any, to, but excluding, the Fundamental Change Repurchase Date, upon:

(i) delivery to the Company (if it is acting as its own Paying Agent), or to a Paying Agent designated by the Company for such purpose in the Fundamental Change Notice, no later than the close of business on the Business Day immediately preceding the Fundamental Change Repurchase Date, of a Purchase Notice, in the form set forth in the Securities or any other form of written notice substantially similar thereto, in each case, duly completed and signed, with appropriate signature guarantee, stating:

(a) the certificate number(s) of the Securities which the Holder will deliver to be repurchased, if such Securities are in certificated form;

(b) the principal amount of Securities to be repurchased, which must be in a minimum amount of $2,000 or an integral multiple of $1,000 in excess thereof; and

-43-

(c) that such principal amount of Securities are to be repurchased pursuant to the terms and conditions specified in this **Section 3.08**; and

(ii) delivery to the Company (if it is acting as its own Paying Agent), or to a Paying Agent designated by the Company for such purpose in the Fundamental Change Notice, at any time after the delivery of such Purchase Notice, of such Securities (together with all necessary endorsements) with respect to which the Fundamental Change Repurchase Right is being exercised.

If such Securities are held in book-entry form through the Depositary, the Purchase Notice shall comply with applicable procedures of the Depositary.

Notwithstanding anything herein to the contrary, any Holder that has delivered the Purchase Notice contemplated by this **Section 3.08(A)** to the Company (if it is acting as its own Paying Agent) or to a Paying Agent designated by the Company for such purpose in the Fundamental Change Notice shall have the right to withdraw such Purchase Notice by delivery, at any time prior to the close of business on the Business Day immediately preceding the Fundamental Change Repurchase Date, of a written notice of withdrawal to the Company (if acting as its own Paying Agent) or the Paying Agent, which notice shall contain the information specified in **Section 3.08(B)(xi)**.

The Paying Agent shall promptly notify the Company of the receipt by it of any Purchase Notice or written notice of withdrawal thereof.

(B) No later than 15 Business Days after the occurrence of a Fundamental Change, the Company shall mail, or cause to be mailed, to all Holders of record of the Securities at their addresses shown in the register of the Registrar, and to beneficial owners as required by applicable law, a notice (the "**Fundamental Change Notice**") of the occurrence of such Fundamental Change and the Fundamental Change Repurchase Right arising as a result thereof. The Company shall deliver a copy of the Fundamental Change Notice to the Trustee and issue a press release through a national newswire. For the avoidance of doubt, a Fundamental Change Notice may be sent prior to the consummation of the related Fundamental Change and in such case may be made conditional on the consummation of that Fundamental Change.

Each Fundamental Change Notice shall state:

(i) the events causing the Fundamental Change;

(ii) the date of such Fundamental Change;

(iii) the Fundamental Change Repurchase Date;

(iv) the date by which the Fundamental Change Repurchase Right must be exercised;

-44-

(v) the Fundamental Change Repurchase Price plus accrued and unpaid interest, if any, to, but excluding, the Fundamental Change Repurchase Date;

(vi) the name and address of the Paying Agent;

(vii) a description of the procedures which a Holder must follow to exercise the Fundamental Change Repurchase Right;

(viii) that, in order to exercise the Fundamental Change Repurchase Right, the Securities must be surrendered for payment of the Fundamental Change Repurchase Price plus accrued and unpaid interest, if any, payable as herein provided upon Repurchase Upon Fundamental Change;

(ix) that the Fundamental Change Repurchase Price, plus accrued and unpaid interest, if any, to, but excluding, the Fundamental Change Repurchase Date, for any Security as to which a Purchase Notice has been given and not withdrawn will be paid as promptly as practicable, but in no event later than the later of such Fundamental Change Repurchase Date and the time of delivery of the Security (together with all necessary endorsements) as described in **clause (viii)** above; *provided*, *however*, that if such Fundamental Change Repurchase Date is after a record date for the payment of an installment of interest and on or before the related interest payment date, then the accrued and unpaid interest, if any, on such Security to, but excluding, such interest payment date will be paid on such interest payment date to the Holder of record of such Security at the close of business on such record date (without any surrender of such Securities by such Holder), and the Holder surrendering such Security for repurchase will not be entitled to any such accrued and unpaid interest unless such Holder was also the Holder of record of such Security at the close of business on such record date;

(x) that, except as otherwise provided herein, on and after such Fundamental Change Repurchase Date (unless there shall be a Default in the payment of the consideration payable as herein provided upon Repurchase Upon Fundamental Change), interest on Securities subject to Repurchase Upon Fundamental Change will cease to accrue, and all rights of the Holders with respect to such Securities shall terminate, other than the right to receive, in accordance herewith, the consideration payable as herein provided upon Repurchase Upon Fundamental Change;

(xi) that a Holder will be entitled to withdraw its election in the Purchase Notice if the Company (if acting as its own Paying Agent), or the Paying Agent receives, prior to the close of business on the Business Day immediately preceding the Fundamental Change Repurchase Date, or such longer period as may be required by law, a letter or telegram, telex or facsimile transmission (receipt of which is confirmed and promptly followed by a letter) setting forth (I) the name of such Holder, (II) a statement that such Holder is

-45-

withdrawing its election to have Securities purchased by the Company on such Fundamental Change Repurchase Date pursuant to a Repurchase Upon Fundamental Change, (III) the certificate number(s) of such Securities to be so withdrawn, if such Securities are in certificated form, (IV) the principal amount of the Securities of such Holder to be so withdrawn, which amount must be in a minimum amount of $2,000 or an integral multiple of $1,000 in excess thereof and (V) the principal amount, if any, of the Securities of such Holder that remain subject to the Purchase Notice delivered by such Holder in accordance with this **Section 3.08**, which amount must be in a minimum amount of $2,000 or an integral multiple of $1,000 in excess thereof;

(xii) the CUSIP number or numbers, as the case may be, of the Securities; and

(xiii) in the case of a Fundamental Change Notice sent prior to the consummation of a Fundamental Change, that the Fundamental Change Repurchase Right is conditional on the consummation of that Fundamental Change.

At the Company's request, upon reasonable prior notice, the Trustee shall mail such Fundamental Change Notice in the Company's name and at the Company's expense; *provided, however*, that the form and content of such Fundamental Change Notice shall be prepared by the Company.

No failure of the Company to give a Fundamental Change Notice shall limit any Holder's right to exercise a Fundamental Change Repurchase Right.

(C) Subject to the provisions of this **Section 3.08**, the Company shall pay, or cause to be paid, the Fundamental Change Repurchase Price, plus accrued and unpaid interest, if any, to, but excluding, the Fundamental Change Repurchase Date, with respect to each Security as to which the Fundamental Change Repurchase Right shall have been exercised to the Holder thereof as promptly as practicable, but in no event later than the later of the Fundamental Change Repurchase Date and the time such Security (together with all necessary endorsements) is surrendered or transferred, by book-entry, to the Paying Agent; *provided, however*, that if such Fundamental Change Repurchase Date is after a record date for the payment of an installment of interest and on or before the related interest payment date, then the accrued and unpaid interest, if any, on such Security to, but excluding, such interest payment date will be paid on such interest payment date to the Holder of record of such Security at the close of business on such record date, and the Holder surrendering such Security for repurchase will not be entitled to any such accrued and unpaid interest unless such Holder was also the Holder of record of such Security at the close of business on such record date.

(D) Prior to 11:00 A.M., New York City time on a Fundamental Change Repurchase Date, the Company shall deposit with a Paying Agent (or, if the Company is acting as its own Paying Agent, segregate and hold in trust in accordance with **Section 2.04**) money, in funds immediately available on the Fundamental Change Repurchase

-46-

Date, sufficient to pay the consideration payable as herein provided upon Repurchase Upon Fundamental Change for all of the Securities that are to be repurchased by the Company on such Fundamental Change Repurchase Date pursuant to a Repurchase Upon Fundamental Change. The Paying Agent shall return to the Company, as soon as practicable, any excess money not required for that purpose.

(E) Once the Fundamental Change Notice and the Purchase Notice have been duly given in accordance with this **Section 3.08** (and subject to Section 3.08(b)), the Securities to be repurchased pursuant to a Repurchase Upon Fundamental Change shall, on the Fundamental Change Repurchase Date, become due and payable in accordance herewith, and, on and after such date (unless there shall be a Default in the payment of the consideration payable as herein provided upon Repurchase Upon Fundamental Change), except as otherwise herein provided, such Securities shall cease to bear interest, and all rights of the Holders with respect to such Securities shall terminate, other than the right to receive, in accordance herewith, such consideration.

(F) If any Security shall not be paid upon surrender thereof for Repurchase Upon Fundamental Change, the principal of, and accrued and unpaid interest on, such Security shall, until paid, bear interest, payable in cash, at the rate borne by such Security on the principal amount of such Security.

(G) Any Security which is to be submitted for Repurchase Upon Fundamental Change only in part shall be delivered pursuant to this **Section 3.08** (with, if the Company or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly executed by, the Holder thereof or its attorney duly authorized in writing), and the Company shall execute, and the Trustee, upon receipt of a Company Order, shall authenticate and make available for delivery to the Holder of such Security without service charge, a new Security or Securities, of any authorized denomination as requested by such Holder, of the same tenor and in aggregate principal amount equal to the portion of such Security not duly submitted for Repurchase Upon Fundamental Change.

(H) Notwithstanding anything herein to the contrary, there shall be no purchase of any Securities pursuant to this **Section 3.08** if the principal amount of the Securities has been accelerated pursuant to **Section 6.02** and such acceleration shall not have been rescinded on or before the applicable Fundamental Change Repurchase Date. The Paying Agent will promptly return to the respective Holders thereof any Securities tendered to it for Repurchase Upon Fundamental Change during the continuance of such an acceleration.

(I) Notwithstanding anything herein to the contrary, if the option granted to Holders to require the repurchase of the Securities upon the occurrence of a Fundamental Change is determined to constitute a tender offer, the Company shall comply with all applicable tender offer rules under the Exchange Act, including Rule 13e-4 and Regulation 14E thereunder, and with all other applicable laws, and will file a Schedule TO or any other schedules required under the Exchange Act or any other applicable laws.

-47-

(J) As used herein and in the Securities, a "**Fundamental Change**" shall be deemed to have occurred at such time as:

(i) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), other than one or more Permitted Holders, is or becomes the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the total outstanding voting power of all classes of the Company's Capital Stock entitled to vote generally in the election of directors; or

(ii) there occurs a sale, transfer, lease, conveyance or other disposition of all or substantially all of the property or assets of the Company, or of the Company and its Subsidiaries on a consolidated basis, to any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), other than one or more Permitted Holders, including any group acting for the purpose of acquiring, holding, voting or disposing of securities within the meaning of Rule 13d-5(b)(1) under the Exchange Act; or

(iii) the Company consolidates with, or merges with or into, another person or any person consolidates with, or merges with or into, the Company, unless the persons that "beneficially owned" (as such term is used in Rule 13d-3 under the Exchange Act), directly or indirectly, the shares of the Company's Voting Stock immediately prior to such consolidation or merger, "beneficially own," directly or indirectly, immediately after such consolidation or merger, shares of the surviving or continuing corporation's Voting Stock representing at least a majority of the total outstanding voting power of all outstanding classes of the Voting Stock of the surviving or continuing corporation in substantially the same proportion as such ownership immediately prior to such consolidation or merger; or

(iv) the following persons cease for any reason to constitute a majority of the Company's Board of Directors:

(a) individuals who on the Issue Date constituted the Company's Board of Directors; and

(b) any new directors whose election to the Company's Board of Directors or whose nomination for election by the Company's stockholders was approved by at least a majority of the directors of the Company then still in office (or by at least a majority of the members of a duly authorized committee of the directors of the Company then still in office) either who were directors of the Company on the Issue Date or whose election or nomination for election was previously so approved; or

(v) the Company is liquidated or dissolved or there is adopted any plan or proposal for the liquidation or dissolution of the Company; or

-48-

(vi) there occurs a "Change in Control" under (and as defined in) the indenture governing the Company's 2.5% Contingent Convertible Subordinated Notes Due 2033.

3.09 REPURCHASE AT OPTION OF HOLDER UPON AN ASSET SALE.

(A) In the event any Asset Sale shall occur and the Company elects, or is required, pursuant to **Section 4.15**, to make an offer to repurchase Securities pursuant to this **Section 3.09**, each Holder of Securities shall, subject to **Section 3.09(B)**, have the right (the "**Asset Sale Repurchase Right**"), at such Holder's option, to require the Company to repurchase all of such Holder's Securities (or portions thereof that are integral multiples of $1,000 in principal amount, subject to a minimum of $2,000), on a date selected by the Company (the "**Asset Sale Repurchase Date**"), which Asset Sale Repurchase Date shall be no later than 35 days, nor earlier than 20 days, after the date the Asset Sale Notice (as defined below) is mailed in accordance with **Section 3.09(C)**, at a price, payable in cash, equal to 100% of the principal amount of the Securities (or portions thereof) to be so repurchased (the "**Asset Sale Repurchase Price**"), plus accrued and unpaid interest, if any, to, but excluding, the Asset Sale Repurchase Date, upon:

(i) delivery to the Company (if it is acting as its own Paying Agent), or to a Paying Agent designated by the Company for such purpose in the Asset Sale Notice, no later than the close of business on the Business Day immediately preceding the Asset Sale Repurchase Date, of a Purchase Notice, in the form set forth in the Securities or any other form of written notice substantially similar thereto, in each case, duly completed and signed, with appropriate signature guarantee, stating:

(a) the certificate number(s) of the Securities which the Holder will deliver to be repurchased, if such Securities are in certificated form;

(b) the principal amount of Securities to be repurchased, which must be in a minimum amount of $2,000 or an integral multiple of $1,000 in excess thereof; and

(c) that such principal amount of Securities are to be repurchased pursuant to the terms and conditions specified in this **Section 3.09**; and

(ii) delivery to the Company (if it is acting as its own Paying Agent), or to a Paying Agent designated by the Company for such purpose in the Asset Sale Notice, at any time after the delivery of such Purchase Notice, of such Securities (together with all necessary endorsements) with respect to which the Asset Sale Repurchase Right is being exercised.

If such Securities are held in book-entry form through the Depositary, the Purchase Notice shall comply with applicable procedures of the Depositary.

-49-

Notwithstanding anything herein to the contrary, any Holder that has delivered the Purchase Notice contemplated by this **Section 3.09(A)** to the Company (if it is acting as its own Paying Agent) or to a Paying Agent designated by the Company for such purpose in the Asset Sale Notice shall have the right to withdraw such Purchase Notice by delivery, at any time prior to the close of business on the Business Day immediately preceding the Asset Sale Repurchase Date, of a written notice of withdrawal to the Company (if acting as its own Paying Agent) or the Paying Agent, which notice shall contain the information specified in **Section 3.09(C)(xiii)**.

The Paying Agent shall promptly notify the Company of the receipt by it of any Purchase Notice or written notice of withdrawal thereof.

(B) Notwithstanding anything to the contrary herein, in connection with a Repurchase Upon Asset Sale, (1) payment by the Company of the principal amount of Securities to be repurchased pursuant to this **Section 3.09** shall be made by Net Cash Proceeds from one or more Asset Sales in accordance with **Section 4.15**; (2) in no event shall the Company be required to repurchase Securities pursuant to this **Section 3.09** to the extent that the aggregate principal amount of the Securities to be repurchased exceeds an amount (the "**Maximum Dollar Amount for Repurchase Upon Asset Sale**") equal to the greater of (i) the Required Offer Amount and (ii) any greater amount (which shall not exceed the total Net Cash Proceeds of all Asset Sales theretofore effected) elected by Company; and (2) if the aggregate principal amount of all Securities properly tendered for repurchase pursuant to such Repurchase Upon Asset Sale exceeds such Maximum Dollar Amount for Repurchase Upon Asset Sale, then the Trustee will select, from such Securities so tendered, the Securities to be repurchased pursuant to such Repurchase Upon Asset Sale on a pro rata basis, by lot or any other method the Trustee considers fair or appropriate or is required by the Depositary of the Securities, such that the aggregate principal amount of such selected Securities will be as close as possible to, but not exceeding, such Maximum Dollar Amount for Repurchase Upon Asset Sale; *provided*, *however*, that such selection must be made in a minimum amount of $2,000 or an integral multiple of $1,000 in excess thereof.

(C) At any time after the Asset Sale, but no later than 10 Business Days after the Company becomes obligated, pursuant to **Section 4.15**, to make an offer to repurchase Securities pursuant to this **Section 3.09**, the Company shall mail, or cause to be mailed, to all Holders of record of the Securities at their addresses shown in the register of the Registrar, and to beneficial owners as required by applicable law, a notice (the "**Asset Sale Notice**") of the occurrence of the applicable Asset Sale and the Asset Sale Repurchase Right arising as a result thereof. The Company shall contemporaneously deliver a copy of the Asset Sale Notice to the Trustee and issue a press release through a national newswire.

Each Asset Sale Notice for a Repurchase Upon Asset Sale shall state:

(i) the events causing the Asset Sale;

(ii) the date of such Asset Sale;

-50-

(iii) the Asset Sale Repurchase Date;

(iv) the date by which the Asset Sale Repurchase Right must be exercised;

(v) the Asset Sale Repurchase Price plus accrued and unpaid interest, if any, to, but excluding, the Asset Sale Repurchase Date;

(vi) the applicable Maximum Dollar Amount for Repurchase Upon Asset Sale;

(vii) that if the aggregate principal amount of all Securities properly tendered for repurchase pursuant to such Repurchase Upon Asset sale exceeds such Maximum Dollar Amount for Repurchase Upon Asset Sale, then the Trustee will select, from such Securities so tendered, the Securities to be repurchased pursuant to such Repurchase Upon Asset Sale on a pro rata basis, by lot or any other method the Trustee considers fair or appropriate or is required by the Depositary of the Securities, such that the aggregate principal amount of such selected Securities will be as close as possible to, but not exceeding, such Maximum Dollar Amount for Repurchase Upon Asset Sale; *provided*, *however*, that such selection must be made in a minimum amount of $2,000 or an integral multiple of $1,000 in excess thereof;

(viii) the name and address of the Paying Agent;

(ix) a description of the procedures which a Holder must follow to exercise the Asset Sale Repurchase Right;

(x) that, in order to exercise the Asset Sale Repurchase Right, the Securities must be surrendered for payment of the Asset Sale Repurchase Price plus accrued and unpaid interest, if any, payable as herein provided upon Repurchase Upon Asset Sale;

(xi) that, subject to **Section 3.09(B)**, the Asset Sale Repurchase Price, plus accrued and unpaid interest, if any, to, but excluding, the Asset Sale Repurchase Date, for any Security as to which a Purchase Notice has been given and not withdrawn will be paid as promptly as practicable, but in no event later than the later of such Asset Sale Repurchase Date and the time of delivery of the Security (together with all necessary endorsements) as described in **Section 3.09(C)(x)** above;

(xii) that, except as otherwise provided herein, on and after such Asset Sale Repurchase Date (unless there shall be a Default in the payment of the consideration payable as herein provided upon Repurchase Upon Asset Sale), interest on Securities subject to Repurchase Upon Asset Sale will cease to accrue, and all rights of the Holders with respect to such Securities shall terminate, other than the right to receive, in accordance herewith, the consideration payable as herein provided upon Repurchase Upon Asset Sale;

-51-

(xiii) that a Holder will be entitled to withdraw its election in the Purchase Notice if the Company (if acting as its own Paying Agent), or the Paying Agent receives, prior to the close of business on the Business Day immediately preceding the Asset Sale Repurchase Date, or such longer period as may be required by law, a letter or telegram, telex or facsimile transmission (receipt of which is confirmed and promptly followed by a letter) setting forth (I) the name of such Holder, (II) a statement that such Holder is withdrawing its election to have Securities purchased by the Company on such Asset Sale Repurchase Date pursuant to a Repurchase Upon Asset Sale, (III) the certificate number(s) of such Securities to be so withdrawn, if such Securities are in certificated form, (IV) the principal amount of the Securities of such Holder to be so withdrawn, which amount must be in a minimum amount of $2,000 or an integral multiple of $1,000 in excess thereof and (V) the principal amount, if any, of the Securities of such Holder that remain subject to the Purchase Notice delivered by such Holder in accordance with this **Section 3.09**, which amount must be in a minimum amount of $2,000 or an integral multiple of $1,000 in excess thereof; and

(xiv) the CUSIP number or numbers, as the case may be, of the Securities.

At the Company's request, upon reasonable prior notice, the Trustee shall mail such Asset Sale Notice in the Company's name and at the Company's expense; *provided, however*, that the form and content of such Asset Sale Notice shall be prepared by the Company.

No failure of the Company to give an Asset Sale Notice shall limit any Holder's right to exercise an Asset Sale Repurchase Right.

(D) Subject to the provisions of this **Section 3.09** (including, without limitation, **Section 3.09(B)**), the Company shall pay, or cause to be paid, the Asset Sale Repurchase Price, plus accrued and unpaid interest, if any, to, but excluding, the Asset Sale Repurchase Date, with respect to each Security as to which the Asset Sale Repurchase Right shall have been exercised to the Holder thereof as promptly as practicable, but in no event later than the later of the Asset Sale Repurchase Date and the time such Security (together with all necessary endorsements) is surrendered or transferred, by book-entry, to the Paying Agent; *provided*, *however*, that if such Asset Sale Repurchase Date is after a record date for the payment of an installment of interest and on or before the related interest payment date, then the accrued and unpaid interest, if any, on such Security to, but excluding, such interest payment date will be paid on such interest payment date to the Holder of record of such Security at the close of business on such record date, and the Holder surrendering such Security for repurchase will not be entitled to any such accrued and unpaid interest unless such Holder was also the Holder of record of such Security at the close of business on such record date.

(E) Subject to **Section 3.09(B)**, prior to 11:00 A.M., New York City time on an Asset Sale Repurchase Date, the Company shall deposit with a Paying Agent (or, if the

-52-

Company is acting as its own Paying Agent, segregate and hold in trust in accordance with **Section 2.04**) money, in funds immediately available on the Asset Sale Repurchase Date, sufficient to pay the consideration payable as herein provided upon Repurchase Upon Asset Sale for all of the Securities that are to be repurchased by the Company on such Asset Sale Repurchase Date pursuant to a Repurchase Upon Asset Sale. The Paying Agent shall return to the Company, as soon as practicable, any excess money not required for that purpose.

(F) Once the Asset Sale Notice and the Purchase Notice have been duly given in accordance with this **Section 3.09**, the Securities to be repurchased pursuant to a Repurchase Upon Asset Sale shall, on the Asset Sale Repurchase Date, become due and payable in accordance herewith, and, on and after such date (unless there shall be a Default in the payment of the consideration payable as herein provided upon Repurchase Upon Asset Sale), except as otherwise herein provided, such Securities shall cease to bear interest, and all rights of the Holders with respect to such Securities shall terminate, other than the right to receive, in accordance herewith, such consideration.

(G) If any Security shall not be paid upon surrender thereof for Repurchase Upon Asset Sale, the principal of, and accrued and unpaid interest on, such Security shall, until paid, bear interest, payable in cash, at the rate borne by such Security on the principal amount of such Security.

(H) Any Security which is to be submitted for Repurchase Upon Asset Sale only in part shall be delivered pursuant to this **Section 3.09** (with, if the Company or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company and the Trustee duly executed by, the Holder thereof or its attorney duly authorized in writing), and the Company shall execute, and the Trustee shall authenticate and make available for delivery to the Holder of such Security without service charge, a new Security or Securities, of any authorized denomination as requested by such Holder, of the same tenor and in aggregate principal amount equal to the portion of such Security not duly submitted for Repurchase Upon Asset Sale.

(I) Notwithstanding anything herein to the contrary, there shall be no purchase of any Securities pursuant to this **Section 3.09** if the principal amount of the Securities has been accelerated pursuant to **Section 6.02** and such acceleration shall not have been rescinded on or before the applicable Asset Sale Repurchase Date. The Paying Agent will promptly return to the respective Holders thereof any Securities tendered to it for Repurchase Upon Asset Sale during the continuance of such an acceleration.

(J) Notwithstanding anything herein to the contrary, if the option granted to Holders to require the repurchase of the Securities upon the occurrence of an Asset Sale is determined to constitute a tender offer, the Company shall comply with all applicable tender offer rules under the Exchange Act, including Rule 13e-4 and Regulation 14E thereunder, and with all other applicable laws, and will file a Schedule TO or any other schedules required under the Exchange Act or any other applicable laws.

agent, and in connection therewith shall cause such instruments to be filed and recorded in such jurisdictions and take such other actions as may be required by applicable law to perfect or continue the perfection of the Lien created under the Collateral Documents on the Collateral owned by or transferred to such Person;

(B) immediately after giving effect to such transaction or series of transactions, no Default or Event of Default shall exist; and

(C) the Company or the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, transfer, lease, conveyance or disposition is made would, on the date of such transaction or series of transactions, after giving pro forma effect thereto and any related financing transactions as if the same had occurred at the beginning of the applicable Four Quarter Period, be permitted to incur at least one dollar of additional Indebtedness (other than Permitted Indebtedness) in compliance with the proviso to **Section 4.13(A)**.

The Company shall deliver to the Trustee prior to the consummation of the proposed transaction an Officers' Certificate to the foregoing effect and an Opinion of Counsel (which may rely upon such Officers' Certificate as to the absence of Defaults and Events of Default) stating that the proposed transaction and such supplemental indenture will, upon consummation of the proposed transaction, comply with this Indenture.

Notwithstanding anything herein to the contrary, the foregoing requirements shall not apply to any transaction or series of transactions involving the sale, transfer, lease, conveyance or disposition of any properties or assets by any Subsidiary to any Guarantor, or the consolidation or merger of any Subsidiary with or into any other Guarantor or the Company.

5.02 SUCCESSOR SUBSTITUTED.

Upon any consolidation, merger or any sale, transfer, lease, conveyance or other disposition of all or substantially all of the property or assets of the Company, or of the Company and its Subsidiaries on a consolidated basis, the successor person formed by such consolidation or into which the Company is merged or to which such sale, transfer, lease, conveyance or other disposition is made shall succeed to, and, except in the case of a lease, be substituted for, and may exercise every right and power of, and shall assume every duty and obligation of, the Company under this Indenture with the same effect as if such successor had been named as the Company herein. When the successor assumes all obligations of the Company hereunder, except in the case of a lease, all obligations of the predecessor shall terminate.

VI. **DEFAULTS AND REMEDIES**

6.01 EVENTS OF DEFAULT.

An "**Event of Default**" occurs if:

-71-

(i) the Company fails to pay the principal of, or premium, if any, on, any Security when the same becomes due and payable, whether at maturity, upon Redemption, on a Fundamental Change Repurchase Date with respect to a Repurchase Upon Fundamental Change, on an Asset Sale Repurchase Date with respect to a Repurchase Upon Asset Sale or otherwise;

(ii) the Company fails to pay an installment of interest (including Special Interest required by **Section 4.22**, if any) on any Security when due, if such failure continues for 30 days after the date when due;

(iii) the Company fails to timely provide a Fundamental Change Notice or Asset Sale Notice, as required by the provisions of this Indenture, if such failure continues for 30 days;

(iv) the Company or any Guarantor fails to comply with any other term, covenant or agreement set forth in the Securities or this Indenture (other than pursuant to **Section 4.22**) and such failure continues for the period, and after the notice, specified in the last paragraph of this **Section 6.01**;

(v) the Company or any of its Subsidiaries defaults in the payment when due, after the expiration of any applicable grace period, of principal of, or premium, if any, on Indebtedness for money borrowed, in the aggregate principal amount then outstanding of $5,000,000 or more, or the acceleration of Indebtedness of the Company or any of its Subsidiaries for money borrowed in such aggregate principal amount or more so that it becomes due and payable prior to the date on which it would otherwise become due and payable and such default is not cured or waived, or such acceleration is not rescinded, within 30 days after notice to the Company by the Trustee or to the Company and the Trustee by Holders of at least 25% in aggregate principal amount of the Securities then outstanding, each in accordance with this Indenture;

(vi) the Company or any of its Subsidiaries fails to pay final judgments, the aggregate uninsured portion of which is at least $5,000,000, and such judgments are not paid or discharged within 60 days;

(vii) any Lien or security interest created by any Collateral Document with respect to Collateral in excess of $5,000,000 ceases to be in full force and effect (except (i) as permitted by the terms of this Indenture or the Collateral Documents or (ii) as a result of the release of a Guarantor or the sale or other disposition of the applicable Collateral in a transaction permitted hereunder or under the Collateral Documents);

(viii) except as permitted by this Indenture, any Subsidiary Guarantee of a Significant Subsidiary shall be held in any final, non-appealable judicial proceeding to be unenforceable or invalid or shall cease for any reason to be in full force and effect or any Guarantor that is a Significant Subsidiary, or

-72-

any Person acting on behalf of any Guarantor that is a Significant Subsidiary, shall deny or disaffirm its obligations under its Subsidiary Guarantee;

(ix) the Company or any of its Significant Subsidiaries or any group of the Company's Subsidiaries that in the aggregate would constitute a Significant Subsidiary of the Company, pursuant to, or within the meaning of, any Bankruptcy Law, insolvency law, or other similar law now or hereafter in effect or otherwise, either:

(A) commences a voluntary case,

(B) consents to the entry of an order for relief against it in an involuntary case,

(C) consents to the appointment of a Custodian of it or for all or substantially all of its property, or

(D) makes a general assignment for the benefit of its creditors; or

(x) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(A) is for relief against the Company or any of its Significant Subsidiaries or any group of the Company's Subsidiaries that in the aggregate would constitute a Significant Subsidiary of the Company in an involuntary case or proceeding, or adjudicates the Company or any of its Significant Subsidiaries or any group of the Company's Subsidiaries that in the aggregate would constitute a Significant Subsidiary of the Company insolvent or bankrupt,

(B) appoints a Custodian of the Company or any of its Significant Subsidiaries or any group of the Company's Subsidiaries that in the aggregate would constitute a Significant Subsidiary of the Company for all or substantially all of the property of the Company or any such Significant Subsidiary or any group of the Company's Subsidiaries that in the aggregate would constitute a Significant Subsidiary of the Company, as the case may be, or

(C) orders the winding up or liquidation of the Company or any of its Significant Subsidiaries or any group of the Company's Subsidiaries that in the aggregate would constitute a Significant Subsidiary of the Company,

and, in the case of each of the foregoing clauses (A), (B) and (C) of this **Section 6.01(x)**, the order or decree remains unstayed and in effect for at least 90 consecutive days; or

-73-

(xi) the Company defaults under a material provision of the Makena Agreement and the default would, with the giving of notice or the passage of time, give the counterparty to the Makena Agreement the right to foreclose upon any assets securing the Company's obligations under the Makena Agreement, and such default continues for a period of 30 days without being cured or waived.

The term "**Bankruptcy Law**" means Title 11, U.S. Code or any similar Federal or State law for the relief of debtors. The term "**Custodian**" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

A Default under **clause (iv)** above is not an Event of Default until (I) the Trustee notifies the Company, or the Holders of at least 25% in aggregate principal amount of the Securities then outstanding notify the Company and the Trustee, of the Default and (II) the Default is not cured within 60 days after receipt of such notice. Such notice must specify the Default, demand that it be remedied and state that the notice is a "**Notice of Default**." If the Holders of at least 25% in aggregate principal amount of the outstanding Securities request the Trustee to give such notice on their behalf, the Trustee shall do so. When a Default is cured, it ceases. For the avoidance of doubt, no failure of the Company or any Restricted Subsidiary to comply with the terms of **Section 4.22** may result in a Default or Event of Default, other than upon the failure to pay any Special Interest required thereby.

6.02 **ACCELERATION.**

If an Event of Default (excluding an Event of Default specified in **Section 6.01(ix)** or **(x)** with respect to the Company (but including an Event of Default specified in **Section 6.01(ix)** or **(x)** solely with respect to a Significant Subsidiary of the Company or any group of the Company's Subsidiaries that in the aggregate would constitute a Significant Subsidiary of the Company)) occurs and is continuing, the Trustee by written notice to the Company, or the Holders of at least 25% in aggregate principal amount of the Securities then outstanding by written notice to the Company and the Trustee, may declare the Securities to be immediately due and payable in full. Upon such declaration, the principal of, and any accrued and unpaid interest on, all Securities shall be due and payable immediately. If an Event of Default specified in **Section 6.01(ix)** or **(x)** with respect to the Company (excluding, for purposes of this sentence, an Event of Default specified in **Section 6.01(ix)** or **(x)** solely with respect to a Significant Subsidiary of the Company or any group of the Company's Subsidiaries that in the aggregate would constitute a Significant Subsidiary of the Company) occurs, the principal of, and accrued and unpaid interest on, all the Securities shall *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder. The Holders of a majority in aggregate principal amount of the Securities then outstanding by written notice to the Trustee may rescind or annul an acceleration and its consequences if (A) the rescission would not conflict with any order or decree, (B) all existing Events of Default, except the nonpayment of principal or interest that has become due solely because of the acceleration, have been cured or waived and (C) all amounts due to the Trustee under **Section 7.07** have been paid.

-74-

6.03 OTHER REMEDIES.

Notwithstanding anything herein to the contrary, if an Event of Default occurs and is continuing, the Trustee may pursue any available remedy by proceeding at law or in equity to collect the payment of amounts due with respect to the Securities or to enforce the performance of any provision of the Securities or this Indenture and may also direct the Collateral Agent to pursue any available remedy or exercise any rights the Collateral Agent has pursuant to the Pledge and Security Agreement, other Collateral Documents or applicable law.

The Trustee may maintain a proceeding even if it does not possess any of the Securities or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative.

6.04 WAIVER OF PAST DEFAULTS.

Subject to **Sections 6.07** and **11.02**, the Holders of a majority in aggregate principal amount of the Securities then outstanding may, by notice to the Trustee, waive any Default or Event of Default and its consequences, other than (A) a Default or Event of Default in the payment of the principal of, or premium, if any, or interest on, any Security, or in the payment of the Redemption Price, the Fundamental Change Repurchase Price or the Asset Sale Repurchase Price (or accrued and unpaid interest, if any, payable as herein provided, upon Redemption, Repurchase Upon Fundamental Change or Repurchase Upon Asset Sale) or (B) any Default or Event of Default in respect of any provision of this Indenture or the Securities which, under **Section 11.02**, cannot be modified or amended without the consent of the Holder of each outstanding Security affected. When a Default or an Event of Default is waived, it is cured and ceases. This **Section 6.04** shall be in lieu of TIA § 316(a)(1)(B), and, as permitted by the TIA, TIA § 316(a)(1)(B) is hereby expressly excluded from this Indenture.

6.05 CONTROL BY MAJORITY.

The Holders of a majority in aggregate principal amount of the Securities then outstanding may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on it. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, is unduly prejudicial to the rights of other Holders or would involve the Trustee in personal liability unless the Trustee is offered indemnity or security satisfactory to it; *provided*, that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction. This **Section 6.05** shall be in lieu of TIA § 316(a)(1)(A), and, as permitted by the TIA, TIA § 316(a)(1)(A) is hereby expressly excluded from this Indenture.

-75-

6.06 LIMITATION ON SUITS.

Except as provided in **Section 6.07**, a Securityholder may not institute any proceeding under this Indenture, or for the appointment of a receiver or a trustee, or for any other remedy under this Indenture unless:

(i) the Holder gives to the Trustee written notice of a continuing Event of Default;

(ii) the Holders of at least 25% in aggregate principal amount of the Securities then outstanding make a written request to the Trustee to pursue the remedy;

(iii) such Holder or Holders offer and, if requested, provide to the Trustee indemnity satisfactory to the Trustee against any loss, liability or expense;

(iv) the Trustee does not comply with the request within 60 days after receipt of such notice, request and offer of indemnity; and

(v) during such 60 day period, the Holders of a majority in aggregate principal amount of the Securities then outstanding do not give the Trustee a direction inconsistent with the request.

A Securityholder may not use this Indenture to prejudice the rights of another Securityholder or to obtain a preference or priority over another Securityholder.

6.07 RIGHTS OF HOLDERS TO RECEIVE PAYMENT.

Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of all amounts due with respect to the Securities, on or after the respective due dates as provided herein, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of the Holder.

6.08 COLLECTION SUIT BY TRUSTEE.

If an Event of Default specified in **Section 6.01(i)** or **(ii)** occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Company for the whole amount due with respect to the Securities, including any unpaid and accrued interest.

6.09 TRUSTEE MAY FILE PROOFS OF CLAIM.

The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee, any predecessor Trustee and the Securityholders allowed in any judicial proceedings relative to the Company or its creditors or properties.

-76-

The Trustee may collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same, and any custodian, receiver, assignee, trustee, liquidator, sequestrator or similar official in any judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents, advisors and counsel, and any other amounts due the Trustee under **Section 7.07**.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Securities or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

6.10 **PRIORITIES.**

If the Trustee collects any money pursuant to this **Article VI**, it shall pay out the money or other property in the following order:

First:                  to the Trustee for amounts due under **Section 7.07** and the Collateral Agent pursuant to the Collateral Documents;

Second:             to Securityholders for all amounts due and unpaid on the Securities, without preference or priority of any kind, according to the amounts due and payable on the Securities; and

Third:               to the Company.

The Trustee, upon prior written notice to the Company, may fix a record date and payment date for any payment by it to Securityholders pursuant to this **Section 6.10**. At least 15 days before each such record date, the Trustee shall mail to each Holder and the Company a written notice that states such record date and payment date and the amount of such payment.

6.11 **UNDERTAKING FOR COSTS.**

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit other than the Trustee of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This **Section 6.11** does not apply to a suit by the Trustee, a suit by a Holder pursuant to **Section 6.07** or a suit by Holders of more than 10% in aggregate principal amount of the outstanding Securities.

-77-

## VII. **TRUSTEE**

7.01 **DUTIES OF TRUSTEE.**

(A) If an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs.

(B) Except during the continuance of an Event of Default:

(i) the Trustee need perform only those duties that are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii) in the absence of bad faith, willful misconduct or negligence on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(C) The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i) the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts;

(ii) the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to **Section 6.05** or any direction provided by the Company in accordance with the terms of the Indenture; and

(iii) this paragraph does not limit the effect of **Section 7.01(B)**.

(D) Every provision of this Indenture that in any way relates to the Trustee is subject to the provisions of this **Section 7.01**.

(E) The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

7.02 **RIGHTS OF TRUSTEE.**

(A) Subject to **Section 7.01**, the Trustee may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper person. The Trustee need not investigate any fact or matter stated in the document; if, however, the Trustee shall determine to make such further inquiry or investigation, it shall be entitled during normal business hours to examine the relevant books, records and premises of the Company, personally or by agent or attorney upon reasonable prior notice.

(B) Before the Trustee acts or refrains from acting, it may require an Officers' Certificate and/or an Opinion of Counsel. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel.

(C) Any request or direction of the Company mentioned herein shall be sufficiently evidenced by a Company Request or Company Order, and any resolution of the Board of Directors shall be sufficiently evidenced by a Board Resolution.

(D) The Trustee may consult with counsel, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(E) The Trustee may act through agents or attorneys and shall not be responsible for the misconduct or negligence of any agent or attorney appointed with due care.

(F) The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its discretion, rights or powers conferred upon it by this Indenture.

(G) The Trustee shall have no duty to inquire as to the performance of the Company with respect to the covenants contained in **Article IV**. In addition, the Trustee shall not be deemed to have knowledge of a Default or an Event of Default except (I) any Default or Event of Default occurring pursuant to **Sections 6.01(i)** or **(ii)** or (II) any Default or Event of Default of which a Responsible Officer of the Trustee shall have received written notification or obtained actual knowledge. Delivery of reports, information and documents to the Trustee under **Article IV** (other than **Sections 4.04** and **4.07**) is for informational purposes only and the Trustee's receipt of the foregoing shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely on Officers' Certificates).

(H) The Trustee shall be under no obligation to exercise any of the rights or powers vested by this Indenture at the request or direction of any of the Holders pursuant to this Indenture unless such Holders shall have offered to the Trustee security or

-79-

indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

(I) The rights, privileges, protections, immunities and benefits given to the Trustee, including without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(J) The Trustee may request that the Company deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(K) Any permissive right of the Trustee to take or refrain from taking actions enumerated in this Indenture shall not be construed as a duty.

(L) The Trustee shall not be responsible for delays or failures in performance resulting from acts beyond its control.

(M) No provision of this Indenture or any Collateral Document shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or under any Collateral Document or to take or omit to take any action under this Indenture or under any Collateral Document or take any action at the request or direction of Holders if it shall have reasonable grounds for believing that repayment of such funds is not assured to it.

(N) Notwithstanding anything contained herein to the contrary, neither the Trustee nor the Registrar shall be responsible for ascertaining whether any transfer, exchange, redemption or repurchase complies with the registration provisions of or exemptions from the Securities Act, Exchange Act, applicable state securities laws or other applicable law.

(O) To the extent not inconsistent herewith, the rights, protections, immunities and indemnities afforded to the Trustee pursuant to this Indenture also shall be afforded to the Collateral Agent acting pursuant to the Collateral Documents.

7.03 INDIVIDUAL RIGHTS OF TRUSTEE.

The Trustee in its individual or any other capacity may become the owner or pledgee of Securities and may otherwise deal with the Company or any of its Affiliates with the same rights the Trustee would have if it were not Trustee. Any Securities Agent may do the same with like rights. The Trustee, however, must comply with **Sections 7.10** and **7.11**.

-80-

7.04 TRUSTEE'S DISCLAIMER.

The Trustee makes no representation as to the validity or adequacy of this Indenture, the Collateral Documents or the Securities; the Trustee shall not be accountable for the Company's use of the proceeds from the Securities; and the Trustee shall not be responsible for any statement in the Securities other than its certificate of authentication.

7.05 NOTICE OF DEFAULTS.

If a Default or Event of Default occurs and is continuing as to which the Trustee has received notice pursuant to the provisions of this Indenture, or as to which a Responsible Officer of the Trustee shall have actual knowledge, then the Trustee shall mail to each Holder a notice of the Default or Event of Default within 90 days after the Trustee has received notice or has actual knowledge thereof unless such Default or Event of Default has been cured or waived; *provided*, *however*, that, except in the case of a Default or Event of Default in payment of any amounts due with respect to any Security, the Trustee may withhold such notice if, and so long as it in good faith determines that, withholding such notice is in the interests of Holders.

7.06 REPORTS BY TRUSTEE TO HOLDERS.

Within 60 days after each March 15, beginning with March 15, 2012, the Trustee shall mail to each Securityholder if required by TIA § 313(a) a brief report dated as of such May 15 that complies with TIA § 313(c). In such event, the Trustee also shall comply with TIA § 313(b).

A copy of each report at the time of its mailing to Securityholders shall be mailed by first class mail to the Company and filed by the Trustee with the SEC and each stock exchange, if any, on which the Securities are listed. The Company shall promptly notify the Trustee of the listing or delisting of the Securities on or from any stock exchange.

7.07 COMPENSATION AND INDEMNITY.

The Company shall pay to the Trustee from time to time such compensation for its services as shall be agreed upon in writing. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Company shall reimburse the Trustee upon request for all reasonable out-of-pocket expenses incurred by it. Such expenses shall include the reasonable compensation and out-of-pocket expenses of the Trustee's agents, advisors and counsel.

The Company shall indemnify the Trustee against any and all loss, liability, damage, claim or expense (including the reasonable fees and expenses of counsel and taxes other than those based upon the income of the Trustee) incurred by it in connection with the acceptance or administration of this trust and the performance of its duties hereunder, including the reasonable costs and expenses of defending itself against any claim (whether asserted by the Company, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers and duties hereunder.

-81-

The Company need not pay for any settlement made without its consent (such consent not to be unreasonably withheld). The Trustee shall notify the Company promptly of any claim for which it may seek indemnification; *provided* that failure to provide any such notice shall not limit the Company's obligations under this **Section 7.07**. The Company need not reimburse any expense or indemnify against any loss or liability incurred by the Trustee through the Trustee's negligence, bad faith or willful misconduct.

To secure the Company's payment obligations in this **Section 7.07**, the Trustee shall have a lien prior to the Securities on all money or property held or collected by the Trustee, except that held in trust to pay amounts due on particular Securities.

The Company shall pay all amounts owing to the Trustee (including in its capacity as Collateral Agent) pursuant to the Collateral Documents.

The obligations of the Company with respect to the Trustee provided for in this **Section 7.07** shall survive any resignation or removal of the Trustee and the termination of this Indenture.

When the Trustee incurs expenses or renders services after an Event of Default specified in **Section 6.01(ix)** or **(x)** occurs, the expenses and the compensation for the services are intended to constitute expenses of administration under any Bankruptcy Law.

7.08 **REPLACEMENT OF TRUSTEE.**

A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this **Section 7.08**.

The Trustee may resign by so notifying the Company in writing 30 Business Days prior to such resignation. The Holders of a majority in aggregate principal amount of the Securities then outstanding may remove the Trustee by so notifying the Trustee and the Company in writing and may appoint a successor Trustee with the Company's consent. The Company may remove the Trustee if:

(i) the Trustee fails to comply with **Section 7.10**;

(ii) the Trustee is adjudged a bankrupt or an insolvent;

(iii) a receiver or other public officer takes charge of the Trustee or its property; or

(iv) the Trustee becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company shall promptly appoint a successor Trustee.

If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee (at the Company's expense), the Company or

-82-

the Holders of at least 10% in aggregate principal amount of the outstanding Securities may petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee fails to comply with **Section 7.10**, the Company or any Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company. Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its succession to Securityholders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in **Section 7.07**.

### 7.09 SUCCESSOR TRUSTEE BY MERGER, ETC.

If the Trustee consolidates with, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Trustee, if such successor corporation is otherwise eligible hereunder.

### 7.10 ELIGIBILITY; DISQUALIFICATION.

There shall at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof, which Trustee (A) is authorized under such laws to exercise corporate trustee power, (B) is subject to supervision or examination by federal or state authorities and (C) has a combined capital and surplus of at least $100,000,000 as set forth in its most recent published annual report of condition. The Trustee shall comply with TIA § 310(b). Nothing in this Indenture shall prevent the Trustee from filing with the SEC the application referred to in the penultimate paragraph of TIA § 310(b).

### 7.11 PREFERENTIAL COLLECTION OF CLAIMS AGAINST COMPANY.

The Trustee shall comply with TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b). A Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated.

VIII. <b>SUBSIDIARY GUARANTEES</b>

### 8.01 SUBSIDIARY GUARANTEES.

(A) The Securities shall be guaranteed by each of the Guarantors (each such guarantee, a "**Subsidiary Guarantee**") in accordance with the provisions of this **Article VIII**.

-83-

**EXHIBIT C**

===============================================================================

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

-----------------------------------

FORM 8-K

CURRENT REPORT

PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

Commission File Number 1-9601

Date of Report (date of earliest event reported): January 11, 2005


K-V PHARMACEUTICAL COMPANY
(Exact name of registrant as specified in its charter)

DELAWARE                                        43-0618919
(State or other jurisdiction of        (I.R.S. Employer Identification No.)
 incorporation or organization)

2503 SOUTH HANLEY ROAD
ST. LOUIS, MISSOURI                               63144
(Address of principal executive offices)        (Zip Code)


(314) 645-6600
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of
the following provisions:

/ / Written communications pursuant to Rule 425 under the Securities Act.
/ / Soliciting material pursuant to Rule 14a-12 under the Exchange Act.
/ / Pre-commencement communications pursuant to Rule 14d-2(b) under the
    Exchange Act.
/ / Pre-commencement communications pursuant to Rule 13e-4(c) under the
    Exchange Act.

===============================================================================



ITEM 1.01          ENTRY INTO A MATERIAL DEFINITIVE AGREEMENT

        On January 11, 2005, K-V Pharmaceutical Company (the
"Company") and certain of its subsidiaries, entered into an amendment (the
"Amendment") to their Loan Agreement, dated as of June 18, 1997, as amended
(the "Loan Agreement"), with Lasalle Bank National Association ("LaSalle").
The Amendment, which was deemed effective as of December 20, 2004, extended
the maturity date of the credit commitment under the Loan Agreement from
December 20, 2004 to December 20, 2005, and increased the amount of the
supplemental credit commitment for acquisitions under the Loan Agreement
from $25 million to $30 million.

On January 11, 2005, the Company and certain of its
subsidiaries also entered into an amendment and restatement of the Loan
Agreement (the "Amendment and Restatement"), deemed effective as of December
31, 2004, with LaSalle and Citibank, F.S.B. ("Citibank"). The Amendment and
Restatement (1) increased the amount of the supplemental credit commitment
for acquisitions under the Loan Agreement from $30 million to $60 million,
(2) increased the amount of the revolving credit commitment under the Loan
Agreement from $40 million to $80 million, and (3) added Citibank as an
additional lender.


        The foregoing summary is qualified in its entirety by the
Amendment and the Amendment and Restatement, copies of which are filed as
Exhibits 10.1 and 10.2, respectively, to this report.

ITEM 9.01          FINANCIAL STATEMENTS AND EXHIBITS

(c)  Exhibits

            10.1    Tenth Amendment to Loan Agreement, dated as of
                    December 20, 2004 by and among Lasalle Bank
                    National Association and K-V Pharmaceutical
                    Company (and its subsidiaries).

            10.2    Amended and Restated Loan Agreement, dated as of
                    December 31, 2004 by and among K-V Pharmaceutical
                    Company (and its subsidiaries) and Lasalle Bank
                    National Association and Citibank, F.S.B.


                    *    *    *


                        -2-



                    SIGNATURES


        Pursuant to the requirements of the Securities Exchange
Act of 1934, the Registrant has duly caused this report to be signed on its
behalf by the undersigned hereunto duly authorized.


Dated: January 18, 2005


                        K-V PHARMACEUTICAL COMPANY


                        By:   /s/ GERALD R. MITCHELL
                              ------------------------------
                            Gerald R. Mitchell
                            Vice President and
                            Chief Financial Officer



                        -3-

- ----------------------------------------------------------------------------

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended March 31, 2006
Commission file number 1-9601

K-V PHARMACEUTICAL COMPANY
(Exact name of registrant as specified in its charter)
2503 South Hanley Road
St. Louis, Missouri 63144
(314) 645-6600

DELAWARE                                43-0618919
(State of Incorporation)          (IRS Employer Identification No.)

Securities Registered Pursuant to Section 12(b) of the Act:
Class A Common Stock, par value $.01 per share      New York Stock Exchange
Class B Common Stock, par value $.01 per share      New York Stock Exchange

Securities Registered Pursuant to Section 12(g) of the Act:
7% Cumulative Convertible Preferred, par value $.01 per share

Indicate by check mark whether the registrant is a well-known seasoned issuer,
as defined in Rule 405 of the Securities Act. Yes [ X ] No [   ]

Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act
of 1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to
such filing requirements for the past 90 days. Yes [ X ] No [  ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item
405 of Regulation S-K is not contained herein, and will not be contained, to
the best of registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K or any
amendment to this Form 10-K. [  ]

Indicate by check mark whether the registrant is a large accelerated filer,
an accelerated filer, or a non-accelerated filer (as defined in Rule 12b-2
of the Act).
Large accelerated filer [ ] Accelerated filer [X] Non-accelerated filer [ ]

Indicate by check mark whether the registrant is a shell company (as defined
in Rule 12b-2 of the Act). Yes [   ] No [ X ]

The aggregate market value of the shares of Class A and Class B Common Stock
held by non-affiliates of the registrant as of September 30, 2005, the last
business day of the registrant's most recently completed second fiscal
quarter, was $548,161,941 and $89,557,184, respectively. As of June 8,
2006, the registrant had outstanding 36,974,977 and 12,524,759 shares of
Class A and Class B Common Stock, respectively, exclusive of treasury shares.

ITEM 1.    BUSINESS
           --------

(a)    GENERAL DEVELOPMENT OF BUSINESS
       -------------------------------

       Unless the context otherwise indicates, when we use the words "we,"
       "our," "us," "our company" or "KV" we are referring to K-V
       Pharmaceutical Company and its wholly-owned subsidiaries, including
       Ther-Rx Corporation, ETHEX Corporation and Particle Dynamics, Inc.

       We were incorporated under the laws of Delaware in 1971 as a
       successor to a business originally founded in 1942. Victor M.
       Hermelin, our Chairman and founder, invented and obtained initial
       patents for early controlled release and enteric coating which
       became part of our core business and a platform for future drug
       delivery emphasis.

       We develop advanced drug delivery technologies which enhance the
       effectiveness of new therapeutic agents, existing pharmaceutical
       products and prescription nutritional products. We have developed
       and patented a wide variety of drug delivery and formulation
       technologies which are primarily focused in four principal areas:
       SITE RELEASE(R) bioadhesives; tastemasking; oral controlled
       release; and oral quick dissolving tablets. We incorporate these
       technologies in the products we market to control and improve the
       absorption and utilization of active pharmaceutical compounds. In
       1990, we established a generic marketing capability through a
       wholly-owned subsidiary, ETHEX Corporation ("ETHEX"), which we
       believe makes us one of the only drug delivery research and
       development companies that also markets "technologically
       distinguished" generic products. In 1999, we established a
       wholly-owned subsidiary, Ther-Rx Corporation ("Ther-Rx"), to market
       branded pharmaceuticals directly to physician specialists.

       Our wholly-owned subsidiary, Particle Dynamics, Inc. ("PDI"), was
       acquired in 1972. Through PDI, we develop and market specialty
       value-added raw materials, including drugs, directly compressible
       and microencapsulated products, and other products used in the
       pharmaceutical, nutritional, food, personal care and other markets.

(b)    SIGNIFICANT BUSINESS DEVELOPMENTS
       ---------------------------------

       In May 2005, we entered into a long-term product development and
       marketing license agreement with Strides Arcolab Limited
       ("Strides"), an Indian generic pharmaceutical developer and
       manufacturer, for exclusive marketing rights in the United States
       and Canada for 10 new generic drugs. Under the agreement, Strides
       is responsible for developing, submitting for regulatory approval
       and manufacturing the 10 products and we are responsible for
       exclusively marketing the products in the territories covered by
       the agreement. Under a separate agreement, we invested $11.3
       million in Strides redeemable preferred stock.

       In May 2005, the Company and FemmePharma, Inc. ("FemmePharma")
       mutually agreed to terminate the license agreement between them
       entered into in April 2002. As part of this transaction, we
       acquired all of the common stock of FemmePharma for $25.0 million
       after certain assets of the entity had been distributed to
       FemmePharma's other shareholders. Under a separate agreement, we
       had previously invested $5.0 million in FemmePharma's convertible
       preferred stock. Included in the acquisition of FemmePharma are the
       worldwide marketing rights to an endometriosis product that has
       successfully completed Phase II clinical trials. This product was
       originally part of the licensing arrangement with FemmePharma that
       provided us, among other things, marketing rights for the product
       principally in the United States. In accordance with the new
       agreement, we acquired worldwide licensing rights of the
       endometriosis product, are no longer responsible for milestone
       payments and royalties specified in the original licensing
       agreement, and secured exclusive worldwide rights for use of the
       FemmePharma technology for vaginal anti-infective products. During
       the fiscal year ended March 31, 2006, the Company recorded expense
       of $30.4 million in connection with the FemmePharma acquisition
       that consisted of $29.6 million for acquired in-process research
       and development and $0.9 million in direct expenses related to the
       transaction. The acquired in-process research and development
       charge represented the estimated fair value of the endometriosis
       product being

developed that, at the time of the acquisition, had no alternative future use and for which technological feasibility had not been established.

In December 2005, we entered into a financing arrangement with St. Louis County, Missouri related to expansion of our operations in St. Louis County. In total, up to $135.5 million of industrial revenue bonds may be issued to us by St. Louis County relative to capital improvements made through December 31, 2009. This agreement provides that 50% of the real and personal property taxes on up to $135.5 million of capital improvements will be abated for a period of 10 years subsequent to the property being placed in service. The industrial revenue bonds are issued by St. Louis County to us upon our payment of qualifying costs of capital improvements and transfer of such improvements to St. Louis County, which are then leased by us for a period ending December 1, 2019, unless earlier terminated. We have the option at any time to discontinue the arrangement and regain full title to the abated property. The industrial revenue bonds bear interest at 4.25% per annum and are payable as to principal and interest concurrently with payments due under the terms of the lease. Industrial revenue bonds totaling $73.0 million were outstanding at March 31, 2006. We have classified the leased assets as property and equipment and have established a capital lease obligation equal to the outstanding principal balance of the industrial revenue bonds. Lease payments may be made by tendering an equivalent portion of the industrial revenue bonds. As the capital lease payments to St. Louis County may be satisfied by tendering industrial revenue bonds (which is our intention), the capital lease obligation, industrial revenue bonds and related interest expense and interest income, respectively, have been offset for presentation purposes in the Consolidated Financial Statements.

In March 2006, we entered into a $43.0 million mortgage loan agreement with one of our primary lenders, in part, to refinance $9.9 million of existing mortgages. The $32.8 million of net proceeds we received from the new mortgage loan will be used for working capital and general corporate purposes. The new mortgage loan bears interest at a rate of 5.91% and matures on April 1, 2021.

In fiscal 2006, we expanded our branded prescription nutritional franchise when Ther-Rx introduced Encora(TM), a twice-daily prescription nutritional supplement designed to meet the key nutritional and preventative health needs of women past their childbearing years. Ther-Rx also introduced two new branded hematinic products, Niferex(R) Gold and Repliva 21/7(TM) in fiscal 2006.

In February 2006, we entered into an exclusive arrangement with Gedeon Richter, Ltd., a European pharmaceutical company, to market a broad group of generic drug products to the U.S. marketplace. The products will serve the cardiovascular, diabetic and central nervous system markets. Subject to FDA approval and patent expirations, we expect to introduce these products to the U.S. market over the next several years through 2017.

During fiscal 2006, we entered into two additional licensing arrangements - one to market both Gynazole-1(R) and Clindesse(TM) in five Scandanavian countries, the other to market Clindesse(TM) in 18 Eastern European countries. These arrangements expanded Gynazole-1(R)'s future international presence beyond the over 50 markets in Europe, Latin America, the Middle East, Asia, Indonesia, the People's Republic of China, Australia and New Zealand covered in other previously signed licensing agreements. We have previously entered into licensing agreements for the right to market Clindesse(TM) in Spain, Portugal, Andorra, Brazil and Mexico. During fiscal 2006, we also received regulatory approvals to market Gynazole-1(R) in 15 Eastern European countries and our first regulatory approval in an Asian market.

In fiscal 2006, we received a favorable court ruling in a Paragraph IV patent infringement action filed against us by AstraZeneca based on our ANDA submissions to market generic formulations of Toprol-XL(R). We believe we were the first company to file with the FDA for generic approval of the 100mg and 200mg dosage strengths, a position that may, upon approval, afford us the opportunity for a six-month exclusivity period for marketing these generic versions. The total branded dollar volume of Toprol-XL(R) in 2005 was $1.3 billion, of which the 100mg and 200mg strengths represented nearly half.

On June 9, 2006, we replaced our $140.0 million credit line by
entering into a new credit agreement with ten banks that provides
for a revolving line of credit for borrowing up to $320.0 million.
The new credit agreement also includes a provision for increasing
the revolving commitment, at the lenders' sole discretion, by up to
an additional $50.0 million. The new credit facility is unsecured
unless we, under certain specified circumstances, utilize the
facility to redeem part or all of our outstanding Convertible
Subordinated Notes. Interest is charged under the facility at the
lower of the prime rate or one-month LIBOR plus 62.5 to 150 basis
points depending on the ratio of senior debt to EBITDA. The new
credit agreement contains financial covenants that impose limits on
dividend payments, require minimum equity, a maximum senior
leverage ratio and minimum fixed charge coverage ratio. The new
credit facility has a five-year term expiring in June 2011.

(c)    INDUSTRY SEGMENTS
       -----------------

We operate principally in three industry segments, consisting of
branded products marketing, specialty generics marketing and
specialty raw materials marketing. Revenues are derived primarily
from directly marketing our own technologically distinguished
generic/non-branded and brand-name products. Revenues may also be
received in the form of licensing revenues and/or royalty payments
based upon a percentage of the licensee's sales of the product, in
addition to manufacturing revenues, when marketing rights to
products using our advanced drug delivery technologies are
licensed. See Note 21 to our Consolidated Financial Statements.

(d)    NARRATIVE DESCRIPTION OF BUSINESS
       ---------------------------------

OVERVIEW

We are a fully integrated specialty pharmaceutical company that
develops, acquires, manufactures and markets technologically
distinguished branded and generic/non-branded prescription
pharmaceutical products. We have a broad range of dosage form
capabilities including tablets, capsules, creams, liquids and
ointments. We conduct our branded pharmaceutical operations through
Ther-Rx and our generic/non-branded pharmaceutical operations
through ETHEX. Through PDI, we also develop, manufacture and market
technologically advanced, value-added raw material products for the
pharmaceutical, nutritional, personal care, food and other markets.

We have a broad portfolio of drug delivery technologies which we
leverage to create technologically distinguished brand name and
specialty generic/non-branded products. We have developed and
patented 15 drug delivery and formulation technologies primarily in
four principal areas: SITE RELEASE(R) bioadhesives, oral controlled
release, tastemasking and oral quick dissolving tablets. We
incorporate these technologies in the products we market to control
and improve the absorption and utilization of active pharmaceutical
compounds. These technologies provide a number of benefits,
including reduced frequency of administration, reduced side
effects, improved drug efficacy, enhanced patient compliance and
improved taste.

We have a long history of developing drug delivery technologies. In
the 1950's, we received what we believe to be the first patents for
sustained release delivery systems which enhance the convenience
and effectiveness of pharmaceutical products. In our early years,
we used our technologies to develop products for other drug
marketers. Our technologies have been used in several well known
products, including Actifed(R) 12-hour, Sudafed(R) SA, Centrum
Jr.(R) and Kaopectate(R) Chewable. Since the 1990's, we have chosen
to focus our drug development expertise on internally developed
products for our branded and generic/non-branded pharmaceutical
businesses.

For example, since its inception in March 1999, our Ther-Rx
business has successfully launched 11 internally developed branded
pharmaceutical products, all of which incorporate our drug delivery
technologies. We have also introduced several technology-improved
versions of the four product franchises acquired by us.
Furthermore, most of the internally developed generic/non-branded
products marketed by our ETHEX business incorporate one or more of
our drug delivery technologies.

Our drug delivery technology allows us to differentiate our
products in the marketplace, both in the branded and
generic/non-branded pharmaceutical areas. We believe that this

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

---

## FORM 10-K

[X]   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended March 31, 2009**

**Or**

[ ]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the transition period from          to**

**Commission file number 1-9601**

---

# K-V PHARMACEUTICAL COMPANY

**(Exact Name of Registrant as Specified in Its Charter)**

---

| | |
|---|---|
| **Delaware** | **43-0618919** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **One Corporate Woods Drive, Bridgeton, MO** | **63044** |
| (Address of Principal Executive Offices) | (ZIP code) |

**(314) 645-6600**

**(Registrant's telephone number, including area code)**

**Securities Registered Pursuant to Section 12(b) of the Act:**

| | |
|---|---|
| Class A Common Stock, par value $.01 per share | New York Stock Exchange |
| Class B Common Stock, par value $.01 per share | New York Stock Exchange |

**Securities Registered Pursuant to Section 12(g) of the Act:**

**7% Cumulative Convertible Preferred, par value $.01 per share**

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☐   No ☒

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulations S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☐   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405) is not contained herein, and will not be contained herein, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

The aggregate market value of the shares of Class A and Class B Common Stock held by non-affiliates of the registrant as of September 28, 2008, the last business day of the registrant's most recently completed second fiscal quarter, was $755,273,000 and $84,710,000, respectively. As of

February 28, 2010, the registrant had outstanding 37,736,871 and 13,311,853 shares of Class A Common Stock and Class B Common Stock, respectively.

DOCUMENTS INCORPORATED BY REFERENCE—None

Table of Contents

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*(Dollars in thousands, except per share data)*

In May 2009, the Company entered into a global confidential settlement agreement with Axcan to dismiss a suit Axcan filed against the Company in June 2007 (see Note 16—"Commitments and Contingencies"). The settlement agreement required the Company to pay Axcan in three installments, $3,500 of which was paid in May 2009. Subsequent to May 2009, the original agreement with Axcan was revised and the Company made a payment of $1,950 to settle the remaining two payments due to Axcan. At March 31, 2009, the Company recorded a settlement liability of $5,450 in accrued liabilities.

Pursuant to the plea agreement that ETHEX entered into with the Department of Justice on March 2, 2010, ETHEX agreed to pay criminal fines, restitution to the Medicare and Medicaid programs and an administrative forfeiture in the aggregate amount of $27,569 (see Note 16—"Commitments and Contingencies"). The plea agreement requires the Company to pay the criminal fines in five installment payments beginning March 6, 2010 and ending July 11, 2012. For fiscal 2009, the Company recorded litigation expense of $23,623 for the present value of the administrative forfeiture and five expected installment payments related to the criminal fines and reduced net revenues by $2,275 for the restitution payments made to the Medicare and Medicaid programs on March 6, 2010. At March 31, 2009, $4,601 of the aggregate plea agreement amount was recorded in accrued liabilities and $21,597 was recorded in other long-term liabilities.

### 14.  Long-Term Debt

Long-term debt as of March 31 consisted of:

|  | 2009 | 2008 |
|---|---|---|
| Convertible notes | $200,000 | $ 200,000 |
| Building mortgages | 37,432 | 39,452 |
| Software financing arrangement | 1,117 | 1,721 |
| Line of credit | — | 30,000 |
|  | 238,549 | 271,173 |
| Less current portion | (37,824) | (202,499) |
|  | $200,725 | $  68,674 |

In May 2003, the Company issued $200,000 principal amount of 2.5% Contingent Convertible Subordinated Notes (the "Notes") that are convertible, under certain circumstances, into shares of Class A Common Stock at an initial conversion price of $23.01 per share. The Notes, which mature on May 16, 2033, bear interest that is payable on May 16 and November 16 of each year at a rate of 2.50% per annum. The Company also is obligated to pay contingent interest at a rate equal to 0.5% per annum during any six-month period from May 16 to November 15 and from November 16 to May 15, with the initial six-month period commencing May 16, 2006, if the average trading price of the Notes per $1,000 principal amount for the five trading day period ending on the third trading day immediately preceding the first day of the applicable six-month period equals $1,200 or more. In November 2007, the average trading price of the Notes reached the threshold for the five-day trading period that resulted in the payment of contingent interest and for the period from November 16, 2007 to May 15, 2008 the Notes paid interest at a rate of 3.00% per annum. In May 2008, the average trading price of the Notes fell below the contingent interest threshold for the five-day trading period and beginning May 16, 2008 the Notes began to pay interest at a rate of 2.50% per annum.

The Company may redeem some or all of the Notes at any time on or after May 21, 2006, at a redemption price, payable in cash, of 100% of the principal amount of the Notes, plus accrued and unpaid interest, including contingent interest, if any. Holders may require the Company to repurchase all or a portion of their Notes on

141

Table of Contents

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

*(Dollars in thousands, except per share data)*

May 16, 2008, 2013, 2018, 2023 and 2028 or upon a change in control, as defined in the indenture governing the Notes, at a purchase price, payable in cash, of 100% of the principal amount of the Notes, plus accrued and unpaid interest, including contingent interest, if any. Holders had the right to require the Company to repurchase all or a portion of their Notes on May 16, 2008 and, accordingly, the Company classified the Notes as a current liability as of March 31, 2008. Since no holders required the Company to repurchase all or a portion of their Notes on this date and because the next occasion holders may require the Company to repurchase all or a portion of their Notes is May 16, 2013, the Notes were classified as a long-term liability as of March 31, 2009. The Notes are subordinate to all of the Company's existing and future senior obligations.

The Notes are convertible, at the holders' option, into shares of the Company's Class A Common Stock prior to the maturity date under the following circumstances:

- during any quarter commencing after June 30, 2003, if the closing sale price of the Company's Class A Common Stock over a specified number of trading days during the previous quarter is more than 120% of the conversion price of the Notes on the last trading day of the previous quarter. The Notes are initially convertible at a conversion price of $23.01 per share, which is equal to a conversion rate of approximately 43.4594 shares per $1,000 principal amount of Notes;

- if the Company has called the Notes for redemption;

- during the five trading day period immediately following any nine consecutive trading day period in which the trading price of the Notes per $1,000 principal amount for each day of such period was less than 95% of the product of the closing sale price of our Class A Common Stock on that day multiplied by the number of shares of our Class A Common Stock issuable upon conversion of $1,000 principal amount of the Notes; or

- upon the occurrence of specified corporate transactions.

The Company has reserved 8,691,880 shares of Class A Common Stock for issuance in the event the Notes are converted.

The Notes, which are unsecured, do not contain any restrictions on the payment of dividends, the incurrence of additional indebtedness or the repurchase of the Company's securities, and do not contain any financial covenants. However, a failure by the Company or any of its subsidiaries to pay any indebtedness or any final non-appealable judgments in excess of $750 constitutes an event of default under the indenture. An event of default would permit the trustee under the indenture or the holders of at least 25% of the Notes to declare all amounts owing to be immediately due and payable and exercise other remedies.

In March 2006, the Company entered into a $43,000 mortgage loan arrangement with one of its primary lenders, in part, to refinance $9,859 of existing mortgages. The $32,764 of net proceeds the Company received from the mortgage loan was used for working capital and general corporate purposes. The mortgage loan, which is secured by three of the Company's buildings, bears interest at a rate of 5.91% and matures on April 1, 2021. The Company is current in all its financial payment obligations under the mortgage loan arrangement. However, the Company believes that at March 31, 2009 it was not in compliance with one or more of the requirements of the mortgage loan documentation. Accordingly, the $37,432 that remained outstanding under the mortgage arrangement as of March 31, 2009 was classified as a current liability as of March 31, 2009.

In June 2007, the Company entered into an installment payment agreement with a financial institution for the purchase of software products and the right to receive consulting or other services from the seller. Upon delivery of the products and services, the financial institution will pay the seller amounts owed for the software products and services. As a result, the Company recorded debt in the amount of $1,733 which will be paid ratably over 16 consecutive quarters to the financial institution. In August 2007, the Company entered into another agreement with the same financial institution for the payment of additional consulting services that will be

142

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*(Dollars in thousands, except per share data)*

provided on a time and material basis. In exchange for the institution paying the seller for fees owed, the Company has recorded additional debt in the amount of $306 which will be paid to the financial institution ratably over 16 consecutive quarters. The two installment payment agreements were discounted using an imputed annual interest rate that approximated the Company's borrowing rate for similar debt instruments at the time of the borrowings.

In June 2006, the Company entered into a credit agreement with ten banks that provided for a revolving line of credit for borrowing up to $320,000. This credit facility also included a provision for increasing the revolving commitment, at the lenders' sole discretion, by up to an additional $50,000. The credit agreement was unsecured unless the Company, under certain specified circumstances, utilized the facility to redeem part or all of its outstanding Notes. Interest was charged under the credit facility at the lower of the prime rate or LIBOR plus 62.5 to 150 basis points, depending on the ratio of senior debt to EBITDA. The credit facility had a five-year term expiring in June 2011. The credit agreement contained financial covenants that imposed limits on dividend payments, required minimum equity, a maximum senior leverage ratio and a minimum fixed charge coverage ratio. In February 2009, the Company repaid $30,000 of borrowings outstanding under the credit facility and deposited $10,900 with Bank of America to support certain letters of credit that were outstanding at March 31, 2009. Subsequent to paying off the outstanding credit line in February 2009, the Company was notified by its lenders that the credit agreement had been terminated. As a result of the termination, the Company wrote off $266 of unamortized deferred financing costs associated with the revolving line of credit. At March 31, 2008, the Company had $942 in open letters of credit issued under the revolving credit line and $30,000 of cash borrowings outstanding under the facility.

The aggregate maturities of long-term debt as of March 31, 2009 were as follows:

| | |
|---|---:|
| e in one year | $ 37,824 |
| e in two years | 561 |
| e in three years | 164 |
| e in four years | 200,000 |
| | $ 238,549 |

The Company paid interest of $9,115, $8,758 and $7,316 for the fiscal years ended March 31, 2009, 2008 and 2007, respectively.

## 15. Taxable Industrial Revenue Bonds

In December 2005, the Company entered into a financing arrangement with St. Louis County, Missouri related to expansion of its operations in St. Louis County. Up to $135,500 of industrial revenue bonds could have been issued to the Company by St. Louis County relative to capital improvements made through December 31, 2009. This agreement provides that 50% of the real and personal property taxes on up to $135,500 of capital improvements will be abated for a period of ten years subsequent to the property being placed in service. Industrial revenue bonds totaling $129,907 were outstanding at March 31, 2009. The industrial revenue bonds are issued by St. Louis County to the Company upon its payment of qualifying costs of capital improvements, which are then leased by the Company for a period ending December 1, 2019, unless earlier terminated. The Company has the option at any time to discontinue the arrangement and regain full title to the abated property. The industrial revenue bonds bear interest at 4.25% per annum and are payable as to principal and interest concurrently with payments due under the terms of the lease. The Company has classified the leased assets as property and equipment and has established a capital lease obligation equal to the outstanding principal balance

143

12-13346-alg    Doc 736    Filed 04/12/13    Entered 04/12/13 17:05:41    Main Document
Pg 108 of 119

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

## FORM 10-K

---

[X]    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended March 31, 2011**

**Or**

[ ]    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the transition period from            to**

**Commission file number 1-9601**

---

# K-V PHARMACEUTICAL COMPANY
### (Exact Name of Registrant as Specified in Its Charter)

---

| | |
|---|---|
| **Delaware** | **43-0618919** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

**One Corporate Woods Drive, Bridgeton, MO 63044**
(Address of Principal Executive Offices) (ZIP code)

**Registrant's telephone number, including area code: (314) 645-6600**

---

**Securities Registered Pursuant to Section 12(b) of the Act:**

| | |
|---|---|
| Class A Common Stock, par value $.01 per share | New York Stock Exchange |
| Class B Common Stock, par value $.01 per share | New York Stock Exchange |

**Securities Registered Pursuant to Section 12(g) of the Act:**

**7% Cumulative Convertible Preferred, par value $.01 per share**

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☐   No ☒

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulations S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☐   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405) is not contained herein, and will not be contained herein, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the shares of Class A and Class B Common Stock held by non-affiliates of the registrant as of September 30, 2010 the last business day of the registrant's most recently completed second fiscal quarter, was $84.8 million and $25.0 million respectively. As of April 29, 2011, the registrant had outstanding 48.6 million and 11.2 million shares of Class A Common Stock and Class B Common Stock, respectively.

DOCUMENTS INCORPORATED BY REFERENCE—

Parts of the registrant's definitive proxy statement for the 2011 Annual Meeting of Shareholders are incorporated by reference in Part III of this Annual Report

Table of Contents

During the fourth quarter of fiscal year 2011 we committed to a plan to divest the generics business. During the fourth quarter of fiscal year 2009, our Board authorized management to sell PDI, our specialty materials segment (see Note 23—"Divestitures" of the Notes to Consolidated Financial Statements in this Report for more information regarding the sale of PDI). Therefore, we have segregated our generics business and PDI's operating results and presented them separately as a discontinued operation for all periods presented. (See Note 23— "Divestitures" of Notes to Consolidated Financial Statements included in this Report.) The decrease in loss from discontinued operations for fiscal year 2010 was due to decreases in PDI's total operating expenses, mostly due to an insurance gain, partially offset by decreases in gross profit. PDI was sold in June 2010. In addition, during the three months ended December 31, 2009, the Company received from Purdue and sold to its customers all of the generic OxyContin® allotted under the Distribution Agreement and recognized net revenue of approximately $143.0 million in the consolidated statement of operations. The Company recognized the revenue when it had determined that persuasive evidence of an arrangement existed, the customers' payment ability had been reasonably assured, title and risk of ownership had been transferred to the customers, and the Company's price to its customers was determined. Additionally, the Company recorded approximately $20.0 million as cost of sales in the three months ended December 31, 2009, which included royalty fees and the cost of the generic OxyContin® supplied by Purdue. Accordingly, the Company recognized gross profit of $123.0 million in the three months ended December 31, 2009 as a result of the Distribution Agreement entered into with Purdue. This income was offset by an impairment charge of $43.1 million for MD&P assets recorded during the fiscal year March 31, 2010, related to our discontinued operations to reduce the carrying value of our MD&P assets for discontinued operations to their fair value.

### Gain on sale in Discontinued Operations

| ($ in millions): | Years Ended March 31, | | Change | |
| | 2010 | 2009 | $ | % |
|---|---|---|---|---|
| Gain on sale in discontinued operations | $    9.2 | $    — | $9.2 | NA% |

During fiscal year 2010, we completed the sale to Perrigo Company of our Paragraph IV ANDA for a generic equivalent version of GlaxoSmithKline's Duac® gel. Under the terms of the transaction, we received $14.0 million from Perrigo Company at closing ($8.7 million, net of tax) and will receive an additional $2.0 million as a milestone payment upon the completion of a successful technical transfer. Also during fiscal year 2010, we recognized a $0.5 million gain from the sale of certain intellectual property and other assets associated with our ANDA for the generic version of Lotensin® 5-mg, 10-mg, 20-mg, and 40-mg Tablets to Huahai US, Inc.

The above gains on sale were recorded in discontinued operations as a result of our decision during the fourth quarter of fiscal year 2011 to divest the generics business.

### Liquidity and Capital Resources

Cash and cash equivalents and working capital (deficiency) were $137.6 million and $(81.3 million), respectively, at March 31, 2011, compared to $60.7 million and ($81.1 million), respectively, at March 31, 2010. Working capital is defined as total current assets minus total current liabilities. The working capital deficiency decreased primarily due to an increase in cash and cash equivalents of $76.9 million, primarily resulting from the March 2011 private placement of Class A Common Stock and 2015 Notes, the reclassification to current assets of our ARS investments and increase in restricted cash of $34.5 million, and an increase in receivables of $32.4 million primarily related to initial sales of Makena™ . These were offset by an increase in accrued liabilities of $190.2 million primarily related to warrants in connection with the loan from U.S. Healthcare and a liability recorded for future milestone payments due to Hologic for our purchase of the rights to Makena™ which were offset by a decrease in accounts payable of $13.3 million which was related to timing of payments to our suppliers.

96

**Table of Contents**

For the fiscal year ended March 31, 2011, net cash used in operating activities of $159.5 million resulted primarily from our net loss offset by noncash items of $54.8 million primarily related to depreciation, gain on sale of assets, loss on debt extinguishments, gain on warrants and impairment of assets. Also contributing to the cash used in operating activities was an increase in receivables which was due to our initial sales of Makena™ that occurred during the fourth quarter of fiscal year 2011 and decrease in accounts payable and accrued liabilities due to timing of payments.

For the fiscal year ended March 31, 2011, net cash flow provided by investing activities of $0.2 million included the $22.0 million related to the sale of PDI, net of fees and the amount held in escrow, $11.0 million cash proceeds pursuant to the sale of Sucralfate and $7.3 million proceeds from an investment in Strides. Additionally, the Company received approximately $3.5 million in insurance proceeds related to a fire that occurred in 2009 at PDI. This was offset by restricted cash related to a loan with our lenders of $7.5 million, one year of interest on deposit of $27.0 million related to our 2015 Notes, and a $12.5 payment to Hologic for Makena™ product rights.

For the fiscal year ended March 31, 2011, net cash provided by financing activities of $236.2 million resulted primarily from proceeds of approximately $80.0 million received from U.S. Healthcare and $218.3 million, net of loan discount, from the 2015 Notes and private equity offering of $29.7 million. These increases were primarily offset by the payment and retirement of loans due to the U.S. Healthcare.

At March 31, 2011, our investment securities included $61.5 million in original principal amount of auction rate securities ("ARS"). Consistent with our investment policy guidelines, the ARS held by us are AAA-rated securities with long-term nominal maturities secured by student loans which are guaranteed by the U.S. Government. Liquidity for the ARS is typically provided by an auction process which allows holders to sell their notes and resets the applicable interest rate at pre-determined intervals, typically between seven to 35 days. However, with the liquidity issues experienced in global credit and capital markets, the ARS experienced failed auctions beginning in February 2008 and throughout fiscal years 2009 through 2011. An auction failure means that the parties wishing to sell their securities could not be matched with an adequate volume of buyers. The securities for which auctions have failed continue to accrue interest at the contractual rate and continue to be auctioned every seven, 14, 28 or 35 days, as the case may be, until the auction succeeds, the issuer calls the securities, or they mature. (See Note 6—"Investment Securities" of the Notes to Consolidated Financial Statements included in this Report for more information regarding the settlement agreement and the proceeds received in connection therewith.)

Our debt balance, including current maturities, was $510.4 million at March 31, 2011 compared to $297.1 million at March 31, 2010. The balances include a $52.4 million and $61.2 million collateralized obligation related to our ARS at March 31, 2011 and March 31, 2010, respectively.

In March 2006, we entered into a $43.0 million mortgage loan arrangement with LaSalle National Bank Association, in part to refinance $9.9 million of existing mortgages. The $32.8 million of net proceeds we received from the mortgage loan was used for working capital and general corporate purposes. The mortgage loan, which is secured by four of our buildings, bears interest at a rate of 5.91% (and a default rate of 10.905%) and matures on April 1, 2021. We were not in compliance with one or more of the requirements of the mortgage loan arrangement as of March 31, 2010. However, on August 5, 2010, we received a letter ("Waiver Letter") approving certain waivers of covenants under the mortgage loan and certain other loan documents entered into in connection with the execution of the mortgage loan (collectively, the "Loan Documents"). In the Waiver Letter, the lenders consented to the following under the Loan Documents:

- Waiver of the requirement that we deliver audited balance sheets, statements of income and expenses and cash flows;

- Waiver of the requirement that we certify financial statements delivered under the Loan Documents;

97

**Table of Contents**

- Waiver of the requirement that we deliver to the lenders Form 10-Ks within 75 days of the close of the fiscal year, Form 10-Qs within 45 days of the close of each of the first three fiscal quarters of the fiscal year, and copies of all IRS tax returns and filings; and

- Waiver, until March 31, 2012, of the requirement that we maintain a net worth, as calculated in accordance with the terms of the Loan Documents, of at least $250 million on a consolidated basis.

With respect to the waiver of the requirement to deliver Form 10-Ks and Form 10-Qs, we agreed to bring our filings current effective with the submission of our Form 10-Q for the quarter ended December 31, 2010 and become timely on a go-forward basis with the filing of our Form 10-K for fiscal year 2011. Effective with the filing of this Form 10-K, the Company is in compliance with the SEC filing requirements contained in the waiver. However, based on current financial projections, the Company does not anticipate meeting the March 31, 2012 minimum net worth requirement. Accordingly, the mortgage is classified as a current liability as of March 31, 2011. If the Company is ultimately unable to meet the minimum net worth requirement by March 31, 2012, it will need to seek an additional waiver from the mortgage lender.

In May 2003, we issued $200.0 million principal amount of the 2033 Notes that are convertible, under certain circumstances, into shares of our Class A Common Stock at an initial conversion price of $23.01 per share. The 2033 Notes bear interest at a rate of 2.50% and mature on May 16, 2033. We are also obligated to pay contingent interest at a rate equal to 0.5% per annum during any six-month period commencing May 16, 2006, if the average trading price of the 2033 Notes per $1,000 principal amount for the five-trading day period ending on the third trading day immediately preceding the first day of the applicable six-month period equals $1,200 or more. We may redeem some or all of the 2033 Notes at any time on or after May 21, 2006, at a redemption price, payable in cash, of 100% of the principal amount of the 2033 Notes, plus accrued and unpaid interest (including contingent interest, if any) to the date of redemption. Holders may require us to repurchase all or a portion of their 2033 Notes on May 16, 2013, 2018, 2023 and 2028, or upon a change in control, as defined in the indenture governing the 2033 Notes, at 100% of the principal amount of the 2033 Notes, plus accrued and unpaid interest (including contingent interest, if any) to the date of repurchase, payable in cash.

In December 2005, we entered into a financing arrangement with St. Louis County, Missouri related to expansion of our operations in St. Louis County. Up to $135.5 million of industrial revenue bonds could have been issued to us by St. Louis County relative to capital improvements made through December 31, 2009. This agreement provides that 50% of the real and personal property taxes on up to $135.5 million of capital improvements will be abated for a period of ten years subsequent to the property being placed in service. Industrial revenue bonds totaling $129.9 million were outstanding at December 31, 2010 and March 31, 2011, respectively. The industrial revenue bonds are issued by St. Louis County to us upon our payment of qualifying costs of capital improvements, which are then leased by us for a period ending December 1, 2019, unless earlier terminated. We have the option at any time to discontinue the arrangement and regain full title to the abated property. The industrial revenue bonds bear interest at 4.25% per annum and are payable as to principal and interest concurrently with payments due under the terms of the lease. We have classified the leased assets as property and equipment and have established a capital lease obligation equal to the outstanding principal balance of the industrial revenue bonds. Lease payments may be made by tendering an equivalent portion of the industrial revenue bonds. As the capital lease payments to St. Louis County may be satisfied by tendering industrial revenue bonds (which is our intention), the capital lease obligation, industrial revenue bonds and related interest expense and interest income, respectively, have been offset for presentation purposes in the consolidated financial statements.

In September 2010 we entered into an agreement with U.S. Healthcare for a loan of $20 million which was subsequently retired in November 2010 when we entered into a new agreement with U.S. Healthcare for a senior secured debt financing package for up to $120 million which was subsequently amended in January 2011 and again in March 2011. In March 2011, the Company repaid in full all the remaining obligations with U.S. Healthcare and terminated the future loan commitments. (See Note 13—"Long-Term Debt" for a description of

98

Table of Contents

the financing with U.S. Healthcare and Note 21—"Equity Transactions" of the Notes to Consolidated Financial Statements in this Report for a description of our $32.3 million private placement of Class A Common Stock and private placement of $225 million aggregate principal amount of the 2015 Notes a portion of the proceeds of which were used to repay the loan obligations with U.S. Healthcare.)

On February 14, 2011, the Company announced that it entered into a definitive agreement with a group of institutional investors to raise approximately $32.3 of gross proceeds from a private placement of 9.95 million shares of its Class A Common Stock at $3.25 per share. The transaction closed on February 17, 2011. The Company used $20.0 of the proceeds from the financing to repay certain outstanding amounts and other outstanding obligations under its credit agreement with U.S. Healthcare. The remaining amount will be used for the launch of Makena™, payment of expenses associated with the transaction and general corporate purposes.

On March 17, 2011, the Company completed the offering and sale of the 2015 Notes. The 2015 Notes bear interest at an annual rate of 12% per year, payable semiannually in arrears on March 15 and September 15 of each year, commencing September 15, 2011. The 2015 Notes will mature March 15, 2015. After an original issue discount of 3%, the Company received proceeds of $218.3 million which were used to fund a first-year interest reserve totaling $27.0 million (reflected as restricted cash on the balance sheet), repay all existing obligations to U.S. Healthcare totaling approximately $61.1 million and pay fees and expenses associated with the offering of the 2015 Notes of approximately $10.0 million. In connection with these payments, the Company also terminated all future loan commitments with U.S. Healthcare. The remaining proceeds, totaling approximately $120.0 million will be used for general corporate purposes, including the launch of Makena™. The 2015 Notes were offered only to accredited investors pursuant to Regulation D under the Securities Act of 1933, as amended (See Note 13—"Long-Term Debt" for a description of the 2015 Notes of the Notes to Consolidated Financial Statements in this Report).

The following table summarizes our contractual obligations (in millions):

| | Total | Less Than 1 Year | 2-3 Years | 4-5 Years | More Than 5 Years |
|---|---|---|---|---|---|
| **Obligations at March 31, 2011** | | | | | |
| Long-term debt obligations(1) | $458.0 | $  33.0 | $200.0 | $225.0 | $     — |
| Scheduled interest obligations(2) | 231.7 | 33.9 | 67.3 | 39.7 | 90.8 |
| Operating lease obligations | 3.5 | 1.3 | 1.3 | 0.7 | 0.2 |
| Hologic obligation(5) | 107.5 | 57.5 | 50.0 | — | — |
| DOJ obligations | 19.4 | 1.0 | 3.0 | 8.7 | 6.7 |
| Total contractual cash obligations(3)(4) | $820.1 | $  126.7 | $321.6 | $274.1 | $  97.7 |

(1)   The next date holders of the 2033 Notes may require us to repurchase all or a portion of their Notes is May 16, 2013. On March 17, 2011, the Company completed the sale of the 2015 Notes. The 2015 Notes bear interest at an annual rate of 12% per year, payable semiannually in arrears on March 15 and September 15 of each year, commencing September 15, 2011. The 2015 Notes will mature March 15, 2015.

(2)   Scheduled interest payments represent the estimated interest payments on the building mortgages, the 2033 Notes and the 2015 Notes.

(3)   Excluded from the contractual obligations table is the liability for unrecognized tax benefits totaling $1.2 million. This liability for unrecognized tax benefits has been excluded because we cannot make a reliable estimate of the period in which the unrecognized tax benefits will be realized.

(4)   The terms of the Evamist® asset purchase agreement provide for two future payments upon achievement of certain net sales milestones. If Evamist®achieves $100.0 million of net sales in a fiscal year, a one-time payment of $10.0 million will be made, and if net sales levels reach $200.0 million in a fiscal year, a one-time payment of up to $20.0 million will be made.

99

**Table of Contents**

(5)    On February 3, 2011, the Company was informed by Hologic that the FDA granted approval for Makena™ and started shipping product in March 2011. Under the revised payment provisions set forth in Amendment No. 2, after the $12.5 million payment on the Transfer Date and a subsequent $12.5 million payment twelve months after the Approval Date, the Company has the right to elect between the following two alternate payment schedules for the remaining payments:

Payment Schedule 1:

- A $45.0 million payment 18 months after the Approval Date, plus a royalty equal to 5% of net sales of Makena™ made during the period from 12 months after the Approval Date to the date the $45.0 million payment is made;

- A $20.0 million payment 21 months after the Approval Date;

- A $20.0 million payment 24 months after the Approval Date; and

- A $10.0 million payment 27 months after the Approval Date.

The royalties will continue to be calculated subsequent to the $45.0 million milestone payment but don't have to be paid as long as the Company makes subsequent milestone payments when due.

Payment Schedule 2:

- A $7.3 million payment 18 months after the Approval Date, plus a royalty equal to 5% of net sales of Makena™ made during the period from 12 months after the Approval Date to 18 months after the Approval Date;

- A $7.3 million payment for each of the succeeding twelve months;

- A royalty payable 24 months following the Approval Date equal to 5% of net sales of Makena™ made during the period from 18 months after the Approval Date to 24 months after the Approval Date; and

- A royalty payable 30 months following the Approval Date equal to 5% of net sales of Makena™ made during the period from 24 months after the Approval Date to 30 months after the Approval Date.

Notwithstanding anything to the contrary in Amendment No. 2, however, the Company may make any of the foregoing payments on or before their due dates, and the date on which the Company makes the final payment contemplated by the selected payment schedule will be the final payment date, after which no royalties will accrue

Moreover, if the Company elects Payment Schedule 1 and thereafter elects to pay the $45.0 million payment earlier than the 18-month deadline, the royalties beginning after 12 months will cease to accrue on the date of the early payment. Additionally, the subsequent payments will be paid in three months intervals following the $45.0 million payment date.

Lastly, if the Company elects Payment Schedule 1 and thereafter does not make any of the milestone payments when due, Amendment No. 2 provides that no payment default will be deemed to occur, provided the Company timely pays the required royalties accruing in the quarter during which the milestone payment has become due but is not paid.

Pursuant to the Indenture governing the $225 million aggregate principal amount of the 2015 Notes, the Company agreed to make the $45.0 million payment under Payment Schedule 1 in February 2012 and agreed to certain other restrictions on its ability to amend the payment schedules.

100

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*(Dollars in millions, except per share data)*

of $15.0 for certain matters. For the fiscal year ended March 31, 2009, the Company recorded litigation and governmental inquiries expense in the amount of $14.4 for product liability actions related to the voluntary product recalls initiated by the Company in calendar year 2008 and early 2009 and alleged damages as a result of the ingestion of purportedly oversized tablets allegedly distributed by the Company (see Note 15—"Commitments and Contingencies"). Of the remaining product liability at March 31, 2011, $7.3 was recorded in accrued liabilities and $2.9 was recorded in other long-term liabilities.

Pursuant to the plea agreement with the U.S. Department of Justice, the Company agreed to pay criminal fines, restitution to the Medicare and Medicaid programs and an administrative forfeiture in the aggregate amount of $27.6 (see Note 15—"Commitments and Contingencies"). In the fiscal year ended March 31, 2009, the Company recorded litigation and governmental inquiries expense of $23.6 for the present value of the administrative forfeiture and five expected installment payments related to the criminal fines and reduced net revenues by $2.3 for the restitution payments owed to the Medicare and Medicaid programs. In the fiscal years ended March 31, 2011, 2010 and 2009, the Company recorded $0.3, $0.4 and $0.3, respectively, of interest accretion expense representing the difference between the present value and the undiscounted amount of the fines and penalties, which is recognized ratably over the period during which payments are due and payable pursuant to the plea agreement. At March 31, 2011, $2.0 of the aggregate plea agreement amount was recorded in accrued liabilities and $17.4 was recorded in other long-term liabilities. In addition, long term liabilities include $1.5 related to long-term tax liabilities, $6.1 for life insurance for the former CEO, and $37.3 for other legal matters. At March 31, 2010, $2.8 of the aggregate plea agreement amount was recorded in accrued liabilities and $19.1 was recorded in other long-term liabilities. In addition, at March 31, 2010, long-term liabilities include $7.8 related to long-term tax liabilities, $5.8 for former CEO life insurance, and $13.3 for other legal matters.

The Makena™ obligation, current portion represents the current portion of the remaining milestone payments owed to Hologic related to the Makena™ product rights as described further in Note 5—"Acquisition".

On April 1, 2011, the Company reduced the list price of Makena™. As a result, the Company recorded a price protection reserve of $25.8 based upon the change in list price.

### 13.  Long-Term Debt

Long-term debt as of March 31 consisted of:

|  | 2011 | 2010 |
|---|---|---|
| Convertible notes | $200.0 | $200.0 |
| Senior notes (less unamortized discount of $6.7 million ) | 218.3 | — |
| Building mortgages | 33.0 | 35.3 |
| Collateralized borrowing | 52.4 | 61.2 |
| Software financing arrangement | — | 0.6 |
|  | 503.7 | 297.1 |
| Less current portion | (85.4) | (63.9) |
|  | $418.3 | $233.2 |

*Convertible notes*

In May 2003, the Company issued $200.0 principal amount of 2.5% Contingent Convertible Subordinated Notes (the "Notes") that are convertible, under certain circumstances, into shares of Class A Common Stock at an initial conversion price of $23.01 per share. The Notes, which mature on May 16, 2033, bear interest that is payable on May 16 and November 16 of each year at a rate of 2.50% per annum. The Company also is obligated

157

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*(Dollars in millions, except per share data)*

to pay contingent interest at a rate equal to 0.5% per annum during any six-month period from May 16 to November 15 and from November 16 to May 15, with the initial six-month period commencing May 16, 2006, if the average trading price of the Notes per $1.0 principal amount for the five trading day period ending on the third trading day immediately preceding the first day of the applicable six-month period equals $1.2 or more. In November 2007, the average trading price of the Notes reached the threshold for the five-day trading period that resulted in the payment of contingent interest and for the period from November 16, 2007 to May 15, 2008 the Notes paid interest at a rate of 3.00% per annum. In May 2008, the average trading price of the Notes fell below the contingent interest threshold for the five-day trading period and beginning May 16, 2008 the Notes began to pay interest at a rate of 2.50% per annum, which is the current rate as of March 31, 2011.

The Company may redeem some or all of the Notes at any time, at a redemption price, payable in cash, of 100% of the principal amount of the Notes, plus accrued and unpaid interest, including contingent interest, if any. Holders may require the Company to repurchase all or a portion of their Notes on May 16, 2013, 2018, 2023 and 2028 or upon a change in control, as defined in the indenture governing the Notes, at a purchase price, payable in cash, of 100% of the principal amount of the Notes, plus accrued and unpaid interest, including contingent interest, if any. Since the next occasion holders may require the Company to repurchase all or a portion of their Notes is May 16, 2013, the Notes were classified as a long-term liability as of March 31, 2011 and 2010. The Notes are subordinate to all of the Company's existing and future senior obligations.

The Notes are convertible, at the holders' option, into shares of the Company's Class A Common Stock prior to the maturity date under the following circumstances:

- during any future quarter, if the closing sale price of the Company's Class A Common Stock over a specified number of trading days during the previous quarter is more than 120% of the conversion price of the Notes on the last trading day of the previous quarter. The Notes are initially convertible at a conversion price of $23.01 per share, which is equal to a conversion rate of approximately 43.4594 shares per $1.0 principal amount of Notes;

- if the Company has called the Notes for redemption;

- during the five trading day period immediately following any nine consecutive trading day period in which the trading price of the Notes per $1.0 principal amount for each day of such period was less than 95% of the product of the closing sale price of our Class A Common Stock on that day multiplied by the number of shares of our Class A Common Stock issuable upon conversion of $1.0 principal amount of the Notes; or

- upon the occurrence of specified corporate transactions.

The Company has reserved 8.7 million shares of Class A Common Stock for issuance in the event the Notes are converted.

The Notes, which are unsecured, do not contain any restrictions on the payment of dividends, the incurrence of additional indebtedness or the repurchase of the Company's securities, and do not contain any financial covenants. However, a failure by the Company or any of its subsidiaries to pay any indebtedness or any final non-appealable judgments in excess of $0.8 constitutes an event of default under the indenture. An event of default would permit the trustee under the indenture or the holders of at least 25% of the Notes to declare all amounts owing to be immediately due and payable and exercise other remedies.

***Senior notes***

On March 17, 2011, the Company completed a private placement with a group of institutional investors of $225.0 aggregate principal amount of 12% Senior Secured Notes due 2015.

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*(Dollars in millions, except per share data)*

The 2015 Notes bear interest at an annual rate of 12% per year, payable semiannually in arrears on March 15 and September 15 of each year, commencing September 15, 2011. The 2015 Notes will mature March 15, 2015. At any time prior to March 15, 2013, the Company may redeem up to 35% of the aggregate principal amount of the 2015 Notes at a redemption price of 112% of the principal amount of the 2015 Notes, plus accrued and unpaid interest to the redemption date, with the net cash proceeds of one or more equity offerings. At any time prior to March 15, 2013, the Company may redeem all or part of the 2015 Notes at a redemption price equal to (1) the sum of the present value, discounted to the redemption date, of (i) a cash payment to be made on March 15, 2013 of 109% of the principal amount of the 2015 Notes, and (ii) each interest payment that is scheduled to be made on or after the redemption date and on or before March 15, 2013, plus (2) accrued and unpaid interest to the redemption date. At any time after March 15, 2013 and before March 15, 2014, the Company may redeem all or any portion of the 2015 Notes at a redemption price of 109% of the principal amount of the 2015 Notes, plus accrued and unpaid interest to the redemption date. At any time after March 15, 2014, the Company may redeem all or any portion of the 2015 Notes at a redemption price of 100% of the principal amount of the 2015 Notes, plus accrued and unpaid interest to the redemption date. The 2015 Notes are secured by certain assets of the Company and certain assets of its subsidiaries.

After an original issue discount of 3%, the Company received proceeds of $218.3 which were used to fund a first year interest reserve totaling $27.0, repay all existing obligations to the U.S. Healthcare totaling approximately $61.1 and pay fees and expenses associated with the Notes Offering of $9.7. In connection with these payments, the Company also terminated all future loan commitments with the U.S. Healthcare. The remaining proceeds, totaling approximately $120.0 will be used for general corporate purposes, including the launch of Makena™.

The 2015 Notes were offered only to accredited investors pursuant to Regulation D under the Securities Act of 1933, as amended.

### *Building mortgages*

In March 2006, the Company entered into a $43.0 mortgage loan arrangement (the "Mortgage Loan") with one of its primary lenders, in part, to refinance $9.9 of existing mortgages. The $32.8 of net proceeds the Company received from the mortgage loan was used for working capital and general corporate purposes. The Mortgage Loan, which is secured by four of the Company's buildings, bears interest at a rate of 5.91% and matures on April 1, 2021. The Company is current in all its financial payment obligations under the Mortgage Loan arrangement. On August 5, 2010, the Company received a letter (the "Waiver Letter") approving certain waivers of covenants under the Mortgage Loan, and certain other loan documents entered into in connection with the execution of the Mortgage Loan (collectively, the "Loan Documents"). Accordingly, the Company recorded the mortgage as a long-term liability at March 31, 2010 since the Waiver Letter was received prior to filing the Form 10-K for the fiscal year ended March 31, 2010. In the Waiver Letter, the lenders consented to the following under the Loan Documents:

- Waiver of the requirement that we deliver audited balance sheets, statements of income and expenses and cash flows;

- Waiver of the requirement that we certify financials delivered under the Loan Documents;

- Waiver of the requirement that we deliver to the lenders Form 10-Ks within 75 days of the close of the fiscal year, Form 10-Qs within 45 days of the close of each of the first three fiscal quarters of the fiscal year, and copies of all IRS tax returns and filings; and

- Waiver, until March 31, 2012, of the requirement that we maintain a net worth, as calculated in accordance with the terms of the Loan Documents, of at least $250.0on a consolidated basis.

159

**Table of Contents**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*(Dollars in millions, except per share data)*

With respect to the waiver of the requirement to deliver Form 10-Ks and Form 10-Qs, we agreed to bring our SEC filings current effective with the submission of our Form 10-Q for the quarter ended December 31, 2010, which the Company did on March 31, 2011 and become timely on a go-forward basis effective with the filing of this Form 10-K for the fiscal year ending March 31, 2011. This waiver applied to our then existing late filings at the time the Waiver Letter was received.

In addition to the waivers our subsidiaries ETHEX and PDI were removed as guarantors under the Loan Documents and to Nesher Pharmaceuticals Inc. was added as a new guarantor under the Loan Documents. Effective with the filing of this Form 10-K, the Company is in compliance with the SEC filing requirements contained in the waiver. However, based on current financial projections, the Company does not anticipate meeting the March 31, 2012 minimum net worth requirement. Accordingly, the mortgage is classified as a current liability as of March 31, 2011. If the Company is ultimately unable to meet the minimum net worth requirement by March 31, 2012, it will need to seek an additional waiver from the mortgage lender.

### Collateralized borrowing

On February 25, 2009, the Company initiated legal action against Citigroup Global Markets Inc. ("CGMI"), through which it acquired the ARS the Company held at that time, in the District Court for the Eastern District of Missouri. On January 21, 2010, the Company and CGMI entered into a Purchase and Release Agreement pursuant to which CGMI agreed to purchase the Company's remaining ARS for an aggregate purchase price of approximately $61.7. The Company also received a two-year option (which expires on January 21, 2012) to reacquire the ARS (in whole or on a class-by-class basis) for the prices at which they were sold, as well as the right to receive further payments in the event any ARS are redeemed prior to the expiration of the option.

In accordance with authoritative guidance ASC 860, *Transfers and Servicing*, the Company accounted for the ARS transfer to CGMI, including the two-year option to reacquire the ARS, as a secured borrowing with pledge of collateral. The transfer of the ARS to CGMI does not meet all of the conditions set forth in ASC 860 in order to be accounted for as a sale. As a secured borrowing with pledge of collateral, the Company was required to record a short-term liability ("collateralized borrowing") as of March 31, 2011 and 2010 for the ARS sale proceeds, representing a borrowing of cash from CGMI. The ARS have been transferred to CGMI and serve as a pledge of collateral under this borrowing. The Company shall continue to carry the ARS as an asset in the accompanying Consolidated Balance Sheets, and it will continue to adjust to the ARS' fair value on a quarterly basis (see Note 7—"Fair Value Measures"). In the event any ARS are redeemed prior to the expiration of the option, the Company will account for the redemptions as a sale pursuant to ASC 860. Through March 31, 2011, $10.1 par value of ARS ($8.8 at CGMI purchase cost) were redeemed.

### Software financing arrangement

The Company renegotiated the contract with the seller during fiscal year 2011 by extending the agreement for three years and now pays only for products and services as they are incurred instead of upfront which was previously financed with a financial institution at March 31, 2010.

160

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

*(Dollars in millions, except per share data)*

*Other*

The aggregate scheduled maturities of long-term debt, (as adjusted by the August 2010 Waiver Letter) as of March 31, 2011 were as follows:

| | |
|---|---:|
| Due in one year. | $ 85.4 |
| Due in two years | — |
| Due in three years. | 200.0 |
| Due in four years | 225.0 |
| Due in five years | — |
| Thereafter | — |
| | $510.4 |

**14.    Taxable Industrial Revenue Bonds**

In December 2005, the Company entered into a financing arrangement with St. Louis County, Missouri related to expansion of its operations in St. Louis County. Up to $135.5 of industrial revenue bonds could have been issued to the Company by St. Louis County relative to capital improvements made through December 31, 2009. This agreement provides that 50% of the real and personal property taxes on up to $135.5 of capital improvements will be abated for a period of ten years subsequent to the property being placed in service. Industrial revenue bonds totaling $129.9 were outstanding at March 31, 2011. The industrial revenue bonds are issued by St. Louis County to the Company upon its payment of qualifying costs of capital improvements, which are then leased by the Company through December 1, 2019, unless earlier terminated. The Company has the option at any time to discontinue the arrangement and regain full title to the abated property. The industrial revenue bonds bear interest at 4.25% per annum and are payable as to principal and interest concurrently with payments due under the terms of the lease. The Company has classified the leased assets as property and equipment and has established a capital lease obligation equal to the outstanding principal balance of the industrial revenue bonds. Lease payments may be made by tendering an equivalent portion of the industrial revenue bonds. As the capital lease payments to St. Louis County may be satisfied by tendering industrial revenue bonds (which is the Company's intention), the capital lease obligation, industrial revenue bonds and related interest expense and interest income, respectively, have been offset for presentation purposes in the consolidated financial statements.

**15.    Commitments and Contingencies**

*Leases*

The Company leases manufacturing, office and warehouse facilities, equipment and automobiles under operating leases expiring through fiscal year 2023. Total rent expense for the fiscal years ended March 31, 2011, 2010 and 2009 were $2.2, $2.9 and $5.0, respectively.

Facility leases with free rent periods or rent escalation clauses are expensed on a straight-line basis over the life of the lease commencing at lease inception.

161