**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
                                                    :
In re:                                              :        Chapter 11
                                                    :
K-V Discovery Solutions, Inc., et al.,              :        Case No. 12-13346 (ALG)
                                                    :
                                    Debtors.         :        Jointly Administered
----------------------------------------------------------------x

### DISCLOSURE STATEMENT FOR SIXTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR K-V DISCOVERY SOLUTIONS, INC. AND ITS AFFILIATED DEBTORS

Dated: New York, New York
       July 17, 2013

**WILLKIE FARR & GALLAGHER LLP**

787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Counsel for the Debtors and Debtors in Possession*

IMPORTANT NOTICE

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY
DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN
CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE SIXTH
AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR K-V DISCOVERY
SOLUTIONS, INC. AND ITS AFFILIATED DEBTORS (THE "**PLAN**").  NO
REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT
CONCERNING THE DEBTORS, THEIR BUSINESS OPERATIONS OR THE VALUE OF
THEIR ASSETS, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE
STATEMENT.

THE DEBTORS URGE YOU TO READ THIS DISCLOSURE STATEMENT CAREFULLY
FOR A DISCUSSION OF VOTING INSTRUCTIONS, RECOVERY INFORMATION,
CLASSIFICATION OF CLAIMS, THE HISTORY OF THE DEBTORS AND THE
REORGANIZATION CASES, THE DEBTORS' BUSINESSES, PROPERTIES AND
RESULTS OF OPERATIONS, HISTORICAL AND PROJECTED FINANCIAL RESULTS
AND A SUMMARY AND ANALYSIS OF THE PLAN.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT NOT OTHERWISE
DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN, A COPY OF
WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1.

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR
AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE A FURTHER
AMENDED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME,
SUBJECT TO THE TERMS OF THE PLAN.  THIS DISCLOSURE STATEMENT SHALL
NOT CONSTITUTE AN OFFER TO SELL, OR THE SOLICITATION OF AN OFFER TO
BUY, NOR WILL THERE BE ANY DISTRIBUTION OF ANY OF THE SECURITIES
DESCRIBED HEREIN UNTIL THE EFFECTIVE DATE OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH
SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL
RULES OF BANKRUPTCY PROCEDURE.  THE PLAN AND THIS DISCLOSURE
STATEMENT WERE NOT REQUIRED TO BE PREPARED IN ACCORDANCE WITH
FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE
NONBANKRUPTCY LAW.  DISSEMINATION OF THIS DISCLOSURE STATEMENT IS
CONTROLLED BY BANKRUPTCY RULE 3017.  ANY REPRESENTATION TO THE
CONTRARY IS A CRIMINAL OFFENSE.  PERSONS TRADING IN OR OTHERWISE
PURCHASING, SELLING OR TRANSFERRING SECURITIES OF THE DEBTORS
SHOULD EVALUATE THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH IT WAS
PREPARED.

THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN
INTEREST IN THESE CASES WITH "ADEQUATE INFORMATION" (AS DEFINED IN
THE BANKRUPTCY CODE) SO THAT THOSE CREDITORS WHO ARE ENTITLED TO

VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT REGARDING SUCH VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN; RATHER THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO AID AND SUPPLEMENT SUCH REVIEW.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT (WHICH WILL BE FILED NO LATER THAN TEN (10) CALENDAR DAYS PRIOR TO THE VOTING DEADLINE (DEFINED BELOW)), AND THE EXHIBITS ATTACHED THERETO AND THE AGREEMENTS AND DOCUMENTS DESCRIBED THEREIN.  IF THERE IS A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.  YOU ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND PLAN SUPPLEMENT AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING HOW TO VOTE WITH RESPECT TO THE PLAN.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS **4:00 P.M. (PREVAILING EASTERN TIME) ON AUGUST 16, 2013,** UNLESS EXTENDED BY THE DEBTORS (THE "**VOTING DEADLINE**").  TO BE COUNTED, BALLOTS MUST BE RECEIVED BY THE VOTING AGENT (AS DEFINED HEREIN) ON OR BEFORE THE VOTING DEADLINE.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT.  THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF, OR REGISTERED PURSUANT TO, A REGISTRATION STATEMENT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR WITH ANY OTHER SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY OTHER SECURITIES REGULATORY AUTHORITY, OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION

CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS BELIEVE THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT, AND THE OFFER OF THE NEW SECURITIES THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE SOLICITATION, ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY SECTION 1145(a)(1) OF THE BANKRUPTCY CODE AND/OR OTHER APPLICABLE EXEMPTIONS (INCLUDING SECTION 4(A)(2) OF THE SECURITIES ACT), AND EXPECT THAT THE OFFER AND ISSUANCE OF THE SECURITIES UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE APPLICABILITY OF SECTION 1145(a)(1) OF THE BANKRUPTCY CODE AND/OR OTHER APPLICABLE EXEMPTIONS (INCLUDING SECTION 4(A)(2) OF THE SECURITIES ACT).

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF OR CREATE ANY DUTY TO UPDATE SUCH INFORMATION.

EXCEPT WITH RESPECT TO THE LETTER FROM THE CREDITORS' COMMITTEE ACCOMPANYING THE DISCLOSURE STATEMENT, NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, NOTICES AND SCHEDULES ATTACHED TO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISOR(S) WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, THE PLAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

FORWARD-LOOKING STATEMENTS:

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTORS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTORS' AND THE REORGANIZED DEBTORS' BUSINESSES.  IN PARTICULAR, STATEMENTS USING WORDS SUCH AS "BELIEVE," "MAY," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER ARTICLE XI.  IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THE DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS.  CONSEQUENTLY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, THEIR ADVISORS OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITIONS OR RESULTS OF OPERATIONS CAN OR WILL BE ACHIEVED.  EXCEPT AS OTHERWISE REQUIRED BY LAW, NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS UNDERTAKE ANY OBLIGATION TO UPDATE OR REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE FOLLOWING APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.

THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.  AS SET FORTH IN THE LETTER FROM THE CREDITORS' COMMITTEE ACCOMPANYING THE DISCLOSURE STATEMENT, THE CREDITORS' COMMITTEE SUPPORTS THE PLAN AND URGES UNSECURED CREDITORS TO VOTE IN FAVOR OF THE PLAN.

# TABLE OF CONTENTS

**Page**

ARTICLE I. INTRODUCTION ........................................................................................1
   1.1.     General. ................................................................................................1
   1.2.     The Confirmation Hearing. ..................................................................2
   1.3.     Classification of Claims and Interests...................................................3
   1.4.     Voting; Holders of Claims Entitled to Vote. ........................................3
   1.5.     Important Matters.................................................................................7

ARTICLE II. SUMMARY OF PLAN AND CLASSIFICATION AND TREATMENT
         OF CLAIMS AND INTERESTS THEREUNDER ...........................................7
   2.1.     General. ................................................................................................7
   2.2.     Summary of Treatment of Claims and Interests Under the Plan. .........9

ARTICLE III. BUSINESS DESCRIPTION; HISTORICAL INFORMATION ...........16
   3.1.     The Debtors' Businesses.....................................................................16
   3.2.     Certain Material Litigation and Regulatory Matters............................22
   3.3.     Summary of Corporate Structure. .......................................................28
   3.4.     Debtors' Prepetition Capital and Debt Structure. ...............................28

ARTICLE IV. EVENTS LEADING TO CHAPTER 11 FILING.................................30

ARTICLE V. REASONS FOR THE SOLICITATION; RECOMMENDATION.......................31

ARTICLE VI. THE PLAN ..........................................................................................31
   6.1.     Overview of Chapter 11......................................................................31
   6.2.     Resolution of Certain Inter-Creditor and Inter-Debtor Issues ...........32
   6.3.     Overview of the Plan. ........................................................................33
   6.4.     Acceptance or Rejection of the Plan;  Effect of Rejection by One or
         More Classes of Claims or Interests. .................................................41
   6.5.     Summary of Capital Structure of Reorganized Debtors. ....................43
   6.6.     Means for Implementation...................................................................45
   6.7.     Equitable Subordination and/or Disallowance of Mr. M. Hermelin's
         Claim....................................................................................................53
   6.8.     Treatment of Executory Contracts and Unexpired Leases. ................57
   6.9.     Discharge of Claims Against and Interests in the Debtors .................59
   6.10.    Exculpation and Limitation of Liability. .............................................60
   6.11.    Releases...............................................................................................60
   6.12.    Injunction. ...........................................................................................62
   6.13.    Injunction Related to Releases and Exculpation..................................63
   6.14.    Injunction Against Interference With Plan. .........................................63
   6.15.    Termination of Subordination Rights and Settlement of Related Claims..........63
   6.16.    Retention of Causes of Action/Reservation of Rights. .......................64
   6.17.    Indemnification Obligations; Insured Current Director & Officer
         Claims. ................................................................................................64
   6.18.    Securities Litigation; Document Retention..........................................65

ARTICLE VII. CONFIRMATION OF THE PLAN OF REORGANIZATION .........................66
    7.1.        Confirmation Hearing. ......................................................66
    7.2.        Confirmation. .....................................................................67
    7.3.        Classification of Claims and Interests.............................74
    7.4.        Consummation. ..................................................................74
    7.5.        Dissolution of the Creditors' Committee.........................74
    7.6.        Post-Confirmation Jurisdiction of the Bankruptcy Court. ................74

ARTICLE VIII. ALTERNATIVES TO CONFIRMATION AND  CONSUMMATION
               OF THE PLAN ...........................................................................76
    8.1.        Alternative Plan(s) of Reorganization. ...........................76
    8.2.        Liquidation Under Chapter 7 of the Bankruptcy Code....................77
    8.3.        Dismissal of the Debtors' Reorganization Cases.............77

ARTICLE IX. SUMMARY OF VOTING PROCEDURES .......................................................77

ARTICLE X. DESCRIPTION AND HISTORY OF CHAPTER 11 CASES ..............................78
    10.1.      General Case Background...................................................78
    10.2.      Retention of Professionals. ................................................78
    10.3.      Employment Obligations. ..................................................79
    10.4.      Continuing Supplier and Customer Relations...................80
    10.5.      Stabilization of Debtors' Business Operations. .................80
    10.6.      Utilities..............................................................................82
    10.7.      Leases of Nonresidential Real Property.............................82
    10.8.      Appointment of a Creditors' Committee. ..........................82
    10.9.      Section 341 Meeting. ........................................................83
    10.10.    Schedules, Statements and Bar Date.................................84
    10.11.    Hologic Matters. ...............................................................84
    10.12.    The DIP Facility................................................................86
    10.13.    Other Material Postpetition Litigation and Settlements....................87
    10.14.    Preferences and Fraudulent Conveyances. ........................91
    10.15.    Deadline Extensions..........................................................92
    10.16.    Entry Into New Headquarters Lease Agreement ...............93
    10.17.    Events Leading to Formulation of Plan; Global Settlement. ............93

ARTICLE XI. CERTAIN RISK FACTORS TO BE CONSIDERED .........................................96
    11.1.      Certain Bankruptcy Considerations...................................96
    11.2.      Risks Relating to the Capital Structure of the Reorganized Debtors.................99
    11.3.      Risks Relating to Tax and Accounting Consequences of the Plan. .................103
    11.4.      Risks Associated With the Debtors' Business. ..................104

ARTICLE XII. CERTAIN FEDERAL INCOME TAX  CONSEQUENCES OF THE
               PLAN ...........................................................................................116
    12.1.      Introduction.......................................................................116
    12.2.      Federal Income Tax Consequences to the Debtors...........117
    12.3.      Federal Income Tax Consequences to Holders of Certain Claims. .................119

ARTICLE XIII. SECURITIES LAW MATTERS ...................................................................122
    13.1.      General...............................................................................122
    13.2.      Initial Offer and Sale of Securities Under Federal Securities Laws. ..............122

13.3.        The Rights Offering Stock. ...........................................................................123
13.4.        New Common Stock. .....................................................................................123

ARTICLE XIV. PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN.....................125
14.1.        Distributions...................................................................................................125
14.2.        No Postpetition Interest on Claims. ...............................................................125
14.3.        Date of Distributions......................................................................................126
14.4.        Distribution Record Date. ..............................................................................126
14.5.        Disbursing Agent. ..........................................................................................126
14.6.        Delivery of Distribution. ................................................................................127
14.7.        Unclaimed Property. ......................................................................................127
14.8.        Satisfaction of Claims. ...................................................................................127
14.9.        Manner of Payment Under Plan......................................................................127
14.10.       Fractional Shares/De Minimis Cash Distributions. ........................................127
14.11.       No Distribution in Excess of Amount of Allowed Claim................................128
14.12.       Exemption From Securities Laws. ..................................................................128
14.13.       Setoffs and Recoupments...............................................................................128
14.14.       Rights and Powers of Disbursing Agent.........................................................129
14.15.       Withholding and Reporting Requirements. .....................................................129
14.16.       Cooperation With Disbursing Agent. .............................................................130
14.17.       Hart-Scott Rodino Antitrust Improvements Act. ...........................................130

ARTICLE XV. PROCEDURES FOR RESOLVING CLAIMS ..............................................130
15.1.        Objections to Claims......................................................................................130
15.2.        Amendment to Claims. ...................................................................................131
15.3.        Disputed Claims.............................................................................................131
15.4.        Estimation of Claims......................................................................................132
15.5.        Expenses Incurred On or After the Effective Date. ........................................133

CONCLUSION    ............................................................................................................134

Annexed as exhibits (the "**Exhibits**") to this Disclosure Statement are copies of the following documents:

- Plan (Exhibit 1);

- Liquidation Analysis (Exhibit 2);

- Reorganized Debtors' Projected Financial Information (Exhibit 3);

- Disclosure Statement Order (without exhibits) (Exhibit 4);

- Rights Offering Procedures (Exhibit 5);

- Stock Purchase Agreement (without exhibits) (Exhibit 6);

- Share Purchase Agreement (Exhibit 7); and

- *K-V Pharmaceutical Co. v. Hermelin*, Case No. 11SL-CC04054, Amended Petition for Declaratory Judgment and Further Relief (dated November 28, 2011) (Exhibit 8).

# ARTICLE I.

# INTRODUCTION

## 1.1.    *General.*

K-V Discovery Solutions, Inc., DrugTech Corporation, FP1096, Inc., K-V Generic Pharmaceuticals, Inc., K-V Pharmaceutical Company, K-V Solutions USA, Inc., Ther-Rx Corporation and Zeratech Technologies USA, Inc. (collectively, the "**Debtors**"), as debtors and debtors in possession in chapter 11 cases pending before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), jointly administered under Case No. 12-13346 (ALG), pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**"), transmit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, in connection with the Debtors' solicitation of votes to confirm the Sixth Amended Joint Chapter 11 Plan of Reorganization for K-V Discovery Solutions, Inc. and Its Affiliated Debtors, dated as of July 17, 2013. ***All Plan Documents are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan), which may result in material changes to the terms of the Plan Documents.***  On the Effective Date, the Plan, all Plan Documents and all other agreements entered into or instruments issued in connection with the Plan and any Plan Document, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto and shall be deemed to become effective simultaneously.

On July 17, 2013, after notice and a hearing, the Bankruptcy Court entered an order (the "**Disclosure Statement Order**"), which, among other things:  (i) approved this Disclosure Statement as containing "adequate information" to enable a hypothetical, reasonable investor typical of holders of Claims against or Interests in the Debtors to make an informed judgment as to whether to accept or reject the Plan; and (ii) authorized the Debtors to use this Disclosure Statement in connection with the solicitation of votes to accept or reject the Plan. **The Disclosure Statement Order establishes August 16, 2013 at 4:00 p.m. (prevailing Eastern Time) as the Voting Deadline for the return of Ballots accepting or rejecting the Plan.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan, and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots.  In addition, detailed voting instructions accompany each Ballot.  Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement and the Exhibits hereto, including the Plan and the Disclosure Statement Order, as well as the instructions accompanying the Ballot in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  In voting on the Plan, holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses other than the information contained in this Disclosure Statement, the Plan and all Exhibits hereto and thereto.

**THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS IN CLASSES 3, 4, 5, 6 AND 7 VOTE TO ACCEPT THE PLAN, AS THE PLAN PROVIDES FOR THE BEST AVAILABLE RECOVERY TO CREDITORS IN SUCH CLASSES.**

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW.  THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY.  HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED EXHIBITS AND ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.

Additional copies of this Disclosure Statement (including the Exhibits hereto) are available upon request made to the Debtors' Claims Agent, Epiq Bankruptcy Solutions, LLC ("**Epiq**"), at the following address:  K-V Discovery Solutions, Inc. Ballot Tabulation Center, c/o Epiq Bankruptcy Solutions, LLC, FDR Station, P.O. Box 5014, New York, NY 10150-5014.  They may also be obtained by contacting the Epiq via telephone at (646) 282-2500.  Additional copies of this Disclosure Statement (including the Exhibits hereto) can also be accessed free of charge from the following website:  http://dm.epiq11.com/KVD.

In addition, a Ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement for the holders of Claims that are entitled to vote to accept or reject the Plan.  If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact Epiq at the address above.

Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the other Exhibits attached hereto and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.

## 1.2.   *The Confirmation Hearing.*

In accordance with the Disclosure Statement Order and section 1128 of the Bankruptcy Code, a hearing will be held before the Honorable Allan L. Gropper, United States Bankruptcy Judge for the Southern District of New York, United States Bankruptcy Court, Courtroom 617, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408 on **August 28, 2013 at 11:00 a.m. (prevailing Eastern Time)**, to consider confirmation of the Plan.  The Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and they have reserved the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, subject to the terms of the Plan.  Objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before **August 19, 2013 at 4:00 p.m. (prevailing Eastern Time)**, in the manner set forth in the Disclosure Statement Order.  The hearing on confirmation of the Plan, may be adjourned

from time to time without further notice except for the announcement of the adjourned date and time at the hearing on confirmation or any adjournment thereof or an appropriate filing with the Bankruptcy Court.

At the Confirmation Hearing, the Bankruptcy Court will, among other things:

- determine whether sufficient majorities in number and amount from each Class entitled to vote have delivered properly executed votes accepting the Plan to approve the Plan;

- hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of;

- determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and

- determine whether to confirm the Plan.

**1.3.    *Classification of Claims and Interests.***

The following table designates the Classes of Claims against and Interests in the Debtors, and specifies which Classes are: (a) impaired or unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, or (c) deemed to accept or reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | No | No (Deemed to accept) |
| Class 2 | Other Secured Claims | No | No (Deemed to accept) |
| Class 3 | Senior Secured Notes Claims | Yes | Yes |
| Class 4 | ETHEX Criminal Fine Claims | Yes | Yes |
| Class 5 | Qui Tam Claims | Yes | Yes |
| Class 6 | Convertible Subordinated Notes Claims | Yes | Yes |
| Class 7 | General Unsecured Claims | Yes | Yes |
| Class 8(a) | Existing Securities Law Claims | Yes | No (Deemed to reject) |
| Class 8(b) | Equitably Subordinated Claims | Yes | No (Deemed to reject) |
| Class 9 | Existing KV Interests | Yes | No (Deemed to reject) |

**1.4.    *Voting; Holders of Claims Entitled to Vote.***

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a chapter 11 plan are entitled to vote to accept or reject such proposed plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are altered under such plan. Classes of claims or equity interests under a chapter 11 plan in which the holders of claims or equity interests are unimpaired are deemed to have accepted such plan and are not entitled to vote to accept or reject the proposed plan. In addition, classes of claims or equity interests in which the holders of claims or equity interests

will not receive or retain any property on account of their claims or equity interests are deemed to have rejected the chapter 11 plan and are not entitled to vote to accept or reject such plan.

In connection with the Plan:

- Claims in Classes 3, 4, 5, 6 and 7 are impaired, will receive a distribution on account of such Claims to the extent provided in the Plan and are entitled to vote to accept or reject the Plan;

- Claims in Classes 1 and 2 are unimpaired and, as a result, holders of such Claims are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan; and

- Claims and Interests in Classes 8(a), 8(b) and 9 are impaired will not receive a distribution on account of such Claims and Interests, respectively, under the Plan, are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the chapter 11 plan. **Your vote on the Plan is important.** The Bankruptcy Code requires as a condition to confirmation of a chapter 11 plan that each class that is impaired and entitled to vote under a plan vote to accept such plan, unless the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan and/or to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the non-acceptance of such plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept such plan (excluding any votes of insiders). Under that section, a chapter 11 plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. This Disclosure Statement, the Exhibits attached hereto, the Plan and the related documents are the only materials the Debtors are providing to creditors for their use in determining whether to vote to accept or reject the Plan, and it is the Debtors' position that such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan.

Please complete and sign your Ballot(s) and, unless you are sending your Ballot to an Intermediary (as defined below) for inclusion in a master Ballot, return such Ballot to the Debtors' claims and voting agent (the "**Voting Agent**") at the applicable address below:

> *If by First-Class Mail:*
> K-V Discovery Solutions, Inc. Ballot Tabulation Center
> c/o Epiq Bankruptcy Solutions, LLC
> FDR Station, P.O. Box 5014
> New York, NY 10150-5014
>
> *If by Hand Delivery or Overnight Mail:*
> K-V Discovery Solutions, Inc. Ballot Tabulation Center
> c/o Epiq Bankruptcy Solutions, LLC
> 757 Third Avenue, 3rd Floor
> New York, NY 10017

TO BE COUNTED, YOUR ORIGINAL BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN **4:00 P.M., PREVAILING EASTERN TIME, ON AUGUST 16, 2013,** UNLESS EXTENDED BY THE DEBTORS.  YOUR BALLOT MAY BE SENT VIA MAIL, OVERNIGHT COURIER OR MESSENGER.  FAXED COPIES AND VOTES SENT ON OTHER FORMS WILL NOT BE ACCEPTED EXCEPT IN THE DEBTORS' SOLE DISCRETION.  ALL BALLOTS MUST BE SIGNED.  IF YOU ARE SENDING YOUR BALLOT TO AN INTERMEDIARY FOR INCLUSION IN A MASTER BALLOT, THE ***INTERMEDIARY*** MUST RECEIVE YOUR PROPERLY COMPLETED BALLOT BY SUCH TIME AND DATE AS SPECIFIED BY THE INTERMEDIARY THAT ALLOWS THE INTERMEDIARY SUFFICIENT TIME TO PROCESS THE BALLOTS.

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from the Classes entitled to vote with respect thereto.  Accordingly, in voting on the Plan, please use only the Ballots sent to you with this Disclosure Statement or provided by the Voting Agent.

The Debtors have fixed **5:00 p.m. (prevailing Eastern time) on July 11, 2013** (the "**Voting Record Date**"), as the time and date for the determination of Persons who are entitled to receive a copy of this Disclosure Statement and all of the related materials and to vote whether to accept or reject the Plan.  Accordingly, only holders of record of Claims as of the Voting Record Date that are entitled to vote on the Plan will receive a Ballot and may vote on the Plan.

All properly completed Ballots received prior to the Voting Deadline will be counted for purposes of determining whether a voting Class of impaired Claims has accepted the Plan.  **Under the Bankruptcy Code, for the Plan to be "accepted," a specified majority vote is required for each Class of impaired Claims entitled to vote on the Plan.  If no votes are received with respect to any Class of impaired Claims entitled to vote on the Plan, then such Class shall be deemed to have accepted the Plan.  If any impaired Class fails to have any Allowed Claims or a Claim temporarily Allowed by the Court as of the date of the**

**Confirmation Hearing, such Class or Classes will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class or Classes pursuant to section 1129(a)(8) of the Bankruptcy Code.** The Voting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Class entitled to vote.

In accordance with Bankruptcy Rule 3017(e), the Debtors will send Ballots to transfer agents, registrars, servicing agents or other intermediaries holding Claims for, or acting on behalf of, beneficial holders of Claims (collectively, the "**Intermediaries**"). Specifically, the Debtors will send Ballots to Intermediaries for distribution to the holders of Claims in Class 3 (Senior Secured Notes Claims) and Class 6 (Convertible Subordinated Notes Claims). Each Intermediary will be entitled to receive, upon request to the Debtors, a reasonably sufficient number of Ballots to distribute to the beneficial owners of the Claims for which it is an Intermediary. Each Intermediary who is tabulating votes of beneficial holders in a summary "master" ballot in a form approved by the Bankruptcy Court (the "**Master Ballot**") must receive returned ballots from beneficial holders by such time and date as specified by the Intermediary so that it can tabulate and return the results to the Voting Agent indicating the number and dollar amount of cast ballots in the group of Claim holders for which it is an Intermediary. Any Intermediaries submitting Master Ballots must certify that each beneficial holder has not cast more than one vote with respect to any given Claim for any purpose, including for determining both the number of votes and the amount of the Claim, even if such holder holds securities of the same type in more than one account. However, persons who hold Claims in more than one voting Class will be entitled to one vote in each such Class, subject to the applicable voting rules.

---

**IMPORTANT - Voting by Intermediary**

**Timing:** If your vote is being processed by an Intermediary, please allow time for transmission of your ballot to your Intermediary for preparation and delivery to the Voting Agent of a Master Ballot reflecting your vote and the votes of other Claims tabulated by the Intermediary.

To be counted, your vote must be received *either* (a) directly by the **Voting Agent** on or before the Voting Deadline, or (b) if your vote is processed by an Intermediary, by **your Intermediary** by such time and date as specified by such Intermediary that allows such Intermediary sufficient time to process the Ballots.

Receipt by the **Intermediary** on or close to the Voting Deadline may not allow sufficient time for the Intermediary to include your vote in the Master Ballot that it prepares and delivers to the Voting Agent by the Voting Deadline.

**Questions on Voting Procedures:** If you have a question concerning the voting procedures, please contact your Intermediary or the Voting Agent.

---

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST
INTERESTS OF ALL HOLDERS OF CLAIMS AND RECOMMEND THAT ALL HOLDERS
OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

**1.5.    *Important Matters.***

   This Disclosure Statement contains projected financial information and certain
other forward-looking statements, all of which are based on various estimates and assumptions
and will not be updated to reflect events occurring after the date hereof.  Such information and
statements are subject to inherent uncertainties and to a wide variety of significant business,
economic and competitive risks, including, among others, those described herein.  Consequently,
actual events, circumstances, effects and results may vary significantly from those included in or
contemplated by such projected financial information and such other forward-looking
statements.  The projected financial information contained herein and in the exhibits annexed
hereto, therefore, is not necessarily indicative of the future financial condition or results of
operations of the Debtors, which in each case may vary significantly from those set forth in such
projected financial information.  Consequently, the projected financial information and other
forward-looking statements contained herein should not be regarded as representations by any of
the Debtors, the Reorganized Debtors, their advisors, or any other Person that the projected
financial conditions or results of operations can or will be achieved.

## ARTICLE II.

## SUMMARY OF PLAN AND CLASSIFICATION AND
## TREATMENT OF CLAIMS AND INTERESTS THEREUNDER

**2.1.    *General.***

   The overall purpose of the Plan is to provide for the restructuring of the Debtors'
liabilities in a manner designed to maximize recovery to stakeholders and to enhance the
financial viability of the Reorganized Debtors.  The Plan reflects an agreement and compromise
(the "**Global Settlement**") among the Debtors, the Creditors' Committee, the holders of at least
75% in dollar amount of the Class 3 Senior Secured Notes Claims, and the holders of
approximately 97% in dollar amount of Class 6 Convertible Subordinated Notes Claims.  Under
this agreement and compromise:  (a) each holder of an Allowed Senior Secured Notes Claim will
receive its pro rata share of a Cash distribution in the amount of (i) $231,409,850 (i.e., the total
amount of Senior Secured Notes Claims for prepetition principal and interest owing under the
Senior Secured Notes less unamortized original issue discount); plus (ii) the amount of any
postpetition interest and accreted original issue discount amount determined by the Bankruptcy
Court to be owed to the holders of Senior Secured Notes under the subordination provisions of
the Convertible Subordinated Notes Indenture (which amounts, if any, shall be determined by the
Bankruptcy Court in connection with confirmation of the Plan); (b) the Debtors' existing
indebtedness under the DIP Credit Agreement will be paid in full in Cash; (c) the Debtors'
existing indebtedness in respect of Convertible Subordinated Notes Claims will be cancelled and
exchanged for 7% of the New Common Stock of Reorganized KV; and (d) each holder of an
Allowed General Unsecured Claim against any Debtor shall receive Cash in an amount equal its
Pro Rata Share of $10,250,000.

All Intercompany Claims will be adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid, continued, or discharged to the extent reasonably determined appropriate by the Reorganized Debtors.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court or by the stockholders of any of the Reorganized Debtors.  All Intercompany Interests shall be preserved under the Plan, and the Debtors' existing corporate structure shall be maintained.  The Qui Tam Claims and ETHEX Criminal Fine Claims shall either be settled or receive the treatment provided in the Plan.  Other Secured Claims shall receive Cash or retain liens, in satisfaction of their Allowed Other Secured Claims, in accordance with the terms of the Plan as described herein and in the Plan.  No distributions shall be made on account of Existing Securities Law Claims, Equitably Subordinated Claims or Existing KV Interests.

The Plan Distributions described above will be funded by, among other sources, the proceeds of the New First Lien Term Loan, the Rights Offering and the sale of the Direct Purchase Shares, in accordance with the Stock Purchase Agreement by and among KV and the Investor Parties and the Share Purchase Agreement by and among KV, the Investor Parties, and Silver Point.  Pursuant to the Stock Purchase Agreement and Share Purchase Agreement (copies of which are annexed hereto as Exhibits 6 and 7, respectively): (a) KV will sell the Investor Parties and Silver Point, and the Investor Parties and Silver Point will purchase, 1,850,000 shares of New Common Stock for an aggregate purchase price of $37 million (i.e., $20 per share); (b) holders of Allowed Convertible Subordinated Notes Claims that (i) are Accredited Investors and (ii) vote to accept the Plan will be eligible to participate, on a pro rata basis, in a Rights Offering for 11,900,000 shares of New Common Stock (representing 76.2% of the total number of shares of New Common Stock to be issued on the Effective Date of the Plan) at an exercise price of $20 per share, for an aggregate exercise price of $238 million, in accordance with the Rights Offering Procedures; and (c) the Rights Offering will be backstopped by the Investor Parties and Silver Point in accordance with the terms of the Stock Purchase Agreement and Share Purchase Agreement (i.e., the Investor Parties and Silver Point will collectively purchase any shares of New Common Stock not validly subscribed and paid for in the Rights Offering).  In consideration of the Investor Parties' and Silver Point's commitments under the Stock Purchase Agreement and Share Purchase Agreement, the Investor Parties and Silver Point will collectively receive 781,250 shares of New Common Stock (representing 5.00% of the total number of shares of New Common Stock to be issued on the Effective Date of the Plan).

**Each of the distributions of New Common Stock under the Plan is subject to dilution by the New Common Stock Securities reserved for management of the Reorganized Debtors pursuant to the Management Incentive Plan (which shall not exceed 10% of the common equity of Reorganized KV on a fully-diluted basis).**  The New Common Stock will not be registered with the SEC or any state securities regulatory authority and will not trade on any exchange, or otherwise be publicly traded.

The Debtors believe that approval of the Plan is their best opportunity to emerge from the Reorganization Cases and enhance their financial viability.  The debt structure of the Reorganized Debtors, after giving effect to the transactions contemplated by the Plan, will substantially de-lever the Company and provide additional liquidity needed to support the Debtors' future operations.  The Debtors believe that the Plan provides for appropriate treatment of all Classes of Claims and Interests, taking into account the valuation of the newly issued

securities implied by the debt and equity financing commitments being provided in connection with consummation of the Plan and the differing natures and priorities of the Claims and Interests.

**2.2.**    *Summary of Treatment of Claims and Interests Under the Plan.*

The following table classifies the Claims against, and Interests in, the Debtors into separate Classes and summarizes the treatment of each Class under the Plan.  The table also identifies which Classes are entitled to vote on the Plan based on provisions of the Bankruptcy Code.  Finally, the table indicates the estimated recovery for each Class.  The summaries in this table are qualified in their entirety by the description and the treatment of such Claims and Interests in the Plan.  **As described in Article XI below, the Debtors' businesses are subject to a number of risks.  The uncertainties and risks related to the Reorganized Debtors make it difficult to determine a precise value of the Reorganized Debtors, the New Common Stock and other distributions under the Plan.  The recoveries and estimates described in the following table represent the Debtors' best estimates given the information available on the date of this Disclosure Statement.  All statements in this section relating to the amount of Claims and Interests are only estimates based on information known to the Debtors as of the date hereof, and the final amounts of Allowed Claims may vary significantly from these estimates.**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified.  Except as specifically noted therein, the Plan does not provide for payment of postpetition interest with respect to Allowed Claims.

| *Class* | *Description* | *Treatment* | *Entitled to Vote* | *Estimated Amount of Claims or Interests in Class* | *Estimated Recovery* |
|---|---|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment, each holder of an Allowed Priority Non-Tax Claim shall receive Cash from the applicable Reorganized Debtor in an amount equal to such Allowed Claim. | No | $0 | 100% |
| Class 2 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, each holder of an Allowed Other Secured | No | $0 | 100% |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------------------------------------|--------------------|
| | | Claim shall receive, at the election of the Reorganized Debtors: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render the Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. | | | |
| Class 3 | Senior Secured Notes Claims | Each holder of an Allowed Senior Secured Notes Claim shall receive, subject to the terms of the Plan (including, without limitation, Section 7.12 thereof), in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim (and in full satisfaction and discharge of any subordination provisions or agreements including the Senior Secured Notes Indenture and the Convertible Subordinated Notes Indenture), its Pro Rata Share of Cash in an aggregate amount equal to (i) $231,409,850, (ii) the Postpetition Interest Amount, if any, and (iii) the Postpetition Accreted OID Amount, if any. | Yes | $231,409,850[1] | 100.0% |
| Class 4 | ETHEX Criminal Fine Claims | Except to the extent that the holder of the ETHEX Criminal Fine Claim agrees to different treatment pursuant to an ETHEX Criminal Fine Settlement Order or otherwise determined by the Bankruptcy | Yes | $16,185,644 | TBD |

---

[1]     This amount is exclusive of any postpetition interest accrued on the Senior Secured Notes and any unamortized original issue discount on the Senior Secured Notes as of the Petition Date.  To the extent that the Bankruptcy Court determines that such amounts are owed to holders of Allowed Senior Secured Notes Claims, the cash distributions to holders of Allowed Senior Secured Notes Claims will increase pro rata by such amounts.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------------------------------------|--------------------|
| | | Court in connection with confirmation of the Plan that satisfies section 1129(b) of the Bankruptcy Code, such holder of an Allowed ETHEX Criminal Fine Claim shall receive, subject to the terms of the Plan, and in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, the ETHEX Criminal Fine Claims Distribution, which shall be paid by Reorganized KV in accordance with the ETHEX Criminal Fine Claims Payment Schedule. | | | |
| Class 5 | Qui Tam Claims | Except to the extent that a holder of a Qui Tam Claim agrees to different treatment pursuant to a Qui Tam Settlement Order or as otherwise determined by the Bankruptcy Court in connection with confirmation of the Plan that satisfies section 1129(b) of the Bankruptcy Code, such holder of an Allowed Qui Tam Claim shall receive, subject to the terms of the Plan and in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claims, the Qui Tam Claims Distribution, which shall be paid by Reorganized KV in accordance with the Qui Tam Claims Payment Schedule. | Yes | $18,433,110 | TBD |

- 11 -

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| Class 6 | Convertible Subordinated Notes Claims | On the Effective Date, or as soon thereafter as reasonably practicable, each holder of an Allowed Convertible Subordinated Notes Claim shall receive, subject to the terms of the Plan, and in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim (and not subject to turnover pursuant to any subordination provision or agreement, including, but not limited to, any such subordination provision set forth in the Convertible Subordinated Notes Indenture), its Pro Rata Share of 7% of the New Common Stock to be issued by Reorganized KV on the Effective Date, subject to dilution by the New Common Stock Securities to be issued pursuant to the Management Incentive Plan. | Yes | $201,114,164 | 10.87%[2] |

---

[2]    The estimated recovery represents the recovery based upon the distribution of the Pro Rata Share of 7% of the New Common Stock to be issued by Reorganized KV, which is subject to dilution by the New Common Stock Securities to be issued to management pursuant to the Management Incentive Plan.  The estimated recovery does not take into account any participation in the Rights Offering by any holder of an Allowed Convertible Subordinated Notes Claim.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| Class 7 | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, subject to section 7.14 of the Plan, if applicable, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of Cash in an amount equal to $10,250,000; provided, in no event shall such distribution be in excess of 100% of the amount of its Allowed General Unsecured Claim. | Yes | $13,923,079 – $18,250,000[3] | 73.6% - 56.2% [4] |
| Class 8(a) | Existing Securities Law Claims | Subject to Section 7.14 of the Plan, if applicable, holders of Existing Securities Law Claims shall not receive or retain any distribution under the Plan on account of such Existing Securities Law Claims. | No | n/a | 0% |
| Class 8(b) | Equitably Subordinated Claims | Subject to Section 7.14 of the Plan, if applicable, holders of Equitably Subordinated Claims shall not receive or retain any | No | n/a | 0% |

---

[3]    The estimated amount of Allowed General Unsecured Claims above excludes estimates of Allowed General Unsecured Claims (i) for which the Debtors have insurance coverage to the extent of such coverage, and (ii) Claims relating to contracts that the Debtors intend to assume or reject.  See Section 6.6(o), "Insured Claims," and Section 6.8(c), "Cure of Defaults for Assumed Executory Contracts and Unexpired Leases."  The range accounts for certain potential litigation risks.

[4]    The Plan treats the Hermelin Claims as Class 8(b) Equitably Subordinated Claims.  To the extent the Bankruptcy Court determines such Claims should be classified as Class 7 General Unsecured Claims and are allowable (which the Debtors dispute), the Debtors believe such Claims would be capped pursuant to section 502(b)(7) of the Bankruptcy Code, and reduced as described in greater detail in Section 6.7 below. If the Hermelin Claims are Allowed in such capped and reduced amounts, the estimated recovery to holders of Class 7 General Unsecured Claims would decrease minimally. If the Hermelin Claims are classified as Class 7 General Unsecured Claims and Allowed in an amount other than as described in Section 6.7 below, depending upon the amount of the Allowed Claim, distributions to Class 7 General Unsecured Claims could be materially decreased.  See Section 11.1(g), "*If the Hermelin Claims Are Not Equitably Subordinated, Disallowed, and/or Reduced Recoveries to Holders of Allowed General Unsecured Claims May Be Materially Diminished*."

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------------------------------------|--------------------|
|  |  | distribution under the Plan on account of such Equitably Subordinated Claims. |  |  |  |
| Class 9 | Existing KV Interests | Holders of Existing KV Interests shall not receive or retain any distribution under the Plan on account of such Existing KV Interests. | No | n/a | n/a |

The recoveries set forth above are estimates and are contingent upon approval of the Plan as proposed.

The Debtors expect that an aggregate of 17,361,111 shares of New Common Stock will be issued under the Plan (after giving effect to the issuance of the maximum amount of New Common Stock Securities that may be issued under the Management Incentive Plan and the Rights Offering). Based on the preceding estimate and for illustrative purposes only, immediately after the consummation of the Plan, the ownership of the Reorganized Debtors, after issuance of the New Common Stock that may be issued pursuant to the Management Incentive Program, would be approximately as described in the following table.

|  | Shares of New Common Stock | Percent Ownership |
|---|---|---|
| Direct Purchase Shares | 1,850,000 | 10.66% |
| Commitment Fee Shares | 781,250 | 4.50% |
| Class 6 | 1,093,750 | 6.30% |
| Rights Offering | 11,900,000 | 68.54% |
| Management Incentive Plan | 1,736,111 | 10.00%(1) |
| **TOTAL** | 17,361,111 | 100.0% |

(1) The total percentage assumes for illustrative purposes that 10% of New Common Stock Securities will be issued under the Management Incentive Plan, which is the maximum amount of New Common Stock Securities that may be issued under such plan. As set forth in the Plan, the Management Incentive Plan will be on terms acceptable to the Debtors and the Investor Parties and contained in the Plan Supplement.

# ARTICLE III.

## BUSINESS DESCRIPTION; HISTORICAL INFORMATION

**3.1.**    *The Debtors' Businesses.*

(a)    **The Debtors.**

The Debtors (together with their non-debtor subsidiaries, the "**Company**"), headquartered in St. Louis, Missouri, are a specialty branded pharmaceutical company with a primary focus in the area of women's healthcare.

The Company, like all pharmaceutical manufacturers, is subject to extensive regulation by the United States Food and Drug Administration (the "**FDA**"), and to a lesser extent, by state, local and foreign governments. The Federal Food, Drug and Cosmetic Act (the "**FFDCA**") and other federal and state statutes and regulations govern or influence the Company's business. In addition, the Company participates in federal healthcare programs, such as Medicaid and Medicare Part B, and as such, is subject to oversight from the Centers for Medicare & Medicaid Services ("**CMS**").

The Company holds numerous domestic and foreign issued patents relating to its controlled-release, site-specific, quick dissolve, and vitamin absorption technologies. In addition, the Company owns or holds licenses to 34 U.S. patents and has 10 U.S. patent applications pending, and approximately 27 foreign patents and numerous foreign patents applications pending primarily in Canada, Europe, Australia, Japan, South America, Mexico and South Korea. The Company also owns more than 300 U.S. and foreign trademark applications and registrations, including trademark protection for certain names of its proprietary controlled-release, taste masking, site-specific and quick dissolve technologies.

The Company sells its products directly to wholesalers, distributors, retail pharmacy chains, mail order pharmacies and group purchasing organizations. The Company also markets its products indirectly to independent pharmacies, managed care organizations, hospitals, pharmacy benefit management companies, government entities, physicians and other healthcare professionals, through its sales force and internal marketing team. These "indirect customers" purchase the Company's products primarily through the Debtors' direct wholesale or distributor channels. During fiscal year 2012,[5] the Company's three largest customers accounted for approximately 62% of gross revenue.

As of the date hereof, the Company employs approximately 135 full time employees, including approximately 85 field based sales representatives, managers and directors. None of the Company's employees are represented by a union. The Debtors do not provide any retiree benefits (within the meaning of section 1114 of the Bankruptcy Code) to their employees.

---

[5]    The Company's fiscal year is from April 1st through March 31st of each year.

(b)    **Company History and Divisions.**

The Company is a successor to a business originally founded in 1942. Historically, the Company was a fully integrated specialty pharmaceutical company that developed, manufactured, acquired and marketed technologically distinguished branded and generic/non-branded prescription pharmaceutical products. In the past, the Company operated in three segments — branded products, specialty generic non-branded products and specialty raw materials. Previously, the Company conducted its generic/non-branded pharmaceutical operations through its wholly-owned subsidiary, ETHEX Corporation ("**ETHEX**"), which focused principally on technologically-distinguished generic products. ETHEX ceased its operations on March 2, 2010 and was dissolved on December 15, 2010. In addition, the Company previously developed, manufactured and marketed raw material products for the pharmaceutical industry and other markets through Particle Dynamics, Inc. ("**PDI**"), which was sold to Particle Dynamics International, LLC ("**PDI LLC**") in June 2010 pursuant to a certain asset purchase agreement (the "**PDI Agreement**").

In May 2010, the Company formed a wholly-owned subsidiary, Nesher Pharmaceuticals, Inc. (which was subsequently renamed K-V Generic Pharmaceuticals, Inc. ("**KV Generic**"), one of the Debtors in these cases), to operate as the Company's sales and marketing arm for its generic products. On August 8, 2011, the Company sold substantially all of the assets of KV Generic and its generic products business to Zydus Pharmaceuticals (USA), Inc. ("**Zydus**") and its subsidiary Zynesher Pharmaceuticals (USA) LLC ("**Zynesher**", and together with Zydus, the "**Zydus Parties**").

Following the divestiture of its generics business and PDI, the Company no longer manufactured any of the products it sells and instead transformed itself into a specialty branded pharmaceutical marketing company primarily focused on women's health care products. Currently, the Company operates only its branded pharmaceutical products business through KV's wholly-owned subsidiary, Ther-Rx Corporation ("**Ther-Rx**"). Ther-Rx was established in 1999 to market brand name prescription pharmaceutical products that incorporated the Company's proprietary technologies. Ther-Rx's business peaked in fiscal year 2008, with net revenues of $212.3 million. However, as discussed further in Section 3.2(a) hereof, due to a nationwide recall and suspension of shipment of all products manufactured by the Company in fiscal year 2009, as well as entering into a consent decree (the "**Consent Decree**") with the Department of Justice ("**DOJ**"), Department of Health and Human Services ("**HHS**") and the FDA, for the past three years, the Company's net revenue has continued to track significantly below the level of net revenue for the time prior to the nationwide recall. In the three and twelve month periods ended March 31, 2013, the Company recorded net revenues of approximately $20.4 million and $66.7 million, respectively, and realized a net loss of approximately $11.3 million and $24.2 million, respectively, from continuing operations. The net loss for the three and twelve month periods ended March 31, 2013 includes a non-cash gain on debt extinguishment of $35.9 million. As a result of the Consent Decree, the products sold by the Company, which are described below, are now manufactured for the Company by third parties.

- 17 -

(c)    **Facilities and Offices.**

On March 4, 2013, the Debtors rejected the lease for their former corporate headquarters at 2280 Schuetz Road in St. Louis, Missouri, pursuant to section 365(d)(4) of the Bankruptcy Code.  Subsequently, the Company relocated their corporate headquarters to 16640 Chesterfield Grove Road in Chesterfield, Missouri.  See Section 10.16, "Entry Into New Headquarters Lease Agreement."

As of the Petition Date, the Debtors also leased four additional facilities from MECW, LLC ("**MECW**"), a non-debtor wholly-owned subsidiary of KV.  Each of these facilities was located in the St. Louis metropolitan area.  KV subleased certain of these facilities. Each of the Debtors' leases with MECW, and all related subleases, have been rejected pursuant to section 365 of the Bankruptcy Code.

(d)    **Products.**

(i)    **Makena®.**

The Company's single-most valuable product is Makena® (hydroxyprogesterone caproate injection), the first and only FDA-approved drug that reduces the risk of preterm birth in women with a singleton pregnancy who have a history of singleton spontaneous preterm birth. Preterm birth is a serious condition that not only carries immeasurable emotional costs, but also extremely high economic costs for affected families and for the nation as a whole.

(1) KV's Acquisition of Makena®.

On January 16, 2008, KV entered into an Asset Purchase Agreement (as amended from time to time, the "**Hologic Purchase Agreement**") [6] with Cytyc Prenatal Products Corp. ("**Cytyc**") and Hologic, Inc. ("**Hologic**", and together with Cytyc, the "**Hologic Parties**"), for the purchase of the worldwide rights to Makena®.  Under the Hologic Purchase Agreement, Makena® and the other assets described therein, were sold to KV effective as of February 4, 2011.  In connection with such sale, KV was obligated to make certain payments to Hologic, which were secured by a lien on certain of the Company's rights in Makena®.  As described in Section 10.11(b) below, pursuant to the Hologic Settlement Agreement (as defined and described below), the Debtors' obligations to Hologic have been released and discharged in exchange for, among other consideration, a cash payment of $60 million from the Debtors to the Hologic Parties.

(2) The FDA and Makena®.

On February 4, 2011, the FDA approved Makena® and granted the Company orphan drug marketing designation under the federal Orphan Drug Act (i.e., a drug designated to

---

[6]    The original Hologic Purchase Agreement has been amended by that certain Amendment No. 1, dated January 8, 2010, Amendment No. 2, dated February 3, 2011, Amendment No. 3, dated February 10, 2011, Amendment No. 4, dated March 10, 2011, Amendment No. 5, dated April 27, 2011, and Amendment No 6, dated January 17, 2012.

treat a rare medical condition).  As part of this designation, the Company was granted a seven-year marketing exclusivity period with respect to Makena®.  Through Ther-Rx, the Company began shipping Makena®, which is manufactured by a third party, in March 2011.

        In March 2011, the Company received letters from certain United States Senators and members of the United States Congress asking the Company to reduce its indicated list price of Makena®.  The legislators also inquired of CMS about the ramification of Makena®'s pricing on the Medicaid system and asked the Federal Trade Commission to initiate an investigation into Makena®'s pricing.

        Consequently, on March 30, 2011, under political pressure resulting in part from misleading press reports about Makena®'s list price, the FDA issued a press release that stated, in order to address purported concerns regarding "access" for patients needing hydroxyprogesterone caproate, the active ingredient in Makena®, the FDA intended to refrain from taking enforcement action with respect to compounding pharmacies producing compounded 17-alpha hydroxyprogesterone caproate ("**17P**"), a compounded version of the active ingredient and a competitor to Makena®.[7]  By its press release, the FDA effectively approved, invited and permitted direct nationwide competition between an entire class of unapproved compounded drug products — without regard to whether such compounded products are customized to meet the medical needs of individual patients for whom Makena® is indicated but medically inappropriate — and an FDA approved orphan drug product.

        Thus, the FDA's statement and the policy it sets forth effectively nullified the Company's right, under the Orphan Drug Act, to seven years of market exclusivity for Makena®.  In addition, the policy contradicted entirely statements made just weeks earlier by the FDA's chief, who hailed the approval of Makena®.  In particular, on March 17, 2011, in testimony before a congressional committee, the Commissioner of the FDA testified that "it is important and an advance that we have an FDA-approved drug to prevent pre-term pregnancy and all of its consequent serious medical concerns for both mother and infant.  And while the drug has been available through compounding, . . . compounding as a practice has been associated with serious health risks, [and] contamination . . . ."[8]

        Within hours following the FDA's press release on March 30, 2011, CMS issued an informational bulletin to State Medicaid programs, which allowed states to choose to pay for the extemporaneously compounded hydroxyprogesterone caproate as an active pharmaceutical ingredient as an alternative to Makena®.  The Company believes that CMS's action and the

---

[7]    Drug compounding is a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication customized to the needs of an individual patient.  Compounded drugs, including compounded versions of 17P, generally are not reviewed or approved by the FDA and their individual formulations, manufacturing processes, labeling, and adverse-event and treatment-failure histories are unknown.  Moreover, the facilities in which the compounding occurs generally are not registered with or routinely inspected by the FDA.

[8]    *FY 2012 FDA Budget: Hearing Before the S. Subcomm. on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies of the S. Comm. on Appropriations*, 112th Cong. 10 (Mar. 17, 2011).

resulting actions taken by certain states have had the effect in certain states of prohibiting, or significantly restricting, the availability of Makena® under various state Medicaid programs.  In the days following the FDA's and CMS's announcements, the Company's stock dropped precipitously from $7.11 per share on March 29, 2011 to $3.93 per share by April 29, 2011, and continued to decrease thereafter.

The Company responded to criticisms from legislators and pressure from regulators by reducing the published list price of Makena® from $1,500 per injection to $690 per injection[9] on March 31, 2011, expanding its patient assistance program for patients who are not covered by health insurance or could otherwise not afford Makena® or their respective co-pays, and offering substantial supplemental rebates to state Medicaid agencies.  Further, the Company has been working directly with health insurers, pharmacy benefit managers, Medicaid management companies, and others regarding the net cost of Makena® coverage and reimbursement programs and other means by which Makena® would be available to patients.

Since the March 2011 FDA announcement, management of the Company and its representatives have met with FDA and CMS staff, respectively, on several occasions to discuss access to, and reimbursement of, Makena® and to provide information to the agencies.  The FDA issued public statements on Makena® on November 8, 2011 and June 15, 2012, and in a "Questions and Answers" document on June 29, 2012, which generally discussed the agency's approach to enforcement action against compounding pharmacies and with respect to compounded 17P.  The FDA stated, among other things, that when "there is an FDA-approved drug that is medically appropriate for a patient, the FDA-approved product should be prescribed and used," and that "the compounding of any drug, including hydroxyprogesterone caproate, should not exceed the scope of traditional pharmacy compounding."  The FDA further stated that it "may take enforcement action against pharmacies that compound large volumes of drugs that are essentially copies of commercially available products and for which there does not appear to be a medical need for individual patients to whom the drug is dispensed." See June 29 Questions and Answers.  In addition, CMS issued an updated statement on June 15, 2012 that referenced the June 15 FDA statement and, among other things, reminded states that they must cover Makena® in compliance with federal law and without imposing unreasonable conditions.

However, because the FDA did not explicitly state that it would take enforcement action against those entities compounding 17P on a large scale, the market and many other stakeholders interpreted the FDA June statements as very harmful to the Company.  Indeed, the day after the June 15, 2012 FDA statement, the Company's stock dropped to a three-year low of $0.75 per share and the Company's senior secured notes and convertible notes began trading at a more severe discount.

---

[9]    Such price is prior to expected further discounting by the mandatory 23.1% Medicaid rebate and other supplemental rebates and discounts already agreed to or currently under negotiation with public and private payors.  Moreover, uninsured patients do not pay the list price of Makena®.  Even before FDA's March 30, 2011 press release, the Company announced that it would provide Makena® free to uninsured patients whose household income was below a specified threshold, and at substantial discounts to other patients on the basis of need.

Overall, the FDA's public stance on compounding 17P and failure to take enforcement action against compounding pharmacies combined with CMS' reimbursement policies invited numerous compounders back into the market and resulted in substantial sales of compounded alternatives to Makena® and effective loss of the Company's orphan drug marketing exclusivity for the affected period of time.  Moreover, limited reimbursement for Makena® under various State Medicaid programs had a severe negative impact on Makena® sales and the Company's overall business prior to the Petition Date.[10]

As set forth in the Debtors' projections, however, the outlook for Makena® is improving.  Since the Petition Date, the Debtors have reached agreements with various states regarding state Medicaid patients' access to, and the states' coverage of, Makena®.  Specifically, since the Petition Date, the Debtors have agreed to terms or renewed agreements with:  (i) Alabama in August 2012; (ii) Oklahoma in September 2012; (iii) Illinois and Florida in October 2012; (iv) Vermont in November 2012; and (v) California in February 2013.  As a result of these agreements, agreements that were in effect prior to the Petition Date and other efforts to expand Makena®, among other factors, since the Petition Date, total Medicaid patient enrollments have increased.  In addition, the Debtors have attempted to protect and expand the market share of Makena® through the pursuit of targeted litigation and other actions against various state Medicaid agencies, including, without limitation, in the Georgia Action and South Carolina Action (each as defined below), as well as against certain pharmacies engaged in the compounding of 17P, as discussed in greater detail in Section 10.13(b) below.  Finally, as a result of the October 2012 unfortunate fungal meningitis outbreak caused by a compounded steroid injection, certain hospitals, physicians, specialty distributors appear to have shifted from using compounded drugs like 17P, which are neither approved nor regulated by the FDA, to using Makena®, resulting in increased revenues.  It remains to be seen if these shifts are temporary or will continue.

In addition, since the tragic meningitis outbreak, compounding pharmacies have been subjected to heavier scrutiny and inspection by the FDA and State Boards of Pharmacy, and there have been calls for new and/or stronger legislation with respect to compounding.  The U.S. Senate Committee on Health, Education, Labor & Pensions recently approved legislation (S. 959) providing for increased federal regulation of certain types of pharmaceutical compounding. Supporters are attempting to obtain full Senate consideration. There has been no committee action in the U.S. House of Representatives on similar legislation.

To the extent such scrutiny continues and/or stronger legislation is enacted into law, Makena® may be subject to decreased competition.  However, at this time, it is not possible to predict whether such events will come to fruition and, if they do, the extent of the impact they will have, if any, on competitors to Makena®.

In fiscal year 2012, the net revenues of Makena® were approximately $11.8 million.  In the three and twelve month periods ended March 31, 2013, net revenues for Makena® were approximately $17.8 million and $54.1 million, respectively.

---

[10]     The Company estimates that approximately 40-45% of the total number of pregnancies in the United States are covered by Medicaid, including patients covered by both Medicaid and private insurance plans.

(ii)    **Evamist®.**

Ther-Rx currently markets and sells Evamist®, a unique, once-a-day therapy spray indicated for the treatment of certain moderate-to-severe symptoms due to menopause.  As noted above, Evamist® is manufactured for the Company by a third party, such that the Company is able to continue marketing and selling Evamist® pursuant to the terms of the Consent Decree.  In fiscal year 2012, the net revenues of Evamist® were approximately $10.5 million.  In the three and twelve month periods ended March 31, 2013, net revenues for Evamist® were approximately $2.1 million and $10.4 million, respectively.

(iii)    **Anti-Infective Creams.**

Upon entering into the Consent Decree, the Company also ceased manufacturing Clindesse® and Gynazole-1®, which are Ther-Rx's vaginal anti-infective products.  The Company now outsources the manufacture of these products to a third party and resumed shipping and selling an equivalent of Gynazole-1® in December 2012 and expects to resume shipping and selling Clindesse® in the first half of fiscal year 2014.  In the fiscal year ended March 31, 2013, net revenues of Gynazole-1® were approximately $1.0 million.  As set forth in the Debtors' projections, the Company expects that both of  these products will contribute to the rebuilding of the Company's branded business beginning in fiscal year 2014.

(e)    **Research and Development.**

The Company's research and development ("**R&D**") activities historically included the development of new drug delivery technologies, the formulation of brand name proprietary products and the development of generic versions of previously approved brand name pharmaceutical products.  To comply with the financial constraints imposed by the FDA in the Consent Decree, the Company reduced the scope of its R&D programs and reduced the size of its scientific affairs department, which handles R&D efforts, to 7 people.  In fiscal year 2012, the Company's total R&D expenses were $16.1 million, which was primarily spent on ongoing clinical trials required for Makena®.  In the three and twelve month periods ended March 31, 2013, the Company's total R&D expenses were $1.1 million and $10.1 million, respectively.

**3.2.**    *Certain Material Litigation and Regulatory Matters.*

(a)    **Voluntary Recall and Consent Decree.**

During fiscal year 2009, the Company announced a series of separate voluntary recalls of certain tablet form generic products as a precaution due to the potential existence of oversized tablets.  Subsequently, the Company suspended shipments of all approved tablet-form products in December 2008 and of all other drug products in January 2009.  Also, in January 2009, the Company initiated a nationwide voluntary recall affecting most of its products.

On March 2, 2009, the Company entered into the Consent Decree regarding its drug manufacturing and distribution and agreed, among other things, not to directly or indirectly cause the manufacture or delivery at or from any of its facilities of any drug for six (6) years or until the Company has satisfied certain requirements designed to demonstrate compliance with the FDA's current good manufacturing practice regulations.  In addition, the Consent Decree

provides for a series of measures that, when satisfied, will permit the Company to resume the manufacture and distribution of its approved drug products.  The Consent Decree was entered by the United States District Court for the Eastern District of Missouri, Eastern Division on March 6, 2009.

With the FDA's approval, the Company continued shipping Evamist® and, after receiving FDA approval, began shipping Makena® in March 2011.  In addition, the Company resumed shipping a Gynazole-1® product in December 2012 and has obtained approval to resume shipping of Clindesse®, in accordance with the terms of the Consent Decree.

(b)    **HHS-OIG Plea Agreement and Divestiture Agreement.**

On March 2, 2010, ETHEX entered into a plea agreement (the "**Plea Agreement**") with the Office of the United States Attorney for the Eastern District of Missouri and DOJ pursuant to which ETHEX pled guilty to two felony counts, each stemming from the failure to make and submit a field alert report to the FDA in September 2008 regarding the discovery of certain undistributed tablets that failed to meet product specifications.  Pursuant to the Plea Agreement, ETHEX agreed to pay a criminal fine in the amount of $23.4 million, payable in installments over the course of several years, and forfeit $1.8 million that was paid after sentencing in satisfaction of forfeiture obligations resulting from the guilty plea.  In total, ETHEX agreed to pay fines, restitution and forfeiture in the aggregate amount of $27.6 million.  As of the Petition Date, the Company had made all payments due under the Plea Agreement as of such date.  The Plan contemplates the resolution and settlement of claims, if any, in respect of the ETHEX Criminal Fine Claims.

In connection with the guilty plea, ETHEX was expected to be excluded from participation in federal health care programs, including Medicare and Medicaid.  In addition, the Office of the Inspector General of the U.S. Department of Health and Human Services ("**HHS OIG**") asserted it had discretionary authority to seek to similarly exclude KV from participation in federal health care programs.

As a result, on November 15, 2010, the Company entered into a divestiture agreement (the "**Divestiture Agreement**") with HHS OIG under which it agreed to sell the assets and operations of ETHEX (the operations of which were ceased on March 2, 2010) to unrelated third parties and to dissolve ETHEX.  Sales of ETHEX's assets and dissolution were completed prior to the deadlines established by the Divestiture Agreement and, as of the Petition Date, ETHEX no longer had any material ongoing assets or operations other than those required to conclude the winding up process under Missouri law.  On May 20, 2011, the Company received a letter from HHS OIG stating that, based on its review of the information provided in the Company's monthly reports, it appeared that the Company and ETHEX had completed their obligations under the Divestiture Agreement.  On July 26, 2012, the Company received a letter from HHS advising it that HHS's case involving a proposed exclusion was being closed and that HHS did not anticipate further action being taken.  On February 13, 2013, the corporate existence of ETHEX ceased.

(c)    **Qui Tam Settlement Agreement.**

On December 6, 2011, the Company entered into a settlement agreement (the "**Qui Tam Settlement Agreement**") with the DOJ, the United States Attorney's Office for the District of Massachusetts, HHS OIG, and the TRICARE Management Activity (collectively, the "**Government Parties**") to resolve certain claims brought by Constance Conrad (the "**Relator**") under the qui tam provisions of the False Claims Act against multiple defendants, including the Company.  Specifically, the Relator alleged that the Company failed to advise CMS that certain products formerly marketed by ETHEX did not qualify for coverage under federal health care programs.  Pursuant to the Qui Tam Settlement Agreement, the Company agreed, among other things, to pay a total sum of $17.0 million, plus interest, to the Government Parties over five years.  In addition, the Company agreed to pay certain attorneys' fees and costs to Relator's counsel.  In return, the Government Parties and Relator dismissed with prejudice all claims relating to the alleged conduct with regard to products formerly marketed by ETHEX, and dismissed all remaining claims.  By entering into the Qui Tam Settlement Agreement, the Company did not admit any wrongdoing in connection with the allegations raised in the Relator's complaint.  As of the Petition Date, the Company had made all payments due under the Qui Tam Settlement Agreement as of such date.

(d)    **Marc S. Hermelin's Exclusion and
Settlement Agreement, and Current Litigation.**

In November 2010, Marc S. Hermelin ("**Mr. M. Hermelin**"), the former Chief Executive Officer of KV from 1975 to December 5, 2008 (when he was terminated for cause by KV) and former member of the Board of Directors for KV, voluntarily resigned as a member of the Company's Board of Directors, and was excluded from participating in federal health care programs for a minimum period of twenty years.  On March 10, 2011, Mr. M. Hermelin pled guilty to two federal misdemeanor counts as a responsible corporate officer of the Company at the time when a misbranding of two morphine sulfate tablets occurred.  As part of the sentence resulting from the guilty plea, Mr. M. Hermelin was fined $1.9 million.

In an effort to avoid adverse consequences to the Company, including the potential discretionary exclusion of the Company from participating in the federal healthcare programs, HHS OIG, Mr. M. Hermelin and his wife (solely with respect to shares owned jointly between them and certain other obligations therein) entered into a settlement agreement (the "**Hermelin Settlement Agreement**") under which Mr. M. Hermelin resigned as trustee of all family trusts that hold KV stock, agreed to divest his personal ownership interests in the Company's Class A Common and Class B Common stock (approximately 1.8 million shares) over a period of time in accordance with a divestiture plan and schedule approved by HHS OIG, and agreed to refrain from voting stock under his personal control.  The Hermelin Settlement Agreement also required Mr. M. Hermelin to agree, for the duration of his exclusion, not to seek to influence or be involved with, in any manner, the governance, management, or operations of the Company.  The Company is a signatory to the Hermelin Settlement Agreement with respect to certain obligations therein.  As long as the parties comply with the Hermelin Settlement Agreement, HHS OIG has agreed not to exercise its discretionary authority to exclude the Company from participation in federal health care programs, thereby allowing the Company and

- 24 -

its subsidiaries (with the single exception of ETHEX) to continue to conduct business through all federal and state health care programs.

On March 22, 2011, Mr. M. Hermelin made a demand on the Company for indemnification with respect to the $1.9 million fine imposed on him as a result of the guilty plea. On October 11, 2011, the Company, at the direction of a Special Committee formed to handle these matters, filed a petition for declaratory judgment in the Circuit Court of St. Louis County against Mr. M. Hermelin seeking a declaration of rights of the parties with regard to Mr. M. Hermelin's employment and indemnification agreements with the Company. The Company alleges that Mr. M. Hermelin is not entitled to payments under such agreements due to breaches of his fiduciary obligations to the Company. On October 14, 2011, Mr. M. Hermelin filed an action in the Court of Chancery in the State of Delaware seeking a determination on the advancement of expenses and indemnification matters. On April 25, 2012, Mr. M. Hermelin filed an amended counterclaim against the Company and a third-party petition against certain former directors and officers of the Company in the St. Louis action seeking damages in excess of $180.0 million. As of the Petition Date, the Company and Mr. M. Hermelin were engaged in litigation regarding the above-referenced matters. As discussed below in Section 6.7 hereof, by the Plan, the Debtors are seeking to equitably subordinate pursuant to section 510(c) of the Bankruptcy Code and/or disallow Claims asserted by Mr. M. Hermelin in the Reorganization Cases.

(e)    **Investor Class Actions.**

In 2008 and thereafter, a number of investors commenced stockholder class actions against KV and certain of its current and former directors and officers for purportedly making false or misleading statements to the FDA related to inspections of the Company's facilities in violation of the federal securities laws. As of the Petition Date, several other class actions, or purported class actions, are pending against the Company and certain current and former officers and directors in multiple jurisdictions.

(i)    **PPFG Securities Litigation**

On December 2, 2008, Joseph Mas filed a securities class action in the United States District Court for the Eastern District of Missouri (the "**Missouri District Court**"), on behalf of himself and all others similarly situated, against KV and certain then current and former officers and directors of KV, alleging violations of Sections 10(b), and Rule 10b-5 promulgated thereunder, and 20(a) of the Securities Exchange Act of 1934 (collectively, the "**Federal Securities Laws**"). Thereafter, two additional securities class actions[11] were filed in the Missouri District Court against KV and certain then current and former officers and directors of KV alleging similar violations of the Federal Securities Laws. On April 15, 2009, the Missouri District Court consolidated these securities class actions into the PPFG Securities Litigation and appointed the Public Pension Fund Group (comprised of the State-Boston

---

[11]    *Herman Unvericht, Individually and on Behalf of All Others Similarly Situated v. KV Pharmaceutical Co., et al.*, Civil Action No. 4:09-cv-00061-RWS, and *Norfolk County Retirement System, on Behalf of Itself and All Others Similarly Situated v. KV Pharmaceutical Co., et al.*, Civil Action No. 4:09-cv-00138-CAS.

Retirement System and the Norfolk County Retirement System) as Lead Plaintiff (the "**PPFG Litigation Lead Plaintiff**").

On May 22, 2009, the PPFG Litigation Lead Plaintiff, on behalf of all persons who purchased publicly traded securities of KV between June 14, 2004 and January 23, 2009, filed a consolidated amended complaint for alleged violations of the Federal Securities Laws against KV and certain current or former officers and directors of KV (the "**Non-Debtor Defendants**").  Thereafter, the Missouri District Court entered an order granting motions to dismiss the consolidated amended complaint filed by KV and the Non-Debtor Defendants.  On June 4, 2012, the United States Court of Appeals for the Eighth Circuit affirmed in part and reversed in part the Missouri District Court order and remanded the matter to the Missouri District Court.

On August 10, 2012, following the Debtors' bankruptcy filing, the Missouri District Court issued an order, *sua sponte*, staying the PPFG Securities Litigation as to the Non-Debtor Defendants (the "**PPFG Stay Order**").  On December 6, 2012, PPFG Litigation Lead Plaintiff filed a motion in the PPFG Securities Litigation (the "**PPFG Stay Order Modification Motion**") to modify the PPFG Stay Order so as to proceed against Mr. M. Hermelin (the sole-remaining Non-Debtor Defendant).  Mr. M. Hermelin and KV objected to the PPFG Stay Order Modification Motion.  On March 22, 2013, the Missouri District Court issued a Memorandum and Order granting the PPFG Stay Order Modification Motion and vacating the PPFG Stay Order solely as to Mr. M. Hermelin, thereby permitting PPFG Litigation Lead Plaintiff to proceed with the PPFG Securities Litigation in the Missouri District Court solely as to Mr. M. Hermelin.  The PPFG Litigation Lead Plaintiff and the individual members thereof (State-Boston Retirement System and the Norfolk County Retirement System) timely filed class and individual proofs of claim against KV for, inter alia, alleged violations of the Federal Securities Laws.  The Debtors dispute the allegations underlying this litigation.

(ii)     **2011 Securities Litigation**

On July 24, 2012, Lori Anderson, as Court-appointed lead plaintiff pursuant to the Private Securities Litigation Reform Act of 1995, filed in the United States District Court for the Eastern District of Missouri a Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws (the "**2011 Securities Litigation Complaint**") in the 2011 Securities Litigation (which is captioned In re K-V Pharmaceutical Company Securities Litigation, 11-cv-01816-AGF) on behalf of all those who purchased or otherwise acquired KV securities between February 14, 2011 and April 4, 2011, inclusive, and were allegedly damaged thereby.  The 2011 Securities Litigation Complaint asserts violations of the federal securities laws, including Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, against one of the Debtors, KV, and against certain non-Debtor individuals identified in the 2011 Securities Litigation Complaint as being officers of one or more of the Debtors, including Gregory Divis, Thomas McHugh, and Scott Goedeke.  The lead plaintiff in the 2011 Securities Litigation and the class of investors she seeks to represent seek to recover for the harm allegedly suffered as a result of the alleged misconduct described in the 2011 Securities Litigation Complaint from applicable insurance, including any directors and officers insurance maintained for the benefit of any of defendants currently named in the 2011 Securities Litigation Complaint or who may be added through the filing of a future complaint, among other sources of potential recovery.  In order to

participate in any potential recoveries obtained in the 2011 Securities Litigation, each member of the putative class will be required to submit a proof of claim form in the 2011 Securities Litigation demonstrating a recognized loss.  The Debtors dispute the allegations set forth in the 2011 Securities Litigation Complaint.

 (f)  **FDA Action, Georgia Action and South Carolina Action.**

   On July 5, 2012, KV and Ther-Rx filed a suit against the FDA and HHS in United States District Court for the District of Columbia (the "**D.C. District Court**") seeking temporary, preliminary and permanent declaratory and injunctive relief to restore the Company's right under the Orphan Drug Act to market exclusivity for Makena® (the "**FDA Action**").  In its complaint, the Company alleged that the FDA and HHS put financial interests of Medicaid, other third-party payers and some patients above the medical interest of all patients for whom Makena® is indicated.  Accordingly, as a result of actions (or inactions) taken by the FDA and HHS, it is difficult or impossible for many patients for whom Makena® is intended to obtain access to the only FDA-approved drug that may help prevent pre-term birth.  Instead, the FDA and HHS have allowed compounding pharmacies to sell unapproved and untested (and therefore, much cheaper) compounded preparations of 17P of uncertain quality and potency.  On September 6, 2012, the D.C. District Court dismissed the FDA Action.  On November 2, 2012, KV and Ther-Rx filed a notice of appeal to the United States Court of Appeals for the District of Columbia Circuit from the D.C. District Court's dismissal of the FDA Action and briefing is ongoing.

   On July 17, 2012, KV and Ther-Rx filed a suit against the Commissioner and Division Chief of the Georgia Department of Community Health ("**Georgia**") in the United States District Court for the Northern District of Georgia regarding Georgia's Medicaid's refusal to cover Makena® (the "**Georgia Action**").  Between March 2011, when Makena® was approved by the FDA and granted orphan drug exclusivity, and the filing of the suit, Georgia has not approved payment for any significant number of vials of the medication for Medicaid patients, despite the state's legal obligation to cover FDA-approved drugs, and effectively relegated such patients to using unapproved compounded versions of 17P.  Georgia filed a motion to dismiss the Georgia Action on August 7, 2012.  On August 9, 2012, the Debtors argued for and were granted a preliminary injunction obligating Georgia, among other things, to no longer favor unapproved products over Makena® for Medicaid patients.  Georgia's motion to dismiss the Georgia Action was denied on November 9, 2012.  On May 8, 2013, KV and Ther-RX as well as Georgia filed motions for summary judgment.  The Georgia Action remains pending as of the date hereof.

   On July 25, 2012, KV and Ther-Rx filed a suit against the Director of Health and Human Services for the State of South Carolina ("**South Carolina**") in the United States District Court for the District of South Carolina, Columbia Division, regarding South Carolina's Medicaid's refusal to cover Makena® (the "**South Carolina Action**").  Similar to Georgia, since March 2011, prior to filing of the suit, South Carolina had not approved payment for virtually any vials of the medication for Medicaid patients, despite the state's legal obligation to cover FDA-approved drugs, and effectively relegated such patients to using unapproved compounded versions of 17P.  On August 13, 2012, South Carolina filed a motion to dismiss the South Carolina Action.  South Carolina's motion to dismiss the South Carolina Action was denied on

- 27 -

December 20, 2012.  Discovery is ongoing.  The South Carolina Action remains pending as of the date hereof.

### 3.3.    *Summary of Corporate Structure.*

Debtor K-V Pharmaceutical Company ("**KV**") directly owns, or is the sole member of, each of the other seven Debtors as well as one domestic non-Debtor and three non-Debtor foreign subsidiaries (the "**Foreign Subs**").  KV is a publicly held company whose two classes of common stock were, prior to the Petition Date, listed on the New York Stock Exchange ("**NYSE**").  The only operations of the one domestic non-Debtor subsidiary relate to ownership of certain non-residential real property, which property is subject to a mortgage that currently is in default.  None of the Foreign Subs, which have limited or no operations, are Debtors herein nor is there any plan for any of them to file insolvency related proceedings in the United States or elsewhere related to the Debtors' restructuring.

### 3.4.    *Debtors' Prepetition Capital and Debt Structure.*

KV's capital stock consists of two classes of common stock and preferred stock.  As of July 19, 2012, KV had 40,000 shares of 7% Cumulative Convertible Preferred Stock (the "**Preferred Stock**") outstanding.  As of June 30, 2012, KV had 49,007,569 outstanding shares of Class A Common Stock, par value $0.01 per share, and 11,075,435 outstanding shares of Class B Common Stock, par value $0.01 per share, exclusive of treasury shares.  In addition, on said date there were 649 registered holders of Class A Common Stock and 257 registered holders of Class B Common Stock (not separately counting shareholders whose shares are held in "nominee" or "street" names).  Both classes of common stock currently were, prior to the Petition Date, listed on the NYSE.[12]  Since the Petition Date, both classes of common stock were delisted by the NYSE.

In June 2012, the Company entered into a Common Stock Purchase Agreement under which it was able to sell up to $20 million of shares of Class A Common Stock to Commerce Court Small Cap Value Fund, Ltd. over a 24-month period subject to a maximum of 11,976,599 shares.  As a result of these Reorganization Cases, the Company currently is unable to avail itself of this equity line of credit.

As of the Petition Date, the Debtors, on a consolidated book value basis, had an aggregate principal balance of up to approximately $425 million of outstanding long-term indebtedness consisting of amounts owed under the Senior Secured Notes and the Convertible Notes (each as defined below), excluding amounts owed to the Hologic Parties, which have been satisfied pursuant to the Hologic Settlement Agreement approved on December 27, 2012.

---

[12]    On July 16, 2012, KV was notified by the New York Stock Exchange Regulation, Inc. ("**NYSE**") that its Class A Common Stock was below listing standard criteria due to average market capitalization being less than $50 million over a 30-day trading period and its stockholder's equity being less than $50 million.  In addition, KV was notified by the NYSE that its Class B Common Stock is below criteria for the average closing price of a security of less than $1.00 over a consecutive 30-day trading period.

(a)      **Senior Secured Notes.**

Pursuant to that certain Indenture, dated as of March 17, 2011, between KV, as Issuer, Wilmington Trust National Association as successor by merger to Wilmington Trust FSB, as trustee, and the remaining Debtors, as guarantors, KV issued $225 million of 12% Senior Secured Notes due 2015 (the "**Senior Secured Notes**").  The original aggregate purchase amount of the Senior Secured Notes was $218,250,000.  As of the Petition Date, the outstanding balance on the Senior Secured Notes, including principal and interest, was approximately $235.8 million, inclusive of unamortized original issue discount, which is secured by substantially all of the Debtors' assets, subject to certain exceptions set forth in the applicable governing documents. See Section 10.13(f), "*Declaratory Judgment Motion*"; Section 10.17, "*Events Leading to Formulation of Plan; Global Settlement*." Because the Senior Secured Notes were issued at a discount, the total amount of the Allowed Senior Notes Claims is exclusive of unamortized original issue discount.

(b)      **Convertible Notes.**

Pursuant to that certain Indenture, dated as of May 16, 2003, between KV, as Issuer, and Deutsche Bank Trust Company Americas, as trustee, KV issued $200 million of 2.5% Contingent Convertible Subordinated Notes due 2033 (the "**Convertible Subordinated Notes**"), which were convertible under certain circumstances into shares of Class A Common Stock.  Due to the commencement of the Reorganization Cases, the conversion feature of the Convertible Subordinated Notes is no longer exercisable.  As of the Petition Date, the outstanding balance on the Convertible Subordinated Notes, including principal and interest, was approximately $201 million.  The Convertible Subordinated Notes are unsecured obligations and are not guaranteed by any of the other Debtors.  Among other things, the Convertible Subordinated Notes Indenture provides for the subordination of the Convertible Subordinated Notes to "Senior Indebtedness" (as defined in the Indenture).

(c)      **Mortgage Loan.**

In March 2006, MECW entered into a $43 million promissory note (the "**Mortgage Loan**") with LaSalle Bank National Association, which was assigned to U.S. Bank National Association, as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2006-LDP7, and further assigned to JPMCC 2006-LDP7 Bridgeton Industrial, LLC ("**Mortgage Lender**") in January 2013.  The Mortgage Loan is guaranteed by Debtors KV and Ther-Rx on a limited basis, subject to the terms and conditions of the applicable guaranty.  On January 30, 2013, Mortgage Lender accelerated the balance of the Mortgage Loan.  Thereafter, on March 1, 2013, the Circuit Court of the 21st Judicial Circuit of Missouri at Clayton, St. Louis County, Missouri granted Mortgage Lender's petition for the appointment of Cassidy Turley as receiver for the real property securing the Mortgage Loan.

(d)      **Trade Obligations.**

The Debtors estimate that, as of August 3, 2012, they had approximately $3 million in unpaid trade and other ordinary course obligations.

# ARTICLE IV.

## EVENTS LEADING TO CHAPTER 11 FILING

Leading up to the commencement of these chapter 11 cases, the Debtors faced significant challenges.  The Company's inability to realize the full value of Makena® due to the FDA's refusal to enforce its orphan drug marketing exclusivity and restrictions on reimbursement imposed by state Medicaid agencies, as well as significant restrictions on manufacturing and marketing of its other products imposed by the Consent Decree, all have had a major negative impact on its revenue and ability to meet its short and long-term obligations.  As a result, the Company's revenue and EBITDA have declined substantially from their peak in fiscal year 2008.

Following the FDA's March 30, 2011 statement, the Company spent significant time, effort and cost not only trying to persuade the FDA to reverse its March 30, 2011 statement regarding Makena® and enforce the orphan drug exclusivity granted to KV, but also complying with post-FDA approval clinical trials (which carry a cost of approximately $10-$15 million per year) and various requirements to continue to qualify Makena® as an orphan drug despite FDA's actions that effectively revoked KV's orphan drug exclusivity.  Moreover, the FDA's June 2012 public statements caused an exceedingly negative market reaction, including causing the Company's stock price to plummet.

With the belief that the value of Makena® would be realized if the FDA enforced the orphan drug exclusivity granted to KV, in May 2012, the Company engaged in preliminary discussions with an ad hoc group of holders of the Convertible Subordinated Notes regarding the potential provision of financing to the Company outside of a bankruptcy filing as well as extending a "put" right of the holders of the Convertible Subordinated Notes under the terms of the Convertible Subordinated Notes Indenture governing the Convertible Subordinated Notes.  Although the ad hoc group of holders of Convertible Subordinated Notes, through its advisors, conducted certain diligence and provided a term sheet to the Company in respect of extending the put right, as a result of, among other things, the Company's looming payment to the Hologic Parties, the parties were unable to reach an agreement.

Thereafter, in July 2012, after the commencement of the FDA Action, the Company and its advisors restarted discussions with the ad hoc group of Convertible Subordinated Noteholders as well as an ad hoc group of Senior Secured Noteholders (the "**Ad Hoc Senior Secured Noteholders Group**") regarding a potential restructuring, with a view towards obtaining a favorable result from the FDA Action.

During this time, the Company also attempted to negotiate an amendment to the Hologic Purchase Agreement to provide a much needed breathing spell, including, an extension of a looming $45 million payment due to Hologic on August 4, 2012.  However, the Company was unsuccessful in obtaining a timely extension of this payment on terms that were acceptable to the Company.  As a result, the Debtors were forced to file these chapter 11 cases on August 4, 2012.

## ARTICLE V.

## REASONS FOR THE SOLICITATION; RECOMMENDATION

Chapter 11 of the Bankruptcy Code provides that unless the terms of section 1129(b) of the Bankruptcy Code are satisfied, for the Bankruptcy Court to confirm the Plan as a consensual plan, the holders of impaired Claims against the Debtors in each Class of impaired Claims entitled to vote on the Plan must accept the Plan by the requisite majorities set forth in the Bankruptcy Code.  An impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds (2/3) in amount of the Claims in such Class actually voting on the Plan have voted to accept it, and (b) more than one-half (1/2) in number of the holders in such Class actually voting on the Plan have voted to accept it (such votes, the "**Requisite Acceptances**").

In light of the significant benefits to be attained by the Debtors and their creditors if the transactions contemplated by the Plan are consummated, the Debtors recommend that all holders of Claims entitled to do so, vote to accept the Plan.  The Debtors reached this decision after considering available alternatives to the Plan and their likely effect on the Debtors' business operations, creditors, and shareholders.  These alternatives included alternative restructuring options under chapter 11 of the Bankruptcy Code, and liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  The Debtors determined, after consulting with their legal and financial advisors, that the Plan, if consummated, will maximize the value of these estates for stakeholders under the circumstances of these Reorganization Cases, as a result of the compromises and settlements embodied therein, as compared to any other chapter 11 reorganization strategy or a liquidation under chapter 7.  For all of these reasons, the Debtors support the Plan and urge the holders of Claims entitled to vote on the Plan to accept and support it.  As set forth in the letter from the Creditors' Committee accompanying the Disclosure Statement, the Creditors' Committee supports the Plan and urges unsecured creditors to vote in favor thereof.

## ARTICLE VI.

## THE PLAN

**6.1.**    *Overview of Chapter 11.*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to restructure its business for the benefit of itself, its creditors and its equity interest holders.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the bankruptcy filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 reorganization case.  A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a chapter 11 plan by the bankruptcy court makes that plan binding upon the debtor, any issuer of securities under the plan, any Person acquiring property under the plan and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

In general, a chapter 11 plan of reorganization:  (a) divides claims and equity interests into separate classes, (b) specifies the property, if any, that each class is to receive under the plan, and (c) contains other provisions necessary to the restructuring of the debtor and that are required or permitted by the Bankruptcy Code.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a chapter 11 plan may not be solicited after the commencement of a chapter 11 case until such time as the court has approved the disclosure statement as containing adequate information.  Pursuant to section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the chapter 11 plan.  To satisfy applicable disclosure requirements, the Debtors submit this Disclosure Statement to holders of Claims that are impaired and not deemed to have rejected the Plan.

## 6.2.    *Resolution of Certain Inter-Creditor and Inter-Debtor Issues*

(a)    **Settlement of Certain Inter-Creditor Issues.**

The treatment of Claims and Interests under the Plan represents, among other things, the settlement and compromise of certain potential inter-creditor disputes.

(b)    **Formation of Debtor Groups for Convenience Purposes.**

The Plan groups the Debtors together solely for purposes of describing treatment under the Plan, confirmation of the Plan and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities.  Notwithstanding the foregoing, the Debtors reserve the right to seek, with the consent of the Investor Parties, to substantively consolidate any two or more Debtors, provided that such substantive consolidation does not materially and adversely impact the amount of the distributions to any Person under the Plan.

(c)    **Intercompany Claims.**

Notwithstanding anything to the contrary herein or in the Plan, on or after the Effective Date, any and all Intercompany Claims will be adjusted (including by contribution,

distribution in exchange for new debt or equity, or otherwise), paid, continued, or discharged to the extent reasonably determined appropriate by the Reorganized Debtors.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court or by the stockholders of any of the Reorganized Debtors.

**6.3.**     *Overview of the Plan.*

      **THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN AND THE EXHIBITS AND SCHEDULES THERETO.**

      The Plan classifies Claims and Interests separately in accordance with the Bankruptcy Code and provides different treatment for different Classes of Claims and Interests. Claims and Interests shall be included in a particular Class only to the extent such Claims or Interests qualify for inclusion within such Class.  The Plan separates the various Claims and Interests (other than those that do not need to be classified) into ten (10) separate Classes.  These Classes take into account the differing nature and priority of Claims against, and Interests in, the Debtors.  Unless otherwise indicated, the characteristics and amounts of the Claims or Interests in the following Classes are based on the books and records of the Debtors.

      This section summarizes the treatment of each of the Classes of Claims and Interests under the Plan and describes other provisions of the Plan.  Only holders of Allowed Claims — Claims that are not in dispute, contingent, or unliquidated in amount and are not subject to an objection or an estimation request — are entitled to receive distributions under the Plan.  For a more detailed description of the definition of "Allowed," see Article I of the Plan. Until a Disputed Claim becomes Allowed, no distributions of New Common Stock, Cash or otherwise will be made.

      The Plan is intended to enable the Debtors to continue present operations without the likelihood of a subsequent liquidation or the need for further financial reorganization.  The Debtors believe that they will be able to perform their obligations under the Plan.  The Debtors also believe that the Plan permits fair and equitable recoveries.

      The Confirmation Date will be the date that the Confirmation Order is entered by the Clerk of the Bankruptcy Court.  The Effective Date will be the first Business Day on or after the Confirmation Date on which all of the conditions to the Effective Date specified in Section 11.2 of the Plan have been satisfied or waived, including the consummation of the transactions contemplated by the Plan.

      The Debtors anticipate that the Effective Date will occur in or around September 2013.  Resolution of any challenges to the Plan may take time and, therefore, the actual Effective Date cannot be predicted with certainty.

      Other than as specifically provided in the Plan, the treatment under the Plan of each Claim and Interest will be in full satisfaction, settlement, release and discharge of all Claims or Interests.  The Debtors will make all payments and other distributions to be made under the Plan unless otherwise specified.

All Claims and Interests, except DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, are placed in the Classes set forth in Article IV of the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified, and the holders thereof are not entitled to vote on the Plan.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

A Claim or Interest also is placed in a particular Class for all purposes, including voting, confirmation and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  However, a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

---

**Interest Will Not Accrue After Petition Date**

Unless otherwise specified in the Plan or by order of the Bankruptcy Court (including with respect to the Postpetition Interest Amount, if any), no interest will accrue or be paid on an Allowed Claim, for any purpose, on or after the Petition Date.

---

(a)    **Unclassified Claims.**

(i)    **DIP Claims.**

Subject to adjustment pursuant to Section 7.12(c) and/or (d) of the Plan, in full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Effective Date, all Allowed DIP Claims shall be paid in full in Cash pursuant to Section 7.2 of the Plan on the Effective Date.  Upon payment and satisfaction in full of all Allowed DIP Claims, all Liens and security interests granted to secure such obligations, whether in the Reorganization Cases or otherwise, shall be terminated and of no further force or effect.

(ii)    **Administrative Expense Claims.**

Administrative Expense Claims Include Certain Prepetition Claims:  To the extent that the Bankruptcy Court authorized the Debtors to satisfy certain Claims arising prior to the Petition Date in the ordinary course of business pursuant to that certain *Amended Order Authorizing Debtors to (I) Honor Certain Prepetition Obligations to Customers and to Continue Customer Programs, and (II) Pay Medicaid and Other Insurance Rebate Obligations* [Docket No. 338], including, without limitation, Claims relating to Medicaid rebates, the Debtors intend to continue to pay such obligations in full in the ordinary course of business in accordance with such order.

Time for Filing Administrative Expense Claims: The holder of an Administrative Expense Claim, other than the holder of: (A) a DIP Claim; (B) a Fee Claim; (C) a 503(b)(9)

- 34 -

Claim; (D) an Administrative Expense Claim that has been Allowed on or before the Effective Date; (E) an Administrative Expense Claim for an expense or liability incurred and payable in the ordinary course of business by a Debtor; (F) an Administrative Expense Claim on account of fees and expenses incurred on or after the Petition Date by ordinary course professionals retained by the Debtors pursuant to an order of the Bankruptcy Court; (G) an Administrative Expense Claim held by a current officer, director or employee of the Debtors for indemnification, contribution, or advancement of expenses pursuant to:  (I) any Debtor's certificate of incorporation, by-laws, or similar organizational document, or (II) any indemnification or contribution agreement approved by the Bankruptcy Court; (H) an Administrative Expense Claim arising, in the ordinary course of business, out of the employment by one or more Debtors of an individual from and after the Petition Date, but only to the extent that such Administrative Expense Claim is solely for outstanding wages, commissions, accrued benefits, or reimbursement of business expenses; (I) a Senior Secured Notes Indenture Trustee Claim; (J) a Convertible Subordinated Notes Indenture Trustee Claim; or (K) a Cash Collateral Expense Claim, must file with the Bankruptcy Court and serve on the Debtors or the Reorganized Debtors (as the case may be), the Claims Agent, and the Office of the United States Trustee, proof of such Administrative Expense Claim **within thirty (30) days after the Effective Date** (the "***Administrative Bar Date***").  Such proof of Administrative Expense Claim must include at a minimum:  (V) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (W) the name of the holder of the Administrative Expense Claim; (X) the amount of the Administrative Expense Claim; (Y) the basis of the Administrative Expense Claim; and (Z) supporting documentation for the Administrative Expense Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

<u>Treatment of Administrative Expense Claims</u>:

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date an Administrative Expense Claim becomes an Allowed Claim, the holder of such Allowed Administrative Expense Claim shall receive from the applicable Reorganized Debtor Cash in an amount equal to such Allowed Claim; <u>provided</u>, <u>however</u>, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities.

In the case of the Senior Secured Notes Indenture Trustee Claim and the Convertible Subordinated Notes Indenture Trustee Claim, such Claims will be paid in the ordinary course of business (subject to the Debtors' prior receipt of invoices and reasonable documentation in connection therewith and without the requirement to file a fee application with the Bankruptcy Court, with copies to be provided to the Investor Parties) but no later than the

Effective Date; provided, that such fees, costs and expenses are reimbursable under the terms of the Senior Secured Notes Indenture and the Convertible Subordinated Notes Indenture, as applicable; and provided, further, that the Senior Secured Notes Indenture Trustee and the Convertible Subordinated Notes Indenture Trustee will receive payment in the ordinary course of business (subject to the Reorganized Debtors' prior receipt of invoices and reasonable documentation in connection therewith) for all reasonable fees, costs, and expenses incurred after the Effective Date in connection with the implementation of any provisions of the Plan (in each case, not to exceed $25,000). In the event that the Debtors dispute all or a portion of the Senior Secured Notes Indenture Trustee Claim or the Convertible Subordinated Notes Indenture Trustee Claim, the Debtors shall pay the undisputed amount of such Senior Secured Notes Indenture Trustee Claim or Convertible Subordinated Notes Indenture Trustee Claim (as the case may be), and segregate the remaining portion of such Claim until such dispute is resolved by the parties or by the Bankruptcy Court.

In the case of the Cash Collateral Expense Claims, such Claims will be paid in full in Cash on the Effective Date to the extent such Claims have not already been paid in Cash in accordance with an order of the Court. In the event that the Debtors dispute all or a portion of the Cash Collateral Expense Claims, the Debtors shall pay the undisputed amount of such Cash Collateral Expense Claims, and segregate the remaining portion of such Claims until such dispute is resolved by the parties or by the Bankruptcy Court.

With respect to payments on account of Senior Secured Notes Indenture Trustee Claims and Ad Hoc Senior Noteholders Group Fee Claims that constitute Adequate Protection Payments (as defined in the Final DIP Order), the Final DIP Order provides, among other things, that in the event the Bankruptcy Court determines that the holders of Senior Secured Notes are not entitled to such Adequate Protection Payments on account of their secured claims or as adequate protection for the diminution in the value of their interests in the Prepetition Collateral (as defined in the Final DIP Order), any such Adequate Protection Payments shall (x) be applied as a payment made to the principal amount of the Senior Secured Notes Claims as of the Petition Date or (y) be disgorged to the extent that such payments exceed the amount of the Secured Claim in respect of the Senior Secured Notes. Notwithstanding the foregoing, pursuant to the Global Settlement, the parties thereto have agreed that no Adequate Protection Payments made to the Senior Secured Notes Indenture Trustee or Ad Hoc Senior Secured Noteholders under the Final DIP Order (or the Court's prior financing orders [Docket Nos. 45, 144]) shall be subject to recharacterization and/or disgorgement as described above.

(iii)   **Fee Claims.**

Time for Filing Fee Claims: Any Professional Person seeking allowance by the Bankruptcy Court of a Fee Claim shall file its respective final application for allowance of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date no later than forty-five (45) calendar days after the Effective Date. Objections to such Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty-five (65) calendar days after the Effective Date or such other date as established by the Bankruptcy Court.

Treatment of Fee Claims:  All Professional Persons seeking allowance by the Bankruptcy Court of a Fee Claim shall be paid in full in such amounts as are approved by the Bankruptcy Court: (i) upon the later of (x) the Effective Date, and (y) fourteen (14) calendar days after the date upon which the order relating to the allowance of any such Fee Claim is entered, or (ii) upon such other terms as may be mutually agreed upon between the holder of such Fee Claim and the Reorganized Debtors.  On the Effective Date, to the extent known, the Reorganized Debtors shall reserve and hold in a segregated account Cash in an amount equal to the accrued but unpaid Fee Claims as of the Effective Date, which Cash shall be disbursed solely to the holders of Allowed Fee Claims with the remainder to be reserved until all Allowed Fee Claims have been paid in full or all remaining Fee Claims have been Disallowed by Final Order, at which time any remaining Cash in the segregated account shall become the sole and exclusive property of the Reorganized Debtors.

(iv)    **U.S. Trustee Fees.**

The Debtors or Reorganized Debtors, as applicable, shall pay all outstanding U.S. Trustee Fees of a Debtor on an ongoing basis on the later of: (i) the Effective Date; and (ii) the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the applicable Reorganization Case, the applicable Reorganization Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

(v)    **Priority Tax Claims.**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive, in the Debtors' or Reorganized Debtors' discretion, either: (A) on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Claim, or (B) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided, however, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due.

(b)    **Classification and Treatment of Claims and Interests.**

(i)    **Priority Non-Tax Claims (Class 1).**

Treatment Under the Plan:  The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment, on the later of the Effective Date and the first Distribution Date after the applicable Priority Non-Tax Claim becomes an Allowed Claim, or as soon after such date as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim shall receive Cash from the applicable Reorganized Debtor in an amount equal to such Allowed Claim.

Voting:  The Priority Non-Tax Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Priority Non-Tax Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

(ii)    **Other Secured Claims (Class 2).**

Treatment Under the Plan:  The legal, equitable and contractual rights of the holders of Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the first Distribution Date after the applicable Other Secured Claim becomes an Allowed Claim, or as soon after such date as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, at the election of the Reorganized Debtors: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render the Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the applicable Debtor or Reorganized Debtor, without further notice to or order of the Bankruptcy Court.  Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided in the Plan.  On the full payment or other satisfaction of such Claims in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

Voting:  The Other Secured Claims are not impaired Claims.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Other Secured Claims.

Deficiency Claims:  To the extent that the value of the Collateral securing each Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under the Plan as an Allowed General Unsecured Claim and shall be classified as a General Unsecured Claim.

(iii)    **Senior Secured Notes Claims (Class 3).**

Allowance:  On the Effective Date, the Senior Secured Notes Claims shall be deemed Allowed Claims in the amount of $231,409,850 and shall not be subject to reduction by the Potential Recharacterization Amount.

Treatment Under the Plan:  On the Effective Date, or as soon as practicable thereafter, each holder of an Allowed Senior Secured Notes Claim shall receive, subject to the terms of the Plan (including, without limitation, Section 7.12 thereof), in full satisfaction,

- 38 -

settlement, release and discharge of, and in exchange for, such Claim (and in full satisfaction and discharge of any and all subordination provisions or agreements including the Senior Secured Notes Indenture and the Convertible Subordinated Notes Indenture), its Pro Rata Share of Cash in an aggregate amount equal to (a) the Allowed Senior Secured Notes Claims, (b) the Postpetition Interest Amount, if any is determined to be owed to the holders of Allowed Senior Secured Notes Claims pursuant to Section 7.11 of the Plan; and (c) the Postpetition Accreted OID Amount, if the Postpetition Interest Amount is determined to be owed to the holders of Allowed Senior Secured Notes Claims pursuant to Section 7.11 of the Plan.

Voting:  The Senior Secured Notes Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such Allowed Senior Secured Notes Claims.

Postpetition Interest:  The Ad Hoc Senior Secured Noteholder Group and Senior Secured Notes Indenture Trustee assert that, pursuant to the subordination provisions of the Convertible Subordinated Notes Indenture, the holders of Senior Secured Notes are entitled to receive payment in full in cash of postpetition interest (including any original issue discount on the Senior Secured Notes that was unamortized as of the Petition Date) before the holders of Convertible Notes may receive a distribution under the Plan.  The Convertible Subordinated Notes Indenture Trustee and the Creditors' Committee dispute this position.  As described in Section 6.6(k) hereof, at or prior to the Confirmation Hearing, the Bankruptcy Court will determine the Postpetition Interest Amount and Postpetition Accreted OID Amount, if any, to which the holders of Senior Secured Notes are entitled under the subordination provisions of the Convertible Subordinated Notes Indenture.  To the extent the Bankruptcy Court determines that the Postpetition Interest Amount is owed, holders of Allowed Senior Secured Notes will also receive their pro rata share of the Postpetition Accreted OID Amount.  The Postpetition Interest Amount and Postpetition Accreted OID Amount, if any, shall be paid in Cash to the holders of Allowed Senior Secured Notes Claims as part of the Plan Distribution to Class 3.

In the event that the Bankruptcy Court order required to be entered pursuant to Section 11.1(d) of the Plan has not become a Final Order on or before the Effective Date, the Debtors will deposit into escrow an amount of Cash equal to the full amount of the Postpetition Interest Amount plus the Postpetition Accreted OID Amount.  Such escrowed funds will be released consistently with the Final Order pertaining to the determination of the Postpetition Interest Amount, if any.

(iv)    **ETHEX Criminal Fine Claims (Class 4).**

Treatment Under the Plan:  Except to the extent that the holder of the ETHEX Criminal Fine Claim agrees to different treatment pursuant to an ETHEX Criminal Fine Settlement Order or as otherwise determined by the Bankruptcy Court in connection with confirmation of the Plan that satisfies section 1129(b) of the Bankruptcy Code, such holder of an Allowed ETHEX Criminal Fine Claim shall receive, subject to the terms of the Plan and in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claims, the ETHEX Criminal Fine Claims Distribution, which shall be paid by Reorganized KV in accordance with the ETHEX Criminal Fine Claims Payment Schedule.

<u>Voting</u>:  The ETHEX Criminal Fine Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such ETHEX Criminal Fine Claims.

(v)    **Qui Tam Claims (Class 5).**

<u>Treatment Under the Plan</u>:  Except to the extent that a holder of a Qui Tam Claim agrees to different treatment pursuant to a Qui Tam Settlement Order or as otherwise determined by the Bankruptcy Court in connection with confirmation of the Plan that satisfies section 1129(b) of the Bankruptcy Code, such holder of an Allowed Qui Tam Claim shall receive, subject to the terms of this Plan and in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claims, the Qui Tam Claims Distribution, which shall be paid by Reorganized KV in accordance with the Qui Tam Claims Payment Schedule.

<u>Voting</u>:  The Qui Tam Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such Qui Tam Claims.

(vi)    **Convertible Subordinated Notes Claims (Class 6).**

<u>Allowance</u>:  On the Effective Date, the Convertible Subordinated Notes Claims shall be deemed Allowed Claims in the amount of $201,114,164.

<u>Treatment Under the Plan</u>:  On the Effective Date, or as soon thereafter as reasonably practicable, each holder of an Allowed Convertible Subordinated Notes Claim shall receive, subject to the terms of the Plan and in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim (and not subject to turnover pursuant to any subordination provision or agreement, including, but not limited to, any such subordination provision set forth in the Convertible Subordinated Notes Indenture) its Pro Rata Share of the Convertible Notes Equity Distribution.

<u>Voting</u>:  The Convertible Subordinated Notes Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such Allowed Convertible Subordinated Notes Claims.

(vii)    **General Unsecured Claims (Class 7).**

<u>Treatment Under the Plan</u>:  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the later of the Effective Date and the first Distribution Date after the applicable General Unsecured Claim becomes an Allowed Claim, or as soon after such date as is reasonably practicable, subject to section 7.14 of the Plan, if applicable, each holder of an Allowed General Unsecured Claim shall receive such holder's Pro Rata Share of the General Unsecured Claims Distribution; <u>provided</u>, in no event shall such distribution be in excess of  100% of the amount of its Allowed General Unsecured Claim.

<u>Voting</u>:  The General Unsecured Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan and the votes of such holders will be solicited with respect to such General Unsecured Claims.

(viii)   **Existing Securities Law Claims (Class 8(a)).**

<u>Treatment Under the Plan</u>:  Subject to Section 7.14 of the Plan, if applicable, holders of Existing Securities Law Claims shall not receive or retain any distribution under the Plan on account of such Existing Securities Law Claims.

<u>Voting</u>:   The Existing Securities Law Claims are impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Existing Securities Law Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Existing Securities Law Claims.

(ix)   **Equitably Subordinated Claims (Class 8(b)).**

<u>Treatment Under the Plan</u>:  Subject to Section 7.14 of the Plan, if applicable, holders of Equitably Subordinated Claims shall not receive or retain any distribution under the Plan on account of such Equitably Subordinated Claims.

<u>Voting</u>:   The Equitably Subordinated Claims are impaired Claims.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Equitably Subordinated Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Equitably Subordinated Claims.

(x)   **Existing KV Interests (Class 9).**

<u>Treatment Under the Plan</u>:  Holders of Existing KV Interests shall not receive or retain any distribution under the Plan on account of such Existing KV Interests.

<u>Voting</u>:  The Existing KV Interests are impaired Interests.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Existing KV Interests are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Existing KV Interests.

**6.4.**   *Acceptance or Rejection of the Plan;*
*Effect of Rejection by One or More Classes of Claims or Interests.*

(a)   **Class Acceptance Requirement.**

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount of the Allowed Claims in such Class and more than one-half (1/2) in number, of holders of such Claims that have voted on the Plan.

(b)      **Tabulation of Votes on a Non-Consolidated Basis.**

All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code.  Notwithstanding the foregoing, the Debtors reserve the right to seek to substantively consolidate any two or more Debtors, provided that such substantive consolidation does not materially and adversely impact the amount of the distributions to any Person under the Plan.

(c)      **Confirmation Pursuant to Section 1129(b)
of the Bankruptcy Code or "Cramdown."**

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes.  Subject to Section 14.5 of the Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  Subject to Section 14.5 of the Plan, the Debtors also reserve the right to request confirmation of the Plan, as it may be modified, supplemented or amended from time to time, with respect to any Class that affirmatively votes to reject the Plan.

(d)      **Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

(e)      **Voting Classes; Deemed Acceptance by Non-Voting Classes.**

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims or Interests in such Class.

(f)      **Confirmation of All Cases.**

Except as otherwise specified in the Plan, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors; provided, however, that, with the consent of the Investor Parties, the Debtors may at any time waive the foregoing condition.

> **Important Note on Estimates**
>
> The estimates in the tables and summaries in this Disclosure Statement may differ from actual distributions because of variations in the asserted or estimated amounts of Allowed Claims, the existence of Disputed Claims and other factors.  Statements regarding projected amounts of Claims or distributions (or the value of such distributions) are estimates by the Debtors based on current information and are not representations as to the accuracy of these amounts.  Except as otherwise indicated, these statements are made as of the date of this Disclosure Statement, and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained in this Disclosure Statement is correct at any other time.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts of Claims or Interests allowed by the Bankruptcy Court.
>
> In addition, the estimated valuation of Reorganized KV and the New Common Stock and the estimated recoveries to holders of Claims are not intended to represent the value at which the New Common Stock could be sold if a market for such securities emerges.  See the risk factor regarding the anticipated lack of an active trading market for the New Common Stock, located in Section 11.2(f).

**6.5.**   *Summary of Capital Structure of Reorganized Debtors.*

(a)   **Post-Emergence Capital Structure.**

The following table summarizes the capital structure of the Reorganized Debtors, including the post-Effective Date financing arrangements the Reorganized Debtors expect to enter into to fund their obligations under the Plan and provide for, among other things, their post-Effective Date working capital needs.  The summary of the Reorganized Debtors' capital structure is qualified in its entirety by reference to the Plan and the applicable Plan Documents.

| <u>Instrument</u> | <u>Description</u> |
|---|---|
| *New First Lien Term Loan* | On the Effective Date, KV, as borrower, and the remaining Debtors, as guarantors, will enter into the New First Lien Term Loan with the New First Lien Lenders and the New First Lien Agent, pursuant to the New First Lien Term Loan Agreement.  The proceeds of the New First Lien Term Loan shall be used to pay in full all DIP Claims. |
| *New Common Stock* | On the Effective Date, Reorganized KV will issue the New Common Stock. |

(b)     **Description of New Common Stock.**

(i)     **Issuance.**

The New Common Stock will be issued to (i) holders of Allowed Class 6 Convertible Subordinated Notes Claims in connection with the Convertible Subordinated Notes Equity Distribution, (ii) Eligible Holders who participate in the Rights Offering, and (iii) the Investor Parties and Silver Point pursuant to the terms of the Stock Purchase Agreement and Share Purchase Agreement, in each case subject to dilution by the New Common Stock Securities issued pursuant to the Management Incentive Plan.

(ii)     **Organizational Documents.**

On the Effective Date, the Amended Certificates of Incorporation and Amended By-Laws, each substantially in the form to be contained in the Plan Supplement, will be automatically authorized, approved and adopted by the Reorganized Debtors.

(iii)     **New Common Stock.**

On the Effective Date, Reorganized KV will issue the New Common Stock, and such shares will be issued pursuant to section 1145 of the Bankruptcy Code and/or section 4(a)(2) of the Securities Act.

(iv)     **Restrictions on Transfer.**

In order to avoid the expense and administrative burden of complying with the reporting obligations under the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act"), the New Stockholders Agreement of Reorganized KV will contain restrictions on transfer of the New Common Stock, designed to ensure that there will be less than 2,000 record holders (inclusive of no more than 500 record holders that are not Accredited Investors) of New Common Stock (determined pursuant to the Exchange Act) and the Amended Certificate of Incorporation and Amended By-Laws of Reorganized KV will provide that all holders of Common Stock will automatically be bound by the New Stockholders Agreement without any further action by such holder.  These transfer restrictions contained in the New Stockholders Agreement will remain in place until the New Stockholders Agreement is amended to provide otherwise; provided, that the Board of Directors of Reorganized KV may waive such transfer restrictions with respect to any particular transfer.  As such, the New Stockholders Agreement of Reorganized KV will require notice of any proposed transfer of New Common Stock and will restrict such transfer on certain grounds to be provided therein, including if the transfer would, if effected, require Reorganized KV to register or qualify such New Common Stock under the Securities Act or Exchange Act.  Such restrictions will be in addition to other restrictions on transfer to be set forth in the New Stockholders Agreement.  See Section 11.2(g), "*Restrictions on Transfer*," and Section 13.4(b)(ii), "*Restrictions in the New Stockholders Agreement*."

**6.6.**    *Means for Implementation.*

(a)    **Continued Corporate Existence and
Vesting of Assets in Reorganized Debtors.**

Except as otherwise provided in the Plan, the Debtors shall continue to exist after
the Effective Date as Reorganized Debtors in accordance with the applicable laws of the
respective jurisdictions in which they are incorporated or organized and pursuant to the
Amended Certificates of Incorporation and Amended By-Laws of the Reorganized Debtors, for
the purposes of satisfying their obligations under the Plan and the continuation of their
businesses.  On or after the Effective Date, each Reorganized Debtor, in its sole and exclusive
discretion, may take such action as permitted by applicable law and such Reorganized Debtor's
organizational documents, as such Reorganized Debtor may determine is reasonable and
appropriate, including, but not limited to, causing: (i) a Reorganized Debtor to be merged into
another Reorganized Debtor, or its Subsidiary and/or affiliate; (ii) a Reorganized Debtor to be
dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a
Reorganized Debtor's case on the Effective Date or any time thereafter.

Except as otherwise provided in the Plan, on and after the Effective Date, all
property of the Estates of the Debtors, including all claims, rights and Causes of Action and any
property acquired by the Debtors under or in connection with the Plan, shall vest in each
respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances
and Interests.  Subject to Section 7.1(a) of the Plan, on and after the Effective Date, the
Reorganized Debtors may operate their businesses and may use, acquire and dispose of property
and prosecute, compromise or settle any Claims (including any Administrative Expense Claims)
and Causes of Action without supervision of or approval by the Bankruptcy Court and free and
clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions
expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the
Reorganized Debtors may pay the charges that they incur on or after the Effective Date for
Professional Persons' fees, disbursements, expenses or related support services without
application to the Bankruptcy Court.

On the Effective Date or as soon as reasonably practicable thereafter, the
Reorganized Debtors may take all actions as may be necessary or appropriate to effect any
transaction described in, approved by, contemplated by, or necessary to effectuate the Plan,
including: (1) the execution and delivery of appropriate agreements or other documents of
merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation
containing terms that are consistent with the terms of the Plan and that satisfy the applicable
requirements of applicable law and any other terms to which the applicable entities may agree;
(2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or
delegation of any asset, property, right, liability, debt or obligation on terms consistent with the
terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of
appropriate certificates or articles of incorporation, reincorporation, merger, consolidation,
conversion or dissolution pursuant to applicable state law; and (4) all other actions that the
applicable entities determine to be necessary or appropriate, including making filings or
recordings that may be required by applicable law.

- 45 -

    (b)      **Plan Funding.**

The Cash Distributions under the Plan shall be funded from:  (a) the Debtors' Cash on hand as of the Effective Date, (b) the proceeds of the New First Lien Term Loan, (c) the proceeds of the Rights Offering, and (d) the proceeds from the sale of the Direct Purchase Shares, including under the Share Purchase Agreement.

    (c)      **Cancellation of Existing Securities and Agreements.**

Except for the purpose of evidencing a right to distribution under the Plan, and except as otherwise set forth in the Plan, on the Effective Date all agreements, instruments, and other documents evidencing any Claim or Interest, other than Intercompany Interests, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged and of no force or effect.  Notwithstanding the foregoing, each of the Senior Secured Notes Indenture and Convertible Subordinated Notes Indenture shall continue in effect solely to the extent necessary to allow the Reorganized Debtors, the Senior Secured Notes Indenture Trustee and the Convertible Subordinated Notes Indenture Trustee to make distributions pursuant to the Plan on account of the Senior Secured Notes Claims and Convertible Subordinated Notes Claims, respectively, and to effectuate any charging liens permitted under the Senior Secured Notes Indenture and Convertible Subordinated Notes Indenture, respectively.  The holders of or parties to such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.  Except as provided pursuant to the Plan, each of the Senior Secured Notes Indenture Trustee and the Convertible Subordinated Notes Indenture Trustee and their respective agents, successors and assigns shall be discharged of all of their obligations associated with the Senior Secured Notes and Convertible Subordinated Notes, respectively.

    (d)      **Cancellation of Certain Existing Security Interests.**

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors (as applicable) any Collateral or other property of either Debtor held by such holder, and any termination statements, instruments of satisfactions, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanic's liens, or lis pendens.

    (e)      **Officers and Boards of Directors.**

On the Effective Date, the initial board of directors of each of the Reorganized Debtors shall consist of those individuals identified in a filing to be made with the Bankruptcy Court on or before the date of the Confirmation Hearing.  The initial board of directors of Reorganized KV will consist of seven (7) members, comprised of the Chief Executive Officer of Reorganized KV, and six (6) individuals to be designated by the Investor Parties pursuant to the New Stockholders Agreement.  On the Effective Date, the officers of each of the Reorganized Debtors shall be the officers that existed immediately prior to the occurrence of the Effective

Date.  The compensation arrangement for any insider of the Debtors that shall become an officer of a Reorganized Debtor will be disclosed in the Plan Supplement to be filed with the Bankruptcy Court on or before the date of the Confirmation Hearing.

The members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such member will be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

Prior to the Effective Date, the Debtors shall purchase a "run off" directors and officers liability policy, which shall (i) be effective as of the Effective Date, (ii) have a six-year coverage period, and (iii) be on terms acceptable to the Debtors and reasonably acceptable to the Investor Parties (the "**Run Off D&O Policy**").

On the Effective Date, the D&O Claim Committee will be formed and will be vested with exclusive authority to act, in its sole discretion, on behalf of the Reorganized Debtors with respect to (i) the administration, negotiation and/or settlement of any Claims asserted under any and all of the Debtors' directors and officers liability insurance policies that are based on pre-Effective Date acts, omissions, events or occurrences and (ii) the administration and distribution of funds from the Current D&O Indemnity Reserve.  Upon dissolution of the D&O Claim Committee, any unused funds in the Current D&O Indemnity Reserve shall remain with the Reorganized Debtors.

(f)    **Management.**

(i)    **Management Incentive Plan.**

On the Effective Date, the board of directors of Reorganized KV will be required to adopt the Management Incentive Plan.  The New Common Stock Securities issued pursuant to the Management Incentive Plan shall dilute all other New Common Stock to be issued pursuant to the Plan.

(ii)    **Post-Emergence Bonus Plan.**

On the Effective Date, KV's Chief Executive Officer, Chief Financial Officer and General Counsel (the "**Key Employees**") shall earn and be paid a bonus by Reorganized KV pursuant to the Post-Emergence Bonus Plan, the substantially final version of which will be contained in the Plan Supplement.  Under the Post-Emergence Bonus Plan, the Key Employees will receive a bonus, based on a percentage of each of their respective base salaries, as a result of the achievement of performance objectives previously set by KV's Board of Directors' Compensation Committee in April 2012 for fiscal year 2013 (i.e., April 1, 2012 through March 31, 2013), as well as an incentive to emerge from bankruptcy expeditiously and as a result of their critical performances during the course of these cases.  The performance objectives portion of the bonuses for each such fiscal year will be included in the Plan Supplement.  This post-emergence bonus is designed to, among other things, incentivize the Key Employees, who are

and continue to be critical to the Company's efforts in implementing the Company's business plan and achieving the improvements to the business since the Petition Date, to expeditiously confirm and consummate the Plan.

The amount of the bonus that will be awarded to the Key Employees varies based on the Key Employee's position with the Company. The Chief Executive Officer shall receive a bonus of 60% of his base salary ($312,000), and the Chief Financial Officer and General Counsel shall each receive a bonus of 40% of their salaries ($124,000 and $126,000, respectively), for fiscal year 2013. The Key Employees will be paid 50% of such bonus in the first payroll after the Effective Date and 50% in the first payroll on or after January 1, 2014.

The post-emergence bonus is supported by each of the Investor Parties, who, after participation in the Rights Offering and completing their purchase of Direct Purchase Shares, will own more than a majority of the new common stock of Reorganized KV.

(g)    **Corporate Action.**

The Reorganized Debtors shall serve on the United States Trustee quarterly reports of the disbursements made until such time as a final decree is entered closing the applicable Reorganization Case or the applicable Reorganization Case is converted or dismissed, or the Bankruptcy Court orders otherwise. Any deadline for filing Administrative Expense Claims shall not apply to fees payable pursuant to section 1930 of title 28 of the United States Code.

On the Effective Date, the Amended Certificates of Incorporation and Amended By-Laws, and any other applicable corporate organizational documents of each of the Reorganized Debtors shall be amended and restated and deemed authorized in all respects.

Any action under the Plan to be taken by or required of the Debtors or the Reorganized Debtors, including, without limitation, the adoption or amendment of certificates of incorporation and by-laws, the issuance of securities and instruments, the implementation of the Management Incentive Plan, or the selection of officers or directors, shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors' or Reorganized Debtors' boards of directors or managers, as applicable, or security holders.

The Debtors and the Reorganized Debtors, shall be authorized to execute, deliver, file, and record such documents (including the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further Bankruptcy Court, corporate, board or shareholder approval or action. In addition, the selection of the Persons who will serve as the initial directors, officers and managers of the Reorganized Debtors as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors, board of managers, or stockholders of the applicable Reorganized Debtor

(h)     **New Stockholders Agreement.**

On the Effective Date, Reorganized KV and all of the holders of New Common Stock of Reorganized KV then outstanding shall be deemed to be parties to the New Stockholders Agreement, substantially in the form contained in the Plan Supplement, without the need for execution by any such holder other than Reorganized KV. The New Stockholders Agreement shall be binding on all parties receiving, and all holders of, New Common Stock of Reorganized KV regardless of whether such parties execute the New Stockholders Agreement.

The New Stockholders Agreement provides, among other things, that Silver Point and Deutsche Bank Securities, Inc. will be entitled to designate one observer to the board of directors of Reorganized KV, subject to the terms and conditions contained in the New Stockholders Agreement.

(i)     **Authorization, Issuance and Delivery of New Common Stock.**

On the Effective Date, Reorganized KV will be authorized to issue or cause to be issued the New Common Stock for distribution in accordance with the terms of the Plan and the Amended Certificate of Incorporation of Reorganized KV, without the need for any further corporate or shareholder action. Certificates, if any, of New Common Stock will bear a legend restricting the sale, transfer, assignment or other disposal of such shares, as more fully set forth in the Amended Certificate of Incorporation of Reorganized KV and the New Stockholders Agreement.

The New Common Stock shall not be registered under the Securities Act of 1933, as amended, and shall not be listed for public trading on any securities exchange, in each case, as of the Effective Date. Distribution of New Common Stock may be made by delivery of one or more certificates representing such shares as described in the Plan, by means of book-entry registration on the books of the transfer agent for shares of New Common Stock or by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable, as provided in Section 8.4(b) of the Plan.

In the period pending distribution of the New Common Stock to any holder entitled pursuant to the Plan to receive New Common Stock, such holder shall be bound by, have the benefit of, and be entitled to enforce the terms and conditions of the New Stockholders Agreement and shall be entitled to exercise any voting rights and receive any dividends or other distributions payable in respect of such holder's New Common Stock (including receiving any proceeds of permitted transfers of such New Common Stock) and to exercise all other rights in respect of the New Common Stock (so that such holder shall be deemed for tax purposes to be the owner of the New Common Stock).

(j)     **New First Lien Term Loan.**

On the Effective Date, without any requirement of further action by security holders or directors of the Debtors, each of the Reorganized Debtors shall be authorized to enter into the New First Lien Term Loan Agreement, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens on collateral securing the New First Lien Term Loan.

(k)      **Postpetition Interest Amount.**

To the extent the Bankruptcy Court determines any amounts are due and owing in respect of the Postpetition Interest Amount, the Debtors or Reorganized Debtors shall pay the Postpetition Interest Amount and the Postpetition Accreted OID Amount in full in Cash pursuant to Section 7.2 of the Plan on the Effective Date. For the avoidance of doubt, notwithstanding any other provision set forth in the Plan or any provision of the Convertible Subordinated Notes Indenture or the Senior Secured Notes Indenture, in the event that any Postpetition Interest Amount and Postpetition Accreted OID Amount are determined to be due and owing, such amounts shall not be payable from the Convertible Subordinated Notes Indenture Trustee or any holder of Convertible Subordinated Notes Claims.

On July 3, 2013, the Ad Hoc Senior Secured Noteholders Group and Senior Secured Notes Indenture Trustee commenced an adversary proceeding against the Convertible Subordinated Notes Indenture Trustee (Adv. No. 13-01381 (ALG)) seeking a judgment declaring that the Convertible Subordinated Notes are subordinated to payment in full of all interest accruing on the Senior Secured Notes from the Petition Date through repayment in full of all principal and interest on the Senior Secured Notes, and all such postpetition interest must be paid to the holders of Senior Secured Notes before the holders of Convertible Subordinated Notes may receive any distributions on account of such Convertible Subordinated Notes. The Convertible Subordinated Notes Indenture Trustee, among others, disputes that either the Postpetition Interest Amount or the Postpetition Accreted OID Amount are owed.

(l)      **Rights Offering and Direct Purchase.**

Purpose. The proceeds of the sale of the Rights Offering Stock and Direct Purchase Shares shall be used to provide up to $275 million in capital to the Reorganized Debtors, which shall be available to fund payments required under the Plan and for ordinary course operations and general corporate purposes of the Reorganized Debtors.

Rights Offering. In accordance with the Rights Offering Procedures and the Stock Purchase Agreement, each Eligible Holder (including each Investor Party) that timely votes to accept the Plan shall receive Subscription Rights to acquire its respective Rights Offering Pro Rata Stock Amount of Rights Offering Stock pursuant to the terms set forth in the Plan and in the Rights Offering Procedures. With respect to each Eligible Holder that timely votes to accept the Plan, each Subscription Right shall represent the right to acquire one share of Rights Offering Stock for the Rights Exercise Price. The total number of shares of Rights Offering Stock to be issued in connection with the Rights Offering will be 11,900,000.

Direct Purchase. On the Effective Date, the Debtors shall issue and sell to the Investor Parties and Silver Point, and the Investor Parties and Silver Point shall purchase, the Direct Purchase Shares, in each case in accordance with the terms and conditions set forth in the Stock Purchase Agreement or the Share Purchase Agreement, as applicable. Notwithstanding anything to the contrary contained in the Plan, if Silver Point or any Investor Party fails to purchase any Direct Purchase Shares (pursuant to the Stock Purchase Agreement or the Share Purchase Agreement, as applicable), the Debtors shall reduce distributions under the Plan to each such Party in respect of its Allowed DIP Claims, if any, in an amount equal to the aggregate

amount of its Unfunded Direct Purchase Obligation.  Notwithstanding anything to the contrary contained in the Plan, if the amount of Silver Point's Allowed DIP Claims related distributions is less than the aggregate amount of its Unfunded Direct Purchase Obligation, then, in accordance with the Share Purchase Agreement, the Debtors shall additionally reduce distributions under the Plan to Silver Point in respect of Silver Point's Allowed Senior Secured Notes Claims such that the aggregate amount so reduced equals the aggregate amount of the remaining Unfunded Direct Purchase Obligation.

Backstop Commitment.  (i) Pursuant to the Stock Purchase Agreement, each of the Investor Parties (other than Kingdon) shall be obligated, severally not jointly, and subject to the terms, conditions and limitations set forth in the Stock Purchase Agreement, to purchase its applicable portion of Unsubscribed Shares (as set forth in the Stock Purchase Agreement); (ii) pursuant to the Share Purchase Agreement, Silver Point shall be obligated, subject to the terms, conditions and limitations set forth in the Share Purchase Agreement, to purchase its applicable portion of Unsubscribed Shares (as set forth in the Share Purchase Agreement). Notwithstanding anything to the contrary contained in the Plan, if Silver Point should fail to purchase any of its portion of Unsubscribed Shares (pursuant to the Share Purchase Agreement), the Debtors shall reduce distributions under the Plan to Silver Point in respect of Silver Point's Allowed DIP Claims in an amount equal to the aggregate amount of the Unfunded Backstop Obligation.  Notwithstanding anything to the contrary contained in the Plan, if the amount of such Allowed DIP Claims related distributions is less than the aggregate amount of the Unfunded Backstop Obligation, then the Debtors shall additionally reduce distributions under the Plan to Silver Point in respect of Silver Point's Allowed Senior Secured Notes Claims such that the aggregate amount so reduced equals the aggregate amount of the remaining Unfunded Backstop Obligation; and (iii) pursuant to the PSA, each member of the Participating Ad Hoc Group shall be obligated, severally not jointly, and subject to the terms, conditions and limitations set forth in the PSA, to purchase its applicable portion of Unsubscribed Shares (as set forth in the PSA).

Commitment Fee.  In consideration for the obligations described in Sections 7.12(c) and (d) of the Plan, on the Effective Date, Reorganized KV shall issue to the Investor Parties, Silver Point and the members of the Participating Ad Hoc Group, as applicable, the Commitment Fee Shares (without payment of any additional consideration therefor) pursuant to the terms of the Stock Purchase Agreement, the Share Purchase Agreement or the PSA, as applicable.

(m)    **Intercompany Interests.**

No Intercompany Interests shall be cancelled pursuant to the Plan, and all Intercompany Interests shall continue in place following the Effective Date, solely for the purpose of maintaining the existing corporate structure of the Debtors and the Reorganized Debtors.

(n)    **Insured Claims.**

Notwithstanding anything to the contrary contained herein or the Plan (but subject to Section 12.12(b) of the Plan), to the extent the Debtors have insurance with respect to any Allowed General Unsecured Claim, Allowed Existing Securities Law Claim or Allowed

Equitably Subordinated Claim, the holder of such Allowed Claim shall (i) have an Allowed Claim in its applicable Class for any SIR Claim, (ii) be paid any amount in excess of any SIR Claim from the proceeds of insurance to the extent that the Claim is insured, and (iii) to the extent not duplicative of (i), receive the treatment provided for in the Plan to the extent the applicable insurance policy does not provide coverage with respect to any portion of the Claim.

Other than any SIR Claims, the Debtors do not believe that there will be any Allowed General Unsecured Claims covered by insurance that exceed the available proceeds of such insurance.  Accordingly, the Debtors do not intend to reserve any Cash or other consideration on account of such Claims (other than on account of any SIR Claims, if applicable).

Certain of the Debtors' insurance policies, which may provide coverage for certain Allowed Claims, include self-insured retentions or deductibles, within which the applicable insurers under such policies are generally not responsible for providing coverage. With respect to certain Claims, the Debtors may not have satisfied the applicable self-insured retentions or deductibles prior to such Claims becoming Allowed Claims.  Accordingly, Section 7.14(b) of the Plan provides for the satisfaction of any applicable unsatisfied self-insured retention or deductible with respect to an Allowed Claim otherwise covered by insurance by bifurcating each such Claim into (i) an insured portion, which shall receive the treatment provided for in Section 7.14(a) of the Plan, and (ii) a SIR Claim, which will share pro rata in Distributions (if any) to its Class of Claims. The Debtors shall establish appropriate reserves for SIR Claims pursuant to Section 9.2(c) of the Plan.

(o)     **Comprehensive Settlement of Claims and Controversies.**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are:  (i) in the best interest of the Debtors, the Reorganized Debtors, and their respective Estates and property, and of holders of Claims or Interests; and (ii) fair, equitable and reasonable.

(p)     **Equitably Subordinated Claims.**

Upon entry of the Confirmation Order, any Equitably Subordinated Claims not previously equitably subordinated pursuant to a Final Order of the Bankruptcy Court and that are subject to an objection filed by the Debtors at least seven (7) days prior to the Voting Deadline shall be deemed equitably subordinated pursuant to section 510(c) of the Bankruptcy Code.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the date of such entry, of such equitable subordination.

To the extent the Hermelin Claims are determined by Final Order not to be properly classified as Class 8(b) Equitably Subordinated Claims, such Claims shall be classified as Class 7 General Unsecured Claims and Disallowed in full based on, among other things, the Debtors' allegations in that certain action captioned K-V Pharmaceutical Company v. Hermelin, Case No. 11SL-CC04054, pending in the Circuit Court of St. Louis County, State of Missouri; provided, that to the extent the Debtors have insurance coverage for the Hermelin Indemnification Claims, such Hermelin Indemnification Claims shall be satisfied from the proceeds of such insurance in accordance with Section 7.14 of the Plan.

To the extent the Hermelin Claims are determined by Final Order not to be (i) properly classified as Class 8(b) Equitably Subordinated Claims or (ii) Disallowed in full, then such Claims shall be Allowed as Class 7 General Unsecured Claims in an aggregate amount not to exceed $40,466.51, and receive the treatment provided under Section 5.7 of the Plan; provided, that notwithstanding the foregoing, to the extent the Debtors have insurance coverage for the Hermelin Indemnification Claims, such Hermelin Indemnification Claims shall be satisfied from the proceeds of such insurance in accordance with Section 7.14 of the Plan.

## 6.7.    *Equitable Subordination and/or Disallowance of Mr. M. Hermelin's Claim.*

As discussed in section 6.6(p) above, the Plan provides for the equitable subordination of the Hermelin Claims pursuant to section 510(c) of the Bankruptcy Code, or, in the alternative, full or partial disallowance of such Claims, subject in each case to Mr. M. Hermelin's rights (if any) to recover all or a portion of the Hermelin Indemnification Claims from the Debtors' insurance policies in accordance with the Plan.

The Hermelin Claims generally relate to amounts allegedly owed to Mr. M. Hermelin, the Company's former chief executive, under his former employment contract with KV (the "**Hermelin Employment Agreement**"), as well as under a separate indemnification agreement with KV (the "**Hermelin Indemnification Agreement**").[13] Mr. M. Hermelin asserts that the Hermelin Claims have a value of not less than $82,950,818.04, comprised of at least $80,000,000 allegedly owing under the Hermelin Employment Agreement, and $2,950,818.04 allegedly owing under the Hermelin Indemnification Agreement.

The Board of Directors of KV formed a special committee responsible for all matters relating to Mr. M. Hermelin, including the Hermelin Claims. Although the Board of Directors of KV authorized the filing and proposal of the Plan and Disclosure Statement, neither that authorization, nor anything contained herein or in the Plan, should be construed as reflecting the position of the members of such Board of Directors that are not on the special committee relating to Mr. M. Hermelin, including the Hermelin Claims.

**The Debtors believe that the treatment of the Hermelin Claims under the Plan is appropriate for the reasons that follow, among others. Mr. M. Hermelin disputes the positions taken by the Debtors and certain facts set forth in the following paragraphs,**

---

[13]    Copies of the Hermelin Employment Agreement and Hermelin Indemnification Agreement are annexed as exhibits to the proof of claim filed by Mr. M. Hermelin, assigned Claim No. 151.

**believes that the Debtors do not have a basis to subordinate and/or disallow the Hermelin
Claims, and intends to oppose such subordination and/or disallowance.**

*Equitable Subordination*

Equitable subordination of a claim is generally appropriate where the following
three conditions are satisfied:  (i) the holder of the claim has engaged in a type of inequitable
conduct; (ii) the inequitable conduct results in injury to the debtor's creditors or confers an unfair
advantage on the claimant; and (iii) application of the equitable subordination doctrine is not
inconsistent with the Bankruptcy Code.  *See Benjamin v. Diamond (In re Mobile Steel Corp.)*,
563 F.2d 692 (5th Cir. 1977).  Claims asserted by insiders of a debtor, such as officers, directors
and certain shareholders, are subject to heightened scrutiny in an equitable subordination
analysis.  *See Le Cafe Creme v. Le Roux (In Re Le Cafe Creme, Ltd.)*, 244 B.R. 221, 235 (Bankr.
S.D.N.Y. 2000) (internal quotation omitted).  Inequitable conduct by an insider may include
fraudulent or illegal conduct, or a breach of fiduciary duty.  *Id*.

The Debtors are seeking equitable subordination of the Hermelin Claims as a
result of Mr. M. Hermelin's breaches of fiduciary duty and unlawful conduct during his tenure as
chief executive officer of the Company, which are discussed in greater detail in KV's Amended
Petition for Declaratory Judgment and Further Relief, dated November 28, 2011 (the "**Petition**"),
a copy of which is annexed hereto as Exhibit 7,  as well as in (i) the pleadings and discovery
served by the Company in that action and in the case captioned *Marc S. Hermelin v. K-V
Pharmaceutical Company,* Civil Action No. 6936-VCG*,*  in the Delaware Court of Chancery,[14]
and (ii) the Information filed in the case *United States v. Ethex Corporation,*  No. 4:10-CR-
00117-ERW (Docket No. 1) (the "**Information**"), in the United States District Court for the
Eastern District of Missouri.[15]  This course of conduct persisted for decades, and led to two
federal criminal convictions of the Company during the 1990s.[16]  Mr. M. Hermelin engaged in
significant and material misconduct while serving as chief executive officer of the Company,
most notably, in connection with the events underlying the Information described above, and the
Company's subsequent entry into the Consent Decree and ETHEX's entry into the Plea
Agreement.  See Disclosure Statement § 3.2(a), "*Voluntary Recall and Consent Decree*," and §
3.2(b), "*HHS-OIG Plea Agreement and Divestiture Agreement*."  That misconduct included, but
was not limited to, Mr. M. Hermelin's failure to take appropriate actions with respect to the FDA
regarding the discovery of certain tablet-form generic pharmaceutical products that failed to meet
product specifications, multiple attempts to impede the work of those investigating such matters
at the Company's facilities, and efforts to conceal critical information with respect to the

---

[14]    The Debtors will provide copies of any documents cited in this Section 6.7 upon reasonable written request
by a party in interest to counsel to the Debtors.

[15]    The United States has stated that Mr. Hermelin is the "Corporate Executive A" described in the
Information.  Mr. Hermelin's position is that he never engaged in conduct attributed in the Information to
"Corporate Executive A" and, therefore, could be not "Corporate Executive A."

[16]    The description of Mr. Hermelin's conduct in this Disclosure Statement is of necessity only a summary.
The Debtors reserve the right to present full and complete evidence thereof at any further proceedings,
including but not limited to evidence from all relevant prior cases and actions.

Company's production facilities and processes from the Company's internal audit and quality control personnel and KV's own Board of Directors and committees thereof.  See Petition ¶ 10. Mr. M. Hermelin's conduct also was unlawful.  On March 10, 2011, Mr. M. Hermelin personally pled guilty in the United States District Court for the Eastern District of Missouri to two federal misdemeanor counts (the "Hermelin Criminal Action") stemming from his failure to exercise the authority and supervisory responsibility reposed in him by the Company.[17]  See Petition ¶ 13. The Company contends these failures resulted in a host of violations, including the manufacture and release of morphine sulfate tablets containing more of the active ingredient than stated on the label, resulting in such tablets being misbranded.  Mr. Hermelin disputes these contentions. Prior to his guilty plea, Mr. Hermelin was excluded from participation "in any capacity in the Medicare, Medicaid, and all Federal health care programs … for a minimum period of twenty years."[18]

Mr. M. Hermelin's breaches of fiduciary duty and unlawful conduct resulted in severe harm to the Company and its stakeholders, which continued after KV's Board of Directors terminated Mr. Hermelin's employment in December 2008.  Given Mr. M. Hermelin's misconduct and the resulting harm to the Company, the Debtors believe equitable subordination of the Hermelin Claims is warranted.

Mr. Hermelin disputes the allegations and characterizations in the Petition and filed a compulsory counterclaim alleging breach of contract and certain other claims in tort against the Company in connection with Mr. Hermelin's employment at the Company, including breach of fiduciary duty, wrongful termination, breach of the covenant of good faith and fair dealing, malicious prosecution, defamation, intentional infliction of emotional distress, and civil conspiracy.  Mr. Hermelin also filed a third-party petition against certain former directors of the Company alleging claims of malicious prosecution, defamation, intentional infliction of emotional distress, civil conspiracy, and breach of fiduciary duty.

*Disallowance in Full of Hermelin Claims*

Under section 502(b)(1) of the Bankruptcy Code, a claim is subject to disallowance if the claim is unenforceable against the debtor and its property under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.  The Hermelin Claims are not enforceable against the Debtors as a result of Mr. M.

---

[17]    Mr. Hermelin has argued elsewhere that his convictions were solely a function of his "status" as a corporate officer at the Company.  This is wrong as a matter of fact and of law. *See  Friedman, et. al. v. Sebelius, et al.,*  Case 1:09-cv-02028-ESH (Docket No. 38) (D.D.C. Dec. 13, 2010) ("**Friedman**"), and cases cited therein, most notably, *United States v. Dotterweich*, 320 U.S. 277 (1943) and *United States v. Park*, 421 U.S. 658 (1975).

[18]    See Letter from U.S. Department of Health and Human Services, dated October 29, 2010.  The exclusion period is, by default, set at 3 years. For the HHS-OIG to extend this to 20 years required a finding, after consideration of material submitted by Mr. Hermelin's counsel, of aggravating circumstances.  The twenty year period is extraordinary; Mr. Hermelin is one of only a very few persons excluded for that long. *See Friedman,* Section III, "Length of Exclusion," and authorities cited therein.

Hermelin's breaches of fiduciary duties and unlawful conduct, as discussed above, and the Company's related termination of Mr. M. Hermelin's employment for cause.

First, Mr. M. Hermelin is not entitled to receive any compensation or benefits pursuant to the Hermelin Employment Agreement. The Hermelin Employment Agreement provided that it could be terminated for cause if Mr. M. Hermelin breached a fiduciary obligation to KV or willfully failed to perform his duties to KV with knowledge of the pertinent facts, which conduct had a material and demonstrable adverse effect on KV. See Petition ¶ 7. On December 5, 2008, the Company terminated Mr. M. Hermelin's employment "for cause" based on Mr. M. Hermelin's misconduct and breach of fiduciary duties to the Company, which had a material and demonstrably adverse effect on the Company, as discussed in greater detail above. See Petition ¶¶ 3, 9. By reason of the termination of Mr. M. Hermelin's employment "for cause," and the misconduct underlying such termination, to the extent based on the Hermelin Employment Agreement, the Hermelin Claims should be fully disallowed. Mr. M. Hermelin disputes such disallowance and contends that, pursuant to an addendum to his Employment Agreement dated November 5, 2004, he is entitled to such benefits upon termination "for any reason," including termination for cause. The Company disputes this contention.

Second, Mr. M. Hermelin's alleged Claims under the Hermelin Indemnification Agreement likewise are not allowable. Mr. M. Hermelin's entitlement to indemnification under such agreement is specifically subject to the "Standard of Conduct" provision set forth in section 7(a) therein. The portion of the Hermelin Claims relating to the Hermelin Indemnification Agreement seeks payment of fines, assessments and forfeitures imposed on him, and expenses he has allegedly incurred, in connection with the Hermelin Criminal Action and his concomitant guilty plea, which stemmed from the same matters underlying the Company's entry into the Consent Decree and ETHEX's entry into the Plea Agreement. Upon information and belief, at all times, Mr. M. Hermelin knew that his conduct in connection with such matters (described in greater detail in Section 6.7(a) above) was wrongful and inconsistent with his duties to the Company, see Petition ¶ 10, in violation of the "Standard of Conduct" provision. Accordingly, the Debtors believe Mr. M. Hermelin is not entitled to indemnification for any liabilities incurred in connection with the Hermelin Criminal Action.

### *Partial Disallowance of Hermelin Claims*

On July 3, 2013, the Debtors filed a motion to cap the Hermelin Claims based solely on section 502(b)(7) of the Bankruptcy Code [Docket No. 968] (the "**Hermelin Claim Cap Motion**"), which would limit the maximum allowable claim arising from the Debtors' termination of the Hermelin Employment Agreement to $1,573,313.47 (i.e., the compensation payable thereunder for the one-year period following such termination). If the Hermelin Cap Motion is granted, the Debtors believe the maximum potential allowable amount of the Hermelin Claims (the "**Maximum Hermelin Claim Amount**") will be $4,524,131.51 ($1,573,313.47 relating to termination of the Hermelin Employment Agreement plus $2,950,818.04 relating to the Hermelin Indemnification Agreement).[19] The Debtors believe the Maximum Hermelin

---

[19]    Although the Debtors dispute that any amounts are owed under either the Hermelin Employment Agreement or the Indemnification Agreement, solely for the purpose of calculating the Maximum Hermelin Claim Amount, the Debtors have included in such amount (i) the maximum potential amount that would be

Claim Amount is subject to further reduction as a result of Mr. M. Hermelin's prepetition recovery of $4,483,665 on account of his alleged Claims, resulting from his improper draw on a letter of credit posted by the Debtors as security for certain termination obligations under the Hermelin Employment Agreement (the "**L/C**"), which draw down occurred over the objection of the Debtors and despite the fact that Mr. M. Hermelin was terminated for cause and thus not entitled to any termination benefits under the Hermelin Employment Agreement. To the extent Mr. M. Hermelin's prepetition recovery on account of the L/C is applied to further reduce the Maximum Hermelin Claim Amount, Mr. M. Hermelin's claims would be further reduced to $40,466.51. The Debtors believe the Hermelin Claims should be disallowed to the extent they exceed such amount.

Mr. Hermelin disputes that the Hermelin Claims are subject to section 502(b)(7) of the Bankruptcy Code and contends that $75 million of those benefits are retirement benefits, not "termination benefits." Mr. Hermelin also disputes that his redemption of the $4.48 million letter of credit was improper and contends that he was entitled to redeem the letter of credit under the terms of the agreement.

**6.8.    *Treatment of Executory Contracts and Unexpired Leases.***

(a)    **General Treatment.**

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases identified on the Schedule of Assumed Contracts and Leases in the Plan Supplement shall be deemed assumed, and all other executory contracts and unexpired leases of the Debtors shall be deemed rejected, except that: (i) any executory contracts and unexpired leases that previously have been assumed or rejected pursuant to a Final Order of the Bankruptcy Court shall be treated as provided in such Final Order; and (ii) all executory contracts and unexpired leases that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date shall be treated as is determined by a Final Order of the Bankruptcy Court resolving such motion. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions and rejections described in Section 10.1 of the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to this Section 10.1 shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law.

(b)    **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

All Claims arising from the rejection of executory contracts or unexpired leases, if any, will be treated as General Unsecured Claims. Upon receipt of the Plan Distribution

---

allowable under 502(b)(7) and (ii) the full amount asserted in the Hermelin POC with regard to the Hermelin Indemnification Agreement. The Debtors reserve all rights to further object to the Hermelin POC on any other or additional grounds.

provided in Section 5.7 of the Plan, all such Claims shall be discharged on the Effective Date, and shall not be enforceable against the Debtors, the Reorganized Debtors or their respective properties or interests in property.  In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Reorganized Debtors on or before the date that is thirty (30) days after the effective date of such rejection (which may be the Effective Date, the date on which the Debtors reject the applicable contract or lease as provided in Section 10.3(c) below, or pursuant to an order of the Bankruptcy Court).  The Debtors will use commercially reasonable efforts to identify counterparties to any executory contracts and unexpired leases that are not listed on the Schedule of Assumed Contracts and Leases (and thus will be rejected pursuant to the Plan), and intend to provide notice to such counterparties of the Debtors' decision to reject such contracts or leases no later than ten (10) calendar days prior to the Confirmation Hearing.

(c)     **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such executory contract or unexpired lease, any monetary defaults arising under each executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the appropriate amount (the "**Cure Amount**") in Cash on the later of thirty (30) days after:  (i) the Effective Date; or (ii) the date on which any Cure Dispute relating to such Cure Amount has been resolved (either consensually or through judicial decision).

No later than ten (10) calendar days prior to the commencement of the Confirmation Hearing, the Debtors shall file a schedule (the "**Cure Schedule**") setting forth the Cure Amount, if any, for each executory contract or unexpired lease to be assumed pursuant to Section 10.1 of the Plan, and serve such Cure Schedule on each applicable counterparty.  Any party that fails to object to the applicable Cure Amount listed on the Cure Schedule within fifteen (15) calendar days of the filing thereof, shall be forever barred, estopped and enjoined from disputing the Cure Amount set forth on the Cure Schedule (including a Cure Amount of $0.00) and/or from asserting any Claim against the applicable Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Cure Schedule.

In the event of a dispute (each, a "**Cure Dispute**") regarding:  (i) the Cure Amount; (ii) the ability of the applicable Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to the proposed assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption.  To the extent a Cure Dispute relates solely to the Cure Amount, the applicable Debtor may assume and/or assume and assign the applicable contract or lease prior to the resolution of the Cure Dispute provided that such Debtor reserves Cash in an amount sufficient to pay the full amount asserted as the required cure payment by the non-Debtor party to such contract or lease (or such

- 58 -

smaller amount as may be fixed or estimated by the Bankruptcy Court).  To the extent the Cure Dispute is resolved or determined unfavorably to the applicable Debtor or Reorganized Debtor, as applicable, such Debtor or Reorganized Debtor, as applicable, may reject the applicable executory contract or unexpired lease after such determination.

(d)    **Compensation and Benefit Programs.**

Except as otherwise expressly provided under the Plan, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their respective employees, retirees and non-employee directors including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans are treated as executory contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  Each of the Reorganized Debtors may, prior to the Effective Date and with the consent of the Investor Parties, enter into employment agreements with employees that become effective on or prior to the Effective Date and survive consummation of the Plan.  Any such agreements (or a summary of the material terms thereof) will be included in the Plan Supplement or otherwise filed with the Bankruptcy Court on or before the date of the Confirmation Hearing.

(e)    **Employment Agreements.**

Notwithstanding anything to the contrary contained in the Plan, all employment agreements between the Debtors and their executive officers as of the Effective Date (the "**Current Officer Employment Agreements**") are treated as executory contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

**6.9.    *Discharge of Claims Against and Interests in the Debtors***

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise provided in the Plan or in the Confirmation Order, each Person that is a holder (as well as any trustees and agents on behalf of such Person) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.  Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor.

Upon the Effective Date, all Claims and Causes of Action against any Debtor related to or arising from any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to a non-Debtor affiliate and/or Subsidiary of the Debtors, shall receive the classification and treatment provided for such Claims in the Plan and shall be discharged and all holders thereof forever precluded and enjoined, pursuant to

- 59 -

sections 105, 524, 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim and Cause of Action against any Reorganized Debtor.

**6.10.   *Exculpation and Limitation of Liability.***

Pursuant to Section 12.8 of the Plan, none of the Released Parties, or the D&O Claim Committee or any member thereof (each solely in their capacity as such), shall have or incur any liability to any holder of any Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, or arising out of the Debtors' restructuring, including without limitation, the negotiation, implementation and execution of the Plan, the Reorganization Cases, the Disclosure Statement, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of the Plan except for gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court.

**6.11.   *Releases.***

(a)   **Released Parties.**

The Plan contains certain release and exculpation provisions applicable to certain Released Parties.  As used herein and in the Plan, the term "Released Parties" means, collectively:  (a) the Debtors and their respective affiliates; (b) the DIP Agent; (c) the DIP Lenders; (d) holders of Senior Secured Notes Claims; (e) holders of Convertible Subordinated Notes Claims; (f) the Senior Secured Notes Indenture Trustee; (g) the Convertible Subordinated Notes Indenture Trustee; (h) each of the Investor Parties; (i) the Creditors' Committee and its current and former members, (j) the Ad Hoc Senior Secured Noteholders Group and its members; (k) the Participating Ad Hoc Group and its members (each of (a) through (k), solely in its capacity as such); (l) Silver Point (in all of its capacities with respect to the Plan); (m) Varana, (n) Telemetry and (o) each of the foregoing parties' current officers, affiliates, partners, directors, employees, agents, members, advisors and professionals (including any attorneys, consultants, financial advisors, investment bankers and other professionals retained by such Persons), together with their respective successors and assigns, each solely in its capacity as such; provided, however, that such attorneys and professional advisors shall only include those that provided services related to the Reorganization Cases and the transactions contemplated by the Plan; provided, further, that no Person shall be a Released Party if it objects to and/or opts out of the releases provided for in Article XII of the Plan.

(b)   **Releases by the Debtors.**

*Pursuant to Section 12.7(a) of the Plan, except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Debtors and Reorganized Debtors, in their individual capacities and as debtor in possession, shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes*

*of Action and liabilities (other than the rights of the Debtors or Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder) against the Released Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, their affiliates and former affiliates, the Reorganized Debtors, the parties released pursuant to Section 12.7 of the Plan, the Reorganization Cases, or the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors or their Estates or Reorganized Debtors, whether directly, indirectly, derivatively or in any representative or any other capacity.*

(c)     **Releases by Holders of Claims and Interests.**

*Pursuant to Section 12.7(b) of the Plan, except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date:  (i) each of the Released Parties; (ii) each holder of a Claim or Interest entitled to vote on the Plan that did not "opt out" of the releases provided in Section 12.7 of the Plan in a timely submitted Ballot; and (iii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all holders of Claims and Interests, in consideration for the obligations of the Debtors and Reorganized Debtors under the Plan, the New Common Stock Securities, the New First Lien Term Loan, the Subscription Rights and other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, and each entity (other than the Debtors) that has held, holds or may hold a Claim or Interest, as applicable, will be deemed to have consented to the Plan for all purposes and the restructuring embodied therein and deemed to forever release, waive and discharge all claims, demands, debts, rights, Causes of Action or liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan) against the Released Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are **based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, their affiliates and former affiliates, the Reorganized Debtors, the Reorganization Cases, or the Plan or the Disclosure Statement.** Without limiting the foregoing and for the avoidance of doubt, each of (w) the holders of Senior Secured Notes Claims, (x) the holders of Convertible Subordinated Notes Claims, (y) the Senior Secured Notes Indenture Trustee, and (z) the Convertible Subordinated Notes Indenture Trustee hereby forever releases, waives and discharges all claims, demands, debts, rights, Causes of Action or liabilities that it has or may have against any Released Party arising under the Senior Secured Notes Indenture or the Convertible Subordinated Notes Indenture including with respect to any (A) make-whole amount or similar type of prepayment premium, right or obligation, (B) subordination obligations of the Convertible Subordinated Notes Indenture Trustee and the holders of the Convertible Subordinated Notes Claims, and (C) fees, expenses or other amounts paid to the Convertible Subordinated Notes Indenture Trustee, the Senior Secured Notes Indenture Trustee, and any holder of a Convertible  Subordinated Notes Claim, a Senior Secured Notes Claim, or any such holder's legal advisor at any time in connection with the restructuring of the Debtors and the Plan.*

(d)    **Inapplicability of Releases.**

*Notwithstanding anything to the contrary contained in the Plan: (i) except to the extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, the releases provided for in this Section 12.7 of the Plan shall not release any non-Debtor entity from any liability arising under (x) the Internal Revenue Code or any state, city or municipal tax code, or (y) any criminal laws of the United States or any state, city or municipality; and (ii) the releases set forth in Section 12.7 of the Plan shall not release any (x) Debtor's claims, right, or Causes of Action for money borrowed from or owed to a Debtor or its Subsidiary by any of its directors, officers or former employees, as set forth in such Debtors' or Subsidiary's books and records, (y) any claims against any Person to the extent such Person asserts a crossclaim, counterclaim and/or claim for setoff which seeks affirmative relief against a Debtor or any of its officers, directors, or representatives and (z) claims against any Person arising from or relating to such Person's gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court.*

*Notwithstanding anything to the contrary contained in the Plan, nothing in the Plan: (i) discharges, releases, or precludes any (a) environmental liability that is not a Claim; (b) environmental claim of the United States that first arises on or after the Confirmation Date, or (c) other environmental claim or environmental liability that is not otherwise dischargeable under the Bankruptcy Code; (ii) releases the Debtors or Reorganized Debtors from any environmental liability that a Debtor or Reorganized Debtor may have as an owner or operator of real property owned or operated by a Debtor or Reorganized Debtor on or after the Confirmation Date; (iii) releases or precludes any environmental liability to the United States on the part of any Persons other than the Debtors and Reorganized Debtors; or (iv) enjoins the United States from asserting or enforcing any liability described in this paragraph.*

The DOJ and SEC have requested the inclusion of additional carve-out language to the discharge, release and injunction provisions contained in Article XII of the Plan. The proposed language addresses, among other matters, (i) the pursuit of certain police or regulatory actions against the Debtors by the United States of America, its departments and/or agencies following the Effective Date, and (ii) the rights of the United States of America, its departments and/or agencies against non-Debtor parties. The Debtors are considering the request. To the extent the parties agree to the inclusion of additional carve-out language, the Debtors will include such agreed-upon language in an amended version of the Plan to be filed in advance of the Confirmation Hearing. To the extent the parties do not come to an agreement, the DOJ and SEC reserve their rights to be heard on the matter in connection with confirmation of the Plan.

**6.12.    *Injunction.***

*Pursuant to Section 12.6 of the Plan, except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors or the Estates will be, with respect to any such Claims or Interests, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against*

*or affecting the Debtors, the Reorganized Debtors, the Estates or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Reorganized Debtors, or the Estates or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, or the Estates or any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained in the Plan shall preclude such Persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan.*

*By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest will be deemed to have specifically consented to the Injunctions set forth in Section 12.6 of the Plan.*

### 6.13.   *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to the Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released in Sections 12.7 and 12.8 of the Plan.

### 6.14.   *Injunction Against Interference With Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

### 6.15.   *Termination of Subordination Rights and Settlement of Related Claims.*

Except as expressly provided in the Plan, the classification and manner of satisfying all Claims and Interests and the respective distributions, treatments and other provisions under the Plan take into account or conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, sections 510(a) and 510(b) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Plan.  The Confirmation Order

shall permanently enjoin, effective as of the Effective Date, all Persons and entities from enforcing or attempting to enforce any such contractual, legal and equitable rights satisfied, compromised and settled pursuant to the Plan.

*Any holder of a Claim (other than a Senior Secured Notes Claim) that constitutes "Senior Indebtedness" (as defined in the Convertible Subordinated Notes Indenture) entitled to the benefit of the subordination provisions contained in Article XI of the Convertible Subordinated Notes Indenture must assert any objection to the treatment of its subordination rights under the Plan on or prior to the deadline to object to the Plan. Any disagreement with the priorities set forth in the Plan or any right to assert contractual subordination under the Convertible Subordinated Notes Indenture, including in respect of claims of "Senior Indebtedness," shall be raised on or prior to the deadline to object to the Plan, and decided at or prior to the Confirmation Hearing, and all issues with respect to contractual subordination not raised or resolved at the Confirmation Hearing shall be governed pursuant to the Plan or, if the decision of the Bankruptcy Court at the Confirmation Hearing differs from the Plan, then such decision shall govern.*

Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim or Interest may have or any distribution to be made pursuant to the Plan on account of such Claim or Interest. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtor, the Reorganized Debtors, their respective properties, and holders of Claims and Interests, and is fair, equitable and reasonable.

### 6.16.   *Retention of Causes of Action/Reservation of Rights.*

Subject to Section 12.7 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims or Causes of Action, rights of setoff, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, or other legal or equitable defenses as fully as if the Reorganization Cases had not been commenced, and all of the Debtors' legal and/or equitable rights respecting any Claim left unimpaired, as set forth in Section 4.2 of the Plan, may be asserted after the Confirmation Date to the same extent as if the Reorganization Cases had not been commenced.

### 6.17.   *Indemnification Obligations; Insured Current Director & Officer Claims.*

Notwithstanding anything to the contrary contained in the Plan, subject to the occurrence of the Effective Date, and solely to the extent of (i) applicable insurance proceeds and (ii) the Current D&O Indemnity Reserve, the obligations of the Debtors to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of directors or officers who were directors or officers of any of the Debtors at any time after the Petition Date, against

any Causes of Action or Claims, remain unaffected thereby after the Effective Date and are not discharged.  On and after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies in effect on the Petition Date, including the Run Off D&O Policy, and all directors and officers of the Debtors at any time after the Petition Date shall be entitled to the full benefits of any such policy for the full term of such policy, regardless of whether such director and/or officers remain in such positions after the Effective Date.  From the Effective Date, the Debtors shall cooperate with any Person that served as a director or officer of a Debtor at any time on and after the Petition Date, and make available to any such Person, subject to applicable confidentiality and privilege concerns, such documents, books, records or information relating to the Debtors' activities prior to the Effective Date that such Person may reasonably require in connection with the defense or preparation for the defense of any claim against such Person relating to any action taken in connection with such Person's role as a director or officer of a Debtor.

On and after the Effective Date, any Person that served as a director or officer of a Debtor at any time on and after the Petition Date shall be entitled on a first-priority basis access to proceeds of any available insurance policy of the Debtors as set forth in section 12.12(a) of the Plan to the extent permissible by applicable law.

Notwithstanding anything to the contrary contained in the Plan, but subject to Section 7.14 therein, as of the Effective Date, any obligation of the Debtors to indemnify, defend, reimburse, advance fees and expenses to, or limit the liability of any director or officer who was not a director or officer of any of the Debtors at any time after the Petition Date, against any Causes of Action or Claims, whether in contract, under state law, pursuant to any of the Debtors' by-laws or other corporate documents of the Debtors, or otherwise, shall be discharged. To the extent any such obligations arise under or constitute executory contracts, such executory contracts shall be deemed rejected as of the Effective Date, notwithstanding anything to the contrary in the Plan.

### 6.18.  *Securities Litigation; Document Retention*.

Notwithstanding anything in the Plan to the contrary (including but not limited to in Article XII of the Plan), but excluding any and all Claims that are derivative of the Debtors, nothing in the Plan shall release, enjoin or otherwise affect in any way any right or ability of the lead plaintiff, any other plaintiff and/or any member of the putative classes in the Securities Litigations to: (i) seek or obtain any discovery in connection with the respective Securities Litigations, (ii) pursue and prosecute the claims asserted, or which may be asserted, against any non-Debtor in the respective Securities Litigations; (iii) enter into or enforce any settlement or enforce any judgment obtained against any non-Debtor in connection with or relating to the respective Securities Litigations, including through coverage provided by any insurance and/or any proceeds therefrom; and (iv) pursue and recover on any claims against KV as a defendant in the respective Securities Litigations solely to the extent of any insurance and/or any proceeds therefrom (excluding any self-insured retention obligation or deductible) that may provide coverage for any liability of KV for the claims asserted in the respective Securities Litigations.

Notwithstanding confirmation of the Plan, and notwithstanding anything in the Plan to the contrary, from and after the Effective Date, (i) the Reorganized Debtors shall

preserve and maintain all of the Debtors' and the Reorganized Debtors' documents, files, books, records, and electronic data (including emails) that relate to the claims, defenses and allegations in the respective Securities Litigations (collectively, the "**Securities Litigation Documents**") whether maintained by the Debtors or the Reorganized Debtors, or any successors thereto or transferees thereof, to the extent required under applicable law, including without limitation under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, et. seq. and 15 U.S.C. § 78u-4(b)(3)(C) thereof, and (ii) nothing shall restrict or impair any right of the lead plaintiffs and/or any representative of the putative classes in the respective Securities Litigations to seek leave under 15 U.S.C. § 78u-4(b)(3)(B) or otherwise, to require any or all of the Debtors or the Reorganized Debtors to preserve Securities Litigation Documents until, with respect to (i) and (ii) above, such time as, in each case with respect to the applicable Securities Litigation:  (I) a final, non-appealable judgment is entered concluding such litigation in full, or (II) such litigation is fully and finally settled.

## ARTICLE VII.

## CONFIRMATION OF THE PLAN OF REORGANIZATION

### 7.1.    *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires the bankruptcy court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan.  The Confirmation Hearing with respect to the Plan is scheduled to commence on August 28, 2013 at 11:00 a.m. (prevailing Eastern Time).  The hearing may be adjourned or continued from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned or continued date made at the Confirmation Hearing (or an appropriate filing with the Bankruptcy Court) or any subsequent adjourned or continued Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a chapter 11 plan of reorganization.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Clerk of the Bankruptcy Court electronically using the Bankruptcy Court's Case Management/Electronic Case File ("**CM/ECF**") System at https://ecf.nysb.uscourts.gov (a CM/ECF password will be required),[20] and by mailing a hard copy of such objection to the chambers of the Honorable Allan L. Gropper of the Bankruptcy Court at One Bowling Green, New York, New York 10004 together with proof of service, and served upon: (i)  Willkie Farr & Gallagher LLP, counsel for the Debtors, 787 Seventh Avenue, New York, NY 10019, Attn:  Paul V. Shalhoub, Robin Spigel, Esq. and Andrew D. Sorkin, Esq.; (ii) Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn: Richard Morrissey, Esq. and Michael Driscoll, Esq.); (iii) counsel to the Creditors Committee, Stroock & Stroock & Lavan LLP, 180 Maiden

---

[20]    A CM/ECF password may be obtained via the Bankruptcy Court's CM/ECF website at https://ecf.nysb.uscourts.gov.

Lane, New York, NY 10038 (Attn: Erez Gilad, Esq. and Matthew Garafolo, Esq.); and (iv) counsel to the Ad Hoc Senior Secured Noteholders Group, Weil, Gotshal & Manges LLP, 767 Fifth Avenue New York, New York 10153 (Attn: Robert J. Lemons, Esq. and Lori R. Fife, Esq.). Bankruptcy Rule 9014 governs objections to confirmation of the Plan.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**7.2.** *Confirmation.*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.

(a)    **Confirmation Requirements.**

Confirmation of a chapter 11 plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than

the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- subject to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that if a class of priority claims has voted to accept the plan, holders of such claims may receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such claims);

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Subject to satisfying the standard for any potential "cramdown" of Classes that vote to reject the Plan, the Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a summary of the relevant statutory confirmation requirements.

(i) **Acceptance.**

Classes 3, 4, 5, 6 and 7 are impaired under the Plan and are entitled to vote to accept or reject the Plan.  Classes 1 and 2 are unimpaired and, therefore, are conclusively presumed to have voted to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Classes 8(a), 8(b) and 9 are impaired and not receiving any property under the Plan, and thus are deemed to have rejected the Plan.

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan, any exhibit, or schedules thereto or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary, subject to the terms of the Plan. The Debtors believe that the Plan will satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to Claims and Interests in Classes 8(a), 8(b) and 9.

The Debtors also will seek confirmation of the Plan over the objection of any individual holders of Claims who are members of an accepting Class. However, there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

(ii)    **Unfair Discrimination and Fair and Equitable Test.**

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired Class if that Class and all junior Classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class. The Debtors believe the Plan will not discriminate unfairly against any non-accepting Class.

(iii)    **Feasibility; Financial Projections.**

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the Plan. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business. Under the terms of the Plan, the Allowed Claims potentially being paid in whole or part in cash are the DIP Claims, Allowed Administrative Expense Claims, Allowed Other Secured Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Senior Secured Notes Claims, Allowed ETHEX Criminal Fine Claims, Allowed Qui Tam Claims, and Allowed General Unsecured Claims. The Debtors have estimated the total amount of these cash payments to be approximately $353 million, exclusive of Allowed ETHEX Criminal Fine Claims and Allowed Qui Tam Claims (see table at Article II, "Summary of Plan Classification and Treatment of Claims and Interests" above) and expect sufficient liquidity from the New First Lien Term Loan, the sale of the Direct Purchase Shares, the Rights Offering and operations to fund these cash payments (and payments in respect

of the Allowed ETHEX Criminal Fine Claims and Allowed Quit Tam Claims) as and when they become due.

In connection with developing the Plan, the Debtors have prepared detailed financial projections (the "**Financial Projections**"), attached as Exhibit 3 hereto and described more fully below, which detail, among other things, the financial feasibility of the Plan. The Financial Projections indicate, on a pro forma basis, the projected level of cash flow is sufficient to satisfy all of the Debtors' future debt and debt related interest cost, research and development, capital expenditure and other obligations during this period. Accordingly, the Debtors believe that confirmation of the Plan is not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS. THE PROJECTIONS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER ARTICLE XII. IN LIGHT OF THESE RISKS AND UNCERTAINTIES, ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FINANCIAL PROJECTIONS.

The Debtors prepared the Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances. The Financial Projections have not been examined or compiled by independent accountants. Moreover, such information is not prepared in accordance with accounting principles generally accepted in the United States ("**GAAP**"). The Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved may vary from the projected results and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

(b)    **Valuation of the Debtors.**

(i)    Valuation

The Debtors retained Jefferies LLC  ("**Jefferies**") as their financial advisor and investment banker in the Reorganization Cases. As described in greater detail in Section 10.17 hereof, the Plan is the culmination of extensive negotiations with the Investor Parties and the Ad Hoc Senior Secured Noteholders Group regarding potential plans of reorganization and the debt

and equity financing commitments supporting such plans. The competitive plan formulation and negotiation process that the Debtors conducted yielded substantial benefits to various of the Debtors' creditors, whose recoveries increased significantly. After exhaustive negotiations with both investor groups, and accounting for the views of the Creditors' Committee and a group of non-Investor Party holders of Convertible Subordinated Notes that represented the majority of holders of Convertible Subordinated Notes who were not Investor Parties (the "**Independent Convertible Noteholder Consortium**"), the Debtors' Board of Directors, in consultation with their advisors, determined that the proposal provided by the Investor Parties (the "**Investor Proposal**") was the Debtors' best available restructuring alternative. Prior to the hearing scheduled on the Debtors' motion to authorize the Debtors to entry into certain agreements relating to the Investor Proposal, the competing investor groups reached an agreement whereby both the Investor Parties and the Ad Hoc Senior Secured Noteholders Group could participate in the debt and equity financing commitments underlying the Plan.[21]

In conjunction with the restructuring transactions contemplated by the Plan, the Debtors will sell the Direct Purchase Shares for $37 million, and conduct a Rights Offering for approximately $238 million of New Common Stock, which Rights Offering will be fully backstopped by the Investor Parties and Silver Point. In connection with consummation of the Plan, the Debtors will enter into the New First Lien Term Loan, which will have an initial principal amount of $100 million, and will be fully drawn upon the Effective Date of the Plan. After taking into account anticipated distributions under the Plan, Jefferies estimates the valuation of the newly issued securities implied by the debt and equity financing commitments being provided in connection with consummation of the Plan to be approximately $413 million, comprised of approximately $100 million of debt and approximately $313 million of equity value. The Rights Offering Stock is valued by the various parties in interest at $20 per share.

Jefferies believes the value provided under the Plan is currently the best measure of the Debtors' value in light of, among other things, the competitive plan formulation and negotiation process that took place in May and June 2013 with the Investor Parties and the Ad Hoc Senior Secured Noteholders Group. Jefferies also believes that this process resulted in the highest value for the Debtors, their estates and their creditors.

The valuation described herein does not constitute a recommendation to any Holder of Claims against the Debtors as to how to vote on the Plan. The estimated reorganization value also does not constitute an opinion as to the fairness, from a financial point of view, of the consideration to be received under the Plan or of the terms and provisions of the Plan.

Based on the foregoing, the equity value of the New Common Stock of Reorganized KV also is $20 per share.[22]

---

[21]    In addition, the Independent Convertible Noteholder Consortium also reached agreement with the Investor Parties regarding the Investor Proposal.

[22]    The share price is the price per share prior to dilution by New Common Stock to be issued to management under the Management Incentive Plan.

Jefferies assumes that the Financial Projections prepared by management and attached hereto as <u>Exhibit 3</u>, have been reasonably prepared in good faith and on a basis reflecting the best available estimates and judgments of the Debtors as to the future operating and financial performance of the Reorganized Debtors.

(ii)    Valuation Considerations

The valuation of the newly issued securities implied by the debt and equity financing commitments being provided in connection with consummation of the Plan is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (1) prevailing interest rates; (2) conditions in the financial markets; (3) the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long term basis; and (4) other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Chapter 11 Cases or by other factors not possible to predict. Accordingly, the implied value stated herein and the Plan of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets.

(c)    **Best Interests Test.**

The "best interests" test requires that the Bankruptcy Court find either:

- that all members of each impaired class have accepted the plan; or

- that each holder of an allowed claim or interest of each impaired class of claims or interests will under the plan receive or retain on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To determine what holders of Claims and Interests in each impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of liquidation under chapter 7 of the Bankruptcy Code. The Cash amount that would be available for satisfaction of Claims and Interests would consist of the proceeds resulting from the disposition of the assets and properties of the Debtors, augmented by the Cash held by the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be: (i) first, reduced by the amount of the Allowed DIP Claims and the secured portion of the Allowed Senior Secured Notes Claims and other Secured Claims; (ii) second, reduced by the costs and expenses of liquidation under chapter 7 (including the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage) and such additional administrative claims that might result from the termination of the Debtors' business; and (iii) third, reduced by the amount of the Allowed Administrative Expense Claims, U.S. Trustee Fees, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims. Any remaining net cash would be allocated to creditors and stakeholders in strict order of priority of claims contained in section 726 of the Bankruptcy Code.

In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts (including vendor and customer contracts) assumed or entered into by the Debtors prior to the filing of the chapter 7 cases. Certain claims that would otherwise be paid over the course of many years would be accelerated, such as the Qui Tam Claims and ETHEX Criminal Fine Claims.

To determine if the Plan is in the best interests of each impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' assets and properties, after subtracting the amounts attributable to the foregoing Claims, must be compared with the value of the property offered to each such Class of Claims under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Reorganization Cases, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to the liquidation of the Debtors under chapter 7.

Moreover, the Debtors believe that the value of any distributions to each Class of Allowed Claims in a chapter 7 case would be materially less than the value of distributions under the Plan and any distribution in a chapter 7 case would not occur for a substantial period of time. It is likely that distribution of the proceeds of the liquidation could be delayed for up to six months after the completion of such liquidation in order to resolve claims and prepare for distributions. In the likely event litigation was necessary to resolve claims asserted in the chapter 7 case, the delay could be prolonged.

The Debtors, with the assistance of Jefferies, have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by creditors and equity interest holders in the event of liquidation as of May 31, 2013 (the "**Liquidation Analysis**"), which is attached hereto as Exhibit 2. The Liquidation Analysis provides: (a) a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates, and (b) the expected recoveries of the Debtors' creditors and equity interest holders under the Plan. As reflected in the Liquidation Analysis, the following Classes of Claims and Interests would have a zero percent (0%) recovery on their Claims or Interests in a liquidation: Class 1, Class 2, Class 3 (to the extent unsecured) Class 4, Class 5, Class 6, Class 7, Class 8(a), Class 8(b) and Class 9. In addition, recoveries on Administrative Expense Claims, Priority Tax Claims and U.S. Trustee Fees also would be between 0% and 79%.

The Liquidation Analysis contains a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Accordingly, the values reflected might not be realized. The chapter 7 liquidation period is assumed to last 90 to 120 days following the appointment of a chapter 7 trustee, allowing for, among other things, the discontinuation and wind-down of operations, the

sale of the operations, the sale of assets, the collection of receivables and the finalization of tax affairs.  All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

### 7.3.    *Classification of Claims and Interests.*

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim and interest into a class with other claims or interests that are "substantially similar."

### 7.4.    *Consummation.*

The Plan will be consummated on the Effective Date.  The Effective Date will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan, as set forth in Section 11.2 of the Plan, have been satisfied or waived pursuant to the Plan.

The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

### 7.5.    *Dissolution of the Creditors' Committee.*

The Creditors' Committee shall be automatically dissolved on the Effective Date and, on the Effective Date, each member (including each officer, director, employee or agent thereof) of the Committee and each professional retained by the Committee shall be released and discharged from all rights, duties, responsibilities and obligations arising from, or related to, the Debtors, their membership on the Creditors' Committee, the Plan or the Reorganization Cases, except with respect to: (i) any matters concerning any Fee Claims held or asserted by any professionals retained by the Committee; or (ii) any appeals of the Confirmation Order, or any appeal relating to the Postpetition Interest Amount, through the date such appeals are finally decided, settled, withdrawn or otherwise resolved.

### 7.6.    *Post-Confirmation Jurisdiction of the Bankruptcy Court.*

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under, or related to the Reorganization Cases for, among other things, the following purposes:

(a)    To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the Cure Disputes resulting therefrom;

(b)    To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)     To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)     To ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(e)     To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)     To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)     To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)     To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     To hear and determine all Fee Claims;

(j)     To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated by the Plan, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(l)     To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release or injunction provisions set forth herein, or to maintain the integrity of the Plan following consummation;

(m)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)     To resolve any disputes concerning whether a Person or entity had sufficient notice of the Reorganization Cases, the Disclosure Statement Hearing, the Confirmation Hearing, any applicable Bar Date, or the deadline for responding or objecting to a Cure Amount, for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

(q)     To recover all Assets of the Debtors and property of the Estates, wherever located;

(r)     To resolve any disputes regarding the subordination provisions or agreements contained in the Convertible Subordinated Notes Indenture; and

(s)     To enter a final decree closing each of the Reorganization Cases.

## ARTICLE VIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Debtors' capital structure will remain over-leveraged and the Debtors will be unable to satisfy in full their debt obligations.  Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

### 8.1.    *Alternative Plan(s) of Reorganization.*

In formulating and developing the Plan, the Debtors have explored numerous alternatives and engaged in an extensive negotiating process with the Investor Parties (who collectively hold approximately 62.5% in principal amount of the Convertible Subordinated Notes), as well as the Ad Hoc Senior Secured Noteholders Group, who had supported the original version of the Plan filed on January 7, 2013 (together with the amended versions of the Plan filed on March 18, 2013, April 22, 2013, and May 1, 2013, collectively, the "**Original Plan**").  As described in greater detail in Section 10.17 hereof, following the Debtors' receipt of the Investor Proposal in April 2013, the Investor Parties and Ad Hoc Senior Secured Noteholders Group each submitted multiple restructuring proposals and counterproposals and ultimately reached a consensual agreement amongst themselves, culminating with the negotiation and documentation of the current version of the Plan.  See Section 10.17, "*Events Leading to Formulation of Plan; Global Settlement*".

The Plan is the product of a competitive plan proposal process, which process has yielded substantially improved recoveries to holders of Claims across the Debtors' capital structure relative to the Original Plan.  The terms of the Plan reflect good faith, arms length negotiations among the Debtors, the Investor Parties, and the Ad Hoc Senior Secured Noteholders Group, as well as the Creditors' Committee, the Convertible Subordinated Notes Indenture Trustee, and Independent Convertible Noteholder Consortium.

The Debtors believe, based on the competitive plan proposal process described herein and in Section 10.17, that the Plan represents their best available restructuring alternative. The Debtors further believe that the Plan fairly adjusts the rights of various Classes of Claims,

and also provides superior recoveries to Classes 3, 4, 5, 6 and 7 over any alternative capable of rational consideration (such as a chapter 7 liquidation), thus enabling stakeholders to maximize their returns.

**8.2.**    *Liquidation Under Chapter 7 of the Bankruptcy Code.*

The Debtors could be liquidated under chapter 7 of the Bankruptcy Code.  A discussion of the effect a chapter 7 liquidation would have on the recoveries of the holders of Claims is set forth in Article VII of this Disclosure Statement.  The Debtors believe that liquidation would result in lower aggregate distributions being made to creditors than those provided for in the Plan, which is demonstrated by the Liquidation Analysis set forth in Article VII and attached as Exhibit 2 to this Disclosure Statement.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES.  THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

**8.3.**    *Dismissal of the Debtors' Reorganization Cases.*

Dismissal of the Debtors' Reorganization Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*.  Upon dismissal of the Reorganization Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time consuming process of negotiations with their creditors, and possibly resulting in costly and protracted litigation in various jurisdictions.  Moreover, holders of Secured Claims may be permitted to foreclose upon the assets that are subject to their Liens, which is likely all of the Debtors' assets, including all of their Cash.  Dismissal may also permit certain unpaid unsecured creditors to obtain and enforce judgments against the Debtors.  The Debtors believe that these actions would seriously undermine their ability to obtain financing and could lead ultimately to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Therefore, the Debtors believe that dismissal of the Reorganization Cases is not a viable alternative to the Plan.

## ARTICLE IX.

## SUMMARY OF VOTING PROCEDURES

This Disclosure Statement, including all exhibits hereto and the related materials included herewith, is being furnished to the holders of Claims in Classes 3, 4, 5, 6 and 7, which are the only Classes entitled to vote on the Plan.

All votes to accept or reject the Plan must be cast by using the Ballot enclosed with this Disclosure Statement (or, with respect to beneficial holders of Senior Secured Notes Claims (Class 3) and Convertible Subordinated Notes Claims (Class 6) voting through an Intermediary, by using the Ballot provided to such holders by their respective Intermediaries).

No other votes will be counted.  Consistent with the provisions of Bankruptcy Rule 3018, the Debtors have fixed July 11, 2013, at 5:00 p.m. (prevailing Eastern Time) as the Voting Record Date.  Ballots must be RECEIVED by the Voting Agent no later than the Voting Deadline, **4:00 p.m. (prevailing Eastern Time) on August 16, 2013**, unless the Debtors, at any time, in their sole discretion, extend such date by oral or written notice to the Voting Agent, in which event the period during which Ballots will be accepted will terminate at 4:00 p.m. (prevailing Eastern Time) on such extended date.  See Section 1.4 "*Voting; Holders of Claims Entitled to Vote*" above for additional disclosures regarding voting, including voting by an Intermediary.

Ballots previously delivered may be withdrawn or revoked at any time prior to the Voting Deadline by the beneficial owner on the Voting Record Date who completed the original Ballot.  Only the person or nominee who submits a Ballot can withdraw or revoke that Ballot.  A Ballot may be revoked or withdrawn either by submitting a superseding Ballot or by providing written notice to the Voting Agent.

Acceptances or rejections may be withdrawn or revoked prior to the Voting Deadline by delivering a written notice of withdrawal or revocation to the Voting Agent.  To be effective, notice of revocation or withdrawal must:  (a) be received on or before the Voting Deadline by the Voting Agent at its address specified in Section 1.4 above; (b) specify the name of the holder of the Claim whose vote on the Plan is being withdrawn or revoked; (c) contain the description of the Claim as to which a vote on the Plan is withdrawn or revoked; and (d) be signed by the holder of the Claim who executed the Ballot reflecting the vote being withdrawn or revoked, in the same manner as the original signature on the Ballot.  The foregoing procedures should also be followed with respect to a person entitled to vote on the Plan who wishes to change (rather than revoke or withdraw) its vote.

## ARTICLE X.

## DESCRIPTION AND HISTORY OF CHAPTER 11 CASES

### 10.1.    *General Case Background.*

On August 4, 2012, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On August 7, 2012, the Bankruptcy Court entered an order [Docket No. 26] authorizing the joint administration of the Reorganization Cases, for procedural purposes only, under Case No. 12-13346.  The Honorable Allan L. Gropper is presiding over the Reorganization Cases.  The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As of the date hereof, no request has been made for the appointment of a trustee or examiner in the Reorganization Cases.

The following is a brief description of certain significant events that have occurred during the pendency of the Reorganization Cases.

### 10.2.    *Retention of Professionals.*

To assist them in carrying out their duties as debtors in possession, and to otherwise represent their interests in the Reorganization Cases, the Debtors filed with the

Bankruptcy Court applications seeking entry of orders authorizing the Debtors to retain: (a) Willkie Farr & Gallagher LLP as their restructuring counsel [Docket No. 77]; (b) Jefferies as their investment banker and financial advisors [Docket No. 78]; (c) Williams & Connolly LLP as their special litigation counsel [Docket No. 114]; (d) SNR Denton US LLP as their special litigation and regulatory counsel [Docket No. 115]; and (e) Ernst & Young LLP as their tax advisor [Docket No. 116]. On September 28, 2012, the Bankruptcy Court entered orders [Docket Nos. 222, 224, 225, and 226, respectively] approving the applications other than Jefferies, whose application was approved by order dated, October 10, 2012 [Docket No. 268].

On August 7, 2012, the Bankruptcy Court entered an order [Docket No. 28] approving the Debtors' application [Docket No. 11], pursuant to 28 U.S.C. § 156(c), authorizing the Debtors to retain Epiq as the Debtors' claims, noticing and balloting agent. On August 29, 2012, the Bankruptcy Court entered an order [Docket No. 223] approving the Debtors' application, pursuant to section 327(a) of the Bankruptcy Code, authorizing the Debtors to retain Epiq as administrative agent for the Debtors [Docket No. 111].

Additionally, on September 28, 2012, the Bankruptcy Court entered an order [Docket No. 227] approving the Debtors' motion seeking authority, pursuant to section 327(e) of the Bankruptcy Code, to employ certain additional professionals, utilized in the ordinary course, to assist the Debtors in their day-to-day business operations [Docket No. 110].

**10.3.    *Employment Obligations*.**

(a)    **Prepetition Employee Compensation.**

The Debtors believe that the continued efforts of their employees are critical to a successful reorganization. On the Petition Date, the Debtors filed with the Bankruptcy Court a motion (the "**Employee Wage Motion**") for entry of an order authorizing the Debtors to pay, among other items, prepetition employee wages, salaries, and other compensation, prepetition employee business expenses, withholding taxes, payroll-related taxes, and other miscellaneous prepetition employee expenses and employee benefits [Docket No. 5]. On August 7, 2012 and August 23, 2012, the Bankruptcy Court entered orders granting interim and final approval of the Employee Wage Motion, respectively [Docket Nos. 29 and 86].

(b)    **Sales Incentive/Severance Plans.**

In addition to fixed compensation, in the ordinary course of business, the Debtors' sales personnel (including sales representatives, senior sales representatives, district managers, area sales directors and a national sales director) receive quarterly incentive payments in accordance with the Debtors' sales incentive program (the "**Sales Incentive Plan**"). Under the Sales Incentive Plan, such sales personnel are compensated based on their attainment of quarterly sales targets set by management. On August 23, 2012, the Bankruptcy Court authorized the Debtors to pay sales incentive obligations owing on account of the full fiscal year 2013 [Docket No. 90]. On November 27, 2012, the Bankruptcy Court authorized the Debtors to pay sales incentive obligations owing to their then current employees on account of the second quarter of fiscal year 2013 [Docket No. 400].

In addition, in the ordinary course of business, the Debtors maintain a severance plan for the benefit of certain eligible employees (as amended from time to time, the "**Severance Plan**").  Pursuant to the Severance Plan, an eligible employee who is terminated in connection with a workforce reduction or the elimination of the applicable employee's position with the Debtors is entitled to receive severance benefits equal to a specified multiple of such employee's weekly base rate of pay, subject to entry into a written separation agreement with the Debtors.  In September 2012, the Debtors reduced the size of their workforce, terminating fifty-five (55) employees who were eligible for payments under the Sales Incentive Plan and/or the Severance Plan.  On September 28, 2012, the Bankruptcy Court authorized the Debtors to (i) honor their obligations to such terminated employees under the Severance Plan and (ii) pay sales incentive obligations owing to such employees on account of the second quarter of fiscal year 2013 [Docket No. 229].

(c)    **Non-Sales Incentive Plan**

The Debtors also maintain an incentive program for certain of their non-sales personnel (the "**Non-Sales Incentive Program**"), including professional employees, support staff, junior managerial/supervisory staff, and certain members of more senior management (none of whom are insiders of the Debtors).  Incentive payments under such program are made annually, in the ordinary course of business, based on attainment of specified corporate, departmental and individual goals.  On April 16, 2013, the Bankruptcy Court authorized the Debtors to pay incentive obligations owing under the Non-Sales Incentive Program on account of the full fiscal year 2013 [Docket No. 748].

**10.4.    *Continuing Supplier and Customer Relations.***

The Debtors believe that maintaining good relationships with their vendors, suppliers and customers is necessary to the continuity of the Debtors' business operations during the Reorganization Cases.  On the Petition Date, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order authorizing the Debtors to continue certain prepetition customer programs, to satisfy, in the ordinary course of business, certain prepetition claims arising from such programs, and to pay Medicaid and other insurance rebate obligations [Docket No. 7].  On August 23, 2012, the Bankruptcy Court entered an order approving the motion [Docket No. 85], which order was subsequently amended by order, dated November 8, 2012 [Docket No. 338].

In addition, the Debtors sought entry of an order granting administrative expense status to obligations arising from postpetition delivery of goods and services ordered prepetition and authorizing the Debtors to pay such obligations in the ordinary course of business [Docket No. 79].  On September 28, 2012, the Bankruptcy Court entered an order approving the motion [Docket No. 230].

**10.5.    *Stabilization of Debtors' Business Operations.***

(a)    **Cash Management.**

The Debtors believed it would be disruptive to their operations if they were forced to significantly change their cash management system upon the commencement of the Reorganization Cases.  Accordingly, on the Petition Date, the Debtors filed with the Bankruptcy

Court a motion (the "**Cash Management Motion**") seeking entry of an order authorizing the continued use of their cash management system and procedures, the continued use of all of their existing bank accounts, and the continuation of intercompany transactions and accordance of administrative expense status to claims for such transactions [Docket No. 4]. Hologic filed two objections (the "**Cash Management Objections**") [Docket Nos. 22 and 66] to the Cash Management Motion in which it objected to, among other things, the Debtors' request to continue their prepetition practices with respect to intercompany transfers. On August 7, 2012 and September 28, 2012, the Bankruptcy Court entered interim orders approving the Cash Management Motion [Docket Nos. 36 and 220]. Each such interim order expressly reserved Hologic's and the Debtors' rights in connection with the Cash Management Motion and the Cash Management Objections. Upon consummation of the Hologic Settlement Agreement (described in Section 10.11(b) below), Hologic's objection to the Cash Management Motion was withdrawn. On January 15, 2013, the Bankruptcy Court entered an order granting the Cash Management Motion on a final basis [Docket No. 540].

       (b)       **Use of Cash Collateral; Extensions of Committee Challenge Deadline.**

       The Debtors could not meet their ongoing postpetition obligations without authorization to use cash claimed as collateral by the Senior Noteholders ("**Cash Collateral**"). On August 9, 2012, an agreed interim order was entered by the Bankruptcy Court authorizing the Debtors to use Cash Collateral, subject to certain terms and conditions, and granting adequate protection [Docket No. 45] (the "**Interim Cash Collateral Order**"). A final order (the "**Final Cash Collateral Order**" and, together with the Interim Cash Collateral Order, the "**Cash Collateral Orders**") authorizing the use of Cash Collateral through October 18, 2012 was entered by the Bankruptcy Court on September 14, 2012 [Docket No. 144]. Subsequently, the Debtors and the Ad Hoc Senior Noteholders Group entered into and filed stipulations seeking to extend the Debtors' authorization to use Cash Collateral. Such stipulations were approved by the Bankruptcy Court on October 16, 2012 [Docket No. 279] and November 21, 2012 [Docket No. 391]. The most recent stipulation approved by the Bankruptcy Court authorized the Debtors to continue using Cash Collateral through and including January 9, 2013. Prior to the expiration of that stipulation, on December 27, 2012, the Bankruptcy Court entered the DIP Order (defined in Section 10.12 below), which authorized the Debtors to continue to use Cash Collateral on the terms and conditions set forth therein. See Section 10.12, "The DIP Facility."

       Pursuant to the Final Cash Collateral Order, the original deadline for the Creditors' Committee to commence a contested matter or adversary proceeding raising claims and defenses against the holders of Senior Notes was November 28, 2012 (the "**Challenge Deadline**"). The Challenge Deadline was extended, with the consent of the Ad Hoc Senior Noteholders Group, on three occasions pursuant to stipulations that were approved by the Bankruptcy Court on November 13, 2012, December 14, 2012 and January 25, 2013 [Docket Nos. 356, 443 and 559, respectively.]

       Solely with respect to certain claims and defenses specified in the applicable orders and stipulations, the Challenge Deadline was further extended pursuant to the DIP Order itself, and stipulations entered into by the Creditors Committee and the DIP Agent thereunder [Docket Nos. 559, 628, 703, 818 and 902]. The most recent stipulation, entered on May 31, 2013, extended the Challenge Deadline through July 3, 2013.

**10.6.**   *Utilities.*

On the Petition Date, the Debtors filed with the Bankruptcy Court a motion for an order:  (a) prohibiting utilities from altering, refusing or discontinuing services; (b) establishing procedures for providing deposits to requesting utility companies; (c) deeming utility companies adequately assured of future performance; and (d) establishing procedures for resolving requests for additional assurance of payment [Docket No. 9].  On August 23, 2012, the Bankruptcy Court entered an order approving the motion [Docket No. 88].

**10.7.**   *Leases of Nonresidential Real Property.*

As of the Petition Date, certain of the Debtors were parties to unexpired leases and/or subleases of nonresidential real property.  Pursuant to orders entered by the Bankruptcy Court on October 19 and November 15, 2012 [Docket Nos. 289, 372], and by operation of section 365(d)(4) of the Bankruptcy Code, each such lease and sublease has been rejected.  On February 13, 2013, the Bankruptcy Court entered an order [Docket No. 598] authorizing KV to enter into a new corporate headquarters lease agreement for premises located at 16640 Chesterfield Grove Road, Suite 200, Chesterfield, Missouri 63005.  See Section 10.16, "Entry Into New Headquarters Lease Agreement."

**10.8.**   *Appointment of a Creditors' Committee.*

Pursuant to section 1102(a)(1) of the Bankruptcy Code, on August 13, 2012, the U.S. Trustee appointed the Creditors' Committee.  The original members of the Creditors' Committee are set forth below:

> Deutsche Bank Trust Company Americas
> 100 Plaza One, 6th Floor
> Mail Stop JCY03-0699
> Jersey City, NJ 07311-3901
> Attn: Stanley Burg
> Vice President
>
> Capital Ventures International
> c/o Susquehanna Advisors Group, Inc.
> 401 City Avenue, Suite 220
> Bala Cynwyd, PA 19004
> Attn:  Todd Silverberg
>        Vice President
>
> S.A.C Arbitrage Fund, LLC
> c/o S.A.C. Capital Advisors, L.P.
> 72 Cummings Point Road
> Stamford, CT 06902
> Attn:  Stuart Davidoff
>
> Applied Discovery, Inc.
> 13427 NE 16th Street

Bellevue, WA 98005
Attn:  Jennelle Evanoff
      Vice President, Finance

Poretta & Orr, Inc.
450 East Street
Doylestown, PA 18901
Attn:  Richard Orr
      Finance Director

As of the date hereof, each of Capital Ventures International, S.A.C. Arbitrage Fund, LLC, and Poretta & Orr, Inc. had resigned voluntarily from the Creditors' Committee.

On September 25, 2012, the Creditors' Committee filed with the Bankruptcy Court applications seeking entry of orders authorizing the Creditors' Committee to retain (i) Stroock & Stroock & Lavan LLP as its primary counsel [Docket No. 202], (ii) Duff & Phelps, LLC as its financial advisor [Docket No. 205] and (iii) Arnall Golden Gregory LLP as its regulatory counsel [Docket No. 207].  On October 10, 2012, the Bankruptcy Court approved such retentions [Docket Nos. 270-72].  On April 16, 2013, the Bankruptcy Court entered an amended order authorizing the retention and employment of Duff & Phelps, LLC to August 13, 2012 [Docket No. 751].

On October 22, 2012, the Bankruptcy Court entered a stipulation and agreed order between the Debtors and the Creditors' Committee regarding the Creditors' Committee's obligation to provide access to certain information to its constituents under the Bankruptcy Code [Docket No. 298].  That stipulation and order also authorized Epiq to administer a website established by the Creditors' Committee's for the benefit of creditors.

On December 19, 2012, the Creditors' Committee filed with the Bankruptcy Court an application for an order authorizing the Creditors' Committee to retain Curtis, Mallet-Prevost, Colt & Mosle LLP as conflicts counsel to the Creditors' Committee in connection with the Declaratory Judgment Motion (defined below in Section 10.13(f)) [Docket No. 457].  On January 15, 2013, the Bankruptcy Court entered an order approving such retention [Docket No. 538].

On April 16, 2013, the Bankruptcy Court entered an amended and restated order approving the retention of Duff & Phelps, LLC on revised terms, *nunc pro tunc* to August 13, 2012, and authorized the Creditors' Committee to retain FourSquare Partners as a consultant to the Committee in connection with the Reorganization Cases [Docket No. 751].

**10.9.**   *Section 341 Meeting.*

On September 24, 2012, the U.S. Trustee convened a meeting of creditors (the "**341 Meeting**") pursuant to section 341(a) of the Bankruptcy Code.  Mr. Thomas S. McHugh, Treasurer and Vice President of K-V Discovery Solutions, Inc., and Treasurer and Vice President or Chief Financial Officer of the other Debtors, attended the 341 Meeting on behalf of the Debtors.  The 341 Meeting was closed on September 24, 2012.

**10.10.** *Schedules, Statements and Bar Date.*

(a)    **Schedules and Statements.**

On September 17, 2012, each Debtor filed with the Bankruptcy Court its Schedules of Assets and Liabilities ("**Schedules**") and Statement of Financial Affairs ("**SoFA**"). The Schedules and SoFAs are available electronically free of charge at http://dm.epiq11.com/KVD.

(b)    **Bar Date.**

On October 10, 2012, the Debtors filed with the Bankruptcy Court a motion seeking an order establishing the bar dates for filing proof of certain claims against the Debtors that arose on or prior to the Petition Date, and approving the form and manner of notice of each bar date [Docket No. 266]. On October 19, 2012, the Bankruptcy Court entered an order [Docket No. 288] (the "**Bar Date Order**") approving the motion and fixing November 30, 2012 as the Bar Date to file proofs of claim for all creditors other than governmental units (the "**General Bar Date**"), and January 31, 2013 as the Bar Date for governmental units (as such term is defined in the Bankruptcy Code) (the "**Governmental Unit Bar Date**"). Pursuant to the Bar Date Order, any creditor affected by an amendment or supplement to the Schedules and SoFAs is required to file a proof of claim by the later of (a) the applicable Bar Date and (b) the date that is thirty (30) days from the date of service of the notice to the affected creditors that the Schedules and SoFAs have been amended or supplemented. Additionally, any counterparty to an executory contract or unexpired lease with the Debtors that is rejected by the Debtors must file a proof of claim for damages arising from such rejection by the later of: (x) the applicable Bar Date, (y) the date that is thirty (30) days following the date of service of notice of entry of an order authorizing the rejection of such executory contract or unexpired lease (which order may include an order confirming a plan of reorganization for the Debtors pursuant to chapter 11 of the Bankruptcy Code), and (z) the date set by any other order of the Bankruptcy Court authorizing the rejection of such contract or lease.

In accordance with the Bar Date Order, on October 30, 2012, a notice regarding the Bar Dates (the "**Bar Date Notice**") was published in The New York Times, and on October 31, 2012, the Bar Date Notice was published in the St. Louis Post-Dispatch. In addition, on or before, October 25, 2012, a proof of claim form and the Bar Date Notice were mailed to all known entities holding potential prepetition claims against the Debtors.

Following passage of the General Bar Date and Governmental Unit Bar Date, over 360 proofs of claim had been filed against the Debtors in the Reorganization Cases.

**10.11.** *Hologic Matters.*

(a)    **Hologic Motion for Relief from the Automatic Stay.**

On September 5, 2012, Hologic filed a motion for relief from the automatic stay of section 362 of the Bankruptcy Code (the "**Lift Stay Motion**") [Docket No. 120], alleging, among other things, that "cause" existed to lift the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code due to the threatened and actual continuing decline in the value of

Hologic's interests in its Makena® collateral, and that it was not adequately protected.  On September 18, 2012, a stipulation and scheduling order relating to the Lift Stay Motion was entered by the Bankruptcy Court [Docket No. 169].

On September 20, 2012, the Debtors filed an objection to the Lift Stay Motion [Docket No. 173] (the "**Lift Stay Objection**") asserting that the value of Hologic's collateral was not declining and that Hologic's interests in its collateral were adequately protected by a substantial equity cushion in such assets, and disputing the amount of Hologic's secured claim and the extent of Hologic's alleged security interest in its Makena® collateral.  The Creditors' Committee also objected to the Lift Stay Motion [Docket No. 174].  On September 25, 2012, Hologic filed a reply to the Lift Stay Objection [Docket No. 190].

A preliminary hearing on the relief sought in the Lift Stay Motion was held before the Bankruptcy Court on September 27, 2012.  Thereafter, Hologic and the Debtors engaged in extensive discovery in connection with the litigation of the Lift Stay Motion, exchanging thousands of pages of documents as well as expert reports and rebuttal reports in support of their respective positions.

(b)     **Hologic Settlement Agreement.**

On December 5, 2012, the Debtors (subject to Bankruptcy Court approval) and the Hologic Parties entered into a settlement agreement (the "**Hologic Settlement Agreement**") resolving the Lift Stay Motion and all other outstanding claims and disputes between the Debtors and the Hologic Parties.  That same day, the Debtors filed a motion seeking Bankruptcy Court approval of the Hologic Settlement Agreement [Docket No. 412].  Pursuant to the Hologic Settlement Agreement, all then-pending litigation or other disputes between any of the Debtors and any of the Hologic Parties was stayed.  On December 19, 2012, the Creditors' Committee filed an objection to the motion to approve the Hologic Settlement Agreement [Docket No. 455]; such objection was resolved in connection with the settlement of the Creditors' Committee's objection to the DIP Motion (defined below) described in Section 10.12 hereof.  On December 27, 2012, the Bankruptcy Court entered an order approving the Hologic Settlement Agreement [Docket No. 498].

Pursuant to the Hologic Settlement Agreement, on December 28, 2012, Hologic was paid $60,000,000 (the "**Settlement Amount**") from the proceeds of the DIP Facility in full satisfaction and discharge of all claims of the Hologic Parties against the Debtors arising from or related to the Hologic Purchase Agreement and the Reorganization Cases.  Further, upon payment of the Settlement Amount, the proof of claim filed by Hologic in the Reorganization Cases was deemed satisfied in full and expunged from the claims register.  The Hologic Settlement Agreement also provided for mutual releases of all claims in favor of the parties thereto and their representatives and related parties.

The Debtors' entry into the Hologic Settlement Agreement eliminated the risk that the Debtors lose the lift stay motion and allow the Debtors to move forward with their efforts to formulate a plan of reorganization based upon Makena®.  Among other things, the Hologic Settlement Agreement also avoided the substantial time, resources and expenses associated with the ongoing, and future, litigation with Hologic.  Absent entry into the

Settlement Agreement, the Debtors and the Hologic Parties would have remained embroiled in value-eroding litigation relating to, among other things, Hologic's lift stay motion.  Moreover, in light of the arguments raised by the parties in such litigation, future litigation between the Hologic Parties and the Debtors was otherwise inevitable in the absence of a consensual resolution of the parties' disputes.

### 10.12. *The DIP Facility*.

In order to consummate the Hologic Settlement Agreement and pay the Settlement Amount to the Hologic Parties, the Debtors required debtor-in-possession financing. In connection therewith, the Debtors contacted over thirty (30) parties in an effort to procure such financing, but received only three formal proposals.  Ultimately, the Debtors determined that, under the circumstances, the postpetition financing proposal submitted by the Ad Hoc Senior Secured Noteholders Group was the best available proposal.

Consequently, on December 11, 2012, the Debtors filed with the Bankruptcy Court a motion (the "**DIP Motion**") seeking entry of an order authorizing the Debtors to, among other things:  (a) obtain senior secured priming debtor-in-possession financing in the aggregate principal amount of $85,000,000, subject to the terms of the DIP Credit Agreement (the "**DIP Facility**"); and (b) use the cash collateral of the senior secured noteholders and grant the senior secured noteholders certain adequate protection relating to such use [Docket No. 431].

KV is the borrower under the DIP Facility, and each of the other Debtors are guarantors.  Silver Point Finance, LLC is the DIP Agent, and the initial DIP Lenders consist of affiliates or funds of each of Silver Point Finance, LLC, Whitebox Advisors, LLC and Pioneer Investment Management, LLC.  The DIP Facility is secured by priming, first-priority liens on substantially all of the Debtors' assets.  The proceeds of the DIP Facility funded the settlement payment to Hologic contemplated by the Hologic Settlement Agreement, and were used for other purposes permitted by the DIP Credit Agreement and related budget.

Shortly after filing the DIP Motion, the Creditors' Committee served document requests and deposition notices on, among others, the Debtors' Chief Executive Officer, Chief Financial Officer and lead Director of KV's Board of Directors, Jefferies, Hologic, Silver Point, in its capacity as a member of the Ad Hoc Senior Secured Noteholders Group, Houlihan Lokey LLP, in its capacity as the financial advisor and investment banker to the Ad Hoc Senior Secured Noteholders Group.  Thereafter, the Debtors and the Ad Hoc Senior Secured Noteholders Group served document requests and deposition notices on the Creditors' Committee and the Chairman of the Creditors' Committee.  On December 19, 2012, the Creditors' Committee filed an objection to the DIP Motion [Docket No. 455].  Certain other parties also filed objections to the DIP Motion [Docket Nos. 446, 449, 450].  After negotiations among the Debtors, the Ad Hoc Senior Secured Noteholders Group, and the various objectors to the DIP Motion, including the Creditors' Committee, the parties reached a settlement of all issues relating to the DIP Motion, and the DIP Facility and proposed order granting the DIP Motion were revised to reflect the compromises agreed to by such parties.  Thereafter, on December 27, 2012, following a hearing, the Bankruptcy Court entered a final order granting the relief requested in the DIP Motion to the extent set forth therein [Docket No. 497] (the "**DIP Order**").

The DIP Facility has been amended on several occasions and the Debtors have obtained waivers of defaults related to the plan milestones contained therein.  In connection with the Global Settlement, the DIP Facility has been further amended to, among other things, remove the plan-related milestones.

**10.13.**  *Other Material Postpetition Litigation and Settlements.*

(a)    **Adversary Proceeding Against Particle Dynamics International, LLC and Fifth Third Bank.**

On September 5, 2012, certain of the Debtors commenced an adversary proceeding (Adv. Pro. No. 12-01861) (the "**Adversary Proceeding**") against PDI LLC and Fifth Third Bank (collectively, the "**PDI Defendants**").  The Debtors' complaint [Adv. Pro. Docket No. 1] requests, pursuant to section 542 of the Bankruptcy Code, that the PDI Defendants turn over certain funds held in an escrow account in accordance with the PDI Agreement (the "**PDI Escrow**"), which the Debtors believed were being improperly withheld.  On October 22, 2012, PDI LLC filed an answer to the complaint and a counterclaim against Debtors KV, DrugTech and KV Discovery alleging breach of contract with respect to the PDI Agreement [Adv. Pro. Docket No. 18].  Also on October 22, 2012, Fifth Third Bank filed an answer to the complaint in the Adversary Proceeding, and asserted a counterclaim against certain of the Debtors and a cross-claim against PDI LLC, each seeking reimbursement of its fees and expenses incurred in connection with the Adversary Proceeding [Adv. Pro. Docket No. 19].  On November 12, 2012, the Debtor-plaintiffs filed answers to each of the PDI Defendants' counterclaims, and PDI LLC filed an answer to Fifth Third Bank's cross-claim [Adv. Pro. Docket Nos. 22-24].  On November 16, 2012, the Bankruptcy Court conducted a preliminary pretrial conference.

In February 2013, the Debtors and PDI Defendants entered into a settlement agreement resolving the PDI Escrow dispute and the Adversary Proceeding (the "**PDI Settlement Agreement**").  The PDI Settlement Agreement generally provides for $550,000 of the funds in the PDI Escrow to be released to the PDI Defendants, and for the remaining escrowed funds (totaling approximately $1.3 million) to be returned to the Debtors.  On February 20, 2013, the Debtors filed a motion seeking Bankruptcy Court approval of the PDI Settlement Agreement [Docket No. 611].  On March 13, 2013, the Bankruptcy Court granted such motion [Docket No. 665].  The remaining escrowed funds were returned to the Debtors on or around March 29, 2013.

(b)    **Actions Against Compounding Pharmacies.**

In addition to the continuation of their prepetition litigation against certain state Medicaid agencies, since the Petition Date the Debtors have pursued actions against various pharmacies engaged in the compounding of 17P.  On October 12, 2012, the Debtors filed a motion with the Bankruptcy Court  [Docket No. 275] (the "**2004 Motion**") seeking an order authorizing and directing the production of documents by Wedgewood Village Pharmacy Inc., PharMerica, Inc. and Alere Women's and Children's Health, LLC (collectively, the "**Examinees**") pursuant to Bankruptcy Rule 2004.  The Debtors are seeking information pertaining to claims the Debtors may have against the Examinees for deceptive and improper marketing and sales practices relating to their compounded 17P products and services.

Preliminary hearings on the 2004 Motion were held before the Bankruptcy Court on November 16, 2012 and December 13, 2012.  In an effort to resolve the 2004 Motion consensually, the Debtors engaged in negotiations with the Examinees regarding the scope of the Debtors' document and information requests.  Ultimately, the Debtors entered into stipulated orders with each of the Examinees granting the 2004 Motion to the extent set forth therein [Docket Nos. 473, 476 and 478] (the "**2004 Orders**"), as well as related protective orders [Docket Nos. 474, 477 and 479] (as may be amended from time to time, the "**Protective Orders**"), which were entered by the Bankruptcy Court on December 21, 2012.  Subject to the terms of the Protective Orders, the Debtors may use documents or other information obtained pursuant to the 2004 Orders in connection with litigation commenced by the Debtors (if any) prior to, on, or after the Effective Date.

The provisions of the Protective Orders survive the Effective Date as and to the extent set forth therein and, notwithstanding anything to the contrary contained herein or the Plan, the rights and obligations of the parties thereto for any breach thereof also shall survive the Effective Date.

(c)    **Settlement With the Zydus Parties.**

As described in Section 3.1(b) above, in August 2011, substantially all of KV Generic's assets, including its generic products business, were sold to the Zydus Parties for $60.5 million in cash, of which $7.5 million was deposited in an escrow account to satisfy certain post-closing indemnification obligations of the Company (the "**Zydus Escrow**").  The purchase agreement between the Company and the Zydus Parties contemplated that, no later than August 8, 2012, the parties would issue joint written instructions to the escrow agent for the Zydus Escrow to release the funds therein to the Company.  However, the Zydus Parties refused to issue such instructions as a result of alleged indemnification and other claims asserted by the Zydus Parties against certain of the Debtors.

In resolution of the Zydus Escrow dispute, on October 19, 2012, the Zydus Parties and certain of the Debtors entered into a settlement agreement (the "**Zydus Settlement Agreement**").  Under the Zydus Settlement Agreement, among other things:  (a) $6.525 million of the $7.5 million in the Zydus Escrow was released to the Debtors, $475,000 of the escrowed funds were disbursed to the Zydus Parties, and the remaining $500,000 remained in escrow as security for the Debtors' obligations to indemnify the Zydus Parties in connection with a certain personal injury action against the Debtors and Zydus Parties; (b) the Zydus Parties agreed to pay approximately $400,000 in back rent owing to the Debtors under a sublease between the Debtors and the Zydus Parties; and (c) the sublease agreement and certain other agreements between the Zydus Parties and the Debtors were terminated.

On November 16, 2012, the Bankruptcy Court approved the Debtors' motion seeking approval of the settlement with the Zydus Parties [Docket No. 383].

(d)    **Convertible Subordinated Notes Indenture Trustee's Rule 2004 Motion**

On November 21, 2012, the Convertible Subordinated Notes Indenture Trustee filed a motion [Docket No. 393] (the "**DB Rule 2004 Motion**") requesting entry of an order

pursuant to Bankruptcy Rule 2004 authorizing the issuance of a subpoena (i) for the production of documents by and (ii) directing the examination of KV, Thompson Coburn LLP, in its capacity as securities counsel to KV, and Cleary Gottlieb Steen & Hamilton LLP, in its capacity as counsel to the initial purchasers of the Convertible Subordinated Notes. By the DB Rule 2004 Motion, the Convertible Subordinated Notes Indenture Trustee is seeking to determine whether the publicly filed version of the Convertible Subordinated Notes Indenture was the version of the Convertible Subordinated Notes Indenture signed at closing and, according to the Convertible Subordinated Notes Indenture Trustee, was "therefore the Indenture under which the Notes were issued." DB Rule 2004 Motion, p. 6. In particular, the Convertible Subordinated Notes Indenture subordination provision provides that "Senior Indebtedness" is required to be paid "in cash or cash equivalent." <u>See</u> Convertible Subordinated Notes Indenture, Article XI. The Convertible Subordinated Notes Indenture Trustee asserts that such language was not included in the version of the Convertible Subordinated Notes Indenture signed at closing and, thus, unless the inclusion of the requirement that Senior Indebtedness be paid in cash or cash equivalent was done by amendment in accordance with Article IX of the Convertible Subordinated Notes Indenture (which governs amendments thereto), the Convertible Subordinated Notes Indenture was not properly amended post-closing.

On December 11, 2012, the Creditors' Committee filed a joinder to the DB Rule 2004 Motion [Docket No. 431]. The hearing on the DB Rule 2004 Motion has been adjourned by the parties from time to time. In light of the Global Settlement, the issues raised by the DB Rule 2004 Motion should not be required to be resolved.

      (e)      **United States Non-Dischargeability Adversary Proceeding.**

On November 26, 2012, the United States of America, through the United States Attorney for the Southern District of New York (the "**United States**") commenced an adversary proceeding (Adv. Pro. No. 12-02005) (the "**Non-Dischargeability Adversary Proceeding**") against KV. The complaint filed by the United States [Adv. Pro. Docket No. 1] (the "**Non-Dischargeability Complaint**"), seeks, among other relief, a declaration by the Bankruptcy Court that the Debtors' obligations in respect of the ETHEX Criminal Fine Claims and Qui Tam Claims are non-dischargeable pursuant to sections 523(a) and 1141(d)(6) of the Bankruptcy Code. KV's deadline to answer or otherwise respond to the Non-Dischargeability Complaint has been extended consensually by the parties from time to time. As of the date hereof, KV's deadline to respond to the Non-Dischargeability Complaint is August 1, 2013 [Adv. Pro. Docket No. 8]. The Debtors are attempting to negotiate with the United States regarding a consensual resolution of the issues underlying the Non-Dischargeability Adversary Proceeding, including the ETHEX Criminal Fine Claims and Qui Tam Claims.

      (f)      **The Declaratory Judgment Motion**

On January 7, 2013, the Creditors' Committee filed a motion (the "**Declaratory Judgment Motion**") [Docket No. 513] seeking a declaration that, as of the Petition Date, the holders of the Senior Secured Notes did not have a security interest in any of the Makena®-related assets that KV purchased from Hologic pursuant to the Hologic Purchase Agreement (such assets, the "**Makena Assets**"). On January 28, 2013, the Ad Hoc Senior Secured Noteholders Group filed an objection to the Declaratory Judgment Motion [Docket No. 562] in

which they asserted that, under the Senior Secured Notes Indenture and the related pledge and security agreement, the holders of Senior Secured Notes had a security in all of the Makena Assets other than (i) the trademark relating to Makena® and (ii) the Debtors' executory rights as of the Petition Date arising under the Hologic Purchase Agreement.  The Senior Secured Notes Indenture Trustee filed a joinder in the Ad Hoc Senior Secured Noteholders Group's objection [Docket No. 560].  On February 1, 2013, the Creditors' Committee filed a reply to the objections of the Ad Hoc Senior Secured Noteholders Group and Senior Secured Notes Indenture Trustee [Docket No. 577].  A hearing on the Declaratory Judgment Motion was held on February 5, 2013.

On February 11, 2013, the Bankruptcy Court issued a memorandum of decision ruling that the holders of Senior Secured Notes did not have a prepetition lien on and were not granted a prepetition security interest in the Debtors' right, title and interest in the Makena Assets, other than Makena® inventory, receivables and proceeds of both [Docket No. 596].  On March 22, 2013, the Bankruptcy Court entered an order granting the Declaratory Judgment Motion to the extent set forth therein [Docket No. 685].

(g)    **Effort to Enforce the Stay Against State of Texas and Ven-A-Care of the Florida Keys, Inc.**

On December 20, 2012, the State of Texas, by and through the Attorney General of Texas, filed a petition seeking certain relief against each of the Debtors and ETHEX in an action entitled *The State of Texas ex rel. Ven-a-Care of the Florida Keys, Inc. v. K-V Pharmaceutical Company, et al.*, Cause No. D-1-GV-12-001788 in the District Court of Travis County, Texas, 53rd Judicial District (the "**Texas Action**").  The Texas Action stems from a suit filed under seal on or about March 14, 2000 by private person Ven-A-Care of the Florida Keys, Inc. ("**Ven-A-Care**" and, together with the State of Texas, "**Texas**").  By the petition, Texas alleges that the Debtors and ETHEX violated the Texas Medicaid Fraud Prevention Act by allegedly knowingly making false statements and misrepresentations of material fact to the Texas Medicaid program regarding the prices of certain pharmaceutical products.  Texas seeks certain monetary and injunctive relief in the Texas Action.

On January 31, 2013, the Debtors filed a motion (the "**Stay Enforcement Motion**") [Docket No. 569] for entry of an order enforcing the automatic stay against Texas in respect of the Texas Action on the grounds that, among other things, that the Texas Action did not fall within the "police and regulatory" exception to the automatic stay.  On February 1, 2013, the Debtors and ETHEX filed a plea to the jurisdiction, verified plea in abatement, and original answer to the petition in the Texas Action. In addition, on February 6, 2013, the Debtors and ETHEX filed a notice of removal of the Texas Action to the United States Bankruptcy Court for the Western District of Texas.  On March 1, 2013, Texas filed a response to the Stay Enforcement Motion [Docket No. 635], alleging that the commencement of the Texas Action does not violate the automatic stay because it constitutes an exercise of police and regulatory power within the meaning of section 362(b)(4) of the Bankruptcy Code.

In May 2013, the Debtors and Texas reached a consensual resolution of the Texas Action and Stay Enforcement Motion.  Pursuant to that consensual resolution, Texas will receive an Allowed General Unsecured Claim in the amount of $3,000,000 in respect of the claims

asserted in the Texas Action, on account of which Texas will share in the General Unsecured Claims Distribution on a pro rata basis with other holders of Allowed General Unsecured Claims.  The parties have agreed to cause the Texas Action and the Stay Enforcement Motion to be dismissed.  On May 28, 2013, the Debtors filed a motion pursuant to Bankruptcy Rule 9019 seeking approval of the Debtors' settlement with Texas [Docket No. 878].  On June 19, 2013, the Bankruptcy Court approved the motion and authorized the Debtors to enter into the settlement with Texas.

**10.14.**  ***Preferences and Fraudulent Conveyances.***

Under the Bankruptcy Code, a debtor may seek to recover, through adversary proceedings in the bankruptcy court, certain transfers of the debtor's property, including payments of cash, made while the debtor was insolvent during the 90 days immediately before the commencement of the bankruptcy case (or, in the case of a transfer to or on behalf of an "insider," one year before the commencement of the bankruptcy case) in respect of antecedent debts to the extent the transferee received more than it would have received on account of such preexisting debt had the debtor been liquidated under chapter 7 of the Bankruptcy Code.  Such transfers include cash payments, pledges of security interests or other transfers of an interest in property.  In order to be preferential, such payments must have been made while the debtor was insolvent; debtors are rebuttably presumed to have been insolvent during the 90-day preference period.  The Bankruptcy Code's preference statute can be very broad in its application because it allows the debtor to recover payments regardless of whether there was any impropriety in such payments.

However, there are certain defenses to such claims.  For example, transfers made in the ordinary course of a debtor's and the transferee's business or transfers made in accordance with ordinary business terms are not recoverable.  Furthermore, if the transferee extended credit contemporaneously with or subsequent to the transfer, and before the commencement of the bankruptcy case, for which the transferee was not repaid, such extension constitutes an offset against an otherwise recoverable transfer of property.  If a transfer is recovered by a debtor, the transferee has a general unsecured claim against the debtor to the extent of the recovery.

Under the Bankruptcy Code and under various state laws, a debtor may also recover or set aside certain transfers of property (fraudulent transfers), including grants of security interests in property, made while the debtor was insolvent or which rendered the debtor insolvent or undercapitalized, if the debtor received less than reasonably equivalent value for such transfer.  The Debtors are in the early stages of analyzing whether they have claims against any persons or entities for preferences or fraudulent conveyances; the Debtors (and/or the Creditors' Committee) may do so in the future.  The statute of limitations with respect to preference actions is scheduled to expire on August 4, 2014.

**10.15.** *Deadline Extensions.*

    (a)    **Extension of Deadline for
Removal of Prepetition Non-Bankruptcy Actions.**

    Pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rules 9006 and 9027, the Debtors' original deadline to remove prepetition non-bankruptcy actions to federal court (the "**Removal Deadline**") was November 2, 2012.  On October 25, 2012, the Bankruptcy Court entered an order [Docket No. 308] extending the Removal Deadline until January 31, 2013.  The Removal Deadline was subsequently extended through May 1, 2013 [Docket No. 579].  On April 24, 2013, the Bankruptcy Court entered an order further extending the Removal Deadline through July 31, 2013 [Docket No. 796].

    (b)    **Extension of Deadline to Assume or Reject
Unexpired Leases of Nonresidential Real Property.**

    As of the Petition Date, certain of the Debtors were party to unexpired leases of nonresidential real property.  Section 365(d)(4) of the Bankruptcy Code provides that any unexpired lease of nonresidential real property under which the debtor is a tenant shall be deemed rejected on the date that is 120 days after the petition date.  Such deadline (the "**365(d)(4) Deadline**") may be extended by the Bankruptcy Court for 90 days, once, for cause.  On December 3, 2012, the Bankruptcy Court entered an order [Docket No. 410] extending the Debtors' time to assume or reject solely the lease for the Debtors' then corporate headquarters (the "**Headquarters Lease**"), located at 2280 Schuetz Road, St. Louis, Missouri, by ninety (90) days, through and including March 4, 2013.  In light of the Debtors' decision to enter into a new headquarters lease, as discussed in Section 10.16 below, the Headquarters Lease was rejected by operation of section 365(d)(4) of the Bankruptcy Code on March 4, 2013.  See Section 10.16, "Entry Into New Headquarters Lease Agreement."

    Notwithstanding the rejection of the Headquarters Lease, the landlord under that lease agreed to allow KV to remain in the premises through March 31, 2013.  As of the end of March 2013, the Debtors completed the transition of their new corporate headquarters, which is now located at 16640 Chesterfield Grove, Suite 200, Chesterfield, Missouri.

    (c)    **Extension of Debtors' Exclusive Periods.**

    Pursuant to section 1121 of the Bankruptcy Code, a chapter 11 debtor has the exclusive right to file and solicit acceptance of a chapter 11 plan for an initial period of 120 days from the date on which the debtor filed for voluntary relief.  If the chapter 11 debtor files a chapter 11 plan within this exclusive period, then it has the exclusive right for 180 days from the filing date to solicit acceptances to such plan.  During these exclusive periods, no other party in interest may file a competing chapter 11 plan.  The Bankruptcy Court may extend these periods upon request of a party in interest and "for cause."

    The Debtors' initial exclusive filing period would have expired on December 3, 2012, and the Debtors' initial exclusive solicitation period would have expired on January 31, 2013.  On November 16, 2012, the Bankruptcy Court entered an order [Docket No. 381] granting the Debtors an extension of their exclusive filing period through and including February 4, 2013

and their exclusive solicitation period through and including April 5, 2013.  On February 5, 2013, the Bankruptcy Court entered an order [Docket No. 587] granting the Debtors a further extension of their exclusive filing period through and including June 17, 2013 and their exclusive solicitation period through and including July 16, 2013.  On June 7, 2013, the Bankruptcy Court entered an order [Docket No. 930] further extending the Debtors' exclusive filing and solicitation periods through August 16, 2013 and September 16, 2013, respectively.

### 10.16.  *Entry Into New Headquarters Lease Agreement*

On January 22, 2013, the Debtors filed with the Bankruptcy Court a motion [Docket No. 556] requesting authority for KV to enter into a new corporate headquarters lease agreement for premises located at 16640 Chesterfield Grove Road, Suite 200, Chesterfield, Missouri 63005.  On February 13, 2013, the Bankruptcy Court entered an order [Docket No. 598] granting that motion.  As discussed in section 10.15 above, the Debtors have transitioned their current headquarters to the new location.

### 10.17.  *Events Leading to Formulation of Plan; Global Settlement.*

In the ten months since the Petition Date, the Debtors have explored various restructuring alternatives and engaged in discussions with various key stakeholders regarding potential chapter 11 plan structures.  These discussions were complicated, in part, by the uncertainty surrounding the treatment of the claims of the Hologic Parties under the Hologic Agreement and the extent of any liens securing such claims, as well as the pending Lift Stay Motion pursuant to which Hologic sought relief from the automatic stay to foreclose on Makena®.  The Lift Stay Motion presented a substantial hurdle to the Debtors' restructuring efforts because Makena® is the Debtors' most valuable asset and would be the centerpiece of any plan of reorganization proposed by the Debtors.  To the extent that Hologic prevailed on its Lift Stay Motion, the Debtors would have lost that crucial asset and their prospects for a successful reorganization would have diminished materially, if not completely.  Thus, resolution of the Hologic disputes was a threshold obstacle to the Debtors' formulation and proposal of a chapter 11 plan.

Recognizing this, the Debtors engaged in negotiations with various constituents to develop a restructuring strategy that would allow for the settlement of Hologic's claims and maximize the value of the Debtors' estates.  As Hologic required payment by December 31, 2012 as a condition to any settlement, it became apparent that the Debtors would require debtor-in-possession financing to resolve their disputes with Hologic.  The Debtors solicited proposals for such financing from over thirty (30) parties.  Generally, interest in providing such financing was extremely limited.  However, the Ad Hoc Senior Secured Noteholders Group indicated that it would be willing to provide the DIP Facility as part of a comprehensive restructuring proposal.  Extensive, good faith negotiations between the Debtors and the Ad Hoc Senior Noteholders Group regarding the terms of such comprehensive restructuring and the related DIP Facility ensued.

Prior to the Debtors' decision to enter into the DIP Facility and pursue the Plan, the Debtors received two other proposals for debtor-in-possession financing.  After extensive, good faith negotiations of one of those proposals, the Debtors determined that entry into the DIP

Facility was the best available financing alternative at that time.   Accordingly, on December 11, 2012, the Debtors sought authority to enter into the DIP Facility, which enabled the Debtors to consummate the Hologic Settlement Agreement and contemplated the Debtors' proposal of the Plan and the pursuit of confirmation thereof.  On December 27, 2012, the Bankruptcy Court authorized the Debtors to enter into the DIP Facility, the terms of which had been modified as a result of further negotiations among the Debtors, the Creditors' Committee, the DIP Agent and other parties.

On January 7, 2013, the Debtors filed the initial versions of the Original Plan and Disclosure Statement [Docket No. 515], in accordance with the milestones under the DIP Facility.  On March 6, 2013, the Debtors (with the consent of the DIP Agent) requested an adjournment of the hearing on approval of the Disclosure Statement, which was originally scheduled for March 19, 2013, to April 23, 2013 [Docket No. 672].

Shortly before the adjourned hearing on the Disclosure Statement, on April 17, 2013, the Debtors received the Investor Proposal.  Although the terms of the Investor Proposal required further negotiation and a further adjournment would (and did) cause the Debtors to be in default under the DIP Facility (as a result of their failure to satisfy the DIP Facility milestone requiring approval of a disclosure statement by April 26, 2013), to facilitate such negotiation and the Debtors' consideration of the Investor Proposal, the Debtors determined to further adjourn the Disclosure Statement Hearing to May 1, 2013 [Docket No. 791].

On May 3, 2013, the Debtors determined to pursue the Investor Proposal, and filed motions with the Court seeking authority to enter into the then-current versions of the Stock Purchase Agreement and exit financing commitment documents, as well as a replacement debtor-in-possession financing facility to be provided by certain of the Investor Parties [Docket Nos. 828 and 824, respectively] (the "**Investor Proposal Motions**").  A hearing on these motions was scheduled for May 8, 2013.  Thereafter, the Debtors received a restructuring counterproposal from the Ad Hoc Senior Secured Noteholders Group, which the Debtors determined was superior to the Investor Proposal.  Consequently, the Debtors determined not to pursue approval of the Investor Proposal Motions and instead would seek authority to enter into certain commitment documents underlying the revised proposal from the Ad Hoc Senior Secured Noteholders Group at the May 8, 2013 hearing.

Immediately prior to the May 8, 2013 hearing, the Investor Parties improved their proposal in certain respects, in order to match the revised proposal from the Ad Hoc Senior Secured Noteholders Group.  In addition, a Chambers conference was held, at which the DIP Agent agreed to a further extension of the Disclosure Statement milestone under the DIP Facility.  This extension facilitated further negotiations among the Debtors, the Investor Parties and Ad Hoc Senior Secured Noteholders Group.

In the weeks that followed the May 8, 2013 Chambers conference, the Investor Parties and Ad Hoc Senior Secured Noteholders Group each submitted multiple revised restructuring proposals, in response to separate letters sent to each group by Jefferies regarding the process for submitting revised proposals, and which indicated ways in which each group could improve its proposals.  After multiple rounds of negotiations with the Investor Parties and Ad Hoc Senior Secured Noteholders Group, the Debtors determined that pursuit of the revised

Investor Proposal would be in the best interests of the Debtors', their estates and creditors, and requested that the Court consider approval of the Investor Proposal Motions at a hearing scheduled for May 31, 2013 [Docket No. 880].

Shortly before the May 31, 2013 hearing, the Ad Hoc Senior Secured Noteholders Group submitted a further revised restructuring proposal. Although the Debtors were prepared to proceed with the Investor Proposal Motions on May 31, 2013, the Debtors determined, after a Chambers conference and numerous discussions among the interested parties, including the Creditors' Committee and Independent Convertible Noteholder Consortium (each of whom indicated that it might support the revised Ad Hoc Senior Secured Noteholders Group proposal, if fully committed), that adjourning the hearing on the Investor Proposal Motions for an additional week would be in the best interests of the Debtors and their estates and creditors. To facilitate such adjournment, the DIP Agent agreed to a further one-week extension of the DIP Facility milestone and the Investor Parties agreed not to immediately exercise their termination rights under the Stock Purchase Agreement.

Following the submission of further revised restructuring proposals from the Ad Hoc Senior Secured Noteholders Group and the Investor Parties (the revised Investor Proposal having included an agreement with the Independent Convertible Noteholder Consortium), the Debtors again determined to pursue the Investor Proposal and rescheduled the hearing regarding entry of orders granting the Investor Proposal Motions. Immediately prior to the scheduled hearing on June 7, 2013, the Investor Parties, Ad Hoc Senior Secured Noteholders Group, the Independent Convertible Noteholder Consortium and the Debtors reached the Global Settlement, pursuant to which, among other things: (a) Silver Point Finance, LLC (and/or its affiliates or funds) (collectively, "**Silver Point**") (a member of the Ad Hoc Senior Secured Noteholders Group and the largest holder of Senior Secured Notes) would be assigned certain of the equity financing commitments (and related commitment fee) under the Stock Purchase Agreement; (b) the existing DIP Facility would remain in place, but would be amended to eliminate the plan confirmation milestones thereunder, among other changes; (c) certain litigable issues between the holders of Convertible Subordinated Notes and the holders of Senior Secured Notes (including, without limitation, issues relating to (i) the alleged entitlement of holders of Senior Secured Notes to a make-whole premium and (ii) the potential recharacterization of adequate protection payments made to the Ad Hoc Senior Secured Noteholders Group and/or Senior Secured Notes) were resolved; (d) the parties agreed that, as a condition precedent to the Effective Date of the Plan (unless waived in accordance with the terms thereof), the Bankruptcy Court would determine to what extent, if any, the holders of Senior Secured Notes are entitled to postpetition interest on account of the subordination provisions of the Convertible Subordinated Notes Indenture (which postpetition interest, if allowed, would include any original issue discount on the Senior Secured Notes that was unamortized as of the Petition Date); and (e) Silver Point agreed to support the Plan (without prejudice to its right to assert that the holders of Senior Secured Notes are entitled to postpetition interest on their claims), and to use reasonable efforts to obtain the agreement of the other members of the Ad Hoc Senior Secured Noteholders Group similarly to support the Plan. The terms of the Global Settlement were read into the record of the June 7, 2013 hearing and was later reflected in revised versions of the Stock Purchase Agreement, Plan, and related documents. Following the Debtors' announcement of the Global Settlement to the Bankruptcy Court, the Bankruptcy Court entered an order approving the

Debtors' motion for authority to enter into the Stock Purchase Agreement, as modified by the terms of the Global Settlement.

For further discussion of the competitive plan process described above, please refer to the *Debtors' Statement Regarding Bringing These Cases to Plan Confirmation Status* [Docket No. 918].

The Plan provides for meaningful recoveries to the Debtors' various constituents and will substantially de-lever the Debtors' capital structure by discharging hundreds of millions of dollars of prepetition debt, thereby providing the Debtors with greater financial flexibility. In addition, under the Plan, the Debtors will retain Makena®, their most valuable asset, as well as each of their other pharmaceutical products, ensuring that the Debtors will continue to operate as a going concern upon emergence from bankruptcy. For these reasons and others, the Debtors believe that confirmation of the Plan is in the best interests of their estates and creditors.

## ARTICLE XI.

## CERTAIN RISK FACTORS TO BE CONSIDERED

| Important Risks to Be Considered |
|---|
| Holders of Claims against the Debtors should read and consider carefully the following risk factors and the other information in this Disclosure Statement, the Plan, the Plan Supplement and the other documents delivered or incorporated by reference in this Disclosure Statement and the Plan, before voting to accept or reject the Plan. |
| These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation. |

**11.1.** *Certain Bankruptcy Considerations.*

(a)    **General.**

Although the Plan is designed to implement the restructuring transactions contemplated thereby and provide distributions to creditors in an expedient and efficient manner, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.

If the Debtors are unable to obtain confirmation of the Plan on a timely basis because of a challenge to confirmation of the Plan or a failure to satisfy the conditions to consummation of the Plan, they may be forced to operate in bankruptcy for an extended period while they try to develop a different chapter 11 plan that can be confirmed. Such a scenario could jeopardize the Debtors' relationships with their key vendors and suppliers, customers and employees, which, in turn, would have an adverse effect on the Debtors' operations. A material deterioration in the Debtors' operations likely would diminish recoveries under any subsequent

chapter 11 plan.  Further, in such event, the Debtors may not have sufficient liquidity to operate in bankruptcy for such an extended period.

    (b)    **Failure to Receive Requisite Acceptances.**

        Classes 3, 4, 5, 6 and 7 are the only Classes that are entitled to vote to accept or reject the Plan.  Although the Debtors believe they will receive the requisite acceptances as a result of the Global Settlement, the Debtors cannot provide assurances that the Requisite Acceptances to confirm the Plan will be received for at least one of these Classes.  If the Requisite Acceptances (excluding any insider votes) are not received for at least one of these Classes, the Debtors will not be able to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code because at least one impaired Class will not have voted in favor of the Plan as required by section 1129(a)(10) of the Bankruptcy Code.  In such a circumstance, the Debtors may seek to accomplish an alternative restructuring of their capitalization and obligations to creditors and obtain acceptances of an alternative plan of reorganization for the Debtors, or otherwise.  Such an alternative restructuring may not have the support of the constituents supporting the Plan (including the holders of more than 75% in principal amount of the Senior Secured Notes and Convertible Subordinated Notes, respectively, and/or the Creditors' Committee) and/or may require the Debtors to liquidate their estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to, or as favorable to the Debtors' creditors as, those proposed in the Plan.

    (c)    **Failure to Secure Confirmation of the Plan.**

        Even if the Requisite Acceptances are received (excluding insider votes for at least one impaired accepting class), the Debtors cannot provide assurances that the Bankruptcy Court will confirm the Plan.  A non-accepting creditor or equity security holder of the Debtors might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or the Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to non-accepting holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  While the Debtors cannot provide assurances that the Bankruptcy Court will conclude that these requirements have been met, the Debtors believe that the Plan will not be followed by a need for further financial reorganization and that non-accepting holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and the costs and uncertainty associated with any such chapter 7 case.

        If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a restructuring of the Debtors could be implemented and what distribution holders of

Claims ultimately would receive with respect to their Claims.  If an alternative reorganization could not be agreed to, it is possible that the Debtors would have to liquidate their assets, in which case it is likely that holders of Claims would receive substantially less favorable treatment than they would receive under the Plan. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

(d)     **Failure to Consummate the Plan.**

Section 11.2 of the Plan contains various conditions to consummation of the Plan, including the Confirmation Order having become final and non-appealable, the Debtors having entered into the Plan Documents (including, without limitation, the New First Lien Term Loan Agreement), and all conditions precedent to effectiveness of such agreements having been satisfied or waived.  As of the date of this Disclosure Statement, there can be no assurance that these or the other conditions to consummation will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.  If the Plan is not consummated and the restructuring completed, these Reorganization Cases will be prolonged and the Debtors may lack sufficient liquidity to effect a successful restructuring under chapter 11 of the Bankruptcy Code.

(e)     **Objections to Classification of Claims.**

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(f)     **Allowance of General Unsecured Claims May Substantially Dilute the Recovery to Holders of General Unsecured Claims Under the Plan.**

As of the date hereof, more than 370 proofs of claim have been filed in the Reorganization Cases.  The Debtors have recently begun the process of reviewing, analyzing and reconciling the scheduled and filed Claims.  Objections have been and will continue to be filed as the claims resolution process progresses.  The aggregate amount of General Unsecured Claims that will ultimately be allowed is not presently determinable, and the Debtors expect that the claims resolution process will not be completed until after the Effective Date.  Because holders of General Unsecured Claims will receive a proportionate share of the General Unsecured Claims Distribution, any increase in the amount of Allowed General Unsecured Claims over the amount estimated by the Debtors would reduce the recovery to the holders of such Claims.

(g)     **If the Hermelin Claims Are Not Equitably Subordinated, Disallowed and/or Reduced, Recoveries to Holders of Allowed General Unsecured Claims May Be Materially Diminished.**

As discussed in Sections 6.6(p) and 6.7 herein, the Debtors are seeking to equitably subordinate or, in the alternative, disallow, the Hermelin Claims, which Mr. M. Hermelin asserts in the amount of not less than $82,950,818.04.  Although the Debtors do not believe that any portion of the Hermelin Claims should be treated as Allowed General Unsecured Claims, for the reasons set forth in Section 11.1(f) above, if all or any significant portion the Hermelin Claims are Allowed as General Unsecured Claims, recoveries to other holders of Allowed General Unsecured Claims will be materially reduced.

If the Hermelin Claims were Allowed as General Unsecured Claims in the full amount asserted of $82,950,818.04, the estimated range of recoveries to holders of Allowed General Unsecured Claims would decrease to approximately 10.1% to 10.6%.  As described in greater detail in Section 6.7 of the Disclosure Statement, the Debtors filed the Hermelin Claims Cap Motion seeking to limit the Maximum Hermelin Claim Amount to $4,524,131.51.  If the Hermelin Claims were allowed as General Unsecured Claims in such amount, the estimated range of recoveries to holders of Allowed General Unsecured Claims would decrease to approximately 45.0% to 55.6%.  The Debtors believe the Maximum Hermelin Claim Amount is subject to further reduction to $40,466.51 for the reasons set forth in Section 6.7 of the Disclosure Statement.  If the Hermelin Claims were Allowed as General Unsecured Claims in such amount, such allowance would have a negligible impact on recoveries to holders of General Unsecured Claims.

(h)     **The Debtors May Object to the Amount or Classification of Your Claim.**

The Debtors reserve the right to object to the amount or classification of any Claim.  It is the Debtors' position that the estimates set forth in this Disclosure Statement cannot be relied on by any creditor whose Claim or Interest is subject to an objection.  Any such Claim holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

(i)     **The Debtors May Adjourn Certain Deadlines.**

In certain circumstances, the Debtors may deem it appropriate to adjourn either or both of the Voting Deadline and/or the Confirmation Hearing.  While the Debtors estimate that the Effective Date will occur in or around September 2013, they cannot provide assurances that applicable dates related to the foregoing will not be extended and the Effective Date will not be delayed.

**11.2.   *Risks Relating to the Capital Structure of the Reorganized Debtors.***

(a)     **Variances From Financial Projections.**

The Financial Projections included as Exhibit 3 to this Disclosure Statement reflect numerous assumptions, which involve significant levels of judgment and estimation concerning the anticipated future performance of the Reorganized Debtors, as well as

assumptions with respect to the prevailing market, economic and competitive conditions, which are beyond the control of the Reorganized Debtors, and which may not materialize, particularly given the current difficult economic environment.  Any significant differences in actual future results versus estimates used to prepare the Financial Projections, such as lower sales, lower volume, lower pricing, increases in production costs, technological changes, competition or changes in the regulatory environment, could result in significant differences from the Financial Projections.  Negative deviations, if any, could have a material and adverse impact on the value of the Reorganized Debtors, and may therefore reduce the anticipated value of the New Common Stock of Reorganized KV and the anticipated recovery of the holders of Allowed Convertible Subordinated Notes Claims in Class 6.

    (b)    **Leverage.**

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have indebtedness.  On the Effective Date, after giving effect to the transactions contemplated by the Plan, in addition to payment of Claims, if any, that require payment beyond the Effective Date and ordinary course debt, the Reorganized Debtors will, on a consolidated basis, have $100 million in secured indebtedness under the New First Lien Term Loan.

**The degree to which the Reorganized Debtors will be leveraged could have important consequences because:**

- it could affect the Reorganized Debtors' ability to satisfy their obligations under the New First Lien Term Loan and the Reorganized Debtors' other obligations;

- a portion of the Reorganized Debtors' cash flow from operations will be used for debt service and unavailable to support operations, or for working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes;

- the Reorganized Debtors' ability to obtain additional debt financing or equity financing in the future may be limited; and

- the Reorganized Debtors' operational flexibility in planning for, or reacting to, changes in their businesses may be severely limited.

    (c)    **Ability to Service Debt.**

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have significant interest expense and principal repayment obligations.  The Reorganized Debtors' ability to make payments on and to refinance their debt, including the obligations under the New First Lien Term Loan, and the Reorganized Debtors' other obligations, will depend on their future financial and operating performance and their ability to generate cash in the future.  This, to a certain extent, is subject to general economic, business, financial, competitive, legislative, regulatory and other factors that are beyond the control of the Reorganized Debtors.

Although the Debtors believe the Plan is feasible, there can be no assurance that the Reorganized Debtors will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be available to pay off the Reorganized Debtors' debt obligations, including, among other obligations, those under the New First Lien Term Loan. The Reorganized Debtors may need to refinance all or a portion of their debt on or before maturity; however, there can be no assurance that the Reorganized Debtors will be able to refinance any of their debt on commercially reasonable terms or at all.

(d)    **Obligations Under the New First Lien Term Loan.**

The Reorganized Debtors' obligations under the New First Lien Term Loan Agreement will be secured by a first lien on substantially all of the assets of the Reorganized Debtors. If the Reorganized Debtors become insolvent or are liquidated, or if there is a default under the New First Lien Term Loan Agreement, and payment on any obligation thereunder is accelerated, the lenders under the New First Lien Term Loan Agreement would be entitled to exercise the remedies available to a secured lender under applicable law, including foreclosure on the collateral that is pledged to secure the indebtedness thereunder, and they would have a claim on the assets securing the obligations under the applicable facility that would be superior to any claim of the holders of unsecured debt.

(e)    **Restrictive Covenants.**

The New First Lien Term Loan Agreement likely will contain various covenants that may limit the discretion of the Reorganized Debtors' management by restricting the Reorganized Debtors' ability to, among other things, incur additional indebtedness, incur liens, pay dividends or make certain restricted payments, consummate certain asset sales, enter into certain transactions with affiliates, merge, consolidate and/or sell or dispose of all or substantially all of their assets. In addition, it is expected that the New First Lien Term Loan Agreement will require the Reorganized Debtors to meet certain financial covenants. As a result of these covenants, the Reorganized Debtors will be limited in the manner in which they conduct their business and they may be unable to engage in favorable business activities or finance future operations or capital needs.

Any failure to comply with the restrictions of the New First Lien Term Loan Agreement or any other subsequent financing agreements may result in an event of default. An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies. If the Reorganized Debtors are unable to repay amounts outstanding under the New First Lien Term Loan Agreement when due, the lenders thereunder could, subject to the terms of the New First Lien Term Loan Agreement, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such facility.

(f)    **Lack of a Trading Market.**

It is anticipated that Reorganized KV will be a private company and that there will be no active trading market for the New Common Stock. The New Common Stock will be subject to restrictions on transfer, and Reorganized KV has no present intention to register any of

the New Common Stock Securities, including the Rights Offering Stock and the Subscription Rights, under the Securities Act, nor to apply to quote or list any of the foregoing on any securities exchange or quotation system or otherwise take any actions that would allow for the New Common Stock to be traded (publicly or otherwise).  Accordingly, there can be no assurance that any market will develop or as to the liquidity of any market that may develop for any such securities.  In addition, Reorganized KV will not be required to file periodic reports with the SEC or otherwise provide financial or other information to the public which may further impair liquidity and prevent brokers or dealers from publishing quotations.  Furthermore, the lack of liquidity may adversely affect the price at which New Common Stock may be sold, if at all.  Consequently, holders of the New Common Stock may bear certain risks associated with holding securities for an indefinite period of time, including, but not limited to, the risk that the New Common Stock will lose some or all of its value.

(g)    **Restrictions on Transfer.**

The issuance of the New Common Stock Securities, including the Rights Offering Stock and the Subscription Rights, pursuant to the Plan shall be exempt from registration pursuant to section 1145 of the Bankruptcy Code and/or Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder to the maximum extent permitted thereunder.  Subject to the transfer restrictions contained in the New Stockholders Agreement, New Common Stock Securities, other than the Rights Offering Stock, may be resold by the holders thereof without restriction, except to the extent that any such holder is deemed to be an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code. See Section 13.4(b)(ii), "*Restrictions in the New Stockholders Agreement.*" The Rights Offering Stock will be "restricted securities" and may not be sold or transferred unless there is an effective registration statement under the Securities Act covering the New Common Stock or the securities are sold or transferred in a transaction that is exempt from or not subject to the registration and prospectus delivery requirement of the Securities Act and otherwise in compliance with state securities laws.  Reorganized KV has no current plans to register any of its securities (including the New Common Stock) under the Securities Act or under equivalent state securities laws such that the recipients of the New Common Stock would be able to resell their securities pursuant to an effective registration statement.  Moreover, Reorganized KV does not currently intend to make publicly available the information required by Rule 144, thereby limiting the ability of holders of New Common Stock to avail themselves of Rule 144.

In addition, the New Stockholders Agreement will contain restrictions on stockholders' ability to transfer the New Common Stock designed to ensure that there will be less than 2,000 record holders (inclusive of no more than 500 investors that are not Accredited Investors) of New Common Stock (determined pursuant to the Exchange Act of 1934) and the Amended Certificate of Incorporation and Amended By-Laws of Reorganized KV will provide that all holders of Common Stock will automatically be bound by the New Stockholders Agreement without any further action by such holder.  The New Stockholders Agreement of Reorganized KV will also require notice of any proposed transfer of New Common Stock and will restrict such transfer on certain grounds to be provided therein, including if the transfer would, if effected, require Reorganized KV to register or qualify such New Common Stock under the Securities Act or Exchange Act.

<u>See</u> Article XIII "*Securities Law Matters*" for additional information regarding restrictions on resale of the New Common Stock.

(h)     **The Implied Valuation of New Common Stock is Not Intended to Represent the Trading Value of the New Common Stock.**

The valuation of the newly issued securities implied by the debt and equity commitments being provided in connection with consummation of the Plan is not intended to represent the trading values of New Common Stock in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things:  (1) prevailing interest rates; (2) conditions in the financial markets; (3) the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long term basis; and (4) other factors that generally influence the prices of securities.  Actual market prices of the New Common Stock also may be affected by the Reorganization Cases or by other factors not possible to predict.  Accordingly, the implied value stated herein and the Plan of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Stock in the public or private markets.

**11.3.     *Risks Relating to Tax and Accounting Consequences of the Plan.***

(a)     **Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal Issues and Involve Factual Determinations.**

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors currently do not intend to seek any ruling from the Internal Revenue Service ("**IRS**") on the tax consequences of the Plan.  Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment in the Plan, or that a court would not sustain such a challenge.

(b)     **Use of Historical Financial Information.**

As a result of the consummation of the Plan and the transactions contemplated thereby, the Reorganized Debtors believe they will be subject to the fresh-start accounting rules.  Fresh-start accounting allows for the assessment of every balance sheet account for possible fair value adjustment, resulting in the emergence of a new company recapitalized and revalued.  This process is guided by purchase price allocation standards under GAAP.

**11.4.**   *Risks Associated With the Debtors' Business.*

(a)     **Makena®-Related Risks.**

(i)     **The Reorganized Debtors May Not Be Able to Achieve Revenues From Sales of Makena® Consistent With Business Expectations.**

The Debtors have certain revenue expectations with respect to sales of Makena®. If the Debtors and/or Reorganized Debtors are unable to further commercialize Makena®, and achieve those revenue expectations with respect to Makena®, this could result in a material adverse impact on the Reorganized Debtors' projections.

The further commercialization of Makena® will depend upon a number of factors, including:  (1) successfully obtaining agreements for coverage and reimbursement rates on behalf of patients and medical practitioners prescribing Makena® with third-party payors, including government authorities, private health insurers and other organizations, such as health maintenance organizations ("**HMOs**"), insurance companies, and Medicaid programs and administrators; (2) the extent to which pharmaceutical compounders continue to produce non-FDA approved purported substitute products; (3) the potential threat of competition from off-label use of other products for the same conditions that Makena® is indicated for; and (4) the Reorganized Debtors' ability to maintain certain net pricing levels and increase unit sales for Makena®.

(ii)     **FDA Non-Enforcement of Makena®'s Orphan Drug Exclusivity Marketing Period May Harm the Business.**

The FDA previously granted an orphan drug designation for Makena®.  As part of this designation, the Debtors were granted a seven-year marketing exclusivity period. Nonetheless, on March 31, 2011, the FDA issued a press release stating that, in order to ensure continued access for patients needing hydroxyprogesterone caproate, the FDA intended to refrain at that time from taking enforcement action with respect to compounding pharmacies producing compounded hydroxyprogesterone caproate in response to individual prescriptions for individual patients.  The continued failure by the FDA to take enforcement action against compounding pharmacies continues to result in substantial sales of compounded alternatives to Makena® and effective loss of some or all of such marketing exclusivity for the affected period of time.

(iii)     **CMS's Position Regarding Medicaid Coverage for Makena®.**

In March 2011, CMS issued an informational bulletin to state Medicaid programs that they can choose to pay for the extemporaneously compounded hydroxyprogesterone caproate as an active pharmaceutical ingredient and this can be covered under the "medical supplies, equipment and appliances suitable for use in the home" portion of home health. Because CMS does not require states to list all of the items they cover under this section in the Medicaid state plan, states can cover hydroxyprogesterone caproate under their current state plans and do not need to submit a state plan amendment to provide for such coverage.  The Debtors believe this has caused the exclusion of Makena® from being provided under various state Medicaid programs.  The Debtors estimate that state Medicaid programs cover approximately 40% to 45% of the total number of pregnancies in the United States.

(iv)     **Subsequent Clinical Trials May Produce Inconsistent Results.**

The FDA's regulations allow certain drugs for serious conditions to be submitted for FDA marketing approval under the basis of one controlled clinical trial instead of the usual case of two clinical trials.  Typically, there is an additional post-marketing commitment to perform a second confirmatory clinical trial.  In granting the original approval for Makena®, the FDA approved the drug based on a single clinical trial.  If the subsequent clinical trial concerning Makena® does not replicate the positive results of the original trial, the FDA can take various actions such as requesting another clinical trial or withdrawing the conditional approval.  The Debtors cannot be certain of the results of the confirmatory clinical trial (expected in 2016) or what action the FDA may take if the results are not as expected based on the first clinical trial.

(v)     **The Debtors Have Been the Subject of
Pricing-Related Criticism Regarding Makena®.**

The Debtors have been criticized regarding the list price of Makena® in numerous letters from members of the United States Senate and Congress, news articles and Internet postings.  In addition, the Debtors have received, and may continue to receive, letters criticizing the Debtors' list pricing of Makena® from numerous medical practitioners and advocacy groups, including the March of Dimes, American College of Obstetricians and Gynecologists, American Academy of Pediatrics and the Society for Maternal Fetal Medicine.  Several of these advocacy groups issued their own press releases regarding their criticism of the list price of Makena® and endorsed the statements made by the FDA regarding compounded product (discussed above).  In addition, the Debtors are aware that certain doctors have chosen to continue prescribing the non-FDA approved purported substitute product made by pharmaceutical compounders in lieu of even considering prescribing Makena®.

The FDA communicated to the Debtors and also separately issued a press release that, in order to ensure continued access for patients needing hydroxyprogesterone caproate, the FDA intended to refrain at that time from taking enforcement action with respect to compounding pharmacies producing compounded hydroxyprogesterone caproate in response to individual prescriptions for individual patients.

The Debtors have responded to these criticisms and events in a number of respects, including the announced reduction in the published list price of Makena® from $1,500 per injection to $690 per injection on March 31, 2011 (prior to expected further discounting of such list price by the mandatory 23.1% Medicaid rebate and other supplemental rebates and discounts already agreed to or currently under negotiation with public and private payors), and the expansion of an already announced patient assistance program for patients who are not covered by health insurance or could otherwise not afford Makena® or their respective co-pays.  Further, the Debtors have worked, and the Reorganized Debtors will continue to work, directly with health insurers, pharmacy benefit managers, Medicaid management companies, and others regarding the net cost of Makena® coverage and reimbursement programs and other means by which Makena® would be available to patients.

The Debtors can give no assurance as to whether these responses and negotiations will be successful at obtaining an economically sufficient price or unit sales for Makena®. The commercial success and viability of the Reorganized Debtors is largely dependent upon these efforts and appropriately responding to the media, physician, institutional, advocacy group and governmental concerns and actions regarding the pricing and sales of Makena®. The pricing and revenues that the Reorganized Debtors must achieve from the sale of Makena®, together with their sales of other products, must be substantial enough to allow them to meet their post-emergence obligations, refinance or retire such debt and liabilities when due, and generate sufficient profits to ensure the Reorganized Debtors' viability as a pharmaceutical company prior to the end of the orphan drug exclusivity period for Makena®.

(b)   **Litigation relating to the Pricing of the Debtors' Products that were Purchased by Government Programs and the Settlement of Certain Government Investigations May Adversely Affect the Reorganized Debtors' Business.**

The Debtors and/or ETHEX have been named as defendants in certain multi-defendant cases alleging that the defendants reported improper or fraudulent pharmaceutical pricing information, which allegedly caused the governmental plaintiffs to incur excessive costs for pharmaceutical products under the Medicaid program. Prior to the Petition Date, several states filed cases or asserted allegations of this type against the Debtors and/or ETHEX seeking civil damages and penalties. Certain of those states have asserted claims in the Reorganization Cases based on alleged misconduct by the Debtors in reporting pricing information.

The Debtors are party to certain agreements, including (i) the agreement to settle the qui tam complaint brought in United States District Court for the District of Massachusetts styled *United States ex rel. Constance Conrad, et al. v. Abbott Laboratories, Inc.,* et al., Civil No. 02-CV-11738-NG (D.Mass); and (ii) the plea agreement with the United States Attorney for the Eastern District of Missouri, which contain terms that could subject the Debtors to further civil and/or criminal sanctions, including the possible exclusion from federal and state health care programs if the Debtors were to violate the terms of such agreements that would include the payment obligations due thereunder.

The Debtors are not currently aware of any other pricing investigations or actions relating to their business that could have a material adverse effect on their ability to operate; however, it is possible that there may be a government investigation or qui tam matter against the Debtors or their subsidiaries of which the Debtors have not yet been advised that could result in civil and/or criminal sanctions, including fines, penalties, debarment from contracting with the government and possible exclusion from federal or state health care programs including Medicare or Medicaid.

(c)   **The Reorganized Debtors May Not Be Able to Achieve Revenues From Sales of their Anti-Infective Products Consistent With Business Expectations.**

The Debtors have certain revenue expectations with respect to sales of Gyanole-1® and Clindesse®. The Debtors resumed shipping and selling an equivalent of Gynazole-1® in December 2012 and plan to reintroduce Clindesse® in the first half of this fiscal year. If the

Debtors and/or the Reorganized Debtors are unable to further commercialize Gynazole-1®, and achieve those revenue expectations with respect to Gynazole-1®, this could result in a material adverse impact on the Reorganized Debtors' projections.  If the Debtors are unable to reintroduce and successfully commercialize Clindesse® or, if the reintroduction is significantly delayed, this could result in a material adverse impact on the Reorganized Debtors' projections.

(d)    **Growth Will Depend on the Debtors' Ability to Develop, Acquire, Fund and Successfully Launch New Products in Addition to their Existing Product Portfolio.**

The Debtors and Reorganized Debtors will need to meet the requirements of the Consent Decree in order to allow more of their approved products to be reintroduced to the market.  The Reorganized Debtors also will need to develop, acquire and commercialize new brand name products to grow their business in the future.  To do this, they will need to identify, develop, acquire and commercialize technologically enhanced branded products, including using their drug delivery technologies.  If the Reorganized Debtors are unable to identify, develop, acquire and commercialize new products, they may need to obtain licenses to additional rights to products, assuming they would be available for licensing.  The Reorganized Debtors may not be successful in pursuing this strategy.

(e)    **Risks Relating to Intellectual Property.**

The Reorganized Debtors' success will depend, in large part, on their ability to protect their current and future technologies and products, to defend their intellectual property rights and to avoid infringing on the proprietary rights of others.

(f)    **Competition and Market Share.**

Competition in the development and marketing of pharmaceutical products is intense and characterized by extensive research efforts and rapid technological progress.  Many companies, including those with financial and marketing resources and development capabilities substantially greater than those the Reorganized Debtors will possess, are engaged in developing, marketing and selling products that compete with those that will be offered by the Reorganized Debtors.  The Reorganized Debtors' competitors may have pricing advantages over the Reorganized Debtors' pharmaceutical products.  In the Reorganized Debtors' specialty pharmaceutical business, they will compete primarily on the basis of product efficacy and safety, breadth of product line and, differentiated features of their products and price.  The Reorganized Debtors believe that, once they have satisfied the requirements of the Consent Decree, their patents, proprietary trade secrets, technological expertise and product development will enable them to develop products to compete effectively in the marketplace.

(g)    **The Debtors May Be Adversely Affected by the Continuing Consolidation of their Distribution Network and the Concentration of their Customer Base.**

The Debtors' principal customers are specialty pharmacies and distributors.  These customers comprise a significant part of the distribution network for specialty pharmaceutical products in the U.S.  As a result, a small number of customers control a significant share of the market. For the twelve months ended March 31, 2013, the three largest

- 107 -

customers, which are specialty pharmacies and distributors, accounted for 19.5%, 14.4% and 14.1% of gross revenues.  The loss of any of these customers could materially and adversely affect the Debtors' business, financial condition, results of operations or cash flows.

(h)     **If the Debtors are Unable to Commercialize Products under Development or that they Acquire, Future Operating Results May Suffer.**

Certain products the Debtors develop or acquire will require significant additional development and investment prior to their commercialization.  Research and development activities, pre-clinical studies and clinical trials (where required), manufacturing activities and the anticipated marketing of product candidates are subject to extensive regulation by a wide range of governmental authorities in the United States, including the FDA.  To satisfy FDA regulatory approval standards for the commercial sale of product candidates, the Debtors must, among other requirements, demonstrate in adequate and well-controlled clinical trials that product candidates are safe and effective.

Even if the Debtors believe that data from their pre-clinical and clinical studies demonstrate safety and efficacy, their analysis of such data is subject to confirmation and interpretation by the FDA, which may have different views on the design, scope or results of our clinical trials, which could delay, limit or prevent regulatory approval.  The FDA wields substantial discretion in deciding whether a drug meets the approval criteria, and even if approved, such approval may be conditioned on, among other things, restricted promotion, restricted distribution, a risk evaluation mitigation strategy, or post-marketing studies. Such restrictions may negatively affect the Debtors' ability to market the drug among competitor products, as well as adversely affect their business.

The Debtors cannot provide assurances that such products or future products will be successfully developed, prove to be safe and effective in clinical trials (if required), meet applicable regulatory standards, or be capable of being manufactured in commercial quantities at reasonable cost or at all. If the Debtors are unable to commercialize products under development or that they acquire, future operating results may suffer.

(i)     **The Debtors Could Be Excluded From Federal Healthcare Programs or Subject to Other Adverse Government Enforcement Actions.**

The Debtors are not aware whether, or the extent to which, any governmental inquiries might result in the payment of fines, penalties or judgments or the imposition of operating restrictions on their business, to the extent such obligations and liabilities are not dischargeable in the Reorganization Cases and/or under the Plan; however, if they are required to pay fines, penalties or judgments, the amount could be material.  Furthermore, any governmental enforcement action could require the Reorganized Debtors to operate under significant restrictions, place substantial burdens on management, hinder the Reorganized Debtors' ability to attract and retain qualified employees and/or cause the Reorganized Debtors to incur significant costs or damages.  Any exclusion would materially harm the Reorganized Debtors and their future business and viability.

(j)      **Negative Publicity May Affect the Reorganized Debtors' Business.**

As a result of the Consent Decree, the Plea Agreement, the Debtors' initial list price of Makena®, ongoing litigation and governmental inquiries and related matters, the Debtors have been the subject of negative publicity. This negative publicity may harm the Reorganized Debtors' relationships with current and future investors, government regulators, employees, customers and vendors. For example, negative publicity may adversely affect the Reorganized Debtors' reputation, which could harm their ability to obtain new customers, maintain existing business relationships with other parties and maintain a viable business in the future. Also, it is possible that the negative publicity and its effect on the Reorganized Debtors' work environment could cause the Reorganized Debtors' employees to terminate their employment or, if they remain employed by the Reorganized Debtors, result in reduced morale that could have a material adverse effect on the business. In addition, negative publicity may continue to adversely affect the Reorganized Debtors' post-emergence equity value and, therefore, employees and prospective employees may also consider the Reorganized Debtors' stability and the value of any equity incentives when making decisions regarding employment opportunities.

(k)      **The Reorganized Debtors May Incur Losses in Connection With Products Liability and Other Litigation.**

The Debtors have in the past been defendants in, or have agreed to indemnify third parties with respect to, a variety of litigation regarding the sale and/or use of their products, including, without limitation, products liability and personal injury suits. Subject to the provisions of Article XII of the Plan, the Reorganized Debtors may be subject to, or have indemnity obligations with respect to, similar litigation in the future, and could incur substantial defense costs and/or liabilities for damages in connection with such suits. With respect to certain actions, the Debtors may not have insurance coverage. Accordingly, such litigation has the potential to materially and adversely impact the Reorganized Debtors' business.

(l)      **The Reorganized Debtors May Be Subject to Heightened Scrutiny By Regulators.**

The Reorganized Debtors, their drug products, the third-party manufacturing facilities for their drug products, the distribution of their drug products, and their promotion and marketing materials are subject to strict and continual review and periodic inspection by the FDA and other regulatory agencies for compliance with pre-approval and post-approval regulatory requirements.

As a result of the Consent Decree and the Plea Agreement, the Reorganized Debtors anticipate that they will be scrutinized more closely than other companies by the FDA and other regulatory agencies, even if they address the issues identified in the Consent Decree and resume distribution of additional products. Failure to comply with post-approval state or federal laws, regulations of the FDA and other regulatory agencies can, among other things, result in warning letters, fines, increased compliance expense, denial or withdrawal of regulatory approvals, exclusion from participation in federal healthcare programs, additional product recalls

- 109 -

or seizures, forced discontinuance of or changes to important promotion and marketing campaigns, operating restrictions and criminal prosecution.

In addition, the requirements or restrictions imposed on the Reorganized Debtors or their products may change, either as a result of administratively adopted policies or regulations or as a result of the enactment of new laws and new government oversight. Any new statutory or regulatory provisions or policy changes could result in delays or increased costs during the period of product development, clinical trials, and regulatory review and approval, as well as increased costs to assure compliance with any new post-approval regulatory requirements.

(m)     **The Supply of Raw Materials and Finished Product May Affect Profitability.**

The active pharmaceutical ingredient (i.e., the chemical compounds that produce the desired therapeutic effect in the Debtors' products) and other materials and supplies used in the products the Debtors currently sell and intend to sell, Makena®, Evamist®, Clindesse®, and Gynazole-1®, are purchased by the Debtors and by their contract manufacturers from many different domestic and foreign suppliers.

The Debtors' contract manufacturers also maintain safety stocks in the Debtors' raw materials inventory, and in certain cases where the Debtors have listed only one supplier in their applications with the FDA, the Debtors have received FDA approval to use alternative suppliers should the need arise. However, there is no guarantee that the Reorganized Debtors will always have timely and sufficient access to a critical raw material or finished product, or access to such materials or products on commercially reasonable terms. A prolonged interruption in the supply of a single-sourced raw material, including the active ingredient, or finished product could cause the Reorganized Debtors' business, financial condition, results of operations or cash flows to be materially adversely affected. In addition, the Reorganized Debtors' contract manufacturers' capabilities could be impacted by quality deficiencies in the products which the Reorganized Debtors' suppliers provide, which could have a material adverse effect on the Reorganized Debtors' business.

To the extent the Reorganized Debtors purchase finished products, it is possible that their suppliers' ability or willingness to supply those products will be disrupted, delayed or terminated. Such disruption, delay or termination could result from regulatory actions by the FDA or other government agencies (including shipping halts, product seizures and recalls affecting such suppliers), labor stoppages, facility damage or casualties, or other sources of interruption. Such interruptions could have a material adverse effect on the Reorganized Debtors' business.

(n)     **The Debtors Rely on Third Parties to Manufacture Debtors' Products.**

The Debtors do not have the capability or facilities to manufacture their own products and therefore have contracted with FDA-approved third parties to manufacture and supply their products. The Debtors currently do not have FDA-approved alternative suppliers to manufacture their products. Therefore, if any of these third-party manufacturers can no longer produce any of Debtors' products for any reason, the Debtors will need to find an alternative

supplier that is willing and able to manufacture the applicable product and which the FDA will need to approve. While the Debtors believe there is sufficient stock of its products to meet customer demand, a prolonged absence of an approved and capable manufacturer could lead to the unavailability of product.

(o)     **The Reorganized Debtors Rely on a Limited Number of Key Executives and Qualified, Scientific, Technical and Managerial Personnel to Operate Their Business.**

The Reorganized Debtors are highly dependent upon their ability to attract and retain qualified scientific, technical and managerial personnel. Their recent reductions in employee headcount have increased this dependence. There is intense competition for qualified personnel in the pharmaceutical and biotechnology industries, and the Reorganized Debtors cannot be sure that they will be able to continue to attract and retain qualified personnel necessary for the development and management of the business. Although the Reorganized Debtors do not believe the loss of one individual would materially harm their business, the Reorganized Debtors' business might be harmed by the loss of services of multiple existing personnel, as well as the failure to recruit additional key scientific, technical and managerial personnel in a timely manner. Much of the know-how the Reorganized Debtors have developed resides in their scientific and technical personnel and is not readily transferable to other personnel.

(p)     **The Loss of Rights Under Licenses Could Harm the Business.**

The Debtors have acquired the rights to manufacture, use and/or market certain products through license agreements. The Reorganized Debtors also expect to continue to obtain licenses for other products and technologies in the future. The license agreements generally will require the Reorganized Debtors to develop the markets for the licensed products. If the Reorganized Debtors do not develop these markets, the licensors may be entitled to terminate these license agreements.

The Reorganized Debtors cannot be certain that they will fulfill all of their obligations under any particular license agreement for any variety of reasons, including lack of sufficient liquidity to fund their obligations, insufficient resources to adequately develop and market a product, lack of market development despite their efforts and lack of product acceptance. The Reorganized Debtors' failure to fulfill their obligations could result in the loss of their rights under a license agreement.

Further, certain products the Reorganized Debtors have the right to license are at certain stages of clinical tests and FDA approval. Failure of any licensed product to receive regulatory approval could result in the loss of the Reorganized Debtors' rights under its license agreement.

(q)    **The Debtors Depend on their Trademarks and Related Rights**

To protect their trademarks and associated goodwill, domain name, and related rights, the Debtors generally rely on federal and state trademark and unfair competition laws, which are subject to change.  Some, but not all, of their trademarks are registered in the jurisdictions where they are used.  Some of the Debtors' other trademarks are the subject of pending applications in the jurisdictions where they are used or intended to be used, and others are not.

It is possible that third parties may own or could acquire rights in trademarks or domain names in the U.S. or abroad that are confusingly similar to or otherwise compete unfairly with the Debtors' marks and domain names, or that the Debtors' use of trademarks or domain names may infringe or otherwise violate the intellectual property rights of third parties.  The use of similar marks or domain names by third parties could decrease the value of the Debtors' trademarks or domain names and hurt its business, for which there may be no adequate remedy.

(r)    **Third Parties May Claim that the Debtors Infringe on Their Proprietary Rights, or Seek to Circumvent the Debtors' Proprietary Rights.**

The Debtors have been sued in the past for, and may in the future be required to defend against charges of infringement of patents, trademarks or other proprietary rights of third parties.  Such defenses could require the Debtors to incur substantial expense and to divert significant effort of their technical and management personnel, and could result in the loss of rights to develop or make certain products or require payment of monetary damages or royalties to license proprietary rights from third parties.  More generally, the outcome of intellectual property litigation and disputes is uncertain and presents a risk to the Debtors' business.

If an intellectual property dispute is settled through licensing or similar arrangements, costs associated with such arrangements may be substantial and could include ongoing royalties.  Furthermore, the Debtors cannot be certain that the necessary licenses would be available on acceptable terms, if at all.  Accordingly, an adverse determination in a judicial or administrative proceeding or failure to obtain necessary licenses could prevent the Debtors from manufacturing, using, selling and/or importing into the U.S. certain of their products, and therefore could have a material adverse effect on their business or results of operations.  Litigation also may be necessary to enforce the Debtors' patents against others or to protect their know-how or trade secrets. That litigation could result in substantial expense or put its proprietary rights at risk of loss, and the Debtors cannot provide assurances that any litigation will be resolved in their favor.

(s)    **Revenues, Gross Profits and Operating Results May Fluctuate Depending Upon Product Sales Mix, Product Pricing, and Costs to Manufacture or Purchase Products.**

The Debtors' future results of operations, financial condition and cash flows will depend to a significant extent upon their product sales mix (the proportion of total sales among products).

The profitability of the Reorganized Debtors' product sales is also dependent upon the prices they are able to charge for their products and the costs to purchase products from third parties in a cost-effective manner. If the Reorganized Debtors' revenues and gross profit decline or do not grow as anticipated, they may not be able to correspondingly reduce their operating expenses to offset the effect of lower sales.

(t)    **Enactment of the Affordable Care Act, Other Legislative Proposals, Third-Party Reimbursement Proposals, Cost-Containment Measures and Healthcare Reform Could Affect the Marketing, Pricing and Demand for Products.**

The enactment of the Patient Protection and Affordable Care Act (the "**Affordable Care Act**") on March 23, 2010, as well as various additional legislative proposals, including proposals relating to prescription drug benefits, could materially impair the pricing and sale of the Reorganized Debtors' products. The Reorganized Debtors' ability to market their products will depend in part on reimbursement levels for the cost of the products and related treatment established by healthcare providers, including government authorities, private health insurers and other organizations, such as HMOs and MCOs. Insurance companies, HMOs, MCOs, Medicaid and Medicare administrators and others regularly challenge the pricing of pharmaceutical products and review their reimbursement practices. In addition, the following factors could significantly influence the purchase of pharmaceutical products, which could result in lower prices and a reduced demand for the Reorganized Debtors' products: (i) the trend toward managed healthcare in the United States; (ii) the growth of organizations such as HMOs and MCOs; (iii) legislative proposals to reform healthcare and government insurance programs; and (iv)price controls and non-reimbursement of new and highly priced medicines for which the economic therapeutic rationales are not established.

The Affordable Care Act is a comprehensive and very complex and far-reaching statute. The cost-containment measures and healthcare reforms in the Affordable Care Act and in other legislative proposals could affect the Reorganized Debtors' ability to sell their products in many possible ways. The Debtors are unable to predict the ultimate impact of the Affordable Care Act, or the content or timing of future healthcare reform legislation and its impact, on the Reorganized Debtors. Those reforms may have a material adverse effect on the Reorganized Debtors' financial condition and results of operations.

The reimbursement status of a newly-approved pharmaceutical product may be uncertain. Reimbursement policies and decisions, either generally affecting all pharmaceutical companies or specifically affecting the Reorganized Debtors, may not include some of the Reorganized Debtors' products or government agencies or third parties may assert that certain of the Reorganized Debtors' products are not eligible for Medicaid, Medicare or other reimbursement and were not so eligible in the past, possibly resulting in demands for damages or refunds. Even if reimbursement policies of third parties grant reimbursement status for a product, the Reorganized Debtors cannot be sure that such reimbursement policies will remain in effect. Limits on reimbursement could reduce the demand for the Reorganized Debtors' products. The unavailability or inadequacy of third-party reimbursement for the Reorganized Debtors' products could reduce or possibly eliminate demand for their products. The Reorganized Debtors are unable to predict whether governmental authorities will enact

- 113 -

additional legislation or regulation that will affect third-party coverage and reimbursement, which could reduce demand for their products.

(u) **Extensive Industry Regulation May Impact Operations.**

All pharmaceutical companies, including the Reorganized Debtors, are subject to extensive, complex, costly and evolving regulation by the federal government, principally the FDA and CMS (with respect to Medicaid) and, to a lesser extent, the U.S. Drug Enforcement Administration (the "**DEA**") and state, local and foreign governments.  The FFDCA, the Controlled Substances Act of 1970 (the "**CSA**") and other federal statutes and regulations govern or influence the testing, manufacturing, packing, labeling, storing, record keeping, safety, approval, advertising, promotion, sale and distribution of the Reorganized Debtors' products. Pharmaceutical manufacturers are also subject to certain record-keeping and reporting requirements, establishment registration and product listing, and FDA inspections.  Failure to comply with applicable FDA or other regulatory requirements may result in criminal prosecution, civil penalties, fines, warning letters, injunctions or holds, recall or seizure of products and total or partial suspension of production, refusal to approve new drug applications, abbreviated new drug applications or other applications or revocation of approvals previously granted, withdrawal of product from marketing, withdrawal of licenses or registrations necessary to conduct business, disqualification from supply contracts with the government, as well as other regulatory actions against the Reorganized Debtors and their products.

In addition to compliance with current good manufacturing practice requirements, drug manufacturers must register each manufacturing facility with the FDA.  Manufacturers and distributors of prescription drug products are also required to be registered in the states where they are located and in certain states that require registration by out-of-state manufacturers and distributors.  Manufacturers also must be registered with the DEA and similar applicable state and local regulatory authorities if they handle controlled substances, and with the U.S. Environmental Protection Agency (the "**EPA**") and similar state and local regulatory authorities if they generate toxic or dangerous wastes, and must also comply with other applicable DEA and EPA requirements.

From time to time, governmental agencies have conducted investigations of pharmaceutical companies relating to the distribution and sale of drug products to government purchasers or subject to government or third-party reimbursement.  However, standards sought to be applied in the course of governmental investigations can be complex and may not be consistent with standards previously applied to our industry generally or previously understood by the Debtors to be applicable to their activities.

The process for obtaining governmental approval to manufacture and market pharmaceutical products is rigorous, time-consuming, costly and uncertain, and the Reorganized Debtors cannot predict the extent to which they may be affected by legislative and regulatory development.  Under the FDA's regulatory framework, many drug products ultimately do not reach the market because they are found to not be safe or effective or cannot meet the FDA's other regulatory requirements.  The Reorganized Debtors are dependent on receiving FDA and other governmental or third-party approvals prior to manufacturing, marketing and shipping many of their products.

After a product is approved, the FDA may revoke or suspend the product approval if compliance with post-market regulatory standards is not maintained or if problems occur after the product reaches the market.  In addition, the FDA may require post-marketing studies to monitor the effect of approved products, and may limit further marketing of the product based on the results of these post-market studies or evidence of safety concerns.  Further, the current regulatory framework may change and additional regulatory or approval requirements may arise at any stage of the Reorganized Debtors' product development that may affect approval, delay the submission or review of an application or require additional expenditures.  The Reorganized Debtors may not be able to obtain necessary regulatory clearances or approvals on a timely basis, if at all, for any of their products under development.  Delays in receipt or failure to receive such clearances or approvals, the loss of previously received clearances or approvals, or failure to comply with existing or future regulatory requirements could have a material adverse effect on the Reorganized Debtors' business. Consequently, the Reorganized Debtors cannot predict whether they will obtain FDA or other necessary approvals or whether the rate, timing and cost of such approvals will adversely affect their product introduction or re-launch plans or results of operations.

(v)      **The Reorganized Debtors Are Subject to Various Federal and State Laws Pertaining to Healthcare Fraud and Abuse.**

Several types of state and federal laws, including anti-kickback and false claims statutes, have been applied to restrict certain marketing practices in the pharmaceutical industry in recent years.  The federal healthcare program anti-kickback statute prohibits, among other things, knowingly and willfully offering, paying, soliciting, or receiving remuneration to induce or in return for purchasing, leasing, ordering, or arranging for the purchase, lease, or order of any health care item or service reimbursable under Medicare, Medicaid, or other federally financed health care programs.  Although there are a number of statutory exemptions and regulatory safe harbors protecting certain common activities from prosecution, the exemptions and safe harbors are drawn narrowly, and practices that involve remuneration to individuals or entities in a position to prescribe, purchase, or recommend our products may be subject to scrutiny if they do not qualify for an exemption or safe harbor.  Federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government, or knowingly making, or causing to be made, a false statement to get a false claim paid or to reduce an amount owed to the federal government.  The majority of states also have statutes or regulations similar to the federal anti-kickback law and false claims laws, which apply to items and services reimbursed under Medicaid and other state programs, or, in several states, apply regardless of the payor.  Sanctions under these federal and state laws may include civil monetary penalties, exclusion of a manufacturer's products from reimbursement under government programs, debarment from contracting with the government, criminal fines, and imprisonment.

The Reorganized Debtors will endeavor to comply with the applicable fraud and abuse laws and to operate within related statutory exemptions and regulatory safe harbors protecting certain common activities from prosecution.  However, the exemptions and safe harbors are drawn narrowly, and practices that involve remuneration to individuals or entities in a position to prescribe, purchase, or recommend our products may be subject to scrutiny if they do not qualify for an exemption or safe harbor.

Violations of fraud and abuse laws may be punishable by civil and/or criminal sanctions, including substantial fines and civil monetary penalties, debarment from contracting with the government, as well as the possibility of exclusion from federal and state health care programs, including Medicaid, Medicare and Veterans Administration health programs. Furthermore, the laws applicable to us are broad in scope and are subject to evolving interpretations and permit governmental authorities to exercise significant discretion. Any determination by a governmental authority that the Reorganized Debtors are not in compliance with applicable laws and regulations could have a material adverse effect on their reputation, business operations and financial results.

## ARTICLE XII.

## CERTAIN FEDERAL INCOME TAX
## CONSEQUENCES OF THE PLAN

**12.1.    *Introduction.***

The following discussion summarizes certain federal income tax consequences expected to result from the consummation of the Plan. This discussion is only for general information purposes and only describes the expected tax consequences to holders entitled to vote on the Plan. It is not a complete analysis of all potential federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws. This discussion is based on the Internal Revenue Code of 1986, as amended ("IRC" or the "Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the IRS, all as in effect on the date of this Disclosure Statement. These authorities may change, possibly retroactively, resulting in federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This discussion assumes that holders of Claims have held such property as "capital assets" within the meaning of IRC Section 1221 (generally, property held for investment). In addition, this discussion assumes that the Debtors' obligations under the Senior Secured Notes and the Convertible Subordinated Notes will be treated as debt for federal income tax purposes.

This discussion does not address all federal income tax considerations that may be relevant to a particular holder in light of that holder's particular circumstances or to holders subject to special rules under the federal income tax laws, such as financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt organizations, tax-qualified retirement plans, partnerships and other pass-through entities, foreign corporations, foreign trusts, foreign estates, holders who are not citizens or residents of the U.S., holders subject to the alternative minimum tax, holders holding Claims as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or

other integrated investment, holders who have a functional currency other than the U.S. dollar and holders that acquired the Claims in connection with the performance of services.

In addition, this discussion does not address the treatment of any fees to be paid pursuant to the Plan.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS, OR ANY OTHER FEDERAL TAX LAWS.

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**12.2.**    *Federal Income Tax Consequences to the Debtors.*

(a)    **Cancellation of Indebtedness and Reduction of Tax Attributes.**

The Debtors generally should realize cancellation of indebtedness income ("**COD Income**") to the extent the sum of (i) Cash and the fair market value of any property received by holders is less than (ii) the sum of (x) the adjusted issue price of any debt exchanged for Cash or other property pursuant to the Plan, and (y) the amount of any unpaid accrued interest on such debt to the extent previously deducted by the Debtors.

The Debtors expect that the amount of COD Income realized upon consummation of the Plan will be significant; however, the ultimate amount of COD Income realized by the Debtors is uncertain because, among other things, it will depend on the fair market value of the New Common Stock on the Effective Date.  Estimated recoveries for the Debtors' various Claims are set forth in Article II above.

COD Income realized by a Debtor will be excluded from income if the discharge of debt occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a chapter 11 plan approved by the court (the "**Bankruptcy Exception**").  Because the Bankruptcy Exception will apply to the transactions consummated pursuant to the Plan, the Debtors will not be required to recognize any COD Income realized as a result of the implementation of the Plan.

A debtor that does not recognize COD Income under the Bankruptcy Exception generally must reduce certain tax attributes by the amount of the excluded COD Income. Attributes subject to reduction include net operating losses ("**NOLs**"), NOL carryforwards and

certain other losses, credits and carryforwards, and the debtor's tax basis in its assets (including stock of subsidiaries).

The Debtors believe that, for federal income tax purposes, the Debtors' consolidated group had approximately $660 million of consolidated NOL and NOL carryforwards as of the filing date. However, the amount of the Debtors' NOLs will not be determined until the Debtors prepare their consolidated federal income tax returns for such periods. Moreover, the Debtors' NOLs are subject to audit and possible challenge by the IRS. Accordingly, the amount of the Debtors' NOLs ultimately may vary from the amounts set forth above. The ultimate effect of the attribute reduction rules is uncertain because, among other things, it will depend on the amount of COD Income realized by the Debtors. Nevertheless, the Debtors currently anticipate that even after application of the attribute reduction rules, the NOL carryforwards will exceed the amount that will be usable over the life of such carryforwards given the limitations imposed by IRC Section 382, as discussed in the following paragraph. The Debtors currently anticipate that they will not be required to reduce tax basis of assets.

(b)    **Section 382 Limitation on NOLs.**

Under IRC Section 382, if a corporation or a consolidated group with NOLs (a "**Loss Corporation**") undergoes an "ownership change," the Loss Corporation's use of its pre-change NOLs (and certain other tax attributes) generally will be subject to an annual limitation in the post-change period. In general, an "ownership change" occurs if the percentage of the value of the Loss Corporation's stock owned by one or more direct or indirect "five percent shareholders" increases by more than fifty percentage points over the lowest percentage of value owned by the five percent shareholders at any time during the applicable testing period (an "**Ownership Change**"). The testing period generally is the shorter of (i) the three-year period preceding the testing date or (ii) the period of time since the most recent Ownership Change of the corporation.

The Debtors expect the consummation of the Plan will result in an Ownership Change of the Debtors' consolidated group. The Debtors expect the use of the Debtors' NOLs remaining after application of the attribute reductions rules described above to be subject to substantial limitations following the consummation of the Plan.

Under Section 382, if an Ownership Change occurs, NOL carryforwards and certain subsequently recognized "built-in" losses and deductions (i.e., losses and deductions that have economically accrued but are unrecognized as of the date of the ownership change) are subject to an annual limitation (the "**Annual Section 382 Limitation**"). As a general rule, a corporation's Annual Section 382 Limitation equals the value of the stock of the corporation (with certain adjustments) immediately before the ownership change, multiplied by the applicable "long-term tax-exempt rate" then in effect (e.g., 2.70% for a May 2013 ownership change). Certain "recognized built-in losses," including certain deductions, triggered during a "recognition period taxable year" may be limited in the same manner as if such loss were an NOL existing as of the ownership change. A "recognition period taxable year" is any taxable year that a portion of which falls within the five year period beginning on the date of the ownership change. Subject to certain limitations, any unused portion of the Annual Section 382 Limitation may be available in subsequent years. A corporation must meet certain continuity of

business enterprise requirements for at least two years following an ownership change in order to preserve the Annual Section 382 Limitation.

IRC section 382(l)(5) provides an exception to the application of the Annual Section 382 Limitation for ownership changes occurring to corporations under the jurisdiction of a Bankruptcy Court if certain requirements are met (the "**(l)(5) Exception**").  In order for the (l)(5) Exception to apply to the Debtors, its historic shareholders and creditors that held certain "qualified indebtedness" (as defined by regulation) prior to implementation of the Plan must own (as a result of being shareholders and creditors immediately prior to implementation of the Plan) more than 50% of the total voting power and total value of New Common Stock after such implementation. The Debtors do not believe that the (l)(5) Exception will be applicable.

Instead, the Debtors anticipate that a special rule under IRC section 382(l)(6) will apply in calculating the Annual Section 382 Limitation.  Under this special rule, the Annual Section 382 Limitation will be calculated by reference to the lesser of (i) the value of the New Common Stock (with certain adjustments) immediately after the ownership change (as opposed to immediately before the ownership change, as discussed above, and including any increase in value resulting from any surrender or cancellation of indebtedness under the bankruptcy case) or (ii) the value of the Debtors' assets (determined without regard to liabilities) immediately before the ownership change.

(c)     **Alternative Minimum Tax.**

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the taxable year.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated, with further adjustments required if AMTI, determined without regard to adjusted current earnings ("**ACE**"), differs from ACE.  A corporation that pays AMT generally is later allowed a nonrefundable credit (equal to a portion of its prior year AMT liability) against its regular federal income tax liability in future taxable years when it is no longer subject to the AMT.

**12.3.   *Federal Income Tax Consequences to Holders of Certain Claims.***

(a)     **Tax Securities.**

The tax consequences of the Plan to a holder of a Claim may depend in part upon: (1) whether such Claim is based on an obligation that constitutes a "security" for federal income tax purposes, and (2) whether all or a portion of the consideration received for such Claim is an obligation that constitutes a "security" for federal income tax purposes.  The determination of whether a debt obligation constitutes a security for federal tax purposes is complex and depends on the facts and circumstances surrounding the origin and nature of the claim.  Generally, obligations arising out of the extension of trade credit have been held not to be tax securities, while corporate debt obligations evidenced by written instruments with original maturities of ten years or more have been held to be tax securities.  The Debtors expect to treat the Convertible Subordinated Notes as securities for federal tax purposes and the following discussion assumes

- 119 -

that the Convertible Subordinated Notes will be respected as securities for federal tax purposes; however, holders are advised to consult their tax advisors with respect to this issue.

(b)    **Exchange of Convertible Subordinated Notes
for New Common Stock and Subscription Rights.**

Assuming that the Convertible Subordinated Notes will be treated as securities for federal income tax purposes, the exchange of Convertible Subordinated Notes for New Common Stock will constitute a recapitalization. Subject to the rules discussed below under "*Other Considerations—Accrued Interest,*" holders of the Subordinated Notes will not recognize gain or loss on the exchange. A Convertible Subordinated Note holder's holding period in the New Common Stock would include the holder's holding period in its Convertible Subordinated Notes, and the holder would have a basis in the New Common Stock equal to the holder's basis in its Convertible Subordinated Notes.

(c)    **General Unsecured Claims (Class 7).**

Holders of General Unsecured Claims will generally recognize gain or loss on the exchange of their claims for the General Unsecured Claims Distribution. Subject to the rules discussed below under "*Other Considerations—Accrued Interest,*" such gain or loss will generally be equal to the difference between (i) Cash received by such holder and (ii) such holder's tax basis in the General Unsecured Claim.

(d)    **Subscription Rights.**

The exercise of a Subscription Right will not be a taxable event. A holder's basis in the New Common Stock acquired pursuant to the Rights Offering will equal the Rights Exercise Price. The holding period of any New Common Stock acquired in the Rights Offering will begin on the date after its acquisition.

(e)    **New Common Stock.**

*Distributions.* A holder of New Common Stock generally will be required to include in gross income as ordinary dividend income the amount of any distributions paid on the New Common Stock to the extent such distributions are paid out of the Reorganized Debtors' current or accumulated earnings and profits as determined for federal income tax purposes. Distributions not treated as dividends for federal income tax purposes will constitute a return of capital and will first be applied against and reduce a holder's adjusted tax basis in the New Common Stock, but not below zero. Any excess amount will be treated as gain from a sale or exchange of the New Common Stock. Holders that are treated as corporations for federal income tax purposes may be entitled to a dividends received deduction with respect to distributions out of earnings and profits.

*Sale or Other Taxable Disposition.* A holder of New Common Stock will recognize gain or loss upon the sale or other taxable disposition of New Common Stock equal to the difference between the amount realized upon the disposition and the holder's adjusted tax basis in the New Common Stock. Subject to the rules discussed below in "*Other Considerations—Market Discount*" and the recapture rules under IRC Section 108(e)(7), any

such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has held the New Common Stock for more than one year as of the date of disposition. Under the IRC Section 108(e)(7) recapture rules, a holder may be required to treat gain recognized on the taxable disposition of the New Common Stock as ordinary income if the holder took a bad debt deduction with respect to the Senior Secured Notes or Convertible Subordinated Notes or recognized an ordinary loss on the exchange of the Senior Secured Notes or Convertible Subordinated Notes for New Common Stock. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

(f)    **Other Considerations.**

*Accrued Interest.* There is general uncertainty regarding the extent to which the receipt of cash or other property should be treated as attributable to unpaid accrued interest. In accordance with the Plan, the Debtors take the position that property distributed pursuant to the Plan will first be allocable to the principal amount of a holder's Claim and then, to the extent necessary, to any unpaid accrued interest thereon. The IRS, however, could take a contrary position.

To the extent any property received pursuant to the Plan is considered attributable to unpaid accrued interest, a holder will recognize ordinary income to the extent the value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the holder. A holder's tax basis in such property should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the Effective Date. A holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.

*Market Discount.* A holder that acquires a debt instrument at a market discount (including in a recapitalization or other exchange pursuant to which the holder's basis in the debt instrument is less than the debt's issue price), generally is required to treat any gain realized on the disposition of the instrument as ordinary income to the extent of accrued market discount not previously included in gross income by the holder. However, special rules apply to the disposition of a market discount obligation in certain types of non-recognition transactions, such as a recapitalization.

(g)    **Information Reporting and Backup Withholding.**

The Debtors (or their paying agent) may be obligated to furnish information to the IRS regarding the consideration received by holders (other than corporations and other exempt holders) pursuant to the Plan.

Holders may be subject to backup withholding (currently, at a rate of 28%) on the consideration received pursuant to the Plan. Certain holders (including corporations) generally are not subject to backup withholding. A holder that is not otherwise exempt generally may

avoid backup withholding by furnishing to the Debtors (or their paying agent) its taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the holder has not been notified by the IRS that it is subject to backup withholding.

Backup withholding is not an additional tax. Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN. NEITHER THE PROPONENTS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

## ARTICLE XIII.

## SECURITIES LAW MATTERS

### 13.1.    *General.*

The Plan provides for Reorganized KV to issue New Common Stock to the holders of Allowed Convertible Subordinated Notes Claims pursuant to Section 7.9 of the Plan, subject to dilution by the New Common Stock Securities that may be issued pursuant to the Management Incentive Plan. The Debtors believe that the New Common Stock and the Subscription Rights constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

No registration statement will be filed under the Securities Act or any state securities laws relating to the initial offer and distribution on the Effective Date under the Plan of the New Common Stock or the Subscription Rights.

### 13.2.    *Initial Offer and Sale of Securities Under Federal Securities Laws.*

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and under state securities laws if three principal requirements are satisfied:

(a)    the securities must be offered and sold "under a plan" of reorganization and must be securities of the debtor, of an affiliate "participating in a joint plan" with the debtor or of a successor to the debtor under the plan;

(b)    the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor or such affiliate; and

- 122 -

(c)    the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property.

In addition, Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder exempt the private offering of securities from registration under the Securities Act and under state securities laws. The Debtors believe that the provisions of section 1145(a)(l) of the Bankruptcy Code and Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder (as applicable) exempt the initial offer and distribution of the New Common Stock and Subscription Rights on the Effective Date under the Plan from federal and state securities registration requirements.

### 13.3.  *The Rights Offering Stock.*

The Debtors will issue the Rights Offering Stock without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145(a)(1) of the Bankruptcy Code, section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder to holders of Allowed Class 6 Convertible Subordinated Notes Claims that qualify as Accredited Investors. All shares of Rights Offering Stock issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

### 13.4.  *New Common Stock.*

(a)    **Issuance of New Common Stock.**

The Debtors believe that the offer and sale of the New Common Stock pursuant to the Plan, including in connection with the Rights Offering, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, state securities laws, and the Bankruptcy Code. In reliance upon the exemptions discussed in Sections 13.2 and 13.3 above, the New Common Stock and the issuance and offer thereof will not be (and is not required to be) registered under the Securities Act or any state securities laws.

(b)    **Resale of New Common Stock.**

(i)    <u>Securities Law Restrictions.</u>

The Debtors further believe that subsequent transfers of the New Common Stock by the holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and supplemented by Section 1145(b)(1) of the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and applicable state securities laws. In addition, the New Common Stock generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of those states; however, the availability of such exemptions cannot be known unless individual state securities laws are examined. Therefore, recipients of the New Common Stock are advised to consult with their own legal

advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest, or (b) offers to sell securities offered or sold under a plan for the holders of such securities, or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan, or (d) is an issuer of the securities within the meaning of Section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of Section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to Section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in Section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Resales of the New Common Stock by Persons deemed to be "underwriters" (which definition includes "controlling person") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144.  Generally, Rule 144 would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met.  However, the Reorganized Debtors do not presently intend to make publicly available the requisite current information regarding the Reorganized Debtors and, as a result, Rule 144 will not be available for resales of New Common Stock by persons deemed to be underwriters.

**Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling person") with respect to the New Common**

**Stock will depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person will be deemed an "underwriter" with respect to the New Common Stock.  In view of the complex nature of the question of whether a particular Person may be an underwriter, the Debtors make no representations concerning the right of any Person to freely resell New Common Stock.** Accordingly, the Debtors recommend that potential recipients of New Common Stock consult their own counsel concerning whether they may freely trade such securities without compliance with the federal and state securities laws.

(ii)    <u>Restrictions in the New Stockholders Agreement</u>.

The New Stockholders Agreement to be entered into by Reorganized KV and the holders of New Common Stock will contain restrictions on a holder's ability to transfer the New Common Stock.  Among other restrictions on transfer, subject to certain limited exceptions, the New Stockholders Agreement will require notice to Reorganized KV of any proposed transfer of New Common Stock and will restrict such transfer if the transfer would, if effected, require Reorganized KV to register or qualify such New Common Stock under the Securities Act or Exchange Act.

(iii)    <u>Legend</u>.

All certificates, if any, representing shares of New Common Stock shall bear a legend that is consistent with the New Stockholders Agreement.

## ARTICLE XIV.

## PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN

**14.1.    *Distributions.***

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.  To the extent provided in the Senior Secured Notes Indenture and Convertible Subordinated Notes Indenture, as applicable, and permitted by applicable law, all Plan Distributions made by the Disbursing Agent to Class 3 (Senior Secured Notes Claims) and Class 6 (Convertible Subordinated Notes Claims) shall be subject to any charging liens in favor of the Senior Secured Notes Indenture Trustee and Convertible Subordinated Notes Indenture Trustee, respectively.

**14.2.    *No Postpetition Interest on Claims.***

Unless otherwise specifically provided for in the Plan, Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

**14.3.    *Date of Distributions.***

Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is practicable, provided that the Reorganized Debtors may utilize periodic distribution dates to the extent appropriate. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**14.4.    *Distribution Record Date.***

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes (other than Classes 3 and 6), as maintained by the Debtors, or their agents, shall be deemed closed and there shall be no further changes in the record holders of any of the Claims after the Distribution Record Date. Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date. Additionally, with respect to payment of any Cure Amounts or any Cure Disputes in connection with the assumption and/or assignment of the Debtors' executory contracts and leases, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the underlying executory contract or lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Amount.

Notwithstanding the foregoing or anything in the Plan or herein to the contrary, in connection with any distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), including to holders of Claims in Classes 3 and 6, the Debtors will be entitled to recognize and deal for all purposes under the Plan with such holders to the extent consistent with the customary practices of DTC used in connection with such distribution. With respect to the New Common Stock to be distributed to holders of Allowed Convertible Subordinated Notes Claims, all of the shares of the New Common Stock shall be issued in the name of such holder or its nominee(s) in accordance with DTC's book-entry exchange procedures, provided, that such shares of New Common Stock are permitted to be held through DTC's book-entry system; provided, that to the extent the New Common Stock is not eligible for distribution in accordance with DTC's customary practices, Reorganized KV will take all such reasonable actions as may be required to cause distributions of New Common Stock to holders of Allowed Convertible Subordinated Notes Claims.

**14.5.    *Disbursing Agent.***

All distributions under the Plan shall be made by the Reorganized Debtors or the Disbursing Agent on and after the Effective Date as provided in the Plan. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by Reorganized Debtors. Furthermore, any such entity required to give a bond shall notify the

Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

### 14.6.   *Delivery of Distribution.*

Subject to Section 8.4(b) of the Plan, the Disbursing Agent will issue, or cause to be issued, and authenticate, as applicable, the applicable Plan Consideration, and subject to Bankruptcy Rule 9010, make all distributions or payments to any holder of an Allowed Claim as and when required by the Plan at: (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the applicable Disbursing Agent, including any addresses included on any filed proofs of Claim or transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the applicable Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter such distribution shall be made to such holder without interest, provided, however, such distributions or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of one year from: (i) the Effective Date; and (ii) the first Distribution Date after such holder's Claim is first Allowed.

### 14.7.   *Unclaimed Property.*

One year from the later of: (i) the Effective Date, and (ii) the first Distribution Date after the applicable Claim is first Allowed, all unclaimed property or interests in property shall revert to the Reorganized Debtors or the successors or assigns of the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records, or proofs of Claim filed against the Debtors, as reflected on the claims register maintained by the Claims Agent.

### 14.8.   *Satisfaction of Claims.*

Unless otherwise provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

### 14.9.   *Manner of Payment Under Plan.*

Except as specifically provided in the Plan, at the option of the Debtors or Reorganized Debtors (as applicable), any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 14.10.  *Fractional Shares/De Minimis Cash Distributions.*

No fractional shares of New Common Stock shall be distributed.  When any distribution would otherwise result in the issuance of a number of shares of New Common Stock

- 127 -

that is not a whole number, the shares of the New Common Stock subject to such distribution will be rounded to the next higher or lower whole number as follows: (i) fractions equal to or greater than ½ will be rounded to the next higher whole number; and (ii) fractions less than ½ will be rounded to the next lower whole number; provided, that the foregoing shall not apply to any rounding of Rights Offering Stock to be distributed, which shall be governed by the Rights Offering Procedures and Section 7.12(c) of the Plan. The total number of shares of New Common Stock to be distributed on account of Allowed Claims will be adjusted as necessary to account for the rounding provided for in the Plan. No consideration will be provided in lieu of fractional shares that are rounded down. Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock or $50.00 in Cash. Fractional shares of New Common Stock that are not distributed in accordance with Section 8.10 of the Plan shall be returned to Reorganized KV

**14.11.** *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Plan Distribution (of a value set forth in the Plan) in excess of the Allowed amount of such Claim plus any postpetition interest on such Claim, to the extent such interest is permitted by Section 8.2 of the Plan

**14.12.** *Exemption From Securities Laws.*

The issuance of and the distribution under the Plan of the New Common Stock Securities, including the Subscription Rights, the Rights Offering Stock, the Direct Purchase Shares, the Commitment Fee Shares, and the Convertible Subordinated Notes Equity Distribution, shall be exempt from registration under the Securities Act any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code and/or Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, to the maximum extent permitted thereunder. Subject to any transfer restrictions contained in the Certificate of Incorporation of Reorganized KV and/or the New Stockholders Agreement, the New Common Stock issued on account of the Convertible Subordinated Notes Equity Distribution may be resold by the holders thereof without restriction, except to the extent that any such holder is deemed to be an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code. All of the New Common Stock Securities other than the Convertible Subordinated Notes Equity Distribution may not be sold or transferred unless there is an effective registration statement under the Securities Act covering the New Common Stock or the securities are sold or transferred in a transaction that is exempt from or not subject to the registration and prospectus delivery requirement of the Securities Act and otherwise in compliance with state securities laws. The availability of the exemption under section 1145 of the Bankruptcy Code, Section 4(a)(2) of the Securities Act and/or any other applicable securities laws shall not be a condition to occurrence of the Effective Date of the Plan.

**14.13.** *Setoffs and Recoupments.*

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off and/or recoup against any Allowed Claim (other than a Senior Secured

Notes Claim or a Convertible Subordinated Notes Claim), and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any and all claims, rights and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; provided, however, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim under the Plan will constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights and Causes of Action that a Reorganized Debtor or its successor may possess against such holder.

### 14.14. *Rights and Powers of Disbursing Agent.*

(a)      **Powers of Disbursing Agent.**

The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments contemplated by the Plan; (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)      **Expenses Incurred on or After the Effective Date.**

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement Claims (including, without limitation, reasonable attorney and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

### 14.15. *Withholding and Reporting Requirements.*

In connection with the Plan and all distributions thereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Plan Distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of any Plan Distribution to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Debtors, Reorganized Debtors or the Disbursing Agent believe are reasonable and appropriate, including requiring a holder of a Claim to submit appropriate tax and withholding certifications.  Notwithstanding any other provision of the Plan: (i) each holder of an Allowed Claim that is to receive a distribution under the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution; and (ii) no Plan Distributions shall be required to be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to

the Reorganized Debtors for the payment and satisfaction of such tax obligations or has, to the Reorganized Debtors' satisfaction, established an exemption therefrom.

### 14.16. *Cooperation With Disbursing Agent.*

The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of holders of Claims, in each case, as set forth in the Debtors' and/or Reorganized Debtors' books and records. The Reorganized Debtors will cooperate in good faith with the Disbursing Agent to comply with the reporting and withholding requirements outlined in Section 8.15 of the Plan.

### 14.17. *Hart-Scott Rodino Antitrust Improvements Act.*

Any New Common Stock to be distributed under the Plan to an entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such entity shall have expired or been terminated. In the event any applicable notification and waiting periods do not expire without objection, the Reorganized Debtors or their agent shall, in their sole discretion, be entitled to sell such entity's shares of New Common Stock that were to be distributed under the Plan to such entity, and thereafter shall distribute the proceeds of the sale to such entity.

## ARTICLE XV.

## PROCEDURES FOR RESOLVING CLAIMS

### 15.1. *Objections to Claims.*

Other than with respect to Fee Claims, only the Reorganized Debtors shall be entitled to object to Claims after the Effective Date. Any objections to those Claims (other than Administrative Expense Claims), shall be served and filed on or before the later of: (i) the date that is one (1) year after the Effective Date; and (ii) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (i) hereof. Any Claims filed after the Bar Date or Administrative Bar Date, as applicable, shall be deemed disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors or the Reorganized Debtors, unless the Person or entity wishing to file such untimely Claim has received Bankruptcy Court authority to do so. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the objecting party effects service in any of the following manners: (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (ii) by first class mail, postage prepaid, on the signatory on the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (iii) if counsel has agreed to or is otherwise deemed to accept service, by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Reorganization Cases (so long as such appearance has not been subsequently withdrawn). From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

**15.2.** *Amendment to Claims.*

From and after the Effective Date, no Claim may be filed to increase or assert additional claims not reflected in an already filed Claim (or Claim scheduled, unless superseded by a filed Claim, on the applicable Debtor's schedules of assets and liabilities filed in the Reorganization Cases) asserted by such claimant and any such Claim shall be deemed disallowed and expunged in its entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors or the Reorganized Debtors unless the claimant has obtained the Bankruptcy Court's prior approval to file such amended or increased Claim.

**15.3.** *Disputed Claims.*

(a)    **No Distributions or Payments Pending Allowance.**

Except as provided in Section 9.3 of the Plan, Disputed Claims shall not be entitled to any Plan Distributions unless and until such Claims become Allowed Claims.

(b)    **Establishment of Disputed Priority Claims Reserve.**

On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors shall set aside and reserve, for the benefit of each holder of a Disputed Administrative Expense Claim, Disputed Priority Tax Claim, Disputed Priority Non-Tax Claim, and Disputed Other Secured Claim, Cash in an amount equal to (i) the amount of such Claim as estimated by the Bankruptcy Court pursuant to an Estimation Order, (ii) if no Estimation Order has been entered with respect to such Claim, the amount in which such Disputed Claim is proposed to be allowed in any pending objection filed by the Debtors, or (iii) if no Estimation Order has been entered with respect to such Claim, and no objection to such Claim is pending on the Effective Date, (A) the amount listed in the Debtors' schedules of assets and liabilities filed in the Reorganization Cases (the "**Schedules**") or (B) if a timely filed proof of claim or application for payment has been filed with the Bankruptcy Court or Claims Agent, as applicable, the amount set forth in such timely filed proof of claim or application for payment, as applicable.  The Reorganized Debtors, in their reasonable discretion, may increase the amount reserved as to any particular Disputed Claim.  Such reserved amounts, collectively, shall constitute the "**Disputed Priority Claims Reserve**".

(c)    **Establishment of Disputed General Unsecured Claims Reserve.**

On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors shall set aside and reserve, from the General Unsecured Claims Distribution, for the benefit of each holder of a Disputed General Unsecured Claim, Cash in an amount equal to the Plan Distribution to which the holder of such Disputed Claim would be entitled if such Disputed Claim were an Allowed Claim, in an amount equal to (i) the amount of such Claim as estimated by the Bankruptcy Court pursuant to an Estimation Order, (ii) if no Estimation Order has been entered with respect to such Claim, the amount in which such Disputed Claim is proposed to be allowed in any pending objection filed by the Debtors, or (iii) if no Estimation Order has been entered with respect to such Claim, and no objection to such Claim is pending on the Effective Date, (A) the amount listed in the Schedules or (B) if a timely filed proof of claim or application for payment has been filed with the Bankruptcy Court or

Claims Agent, as applicable, the amount set forth in such timely filed proof of claim or application for payment, as applicable. The Reorganized Debtors, in their discretion, may increase the amount reserved as to any particular Disputed Claim. Such reserved amounts, collectively, shall constitute the "**Disputed General Unsecured Claims Reserve**". The Debtors shall not be required to reserve any Cash or other consideration on account of any Disputed General Unsecured Claim the Debtors reasonably believe is covered by insurance; provided, that, notwithstanding the foregoing, the Reorganized Debtors shall reserve Cash in an amount equal to the Plan Distribution to which the holder of any such Disputed General Unsecured Claim would be entitled on account of any SIR Claim that would be Allowed if such Disputed General Unsecured Claim were an Allowed Claim, in the amount of such SIR Claim; provided that the amount of the Disputed General Unsecured Claims Reserve shall be determined in consultation with the Creditors' Committee.

(d)    **Plan Distributions to Holders of Subsequently Allowed Claims.**

On each Distribution Date (or such earlier date as determined by the Reorganized Debtors or the Disbursing Agent in their sole discretion but subject to Section 9.3 of the Plan), the Disbursing Agent will make distributions or payments from the applicable Disputed Claims Reserve on account of any Disputed Claim that has become an Allowed Claim since the occurrence of the previous Distribution Date. The Disbursing Agent shall distribute in respect of such newly Allowed Claims the Plan Distributions to which holders of such Claims would have been entitled under the Plan if such newly Allowed Claims were fully or partially Allowed, as the case may be, on the Effective Date, less direct and actual expenses, fees, or other direct costs of maintaining Plan Consideration on account of such Disputed Claims.

(e)    **Distribution of Reserved Plan Consideration Upon Disallowance.**

To the extent any Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, or Disputed Other Secured Claim has become Disallowed in full or in part (in accordance with the procedures set forth in the Plan), any Plan Consideration held by the Reorganized Debtors on account of, or to pay, such Disputed Claim shall become the sole and exclusive property of Reorganized KV or its successors or assigns.

After all Disputed General Unsecured Claims have been either Allowed or Disallowed, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of any Cash remaining in the Disputed General Unsecured Claims Reserve.

**15.4.    *Estimation of Claims.***

The Debtors and/or Reorganized Debtors may request that the Bankruptcy Court enter an Estimation Order with respect to any Claim, pursuant to section 502(c) of the Bankruptcy Code, for purposes of determining the Allowed amount of such Claim regardless of whether any Person has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim for purposes of determining the allowed amount of such Claim at any time. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim for allowance purposes, that estimated amount will constitute either the Allowed amount of such Claim or a

maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the objecting party may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, settled, resolved or withdrawn by any mechanism approved by the Bankruptcy Court.

**15.5.**    *Expenses Incurred On or After the Effective Date.*

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by any Professional Person or the Claims Agent on or after the Effective Date in connection with implementation of the Plan, including without limitation, reconciliation of, objection to, and settlement of Claims, shall be paid in Cash by the Reorganized Debtors.

[*The remainder of this page is intentionally left blank.*]

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to holders of Claims. Other alternatives would involve significant delay, uncertainty and substantial administrative costs and are likely to reduce any return to creditors who hold Claims. The Debtors urge the holders of impaired Claims in Classes 3, 4, 5, 6 and 7 who are entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots to the Voting Agent so that they will be received not later than 4:00 p.m. (prevailing Eastern Time) on August 16, 2013.

Dated: July 17, 2013
St. Louis, Missouri

Respectfully submitted,

K-V PHARMACEUTICAL COMPANY
on behalf of itself and its affiliated Debtors

By: /s/ Thomas S. McHugh
Thomas S. McHugh
Chief Financial Officer

Counsel:

WILLKIE FARR & GALLAGHER LLP

Matthew A. Feldman, Esq.
Paul V. Shalhoub, Esq.
Robin Spigel, Esq.
Andrew D. Sorkin, Esq.
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

Counsel for the Debtors and Debtors in Possession

## EXHIBIT 1

**Plan**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x
In re                                                                :        Chapter 11
                                                                     :
K-V Discovery Solutions, Inc., et al.,[1]                            :        Case No. 12-13346 (ALG)
                                                                     :
                                            Debtors.                 :        (Jointly Administered)
-------------------------------------------------------------------- x

---

## SIXTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR K-V DISCOVERY SOLUTIONS, INC. AND ITS AFFILIATED DEBTORS

---

Dated:        New York, New York
              July 17, 2013

**WILLKIE FARR & GALLAGHER LLP**
*Counsel for the Debtors and Debtors in Possession*
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

---

[1]    The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) K-V Discovery Solutions, Inc. (7982); (ii) DrugTech Corporation (3690); (iii) FP1096, Inc. (3119); (iv) K-V Generic Pharmaceuticals, Inc. (7844); (v) K-V Pharmaceutical Company (8919); (vi) K-V Solutions USA, Inc. (4772); (vii) Ther-Rx Corporation (3624); and (viii) Zeratech Technologies USA, Inc. (6911). The Debtors' executive headquarters are located at 16640 Chesterfield Grove, Suite 200, Chesterfield, MO 63005.

# TABLE OF CONTENTS

Page

ARTICLE I.    DEFINITIONS AND INTERPRETATION ............................................1

ARTICLE II.   RESOLUTION OF CERTAIN INTER-CREDITOR AND INTER-DEBTOR
              ISSUES ...................................................................................19

    2.1.    *Settlement of Certain Inter-Creditor Issues.* ..................................19
    2.2.    *Formation of Debtor Groups for Convenience Purposes.* ...............19
    2.3.    *Intercompany Claims.* ......................................................19

ARTICLE III.  ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, U.S. TRUSTEE
              FEES AND PRIORITY TAX CLAIMS .............................................19

    3.1.    *DIP Claims.* ...............................................................20
    3.2.    *Administrative Expense Claims.* ............................................20
    3.3.    *Fee Claims.* ...............................................................22
    3.4.    *U.S. Trustee Fees.* .........................................................23
    3.5.    *Priority Tax Claims.* .......................................................23

ARTICLE IV.   CLASSIFICATION OF CLAIMS AND INTERESTS ......................................23

    4.1.    *Classification of Claims and Interests.* ....................................23
    4.2.    *Unimpaired Classes of Claims.* ............................................24
    4.3.    *Impaired Classes of Claims and Interests.* ................................24
    4.4.    *Separate Classification of Other Secured Claims.* ........................25

ARTICLE V.    TREATMENT OF CLAIMS AND INTERESTS ...........................................25

    5.1.    *Priority Non-Tax Claims (Class 1).* ......................................25
    5.2.    *Other Secured Claims (Class 2).* ..........................................25
    5.3.    *Senior Secured Notes Claims (Class 3).* ..................................26
    5.4.    *ETHEX Criminal Fine Claims (Class 4).* ..................................26
    5.5.    *Qui Tam Claims (Class 5)* ................................................27
    5.6.    *Convertible Subordinated Notes Claims (Class 6).* ........................27
    5.7.    *General Unsecured Claims (Class 7).* ......................................27
    5.8.    *Existing Securities Law Claims (Class 8(a)).* ..............................28
    5.9.    *Equitably Subordinated Claims (Class 8(b)).* ..............................28

**5.10.**    *Existing KV Interests (Class 9).* .........................................................................28

ARTICLE VI. ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
        REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR INTERESTS ..28

**6.1.**    *Class Acceptance Requirement.* .............................................................28

**6.2.**    *Tabulation of Votes on a Non-Consolidated Basis.* ..........................29

**6.3.**    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or
        "Cramdown."* ................................................................................................29

**6.4.**    *Elimination of Vacant Classes.* .............................................................29

**6.5.**    *Voting Classes; Deemed Acceptance by Non-Voting Classes.* ........29

**6.6.**    *Confirmation of All Cases.* .....................................................................29

ARTICLE VII. MEANS FOR IMPLEMENTATION ...............................................................30

**7.1.**    *Continued Corporate Existence and Vesting of Assets in Reorganized
        Debtors.* .........................................................................................................30

**7.2.**    *Plan Funding.* .............................................................................................31

**7.3.**    *Cancellation of Existing Securities and Agreements.* ......................31

**7.4.**    *Cancellation of Certain Existing Security Interests.* ........................31

**7.5.**    *Officers and Boards of Directors.* .........................................................31

**7.6.**    *Management Incentive Plan.* ...................................................................32

**7.7.**    *Corporate Action.* ......................................................................................32

**7.8.**    *New Stockholders Agreement.* ................................................................33

**7.9.**    *Authorization, Issuance and Delivery of New Common Stock.* .......33

**7.10.**    *New First Lien Term Loan.* ....................................................................34

**7.11.**    *Postpetition Interest Amount.* ................................................................34

**7.12.**    *Rights Offering and Direct Purchase.* ..................................................34

**7.13.**    *Intercompany Interests.* ...........................................................................35

**7.14.**    *Insured Claims.* ...........................................................................................36

**7.15.**    *Comprehensive Settlement of Claims and Controversies.* ...............36

**7.16.**    *Equitably Subordinated Claims.* ............................................................36

ARTICLE VIII. DISTRIBUTIONS .........................................................................................37

**8.1.**    *Distributions.* ..............................................................................................37

**8.2.**    *No Postpetition Interest on Claims.* .....................................................37

**8.3.**    *Date of Distributions.* ...............................................................................37

**8.4.**    *Distribution Record Date.* ........................................................................37

8.5.      *Disbursing Agent.* ................................................................38

8.6.      *Delivery of Distribution.* .......................................................38

8.7.      *Unclaimed Property.* .............................................................38

8.8.      *Satisfaction of Claims.* .........................................................39

8.9.      *Manner of Payment Under Plan.* ...........................................39

8.10.     *Fractional Shares/De Minimis Cash Distributions.* ................39

8.11.     *No Distribution in Excess of Amount of Allowed Claim.* ..........39

8.12.     *Exemption from Securities Laws.* ...........................................39

8.13.     *Setoffs and Recoupments.* .....................................................40

8.14.     *Rights and Powers of Disbursing Agent.* ................................40

8.15.     *Withholding and Reporting Requirements.* ..............................41

8.16.     *Cooperation with Disbursing Agent.* ......................................41

8.17.     *Hart-Scott Rodino Antitrust Improvements Act.* ......................41

ARTICLE IX.PROCEDURES FOR RESOLVING CLAIMS ....................................42

9.1.      *Objections to Claims.* ...........................................................42

9.2.      *Amendment to Claims.* ..........................................................42

9.3.      *Disputed Claims.* ..................................................................42

9.4.      *Estimation of Claims.* ...........................................................44

9.5.      *Expenses Incurred On or After the Effective Date.* ..................44

ARTICLE X.EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..............45

10.1.     *General Treatment.* ...............................................................45

10.2.     *Claims Based on Rejection of Executory Contracts or Unexpired Leases.* .....45

10.3.     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*..45

10.4.     *Compensation and Benefit Programs.* .....................................46

10.5.     *Employment Agreements.* .......................................................46

ARTICLE XI.CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ............47

11.1.     *Conditions Precedent to Confirmation.* ...................................47

11.2.     *Conditions Precedent to the Effective Date.* ............................47

11.3.     *Waiver of Conditions Precedent and Bankruptcy Rule 3020(e) Automatic Stay.* ................................................................48

11.4.     *Effect of Failure of Conditions.* .............................................48

ARTICLE XII.EFFECT OF CONFIRMATION ....................................................................49

    12.1.    *Binding Effect.* ...................................................................................49

    12.2.    *Vesting of Assets.* ...............................................................................49

    12.3.    *Discharge of Claims Against and Interests in the Debtors.* ............................49

    12.4.    *Term of Pre-Confirmation Injunctions or Stays.* ........................................50

    12.5.    *Injunction Against Interference With Plan.* ...............................................50

    12.6.    *Injunction.* .......................................................................................50

    12.7.    *Releases.* ..........................................................................................51

    12.8.    *Exculpation and Limitation of Liability.* ..................................................53

    12.9.    *Injunction Related to Releases and Exculpation.* ........................................53

    12.10.   *Termination of Subordination Rights and Settlement of Related Claims.* ......53

    12.11.   *Retention of Causes of Action/Reservation of Rights.* ................................54

    12.12.   *Indemnification Obligations; Insured Current Director & Officer Claims.* ...54

    12.13.   *Securities Litigations; Document Retention.* .............................................55

ARTICLE XIII.RETENTION OF JURISDICTION ....................................................56

ARTICLE XIV.MISCELLANEOUS PROVISIONS...................................................57

    14.1.    *Exemption from Certain Transfer Taxes.* .................................................57

    14.2.    *Retiree Benefits.* ................................................................................58

    14.3.    *Dissolution of Creditors' Committee.* .....................................................58

    14.4.    *Termination of Professionals.* ...............................................................58

    14.5.    *Amendments.* .....................................................................................58

    14.6.    *Revocation or Withdrawal of this Plan.* ...................................................59

    14.7.    *Allocation of Plan Distributions Between Principal and Interest.*...................59

    14.8.    *Severability.* ......................................................................................59

    14.9.    *Governing Law.* ..................................................................................60

    14.10.   *Section 1125(e) of the Bankruptcy Code.* .................................................60

    14.11.   *Inconsistency.* ....................................................................................60

    14.12.   *Time.* ...............................................................................................60

    14.13.   *Exhibits.* ...........................................................................................61

    14.14.   *Notices.* ............................................................................................61

    14.15.   *Filing of Additional Documents.* ............................................................61

    14.16.   *Reservation of Rights.* .........................................................................61

## INTRODUCTION[2]

K-V Discovery Solutions, Inc. and the other debtors and debtors in possession in the above-captioned cases propose the following sixth amended joint chapter 11 plan of reorganization for the resolution of the Claims against and Interests in the Debtors.

Reference is made to the Disclosure Statement accompanying this Plan, including the exhibits and supplements thereto, for a discussion of the Debtors' history, business, properties and operations, projections for those operations, risk factors, a summary and analysis of this Plan, and certain related matters including, among other things, certain tax matters, and the securities and other consideration to be issued and/or distributed under this Plan.  Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127, Fed. R. Bankr. P. 3019 and Sections 14.5 and 14.6 of this Plan, the Debtors, reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation.

The only Persons that are entitled to vote on this Plan are the holders of Senior Secured Notes Claims, ETHEX Criminal Fine Claims, Qui Tam Claims, Convertible Subordinated Notes Claims, and General Unsecured Claims. Such Persons are encouraged to read the Plan and the Disclosure Statement and their respective exhibits and schedules in their entirety before voting to accept or reject the Plan.  No materials other than the Disclosure Statement, the respective schedules, notices and exhibits attached thereto and referenced therein, and the letter from the Creditors' Committee in support of the Plan, have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

### A.    Definitions.

The following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural):

**1.1.    *2011 Securities Litigation*** means that certain securities class action litigation currently styled *In re K-V Pharmaceutical Company Securities Litigation*, No. 11CV01816 AGF, pending in the United States District Court for the Eastern District of Missouri, Eastern Division, including the Consolidated Amended Class Action Complaint For Violations Of Federal Securities Laws filed therein and any amendments thereto, and all cases consolidated thereunder, and including any appeals in connection therewith.

**1.2.    *503(b)(9) Claims*** means Claims that have been timely and properly filed prior to the Bar Date and that are granted administrative expense priority treatment pursuant to section 503(b)(9) of the Bankruptcy Code.

---

[2]    All capitalized terms used but not defined herein have the meanings set forth in Article I herein.

**1.3.**    *Accredited Investor* means an "accredited investor" as defined in Rule 501(a) promulgated under Regulation D under the Securities Act.

**1.4.**    *Ad Hoc Senior Secured Noteholders Group* means that certain ad hoc group of certain holders of Senior Secured Notes for which a Bankruptcy Rule 2019 statement was filed by Weil, Gotshal & Manges LLP.

**1.5.**    *Ad Hoc Senior Secured Noteholders Group Advisors* means Weil, Gotshal & Manges LLP, as counsel to the Ad Hoc Senior Secured Noteholders Group, Houlihan Lokey Capital, Inc., as financial advisor to the Ad Hoc Senior Secured Noteholders Group and Fortgang Consulting LLC, as advisor to the Ad Hoc Senior Secured Noteholders Group.

**1.6.**    *Administrative Bar Date* has the meaning set forth in Section 3.2(a) of this Plan.

**1.7.**    *Administrative Expense Claim* means (a) any right to payment constituting a cost or expense of administration of the Reorganization Cases of the kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code (other than a Fee Claim or U.S. Trustee Fees) for the period from the Petition Date to the Effective Date, including, without limitation: (i) any actual and necessary costs and expenses of preserving the Estates, any actual and necessary costs and expenses of operating the Debtors' business, and any indebtedness or obligations incurred or assumed by the Debtors during the Reorganization Cases; (ii) 503(b)(9) Claims; (iii) any payment to be made under this Plan to cure a default on an assumed executory contract or unexpired lease; (iv) the Senior Secured Notes Indenture Trustee Claim; (v) the Convertible Subordinated Notes Indenture Trustee Claim; and (vi) the Cash Collateral Expense Claims, and (b) any Claim that arose prior to the Petition Date that the Debtors are authorized to satisfy in the ordinary course of business pursuant to, and in accordance with, that certain *Amended Order Authorizing Debtors to (I) Honor Certain Prepetition Obligations to Customers and to Continue Customer Programs, and (II) Pay Medicaid and Other Insurance Rebate Obligations* [*Docket No. 338*], including, without limitation, Claims relating to Medicaid rebates.

**1.8.**    *Allowed Claim* or Allowed [_____] Claim (with respect to a specific type of Claim, if specified) means: (a) any Claim (or a portion thereof) as to which no action to dispute, deny, equitably subordinate or otherwise limit recovery with respect thereto, or alter priority thereof, has been sought within the applicable period of limitation fixed by this Plan or applicable law, except to the extent the Debtors or Reorganized Debtors, as the case may be, object to the enforcement of such Claim or, if an action to dispute, deny, equitably subordinate or otherwise limit recovery with respect thereto, or alter priority thereof, has been sought, to the extent such Claim has been allowed (whether in whole or in part) by a Final Order of a court of competent jurisdiction with respect to the subject matter; or (b) any Claim or portion thereof that is allowed (i) in any contract, instrument, or other agreement entered into in connection with the Plan, (ii) pursuant to the terms of the Plan, (iii) by Final Order of the Bankruptcy Court, or (iv) with respect to an Administrative Expense Claim only (x) that was incurred by a Debtor in the ordinary course of business during the Reorganization Cases to the extent due and owing without defense, offset, recoupment or counterclaim of any kind, and (y) that is not otherwise disputed.

**1.9.**  ***Amended By-Laws*** means the amended and restated by-laws for the applicable Reorganized Debtor, on terms and conditions acceptable to the Debtors and the Investor Parties, substantially final forms of which will be contained in the Plan Supplement.

**1.10.**  ***Amended Certificates of Incorporation*** means the amended and restated certificates of incorporation (or articles of incorporation, as applicable) for the applicable Reorganized Debtor, on terms and conditions acceptable to the Investor Parties, substantially final forms of which will be contained in the Plan Supplement.

**1.11.**  ***Assets*** means all of the right, title and interest of the Debtors in and to property of whatever type or nature (real, personal, mixed, intellectual, tangible or intangible).

**1.12.**  ***Ballot*** means the form approved by the Bankruptcy Court and distributed to holders of impaired Claims entitled to vote on the Plan on which is to be indicated the acceptance or rejection of the Plan.

**1.13.**  ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Reorganization Cases.

**1.14.**  ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York, or any other court exercising competent jurisdiction over the Reorganization Cases or any proceeding therein.

**1.15.**  ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Reorganization Cases, and any Local Rules of the Bankruptcy Court.

**1.16.**  ***Bar Date*** means any deadline for filing proofs of Claim, including, without limitation, Claims arising prior to the Petition Date (including 503(b)(9) Claims) and Administrative Expense Claims, as established by an order of the Bankruptcy Court or under the Plan.

**1.17.**  ***Bastogne*** means Bastogne Capital Management, LLC.

**1.18.**  ***Business Day*** means any day other than a Saturday, Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

**1.19.**  ***Cash*** means the legal currency of the United States and equivalents thereof.

**1.20.**  ***Cash Collateral Expense Claims*** means all amounts owing to the holders of Senior Secured Notes, the Ad Hoc Senior Secured Noteholders Group, and the Senior Secured Notes Indenture Trustee in respect of any fee or expense obligation (including the fees and expenses of their counsel and other advisors) incurred through the Effective Date of this Plan pursuant to (i) that certain *Agreed Interim Order (1) Authorizing Use of Cash Collateral and Providing for Adequate Protection, (2) Granting Liens and Providing Superpriority Administrative Expense Status, (3) Modifying the Automatic Stay and (4) Scheduling a Final Hearing, Pursuant to Sections 105, 361, 362, and 363 of the Bankruptcy Code* [Docket No. 45];

(ii) that certain *Final Order (1) Authorizing Use of Cash Collateral and Providing for Adequate Protection, (2) Granting Liens and Providing Superpriority Administrative Expense Status, and (3) Modifying the Automatic Stay Pursuant to Sections 105, 361, 362, and 363 of the Bankruptcy Code* [Docket No. 144]; or (iii) the Final DIP Order.

**1.21.**    ***Causes of Action*** means any and all actions, causes of action (including avoidance actions), suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and Claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise.

**1.22.**    ***Claim*** means any "claim" against any Debtor as defined in section 101(5) of the Bankruptcy Code, including, without limitation, any Claim arising after the Petition Date.

**1.23.**    ***Claims Agent*** means Epiq Bankruptcy Solutions, LLC, or any other entity approved by the Bankruptcy Court to act as the Debtors' claims and noticing agent pursuant to 28 U.S.C. §156(c).

**1.24.**    ***Class*** means each category of Claims or Interests established under Article IV of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**1.25.**    ***Collateral*** means any property or interest in property of the estates of the Debtors subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

**1.26.**    ***Commitment Fee Shares*** means 5% (781,250 shares) of New Common Stock to be issued to and allocated among the Investor Parties as compensation for their undertakings in the Stock Purchase Agreement (or to Silver Point pursuant to the Share Purchase Agreement), subject to dilution by the New Common Stock Securities to be issued pursuant to the Management Incentive Plan.

**1.27.**    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**1.28.**    ***Confirmation Hearing*** means a hearing to be held by the Bankruptcy Court regarding confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**1.29.**    ***Confirmation Order*** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and reasonably acceptable to the Debtors and the Investor Parties.

**1.30.**    ***Convertible Subordinated Notes*** mean the 2.5% Contingent Convertible Subordinated Notes due 2033, issued pursuant to the Convertible Subordinated Notes Indenture, in the original aggregate principal amount of $200,000,000.

**1.31.** *Convertible Subordinated Notes Claims* means all Claims (excluding Existing Securities Law Claims) against KV, as issuer, arising under the Convertible Subordinated Notes and the Convertible Subordinated Notes Indenture (and related documents).

**1.32.** *Convertible Subordinated Notes Equity Distribution* means 7% (1,093,750 shares) of New Common Stock to be issued by Reorganized KV on the Effective Date to holders of Allowed Convertible Subordinated Notes Claims pursuant to the Plan, subject to dilution by the New Common Stock Securities to be issued pursuant to the Management Incentive Plan.

**1.33.** *Convertible Subordinated Notes Indenture* means that certain indenture dated as of May 16, 2003 (as amended, modified or supplemented from time to time), between KV, as issuer, and the Convertible Subordinated Notes Indenture Trustee, related to the Convertible Subordinated Notes, including all agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith (in each case, as amended, modified or supplemented from time to time).

**1.34.** *Convertible Subordinated Notes Indenture Trustee* means Deutsche Bank Trust Company Americas, solely in its capacity as indenture trustee under the Convertible Subordinated Notes Indenture.

**1.35.** *Convertible Subordinated Notes Indenture Trustee Claim* means all Claims of the Convertible Subordinated Notes Indenture Trustee for reasonable and documented fees and expenses under the terms of the Convertible Subordinated Notes Indenture (including, but not limited to, the reasonable and documented fees, costs and expenses incurred by the Convertible Subordinated Notes Indenture Trustee's professionals).

**1.36.** *Creditors' Committee* means the statutory committee of unsecured creditors appointed in the Reorganization Cases in accordance with section 1102 of the Bankruptcy Code, as the same may be reconstituted from time to time.

**1.37.** *Cure Amount* has the meaning set forth in Section 10.3 of this Plan.

**1.38.** *Cure Dispute* has the meaning set forth in Section 10.3 of this Plan.

**1.39.** *Cure Schedule* has the meaning set forth in Section 10.3 of this Plan.

**1.40.** *Current D&O Indemnity Reserve* means Cash in the amount of $2,000,000 to be reserved by the Debtors or Reorganized Debtors, as the case may be, on the Effective Date, which reserve shall be used for the purpose of indemnifying, defending, reimbursing, exculpating, advancing fees and expenses to, or limiting the liability of directors or officers who were directors or officers of any of the Debtors at any time after the Petition Date, against any Causes of Action or Claims.

**1.41.** *Current Officer Employment Agreements* has the meaning set forth in Section 10.5 of this Plan.

**1.42.** *D&O Claim Committee* means that certain committee, the members of which shall be identified in a filing to be included in the Plan Supplement.

**1.43.**    *Debtor(s)* means, individually or collectively, as the context requires: KV; K-V Discovery Solutions, Inc.; DrugTech Corporation; FP1096, Inc.; K-V Generic Pharmaceuticals, Inc.; K-V Solutions USA, Inc.; Ther-Rx Corporation; and Zeratech Technologies USA, Inc.

**1.44.**    *DIP Agent* means Silver Point, solely in its capacity as administrative agent under the DIP Credit Agreement, and any of its successors or assigns.

**1.45.**    *DIP Claims* means all Claims held by the DIP Agent and/or the DIP Lenders arising under or pursuant to the DIP Credit Agreement, including, without limitation, Claims for all principal amounts outstanding, interest, fees, reasonable and documented expenses, costs and other charges of the DIP Agent and the DIP Lenders.

**1.46.**    *DIP Credit Agreement* means that certain senior secured debtor-in-possession term loan agreement, dated December 11, 2012, by and among KV, as borrower, certain of the subsidiaries of KV, as guarantors, the DIP Agent, and the DIP Lenders (as may be amended, modified or supplemented from time to time on the terms and conditions set forth therein), and including any and all documents and instruments executed in connection therewith.

**1.47.**    *DIP Lenders* means the lenders party to the DIP Credit Agreement from time to time.

**1.48.**    *DIP Loan* means the senior secured debtor-in-possession term loan by and among KV, as borrower, certain of the subsidiaries of KV, as guarantors, the DIP Agent, and the DIP Lenders, the terms of which are set forth in the DIP Credit Agreement.

**1.49.**    *Direct Purchase Shares* means 11.84% (1,850,000 shares) of New Common Stock to be directly purchased by the Investor Parties under the Plan (or by Silver Point pursuant to the Share Purchase Agreement), subject to dilution by the Management Incentive Plan.

**1.50.**    *Disallowed* means a finding of the Bankruptcy Court in a Final Order, or provision in the Plan providing, that a Disputed Claim shall not be an Allowed Claim.

**1.51.**    *Disbursing Agent* means the entity, which may be a Reorganized Debtor, designated by the Debtors or the Reorganized Debtors to distribute the Plan Consideration, the Direct Purchase Shares, the Commitment Fee Shares, the Rights Offering Stock, and New First Lien Term Loan.

**1.52.**    *Disclosure Statement* means the disclosure statement that relates to this Plan, as such disclosure statement may be amended, modified, or supplemented from time to time (including all exhibits and schedules annexed thereto or referred to therein).

**1.53.**    *Disclosure Statement Hearing* means a hearing held by the Bankruptcy Court to consider approval of the Disclosure Statement as containing adequate information as required by section 1125 of the Bankruptcy Code, as the same may be adjourned or continued from time to time.

**1.54.**    *Disputed Claim* means, as of any relevant date, any Claim, or any portion thereof: (a) that is not an Allowed Claim or Disallowed Claim as of the relevant date; or (b) for which a

proof of Claim or Interest has been timely filed with the Bankruptcy Court or a written request for payment has been made, to the extent the Debtors or any party in interest has interposed a timely objection or request for estimation, which objection or request for estimation has not been withdrawn or determined by a Final Order as of the relevant date.

**1.55.** ***Disputed Claims Reserves*** means, collectively, the Disputed General Unsecured Claims Reserve and the Disputed Priority Claims Reserve.

**1.56.** ***Disputed General Unsecured Claims Reserve*** has the meaning set forth in Section 9.3(c) of this Plan.

**1.57.** ***Disputed Priority Claims Reserve*** has the meaning set forth in Section 9.3(b) of this Plan.

**1.58.** ***Distribution Date*** means: (a) the Initial Distribution Date; (b) any Interim Distribution Date; or (c) the Final Distribution Date, as the context requires.

**1.59.** ***Distribution Record Date*** means, with respect to all Classes for which distributions are to be made under the Plan (other than Classes 3 and 6), the third Business Day after the Confirmation Date or such other later date as shall be established by the Bankruptcy Court in the Confirmation Order.

**1.60.** ***DTC*** means The Depository Trust Company.

**1.61.** ***Effective Date*** means the first Business Day on which all conditions to the Effective Date set forth in Section 11.2 hereof have been satisfied or waived, and no stay of the Confirmation Order is in effect.

**1.62.** ***Eligible Holder*** means any holder of an Allowed Convertible Subordinated Notes Claim as of the record date set forth in the Rights Offering Procedures who has timely and affirmatively certified in writing that such holder is an Accredited Investor in accordance with the Rights Offering Procedures. Notwithstanding the foregoing, each of the Investor Parties and Silver Point shall be deemed Accredited Investors for purposes of the Plan and the Rights Offering without any further action by such Investor Parties or Silver Point.

**1.63.** ***Equitably Subordinated Claim*** means: (a) subject to Section 7.16 hereof, any Hermelin Claim; or (b) any other Claim subject to subordination pursuant to section 510(c) of the Bankruptcy Code.

**1.64.** ***Estate*** means each estate created in the Reorganization Cases pursuant to section 541 of the Bankruptcy Code.

**1.65.** ***Estimation Order*** means an order or orders of the Bankruptcy Court estimating for voting and/or distribution purposes (under section 502(c) of the Bankruptcy Code) the allowed amount of any Claim. The defined term Estimation Order includes the Confirmation Order if the Confirmation Order grants the same relief that would have been granted in a separate Estimation Order.

**1.66.** ***ETHEX Criminal Fine Claims*** means all Claims against any Debtor arising from or relating to that certain action captioned *United States of America v. ETHEX Corporation*, No. 4:10-CR-00117 (ERW) (E.D. Mo.), including, without limitation, Claims relating to criminal fines or other amounts required to be paid pursuant to the March 2, 2010 judgment entered by the United States District Court for the Eastern District of Missouri in such action (as subsequently modified by order dated November 16, 2010).

**1.67.** ***ETHEX Criminal Fine Claims Distribution*** means Cash payments in an amount equal to $10,002,716.50.

**1.68.** ***ETHEX Criminal Fine Claims Payment Schedule*** means Cash payments to be made by Reorganized KV as follows: (i) on or as soon thereafter as is reasonably practicable following the Effective Date, $4,231,584.50, and (ii) twelve (12) quarterly payments of $480,927.50, which shall be paid on each of (a) December 13, 2013, (b) March 14, 2014, (c) June 13, 2014, (d) September 13, 2014, (e) December 15, 2014, (f) March 16, 2015, (g) June 15, 2015, (h) September 15, 2015, (i) December 15, 2015, (j) March 15, 2016, (k) June 15, 2016, and (l) September 15, 2016.

**1.69.** ***ETHEX Criminal Fine Settlement Order*** means an order of the Bankruptcy Court, if any, that, among other things, approves a settlement, in form and substance acceptable to the Debtors and acceptable in amount to the Investor Parties, among the applicable Debtors and the United States Attorney for the Eastern District of Missouri relating to the ETHEX Criminal Fine Claims.

**1.70.** ***Existing KV Interests*** means the Interests in KV outstanding prior to the Effective Date.

**1.71.** ***Existing Securities Law Claim*** means any Claim, whether or not the subject of an existing lawsuit: (a) arising from rescission of a purchase or sale of any securities of any Debtor or an affiliate of any Debtor; (b) for damages arising from the purchase or sale of any such security; (c) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred on account of the foregoing Claims; or (d) except as otherwise provided for in this Plan, including Section 12.12 hereof, for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim.

**1.72.** ***Farallon*** means, collectively, Farallon Capital Partners, LP, Farallon Capital Institutional Partners, LP, Farallon Capital Institutional Partners II, LP, Farallon Capital Offshore Investors II, LP, Farallon Capital (AM) Investors, LP, Farallon Capital Institutional Partners III, LP, and Noonday Offshore, Inc.

**1.73.** ***Fee Claim*** means a Claim by a Professional Person for compensation, indemnification or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103(a) of the Bankruptcy Code in connection with the Reorganization Cases, including, without limitation, in connection with final fee applications of such Professional Persons.

-8-

**1.74.    *Final Distribution Date*** means the first Business Day that is 20 Business Days after the date on which all Disputed Claims have been resolved by Final Order (or such earlier or later date as may be reasonably determined by the Reorganized Debtors).

**1.75.    *Final DIP Order*** means that certain Final Order (1) Authorizing Postpetition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Priority, (3) Authorizing Use of Cash Collateral and Providing for Adequate Protection, and (4) Modifying the Automatic Stay, Pursuant to Sections 105, 361, 362, 363, 364 and 507(b) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014 [Docket No. 497], as amended, modified or supplemented by the Bankruptcy Court from time to time.

**1.76.    *Final Order*** means an order, ruling or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Reorganization Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court) that: (a) is in full force and effect; (b) is not stayed; and (c) is no longer subject to review, reversal, modification or amendment, by appeal or writ of certiorari; provided, however, that the possibility that a motion under Rule 50 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Civil Procedure or Bankruptcy Rules, may be filed relating to such order, ruling or judgment shall not cause such order, ruling or judgment not to be a Final Order.

**1.77.    *General Unsecured Claim*** means any Claim other than: (a) a Secured Claim, including DIP Claims, Other Secured Claims, and Senior Secured Notes Claims; (b) an Administrative Expense Claim; (c) a Fee Claim; (d) a Priority Tax Claim; (e) a Priority Non-Tax Claim; (f) a Qui Tam Claim; (g) an ETHEX Criminal Fine Claim; (h) a Convertible Subordinated Notes Claim; (i) an Intercompany Claim; (j) an Existing Securities Law Claim; (k) an Equitably Subordinated Claim; and (l) U.S. Trustee Fees, and shall not include Claims that are Disallowed or released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of this Plan or otherwise.

**1.78.    *General Unsecured Claims Distribution*** means Cash in an amount equal to $10,250,000.

**1.79.    *Hermelin Claims*** mean all Claims against any Debtor asserted by or on behalf of Marc S. Hermelin, including, without limitation, the Hermelin Indemnification Claims and all other Claims asserted in the proof of claim assigned Claim No. 151 by the Claims Agent.

**1.80.    *Hermelin Indemnification Claims*** mean all Claims against any Debtor asserted by or on behalf of Marc S. Hermelin relating to alleged indemnification obligations of any such Debtor in favor of Marc S. Hermelin, including, without limitation, claims asserted pursuant to that certain Indemnification Agreement, dated as of October 29, 2008, by and between Marc S. Hermelin and KV (as may have been amended, modified and/or supplemented).

**1.81.    *Hoak*** means Hoak & Co.

**1.82.    *Initial Distribution Date*** means the Effective Date or as soon thereafter as is practicable.

**1.83.** *Intercompany Claim* means any Claim (including an Administrative Expense Claim), Cause of Action, or remedy asserted by a Debtor against another Debtor.

**1.84.** *Intercompany Interest* means any Interest held by a Debtor in another Debtor.

**1.85.** *Interest* means the interest (whether legal, equitable, contractual or other rights) of any holders of any class of equity securities of any of the Debtors represented by shares of common or preferred stock or other instruments evidencing an ownership interest in any of the Debtors, whether or not certificated, transferable, voting or denominated "stock" or a similar security, and any Claim or Cause of Action related to or arising from the foregoing, or any option, warrant or right, contractual or otherwise, to acquire any such interest.

**1.86.** *Interim Distribution Date* means any date, other than the Final Distribution Date, after the Initial Distribution Date on which the Reorganized Debtors determine, that an interim distribution should be made to holders of Allowed Claims in light of, inter alia, resolutions of Disputed Claims and the administrative costs of such a distribution.

**1.87.** *Investor Parties* means those certain parties, Capital Ventures International, Greywolf Capital Overseas Master Fund, Greywolf Capital Partners II L.P., Greywolf Opportunities Fund L.L.C., Kingdon Associates, Kingdon Credit Master Fund L.P., Kingdon Family Partnership, L.P., M. Kingdon Offshore Master Fund L.P., and Deutsche Bank Securities, Inc. (solely with respect to the Distressed Products Group), who are signatories to the Stock Purchase Agreement.

**1.88.** *Key Employees* means Gregory Divis, in his capacity as Chief Executive Officer and President of the Debtors, Thomas McHugh, in his capacity as Chief Financial Officer, Treasurer and Vice President of the Debtors, and Patrick Christmas, in his capacity as General Counsel, Secretary and Vice President of the Debtors.

**1.89.** *Kingdon* means Kingdon Capital Management, LLC and/or any of its affiliates.

**1.90.** *KV* means K-V Pharmaceutical Company, one of the Debtors.

**1.91.** *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.92.** *Management Incentive Plan* means the management equity incentive plan (equivalent to up to 10% of New Common Stock) upon the Effective Date, on a fully diluted basis, to be established for certain members of management of the Reorganized Debtors on the Effective Date and shall be on terms reasonably acceptable to the Debtors and the Investor Parties. A copy of the Management Incentive Plan shall be contained in the Plan Supplement.

**1.93.** *Medicaid Participating States* has the meaning given to it in the Prepetition Qui Tam Settlement Agreement.

**1.94.** *New Common Stock* means, collectively, up to 15,625,000 shares of common stock of Reorganized KV, par value $0.01, to be issued by Reorganized KV in connection with the implementation of, and as authorized by, this Plan.

**1.95.**    ***New Common Stock Securities*** means, collectively, New Common Stock and options, warrants, or other securities convertible into New Common Stock, to be issued by Reorganized KV in connection with the implementation of, and as authorized by, this Plan.

**1.96.**    ***New Stockholders Agreement*** means the stockholders agreement, to be dated as of the Effective Date, among Reorganized KV and each of the Persons receiving New Common Stock Securities under the Plan, including through the Rights Offering, which shall be in form and substance acceptable to the Debtors and the Investor Parties, and a substantially final form of which will be contained in the Plan Supplement.

**1.97.**    ***New First Lien Agent*** means the administrative agent under the New First Lien Term Loan Agreement, and any of its successors or assigns.

**1.98.**    ***New First Lien Lenders*** means the lenders party to the New First Lien Term Loan Agreement.

**1.99.**    ***New First Lien Term Loan*** means the first lien term loan facility, the terms of which shall be set forth in the New First Lien Term Loan Agreement, which (a) shall be in the original principal amount of $100,000,000 or such other amount as agreed to by the Debtors and the Investor Parties as set forth in the Stock Purchase Agreement, (b) be funded by the New First Lien Lenders on the Effective Date, and (c) be otherwise on terms reasonably acceptable to the Debtors and the Investor Parties as set forth in the Stock Purchase Agreement.

**1.100.**    ***New First Lien Term Loan Agreement*** means that certain first lien term loan agreement, by and among Reorganized KV, as borrower, those entities identified as "guarantors" in the New First Lien Term Loan Agreement, the New First Lien Agent, and the New First Lien Lenders (as may be amended, modified or supplemented from time to time on the terms and conditions set forth therein), to be dated as of the Effective Date, the principal terms of which shall be contained in the Plan Supplement (which such terms shall not be amended in a manner that is materially adverse to Silver Point unless Silver Point consents to such amendment in writing prior thereto), and including any and all documents and instruments executed in connection therewith, each of which shall be on terms and in form and substance reasonably satisfactory to the Debtors and the Investor Parties as set forth in the Stock Purchase Agreement.

**1.101.**    ***Other Secured Claim*** means any Secured Claim against a Debtor other than (a) DIP Claims or (b) Senior Secured Notes Claims.

**1.102.**    ***Participating Ad Hoc Group*** means, collectively, (i) Scoggin, (ii) Farallon, (iii) Silverback, (iv) Bastogne, and (v) Hoak.

**1.103.**    ***Person*** means any individual, corporation, partnership, association, indenture trustee, limited liability company, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, Interest holder, or any other entity or organization of whatever nature.

**1.104.**    ***Petition Date*** means August 4, 2012, the date on which the Debtors commenced the Reorganization Cases.

**1.105.** *Plan* means this sixth amended joint chapter 11 plan proposed by the Debtors, including, without limitation, all applicable exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time with the consent of the Investor Parties as set forth herein, and in accordance with the provisions of the Bankruptcy Code and Bankruptcy Rules and the terms hereof or thereof.

**1.106.** *Plan Consideration* means, with respect to any Class of Claims entitled to a distribution under this Plan, Cash, and/or New Common Stock, as the context requires.

**1.107.** *Plan Distribution* means the payment or distribution under the Plan of the Plan Consideration.

**1.108.** *Plan Documents* means the documents, other than the Plan, to be executed, delivered, assumed, and/or performed in connection with the consummation of the Plan, including, without limitation, the documents to be included in the Plan Supplement, the Stock Purchase Agreement, the New First Lien Term Loan Agreement, the New Stockholders Agreement, the Amended Certificates of Incorporation of the applicable Reorganized Debtors, the Amended By-laws of the applicable Reorganized Debtors, the Management Incentive Plan, the Schedule of Assumed Contracts and Leases, the notice of the D&O Claim Committee composition and any and all exhibits to the Plan and the Disclosure Statement; provided, that, subject to Section 14.9 hereof, all Plan Documents shall be in form and substance reasonably acceptable to the Investor Parties and the Debtors.

**1.109.** *Plan Supplement* means the supplemental appendix to this Plan, to be filed no later than ten (10) calendar days prior to the deadline for Ballots to be received in connection with voting to accept or reject the Plan, which will contain, among other things, draft forms, signed copies, or summaries of material terms, as the case may be, of the Plan Documents.

**1.110.** *Post-Emergence Bonuses* mean the bonuses to be paid by Reorganized KV to the Key Employees pursuant to the Post-Emergence Bonus Plan.

**1.111.** *Post-Emergence Bonus Plan* means the bonus plan to provide for payment of bonuses to the Key Employees.  A copy of the Post-Emergence Bonus Plan, which may be included as part of the Management Incentive Plan, shall be contained in the Plan Supplement.

**1.112.** *Postpetition Accreted OID Amount* means, in the event that the Bankruptcy Court determines that a Postpetition Interest Amount is due and owing, $4,694.02 per diem from the Petition Date through the date the Bankruptcy Court determines the Postpetition Interest Amount will have accrued; for the avoidance of doubt, the foregoing per diem amount is a fixed per diem amount and shall not be subject to increase or reduction.

**1.113.** *Postpetition Interest Amount* means the amount (if any) of interest due and owing from and after the Petition Date to the Senior Secured Notes Indenture Trustee or any holder of the Senior Secured Notes under the Senior Secured Notes Indenture, as determined by the Bankruptcy Court at or prior to the Confirmation Hearing to be due and payable pursuant to the subordination provisions of the Convertible Subordinated Notes Indenture, provided, that such amount, if any, shall be paid solely in Cash by the Debtors pursuant to the terms set forth in this Plan.

**1.114.** *Potential Recharacterization Amount* means an amount equal to all payments made at any time through the Effective Date (a) made to or on account of or for the benefit of the Senior Secured Notes Indenture Trustee, the collateral agent under the Senior Secured Notes Indenture, the Ad Hoc Senior Secured Noteholders Group and/or any holders of the Senior Secured Notes as adequate protection pursuant to the Final DIP Order or otherwise, and (b) for reimbursement of fees and expenses made by KV to the DIP Agent, the DIP Lenders, the Senior Secured Notes Indenture Trustee, the collateral agent under the Senior Secured Notes Indenture, the Ad Hoc Senior Secured Noteholders Group and/or any holders of the Senior Secured Notes.

**1.115.** *PPFG Securities Litigation* means the consolidated federal securities class action litigation styled *Public Pension Fund Group v. KV Pharmaceutical Company, et al.*, Case No. 08cv01859 (CEJ), pending in the United States District Court for the Eastern District of Missouri, and filed on behalf of the purchasers of publicly traded securities of K-V Pharmaceutical Company between June 15, 2004 and January 23, 2009.

**1.116.** *Prepetition Qui Tam Settlement Agreement* means that certain Settlement Agreement, entered into in or around December 2011, by and among the United States of America, acting through the United States Department of Justice and the Untied States Attorney's Office for the District of Massachusetts, and on behalf of the Office of Inspector General of the Department of Health and Human Services and the TRICARE Management Activity; KV; and Constance Conrad.

**1.117.** *Priority Non-Tax Claim* means any Claim, other than an Administrative Expense Claim, a Fee Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

**1.118.** *Priority Tax Claim* means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.119.** *Professional Person(s)* means all Persons retained by order of the Bankruptcy Court in connection with the Reorganization Cases, pursuant to sections 327, 328, 330 or 1103 of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to order of the Bankruptcy Court.

**1.120.** *Pro Rata Share* means with respect to any distribution on account of an Allowed Claim, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in its Class.

**1.121.** *PSA* means that certain Plan Support Agreement dated June 6, 2013, by and among the Investors and (i) the Participating Ad Hoc Group, (ii) Varana, and (ii) Telemetry.

**1.122.** *Qui Tam Claims* means all Claims against any Debtor arising from or relating to that certain action captioned *United States ex rel. Constance Conrad v. Abbott Laboratories, Inc. et al.,* No. 02-CV-11738-NG (D. Mass) settled pursuant to the Prepetition Qui Tam Settlement Agreement (including, all other settlement agreements between KV and each Medicaid Participating States arising from or relating to the Settlement Agreement referred to in Section 1.116), and shall not include Claims where a timely and properly filed proof of claim was not

filed; <u>provided</u> that, the Claim of Constance Conrad for fees and costs as set forth in paragraph 4 of the Prepetition Qui Tam Settlement Agreement shall be treated as a General Unsecured Claim.

**1.123.** ***Qui Tam Claims Distribution*** means Cash payments in an amount equal to $10,002,716.50.

**1.124.** ***Qui Tam Claims Payment Schedule*** means Cash payments to be made by Reorganized KV as follows: (i) on or as soon thereafter as is reasonably practicable following the Effective Date, $4,231,584.50, and (ii) twelve (12) quarterly payments of $480,927.50, which shall be paid on each of (a) December 13, 2013, (b) March 14, 2014, (c) June 13, 2014, (d) September 13, 2014, (e) December 15, 2014, (f) March 16, 2015, (g) June 15, 2015, (h) September 15, 2015, (i) December 15, 2015, (j) March 15, 2016, (k) June 15, 2016, and (l) September 15, 2016; provided that, in the case of (i) and (ii) each holder of an Allowed Qui Tam Claim shall receive a Pro Rata Share of the Qui Tam Claims Distribution in an amount that is proportionate to the payment schedule set forth on Exhibits A and B to the Prepetition Qui Tam Settlement Agreement (adjusted proportionately to account for any Medicaid Participating State that did not timely and properly file a proof of claim in the Reorganization Cases).

**1.125.** ***Qui Tam Settlement Order*** means one or more orders of the Bankruptcy Court, if any, that, among other things, approves one or more settlements, each in form and substance acceptable to the Debtors and acceptable in amount to the Investor Parties, relating to the Qui Tam Claims, among (i) the applicable Debtors, Constance Conrad and the United States Department of Justice, and/or (ii) the applicable Debtors and any applicable Medicaid Participating States.

**1.126.** ***Released Parties*** means, collectively: (a) the Debtors and their respective affiliates; (b) the DIP Agent; (c) the DIP Lenders; (d) holders of Senior Secured Notes Claims; (e) holders of Convertible Subordinated Notes Claims; (f) the Senior Secured Notes Indenture Trustee; (g) the Convertible Subordinated Notes Indenture Trustee; (h) each of the Investor Parties; (i) the Creditors' Committee and its current and former members, (j) the Ad Hoc Senior Secured Noteholders Group and its members; (k) the Participating Ad Hoc Group and its members (each of (a) through (k), solely in its capacity as such); (l) Silver Point (in all of its capacities with respect to this Plan); (m) Varana, (n) Telemetry and (o) each of the foregoing parties' current officers, affiliates, partners, directors, employees, agents, members, advisors and professionals (including any attorneys, consultants, financial advisors, investment bankers and other professionals retained by such Persons), together with their respective successors and assigns, each solely in its capacity as such; provided, however, that such attorneys and professional advisors shall only include those that provided services related to the Reorganization Cases and the transactions contemplated by the Plan; provided, further, that no Person shall be a Released Party if it objects to and/or opts out of the releases provided for in Article XII of the Plan.

**1.127.** ***Reorganization Cases*** means the jointly-administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and captioned *In re K-V Discovery Solutions, Inc., et al.*, No. 12-13346 (ALG) (Jointly Administered).

**1.128.** ***Reorganized Debtor*** means the applicable reorganized Debtor or any successors thereto by merger, consolidation or otherwise, on and after the Effective Date, after giving effect to the restructuring transactions occurring on the Effective Date in accordance with this Plan.

**1.129.** ***Reorganized KV*** means KV on and after the Effective Date.

**1.130.** ***Rights Exercise Price*** means the purchase price for each share of Rights Offering Stock, as set forth in the Rights Offering Procedures and approved by the Bankruptcy Court. The Rights Exercise Price for the Rights Offering Stock will be set at $20.00 per share of New Common Stock.

**1.131.** ***Rights Offering*** means the offering of Subscription Rights to purchase 11,900,000 shares of New Common Stock to be issued by Reorganized KV pursuant to the Plan, for an aggregate purchase price of the Rights Offering Amount.

**1.132.** ***Rights Offering Amount*** means up to $238 million.

**1.133.** ***Rights Offering Pro Rata Stock Amount*** means, with respect to each Eligible Holder, a number of shares of Rights Offering Stock equal to the ratio (expressed as a percentage) of (i) such Eligible Holder's Rights Participation Claim Amount to (ii) $200,000,000, multiplied by the total number of shares of Rights Offering Stock, with the product of the foregoing rounded down to the next whole number, subject to the agreement by each of the Investor Parties (other than Kingdon) pursuant to the Stock Purchase Agreement to purchase its proportion of the Unsubscribed Shares.

**1.134.** ***Rights Offering Procedures*** means the procedures governing the Rights Offering, which procedures are attached as an exhibit to the Disclosure Statement, and shall be reasonably acceptable to the Debtors and the Investor Parties.

**1.135.** ***Rights Offering Stock*** means the shares of the New Common Stock issued pursuant to the Rights Offering, including any Unsubscribed Shares acquired by any Investor Parties pursuant to the Stock Purchase Agreement (or by Silver Point pursuant to the Share Purchase Agreement). The Rights Offering Stock shall be subject to dilution from the New Common Stock Securities issued pursuant to the Management Incentive Plan.

**1.136.** ***Rights Participation Claim Amount*** means, in the case of a holder of a Convertible Subordinated Notes Claim who is an Eligible Holder, the principal amount of such holder's Convertible Subordinated Notes Claim.

**1.137.** ***Run Off D&O Policy*** has the meaning set forth in Section 7.5(c) of this Plan.

**1.138.** ***Schedule of Assumed Contracts and Leases*** means a schedule of the contracts and leases to be assumed pursuant to section 365 of the Bankruptcy Code and Section 10.1 hereof, which shall be filed by the Debtors (in consultation with the Investor Parties) at least five (5) calendar days prior to the deadline for Ballots to be received in connection with voting on the Plan, and which shall be reasonably acceptable to the Debtors and the Investor Parties, as such schedule may be amended from time to time on or before the Confirmation Date.

**1.139.**   *Schedules* has the meaning set forth in Section 9.3(b) of this Plan.

**1.140.**   *Scoggin* means, collectively, Scoggin Capital Management II LLC, Scoggin International Fund, Ltd., Scoggin Worldwide Fund, Ltd., and J. Goldman Master Fund, L.P.

**1.141.**   *Secured Claim* means a Claim, either as set forth in this Plan, as agreed to by the holder of such Claim and the Debtors or as determined by a Final Order in accordance with sections 506(a) and 1111(b) of the Bankruptcy Code: (a) that is secured by a valid, perfected and enforceable Lien on Collateral, to the extent of the value of the Claim holder's interest in such Collateral as of the Confirmation Date; or (b) to the extent that the holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

**1.142.**   *Securities Act* means the Securities Act of 1933, as amended.

**1.143.**   *Securities Litigation Documents* has the meaning set forth in Section 12.13(b) of this Plan.

**1.144.**   *Securities Litigations* means, collectively, the 2011 Securities Litigation and the PPFG Securities Litigation.

**1.145.**   *Senior Secured Notes* mean the 12% Senior Secured Notes due March 15, 2015 issued pursuant to the Senior Secured Notes Indenture, in the original aggregate principal amount of $225,000,000 with an original aggregate purchase amount of $218,250,000 paid by the original beneficial holders of the Senior Notes.

**1.146.**   *Senior Secured Notes Claims* means all Claims (including undersecured claims, if any, pursuant to section 506 of the Bankruptcy Code, but excluding Existing Securities Law Claims) against KV, as issuer, and each of the other Debtors, as guarantors, arising under the Senior Secured Notes and the Senior Secured Notes Indenture (and related documents); provided, however, that Senior Secured Notes Claims shall only include the amount of original issue discount that had accreted as of the Petition Date pursuant to the terms of the Senior Secured Notes Indenture.

**1.147.**   *Senior Secured Notes Indenture* means that certain indenture dated as of March 17, 2011 (as amended, modified or supplemented from time to time), between KV, as issuer, each of the other Debtors, as guarantors, and the Senior Secured Notes Indenture Trustee, related to the Senior Secured Notes, including all agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith (in each case, as amended, modified or supplemented from time to time).

**1.148.**   *Senior Secured Notes Indenture Trustee* means Wilmington Trust National Association as successor by merger to Wilmington Trust FSB, solely in its capacity as indenture trustee and collateral agent under the Senior Secured Notes Indenture.

**1.149.**   *Senior Secured Notes Indenture Trustee Claim* means all Claims of the Senior Secured Notes Indenture Trustee for reasonable and documented fees and expenses under the terms of the Senior Secured Notes Indenture (including, but not limited to, the reasonable and

documented fees, costs and expenses incurred by the Senior Secured Notes Indenture Trustee's professionals).

**1.150.** ***Share Purchase Agreement*** means that certain Share Purchase Agreement dated June 21, 2013, entered into by and among the Investors, Silver Point and KV.

**1.151.** ***Silverback*** means Silverback Asset Management, LLC.

**1.152.** ***Silver Point*** means Silver Point Finance, LLC or one or more of its affiliates.

**1.153.** ***SIR Claim*** means the unsatisfied portion of any self-insured retention or deductible as of the date an Allowed Claim is Allowed.

**1.154.** ***Stock Purchase Agreement*** means that certain Second Amended and Restated Stock Purchase and Backstop Agreement, dated June 6, 2013, by and among the Investor Parties and KV (as amended, modified and/or supplemented from time to time).

**1.155.** ***Subscription Rights*** means the non-transferable, non-certificated subscription rights of Eligible Holders that timely vote to accept the Plan to purchase shares of Rights Offering Stock in connection with the Rights Offering on the terms and subject to the conditions set forth in the Plan and the Rights Offering Procedures.

**1.156.** ***Subsidiary*** means any corporation, association or other business entity of which at least the majority of the securities or other ownership interest is owned or controlled by a Debtor and/or one or more subsidiaries of the Debtor.

**1.157.** ***Telemetry*** means Telemetry Securities LLC.

**1.158.** ***U.S. Trustee*** means the United States Trustee for the Southern District of New York.

**1.159.** ***U.S. Trustee Fees*** means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

**1.160.** ***Unfunded Backstop Obligation*** means any obligation of Silver Point to purchase Unsubscribed Shares that has not been performed on the Effective Date in accordance with the Share Purchase Agreement.

**1.161.** ***Unfunded Direct Purchase Obligation*** means any obligation of Silver Point or any Investor Party to purchase Direct Purchase Shares that has not been performed on the Effective Date in accordance with the Share Purchase Agreement or the Stock Purchase Agreement, as applicable.

**1.162.** ***Unsubscribed Shares*** means shares of Rights Offering Stock that are not timely, duly and validly subscribed and paid for by Eligible Holders that timely vote to accept the Plan in accordance with the Rights Offering Procedures.

**1.163.** ***Varana*** means Varana Capital Master, LP.

B.       **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein. Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. Except for the rules of construction contained in sections 102(5) of the Bankruptcy Code, which shall not apply, the rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. Any reference in this Plan to a contract, instrument, release, indenture, or other agreement or documents being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, and any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented. Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, releases, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules. The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns.

C.       *Appendices and Plan Documents.*

All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein. The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. Holders of Claims and Interests may inspect a copy of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or via the Claims Agent's website at http://dm.epiq11.com/KVD, or obtain a copy of the Plan Documents by a written request sent to the Claims Agent at the following address:

> Epiq Bankruptcy Solutions, LLC
> FDR Station
> P.O. Box 5014
> New York, NY 10150-5014
> (646) 282-2500

# ARTICLE II.

## RESOLUTION OF CERTAIN INTER-CREDITOR AND INTER-DEBTOR ISSUES

### 2.1.   *Settlement of Certain Inter-Creditor Issues.*

The treatment of Claims and Interests under this Plan represents, among other things, the settlement and compromise of certain potential inter-creditor disputes.

### 2.2.   *Formation of Debtor Groups for Convenience Purposes.*

The Plan groups the Debtors together solely for purposes of describing treatment under the Plan, confirmation of the Plan and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities. Notwithstanding the foregoing, the Debtors reserve the right to seek, with the consent of the Investor Parties, to substantively consolidate any two or more Debtors, provided that such substantive consolidation does not materially and adversely impact the amount of the distributions to any Person under the Plan.

### 2.3.   *Intercompany Claims.*

Notwithstanding anything to the contrary herein, on or after the Effective Date, any and all Intercompany Claims will be adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid, continued, or discharged to the extent reasonably determined appropriate by the Reorganized Debtors. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court or by the stockholders of any of the Reorganized Debtors.

# ARTICLE III.

## ADMINISTRATIVE EXPENSE CLAIMS,
## FEE CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS

The Plan constitutes a joint plan of reorganization for each of the Debtors.  All Claims and Interests, except Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, are placed in the Classes set forth in Article IV below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims of the Debtors have not been classified, and the holders thereof are not entitled to vote on this Plan.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

A Claim or Interest also is placed in a particular Class for all purposes, including voting, confirmation and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  However, a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

### 3.1.    *DIP Claims.*

Subject to adjustment pursuant to Section 7.12(c) and/or (d) hereof, in full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Effective Date, all Allowed DIP Claims shall be paid in full in Cash pursuant to Section 7.2 on the Effective Date.  Upon payment and satisfaction in full of all Allowed DIP Claims, all Liens and security interests granted to secure such obligations, whether in the Reorganization Cases or otherwise, shall be terminated and of no further force or effect.

### 3.2.    *Administrative Expense Claims.*

(a)    Time for Filing Administrative Expense Claims.

The holder of an Administrative Expense Claim, other than the holder of:

(i)    a DIP Claim;

(ii)    a Fee Claim;

(iii)    a 503(b)(9) Claim;

(iv)    an Administrative Expense Claim that has been Allowed on or before the Effective Date;

(v)    an Administrative Expense Claim for an expense or liability incurred and payable in the ordinary course of business by a Debtor;

(vi)    an Administrative Expense Claim on account of fees and expenses incurred on or after the Petition Date by ordinary course professionals retained by the Debtors pursuant to an order of the Bankruptcy Court;

(vii)    an Administrative Expense Claim held by a current officer, director or employee of the Debtors for indemnification, contribution, or advancement of expenses pursuant to: (A) any Debtor's certificate of incorporation, by-laws, or similar organizational document, or (B) any indemnification or contribution agreement approved by the Bankruptcy Court;

(viii)   an Administrative Expense Claim arising, in the ordinary course of business, out of the employment by one or more Debtors of an individual from and after the Petition Date, but only to the extent that such Administrative Expense Claim is solely for outstanding wages, commissions, accrued benefits, or reimbursement of business expenses;

(ix)   a Senior Secured Notes Indenture Trustee Claim;

(x)   a Convertible Subordinated Notes Indenture Trustee Claim; or

(xi)   a Cash Collateral Expense Claim

must file with the Bankruptcy Court and serve on the Debtors or Reorganized Debtors (as the case may be), the Claims Agent, and the Office of the United States Trustee, proof of such Administrative Expense Claim **within thirty (30) days after the Effective Date** (the "*Administrative Bar Date*"). Such proof of Administrative Expense Claim must include at a minimum: (i) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (ii) the name of the holder of the Administrative Expense Claim; (iii) the amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

(b)   Treatment of Administrative Expense Claims.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date an Administrative Expense Claim becomes an Allowed Claim, the holder of such Allowed Administrative Expense Claim shall receive from the applicable Reorganized Debtor Cash in an amount equal to such Allowed Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities.

In the case of the Senior Secured Notes Indenture Trustee Claim and the Convertible Subordinated Notes Indenture Trustee Claim, such Claims will be paid in the ordinary course of business (subject to the Debtors' prior receipt of invoices and reasonable documentation in connection therewith and without the requirement to file a fee application with the Bankruptcy Court, with copies to be provided to the Investor Parties) but no later than the Effective Date; provided, that such fees, costs and expenses are reimbursable under the terms of

the Senior Secured Notes Indenture and the Convertible Subordinated Notes Indenture, as applicable; and provided, further, that the Senior Secured Notes Indenture Trustee and the Convertible Subordinated Notes Indenture Trustee will receive payment in the ordinary course of business (subject to the Reorganized Debtors' prior receipt of invoices and reasonable documentation in connection therewith) for all reasonable fees, costs, and expenses incurred after the Effective Date in connection with the implementation of any provisions of this Plan (in each case, not to exceed $25,000).  In the event that the Debtors dispute all or a portion of the Senior Secured Notes Indenture Trustee Claim or the Convertible Subordinated Notes Indenture Trustee Claim, the Debtors shall pay the undisputed amount of such Senior Secured Notes Indenture Trustee Claim or Convertible Subordinated Notes Indenture Trustee Claim (as the case may be), and segregate the remaining portion of such Claim until such dispute is resolved by the parties or by the Bankruptcy Court.

In the case of the Cash Collateral Expense Claims, such Claims will be paid in full in Cash on the Effective Date to the extent such Claims have not already been paid in Cash in accordance with an order of the Court.  In the event that the Debtors dispute all or a portion of the Cash Collateral Expense Claims, the Debtors shall pay the undisputed amount of such Cash Collateral Expense Claims, and segregate the remaining portion of such Claims until such dispute is resolved by the parties or by the Bankruptcy Court.

**3.3.** *Fee Claims.*

(a)   Time for Filing Fee Claims.

Any Professional Person seeking allowance by the Bankruptcy Court of a Fee Claim shall file its respective final application for allowance of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date no later than forty-five (45) calendar days after the Effective Date. Objections to such Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty-five (65) calendar days after the Effective Date or such other date as established by the Bankruptcy Court.

(b)   Treatment of Fee Claims.

All Professional Persons seeking allowance by the Bankruptcy Court of a Fee Claim shall be paid in full in such amounts as are approved by the Bankruptcy Court: (i) upon the later of (x) the Effective Date, and (y) fourteen (14) calendar days after the date upon which the order relating to the allowance of any such Fee Claim is entered, or (ii) upon such other terms as may be mutually agreed upon between the holder of such Fee Claim and the Reorganized Debtors. On the Effective Date, to the extent known, the Reorganized Debtors shall reserve and hold in a segregated account Cash in an amount equal to the accrued but unpaid Fee Claims as of the Effective Date, which Cash shall be disbursed solely to the holders of Allowed Fee Claims with the remainder to be reserved until all Allowed Fee Claims have been paid in full or all remaining Fee Claims have been Disallowed by Final Order, at which time any remaining Cash in the segregated account shall become the sole and exclusive property of the Reorganized Debtors.

### 3.4. *U.S. Trustee Fees.*

The Debtors or Reorganized Debtors, as applicable, shall pay all outstanding U.S. Trustee Fees of a Debtor on an ongoing basis on the later of: (i) the Effective Date; and (ii) the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the applicable Reorganization Case, the applicable Reorganization Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

### 3.5. *Priority Tax Claims*.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive, in the Debtors' or Reorganized Debtors' discretion, either: (i) on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Claim, or (ii) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided, however, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due.

## ARTICLE IV.

## CLASSIFICATION OF CLAIMS AND INTERESTS

### 4.1. *Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors, and specifies which Classes are: (i) impaired or unimpaired by this Plan; (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code; and (iii) deemed to accept or reject this Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | No | No (Deemed to accept) |
| Class 2 | Other Secured Claims | No | No (Deemed to accept) |
| Class 3 | Senior Secured Notes Claims | Yes | Yes |
| Class 4 | ETHEX Criminal Fine Claims | Yes | Yes |
| Class 5 | Qui Tam Claims | Yes | Yes |
| Class 6 | Convertible Subordinated Notes Claims | Yes | Yes |

| Class 7 | General Unsecured Claims | Yes | Yes |
|---|---|---|---|
| Class 8(a) | Existing Securities Law Claims | Yes | No (Deemed to reject) |
| Class 8(b) | Equitably Subordinated Claims | Yes | No (Deemed to reject) |
| Class 9 | Existing KV Interests | Yes | No (Deemed to reject) |

**4.2.    *Unimpaired Classes of Claims.***

The following Classes of Claims are unimpaired and, therefore, deemed to have accepted this Plan and are not entitled to vote on this Plan under section 1126(f) of the Bankruptcy Code.

(a)    Class 1: Class 1 consists of all Priority Non-Tax Claims.

(b)    Class 2: Class 2 consists of all Other Secured Claims.

**4.3.    *Impaired Classes of Claims and Interests.***

(a)    The following Classes of Claims are impaired and entitled to vote on this Plan:

(i)    Class 3: Class 3 consists of all Senior Secured Notes Claims.

(ii)    Class 4: Class 4 consists of all ETHEX Criminal Fine Claims.

(iii)    Class 5: Class 5 consists of all Qui Tam Claims.

(iv)    Class 6: Class 6 consists of all Convertible Subordinated Notes Claims.

(v)    Class 7: Class 7 consists of all General Unsecured Claims.

(b)    The following Classes of Claims and Interests are impaired and deemed to have rejected this Plan and, therefore, are not entitled to vote on this Plan under section 1126(g) of the Bankruptcy Code:

(i)    Class 8(a): Class 8(a) consists of all Existing Securities Law Claims.

(ii)    Class 8(b): Class 8(b) consists of all Equitably Subordinated Claims.

(iii)    Class 9: Class 9 consists of all Existing KV Interests.

**4.4.**     *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on Collateral different than that securing any other Other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving Plan Distributions.

## ARTICLE V.

## TREATMENT OF CLAIMS AND INTERESTS

**5.1.**     *Priority Non-Tax Claims (Class 1).*

(a)     Treatment: The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by this Plan. Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment, on the later of the Effective Date and the first Distribution Date after the applicable Priority Non-Tax Claim becomes an Allowed Claim, or as soon after such date as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim shall receive Cash from the applicable Reorganized Debtor in an amount equal to such Allowed Claim.

(b)     Voting: The Priority Non-Tax Claims are not impaired Claims. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Priority Non-Tax Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

**5.2.**     *Other Secured Claims (Class 2).*

(a)     Treatment: The legal, equitable and contractual rights of the holders of Other Secured Claims are unaltered by this Plan. Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the first Distribution Date after the applicable Other Secured Claim becomes an Allowed Claim, or as soon after such date as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, at the election of the Reorganized Debtors: (i) Cash in an amount equal to such Allowed Claim; or (ii) such other treatment that will render the Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; provided, however, that Other Secured Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the applicable Debtor or Reorganized Debtor, without further notice to or order of the Bankruptcy Court. Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided herein. On the full payment or other satisfaction of such Claims in accordance with the Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(b)     Voting: The Other Secured Claims are not impaired Claims. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Other Secured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Allowed Other Secured Claims.

(c)     Deficiency Claims: To the extent that the value of the Collateral securing each Other Secured Claim is less than the Allowed amount of such Other Secured Claim, the undersecured portion of such Allowed Claim shall be treated for all purposes under this Plan as an Allowed General Unsecured Claim and shall be classified as a General Unsecured Claim.

**5.3.    *Senior Secured Notes Claims (Class 3).***

(a)     Allowance: On the Effective Date, the Senior Secured Notes Claims shall be deemed Allowed Claims in the amount of $231,409,850 and shall not be subject to reduction by the Potential Recharacterization Amount.

(b)     Treatment: On the Effective Date, or as soon as practicable thereafter, each holder of an Allowed Senior Secured Notes Claim shall receive, subject to the terms of this Plan (including, without limitation, Section 7.12 hereof) in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim (and in full satisfaction and discharge of any and all subordination provisions or agreements including the Senior Secured Notes Indenture and the Convertible Subordinated Notes Indenture), its Pro Rata Share of Cash in an aggregate amount equal to (i) the Allowed Senior Secured Notes Claims, (ii) the Postpetition Interest Amount, if any is determined to be owed to the holders of Allowed Senior Secured Notes Claims pursuant to Section 7.11 hereof; and (iii) the Postpetition Accreted OID Amount, if the Postpetition Interest Amount is determined to be owed to the holders of Allowed Senior Secured Notes Claims pursuant to Section 7.11 hereof.

(c)     Voting:  The Senior Secured Notes Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such Allowed Senior Secured Notes Claims.

**5.4.    *ETHEX Criminal Fine Claims (Class 4).***

(a)     Treatment: Except to the extent that the holder of the ETHEX Criminal Fine Claim agrees to different treatment pursuant to an ETHEX Criminal Fine Settlement Order or as otherwise determined by the Bankruptcy Court in connection with confirmation of this Plan that satisfies section 1129(b) of the Bankruptcy Code, such holder of an Allowed ETHEX Criminal Fine Claim shall receive, subject to the terms of this Plan and in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claims, the ETHEX Criminal Fine Claims Distribution, which shall be paid by Reorganized KV in accordance with the ETHEX Criminal Fine Claims Payment Schedule.

(b)     Voting:  The ETHEX Criminal Fine Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such ETHEX Criminal Fine Claims.

**5.5.** *Qui Tam Claims (Class 5)*

(a) <u>Treatment</u>: Except to the extent that a holder of a Qui Tam Claim agrees to different treatment pursuant to a Qui Tam Settlement Order or as otherwise determined by the Bankruptcy Court in connection with confirmation of this Plan that satisfies section 1129(b) of the Bankruptcy Code, such holder of an Allowed Qui Tam Claim shall receive, subject to the terms of this Plan and in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claims, the Qui Tam Claims Distribution, which shall be paid by Reorganized KV in accordance with the Qui Tam Claims Payment Schedule.

(b) <u>Voting</u>: The Qui Tam Claims are impaired Claims.  Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such Qui Tam Claims.

**5.6.** *Convertible Subordinated Notes Claims (Class 6).*

(a) <u>Allowance</u>: On the Effective Date, the Convertible Subordinated Notes Claims shall be deemed Allowed Claims in the amount of $201,114,164.

(b) <u>Treatment</u>: On the Effective Date, or as soon thereafter as reasonably practicable, each holder of an Allowed Convertible Subordinated Notes Claim shall receive, subject to the terms of the Plan and in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim (and not subject to turnover pursuant to any subordination provision or agreement, including, but not limited to, any such subordination provision set forth in the Convertible Subordinated Notes Indenture) its Pro Rata Share of the Convertible Notes Equity Distribution.

(c) <u>Voting</u>: The Convertible Subordinated Notes Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan, and the votes of such holders will be solicited with respect to such Allowed Convertible Subordinated Notes Claims.

**5.7.** *General Unsecured Claims (Class 7).*

(a) <u>Treatment</u>: Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the later of the Effective Date and the first Distribution Date after the applicable General Unsecured Claim becomes an Allowed Claim, or as soon after such date as is reasonably practicable, subject to section 7.14 hereof, if applicable, each holder of an Allowed General Unsecured Claim shall receive such holder's Pro Rata Share of the General Unsecured Claims Distribution; <u>provided</u>, in no event shall such distribution be in excess of 100% of the amount of its Allowed General Unsecured Claim.

(b) <u>Voting</u>:  The General Unsecured Claims are impaired Claims. Holders of such Claims are entitled to vote to accept or reject the Plan and the votes of such holders will be solicited with respect to such General Unsecured Claims.

**5.8.**   *Existing Securities Law Claims (Class 8(a)).*

(a)   Treatment: Subject to section 7.14 hereof, if applicable, holders of Existing Securities Law Claims shall not receive or retain any distribution under the Plan on account of such Existing Securities Law Claims.

(b)   Voting: The Existing Securities Law Claims are impaired Claims. In accordance with section 1126(g) of the Bankruptcy Code, the holders of Existing Securities Law Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Existing Securities Law Claims.

**5.9.**   *Equitably Subordinated Claims (Class 8(b)).*

(a)   Treatment: Subject to section 7.14 hereof, if applicable, holders of Equitably Subordinated Claims shall not receive or retain any distribution under the Plan on account of such Equitably Subordinated Claims.

(b)   Voting: The Equitably Subordinated Claims are impaired Claims. In accordance with section 1126(g) of the Bankruptcy Code, the holders of Equitably Subordinated Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Equitably Subordinated Claims.

**5.10.**   *Existing KV Interests (Class 9).*

(a)   Treatment:  Holders of Existing KV Interests shall not receive or retain any distribution under the Plan on account of such Existing KV Interests.

(b)   Voting:  The Existing KV Interests are impaired Interests.  In accordance with Section 1126(g) of the Bankruptcy Code, the holders of Existing KV Interests are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Existing KV Interests.

**ARTICLE VI.**

**ACCEPTANCE OR REJECTION OF
THE PLAN; EFFECT OF REJECTION BY ONE
OR MORE CLASSES OF CLAIMS OR INTERESTS**

**6.1.**   *Class Acceptance Requirement.*

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount of the Allowed Claims in such Class and more than one-half (1/2) in number of holders of such Claims that have voted on the Plan.

**6.2.    *Tabulation of Votes on a Non-Consolidated Basis.***

All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code.  Notwithstanding the foregoing, the Debtors reserve the right to seek to substantively consolidate any two or more Debtors, provided that, such substantive consolidation does not materially and adversely impact the amount of the distributions to any Person under the Plan.

**6.3.    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown."***

Because certain Classes are deemed to have rejected this Plan, the Debtors will request confirmation of this Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes.  Subject to Section 14.5 of the Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  Subject to Section 14.5 of the Plan, the Debtors also reserve the right to request confirmation of the Plan, as it may be modified, supplemented or amended from time to time, with respect to any Class that affirmatively votes to reject the Plan.

**6.4.    *Elimination of Vacant Classes.***

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**6.5.    *Voting Classes; Deemed Acceptance by Non-Voting Classes.***

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims or Interests in such Class.

**6.6.    *Confirmation of All Cases.***

Except as otherwise specified herein, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors; provided, however, that, with the consent of the Investor Parties, the Debtors may at any time waive this Section 6.6.

# ARTICLE VII.

# MEANS FOR IMPLEMENTATION

**7.1.**    *Continued Corporate Existence and Vesting of Assets in Reorganized Debtors.*

(a)    Except as otherwise provided in this Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Certificates of Incorporation and Amended By-Laws of the Reorganized Debtors, for the purposes of satisfying their obligations under the Plan and the continuation of their businesses. On or after the Effective Date, each Reorganized Debtor, in its sole and exclusive discretion, may take such action as permitted by applicable law and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, but not limited to, causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor, or its Subsidiary and/or affiliate; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's case on the Effective Date or any time thereafter.

(b)    Except as otherwise provided in this Plan, on and after the Effective Date, all property of the Estates of the Debtors, including all claims, rights and Causes of Action and any property acquired by the Debtors under or in connection with this Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances and Interests. Subject to Section 7.1(a) hereof, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

(c)    On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

7.2.    *Plan Funding.*

The Cash Distributions under this Plan shall be funded from: (a) the Debtors' Cash on hand as of the Effective Date; (b) the proceeds of the New First Lien Term Loan; (c) the proceeds of the Rights Offering; and the (d) the proceeds from the sale of the Direct Purchase Shares, including under the Share Purchase Agreement.

7.3.    *Cancellation of Existing Securities and Agreements.*

Except for the purpose of evidencing a right to distribution under this Plan, and except as otherwise set forth herein, on the Effective Date all agreements, instruments, and other documents evidencing any Claim or Interest, other than Intercompany Interests, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged and of no force or effect. Notwithstanding the foregoing, each of the Senior Secured Notes Indenture and Convertible Subordinated Notes Indenture shall continue in effect solely to the extent necessary to allow the Reorganized Debtors, the Senior Secured Notes Indenture Trustee and the Convertible Subordinated Notes Indenture Trustee to make distributions pursuant to this Plan on account of the Senior Secured Notes Claims and Convertible Subordinated Notes Claims, respectively, and to effectuate any charging liens permitted under the Senior Secured Notes Indenture and Convertible Subordinated Notes Indenture, respectively. The holders of or parties to such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan. Except as provided pursuant to this Plan, each of the Senior Secured Notes Indenture Trustee and the Convertible Subordinated Notes Indenture Trustee and their respective agents, successors and assigns shall be discharged of all of their obligations associated with the Senior Secured Notes and Convertible Subordinated Notes, respectively.

7.4.    *Cancellation of Certain Existing Security Interests.*

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors (as applicable) any Collateral or other property of either Debtor held by such holder, and any termination statements, instruments of satisfactions, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanic's liens, or lis pendens.

7.5.    *Officers and Boards of Directors.*

(a)    On the Effective Date, the initial board of directors of each of the Reorganized Debtors shall consist of those individuals identified in a filing to be made with the Bankruptcy Court on or before the date of the Confirmation Hearing.  The initial board of directors of Reorganized KV will consist of seven (7) members, comprised of the Chief Executive Officer of Reorganized KV and six (6) individuals to be designated by the Investor Parties pursuant to the New Stockholders Agreement.  On the Effective Date, the officers of each of the Reorganized Debtors shall be the officers that existed immediately prior to the occurrence

of the Effective Date. The compensation arrangement for any insider of the Debtors that shall become an officer of a Reorganized Debtor will be disclosed in the Plan Supplement to be filed with the Bankruptcy Court on or before the date of the Confirmation Hearing.

(b)    The members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such member will be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the directors of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

(c)    Prior to the Effective Date, the Debtors shall purchase a "run off" directors and officers liability policy, which shall (i) be effective as of the Effective Date, (ii) have a six-year coverage period, and (iii) be on terms acceptable to the Debtors and reasonably acceptable to the Investor Parties (the "**Run Off D&O Policy**").

(d)    On the Effective Date, the D&O Claim Committee shall be formed and shall be vested with exclusive authority to act, in its sole discretion, on behalf of the Reorganized Debtors with respect to (i) the administration, negotiation and/or settlement of any Claims asserted under any and all of the Debtors' directors and officers liability insurance policies that are based on pre-Effective Date acts, omissions, events or occurrences and (ii) the administration and distribution of funds from the Current D&O Indemnity Reserve.

### 7.6.    *Management.*

(a)    <u>Management Incentive Plan</u>.  On the Effective Date, the board of directors of Reorganized KV will be required to adopt the Management Incentive Plan.  The New Common Stock Securities issued pursuant to the Management Incentive Plan shall dilute all other New Common Stock to be issued pursuant to this Plan.

(b)    <u>Post-Emergence Bonus Plan</u>.  After the Effective Date, in accordance with the terms of the Post-Emergence Bonus Plan, Reorganized KV will be required to pay the Post-Emergence Bonuses to the Key Employees.

### 7.7.    *Corporate Action.*

(a)    The Reorganized Debtors shall serve on the United States Trustee quarterly reports of the disbursements made until such time as a final decree is entered closing the applicable Reorganization Case or the applicable Reorganization Case is converted or dismissed, or the Bankruptcy Court orders otherwise. Any deadline for filing Administrative Expense Claims shall not apply to fees payable pursuant to section 1930 of title 28 of the United States Code.

(b)    On the Effective Date, the Amended Certificates of Incorporation and Amended By-Laws, and any other applicable corporate organizational documents of each of the Reorganized Debtors shall be amended and restated and deemed authorized in all respects.

(c)      Any action under the Plan to be taken by or required of the Debtors or the Reorganized Debtors, including, without limitation, the adoption or amendment of certificates of incorporation and by-laws, the issuance of securities and instruments, the implementation of the Management Incentive Plan, or the selection of officers or directors, shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors' or Reorganized Debtors' boards of directors or managers, as applicable, or security holders.

(d)      The Debtors and the Reorganized Debtors, shall be authorized to execute, deliver, file, and record such documents (including the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further Bankruptcy Court, corporate, board or shareholder approval or action. In addition, the selection of the Persons who will serve as the initial directors, officers and managers of the Reorganized Debtors as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors, board of managers, or stockholders of the applicable Reorganized Debtor.

### 7.8.    *New Stockholders Agreement.*

On the Effective Date, Reorganized KV and all of the holders of New Common Stock of Reorganized KV then outstanding shall be deemed to be parties to the New Stockholders Agreement, substantially in the form contained in the Plan Supplement, without the need for execution by any such holder other than Reorganized KV. The New Stockholders Agreement shall be binding on all parties receiving, and all holders of, New Common Stock of Reorganized KV regardless of whether such parties execute the New Stockholders Agreement.

### 7.9.    *Authorization, Issuance and Delivery of New Common Stock.*

(a)      On the Effective Date, Reorganized KV is authorized to issue or cause to be issued the New Common Stock for distribution in accordance with the terms of this Plan and the Amended Certificate of Incorporation of Reorganized KV, without the need for any further corporate or shareholder action. Certificates, if any, of New Common Stock will bear a legend restricting the sale, transfer, assignment or other disposal of such shares, as more fully set forth in the Amended Certificate of Incorporation of Reorganized KV and the New Stockholders Agreement.

(b)      The New Common Stock shall not be registered under the Securities Act of 1933, as amended, and shall not be listed for public trading on any securities exchange, in each case, as of the Effective Date. Distribution of New Common Stock may be made by delivery of one or more certificates representing such shares as described herein, by means of book-entry registration on the books of the transfer agent for shares of New Common Stock or by means of book-entry exchange through the facilities of the DTC in accordance with the customary practices of the DTC, as and to the extent practicable, as provided in Section 8.4(b) hereof.

(c)      In the period pending distribution of the New Common Stock to any holder entitled pursuant to this Plan to receive New Common Stock, such holder shall be

bound by, have the benefit of, and be entitled to enforce the terms and conditions of the New Stockholders Agreement and shall be entitled to exercise any voting rights and receive any dividends or other distributions payable in respect of such holder's New Common Stock (including receiving any proceeds of permitted transfers of such New Common Stock) and to exercise all other rights in respect of the New Common Stock (so that such holder shall be deemed for tax purposes to be the owner of the New Common Stock).

### 7.10. *New First Lien Term Loan.*

On the Effective Date, without any requirement of further action by security holders or directors of the Debtors, each of the Reorganized Debtors shall be authorized to enter into the New First Lien Term Loan Agreement, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens on collateral securing the New First Lien Term Loan.

### 7.11. *Postpetition Interest Amount.*

To the extent the Bankruptcy Court determines any amounts are due and owing in respect of the Postpetition Interest Amount, the Debtors or Reorganized Debtors shall pay the Postpetition Interest Amount and the Postpetition Accreted OID Amount in full in Cash pursuant to Section 7.2 on the Effective Date; for the avoidance of doubt, notwithstanding any other provision set forth herein or any provision of the Convertible Subordinated Notes Indenture or the Senior Secured Notes Indenture, in the event that any Postpetition Interest Amount and Postpetition Accreted OID Amount are determined to be due and owing, such amounts shall not be payable from the Convertible Subordinated Notes Indenture Trustee or any holder of Convertible Subordinated Notes Claims.

### 7.12. *Rights Offering and Direct Purchase.*

(a)    Purpose.  The proceeds of the sale of the Rights Offering Stock and Direct Purchase Shares shall be used to provide up to $275 million in capital to the Reorganized Debtors, which shall be available to fund payments required under this Plan and for ordinary course operations and general corporate purposes of the Reorganized Debtors.

(b)    Rights Offering.  In accordance with the Rights Offering Procedures and the Stock Purchase Agreement, each Eligible Holder (including each Investor Party) that timely votes to accept the Plan shall receive Subscription Rights to acquire its respective Rights Offering Pro Rata Stock Amount of Rights Offering Stock pursuant to the terms set forth in this Plan and in the Rights Offering Procedures.  With respect to each Eligible Holder that timely votes to accept the Plan, each Subscription Right shall represent the right to acquire one share of Rights Offering Stock for the Rights Exercise Price.  The total number of shares of Rights Offering Stock to be issued in connection with the Rights Offering will be 11,900,000.

(c)    Direct Purchase.  On the Effective Date, the Debtors shall issue and sell to the Investor Parties and Silver Point, and the Investor Parties and Silver Point shall purchase, the Direct Purchase Shares, in each case in accordance with the terms and conditions set forth in the Stock Purchase Agreement or the Share Purchase Agreement, as applicable. Notwithstanding anything to the contrary contained herein, if Silver Point or any Investor Party fails to purchase

any Direct Purchase Shares (pursuant to the Stock Purchase Agreement or the Share Purchase Agreement, as applicable), the Debtors shall reduce distributions under this Plan to each such Party in respect of its Allowed DIP Claims, if any, in an amount equal to the aggregate amount of its Unfunded Direct Purchase Obligation.  Notwithstanding anything to the contrary contained herein, if the amount of Silver Point's Allowed DIP Claims related distributions is less than the aggregate amount of its Unfunded Direct Purchase Obligation, then, in accordance with the Share Purchase Agreement, the Debtors shall additionally reduce distributions under this Plan to Silver Point in respect of Silver Point's Allowed Senior Secured Notes Claims such that the aggregate amount so reduced equals the aggregate amount of the remaining Unfunded Direct Purchase Obligation.

(d)    Backstop Commitment.  (i) Pursuant to the Stock Purchase Agreement, each of the Investor Parties (other than Kingdon) shall be obligated, severally not jointly, and subject to the terms, conditions and limitations set forth in the Stock Purchase Agreement, to purchase its applicable portion of Unsubscribed Shares (as set forth in the Stock Purchase Agreement);  (ii) Pursuant to the Share Purchase Agreement, Silver Point shall be obligated, subject to the terms, conditions and limitations set forth in the Share Purchase Agreement, to purchase its applicable portion of Unsubscribed Shares (as set forth in the Share Purchase Agreement).  Notwithstanding anything to the contrary contained herein, if Silver Point should fail to purchase any of its portion of Unsubscribed Shares (pursuant to the Share Purchase Agreement), the Debtors shall reduce distributions under this Plan to Silver Point in respect of Silver Point's Allowed DIP Claims in an amount equal to the aggregate amount of the Unfunded Backstop Obligation.  Notwithstanding anything to the contrary contained herein, if the amount of such Allowed DIP Claims related distributions is less than the aggregate amount of the Unfunded Backstop Obligation, then the Debtors shall additionally reduce distributions under this Plan to Silver Point in respect of Silver Point's Allowed Senior Secured Notes Claims such that the aggregate amount so reduced equals the aggregate amount of the remaining Unfunded Backstop Obligation; and (iii) Pursuant to the PSA, each member of the Participating Ad Hoc Group shall be obligated, severally not jointly, and subject to the terms, conditions and limitations set forth in the PSA, to purchase its applicable portion of Unsubscribed Shares (as set forth in the PSA).

(e)    Commitment Fee.  In consideration for the obligations described in Sections 7.12(c) and (d) above, on the Effective Date, Reorganized KV shall issue to the Investor Parties, Silver Point and the members of the Participating Ad Hoc Group, as applicable, the Commitment Fee Shares (without payment of any additional consideration therefor) pursuant to the terms of the Stock Purchase Agreement, the Share Purchase Agreement or the PSA, as applicable.

**7.13.    *Intercompany Interests.***

No Intercompany Interests shall be cancelled pursuant to this Plan, and all Intercompany Interests shall continue in place following the Effective Date, solely for the purpose of maintaining the existing corporate structure of the Debtors and the Reorganized Debtors.

### 7.14.    *Insured Claims.*

Notwithstanding anything to the contrary contained herein (but subject to Section 12.12(b) hereof), to the extent the Debtors have insurance with respect to any Allowed General Unsecured Claim, Allowed Existing Securities Law Claim or Allowed Equitably Subordinated Claim, the holder of such Allowed Claim shall (i) have an Allowed Claim in its applicable Class for any SIR Claim, (ii) be paid any amount in excess of any SIR Claim from the proceeds of insurance to the extent that the Claim is insured, and (iii) to the extent not duplicative of (i), receive the treatment provided for in this Plan to the extent the applicable insurance policy does not provide coverage with respect to any portion of the Claim.

### 7.15.    *Comprehensive Settlement of Claims and Controversies.*

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under this Plan, the provisions of this Plan will constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to this Plan on account of any Allowed Claim or Allowed Interest. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (a) in the best interest of the Debtors, the Reorganized Debtors, and their respective Estates and property, and of holders of Claims or Interests; and (b) fair, equitable and reasonable.

### 7.16.    *Equitably Subordinated Claims.*

(a)    Upon entry of the Confirmation Order, any Equitably Subordinated Claims not previously equitably subordinated pursuant to a Final Order of the Bankruptcy Court and that are subject to an objection filed by the Debtors at least seven (7) days prior to the Voting Deadline shall be deemed equitably subordinated pursuant to section 510(c) of the Bankruptcy Code. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the date of such entry, of such equitable subordination.

(b)    To the extent the Hermelin Claims are determined by Final Order not to be properly classified as Class 8(b) Equitably Subordinated Claims, such Claims shall be classified as Class 7 General Unsecured Claims and Disallowed in full based on, among other things, the Debtors' allegations in that certain action captioned *K-V Pharmaceutical Company v. Hermelin*, Case No. 11SL-CC04054, pending in the Circuit Court of St. Louis County, State of Missouri; provided, that to the extent the Debtors have insurance coverage for the Hermelin Indemnification Claims, such Hermelin Indemnification Claims shall be satisfied from the proceeds of such insurance in accordance with Section 7.14 hereof.

(c)    To the extent the Hermelin Claims are determined by Final Order not to be (i) properly classified as Class 8(b) Equitably Subordinated Claims or (ii) Disallowed in full, then such Claims shall be Allowed as Class 7 General Unsecured Claims in an aggregate amount not to exceed $40,466.51, and receive the treatment provided under Section 5.7 hereof; provided, that notwithstanding the foregoing, to the extent the Debtors have insurance coverage for the

Hermelin Indemnification Claims, such Hermelin Indemnification Claims shall be satisfied from the proceeds of such insurance in accordance with Section 7.14 hereof.

## ARTICLE VIII.

## DISTRIBUTIONS

**8.1.** *Distributions.*

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims in accordance with the terms of this Plan. To the extent provided in the Senior Secured Notes Indenture and Convertible Subordinated Notes Indenture, as applicable, and permitted by applicable law, all Plan Distributions made by the Disbursing Agent to Class 3 (Senior Secured Notes Claims) and Class 6 (Convertible Subordinated Notes Claims) shall be subject to any charging liens in favor of the Senior Secured Notes Indenture Trustee and Convertible Subordinated Notes Indenture Trustee, respectively.

**8.2.** *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan, Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

**8.3.** *Date of Distributions.*

Unless otherwise provided herein, any distributions and deliveries to be made hereunder shall be made on the Effective Date or as soon thereafter as is practicable, provided that the Reorganized Debtors may utilize periodic distribution dates to the extent appropriate. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**8.4.** *Distribution Record Date.*

(a)    As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes (other than Classes 3 and 6), as maintained by the Debtors, or their agents, shall be deemed closed and there shall be no further changes in the record holders of any of the Claims after the Distribution Record Date. Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date. Additionally, with respect to payment of any Cure Amounts or any Cure Disputes in connection with the assumption and/or assignment of the Debtors' executory contracts and leases, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the underlying executory contract or lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Amount.

(b)     Notwithstanding the foregoing or anything herein to the contrary, in connection with any distribution under this Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), including to holders of Claims in Classes 3 and 6, the Debtors will be entitled to recognize and deal for all purposes under the Plan with such holders to the extent consistent with the customary practices of DTC used in connection with such distribution. With respect to the New Common Stock to be distributed to holders of Allowed Convertible Subordinated Notes Claims, all of the shares of the New Common Stock shall be issued in the name of such holder or its nominee(s) in accordance with DTC's book-entry exchange procedures, provided, that such shares of New Common Stock are permitted to be held through DTC's book-entry system; provided that to the extent the New Common Stock is not eligible for distribution in accordance with DTC's customary practices, Reorganized KV will take all such reasonable actions as may be required to cause distributions of New Common Stock to holders of Allowed Convertible Subordinated Notes Claims.

### 8.5.   *Disbursing Agent.*

All distributions under this Plan shall be made by the Reorganized Debtors or the Disbursing Agent on and after the Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by Reorganized Debtors. Furthermore, any such entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

### 8.6.   *Delivery of Distribution.*

Subject to Section 8.4(b) of the Plan, the Disbursing Agent will issue, or cause to be issued, and authenticate, as applicable, the applicable Plan Consideration, and subject to Bankruptcy Rule 9010, make all distributions or payments to any holder of an Allowed Claim as and when required by this Plan at: (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the applicable Disbursing Agent, including any addresses included on any filed proofs of Claim or transfers of Claim filed pursuant to Bankruptcy Rule 3001. In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the applicable Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter such distribution shall be made to such holder without interest, provided, however, such distributions or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of one year from: (i) the Effective Date; and (ii) the first Distribution Date after such holder's Claim is first Allowed.

### 8.7.   *Unclaimed Property.*

One year from the later of: (i) the Effective Date, and (ii) the first Distribution Date after the applicable Claim is first Allowed, all unclaimed property or interests in property shall revert to the Reorganized Debtors or the successors or assigns of the Reorganized Debtors,

and the Claim of any other holder to such property or interest in property shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records, or proofs of Claim filed against the Debtors, as reflected on the claims register maintained by the Claims Agent.

### 8.8.    *Satisfaction of Claims.*

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims hereunder shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

### 8.9.    *Manner of Payment Under Plan.*

Except as specifically provided herein, at the option of the Debtors or Reorganized Debtors (as applicable), any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 8.10.    *Fractional Shares/De Minimis Cash Distributions.*

No fractional shares of New Common Stock shall be distributed. When any distribution would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the shares of the New Common Stock subject to such distribution will be rounded to the next higher or lower whole number as follows: (i) fractions equal to or greater than ½ will be rounded to the next higher whole number; and (ii) fractions less than ½ will be rounded to the next lower whole number; provided, that the foregoing shall not apply to any rounding of Rights Offering Stock to be distributed, which shall be governed by the Rights Offering Procedures and Section 7.12(c) of this Plan. The total number of shares of New Common Stock to be distributed on account of Allowed Claims will be adjusted as necessary to account for the rounding provided for in this Plan. No consideration will be provided in lieu of fractional shares that are rounded down. Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock or $50.00 in Cash. Fractional shares of New Common Stock that are not distributed in accordance with this Section 8.10 shall be returned to Reorganized KV.

### 8.11.    *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Plan Distribution (of a value set forth herein) in excess of the Allowed amount of such Claim plus any postpetition interest on such Claim, to the extent such interest is permitted by Section 8.2 of this Plan.

### 8.12.    *Exemption from Securities Laws.*

The issuance of and the distribution under the Plan of the New Common Stock Securities, including the Subscription Rights, the Rights Offering Stock, the Direct Purchase Shares, the Commitment Fee Shares, and the Convertible Subordinated Notes Equity

Distribution, shall be exempt from registration under the Securities Act any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code and/or Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, to the maximum extent permitted thereunder.   Subject to any transfer restrictions contained in the Certificate of Incorporation of Reorganized KV and/or the New Stockholders Agreement, the New Common Stock issued on account of the Convertible Subordinated Notes Equity Distribution may be resold by the holders thereof without restriction, except to the extent that any such holder is deemed to be an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code.  All of the New Common Stock Securities other than the Convertible Subordinated Notes Equity Distribution may not be sold or transferred unless there is an effective registration statement under the Securities Act covering the New Common Stock or the securities are sold or transferred in a transaction that is exempt from or not subject to the registration and prospectus delivery requirement of the Securities Act and otherwise in compliance with state securities laws.  The availability of the exemption under section 1145 of the Bankruptcy Code, Section 4(a)(2) of the Securities Act and/or any other applicable securities laws shall not be a condition to occurrence of the Effective Date of the Plan.

### 8.13.  *Setoffs and Recoupments.*

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off and/or recoup against any Allowed Claim (other than a Senior Secured Notes Claim or a Convertible Subordinated Notes Claim), and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any and all claims, rights and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; provided, however, that neither the failure to effect a setoff or recoupment nor the non-allowance of any Claim hereunder will constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights and Causes of Action that a Reorganized Debtor or its successor may possess against such holder.

### 8.14.  *Rights and Powers of Disbursing Agent.*

(a)      *Powers of Disbursing Agent.* The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all applicable distributions or payments contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b)      *Expenses Incurred on or After the Effective Date.* Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement Claims (including, without limitation, reasonable attorney and other

professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

### 8.15.    *Withholding and Reporting Requirements.*

In connection with this Plan and all distributions hereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Plan Distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of any Plan Distribution to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Debtors, Reorganized Debtors or the Disbursing Agent believe are reasonable and appropriate, including requiring a holder of a Claim to submit appropriate tax and withholding certifications. Notwithstanding any other provision of this Plan: (i) each holder of an Allowed Claim that is to receive a distribution under this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution; and (ii) no Plan Distributions shall be required to be made to or on behalf of such holder pursuant to this Plan unless and until such holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations or has, to the Reorganized Debtors' satisfaction, established an exemption therefrom.

### 8.16.    *Cooperation with Disbursing Agent.*

The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of holders of Claims, in each case, as set forth in the Debtors' and/or Reorganized Debtors' books and records. The Reorganized Debtors will cooperate in good faith with the Disbursing Agent to comply with the reporting and withholding requirements outlined in Section 8.15 hereof.

### 8.17.    *Hart-Scott Rodino Antitrust Improvements Act.*

Any New Common Stock to be distributed under the Plan to an entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such entity shall have expired or been terminated. In the event any applicable notification and waiting periods do not expire without objection, the Reorganized Debtors or their agent shall, in their sole discretion, be entitled to sell such entity's shares of New Common Stock that were to be distributed under the Plan to such entity, and thereafter shall distribute the proceeds of the sale to such entity.

# ARTICLE IX.

## PROCEDURES FOR RESOLVING CLAIMS

**9.1.**    *Objections to Claims.*

Other than with respect to Fee Claims, only the Reorganized Debtors shall be entitled to object to Claims after the Effective Date. Any objections to those Claims (other than Administrative Expense Claims), shall be served and filed on or before the later of: (i) the date that is one (1) year after the Effective Date; and (ii) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (i) hereof. Any Claims filed after the Bar Date or Administrative Bar Date, as applicable, shall be deemed disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors or the Reorganized Debtors, unless the Person or entity wishing to file such untimely Claim has received Bankruptcy Court authority to do so. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the objecting party effects service in any of the following manners: (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (ii) by first class mail, postage prepaid, on the signatory on the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (iii) if counsel has agreed to or is otherwise deemed to accept service, by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Reorganization Cases (so long as such appearance has not been subsequently withdrawn). From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

**9.2.**    *Amendment to Claims.*

From and after the Effective Date, no Claim may be filed to increase or assert additional claims not reflected in an already filed Claim (or Claim scheduled, unless superseded by a filed Claim, on the applicable Debtor's schedules of assets and liabilities filed in the Reorganization Cases) asserted by such claimant and any such Claim shall be deemed disallowed and expunged in its entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors or the Reorganized Debtors unless the claimant has obtained the Bankruptcy Court's prior approval to file such amended or increased Claim.

**9.3.**    *Disputed Claims.*

(a)    <u>No Distributions or Payments Pending Allowance</u>. Except as provided in this Section 9.3, Disputed Claims shall not be entitled to any Plan Distributions unless and until such Claims become Allowed Claims.

(b)    <u>Establishment of Disputed Priority Claims Reserve</u>. On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors shall set aside and reserve, for the benefit of each holder of a Disputed Administrative Expense Claim, Disputed Priority Tax Claim, Disputed Priority Non-Tax Claim, and Disputed Other Secured Claim, Cash in an amount equal to (i) the amount of such Claim as estimated by the Bankruptcy Court

pursuant to an Estimation Order, (ii) if no Estimation Order has been entered with respect to such Claim, the amount in which such Disputed Claim is proposed to be allowed in any pending objection filed by the Debtors, or (iii) if no Estimation Order has been entered with respect to such Claim, and no objection to such Claim is pending on the Effective Date, (A) the amount listed in the Debtors' schedules of assets and liabilities filed in the Reorganization Cases (the "***Schedules***") or (B) if a timely filed proof of claim or application for payment has been filed with the Bankruptcy Court or Claims Agent, as applicable, the amount set forth in such timely filed proof of claim or application for payment, as applicable. The Reorganized Debtors, in their reasonable discretion, may increase the amount reserved as to any particular Disputed Claim. Such reserved amounts, collectively, shall constitute the "***Disputed Priority Claims Reserve***".

(c)     Establishment of Disputed General Unsecured Claims Reserve. On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors shall set aside and reserve, from the General Unsecured Claims Distribution, for the benefit of each holder of a Disputed General Unsecured Claim, Cash in an amount equal to the Plan Distribution to which the holder of such Disputed Claim would be entitled if such Disputed Claim were an Allowed Claim, in an amount equal to (i) the amount of such Claim as estimated by the Bankruptcy Court pursuant to an Estimation Order, (ii) if no Estimation Order has been entered with respect to such Claim, the amount in which such Disputed Claim is proposed to be allowed in any pending objection filed by the Debtors, or (iii) if no Estimation Order has been entered with respect to such Claim, and no objection to such Claim is pending on the Effective Date, (A) the amount listed in the Schedules or (B) if a timely filed proof of claim or application for payment has been filed with the Bankruptcy Court or Claims Agent, as applicable, the amount set forth in such timely filed proof of claim or application for payment, as applicable.  The Reorganized Debtors, in their discretion, may increase the amount reserved as to any particular Disputed Claim. Such reserved amounts, collectively, shall constitute the "***Disputed General Unsecured Claims Reserve***".  For the avoidance of doubt, the Debtors shall not be required to reserve any Cash or other consideration on account of any Disputed General Unsecured Claim the Debtors reasonably believe is covered by insurance; provided, that, notwithstanding the foregoing, the Reorganized Debtors shall reserve Cash in an amount equal to the Plan Distribution to which the holder of any such Disputed General Unsecured Claim would be entitled on account of any SIR Claim that would be Allowed if such Disputed General Unsecured Claim were an Allowed Claim, in the amount of such SIR Claim; provided that the amount of the Disputed General Unsecured Claims Reserve shall be determined in consultation with the Creditors' Committee.

(d)     Plan Distributions to Holders of Subsequently Allowed Claims. On each Distribution Date (or such earlier date as determined by the Reorganized Debtors or the Disbursing Agent in their sole discretion but subject to this Section 9.3), the Disbursing Agent will make distributions or payments from the applicable Disputed Claims Reserve on account of any Disputed Claim that has become an Allowed Claim since the occurrence of the previous Distribution Date. The Disbursing Agent shall distribute in respect of such newly Allowed Claims the Plan Distributions to which holders of such Claims would have been entitled under this Plan if such newly Allowed Claims were fully or partially Allowed, as the case may be, on the Effective Date, less direct and actual expenses, fees, or other direct costs of maintaining Plan Consideration on account of such Disputed Claims.

    (e)   <u>Distribution of Reserved Plan Consideration Upon Disallowance</u>.

        (i)    To the extent any Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, or Disputed Other Secured Claim has become Disallowed in full or in part (in accordance with the procedures set forth in the Plan), any Plan Consideration held by the Reorganized Debtors on account of, or to pay, such Disputed Claim shall become the sole and exclusive property of Reorganized KV or its successors or assigns.

        (ii)   After all Disputed General Unsecured Claims have been either Allowed or Disallowed, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of any Cash remaining in the Disputed General Unsecured Claims Reserve.

**9.4.** *Estimation of Claims.*

The Debtors and/or Reorganized Debtors may request that the Bankruptcy Court enter an Estimation Order with respect to any Claim, pursuant to section 502(c) of the Bankruptcy Code, for purposes of determining the Allowed amount of such Claim regardless of whether any Person has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim for purposes of determining the allowed amount of such Claim at any time. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim for allowance purposes, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the objecting party may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, resolved or withdrawn by any mechanism approved by the Bankruptcy Court.

**9.5.** *Expenses Incurred On or After the Effective Date.*

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by any Professional Person or the Claims Agent on or after the Effective Date in connection with implementation of this Plan, including without limitation, reconciliation of, objection to, and settlement of Claims, shall be paid in Cash by the Reorganized Debtors.

# ARTICLE X.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**10.1.    *General Treatment.***

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases identified on the Schedule of Assumed Contracts and Leases in the Plan Supplement shall be deemed assumed, and all other executory contracts and unexpired leases of the Debtors shall be deemed rejected, except that: (i) any executory contracts and unexpired leases that previously have been assumed or rejected pursuant to a Final Order of the Bankruptcy Court shall be treated as provided in such Final Order; and (ii) all executory contracts and unexpired leases that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date shall be treated as is determined by a Final Order of the Bankruptcy Court resolving such motion. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions and rejections described in this Section 10.1 pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to this Section 10.1 shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law.

**10.2.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases.***

All Claims arising from the rejection of executory contracts or unexpired leases, if any, will be treated as General Unsecured Claims. Upon receipt of the Plan Distribution provided in Section 5.7 of the Plan, all such Claims shall be discharged on the Effective Date, and shall not be enforceable against the Debtors, the Reorganized Debtors or their respective properties or interests in property.  In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Reorganized Debtors on or before the date that is thirty (30) days after the effective date of such rejection (which may be the Effective Date, the date on which the Debtors reject the applicable contract or lease as provided in Section 10.3(c) below, or pursuant to an order of the Bankruptcy Court).

**10.3.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.***

(a)    Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such executory contract or unexpired lease, any monetary defaults arising under each executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the appropriate amount (the "***Cure Amount***") in Cash on the later of thirty (30) days after: (i) the

Effective Date; or (ii) the date on which any Cure Dispute relating to such Cure Amount has been resolved (either consensually or through judicial decision).

(b)    No later than ten (10) calendar days prior to the commencement of the Confirmation Hearing, the Debtors shall file a schedule (the "*Cure Schedule*") setting forth the Cure Amount, if any, for each executory contract or unexpired lease to be assumed pursuant to Section 10.1 of the Plan, and serve such Cure Schedule on each applicable counterparty. Any party that fails to object to the applicable Cure Amount listed on the Cure Schedule within fifteen (15) calendar days of the filing thereof, shall be forever barred, estopped and enjoined from disputing the Cure Amount set forth on the Cure Schedule (including a Cure Amount of $0.00) and/or from asserting any Claim against the applicable Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Cure Schedule.

(c)    In the event of a dispute (each, a "*Cure Dispute*") regarding: (i) the Cure Amount; (ii) the ability of the applicable Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to the proposed assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption. To the extent a Cure Dispute relates solely to the Cure Amount, the applicable Debtor may assume and/or assume and assign the applicable contract or lease prior to the resolution of the Cure Dispute provided that such Debtor reserves Cash in an amount sufficient to pay the full amount asserted as the required cure payment by the non-Debtor party to such contract or lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court). To the extent the Cure Dispute is resolved or determined unfavorably to the applicable Debtor or Reorganized Debtor, as applicable, such Debtor or Reorganized Debtor, as applicable, may reject the applicable executory contract or unexpired lease after such determination.

### 10.4.    *Compensation and Benefit Programs.*

Except as otherwise expressly provided hereunder, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their respective employees, retirees and non-employee directors including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans are treated as executory contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  Each of the Reorganized Debtors may, prior to the Effective Date and with the consent of the Investor Parties, enter into employment agreements with employees that become effective on or prior to the Effective Date and survive consummation of this Plan. Any such agreements (or a summary of the material terms thereof) will be included in the Plan Supplement or otherwise filed with the Bankruptcy Court on or before the date of the Confirmation Hearing.

### 10.5.    *Employment Agreements.*

Notwithstanding anything to the contrary contained herein, all employment agreements between the Debtors and their executive officers as of the Effective Date (the

"***Current Officer Employment Agreements***") are treated as executory contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

## ARTICLE XI.

## CONDITIONS PRECEDENT TO
## CONSUMMATION OF THE PLAN

**11.1.**    ***Conditions Precedent to Confirmation.***

Confirmation of this Plan is subject to:

(a)    the order approving the Stock Purchase Agreement becoming a Final Order;

(b)    the Disclosure Statement having been approved by the Bankruptcy Court as having adequate information in accordance with section 1125 of the Bankruptcy Code;

(c)    entry of the Confirmation Order; and

(d)    the Bankruptcy Court having entered an order, which may include the Confirmation Order, determining the Postpetition Interest Amount (if any), including the calculation for determining such Postpetition Interest Amount.

**11.2.**    ***Conditions Precedent to the Effective Date.***

The occurrence of the Effective Date is subject to:

(a)    the Confirmation Order having become a Final Order;

(b)    the Plan Documents being executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by a Debtor that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith;

(c)    all material governmental, regulatory and third party approvals, authorizations, certifications, rulings, no-action letters, opinions, waivers and/or consents in connection with the Plan, if any, having been obtained and remaining in full force and effect, and there existing no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the consummation of the Plan;

(d)    the New First Lien Term Loan Agreement and all related documents provided for therein or contemplated thereby having been duly and validly executed and delivered by all parties thereto and consummated, and being in full force and effect (with all conditions precedent to such agreement having occurred or otherwise been satisfied or waived);

(e)      the Amended Certificates of Incorporation shall have been filed with the applicable authorities of the relevant jurisdictions of incorporation and shall have become effective in accordance with such jurisdictions' corporation laws; and

(f)      the Stock Purchase Agreement and Rights Offering and transactions contemplated thereby shall have been consummated, and all fees and expenses payable to the Investor Parties pursuant to the Stock Purchase Agreement and to Silver Point pursuant to the Share Purchase Agreement shall have been paid in full.

### 11.3.   *Waiver of Conditions Precedent and Bankruptcy Rule 3020(e) Automatic Stay.*

(a)      The condition precedent set forth in Section 11.1(d) may only be waived if each of (i) the Debtors, (ii) the Investor Parties, (iii) the Participating Ad Hoc Group, (iv) Varana, (v) Telemetry, and (vi) Silver Point consents in writing to a waiver thereof.

(b)      In addition to Section 11.3(a), in the event that the waiver of a condition precedent set forth in Section 11.1 or Section 11.2 would have a material adverse effect on Silver Point, each such waiver shall require the prior written consent of Silver Point.

(c)      Subject to 11.3(a), the Debtors, with the consent of the Investor Parties, shall have the right to waive any condition precedent set forth in Section 11.2 of this Plan at any time without leave of or notice to the Bankruptcy Court and without formal action other than proceeding with consummation of the Plan. Further, the stay of the Confirmation Order, pursuant to Bankruptcy Rule 3020(e), shall be deemed waived by the Confirmation Order.

(d)      If any condition precedent to the Effective Date is waived pursuant to this Section 11.3 and the Effective Date occurs, the waiver of such condition shall benefit from the "mootness doctrine," and the act of consummation of this Plan shall foreclose any ability to challenge this Plan in any court.

### 11.4.   *Postpetition Interest Amount Escrow.*

In the event that the Bankruptcy Court order required to be entered pursuant to Section 11.1(d) has not become a Final Order on or before the Effective Date, the Debtors shall deposit into escrow an amount of Cash equal to the full amount of the Postpetition Interest Amount plus the Postpetition Accreted OID Amount.  Such escrowed funds will be released consistently with the Final Order pertaining to the determination of the Postpetition Interest Amount, if any.

### 11.5.   *Effect of Failure of Conditions.*

If all of the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived (as provided in Section 11.3 above) on or before the first Business Day that is more than 60 days after the Confirmation Date, or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, then the Debtors may file a motion to vacate the Confirmation Order before all of the conditions have been satisfied or duly waived. Notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in

Section 11.2 hereof are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to this Section 11.4, this Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no distributions under this Plan shall be made, the Debtors and all holders of Claims and Interests in the Debtors shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against or Interest in the Debtors; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other entity with respect to any matter set forth in the Plan.

## ARTICLE XII.

## EFFECT OF CONFIRMATION

### 12.1.  *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of this Plan shall bind any holder of a Claim against, or Interest in, the Debtors and inure to the benefit of and be binding on such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under this Plan and whether or not such holder has accepted this Plan.

### 12.2.  *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, and except as otherwise provided in this Plan, the property of each Estate shall vest in the applicable Reorganized Debtor, free and clear of all Claims, Liens, encumbrances, charges, and other Interests, except as provided herein or in the Confirmation Order. The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as provided herein.

### 12.3.  *Discharge of Claims Against and Interests in the Debtors.*

(a)    Generally. Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise provided herein or in the Confirmation Order, each Person that is a holder (as well as any trustees and agents on behalf of such Person) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided herein, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, 1141 of the Bankruptcy Code, from prosecuting or

asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor.

(b)    Claims Related to Non-Debtor Affiliates and Subsidiaries. Upon the Effective Date, all Claims and Causes of Action against any Debtor related to or arising from any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to a non-Debtor affiliate and/or Subsidiary of the Debtors, shall receive the classification and treatment provided for such Claims in the Plan and shall be discharged and all holders thereof forever precluded and enjoined, pursuant to sections 105, 524, 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim and Cause of Action against any Reorganized Debtor.

### 12.4.    *Term of Pre-Confirmation Injunctions or Stays.*

Unless otherwise provided herein, all injunctions or stays arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 12.5.    *Injunction Against Interference With Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan.

### 12.6.    *Injunction.*

(a)    *Except as otherwise provided in this Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors or the Estates are, with respect to any such Claims or Interests, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, the Estates or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Reorganized Debtors, or the Estates or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, or the Estates or any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons (iv)*

*acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; provided, however, that nothing contained herein shall preclude such Persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of this Plan.*

(b)     By accepting distributions pursuant to this Plan, each holder of an Allowed Claim or Interest will be deemed to have specifically consented to the Injunctions set forth in this Section.

### 12.7.   *Releases.*

(a)     *Releases by the Debtors. For good and valuable consideration, the adequacy of which is hereby confirmed, and except as otherwise provided in this Plan or the Confirmation Order, as of the Effective Date, the Debtors and Reorganized Debtors, in their individual capacities and as debtor in possession, shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or Reorganized Debtors to enforce this Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder) against the Released Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, their affiliates and former affiliates, the Reorganized Debtors, the parties released pursuant to this Section 12.7, the Reorganization Cases, or this Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors or their Estates or Reorganized Debtors, whether directly, indirectly, derivatively or in any representative or any other capacity.*

(b)     *Releases by Holders of Claims and Interests. Except as otherwise provided in this Plan or the Confirmation Order, on the Effective Date: (i) each of the Released Parties; (ii) each holder of a Claim or Interest entitled to vote on this Plan that did not "opt out" of the releases provided in Section 12.7 of the Plan in a timely submitted Ballot; and (iii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all holders of Claims and Interests, in consideration for the obligations of the Debtors and Reorganized Debtors under this Plan, the New Common Stock Securities, the New First Lien Term Loan, the Subscription Rights and other contracts, instruments, releases, agreements or documents executed and delivered in connection with this Plan, and each entity (other than the Debtors) that has held, holds or may hold a Claim or Interest, as applicable, will be deemed to have consented to this Plan for all purposes and the restructuring embodied herein and deemed to forever release, waive and discharge all claims, demands, debts, rights, Causes of Action or liabilities (other than the right to enforce the obligations of any party under this Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with this Plan) against the Released Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in*

*law, equity or otherwise that are **based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, their affiliates and former affiliates, the Reorganized Debtors, the Reorganization Cases, or this Plan or the Disclosure Statement**. Without limiting the foregoing and for the avoidance of doubt, each of (w) the holders of Senior Secured Notes Claims, (x) the holders of Convertible Subordinated Notes Claims, (y) the Senior Secured Notes Indenture Trustee, and (z) the Convertible Subordinated Notes Indenture Trustee hereby forever releases, waives and discharges all claims, demands, debts, rights, Causes of Action or liabilities that it has or may have against any Released Party arising under the Senior Secured Notes Indenture or the Convertible Subordinated Notes Indenture including with respect to any (A) make-whole amount or similar type of prepayment premium, right or obligation,(B) subordination obligations of the Convertible Subordinated Notes Indenture Trustee and the holders of the Convertible Subordinated Notes Claims, and (C) fees, expenses or other amounts paid to the Convertible Subordinated Notes Indenture Trustee, the Senior Secured Notes Indenture Trustee and any holder of a Convertible Subordinated Notes Claim, a Senior Secured Notes Claim, or any such holder's legal advisor at any time in connection with the restructuring of the Debtors and this Plan.*

*(c)     Notwithstanding anything to the contrary contained herein: (i) except to the extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, the releases provided for in this Section 12.7 of the Plan shall not release any non-Debtor entity from any liability arising under (x) the Internal Revenue Code or any state, city or municipal tax code, or (y) any criminal laws of the United States or any state, city or municipality; and (ii) the releases set forth in this Section 12.7 shall not release any (x) Debtor's claims, right, or Causes of Action for money borrowed from or owed to a Debtor or its Subsidiary by any of its directors, officers or former employees, as set forth in such Debtors' or Subsidiary's books and records, (y) any claims against any Person to the extent such Person asserts a crossclaim, counterclaim and/or claim for setoff which seeks affirmative relief against a Debtor or any of its officers, directors, or representatives and (z) claims against any Person arising from or relating to such Person's gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court.*

*(d)     Notwithstanding anything to the contrary contained herein, nothing herein: (i) discharges, releases, or precludes any (a) environmental liability that is not a Claim; (b) environmental claim of the United States that first arises on or after the Confirmation Date, or (c) other environmental claim or environmental liability that is not otherwise dischargeable under the Bankruptcy Code; (ii) releases the Debtors or Reorganized Debtors from any environmental liability that a Debtor or Reorganized Debtor may have as an owner or operator of real property owned or operated by a Debtor or Reorganized Debtor on or after the Confirmation Date; (iii) releases or precludes any environmental liability to the United States on the part of any Persons other than the Debtors and Reorganized Debtors; or (iv) enjoins the United States from asserting or enforcing any liability described in this paragraph.*

**12.8.  *Exculpation and Limitation of Liability.***

*None of the Released Parties, or the D&O Claim Committee or any member thereof (each solely in their capacity as such), shall have or incur any liability to any holder of any Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, or arising out of the Debtors' restructuring, including without limitation, the negotiation, implementation and execution of this Plan, the Reorganization Cases, the Disclosure Statement, the solicitation of votes for and the pursuit of confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all activities leading to the promulgation and confirmation of this Plan except for gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court.*

**12.9.  *Injunction Related to Releases and Exculpation.***

*The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to this Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released in Sections 12.7 and 12.8 of this Plan.*

**12.10.  *Termination of Subordination Rights and Settlement of Related Claims.***

(a)    Except as expressly provided herein, the classification and manner of satisfying all Claims and Interests and the respective distributions, treatments and other provisions under the Plan take into account or conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, sections 510(a) and 510(b) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Plan. The Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Persons and entities from enforcing or attempting to enforce any such contractual, legal and equitable rights satisfied, compromised and settled pursuant to the Plan. Any holder of a Claim (other than a Senior Secured Notes Claim) that constitutes "Senior Indebtedness" (as defined in the Convertible Subordinated Notes Indenture) entitled to the benefit of the subordination provisions contained in Article XI of the Convertible Subordinated Notes Indenture must assert any objection to the treatment of its subordination rights under the Plan on or prior to the deadline to object to the Plan.  Any disagreement with the priorities or distributions set forth in the Plan or any right to assert contractual subordination under the Convertible Subordinated Notes Indenture, including in respect of claims of "Senior Indebtedness," shall be raised on or prior to the deadline to object to the Plan, and decided at or prior to the Confirmation Hearing, and all issues with respect to contractual subordination not raised or resolved at the Confirmation

Hearing shall be governed pursuant to the Plan or, if the decision of the Bankruptcy Court at the Confirmation Hearing differs from the Plan, then such decision shall govern.

(b) Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under this Plan, the provisions of this Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim or Interest may have or any distribution to be made pursuant to this Plan on account of such Claim or Interest. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtor, the Reorganized Debtors, their respective properties, and holders of Claims and Interests, and is fair, equitable and reasonable.

### 12.11. *Retention of Causes of Action/Reservation of Rights.*

Subject to Section 12.7 of this Plan, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims or Causes of Action, rights of setoff, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, or other legal or equitable defenses as fully as if the Reorganization Cases had not been commenced, and all of the Debtors' legal and/or equitable rights respecting any Claim left unimpaired, as set forth in Section 4.2 herein, may be asserted after the Confirmation Date to the same extent as if the Reorganization Cases had not been commenced.

### 12.12. *Indemnification Obligations; Insured Current Director & Officer Claims.*

(a) Notwithstanding anything to the contrary contained herein, subject to the occurrence of the Effective Date, and solely to the extent of (i) applicable insurance proceeds and (ii) the Current D&O Indemnity Reserve, the obligations of the Debtors to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of directors or officers who were directors or officers of any of the Debtors at any time after the Petition Date, against any Causes of Action or Claims, remain unaffected thereby after the Effective Date and are not discharged.  On and after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies in effect on the Petition Date, including the Run Off D&O Policy, and all directors and officers of the Debtors at any time after the Petition Date shall be entitled to the full benefits of any such policy for the full term of such policy, regardless of whether such director and/or officers remain in such positions after the Effective Date.  From the Effective Date, the Debtors shall cooperate with any Person that served as a director or officer of a Debtor at any time on and after the Petition Date, and make available to any such Person, subject to applicable confidentiality and privilege concerns, such documents, books, records or information relating to the Debtors' activities prior to the Effective Date that such Person may reasonably require in connection with the defense or preparation for the defense of any claim against such Person relating to any action taken in connection with such Person's role as a director or officer of a Debtor.

(b)        On and after the Effective Date, any Person that served as a director or officer of a Debtor at any time on and after the Petition Date shall be entitled on a first-priority basis access to proceeds of any available insurance policy of the Debtors as set forth in section 12.12(a) to the extent permissible by applicable law.

(c)        Notwithstanding anything to the contrary contained herein, but subject to Section 7.14 hereof, as of the Effective Date, any obligation of the Debtors to indemnify, defend, reimburse, advance fees and expenses to, or limit the liability of any director or officer who was not a director or officer of any of the Debtors at any time after the Petition Date, against any Causes of Action or Claims, whether in contract, under state law, pursuant to any of the Debtor's by-laws or other corporate documents of the Debtors, or otherwise, shall be discharged. To the extent any such obligations arise under or constitute executory contracts, such executory contracts shall be deemed rejected as of the Effective Date, notwithstanding anything to the contrary herein.

### 12.13. *Securities Litigations; Document Retention.*

(a)        Notwithstanding anything in the Plan to the contrary (including but not limited to in Article XII of the Plan), but excluding any and all derivative Claims on behalf of the Debtors, nothing in the Plan shall release, enjoin or otherwise affect in any way any right or ability of the lead plaintiff, any other plaintiff and/or any member of the putative classes in the Securities Litigations to: (i) seek or obtain any discovery in connection with the respective Securities Litigations, (ii) pursue and prosecute the claims asserted, or which may be asserted, against any non-Debtor in the respective Securities Litigations; (iii) enter into or enforce any settlement or enforce any judgment obtained against any non-Debtor in connection with or relating to the respective Securities Litigations, including through coverage provided by any insurance and/or any proceeds therefrom; and (iv) pursue and recover on any claims against KV as a defendant in the respective Securities Litigations solely to the extent of any insurance and/or any proceeds therefrom (excluding any self-insured retention obligation or deductible) that may provide coverage for any liability of KV for the claims asserted in the respective Securities Litigations.

(b)        Notwithstanding confirmation of the Plan, and notwithstanding anything in the Plan to the contrary, from and after the Effective Date, (i) the Reorganized Debtors shall preserve and maintain all of the Debtors' and the Reorganized Debtors' documents, files, books, records, and electronic data (including emails) that relate to the claims, defenses and allegations in the respective Securities Litigations (collectively, the "Securities Litigation Documents") whether maintained by the Debtors or the Reorganized Debtors, or any successors thereto or transferees thereof, to the extent required under applicable law, including without limitation under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, et. seq. and 15 U.S.C. § 78u-4(b)(3)(C) thereof, and (ii) nothing shall restrict or impair any right of the lead plaintiffs and/or any representative of the putative classes in the respective Securities Litigations to seek leave under 15 U.S.C. § 78u-4(b)(3)(B) or otherwise, to require any or all of the Debtors or the Reorganized Debtors to preserve Securities Litigation Documents until, with respect to (i) and (ii) above, such time as, in each case with respect to the applicable Securities Litigation:  (I) a final, non-appealable judgment is entered concluding such litigation in full, or (II) such litigation is fully and finally settled.

# ARTICLE XIII.

# RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under, or related to the Reorganization Cases for, among other things, the following purposes:

(a)    To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the Cure Disputes resulting therefrom;

(b)    To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    To hear and resolve any disputes arising from or relating to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004, or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)    To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(e)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)    To issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)    To hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)    To hear and determine all Fee Claims;

(j)    To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any

transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(l)      To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, including any release or injunction provisions set forth herein, or to maintain the integrity of this Plan following consummation;

(m)      To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)      To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)      To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)      To resolve any disputes concerning whether a Person or entity had sufficient notice of the Reorganization Cases, the Disclosure Statement Hearing, the Confirmation Hearing, any applicable Bar Date, or the deadline for responding or objecting to a Cure Amount, for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

(q)      To recover all Assets of the Debtors and property of the Estates, wherever located; and

(r)      To resolve any disputes regarding the subordination provisions or agreements contained in the Convertible Subordinated Notes Indenture; and

(s)      To enter a final decree closing each of the Reorganization Cases.

## ARTICLE XIV.

## MISCELLANEOUS PROVISIONS

### 14.1.   *Exemption from Certain Transfer Taxes.*

To the fullest extent permitted by applicable law, all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under this Plan, the sale by the Debtors of any owned property pursuant to section 363(b) of the Bankruptcy Code, and any assumption, assignment, and/or sale by the Debtors of their interests in unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### 14.2.   *Retiree Benefits.*

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits (within the meaning of, and subject to the limitations of, section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, for the duration of the period for which either Debtor had obligated itself to provide such benefits. Nothing herein shall: (i) restrict the Debtors' or the Reorganized Debtors' right to modify the terms and conditions of the retiree benefits, if any, as otherwise permitted pursuant to the terms of the applicable plans, non-bankruptcy law, or section 1114(m) of the Bankruptcy Code; or (ii) be construed as an admission that any such retiree benefits are owed by the Debtors.

### 14.3.   *Dissolution of Creditors' Committee*.

The Creditors' Committee shall be automatically dissolved on the Effective Date and, on the Effective Date, each member (including each officer, director, employee or agent thereof) of the Committee and each professional retained by the Committee shall be released and discharged from all rights, duties, responsibilities and obligations arising from, or related to, the Debtors, their membership on the Creditors' Committee, the Plan or the Reorganization Cases, *except* with respect to: (i) any matters concerning any Fee Claims held or asserted by any professionals retained by the Committee; or (ii) any appeals of the Confirmation Order, or any appeal relating to the Postpetition Interest Amount, through the date such appeals are finally decided, settled, withdrawn or otherwise resolved.

### 14.4.   *Termination of Professionals.*

On the Effective Date, the engagement of each Professional Person retained by the Debtors and the Creditors' Committee, if any, shall be terminated without further order of the Bankruptcy Court or act of the parties; provided, however, such Professional Persons shall be entitled to prosecute their respective Fee Claims and represent their respective constituents with respect to applications for payment of such Fee Claims and the Reorganized Debtors shall be responsible for the fees, costs and expenses associated with the prosecution of such Fee Claims. Nothing herein shall preclude any Reorganized Debtor from engaging a Professional Person on and after the Effective Date in the same capacity as such Professional Person was engaged prior to the Effective Date.

### 14.5.   *Amendments.*

(a)      *Plan Modifications.* This Plan may be amended, modified, or supplemented by the Debtors, with the consent of the Investor Parties, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court; notwithstanding the foregoing, this Plan shall not be amended in a manner that is materially adverse to Silver Point without Silver Point's prior written consent.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this

Plan, the Debtors may, with the consent of the Investor Parties, remedy any defect or omission or reconcile any inconsistencies in this Plan, the Plan Documents and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)     *Other Amendments.* Prior to the Effective Date, the Debtors may, with the consent of the Investor Parties, make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; provided, however, that, such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests under the Plan.

### 14.6.   *Revocation or Withdrawal of this Plan.*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date.  If the Debtors revoke or withdraw this Plan prior to the Effective Date as to any or all of the Debtors, or if confirmation or consummation as to any or all of the Debtors does not occur, then, with respect to such Debtors: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void; and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person, (ii) prejudice in any manner the rights of such Debtors or any other Person or (iii) constitute an admission of any sort by the Debtors or any other Person.

### 14.7.   *Allocation of Plan Distributions Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

### 14.8.   *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (and subject to the consent of the Investor Parties, which shall not be unreasonably withheld) shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and

shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 14.9.   *Investor Parties' Consent Rights*

To the extent that this Plan requires the form and/or substance of any document to be acceptable to the Investor Parties, or the Investor Parties to consent to the taking of any action hereunder, unless otherwise specifically stated herein, any determination by the Investor Parties as to the acceptability of any such document or any such consent shall be provided in accordance with the Stock Purchase Agreement.

### 14.10.   *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent a Plan Document or exhibit or schedule to the Plan provides otherwise, the rights, duties, and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 14.11.   *Section 1125(e) of the Bankruptcy Code.*

The Debtors have, and upon confirmation of this Plan shall be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and the Debtors, the Creditors' Committee, the Investor Parties, the Participating Ad Hoc Group, Varana, Telemetry and the members of the Ad Hoc Senior Secured Noteholders Group (and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys) participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, solicitation and/or purchase of the securities offered and sold under this Plan, and therefore are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or offer, issuance, sale, or purchase of the securities offered and sold under this Plan.

### 14.12.   *Inconsistency.*

In the event of any inconsistency among the Plan, the Disclosure Statement, the Plan Documents, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

### 14.13.   *Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**14.14.** *Exhibits.*

All exhibits to this Plan are incorporated and are a part of this Plan as if set forth in full herein.

**14.15.** *Notices.*

In order to be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> K-V Pharmaceutical Company
> 16640 Chesterfield Grove, Suite 200
> Chesterfield, MO 63005
> Attn:   Thomas S. McHugh
>           Chief Financial Officer
>
> -and-
>
> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, New York  10019-6099
> Attn:   Paul V. Shalhoub, Esq.
>           Robin Spigel, Esq.
> Telephone:  (212) 728-8000
> Facsimile:  (212) 728-8111
>
> Counsel to the Debtors

**14.16.** *Filing of Additional Documents.*

On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**14.17.** *Reservation of Rights.*

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of this Plan, any statement or provision contained herein, or the taking of any action by the Creditors' Committee, the Investor Parties, Silver Point or the Debtors with respect to this Plan shall be or shall be deemed to be, an admission or waiver of any rights of the Creditors' Committee, the Investor Parties or the Debtors with respect to any Claims or Interests prior to the Effective Date.

Dated:  July 17, 2013
        St. Louis, Missouri

                                    Respectfully submitted,

                                    K-V PHARMACEUTICAL COMPANY
                                    on behalf of itself and its affiliated Debtors

                                    By: /s/ Thomas S. McHugh
                                        Thomas S. McHugh
                                        Chief Financial Officer

Counsel:

WILLKIE FARR & GALLAGHER LLP

Matthew A. Feldman, Esq.
Paul V. Shalhoub, Esq.
Robin Spigel, Esq.
Andrew D. Sorkin, Esq.
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

Counsel for the Debtors and Debtors in Possession

# EXHIBIT 2

**Liquidation Analysis**

($ US in thousands)

| | Book Value (Unaudited) 5/31/2013 | Notes | Assumed Recovery Percentage | | Estimated Liquidation Value | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| **CURRENT ASSETS: (A, B)** | | | | | | |
| Cash and Cash Equivalents | $ 39,000 | A | 100% | 100% | $ 39,000 | $ 39,000 |
| Restricted Cash | 500 | B | 0% | 40% | - | 200 |
| Accounts Receivable, Net | 21,000 | C | 48% | 76% | 10,000 | 16,000 |
| Inventories, Net | 6,000 | D | 17% | 33% | 1,000 | 2,000 |
| Other Current Assets | 3,000 | E | 0% | 0% | - | - |
| **Total Current Assets** | $ 69,500 | | | | $ 50,000 | $ 57,200 |
| **PROPERTY, PLANT AND EQUIPMENT, NET:** | | | | | | |
| Property, Plant and Equipment, Net | $ 1,300 | F | 10% | 20% | $ 130 | $ 260 |
| **OTHER ASSETS:** | | | | | | |
| Intangible Assets, Net | $ 107,000 | G | | | | |
| Makena | | G/H | 56% | 110% | $33,200 | $76,100 |
| Evamist | | G/H | | | 7,000 | 12,000 |
| Cliindesse | | G/H | | | 15,000 | 20,000 |
| Gynazole | | G/H | | | 5,000 | 10,000 |
| Other Assets | $ 15,000 | I | 20% | 27% | 3,000 | 4,000 |
| **Total Other Assets** | $ 122,000 | | | | $ 63,200 | $ 122,100 |
| **Total Assets** | $ 192,800 | | | | | |
| **Preliminary Liquidation Value Range** | | | | | $ 113,330 | $ 179,560 |
| Costs Associated with Liquidation | | J | | | 4,934 | 7,323 |
| **Net Estimated Proceeds Available for Distribution** | | | | | $ 108,396 | $ 172,237 |
| Makena (Excludes Inventories & AR) | | | | | $ 31,755 | $ 72,996 |
| Secured Assets | | | | | $ 76,641 | $ 99,241 |
| **Costs of Liquidation** | | J | | | | |
| Corporate Payroll | | | | | $ 1,500 | 750 |
| Trustee | | | | | 2,230 | 4,211 |
| Product Sale Expenses | | | | | 1,204 | 2,362 |
| **Total Costs of Liquidation** | | | | | $ 4,934 | $ 7,323 |

($ US in thousands)

| | Class | Estimated Allowable Claim | Notes | Consolidated Low | Consolidated High | Secured Assets Low | Secured Assets High | Makena (Excludes Inventories & AR) Low | Makena (Excludes Inventories & AR) High |
|---|---|---|---|---|---|---|---|---|---|
| **Net Estimated Proceeds Available for Distribution** | | | | $ 108,396 | $ 172,237 | $ 76,641 | $ 99,241 | $ 31,755 | $ 72,996 |
| **DIP Claims** | | | | | | | | | |
| DIP Facility [1] | | $ 64,662 | K | | | | | | |
| **Total DIP Claims** | | **64,662** | | $ 64,662 | $ 64,662 | $ 32,908 | $ - | $ 31,755 | $ 64,662 |
| Recovery Rate | | | | 100.0% | 100.0% | 32,908 | - | 31,755 | 64,662 |
| **Senior Secured Notes Claim (Secured Claim)** | 3 | | | | | | | | |
| Senior Secured Notes Claims | | $ 231,410 | K | | | | | | |
| **Total Senior Secured Notes Claims** | | **231,410** | | $ 43,734 | $ 99,241 | $ 43,734 | $ 99,241 | $ - | $ - |
| Recovery Rate | | | | 18.9% | 42.9% | 43,734 | 99,241 | - | - |
| **Administrative & Priority Claims** | | | L | | | | | | |
| Administrative Expense Claims | | $ 2,400 | | $ - | $ 1,887 | $ - | $ - | $ - | $ - |
| Fee Claims | | 8,000 | | - | 6,290 | - | - | - | - |
| 503(b)(9) Claims | | - | | - | - | - | - | - | - |
| U.S. Trustee Fees | | 100 | | - | 79 | - | - | - | - |
| Priority Tax Claims | | 100 | | - | 79 | - | - | - | - |
| **Total Administrative & Priority Claims** | | **10,600** | | $ - | $ 8,334 | $ - | $ - | $ - | $ - |
| Recovery Rate | | | | 0.0% | 78.6% | - | - | - | - |
| **Priority Non-Tax Claims** | 1 | | | | | | | | |
| Priority Non-Tax Claims | | $ 850 | K | | | | | | |
| **Total Priority Non-Tax Claims** | | **850** | | $ - | $ - | $ - | $ - | $ - | $ - |
| Recovery Rate | | | | 0.0% | 0.0% | - | - | - | - |
| **Other Secured Claims** | 2 | | | | | | | | |
| Other Secured Claims | | $ - | K | | | | | | |
| **Total Other Secured Claims** | | **-** | | $ - | $ - | $ - | $ - | $ - | $ - |
| Recovery Rate | | | | 0.0% | 0.0% | - | - | - | - |
| **Senior Secured Notes Claim (Unsecured Claim)** | 3 | | | | | | | | |
| Senior Secured Notes Claims | | $ 231,410 | K | | | | | | |
| **Total Senior Secured Notes Claims** | | **231,410** | | $ - | $ - | $ - | $ - | $ - | $ - |
| Recovery Rate | | | | 0.0% | 0.0% | - | - | - | - |
| **Total Unsecured Claims** | | | | | | | | | |
| ETHEX Criminal Fine Claims | 4 | $ 16,186 | M | $ - | $ - | $ - | $ - | $ - | $ - |
| Qui Tam Claims | 5 | 18,183 | M | - | - | - | - | - | - |
| Convertible Subordinated Notes Claims | 6 | 201,114 | M | - | - | - | - | - | - |
| Estimated General Unsecured Claims | 7 | 13,923 | M | - | - | - | - | - | - |
| **Total Unsecured Claims** | | **249,406** | | $ - | $ - | $ - | $ - | $ - | $ - |
| Recovery Rate | | | | 0.0% | 0.0% | - | - | - | - |
| **Subordinated Claims** | 8 | | | | | | | | |
| Hermelin Claims | | $ - | N | | | | | | |
| **Total Subordinated Claims** | | **-** | | $ - | $ - | $ - | $ - | $ - | $ - |
| Recovery Rate | | | | 0.0% | 0.0% | - | - | - | - |
| **Existing KV Interests** | 9 | | | | | | | | |
| Existing KV Interests | | $ - | | | | | | | |
| **Total Existing KV Interests** | | **-** | | $ - | $ - | $ - | $ - | $ - | $ - |
| Recovery Rate | | | | 0.0% | 0.0% | - | - | - | - |

(1) Assumes DIP lenders foreclose/close on undrawn DIP proceeds.

**INTRODUCTION**

The Debtors, with the assistance of their investment banker and financial advisor, Jefferies LLC ("**Jefferies**"), have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**") in connection with the Disclosure Statement for the purpose of evaluating whether the Plan[1] meets the so-called "best interests test" under Section 1129(a)(7) of the Bankruptcy Code.  With respect to each impaired Class of Claims and Interests, confirmation of the Plan requires that each holder of a Claim or Interest either (a) accepts the Plan or (b) receives or retains under the Plan property of a value, as of the Plan's Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code.

In determining whether the best interests test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets, which are primarily the rights to market and sell certain pharmaceutical products, including the Food and Drug Administration (the "**FDA**") approved drug Makena® (taking into account the time necessary to accomplish the liquidation).

The total value available would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors as of May 31, 2013.  The total value available would be:  (i) first, reduced by the amount of the Allowed DIP Claims, the secured portion of the Allowed Senior Secured Notes Claims and Other Secured Claims; (ii) second, reduced by the costs and expenses of liquidation under chapter 7 (including the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage) and such additional administrative claims that might result from the termination of the Debtors' business; and (iii) third, reduced by the amount of the Allowed Administrative Expense Claims, U.S. Trustee Fees, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims.  Any remaining net cash would be allocated to creditors and stakeholders in strict order of priority of claims contained in section 726 of the Bankruptcy Code.  The Liquidation Analysis has been prepared assuming that the Debtors' chapter 11 cases convert to chapter 7 cases under the Bankruptcy Code.  The Liquidation Analysis has been prepared based on the Debtors' balance sheet as of May 31, 2013.

Estimating recoveries in any hypothetical chapter 7 liquidation is an uncertain process due to the number of unknown variables and is necessarily speculative.  Thus, extensive use of estimates and assumptions has been made that, although considered reasonable by the Debtors and their financial advisor, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors.

The Liquidation Analysis presents the liquidation of the Debtors on a consolidated basis. Proceeds realized from each Debtor are aggregated in a common distribution source.  For

---

[1]       Capitalized terms not otherwise defined herein have the meanings given to them in the Disclosure Statement or Plan, as applicable.

purposes of distribution, each and every Claim asserted against or Interest in any Debtor is presumed to be entitled to a distribution from the aggregated proceeds.  Any Claim against a Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors are deemed to have one right to a distribution from the aggregated proceeds.  Notwithstanding the foregoing, and notwithstanding that the holders of Senior Secured Notes Claims do not have a lien on Makena® related assets, (see Note L infra), including any Makena® related intellectual property held by DrugTech (which, for purposes of the Liquidation Analysis, the Debtors' estimate would not have any value in a chapter 7 liquidation), for each Debtor individually, it is assumed that no value would be available to any creditors other than the DIP Lenders and the holders of Senior Secured Notes Claims.

ESTIMATE OF NET PROCEEDS

Liquidation values have been estimated based upon the estimated proceeds to be realized in connection with the sale of the Debtors' pharmaceutical rights or the percentage of recovery of the gross book value of the Debtors' assets that a chapter 7 trustee might realize.  The Liquidation Analysis does not take into account any insurance proceeds that may be paid out to any holder of an Allowed Claim.

ESTIMATE OF COSTS

Proceeds from a chapter 7 liquidation would be reduced by administrative costs incurred during the liquidation period.  These costs would include fees payable to a trustee in bankruptcy and professional advisors to the trustee, salaries, occupancy, costs of sale of assets, costs of closing their office and costs of the claims reconciliation and adjudication process, plus any unpaid expenses incurred by the Debtors during their chapter 11 cases and allowed in the chapter 7 cases, such as compensation for professionals and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee.

DISTRIBUTION OF NET PROCEEDS

Under a chapter 7 liquidation, all secured claims are required to be satisfied from the proceeds of the collateral securing such claims before any such proceeds would be distributed to any other creditors.  This analysis assumes the application of the rule of absolute priority of distributions with respect to the remaining proceeds of the Debtors.  Under that rule, no junior creditor receives any distribution until all senior creditors are paid in full.  The costs, expenses and fees associated with the liquidation would be paid in full from the liquidation proceeds before the balance of the proceeds would be made available to pay chapter 11 administrative Claims, and then to pay priority Claims and then to pay unsecured Claims.  This analysis also assumes that the subordination provisions contained within the Convertible Subordinated Notes Indenture are valid.  In connection therewith, except to the extent provided in the Convertible Subordinated Notes Indenture regarding the payment of fees and expenses of the Convertible Subordinated Notes Indenture Trustee, until the holders of Senior Secured Notes Claims

are paid in full, the chapter 7 trustee would distribute directly to the holders of Allowed Senior Secured Notes Claims any liquidation proceeds to which holders of Allowed Convertible Subordinated Notes Claims otherwise would be entitled.

It is likely that the pool of General Unsecured Claims would be significantly larger in a chapter 7 liquidation than in a chapter 11 restructuring, including claims that could arise by reason of the breach or rejection of obligations assumed by the Debtors during their chapter 11 cases and the rejection of executory contracts or other obligations entered into by the Debtors both prior to and during the pendency of their chapter 11 proceeding, which would dilute any potential recoveries to other holders of General Unsecured Claims.  The Debtors have not attempted to estimate such additional General Unsecured Claims, including any claims that would arise as a result of rejection damages.  Accordingly, it is assumed that the total amount of Claims allowable in a chapter 7 liquidation will be significantly higher than the total allowed general unsecured claims in the chapter 11 cases.

The Liquidation Analysis assumes that there are no recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other causes of action and does not include the estimated costs of pursuing those actions.

The following Liquidation Analysis should be reviewed in conjunction with the accompanying notes.

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS OR THE ABILITY TO ACHIEVE FORECASTED RESULTS.  IN THE EVENT THE CHAPTER 11 CASES ARE CONVERTED TO CHAPTER 7 CASES, ACTUAL RESULTS MAY VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THE LIQUIDATION ANALYSIS AND THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED WOULD BE REALIZED.

NOTHING CONTAINED IN THIS HYPOTHETICAL LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS.

EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THIS LIQUIDATION ANALYSIS WAS PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT THESE ANALYSES IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE DEBTORS DO NOT INTEND AND DO NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR OTHERWISE REVISE THE LIQUIDATION ANALYSIS (OR ANY OTHER PART OF THE DISCLOSURE STATEMENT) TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THIS LIQUIDATION ANALYSIS IS PREPARED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

THEREFORE, THE LIQUIDATION ANALYSIS MAY NOT BE RELIED ON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE LIQUIDATION ANALYSIS.

THIS LIQUIDATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE DISCLOSURE STATEMENT AND PLAN AND TO ENABLE THE HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE RESTRUCTURING AND PLAN AND SHOULD NOT BE USED OR RELIED ON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR INTERESTS IN, THE DEBTORS OR ANY OF ITS AFFILIATES.

**GENERAL ASSUMPTIONS**

ASSET SALE METHODOLOGY

The conversion of the Debtors' chapter 11 reorganization to chapter 7 would entail a forced sale of the Debtors' assets in one or more sales pursuant to Section 363 of the Bankruptcy Code, which, for purposes of this Liquidation Analysis, is assumed to take place over a 90-day period of time.  It is assumed that such a process, coupled with the following factors, would adversely affect the proceeds that would be realized from the sale of the Debtors' assets.  These factors include the following, among others:

- Negative press coverage that the Debtors have received with respect to the pricing of Makena® and uncertainties regarding future growth prospects for Makena®
- That the exclusive marketing period associated with Makena®'s orphan drug designation ends in less than 5 years
- Continued competition from compounders with respect to Makena® and the potential for competition from alternative sources, including the potential threat of competition from off label use of other products for the same conditions for which Makena® is indicated
- That the Debtors have engaged in litigation against the FDA and various state Medicaid agencies
- The lack of recent sales history for two of the Debtors' products, Gynazole-1® and Clindesse®
- Potential concerns by prospective purchasers regarding the effect of the Consent Decree with the FDA regarding drug manufacture and distribution
- Continued resistance by various third-party payors to reimburse costs of Makena® and ongoing challenges with obtaining agreements with various state Medicaid agencies
- The "as is" nature of the asset sales, given the trustee's limited ability to provide representations and warranties and indemnities to buyers

Accordingly, for purposes of computing the hypothetical liquidation proceeds, the Debtors assumed that the realized liquidation values would reflect a discount from the values that would exist in the absence of a chapter 7 liquidation.  The discounts are the Debtors' best judgment in the face of complex uncertainties and the absence of information regarding the forced liquidation of other specialty pharmaceutical products. For details on the methodology utilized to estimate liquidation proceeds of each product, refer to the notes to this Liquidation Analysis.

**NOTES**

NOTE A – CASH AND CASH EQUIVALENTS

It is assumed that cash and cash equivalents of approximately $39.0 million are fully recoverable.

NOTE B – RESTRICTED CASH

It is assumed that 0% to 40% of the currently restricted cash of approximately $0.5 million projected to be in the Debtors' accounts is recoverable.

NOTE C – ACCOUNTS RECEIVABLE, NET

The analysis of accounts receivables assumes that a chapter 7 trustee would retain certain existing staff of the Debtors to handle an aggressive collection effort for outstanding trade accounts receivable.  Collections during a liquidation of the Debtors may be significantly compromised as customers may attempt to set off outstanding amounts owed to the Debtors against alleged damage and breach of contract claims. The liquidation value of accounts receivable was estimated by applying a recovery factor consistent with the Debtors' experience in collecting accounts receivable and the expectation of additional attempts to set off.  The estimate also considers the inevitable difficulty a liquidating company has in collecting its receivables and any concessions that might be required to facilitate the collection of certain accounts.  Estimated recoveries are from 48% to 76% of net accounts receivable.

NOTE D – INVENTORIES, NET

Inventories consist principally of unsold finished products.  Based upon implied recovery rates of 17% to 33%, the Debtors estimate the projected gross recoveries from the orderly liquidation of inventory to range from $1.0 million to $2.0 million.

NOTE E – OTHER CURRENT ASSETS

Other current assets consist primarily of deposits, prepaid insurance, and other prepaid expenses.  The Debtors estimate that these assets will have limited value in a liquidation.

NOTE F – PROPERTY, PLANT & EQUIPMENT, NET

The property, plant and equipment value relates primarily to office furniture and equipment.

## NOTE G – INTANGIBLE ASSETS, NET

The value of intangible assets is assumed to be included within the sale proceeds of the Debtors' pharmaceutical products.  No value is ascribed to any other intangible assets the Debtors may own.

## NOTE H – PROCEEDS FROM ASSET SALES

The Liquidation Analysis assumes the Debtors' products would be sold within a 90-day period following conversion to a chapter 7.  For Makena® and Evamist®, it is assumed that a buyer would pay a multiple of 1.00x – 1.50x annualized net revenues recorded in the last 6 months prior to the assumed date of liquidation.  It is further assumed that a buyer of Makena® would deduct from the purchase price the costs of ongoing FDA clinical trial obligations and allowances due to State Medicaid agencies and commercial payers as of the date of sale.  It is assumed that a buyer of Evamist® would deduct from the purchase price any known rebates due as of the date of sale.

For Gynazole-1® and Clindesse®, products without any recent sales track record, it is assumed that a buyer would seek to structure any transaction contingent on future sales performance.  It is assumed that a chapter 7 trustee's preference would be to avoid such an arrangement, and to negotiate upfront receipt of cash proceeds.  This likely would entail a substantial discount.  The Debtors believe that it would be highly unlikely that a buyer would be willing to offer more than $30.0 million in immediate consideration for the two products.

U.S. taxes due on the gain (if any) from the sale of the Debtors' products are assumed to be offset by existing tax attributes and deductions generated by payments made in the chapter 7 cases.

## NOTE I – OTHER ASSETS

It is assumed that other assets of approximately $15.0 million will have limited value in a liquidation.

## NOTE J – COSTS ASSOCIATED WITH LIQUIDATION

Corporate payroll and certain operating costs during the liquidation are based upon the assumption that certain corporate functions would be retained to oversee the liquidation process for 90 days. The remaining staff would also be needed to maintain and close the accounting records and to complete certain administrative tasks including payroll and tax forms and records.

Chapter 7 trustee fees include those fees associated with the appointment of a chapter 7 trustee in accordance with Section 326 of the Bankruptcy Code.  Trustee fees are calculated at 3% of the gross proceeds of the liquidation (excluding cash).
Fees associated with professionals related to the sale of the Company's pharmaceutical products have been calculated at 2.0% of the asset sale proceeds.  The combined corporate payroll expenses, trustee fees and fees for professionals associated with pharmaceutical product  sales are assumed to range from $4.9 million to $7.3 million.

NOTE K – SECURED CLAIMS

For purposes of the Liquidation Analysis, the Debtors have assumed that Secured Claims consist of the estimated amount owed under the DIP Credit Agreement, the Senior Secured Notes and any pre-petition accrued interest.  It is assumed that there are no Other Secured Claims.  It is assumed that amounts due under the DIP Credit Agreement are secured by a first-priority lien on all of the assets of the Debtors and repayment of the DIP is applied first, to Makena® and all Makena® related assets, and second, to all other available assets.  Amounts due under the Senior Secured Notes are assumed to be secured by a second-priority lien on all the assets of the Debtors other than Makena® and all Makena® related assets (other than Makena® inventory and receivables, and proceeds of each, which are treated as secured consistent with the *Memorandum Of Decision Granting Motion By The Official Committee Of Unsecured Creditors For A Declaration That The Senior Noteholders Did Not Have A Security Interest In The Makena Assets As Of The Petition Date*, dated February 11, 2013 (Docket No. 596)).

NOTE L – ADMINISTRATIVE AND PRIORITY CLAIMS

Chapter 11 Administrative, Priority Non-Tax and Priority Tax Claims include estimated professional fee claims, claims entitled to priority under Section 503 of the Bankruptcy Code, and U.S. Trustee Fees.  Professional fees assume current monthly rates for all professionals currently involved in the Debtors' chapter 11 cases for a period of two months plus unpaid holdback amounts.  To the extent the Bankruptcy Court authorized the Debtors to make payments on prepetition unsecured claims in the ordinary course of business, such claims to the extent unpaid are considered Administrative Claims.  Total Administrative, Priority Non-Tax and Priority Tax Claims are estimated to be $11.5 million.

NOTE M – UNSECURED CLAIMS

For purposes of the Liquidation Analysis, the Debtors have assumed that general unsecured claims will consist of Qui Tam Claims, ETHEX Criminal Fine Claims and General Unsecured Claims, including Convertible Subordinated Notes Claims.  The Liquidation Analysis does not attempt to estimate potential additional General Unsecured Claims that likely would arise as a result of the termination of the Debtors' business, including any rejection damage Claims.  Such additional claims likely would result from a cessation of operations as contemplated herein and would likely be substantial in amount.

For purposes of the Liquidation Analysis, the Debtors have assumed that the Qui Tam Claims and ETHEX Criminal Fine Claims are estimated to be $18.2 million and $16.2 million, respectively, for a total of $34.4 million.

NOTE N – SUBORDINATED CLAIMS

The subordinated claims consist of the Hermelin Claims which are estimated at $0.  Mr. Hermelin filed a proof of claim against K-V Pharmaceutical Company in the amount of approximately $83.0 million for alleged amounts due under an employment agreement with KV and an indemnification agreement with the Company.

# EXHIBIT 3

**Financial Projections**

| Selected Financial Information | For the Fiscal Year Ending March 31, | | | | | |
|---|---|---|---|---|---|---|
| ($Millions) | 2014[1] | 2015 | 2016 | 2017 | 2018 | 2019 |
| Net Revenues | $ 95.9 | $ 147.3 | $ 164.7 | $ 180.4 | $ 167.2 | $ 66.2 |
| COGS | 6.2 | 12.1 | 17.1 | 19.1 | 14.7 | 10.8 |
| Gross Profit | $ 89.7 | $ 135.2 | $ 147.6 | $ 161.3 | $ 152.5 | $ 55.4 |
| *Gross Margin* | *93.5%* | *91.8%* | *89.6%* | *89.4%* | *91.2%* | *83.6%* |
| Research & Development | $ 11.2 | $ 12.0 | $ 10.6 | $ 10.4 | $ 7.1 | $ 3.1 |
| Selling & Administrative Expenses | 32.0 | 43.5 | 44.4 | 43.9 | 40.0 | 20.4 |
| Total Operating Expenses | 43.2 | 55.5 | 54.9 | 54.4 | 47.1 | 23.5 |
| EBITDA | $ 46.5 | $ 79.7 | $ 92.7 | $ 106.9 | $ 105.5 | $ 31.9 |
| *EBITDA Margin* | *48.4%* | *54.1%* | *56.3%* | *59.3%* | *63.1%* | *48.1%* |
| Depreciation and Amortization | 15.1 | 20.2 | 20.2 | 20.2 | 17.3 | 3.0 |
| EBIT | $ 31.3 | $ 59.5 | $ 72.5 | $ 86.8 | $ 88.2 | $ 28.9 |
| *EBIT Margin* | *32.7%* | *40.4%* | *44.0%* | *48.1%* | *52.7%* | *43.6%* |
| | | | | | | |
| Memo: | | | | | | |
| Gross To Net Revenue % | 68.2% | 68.5% | 68.6% | 68.7% | 68.8% | 72.1% |
| Estimated Exit Gross Makena Market Share % [2] | 24.4% | 25.0% | 25.0% | 25.0% | 4.9% | 1.1% |
| Estimated Exit Net Makena Market Share % [3] | 14.7% | 15.0% | 15.0% | 15.0% | 2.9% | 0.7% |

(1) Represents partial fiscal year from July 1, 2013 to March 31, 2014.

(2) Market share is calculated based on an estimated annual patient population of 105,000 patients, or approximately 26,250 per quarter, which represents the Company's estimate of patients who are both insured and likely to seek some form of treatment.

(3) Market share is calculated based on an estimated annual patient population of 105,000 patients, or approximately 26,250 per quarter, which represents the Company's estimate of patients who are both insured and likely to seek some form of treatment. Net Makena market share represents adjustments for estimated cancellations and for patients who receive therapy at some or no cost.

### A.    General Assumptions

#### 1.    Overview

The consolidated Financial Projections have been prepared by management and are based upon the Company's detailed operating forecast for the fiscal years ending March 31, 2014 through 2019. The Financial Projections are based on various strategic reviews, historical performance, management's view of market dynamics, the regulatory environment as well as corresponding assumptions regarding pricing, market share expected to be achieved, patient mix and cost structure.

#### 2.    Forecast Period

The information for the fiscal year ending March 31, 2014 represents a partial fiscal year from July 1, 2013 to March 31, 2014.

#### 3.    Net Revenue

Consolidated net revenue is comprised of sales from the Debtors' existing product portfolio which includes Makena®, Evamist®, Gynazole-1® and Clindesse®. Net revenue is expected to increase in fiscal years 2014 to 2017 due primarily to projected increases in market share for Makena®, continued growth of Gynazole-1®, which began selling in January 2013 and the re-launch of Clindesse® which is expected to occur in the first half of fiscal year 2014.  Net revenues begin to decline at the end of fiscal year 2018, primarily due to Makena® reaching the end of its orphan drug exclusivity period in February 2018.

#### 4.    Cost of Goods Sold (COGS)

COGS, which is primarily comprised of product costs charged to the Company by its third party manufacturers, is expected to increase from 2014 to 2017 primarily due to an expectation of higher sales volume and then is expected to begin to decline at the end of fiscal year 2018, primarily due to declining Makena® volume.

#### 5.    Gross Margin

Gross margin as a percentage of net revenue is expected to be 93.5% in 2014 then is expected to decline modestly in future years as sales of Gynazole-1® and Clindesse® are forecasted to be a larger proportion of overall net revenues.

#### 6.    Research & Development Expenses

Research & Development ("R&D") expenses are primarily related to the clinical studies costs associated with the Makena® post approval studies required by the FDA and personnel related costs.  R&D is expected to decline beginning in 2017 as the activity level in the studies begins to decrease.

### 7. Selling & Administrative Expenses

Selling & Administrative ("S&A") expenses, which are comprised primarily of sales, advertising and promotion and corporate costs are projected to increase modestly through fiscal year 2016 due primarily to inflation adjustments.  S&A is projected to decline beginning in 2018, primarily as a result of anticipated lower operating costs in connection with a decrease in sales of Makena® at the end of its orphan drug exclusivity period.

### 8. Depreciation & Amortization

Depreciation & Amortization ("D&A") is comprised primarily of amortization of the capitalized costs of Makena® and Evamist®.  D&A is expected to remain stable until February 2018 at which time the capitalized cost of Makena® will be fully amortized.

## **EXHIBIT 4**

**Disclosure Statement Order (without exhibits)**

UNITED STATES BANKRUPTCY COURTSOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

In re                                    :         Chapter 11
                                         :
K-V Discovery Solutions, Inc., et al.,[1]  :         Case No. 12-13346 (ALG)
                                         :
            Debtors.                     :         (Jointly Administered)

-------------------------------------------------------x

**ORDER:  (I) APPROVING DISCLOSURE STATEMENT;
(II) ESTABLISHING DATE OF CONFIRMATION HEARING;
(III) ESTABLISHING PROCEDURES FOR SOLICITATION AND
TABULATION OF VOTES TO ACCEPT OR REJECT PLAN,
INCLUDING (A) APPROVING FORM AND MANNER OF SOLICITATION
PACKAGES, (B) APPROVING FORM AND MANNER OF NOTICE OF THE
CONFIRMATION HEARING, (C) ESTABLISHING RECORD DATE
AND APPROVING PROCEDURES FOR DISTRIBUTION OF SOLICITATION
PACKAGES, (D) APPROVING FORMS OF BALLOTS, (E) ESTABLISHING
DEADLINE FOR RECEIPT OF BALLOTS, AND (F) APPROVING
PROCEDURES FOR VOTE TABULATIONS; (IV) ESTABLISHING
DEADLINE AND PROCEDURES FOR FILING
OBJECTIONS TO CONFIRMATION OF PLAN; (V) APPROVING
RIGHTS OFFERING PROCEDURES; AND (IV) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**")[2] of the debtors and debtors in

possession in the above-captioned cases (collectively, the "**Debtors**") for entry of an order,

pursuant to sections 105, 363, 1125 and 1126 of title 11 of the United States Code (the

"**Bankruptcy Code**"), Rules 2002, 3016, 3017 and 3020 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**") and Rule 3017-1 of the Local Bankruptcy Rules for the

Southern District of New York (the "**Local Rules**"), (i) approving the Disclosure Statement for

Sixth Amended Joint Chapter 11 Plan of Reorganization for K-V Discovery Solutions, Inc. and

---

[1]    The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) K-V
       Discovery Solutions, Inc. (7982); (ii) DrugTech Corporation (3690); (iii) FP1096, Inc. (3119); (iv) K-V
       Generic Pharmaceuticals, Inc. (7844); (v) K-V Pharmaceutical Company (8919); (vi) K-V Solutions USA,
       Inc. (4772); (vii) Ther-Rx Corporation (3624); and (viii) Zeratech Technologies USA, Inc. (6911).  The
       Debtors' executive headquarters are located at 16640 Chesterfield Grove Road, Suite 200, Chesterfield,
       Missouri 63005.

[2]    Capitalized terms used but not defined herein have the meanings assigned to them in the Motion or the Plan
       (defined below), as applicable.

Its Affiliated Debtors (including all exhibits thereto and as may be amended, modified or supplemented from time to time, the "**Disclosure Statement**"); (ii) establishing the date of the hearing on confirmation of the Plan (the "**Confirmation Hearing**"); (iii) establishing procedures for the solicitation and tabulation of votes to accept or reject the Sixth Amended Joint Chapter 11 Plan of Reorganization for K-V Discovery Solutions, Inc. and Its Affiliated Debtors (including all exhibits thereto and as may be amended, modified or supplemented from time to time, the "**Plan**"), including (a) approving the form and manner of the solicitation packages to be sent to parties in interest in these cases, (b) approving the form and manner of notice of the Confirmation Hearing, (c) establishing a voting record date and approving procedures for distributing solicitation packages, (d) approving the forms of ballots, (e) establishing the deadline for the receipt of ballots, and (f) approving procedures for tabulating acceptances and rejections of the Plan; (iv) establishing the deadline and procedures for filing objections to confirmation of the Plan; (v) approving the procedures for the Rights Offering substantially in the form annexed hereto as Exhibit D (including all exhibits thereto, and as the same may be amended, modified or supplemented from time to time, the "**Rights Offering Procedures**"); and (vi) granting related relief; and it appearing that due and sufficient notice pursuant to Bankruptcy Rule 2002(b) of the hearing to approve the Motion and the Disclosure Statement has been given; and after due deliberation; and the relief requested in the Motion being in the best interests of the Debtors, their estates and creditors and other parties in interest; and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED AND DECREED that:

1.      The Motion is granted as set forth herein.

2.      The Disclosure Statement is approved as containing adequate information

within the meaning of section 1125 of the Bankruptcy Code.

3.      Except as provided in paragraph 5 below, the Debtors shall mail or cause

to be mailed to holders of claims against each of the Debtors entitled to vote on the Plan, so that

such mailing commences no later than July 19, 2013 (the "**Solicitation Commencement**

**Deadline**"), a solicitation package containing: (a) written notice (the "**Confirmation Hearing**

**Notice**"), substantially in the form attached hereto as Exhibit A, of (i) the Court's approval of the

Disclosure Statement, (ii) the deadline for voting on the Plan, (iii) the date of the Confirmation

Hearing, and (iv) the deadline and procedures for filing objections to confirmation of the Plan,

which Confirmation Hearing Notice is approved; (b) copies of the Plan and the Disclosure

Statement which may (but shall not required to) be in PDF format on a CD-ROM; (c) the

appropriate ballot (substantially in the form attached hereto as Exhibits B-1 through B-7) and

ballot return envelope; and (d) such other information as the Court may direct or approve

(collectively, the "**Solicitation Package**").  The Solicitation Package and the manner of service

of the Solicitation Package satisfies the requirements of Bankruptcy Rule 3017(d).

4.      Pursuant to Bankruptcy Rule 3017(d), the Debtors are not required to

transmit a Solicitation Package to (a) Unimpaired Creditors or (b) the holders of Claims and

Interests classified in Classes 8(a) (Existing Securities Law Claims), 8(b) (Equitably

Subordinated Claims) and 9 (Existing KV Interests) (collectively, Classes 8(a), 8(b) and 9, the

"**Deemed Rejecting Parties**" and, collectively with Unimpaired Creditors, the "**Non-Voting**

**Parties**").  For the avoidance of doubt, holders of Claims in Classes 8(a) and 8(b) are Deemed

Rejecting Parties notwithstanding the potential availability of insurance proceeds to satisfy their

respective Claims, in whole or in part.  The Debtors shall mail or cause to be mailed to each

- 3 -

Non-Voting Party, so that such mailing commences no later than the Solicitation

Commencement Deadline, the applicable Non-Voting Creditor Notice, substantially in the forms

attached hereto as Exhibit C-1 (for Unimpaired Creditors) and C-2 (for Deemed Rejecting

Parties).  Subject to the procedures set forth herein relating to temporary allowance of Claims for

voting purposes, the Non-Voting Parties shall not be entitled to vote on the Plan.

          5.       With respect to Solicitation Packages to be distributed to holders of

Claims in Classes 3 and 6, the Debtors shall distribute or cause to be distributed Solicitation

Packages, including Ballots, to record holders of the Debtors' securities in such Classes,

including without limitation, brokers, banks, commercial banks, transfer agents, trust companies,

dealers, or other agents or nominees (collectively, the "**Voting Nominees**"),[3] and each Voting

Nominee shall be entitled to receive via overnight or hand delivery reasonably sufficient

numbers of Solicitation Packages (including Beneficial Ballots) to distribute via first class mail

to the beneficial owners of the Claims and Interests for whom such Voting Nominee acts

(collectively, the "**Beneficial  Owners**").  Each Voting Nominee is directed to forward the

Solicitation Package to the Beneficial Owners of the securities entitled to vote on the Plan

represented by such Voting Nominee using one of the following two methods (to be selected by

the Voting Nominee) within five (5) business days of receipt of the Solicitation Packages:

        a.     Master Ballots:  A Voting Nominee may obtain the votes of Beneficial
Owners by forwarding to the Beneficial Owners the applicable unsigned
Beneficial Ballot, together with the Solicitation Package, a return envelope
provided by, and addressed to, the Voting Nominee, and other materials
requested to be forwarded.  Each such Beneficial Owner may then indicate
its vote on the Beneficial Ballot, provide the information requested in the
Beneficial Ballot, review the certifications contained in the Beneficial
Ballot, and return the Beneficial Ballot in sufficient time to be summarized

---

[3]    For the avoidance of doubt, the Senior Secured Notes Indenture Trustee and the Convertible Subordinated
Notes Indenture Trustee will not be considered Voting Nominees, and shall have no obligation with respect
to distribution and/or tabulation of Master Ballots or Beneficial Ballots for Class 3 or Class 6.

on a master ballot (the "**Master Ballot**"), in substantially the forms annexed hereto as Exhibits B-2 (for Class 3) and B-6 (for Class 6).  The Voting Nominee then will summarize the individual votes of its respective Beneficial Owners from their Beneficial Ballots on the Master Ballot and then return the Master Ballot to the Solicitation Agent so that it is received prior to the Voting Deadline.  All Beneficial Ballots returned by Beneficial Owners will be retained by Voting Nominees for inspection for at least one year from the Voting Deadline.

b.    Pre-Validated Ballots:  A Voting Nominee may pre-validate a Beneficial Ballot by, as applicable:  (i) signing the applicable Beneficial Ballot; (ii) indicating on the Beneficial Ballot the account number of the applicable Beneficial Owner, and the amount of the securities held by the Voting Nominee for such Beneficial Owner; and (iii) forwarding such Beneficial Ballot together with the Solicitation Package and other materials requested to be forwarded to the Beneficial Owner for voting.  The Beneficial Owner may then indicate its vote on the Beneficial Ballot, provide the information requested in the Beneficial Ballot, review the certifications contained in the Beneficial Ballot, and return the Beneficial Ballot directly to the Solicitation Agent so that it is received by the Solicitation Agent before the Voting Deadline.  A list of the Beneficial Owners to whom pre-validated Beneficial Ballots were delivered will be maintained by each applicable Voting Nominee for inspection for at least one year from the Voting Deadline.

6.    The Debtors are authorized to distribute or cause to be distributed Master Ballots to the Voting Nominees in Classes 3 and 6 in accordance with customary procedures.  Each Voting Nominee shall (i) return such results in a Master Ballot, (ii) return the original underlying Ballots of the Beneficial Owners, and (iii) retain the copies of the underlying Ballots received from the Beneficial Owners for inspection for a period of one year following the Voting Deadline.

7.    5:00 p.m. (prevailing Eastern time) on July 11, 2013 is established as the record date (the "**Voting Record Date**") for purposes of determining the creditors and interest holders of the Debtors entitled to receive the Solicitation Package or a Non-Voting Creditor Notice and to vote on the Plan, provided, however, that with respect to transfers of claims filed pursuant to Bankruptcy Rule 3001, the holder of a claim as of the Voting Record Date shall be

the transferor of such claim unless the documentation evidencing such transfer was docketed by the Bankruptcy Court on or before twenty (21) days prior to the Voting Record Date and no timely objection with respect to such transfer was filed by the transferor.

8.      Epiq Bankruptcy Solutions, LLC ("**Epiq**" or the "**Solicitation Agent**" or the "**Balloting Agent**", as applicable) will inspect, monitor and supervise the Plan solicitation process, tabulate the ballots and certify to the Court the results of the balloting.

9.      The Debtors are permitted to dispense with the mailing of Solicitation Packages or Non-Voting Creditor Notices to addresses and entities to which the notice of the Disclosure Statement hearing was returned by the United States Postal Service as undeliverable, unless the Debtors or the Solicitation Agent are provided with an accurate address.

10.     The Ballots, including the Master Ballots, substantially in the forms attached hereto as Exhibits B-1 through B-7, are hereby approved.

11.     All Ballots and Master Ballots must be properly executed, completed and delivered to the Balloting Agent by first class mail, by overnight or hand delivery, or courier, to: K-V Discovery Solutions, Inc. Ballot Tabulation Center, c/o Epiq Bankruptcy Solutions, LLC, FDR Station, P.O. Box 5014, New York, NY 10150-5014, so that the Ballots and Master Ballots are received on or before August 16, 2013 at 4:00 p.m. (prevailing Eastern Time) (the "**Voting Deadline**"), unless extended by the Debtors.  Ballots and Master Ballots cast by facsimile, email or other electronic transmission will not be counted unless approved by the Debtors in writing.

12.     For purposes of voting on the Plan, the amount of a claim held by a creditor or the number of any interests held by an interest holder shall be determined pursuant to the following guidelines:

      a.      the claim amount listed in the Debtors' schedules of liabilities, provided that (i) such claim is not scheduled as contingent, unliquidated,

undetermined or disputed, and (ii) no proof of claim has been timely filed (or otherwise deemed timely filed by the Court under applicable law);

b. the noncontingent and liquidated amount specified in a proof of claim timely filed with the Court or Epiq (or otherwise deemed timely filed by the Court under applicable law) to the extent the proof of claim is not the subject of an objection filed no later than ten (10) business days prior to the Voting Deadline (or, if such claim has been resolved pursuant to a stipulation or order entered by the Court, or otherwise resolved by the Court, the amount set forth in such stipulation or order);

c. the amount temporarily allowed by the Court for voting purposes, pursuant to Bankruptcy Rule 3018(a), provided that a motion is brought, notice is provided and a hearing is held no later than five (5) business days prior to the Confirmation Hearing, in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules; or

d. except as otherwise provided in subparagraph (c) hereof, with respect to ballots cast by alleged creditors whose claims (i) are not listed on the Debtors' schedules of liabilities or (ii) are listed as disputed, contingent and/or unliquidated on the Debtors' schedules of liabilities, but who have timely filed proofs of claim in unliquidated or unknown amounts that are not the subject of an objection filed before the commencement of the Confirmation Hearing, such ballots shall be counted as allowed claims in the amount of $1 solely for the purposes of determining whether the requirements of section 1126(c) of the Bankruptcy Code have been satisfied.

13. Subject to paragraph 12(c) hereof, holders of claims filed in the amount of $0.00 shall not be entitled to vote.

14. The Debtors may object to any claim (as defined in section 101(5) of the Bankruptcy Code) solely for Plan voting purposes by filing a determination motion (the "**Determination Motion**") no later than ten (10) business days prior to the Voting Deadline with the Court.  Responses, if any, to the Determination Motion shall be filed no later than five (5) business days prior to the hearing on the Determination Motion.  The Court has provisionally scheduled a hearing on any such Determination Motions for August 23, 2013 at 11:00 a.m. (prevailing Eastern time).  If a Determination Motion is filed, the ruling by the Court on the Determination Motion shall be considered a ruling with respect to the allowance of the claim(s)

- 7 -

under Bankruptcy Rule 3018 and such claim(s) shall be counted, for voting purposes only, in the amount determined by the Court. The filing of a Determination Motion or a ruling by the Court thereon shall not affect the right or ability of the Debtors, upon the Effective Date, to later object to such claim(s) for any other purposes, including distribution under the Plan.

15.    If a creditor casts a ballot and has timely filed a proof of claim (or has otherwise had a proof of claim deemed timely filed by the Court under applicable law), but the creditor's claim is the subject of an objection filed no later than ten (10) business days before the Voting Deadline, such creditor's ballot shall not be counted (subject to the immediately following sentence), unless such claim is temporarily allowed by the Court for voting purposes, pursuant to Bankruptcy Rule 3018(a), after a Claims Estimation Motion (as defined below) is brought by such creditor, notice is provided and a hearing is held no later than August 23, 2013 at 11:00 a.m. (prevailing Eastern time). If an objection to a claim requests that such claim be reclassified and/or allowed in a fixed, reduced amount, such claimant's ballot shall be counted in such reduced amount and/or as the reclassified category, unless otherwise ordered by the Court after a Claims Estimation Motion is brought by such creditor in accordance with the provisions of this Order.

16.    Creditors seeking to have a claim temporarily allowed for purposes of voting to accept or reject the Plan pursuant to Bankruptcy Rule 3018(a) must file a motion (the "**Claims Estimation Motion**") for such relief no later than five (5) business days prior to the Voting Deadline. The Court has provisionally scheduled a hearing on any such Claims Estimation Motions for August 23, 2013 at 11:00 a.m. (prevailing Eastern time).

17.    Any holder of a Claim (other than a Senior Secured Notes Claim) that constitutes "Senior Indebtedness" (as defined in the Convertible Subordinated Notes Indenture)

- 8 -

entitled to the benefit of the subordination provisions contained in Article XI of the Convertible

Subordinated Notes Indenture must assert any objection to the treatment of its subordination

rights under the Plan on or prior to the deadline to object to the Plan.  Any disagreement with the

priorities or distributions set forth in the Plan or any right to assert contractual subordination

under the Convertible Subordinated Notes Indenture, including in respect of claims of "Senior

Indebtedness," shall be raised on or prior to the deadline to object to the Plan, and decided at or

prior to the Confirmation Hearing, and all issues with respect to contractual subordination not

raised or resolved at the Confirmation Hearing shall be governed pursuant to the Plan or, if the

decision of the Bankruptcy Court at the Confirmation Hearing differs from the Plan, then such

decision shall govern.

       18.     The following voting procedures and standard assumptions shall be used

in tabulating the Ballots:

    a.     For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate claims held by a single creditor in a particular class will be aggregated as if such creditor held one claim against the Debtors in such class, and the votes related to such claims will be treated as a single vote to accept or reject the Plan.

    b.     Creditors must vote all of their claims or interests within a particular class either to accept or reject the Plan and may not split their vote. Accordingly, a ballot (or multiple ballots with respect to multiple claims within a single class) that partially rejects and partially accepts the Plan will not be counted.

    c.     Ballots that fail to indicate an acceptance or rejection of the Plan or that indicate both acceptance and rejection of the Plan, but which are otherwise properly executed and received prior to the Voting Deadline, will not be counted.

    d.     Only ballots that are timely received with signatures will be counted. Unsigned ballots will not be counted.

    e.     Ballots postmarked prior to the Voting Deadline, but received after the Voting Deadline, will not be counted.

f.      Ballots which are illegible, or contain insufficient information to permit the identification of the creditor, will not be counted.

g.      Whenever a creditor casts more than one ballot voting the same claim prior to the Voting Deadline, the last valid ballot received prior to the Voting Deadline shall be deemed to reflect the voter's intent and supersede any prior ballots.

h.      If a creditor simultaneously casts inconsistent duplicate ballots with respect to the same claim, such ballots shall not be counted.

i.      Each creditor shall be deemed to have voted the full amount of its claim. Unless otherwise ordered by the Court, questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots shall be determined by the Balloting Agent and the Debtors in their sole discretion, which determination shall be final and binding.

j.      If no creditor or interest holder in a particular class or classes entitled to vote to accept or reject the Plan votes either to accept or reject the Plan, such class or classes shall be deemed to have accepted the Plan.

19.      In the event any class of claims or interests does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, such class or classes will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

20.      The following additional rules apply to the tabulation of Master Ballots and Beneficial Ballots cast by Voting Nominees and Beneficial Owners:

a.      Votes cast by Beneficial Owners through a Voting Nominee will be applied against the positions held by such entities in the applicable security as of the Voting Record Date, as evidenced by the record and depository listings. Votes submitted by a Voting Nominee, pursuant to the Master Ballots or pre-validated Beneficial Ballots, will not be counted in excess of the principal amount of such securities held by such Voting Nominee.

- 10 -

b.       To the extent that conflicting votes or "overvotes" are submitted by a Voting Nominee, the Balloting Agent, in good faith, will attempt to reconcile discrepancies with the Voting Nominee.

c.       To the extent that overvotes on the Master Ballot are not reconcilable prior to the preparation of the vote certification, the Balloting Agent will apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballots or pre-validated Beneficial Ballots that contained the overvote, but only to the extent of the Voting Nominee's position in the applicable security.

d.       Where a Beneficial Owner holds its Class 3 or 6 securities through more than one Voting Nominee, it must execute a separate Class 3 or 6 Ballot, respectively, for each block of securities.  However, such holder must vote all of its Claims in each Class in the same manner, to either accept or reject the Plan.  Accordingly, if such holder returns more than one Ballot to more than one Voting Nominee voting different Claims within each Class under the Plan and the Ballots are not voted in the same manner, as reflected on such separate Master Ballots, such votes will not be counted.

e.       For the purposes of tabulating votes, each Beneficial Owner will be deemed to have voted the principal amount relating to such security, although the Voting Agent will adjust such principal amount to reflect the claim amount, including prepetition interest.

21.      Any objection, comment or response to confirmation of the Plan (including any supporting memoranda) must be in writing, served on the parties identified below, and filed with the Court, together with proof of service, such that the foregoing are received by such parties and the Court on or before **August 19, 2013 at 4:00 p.m.** (prevailing Eastern Time). The Court shall consider only timely filed written objections.  All objections not timely filed and served in accordance with the provisions of this Motion are hereby deemed waived.  Objections to confirmation of the Plan shall provide proposed language to remedy such objections and shall be served on the following parties:  (i) counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019 (Attn: Robin Spigel, Esq. and Andrew D. Sorkin, Esq.); (ii) counsel to the Creditors Committee, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038 (Attn: Erez Gilad, Esq. and Matthew Garofalo,

Esq.); (iii) counsel to the agent and lenders under the Debtors' debtor-in-possession financing

facility, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Lori R.

Fife, Esq. and Robert J. Lemons, Esq.); and (iv) counsel for the Office of the United States

Trustee, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Richard Morrissey, Esq.

and Michael Driscoll, Esq.).

22.    The Confirmation Hearing shall be held before this Court on **August 28,**

**2013 at 11:00 a.m.** (prevailing Eastern Time), or as soon thereafter as counsel can be heard,

before the Honorable Allan L. Gropper of the United States Bankruptcy Court for the Southern

District of New York at the United States Bankruptcy Court for the Southern District of New

York, One Bowling Green, New York, New York 10004.

23.    The Confirmation Hearing may be adjourned from time to time without

further notice to creditors and other parties-in-interest by an announcement of the adjourned date

at the Confirmation Hearing of any adjournment thereof or an appropriate filing with the Court.

24.    Prior to mailing the Disclosure Statement, Solicitation Packages, and Non-

Voting Creditor Notices, the Debtors may fill in any missing dates and other information, correct

any typographical errors, make the revisions to the Disclosure Statement and Plan reflected in

the record of the hearing on the Motion, include in the Solicitation Packages a letter from the

Creditors' Committee in support of the Plan, and make such other non-material, non-substantive

changes to any such documents as the Debtors deem appropriate.

25.    The Rights Offering Procedures in substantially the form annexed hereto

as Exhibit D are approved. The Debtors are hereby authorized and empowered to conduct the

Rights Offering pursuant to the terms and provisions of the Rights Offering Procedures, and may

take such actions, including, but not limited to, engaging a subscription agent, and expending

funds as necessary or appropriate to conduct and implement the Rights Offering.

26.     The Debtors hereby are authorized and empowered to take such steps and

expend such funds as are necessary to implement the terms of this Order.

27.     This Court shall retain jurisdiction over all matters related to or arising

from the Motion or the interpretation or implementation of this Order.

Dated: New York, New York
        July 17, 2013

                        /s/ ALLAN L. GROPPER
                        THE HONORABLE ALLAN L. GROPPER
                        UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT 5

### Rights Offering Procedures

# RIGHTS OFFERING PROCEDURES[1]

**NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN OR IN THE PLAN, THE OFFER TO PARTICIPATE IN THE RIGHTS OFFERING DESCRIBED HEREIN IS BEING MADE ONLY TO THOSE ELIGIBLE HOLDERS THAT CERTIFY THAT THEY ARE ACCREDITED INVESTORS.  THE EXERCISE OF SUBSCRIPTION RIGHTS BY SUCH HOLDERS SHALL BE SUBJECT TO THE PROCEDURES DESCRIBED HEREIN.**

## 1.     Introduction

Each Eligible Holder (as defined below) has the right, but not the obligation, to purchase a portion of 11,900,000 shares of New Common Stock (the "Rights Offering Stock"), representing 76.2% of the total shares of New Common Stock to be issued pursuant to the Plan (as defined below) on the Effective Date (which shall be subject to dilution by any New Common Stock Securities to be issued pursuant to the Management Incentive Plan), by completing and executing a rights offering subscription form (the "Subscription Form") that will be sent to each Eligible Holder herewith upon receipt of each such holder's Investor Certificate (as defined below) certifying that such holder is an Accredited Investor.  The price per share of New Common Stock payable in connection with such a purchase will be $20.00 (the "Purchase Price").  Any reference to an Eligible Holder's "Aggregate Exercise Price" shall mean the Purchase Price multiplied by the number of shares of New Common Stock such Eligible Holder duly elects to purchase in accordance with and subject to these Rights Offering Procedures.

Each Eligible Holder shall have the right to purchase up to its Rights Offering Pro Rata Stock Amount of the Rights Offering Stock pursuant to the Rights Offering ("Subscription Rights"), all pursuant to the terms set forth herein, in the Subscription Form and in the Plan. There will be no over subscription rights provided to the Eligible Holders in connection with the Rights Offering.  With respect to each Eligible Holder, each Subscription Right shall represent the right to acquire one (1) Rights Offering Share for the Purchase Price.  The Debtors will not and do not plan to apply for listing or quotation of the Subscription Rights or the underlying Rights Offering Stock on any public exchange or quotation system.  Fractional shares of Rights Offering Stock shall not be issued upon exercise of the Subscription Rights.  The number of shares of Rights Offering Stock issued upon any holder's exercise of its Subscription Rights will be rounded down to the nearest whole share and no compensation shall be paid in respect of any such fractional shares.

For purposes of these Rights Offering Procedures, each of the following capitalized terms shall have the meaning set forth below:

"Accredited Investor" means an "accredited investor" as defined in Rule 501(a) under Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act").

---

[1]    Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Plan (as defined below).

"DIP Exchange Form" means that certain letter agreement between the Debtors and an Investor Party, pursuant to which the applicable Investor Party will agree to surrender in exchange for New Common Stock all or a portion of the DIP Claims held by such Investor Parties (or their affiliates), as more fully set forth in Section 1.4(a) of the SPBA.

"Eligible Holder" means a holder of an Allowed Convertible Subordinated Notes Claim as of the Voting Record Date that (i) certified in accordance with Section 2 hereof that it is an Accredited Investor as of the Voting Record Date and (ii) votes to accept the Plan. Notwithstanding the foregoing, each of the Investor Parties and Silver Point shall be deemed Eligible Holders without any further action by such Investor Parties or Silver Point (provided that, prior to the commencement of the Rights Offering, each of the foregoing parties provide to the Debtors or the Subscription Agent the information necessary for the Subscription Agent to confirm the amount of the Convertible Subordinated Notes held by each such party).

"Investor Certificate" means the certificate (together with the accompanying instructions) that was mailed to each record holder of an Allowed Convertible Subordinated Notes Claim as of the Voting Record Date, pursuant to which each such holder seeking to exercise Subscription Rights is required to certify that it is an Accredited Investor and the total amount of Allowed Certified Convertible Notes Claims held by such holder.

"Plan" means the Sixth Amended Joint Chapter 11 Plan of Reorganization for KV Discovery Solutions, Inc. and its Affiliated Debtors, as such plan of reorganization may be amended or modified from time to time in accordance with its terms.

"Rights Offering Deadline" means 4:00 p.m. (prevailing Eastern time) on August 16, 2013 (as may be extended in accordance with the terms of these Rights Offering Procedures).

"SPBA" means that certain Second Amended and Restated Stock Purchase and Backstop Agreement, dated June 6, 2013, by and among Capital Ventures International, Greywolf Capital Overseas Master Fund, Greywolf Capital Partners II L.P., Greywolf Opportunities Fund L.L.C., Kingdon Associates, Kingdon Credit Master Fund L.P., Kingdon Family Partnership, L.P., M. Kingdon Offshore Master Fund L.P., Deutsche Bank Securities, Inc. (solely with respect to the Distressed Products Group) and K-V Pharmaceutical Company, as the same may be amended, modified and/or supplemented from time to time.

"Subscription Agent" means Epiq Bankruptcy Solutions, LLC, in its capacity as such.

"Voting Record Date" means July 11, 2013 at 5:00 p.m. (prevailing Eastern time).

Only Eligible Holders shall be entitled to participate in the Rights Offering.

***Before exercising any Subscription Rights, Eligible Holders should read the Disclosure Statement, including the section entitled "Certain Risk Factors To Be Considered," and the Plan.***

2.      **Determination of Accredited Investor Status**

The Debtors have previously undertaken a mailing to each holder of an Allowed Convertible Subordinated Notes Claim as of the Voting Record Date an Investor Certificate to determine which such holders are Accredited Investors, and the amount of Allowed Convertible Notes Claims held by each such holder.  Each Eligible Holder seeking to exercise Subscription Rights is required to certify its status as an Accredited Investor to the Debtors by duly completing and returning an Investor Certificate.

Each holder of an Allowed Convertible Subordinated Notes Claim that properly completes and timely returns an Investor Certificate to the Subscription Agent in accordance with the instructions set forth therein certifying that it is an Accredited Investor has been mailed these Rights Offering Procedures and the related offering documents, including the Subscription Form and the Disclosure Statement (collectively, the "Rights Offering Documents").

**Any holder of an Allowed Convertible Subordinated Notes Claim that does not timely return the Investor Certificate will forfeit any and all rights that it may have under the Rights Offering with respect to the Allowed Convertible Subordinated Notes Claims.**

3.      **Commencement/Expiration of the Rights Offering**

Eligible Holders may exercise their Subscription Rights at any time after receipt of the Rights Offering Documents, until the Rights Offering Deadline.  If the Rights Offering Deadline is extended in accordance with the terms of these Rights Offering Procedures, the Subscription Agent shall promptly notify all potential Eligible Holders in writing (including by electronic mail) and/or by posting a notice on the website maintained by the Subscription Agent (http://dm.epiq11.com/KVD) of such extension and of the new Rights Offering Deadline.  Each Eligible Holder intending to participate in the Rights Offering must affirmatively make an election to exercise its Subscription Rights on or prior to the Rights Offering Deadline in accordance with the provisions of Section 4 below, and must vote to accept the Plan.

4.      **Exercise of Subscription Rights**

To exercise its Subscription Rights, each Eligible Holder must designate on its Subscription Form that it wishes to exercise its Subscription Rights, return the fully-executed Subscription Form in accordance with the directions contained therein, and pay the applicable Aggregate Exercise Price to the Subscription Agent on or prior to the applicable Payment Deadline (as defined below) in accordance with the Payment Instructions (as defined below) set forth on the Subscription Form.  Such election to exercise the Subscription Rights shall become irrevocable and shall be binding upon the earlier of:  (i) the date on which the applicable Aggregate Exercise Price is received by the Subscription Agent and (ii) the Rights Offering Deadline.  Each Eligible Holder is entitled to participate in the Rights Offering solely to the extent of its Rights Offering Pro Rata Stock Amount.  Each Eligible Holder may exercise all or any portion of such holder's Subscription Rights pursuant to the procedures outlined below; provided, however, that no fractional shares of New Common Stock shall be issued pursuant to any exercise of Subscription Rights.

To exercise its Subscription Rights, each Eligible Holder must (i) deliver a duly executed and completed Subscription Form indicating such Eligible Holder's election to exercise such portion of its Subscription Rights as set forth therein, which must **actually be received** by the Subscription Agent on or prior to the Rights Offering Deadline and (ii) pay to the Subscription Agent, by wire transfer of immediately available funds,[2] the Aggregate Exercise Price so that such payment is actually received by the Subscription Agent on or before the Payment Deadline, in accordance with the instructions provided below and in the Subscription Form. All Subscription Rights duly exercised in accordance with these Rights Offering Procedures are irrevocable. If, prior to the Rights Offering Deadline, the Subscription Agent for any reason does not receive from or on behalf of an Eligible Holder a duly executed and completed Subscription Form, such Eligible Holder shall be deemed to have fully and irrevocably relinquished and waived its Subscription Rights.

Any attempt to exercise the Subscription Rights after the Rights Offering Deadline shall be null and void and the Debtors shall not be obligated to honor any such purported exercise received by the Subscription Agent after the Rights Offering Deadline regardless of when the documents relating thereto were sent. Failure to have timely and properly completed and returned an Investor Certificate to the Subscription Agent shall have rendered a holder of an Allowed Convertible Subordinated Notes Claims that would otherwise qualify as an Eligible Holder ineligible to participate in the Rights Offering.

The method of delivery of the Subscription Form and any other required documents is at each Eligible Holder's option and sole risk, and delivery will be considered made only when actually received by the Subscription Agent. If delivery is by mail, registered mail with return receipt requested, properly insured, is encouraged and strongly recommended. In all cases, you should allow sufficient time to ensure timely delivery prior to the Rights Offering Deadline.

Delivery shall be made to:

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Attn: KVD Rights Offering

**Payment for Rights Offering Stock**

The Subscription Forms shall include written instructions (the "Payment Instructions") relating to the payment of the Aggregate Exercise Price for each Eligible Holder that exercises Subscription Rights. The Payment Instructions shall include, for each Eligible

---

[2]       Notwithstanding anything to the contrary herein or in the Subscription Form, with respect to any Investor Parties who are party to the DIP Exchange Form, payment of the applicable portion of the Aggregate Purchase Price may be made pursuant to the terms and conditions set forth in the DIP Exchange Form.

Holder exercising Subscription Rights, (i) wire transfer instructions for the payment of the Aggregate Exercise Price and (ii) the deadline by which payment of the Aggregate Exercise Price must be made, which deadline shall be, for Eligible Holders who are not Investor Parties, the Rights Offering Deadline and, for Eligible Holders who are Investor Parties, the Closing (as such term is defined in the SPBA) (in each case, such date, the "Payment Deadline").

If, on or prior to the applicable Payment Deadline, the Subscription Agent for any reason does not receive from or on behalf of an Eligible Holder immediately available funds by wire transfer in an amount equal to the Aggregate Exercise Price for such Eligible Holder's exercised Subscription Rights, such Eligible Holder shall be deemed to have fully and irrevocably relinquished and waived its Subscription Rights; provided, however, that notwithstanding the foregoing, the Debtors reserve the right to pursue all remedies at equity and in law to compel payment or seek damages for such Eligible Holder's non-payment.  In no event, however, shall any Eligible Holder be liable on any theory of liability for any special, indirect, consequential or punitive damages as a result of its failure to deliver the Aggregate Exercise Price.

## Subsequent Determination of Allowed Convertible Subordinated Notes Claim

If, after the Voting Record Date, but at least seven (7) calendar days prior to the Rights Offering Deadline, as a result of a Bankruptcy Court order estimating, allowing, disallowing or reclassifying an Allowed Convertible Subordinated Notes Claim, an Eligible Holder becomes entitled to Subscription Rights (or a different amount of Subscription Rights than initially granted), such Eligible Holder shall be permitted to participate in the Rights Offering only with respect to such Allowed Convertible Subordinated Notes Claim as so estimated, allowed, disallowed or reclassified.

## Disputes, Waivers, and Extensions

All determinations as to the proper completion, due execution, timeliness, or eligibility of any exercise arising in connection with the submission of a Subscription Form and other matters affecting the validity or effectiveness of any attempted exercise of any Subscription Rights shall be made by the Debtors in their sole discretion, reasonably exercised in good faith, which determinations shall be final and binding.  An Eligible Holder shall be deemed not to have complied with subscription instructions, and such Eligible Holder's Subscription Form shall be deemed not duly executed and completed unless and until all defects and irregularities have been waived or cured within such time as the Debtors determine in their discretion, reasonably exercised in good faith.  The Debtors reserve the right, but are under no obligation, to give notice to any Eligible Holder regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Eligible Holder and the Debtors may, but are under no obligation to, permit such defect or irregularity to be cured within such time as it may determine in good faith.  None of the Debtors, the Subscription Agent, the Investor Parties or any of their respective advisors or agents shall incur any liability for failure to give such notification.

The Debtors may extend the duration of the Rights Offering and the Rights Offering Deadline with the approval of the Bankruptcy Court, or adopt additional detailed

procedures to more efficiently administer the distribution and exercise of the Subscription Rights that are not inconsistent with these procedures without further Bankruptcy Court Approval.

Solely with respect to the Investor Parties, in the event of any inconsistency between these Rights Offering Procedures and any provision of the SPBA, such provision of the SPBA will control.

## Funds

All payments required to be made in connection with an Eligible Holder's exercise of its Subscription Rights (the "Rights Offering Funds") shall be deposited in accordance with the paragraph entitled "Payment for Rights Offering Stock" above and held by the Subscription Agent in a segregated account or accounts pending the Effective Date, which segregated account or accounts will: (i) not constitute property of the Debtors' estates until the Effective Date; (ii) be separate and apart from, and not commingled with, the Subscription Agent's general operating funds and any other funds subject to any lien or any cash collateral arrangements; and (iii) be maintained for the sole purpose of holding the money for administration of the Rights Offering until the Effective Date. The Subscription Agent shall not use the Rights Offering Funds for any purpose other than to release the funds as directed by the Debtors on the Effective Date and shall not encumber, or permit the Rights Offering Funds to be encumbered, by any lien or similar encumbrance.

## Waiver

Each Eligible Holder that participates in the Rights Offering shall be deemed, by virtue of such participation, to have waived and released, to the fullest extent permitted under applicable law, all rights, claims or causes of action against the Debtors, the Reorganized Debtors, the Investor Parties and each of their respective subsidiaries, affiliates, advisors and agents, and the Subscription Agent arising out of or related to the receipt, delivery, disbursements, calculations, transmission or segregation of cash, Subscription Rights and Rights Offering Stock in connection with the Rights Offering, except to the extent such claims arise out of gross negligence or willful misconduct by any such party. Notwithstanding the foregoing, for the avoidance of doubt, neither the Debtors nor the Investor Parties are hereby waiving any claims that they may have pursuant to the SPBA or the Share Purchase Agreement.

## Stockholders Agreement

Each Eligible Holder that purchases and becomes a holder of New Common Stock of Reorganized KV pursuant to the Rights Offering shall be deemed, pursuant to Section 7.8 of the Plan, to be a party to the New Stockholders Agreement.

## 5.     Transfer Restriction; Revocation

The Subscription Rights are not transferable or detachable from the Allowed Convertible Subordinated Notes Claims. Subscription Rights may be exercised only by or through the Eligible Holder entitled to receive such Subscription Rights on the Voting Record Date. Any transfer or attempted transfer of the Subscription Rights will be null and void and the Subscription Agent will not treat any purported transferee thereof as the holder of any

Subscription Rights or permit any such purported transferee to exercise Subscription Rights or purchase shares in the Rights Offering.  Once the Eligible Holder has properly exercised its Subscription Rights and paid its Aggregate Exercise Price, such exercise will not be permitted to be revoked by such Eligible Holder.  In the event that an Eligible Holder who has properly exercised its Subscription Rights and paid the Aggregate Exercise Price sells or otherwise transfers its underlying Convertible Subordinated Notes, the successor to or the transferee of, such Convertible Subordinated Notes shall not be deemed an Eligible Holder as defined in these Rights Offering Procedures.

**6.      Return of Payment**

If the Plan, and therefore the Rights Offering, is not consummated, any cash paid to the Subscription Agent will be returned to the applicable Eligible Holder as soon as reasonably practicable after the date on which the Rights Offering is terminated, without any interest or deduction.

**7.      Subsequent Adjustments**

If, as of the Rights Offering Deadline, as a result of allowances of Allowed Convertible Subordinated Notes Claims or other actions following the Voting Record Date, more than all of the Rights Offering Stock subject to the Rights Offering has been subscribed for, each properly exercising Eligible Holder's Subscription Rights shall be reduced on a pro rata basis. The difference between the Aggregate Exercise Price actually paid by such exercising Eligible Holder and the Aggregate Exercise Price that such Eligible Holder is required to pay after giving effect to the reduction, if any, shall be refunded, without interest, on or as soon as reasonably practicable after the Effective Date.

**8.      Inquiries and Transmittal of Documents; Subscription Agent**

The instructions contained in the Subscription Form should be carefully read and strictly followed.

Questions relating to the Rights Offering should be directed to the Subscription Agent at the following phone number:

**EPIQ BANKRUPTCY SOLUTIONS, LLC**
**(646) 282-2500**

The risk of non-delivery of all documents and payments is on the Eligible Holder electing to exercise its Subscription Rights and not the Debtors, the Subscription Agent or any other Eligible Holder.

**9.      Registration**

Each of the Subscription Rights are being and the Rights Offering Stock will be issued to the Eligible Holders participating in the Rights Offering without registration under the Securities Act in reliance upon the exemption provided in section 4(a)(2) and/or Regulation D of the Securities Act.  None of the shares of Rights Offering Stock have been registered or, except

as provided in the Registration Rights Agreement, will be registered, under the Securities Act, or any State or local law requiring registration for offer or sale of a security.  There is not and there may never be a public market for the Rights Offering Stock, and there are no guarantees or expectations that the Debtors will seek or be able to meet the eligibility requirements of any stock exchange or that a public market for the Rights Offering Stock will ever develop.  To the extent a certificate is issued with respect to the Rights Offering Stock, such certificate will contain a restricted securities legend (in addition to any legends required under the New Stockholders Agreement).

**10.      Rights Offering Conditioned Upon Confirmation of the Plan; Reservation of Rights**

Notwithstanding anything to the contrary herein and in the Rights Offering Documents, all exercises of Subscription Rights are subject to and conditioned upon the confirmation of the Plan and the occurrence of the Effective Date.  Notwithstanding anything contained herein, the Disclosure Statement or the Plan to the contrary, the Debtors, in consultation with the Investor Parties, reserve the right to modify these Rights Offering Procedures in order to comply with applicable law or otherwise.

**11.      Rights Offering Stock Distribution Date**

The Rights Offering Stock acquired in connection with the Rights Offering by Eligible Holders that have elected to participate in the Rights Offering and who have validly exercised their Subscription Rights shall be distributed in accordance with the distribution provisions contained in the Plan.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
|  | ) |  |
| K-V Discovery Solutions Inc., <u>et al.</u>,[1] | ) | Case No. 12-13346 (ALG) |
|  | ) |  |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
_____ )

**INSTRUCTIONS TO SUBSCRIPTION FORM FOR RIGHTS**
**OFFERING CONTEMPLATED BY SIXTH AMENDED**
**JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR**
**K-V DISCOVERY SOLUTIONS, INC. AND ITS AFFILIATED DEBTORS**

---

**RIGHTS OFFERING DEADLINE**

**The deadline to exercise Subscription Rights[2] is 4:00 p.m. (prevailing Eastern time)**
**on August 16, 2013 (the "Rights Offering Deadline").**

---

To Holders of Allowed Convertible Subordinated Notes Claims:

[By order, dated [_____], 2013 (the "**Disclosure Statement Order**"), the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") approved the Disclosure Statement for the Sixth Amended Joint Chapter 11 Plan of Reorganization for KV Discovery Solutions, Inc. and its Affiliated Debtors (as amended, modified and/or supplemented, the "**Disclosure Statement**").] A copy of the proposed Sixth Amended Joint Chapter 11 Plan of Reorganization for K-V Discovery Solutions, Inc. and its Affiliated Debtors (as amended, modified and/or supplemented, the "<u>Plan</u>") is annexed to the Disclosure Statement as Exhibit 1.

---

[1]     The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) K-V Discovery Solutions, Inc. (7982); (ii) DrugTech Corporation (3690); (iii) FP1096, Inc. (3119); (iv) K-V Generic Pharmaceuticals, Inc. (7844); (v) K-V Pharmaceutical Company (8919); (vi) K-V Solutions USA, Inc. (4772); (vii) Ther-Rx Corporation (3624); and (viii) Zeratech Technologies USA, Inc. (6911). The Debtors' executive headquarters are located at 16640 Chesterfield Grove, Suite 200, Chesterfield, MO 63005.

[2]     Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan or the Rights Offering Procedures (each as defined below).

Pursuant to the Plan, each holder of an Allowed Convertible Subordinated Notes Claim as of the Voting Record Date that (i) votes to accept the Plan and (ii) certifies pursuant to a properly completed and timely submitted Investor Certificate that he, she or it is an Accredited Investor[3] (each, an "**Eligible Holder**") has the right to subscribe for up to its Rights Offering Pro Rata Stock Amount of 11,900,000 shares of New Common Stock of Reorganized KV (the "**Rights Offering Stock**"), representing 76% of the total shares of New Common Stock to be issued pursuant to the Plan on the Effective Date, at a price per share of $20.00. For a complete description of the Rights Offering see the accompanying Rights Offering Procedures (the "**Rights Offering Procedures**").

Eligible Holders as of the Voting Record Date may exercise Subscription Rights in accordance with the Rights Offering Procedures. Please utilize the attached Subscription Form to exercise your Subscription Rights. In order to elect to participate in the Rights Offering, you must (a) arrange for payment of the Aggregate Exercise Price (defined below) in accordance with the directions below, and (b) complete the attached Subscription Form, and return the Subscription Form to Epiq Bankruptcy Solutions, LLC (the "**Subscription Agent**"), at the following address, so that it is received by the Rights Offering Deadline:

> Epiq Bankruptcy Solutions, LLC
> 757 Third Avenue, 3rd Floor
> New York, NY 10017
> Attn: KVD Rights Offering

**Please be aware that, notwithstanding anything to the contrary herein or in the Rights Offering Procedures, you must complete the Ballot for Class 6 Convertible Subordinated Notes Claims (the "Class 6 Ballot") (which is included in the materials that were sent to you with the Disclosure Statement) and vote to accept the Plan in order to exercise your Subscription Rights and receive Rights Offering Stock.**

**Questions**. If you have any questions about this Subscription Form or the exercise procedures described herein and in the Rights Offering Procedures, please contact the Subscription Agent at (646) 282-2500.

**The Subscription Agent must receive your executed Rights Offering Form and the related payment by the Rights Offering Deadline or your exercise of your Subscription Rights shall be void and you will be deemed to have fully and irrevocably relinquished and waived your Subscription Rights.**

To purchase Rights Offering Stock pursuant to the Rights Offering:

1. **Review** Items 1 and 2a of the Subscription Form, setting forth (a) the principal amount of Convertible Subordinated Notes held by you as of the Voting Record Date, as certified by your bank, broker or other nominee ("**Nominee**") in your Investor

---

[3]     "Accredited Investor" is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended.

Certificate, and (b) the maximum number of Rights Offering Stock you are entitled to purchase based on such certified principal amount.

2. **Complete** Item 2b of the Subscription Form, indicating the whole number of shares of Rights Offering Stock which you wish to purchase upon your exercise of the Subscription Rights.

3. **Make Payment** of your Aggregate Exercise Price in accordance with the terms of Item 3 of the Subscription Form.

4. **Read and Complete** the certification in Item 4 of the Subscription Form.

5. **Return the Subscription Form** to the Subscription Agent at the address specified in Item 4 below on or before the Rights Offering Deadline.

6. **Complete and Return the Class 6 Ballot**, which must indicate your acceptance of the Plan, in accordance with the instructions set forth in the Class 6 Ballot.

7. **Please Note** that your election to exercise the Subscription Rights will become binding on the Debtors upon the earlier of (i) the date the applicable Aggregate Exercise Price is received by the Subscription Agent and (ii) the Rights Offering Deadline.

*Before exercising any Subscription Rights you should read the Disclosure Statement, including the section entitled "Certain Risk Factors to be Considered" and the valuation of the Debtors contained therein.*

**SUBSCRIPTION FORM FOR RIGHTS
OFFERING CONTEMPLATED BY SIXTH AMENDED
JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR
K-V DISCOVERY SOLUTIONS, INC. AND ITS AFFILIATED DEBTORS**

---

**RIGHTS OFFERING DEADLINE**

**The Rights Offering Deadline is
4:00 p.m. (prevailing Eastern time) on August 16, 2013.**

---

**Please consult the Instructions to Subscription Form accompanying this
Subscription Form as well as the Rights Offering Procedures for additional
information with respect to this Subscription Form.**

---

**Item 1. Amount of Convertible Subordinated Notes**.  Based on the information provided by your Nominee in your Investor Certificate, as of the Voting Record Date of 5:00 p.m. (prevailing Eastern time) on July 11, 2013, you held (or were the authorized signatory of the beneficial owner of) Convertible Subordinated Notes in the following principal amount (the "**Certified Principal Amount**"):

$[_____]
Certified Principal Amount

**Item 2. Subscription Rights**. Pursuant to the Plan and the accompanying Rights Offering Procedures, each Eligible Holder is entitled to participate in the Rights Offering up to its Rights Offering Pro Rata Stock Amount of the Rights Offering Stock.  The maximum number of Rights Offering Stock you are entitled to purchase has been calculated based on the information provided by you and your Nominee in the Investor Certificate and is set forth in Item 2a below.  To subscribe, fill out Item 2b below and read and complete Item 4 below, and follow all other instructions with respect to payment and the delivery of your completed form.

**2a. Calculation of Maximum Number of Shares of Rights Offering Stock**.  The maximum number of Rights Offering Stock for which you may subscribe is calculated as follows:

[_____]                    [_____]
Certified Principal Amount        X   0.0595  =        Maximum Number of shares of Rights
                                                       Offering Stock (Rounded Down to
                                                       Nearest Whole Number)

**2b. Exercise Amount**. By filling in the following blanks, you are agreeing to purchase the number of Rights Offering Stock specified below (specify whole number of shares of Rights Offering Stock not greater than the Maximum Number of Shares of Rights Offering Stock in Item 2a), at an initial price of $20.00 per share, on the terms of and subject to the conditions set forth in the Rights Offering Procedures.

| | | | |
|---|---|---|---|
| _____<br>(Indicate number of shares of Rights Offering Stock you elect to purchase)[4] | X | $20.00 | $_____<br>  (Aggregate Exercise Price) |

**Item 3. Procedure for Payment.**  The Aggregate Exercise Price indicated in Item 2b above must be sent by wire transfer in immediately available funds so that it is received by the Subscription Agent on or before the Rights Offering Deadline.  The wire instructions for the Subscription Agent are as follows:

Wire Instructions:

**Account Name:**          **[To be completed]**
**Account #:**              **[To be completed]**
**ABA/Routing #:**        **[To be completed]**
**Bank Name:**            **[To be completed]**
**Bank Address:**         **[To be completed]**
**Memo/Note Field:**     **[Insert Holder's Name]**

**If, prior to the Rights Offering Deadline, all of the steps outlined in this Subscription Form are not completed, you will be deemed to have fully and irrevocably relinquished and waived your right to participate in the Rights Offering.**

---

[4]        This amount may not be greater than the Maximum Number of shares of Rights Offering Stock in Item 2a.

- 2 -

**Item 4. Certification.** I certify that I am the holder, or the authorized signatory of the holder, of the amount of Convertible Subordinated Notes listed under Item 1 above.

Date: _____, 2013

Name of Holder: _____

Social Security or
Federal Tax I.D. _____
No.:

Signature: _____

Name of Person Signing: _____

Title: _____

Street Address:_____

City, State, Zip Code: _____

Telephone Number: _____

**THE COMPLETED FORM MUST BE RECEIVED BY THE SUBSCRIPTION AGENT AT THE FOLLOWING ADDRESS BY THE RIGHTS OFFERING DEADLINE:**

> **EPIQ BANKRUPTCY SOLUTIONS, LLC**
> **757 THIRD AVENUE, 3RD FLOOR**
> **NEW YORK, NY 10017**
> **ATTN: KVD RIGHTS OFFERING**

**IN ADDITION, FOR YOUR RIGHTS TO BE VALIDLY EXERCISED, YOUR COMPLETED CLASS 6 BALLOT, INDICATING YOUR ACCEPTANCE OF THE PLAN, MUST BE RECEIVED BY THE SOLICITATION AGENT (AS DEFINED IN THE CLASS 6 BALLOT) ON OR BEFORE THE VOTING DEADLINE (AS DEFINED IN THE CLASS 6 BALLOT).**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
|  | ) |  |
| K-V Discovery Solutions Inc., et al.,[1] | ) | Case No. 12-13346 (ALG) |
|  | ) |  |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
_____ | ) |  |

## INVESTOR CERTIFICATE

[By order, dated [_____], 2013 (the "Disclosure Statement Order"), the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") approved the Disclosure Statement for the Sixth Amended Joint Chapter 11 Plan of Reorganization for KV Discovery Solutions, Inc. ("KV") and its Affiliated Debtors (as amended, modified and/or supplemented, the "Disclosure Statement").] A copy of the proposed Sixth Amended Joint Chapter 11 Plan of Reorganization for K-V Discovery Solutions, Inc. and its Affiliated Debtors (as amended, modified and/or supplemented, the "Plan")[2] is annexed to the Disclosure Statement as Exhibit 1. As part of the Plan, KV will conduct an offering (the "Rights Offering") for 11,900,000 shares of New Common Stock of Reorganized KV to be issued pursuant to the Plan (representing 76.2% of the total shares of New Common Stock to be issued on the Effective Date of the Plan) (the "Rights Offering Stock"), to Eligible Holders via the issuance of subscription rights (the "Subscription Rights") to purchase such Rights Offering Stock. The Rights Offering will be conducted pursuant to certain procedures approved by the Bankruptcy Court, which are attached as Exhibit D to the Disclosure Statement Order and will be mailed to potential Eligible Holders who properly complete and timely return this certificate in accordance with the instructions set forth herein (the "Rights Offering Procedures").

An "Eligible Holder" is a holder of an Allowed Convertible Subordinated Notes Claim as of July 11, 2013 (the "Voting Record Date") that (i) timely and properly certifies in accordance with Section 1 hereof that it is an Accredited Investor as of the Voting Record Date and (ii) votes to accept the Plan. The term "Accredited Investor" is defined in Schedule A attached hereto. A holder of an Allowed Convertible Subordinated Notes Claim that certifies that such holder is an Accredited Investor will receive a subscription exercise form (the "Subscription Form" and,

---

[1]    The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) K-V Discovery Solutions, Inc. (7982); (ii) DrugTech Corporation (3690); (iii) FP1096, Inc. (3119); (iv) K-V Generic Pharmaceuticals, Inc. (7844); (v) K-V Pharmaceutical Company (8919); (vi) K-V Solutions USA, Inc. (4772); (vii) Ther-Rx Corporation (3624); and (viii) Zeratech Technologies USA, Inc. (6911). The Debtors' executive headquarters are located at 16640 Chesterfield Grove, Suite 200, Chesterfield, MO 63005.

[2]    Capitalized terms used but not defined herein have the meanings assigned them in the Plan.

together with the Rights Offering Procedures, the "Rights Offering Documents") entitling such holder to exercise its Subscription Rights, subject to the terms and conditions set forth therein and in the Rights Offering Procedures.

This letter is not an offer with respect to the New Common Stock and does not create any obligations whatsoever on the part of the Debtors to make an offer to or on the part of the recipient.

**IN ORDER TO BE ELIGIBLE TO PARTICIPATE IN THE RIGHTS OFFERING, YOU MUST COMPLETE AND RETURN THIS CERTIFICATE, INCLUDING THE CONFIRMATION OF OWNERSHIP FORM ATTACHED HERETO, TO EPIQ BANKRUPTCY SOLUTIONS, LLC (THE "SUBSCRIPTION AGENT") AT THE FOLLOWING ADDRESS, SO THAT IT IS RECEIVED BY 4:00 P.M. PREVAILING EASTERN TIME ON AUGUST 2, 2013:**

> Epiq Bankruptcy Solutions, LLC
> 757 Third Avenue, 3rd Floor
> New York, NY 10017
> Attn: KVD Rights Offering

**DELIVERY OF THIS INVESTOR CERTIFICATE TO AN ADDRESS OTHER THAN AS SET FORTH ABOVE WILL NOT CONSTITUTE A VALID DELIVERY.**

**PLEASE READ THE ACCOMPANYING INSTRUCTIONS CAREFULLY.**

*Section 1*

Is the undersigned an Accredited Investor (as defined in Schedule A hereto)?

| _____ **Yes**, the undersigned is an Accredited Investor | _____ **No**, the undersigned is not an Accredited Investor |
|---|---|

**If the answer to the question immediately above is marked as "Yes," the undersigned shall proceed to Section 2.  If the above is marked as "No," the undersigned need not proceed to Section 2 and should not return this form, as the undersigned shall not receive any Subscription Rights or be entitled to participate in the Rights Offering.**

*Section 2*

Please complete and return this Investor Certificate **and attached confirmation of ownership form** to the Subscription Agent by first class mail, overnight mail or hand delivery so that it is received no later than 4:00 p.m. (prevailing Eastern time) on **August 2, 2013**.

Subscription Agent:

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Attn:  KVD Rights Offering

3

IN WITNESS WHEREOF, the undersigned has executed this Investor Certificate on the date set forth below and confirms that this Investor Certificate (i) contains accurate representations with respect to the undersigned and (ii) is a certification to KV and the Bankruptcy Court.

Dated: _____, 2013

Name of Undersigned:

_____
(Please Print or Type)

Signature: _____

By :_____
(Please Print or Type)

Title:_____
(Please Print or Type)

Address and telephone number:

_____

_____

_____

Email address:

_____

Aggregate principal amount of Convertible Subordinated Notes held as of the Voting Record Date, i.e., July 11, 2013 (this amount must match the amount in the attached confirmation of ownership that has been certified by your Nominee (as defined in the attached confirmation of ownership)):

_____

**THE RIGHTS OFFERING DOCUMENTS WILL BE MAILED TO POTENTIAL ELIGIBLE HOLDERS WHO PROPERLY COMPLETE AND TIMELY RETURN THIS INVESTOR CERTIFICATE AT THE ADDRESS INDICATED ABOVE.**

## <u>CONFIRMATION OF OWNERSHIP</u>

Your ownership of Convertible Subordinated Notes must be confirmed by bank, broker, or other nominee (each a "**Nominee**") holding your Convertible Subordinated Notes as of the Voting Record Date.  The Nominee holding your Convertible Subordinated Notes as of the Voting Record Date, July 11, 2013, must complete the box below on your behalf.

| <u>For Use Only by the Nominee</u> | |
|---|---|
| DTC Participant Name:<br><br>_____<br><br>DTC Participant Number: _____<br><br>Principal Amount of Convertible Subordinated Notes (CUSIP No. 482740AC1) held by Nominee for this account as of the Record Date, _____, 2013:<br><br>$_____<br>Certified Principal Amount<br><br>_____<br>Nominee Contact name<br><br>(_____)_____<br>Nominee Contact telephone number | Nominee's Medallion Guarantee: |

<u>Schedule A</u>

<u>Accredited Investor Definition</u>

"Accredited Investor" shall mean any person who comes within any of the following categories:

(a)    a bank as defined in Section 3(a)(2) of the Securities Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity;

(b)    a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended;

(c)    an insurance company as defined in Section 2(13) of the Securities Act;

(d)    an investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act");

(e)    a business development company as defined in Section 2(a)(48) of the Investment Company Act;

(f)    a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958;

(g)    a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if the plan has total assets in excess of $5,000,000;

(h)    an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 ("<u>ERISA</u>") if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000, or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(i)    a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended;

(j)    an organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring any Rights Offering Stock and that has total assets in excess of $5,000,000;

(k)    a director or executive officer of KV;

(l)     an individual whose net worth, or joint net worth with that person's spouse, exceeds $1,000,000 (excluding for this purpose the value of such individual's primary residence, calculated by subtracting from the estimated fair market value of the property the amount of debt secured by the property, up to the estimated fair market value of the property);

(m)    an individual who had an income in excess of $200,000 in each of the two most recent years (or joint income with his or her spouse in excess of $300,000 in each of those years) and has a reasonable expectation of reaching the same income level in the current year;

(o)     a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Rights Offering Stock, whose purchase is directed by a sophisticated person, being defined as a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of the prospective investment.

(p)     an entity in which all of the equity owners are Accredited Investors.

## EXHIBIT 6

**Stock Purchase Agreement (without exhibits)**

**Execution Version**

**SECOND AMENDED AND RESTATED STOCK PURCHASE AND BACKSTOP AGREEMENT**

**by and among**

**K-V Pharmaceutical Company**

**and**

**The Investors listed on <u>Appendix 1</u> hereto**

**Dated as of June 6, 2013**

## TABLE OF CONTENTS

Page

1.   **Purchase and Sale** ...................................................................................2
   1.1.   **The Rights Offering** ....................................................................2
   1.2.   **Direct Commitments** ...................................................................3
   1.3.   **Purchase and Sale Arrangements** ...............................................3
   1.4.   **Closing** .......................................................................................6
   1.5.   **Commitment Fee** .........................................................................7
   1.6.   **Transaction Expenses** .................................................................7
   1.7.   **Interest; Costs and Expenses; Administrative Expense** ...............8

2.   **Representations and Warranties of the Company** ......................................8
   2.1.   **Organization of the Company** ......................................................9
   2.2.   **Capitalization of the Company** ....................................................9
   2.3.   **Issuance** ......................................................................................9
   2.4.   **Organization and Capitalization of the Subsidiaries** ....................9
   2.5.   **Authority; No Conflict** ...............................................................10
   2.6.   **Legal Proceedings** .....................................................................11
   2.7.   **Exemption from Registration** .....................................................11
   2.8.   **Title to Intellectual Property** .....................................................11
   2.9.   **Licenses and Permits** .................................................................12
   2.10.  **Compliance With Laws** ..............................................................12
   2.11.  **Compliance With Environmental Laws** .......................................12
   2.12.  **Financial Statements** .................................................................12
   2.13.  **Title to Property; Leases** ...........................................................12
   2.14.  **Brokers or Finders** ....................................................................13
   2.15.  **Arm's Length** ............................................................................13
   2.16.  **Tax Matters** ...............................................................................13
   2.17.  **Takeover Statutes** .....................................................................14
   2.18.  **No Off-Balance Sheet Liabilities** ...............................................14
   2.19.  **Labor Relations; Employees** ......................................................14
   2.20.  **Employee Benefit Plans** .............................................................15
   2.21.  **Company SEC Documents and Disclosure Statement** .................15
   2.22.  **No Unlawful Payments** ...............................................................15
   2.23.  **Compliance with Money Laundering Laws** .................................16
   2.24.  **Compliance with Sanctions Laws** ...............................................16
   2.25.  **Absence of Certain Changes** ......................................................16
   2.26.  **Material Contracts** ....................................................................17
   2.27.  **Internal Control Over Financial Reporting** ................................17
   2.28.  **Disclosure Controls and Procedures** ..........................................17

3.   **Representations and Warranties of the Investors** ...................................18
   3.1.   **Organization of Such Investor** ..................................................18

i

| | | | |
|---|---|---|---|
| | 3.2. | **Authority; No Conflict** | 18 |
| | 3.3. | **Shares Not Registered** | 19 |
| | 3.4. | **Legends** | 19 |
| | 3.5. | **Acquisition for Own Account** | 19 |
| | 3.6. | **Accredited Investor** | 19 |
| | 3.7. | Intentionally omitted | 19 |
| | 3.8. | **Brokers or Finders** | 19 |
| | 3.9. | **Legal Proceedings** | 19 |
| | 3.10. | **Sufficiency of Funds** | 19 |
| | 3.11. | **Information** | 20 |
| | 3.12. | **Arm's Length** | 20 |
| 4. | | **Covenants of the Company** | 20 |
| | 4.1. | **Agreement Motion and Agreement Order** | 20 |
| | 4.2. | **Rights Offering** | 20 |
| | 4.3. | **Conditions Precedent** | 20 |
| | 4.4. | **Notification** | 21 |
| | 4.5. | **HSR Act** | 21 |
| | 4.6. | **New Registration Rights Agreement and New Stockholders Agreement** | 21 |
| | 4.7. | **Conduct of the Business** | 21 |
| | 4.8. | **Access to Information** | 23 |
| | 4.9. | **Alternate Transaction Proposals** | 23 |
| | 4.10. | **Agreement to Support the Chapter 11 Plan** | 26 |
| | 4.11. | **Public Disclosure** | 26 |
| 5. | | **Covenants of the Investors** | 27 |
| | 5.1. | **Conditions Precedent** | 27 |
| | 5.2. | **HSR Act** | 27 |
| | 5.3. | **Information** | 27 |
| | 5.4. | **Agreement Order** | 27 |
| | 5.5. | **Agreement to Support the Chapter 11 Plan** | 27 |
| | 5.6. | **Transfers** | 28 |
| 6. | | **Conditions to Closing** | 29 |
| | 6.1. | **Conditions Precedent to Obligations of the Investors** | 29 |
| | 6.2. | **Conditions Precedent to Obligations of the Company** | 31 |
| | 6.3. | **Waiver of Conditions** | 32 |
| 7. | | **Termination** | 32 |
| 8. | | **Indemnification** | 36 |
| 9. | | **Survival of Representations and Warranties** | 36 |
| 10. | | **Amendments and Waivers** | 36 |
| 11. | | **Notices, etc** | 37 |
| 12. | | **Miscellaneous** | 39 |
| | 12.1. | **Assignment; Third Party Beneficiaries** | 39 |

ii

| | | |
|---|---|---|
| 12.2. | **Severability** | 39 |
| 12.3. | **Entire Agreement** | 39 |
| 12.4. | **Counterparts** | 39 |
| 12.5. | **Governing Law** | 39 |
| 12.6. | **Submission to Jurisdiction** | 40 |
| 12.7. | **Waiver of Trial by Jury** | 40 |
| 12.8. | **Further Assurances** | 40 |
| 12.9. | **No Specific Performance** | 40 |
| 12.10. | **Headings** | 40 |
| 12.11. | **Interpretation; Rules of Construction** | 41 |
| 12.12. | **Non-Recourse** | 41 |
| 12.13. | **Several, Not Joint, Obligations** | 41 |
| 12.14. | **Disclosure** | 41 |
| 12.15. | **Equity Commitment Agreement** | 41 |
| 12.16. | **Effectiveness** | 41 |
| 13. | **Definitions** | 41 |
| 13.1. | **Certain Defined Terms** | 41 |

Exhibits:

A – [Reserved]

B – New Charter

C – New By-laws

D – New Stockholders Agreement

E – Chapter 11 Plan

F – Indemnification Provisions

G – New Registration Rights Agreement

THIS SECOND AMENDED AND RESTATED STOCK PURCHASE AND BACKSTOP AGREEMENT (as it may be amended, supplemented or otherwise modified from time to time, this "Agreement") is entered into as of June 6, 2013, by and among K-V Pharmaceutical Company, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), and each of the undersigned entities and/or their investment advisors, managers, intermediaries or nominees set forth on Appendix 1 hereto (each, an "Investor" and, collectively, the "Investors"). Capitalized terms used in this Agreement are defined in Section 13 hereof.

## RECITALS

WHEREAS, on August 4, 2012, each of the Company, K-V Discovery Solutions, Inc., DrugTech Corporation, FP1096, Inc., K-V Generic Pharmaceuticals, Inc., K-V Solutions USA, Inc., Ther-Rx Corporation and Zeratech Technologies USA, Inc. (collectively, the "Debtors") filed voluntary petitions for relief (the "Chapter 11 Cases") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, on May 3, 2013, the Company and the Investors executed a Stock Purchase and Backstop Agreement (the "Original Agreement"), and the Company filed motions, including a motion (the "Agreement Motion") seeking the entry of an order of the Bankruptcy Court (the "Agreement Order") (a) approving and authorizing the Company to enter into this Agreement, and (b) authorizing the Company and the other Debtors to perform their respective obligations hereunder, including the payment (1), in accordance with, and subject to, the terms and conditions hereof, of the Transaction Expenses and the Alternate Transaction Damages provided for herein and (2) the fees and expenses provided for under the Contemplated Exit Facility, and supporting papers (the "Original Papers") asking the Bankruptcy Court to approve the Original Agreement;

WHEREAS, the Company and the Investors executed an Amended and Restated Stock Purchase and Backstop Agreement, dated as of May 28, 2013, which amended and restated the Original Agreement in its entirety (the "Amended Agreement"), and the Company filed motions and supporting papers on May 29, 2013 and May 30, 2013 asking the Bankruptcy Court to approve the Amended Agreement;

WHEREAS, the Bankruptcy Court has not approved the Original Agreement or the Amended Agreement;

WHEREAS, the Company and the Investors now wish to enter into this Agreement, which amends and restates the Amended Agreement in its entirety;

WHEREAS, the Investors and the Company are seeking to implement a restructuring of the Company pursuant to the terms and conditions set forth in the Chapter 11 Plan;

WHEREAS, the Company intends to propose and submit the Chapter 11 Plan to the Bankruptcy Court for its approval;

WHEREAS, on or prior to June 7, 2013, the Company intends to file with the Bankruptcy Court supporting papers with respect to this Agreement;

WHEREAS, the Company has requested that the Investors, severally and not jointly, participate in the Chapter 11 Plan, and the Investors are willing to participate in the Chapter 11 Plan, on the terms and subject to the conditions contained in this Agreement;

-1-

WHEREAS, pursuant to the Chapter 11 Plan, the Company will conduct a rights offering, on the terms set forth in the Chapter 11 Plan and this Agreement (the "Rights Offering"), by distributing to each holder of an Allowed Convertible Subordinated Notes Claim that is an Accredited Investor (and/or its investment advisor, manager, intermediary or nominee that is an Accredited Investor) as of the Voting Record Date ("Eligible Holders") non-transferable, non-certificated rights ("Rights") to acquire, at a purchase price of $20 per share (the "Purchase Price"), such Eligible Holder's Pro Rata Share of 11,900,000 shares (the "Rights Offering Shares") of new common stock of the reorganized Company (the "New Common Stock");

WHEREAS, in order to facilitate the Rights Offering, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein, (a) each Investor, severally and not jointly, has agreed to purchase in the Rights Offering, and the Company has agreed to sell to such Investor on the Effective Date, at the Purchase Price, the number of Rights Offering Shares corresponding to such Investor's name as set forth on Appendix 1 hereto (as to each Investor, such Investor's Rights Offering Shares), representing such Investor's pro rata share of the Rights Offering Shares, and (b) each Investor, other than those advised by Kingdon Capital Management, L.L.C. (collectively, "Kingdon"), severally and not jointly, has agreed to purchase on the Effective Date, and the Company has agreed to sell to each Investor on the Effective Date, at the Purchase Price, such Investor's Backstop Commitment Percentage of the Rights Offering Shares that have not been validly subscribed for by Eligible Holders by the Rights Offering Deadline (the "Unsubscribed Shares");

WHEREAS, in order to supplement the funds to be raised in the Rights Offering, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein, each Investor, severally and not jointly, has agreed to purchase on the Effective Date, and the Company has agreed to sell to such Investor on the Effective Date, at the Purchase Price, the number of shares of New Common Stock (the "Direct Subscription Shares") corresponding to such Investor's name under the column entitled "Direct Subscription Shares") on Appendix 1 hereto (as to each Investor, such Investor's Direct Subscription Shares); and

WHEREAS, the Rights Offering Shares and Direct Subscription Shares, collectively, will represent 88% of the total shares of New Common Stock to be issued as of the Effective Date;

WHEREAS, the shares of New Common Stock issued herein as a Commitment Fee will represent 5% of the total shares of New Common Stock to be issued as of the Effective Date; and

WHEREAS, as a result of the commitments by the Investors hereunder, the Investors have committed hereunder to invest up to a total of $275 million in the reorganized Company, subject to the terms hereof.

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties and covenants set forth herein, and other good and valuable consideration, the Company and the Investors agree as follows:

1.    **The Rights Offering; Direct Commitments; Purchase and Sale Arrangements**.

1.1.    **The Rights Offering**.

(a)    The Company will commence the Rights Offering contemporaneously with, and as part of, the solicitation process for the Chapter 11 Plan. The Rights Offering shall be conducted and consummated on the terms, subject to the conditions and in accordance with the Rights Offering Procedures.

-2-

(b)        In the Rights Offering, each Investor, severally and not jointly, agrees to subscribe for, pursuant to the Rights Offering, and purchase at the Closing, and the Company agrees to sell to such Investor at the Closing, at the aggregate Purchase Price therefor, such Investor's Rights Offering Shares as set forth on Appendix 1 hereto in full on the terms set forth in the Chapter 11 Plan and the Rights Offering Procedure.

(c)        Each Backstop Investor hereby agrees, severally and not jointly, to purchase at the Closing, and the Company hereby agrees to sell and issue to such Backstop Investor, at the aggregate Purchase Price therefor, such Backstop Investor's Backstop Commitment Percentage of all Unsubscribed Shares as of the Rights Offering Deadline; provided, that each Backstop Investor shall have no obligation to purchase Unsubscribed Shares that are Rights Offering Shares which another Investor is obligated to purchase pursuant to Section 1.1(b), except to the extent otherwise provided in Section 1.3.  The Rights Offering Shares which each of the Investors is required to purchase pursuant to Section 1.1(b) and the Unsubscribed Shares which each of the Backstop Investors is required to purchase pursuant to this Section 1.1(c) are referred to herein as such Investor's "Equity Investor Shares".

(d)        Any purchase of New Common Stock by an Investor pursuant to Section 1.1(b) and Section 1.1(c) shall be on the terms, subject to the conditions, and in reliance on the representations and warranties set forth in this Agreement, and, in each case, on the terms set forth in the Chapter 11 Plan and the Rights Offering Procedures.  The shares purchased pursuant to Section 1.1(b) and Section 1.1(c) shall, upon issuance thereof, be duly authorized, validly issued, fully paid and nonassessable, and free and clear of any Encumbrances, other than Encumbrances created by Legal Requirements, the New Stockholders Agreement or the Organizational Documents of the Company.

(e)        The Company hereby agrees and undertakes to deliver to the Investors a certification by an executive officer of the Company of either (i) a true and accurate calculation of the number of Unsubscribed Shares, and the aggregate Purchase Price therefor (a "Purchase Notice"), or (ii) in the absence of any Unsubscribed Shares, the fact that there are no Unsubscribed Shares and that the Backstop Commitments are terminated (a "Satisfaction Notice"), in either case as soon as practicable after the Rights Offering Deadline and, in any event, at least five (5) Business Days prior to the Effective Date (the date of transmission of confirmation of delivery (pursuant to Section 11) of a Purchase Notice or a Satisfaction Notice, the "Determination Date").

1.2.    **Direct Commitments**.  On the terms, subject to the conditions, and in reliance on the representations and warranties set forth in this Agreement, each Investor hereby agrees, severally and not jointly, to purchase at the Closing, and the Company hereby agrees to sell and issue to such Investor at the Closing, at the aggregate Purchase Price therefor, such Investor's Direct Subscription Shares, which shares shall, upon issuance thereof, be duly authorized, validly issued, fully paid and nonassessable, and free and clear of any Encumbrances, other than Encumbrances created by Legal Requirements, the New Stockholders Agreement or the Organizational Documents of the Company.

1.3.    **Purchase and Sale Arrangements**.

(a)        In the event that an Investor defaults on its obligation to purchase Rights Offering Shares pursuant to Section 1.1(b) or Direct Subscription Shares pursuant to Section 1.2 or in the event that a Backstop Investor defaults on its obligation to purchase Unsubscribed Shares under Section 1.1(c) or in the event that an Investor defaults on its obligations under this Section 1.3(a) (each such Investor, a "Defaulting Investor"), and subject to

-3-

the terms and conditions contained in this Section 1.3(a), then each Backstop Investor that is not a Defaulting Investor (each, a "Non-Defaulting Investor") hereby agrees, severally and not jointly, to purchase, and the Company hereby agrees to sell and issue to such Non-Defaulting Investor, at the aggregate Purchase Price therefor, such Non-Defaulting Investor's Adjusted Commitment Percentage (determined in accordance with Section 1.4(b)) of all Rights Offering Shares, Direct Subscription Shares and/or Unsubscribed Shares required to be purchased by the Defaulting Investor pursuant to Section 1.1(b), Section 1.1(c), Section 1.2 or this Section 1.3(a), as applicable, and not so purchased; provided, that in no event or under any circumstances shall any Investor be required to (i) make an investment (whether in cash or exchange of DIP Claims or otherwise) in excess of such Investor's Total Investor Commitment Amount or (ii) purchase or subscribe for such Defaulting Investor's Rights Offering Shares, Direct Subscription Shares and/or Unsubscribed Shares unless, as a result of such purchases by all Non-Defaulting Investors, the total proceeds to be paid to the Company as of the Closing from the Rights Offering and the purchase of Direct Subscription Shares and Unsubscribed Shares pursuant to Section 1.1, Section 1.2 and this Section 1.3(a) shall equal at least the aggregate amount of all the Investors' Total Investor Commitment Amounts; provided, that any DIP Claims deemed surrendered pursuant to a Defaulting DIP Lender Exchange under Section 1.3(a) shall be deemed proceeds paid to the Company. The parties acknowledge and agree that (i) the obligations of the Non-Defaulting Investors pursuant to this Section 1.3(a) shall not be in limitation of any rights or remedies that the Company or any Non-Defaulting Investor may exercise against a Defaulting Investor, and (ii) if any Defaulting Investor shall hold a DIP Claim as of the Effective Date, the Company shall elect to deem all or any portion of such DIP Claim held by such Defaulting Investor surrendered in exchange for a number of shares of New Common Stock equal to the aggregate amount of such DIP Claim that the Company elects to deem surrendered (but no greater than the total amount of such Investor's Total Investor Commitment Amount on which such Defaulting Investor has defaulted) divided by the Purchase Price (a "Defaulting DIP Lender Exchange"), which such New Common Stock issued pursuant to a Defaulting DIP Lender Exchange will be applied, first, to any default with respect to Direct Subscription Shares and Rights Offering Shares, pro rata based on the number of Direct Subscription Shares and Rights Offering Shares such Defaulting Investor committed to purchase hereunder, before being applied to any Unsubscribed Shares any such Defaulting Investor committed to purchase hereunder. In connection with any Defaulting DIP Lender Exchange, each Investor hereby constitutes and appoints the Company as such Investor's true and lawful agent and attorney-in-fact, with full power and authority in such Investor's name, place and stead, with full power of substitution, to execute (A) any agreements, instruments of conveyance and assignment as may be necessary, appropriate, proper, advisable, incidental or convenient to consummate such Defaulting DIP Lender Exchange (including, without limitation, any amendment to the DIP Credit Agreement, if necessary), and (B) such related instruments as may be necessary, appropriate, proper, advisable, incidental or convenient to evidence such consummation. The Rights Offering Shares, Direct Subscription Shares and/or Unsubscribed Shares which each of the Non-Defaulting Investors is required to purchase on the terms and subject to the conditions contained in this Section 1.3(a) are referred to herein as such Non-Defaulting Investor's "Defaulting Shares" and, together with the Unsubscribed Shares it is required to purchase pursuant to Section 1.1(c), such Non-Defaulting Investor's "Backstop Shares".

    (b)  In the event that (A) any Investor defaults on its obligation to purchase Rights Offering Shares under Section 1.1(b) or Direct Subscription Shares under Section 1.2, a Backstop Investor defaults on its obligation to purchase Unsubscribed Shares under Section 1.1(c) or any Investor defaults on its obligations under Section 1.3(a), and (B) pursuant to the provisions of Section 1.3(a), the total proceeds to be paid to the Company as of the Closing from the Rights Offering and the purchase of Direct Subscription Shares and Unsubscribed

Shares pursuant to Section 1.1, Section 1.2 and this Section 1.3 (including through a Defaulting DIP Lender Exchange) do not equal at least the aggregate amount of all the Investors' Total Investor Commitment Amounts, then the Non-Defaulting Investors shall have the right, but shall not be obligated, to elect to purchase, at the Purchase Price, any or all such Rights Offering Shares, Direct Subscription Shares and/or Unsubscribed Shares that such Defaulting Investor was obligated but failed to purchase (in proportion to the respective Total Investor Commitment Amounts of the Non-Defaulting Investors so electing or in such other proportions as such Non-Defaulting Investors may agree); *provided*, *however*, if the remaining Non-Defaulting Investors do not elect to purchase all the Rights Offering Shares, Direct Subscription Shares and/or Unsubscribed Shares that the Defaulting Investor was obligated but failed to purchase (after accounting for any Defaulting DIP Lender Exchange), then the Company may seek to arrange for one or more third parties who are able to make the representations set forth in Section 3 hereof to become Investors hereunder (each such Person, a "Third Party Investor") and purchase the Remaining Rights Offering Shares, Direct Subscription Shares and/or Unsubscribed Shares (as applicable) at the Purchase Price and on identical terms and conditions set forth in this Agreement, including all Exhibits hereto. For purposes of this Agreement, the term "Remaining Rights Offering Shares, Direct Subscription Shares and/or Unsubscribed Shares" shall mean the Rights Offering Shares, Direct Subscription Shares and/or Unsubscribed Shares that (i) the Defaulting Investor was required to purchase but did not purchase and (ii) the Non-Defaulting Investors elect not to purchase pursuant to the immediately preceding sentence. The Company shall promptly notify each of the Non-Defaulting Investors of the identities of all prospective Third Party Investors that the Company negotiates with regarding the purchase of any Remaining Rights Offering Shares, Direct Subscription Shares and/or Unsubscribed Shares. Any such Third Party Investor shall be entitled to receive, at Closing, a pro rata portion of the Defaulting Investor's Commitment Fee (based upon the portion of the Defaulting Investor's stock purchase obligations that are assumed by such Third Party Investor). The Investors acknowledge and agree that if the Company identifies one or more third parties who are able to make the representations set forth in Section 3 hereof to become Investors hereunder and purchase all Remaining Rights Offering Shares, Direct Subscription Shares and/or Unsubscribed Shares of the Defaulting Investor(s) at the Purchase Price and are ready, willing and able to sign a joinder to this Agreement which shall provide that such third party will become an Investor hereunder with respect to all Remaining Rights Offering Shares, Direct Subscription Shares and/or Unsubscribed Shares on substantially identical terms and conditions set forth in this Agreement, including all Exhibits hereto, then each such Investor shall reasonably cooperate with the Company in its efforts to cause such third party to become a party to this Agreement and an Investor hereunder; provided, however, that in the event that the Non-Defaulting Investors object to any Person becoming a Third Party Investor, the Non-Defaulting Investors shall have the right (even if they did not initially elect to do so) to purchase (at the Purchase Price) the Remaining Rights Offering Shares, Direct Subscription Shares and/or Unsubscribed Shares that such Person was prepared to purchase and thereby preclude such Person from becoming a Third Party Investor. For the avoidance of doubt, if the Non-Defaulting Investors object to any prospective Third Party Investors but do not elect to purchase (at the Purchase Price) the Remaining Rights Offering Shares, Direct Subscription Shares and/or Unsubscribed Shares that such Person is prepared to purchase, such Person shall not be precluded from becoming a Third Party Investor hereunder. No Person seeking to become a Third Party Investor shall have any rights under this Agreement and shall not be a third-party beneficiary hereof unless and until such Person signs a joinder agreement in form and substance reasonably satisfactory to the Company and the Non-Defaulting Investors. If such arrangements with third parties are not made within thirty (30) days of the day on which the Closing would have occurred if no default had occurred hereunder, then, so long as each Non-Defaulting Investor has complied in all material respects with its obligations pursuant to this Section 1.3(b), the Non-Defaulting Investors may terminate this Agreement. Nothing

contained in this Section 1.3(b), including, if applicable, the termination of this Agreement, shall relieve a Defaulting Investor of any liability it may have to the other parties hereto and/or any other person or entity, including the Debtors or the Committee, resulting from its default; provided, however, that no Investor shall be liable for its breach of this Agreement in excess of the amount provided for in Section 12.9.

1.4.  **Closing.**

(a)    The closing hereunder of the purchase and sale of Rights Offering Shares, Direct Subscription Shares and Backstop Shares with respect to the Investors (the "Closing") will occur at 10:00 a.m., New York City time, on the Effective Date; provided, however, that if, as of the date established as the Effective Date, any Investor has become a Defaulting Investor on, or within five (5) Business Days prior to, the anticipated Closing and the Non-Defaulting Investors are required or elect to purchase such Defaulting Investor's Shares pursuant to Section 1.3(a) or Section 1.3(b), respectively, the Effective Date shall be postponed and the Closing shall occur at 10:00 a.m., prevailing Eastern time, on a Business Day mutually agreed upon between the Company and the Requisite Investors (not to exceed five (5) Business Days following the previously scheduled Effective Date); provided, further, however, that if, as of the date established as the Effective Date, (1) any Investor has become a Defaulting Investor, (2) the Non-Defaulting Investors are not required or do not elect to purchase all of such Defaulting Investor's Shares, and (3) one or more third parties agrees to purchase such Defaulting Investor's Remaining Rights Offering Shares, Direct Subscription Shares and/or Unsubscribed Shares in accordance with Section 1.3(b), then the Effective Date shall be postponed and the Closing shall occur at 10:00 a.m., prevailing Eastern time, on a Business Day mutually agreed upon between the Company and the Requisite Investors (not to exceed five (5) Business Days following the date on which there are Investors with commitments to purchase all of the Shares of the Defaulting Investor(s)).  At the Closing, (i) each Investor shall pay to the Company an amount equal to the product of (A) the sum of the number of shares of New Common Stock to be purchased by such Investor pursuant to Sections 1.1, 1.2 and 1.3, and (B) the Purchase Price, by (x) wire transfer of immediately available funds to an account designated by the Company pursuant to wire instructions previously provided by the Company to such Investor no later than at least two (2) Business Days prior to the anticipated Effective Date, (y) executing and delivering to the Company a duly completed DIP Exchange Form (as defined in the Rights Offering Procedures), prior to the Rights Offering Deadline (as defined in the Rights Offering Procedures), whereby such Investor agrees to surrender in exchange for such Rights Offering Shares, Direct Subscription Shares or Backstop Shares all or a portion of the DIP Claims held by such Investor (or by an Affiliate of such Investor), or (z) a combination of (x) and (y) above, and (ii) the Company shall issue and deliver to each Investor its Commitment Fee Shares and the number of shares of New Common Stock purchased by such Investor pursuant to Sections 1.1, 1.2 and 1.3, in each case duly authorized, validly issued, fully paid and nonassessable, and free and clear of any Encumbrances, other than Encumbrances created by Legal Requirements, the New Stockholders Agreement or the Organizational Documents of the Company, as well as (A) a certificate or certificates duly executed on behalf of the Company registered in the name of such Investor (or its designee(s)) representing the number of Shares to be issued to such Investor by the Company pursuant to this Agreement, and (B) such other certificates, counterparts to agreements, documents or instruments required by it to be delivered to such Investor pursuant to Section 6.1 or reasonably requested by any Investor.  The agreements, instruments, certificates and other documents to be delivered on the Effective Date by or on behalf of the Company will

be delivered to the Investors at the offices of Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020 (Attn: Peter Ehrenberg, Esq.).

(b)     In no event shall any Investor be required to purchase (whether in cash or exchange of DIP Claims or otherwise) Rights Offering Shares, Direct Subscription Shares and/or Backstop Shares for an aggregate Purchase Price that exceeds the Total Investor Commitment Amount for such Investor.   In the event that a Non-Defaulting Investor is not required to purchase Defaulting Shares because such purchase would result in the aggregate Purchase Price being paid by such Non-Defaulting Investor for Rights Offering Shares, Direct Subscription Shares and Backstop Shares to exceed the Total Investor Commitment Amount for such Non-Defaulting Investor (whether in cash or exchange of DIP Claims or otherwise), then the other Non-Defaulting Investors' Adjusted Commitment Percentage shall be recalculated, for purposes of <u>Section 1.3(a)</u> assuming solely for the purpose of this calculation that the Non-Defaulting Investor that is not required to purchase Defaulting Shares is a Defaulting Investor.

(c)     All Shares will be delivered with any and all issue, stamp, transfer or similar taxes or duties payable in connection with such delivery duly paid by the Company to the extent required under the Confirmation Order or applicable Legal Requirements.

(d)     Notwithstanding anything to the contrary in this Agreement (but without limiting the provisions of <u>Section 12.1</u>), any Investor, in its sole discretion, may designate that some or all of the Shares be issued in the name of, and delivered to, one or more of its Affiliates over which such Investor or any of its Affiliates exercises investment authority (including any Related Fund of such Investor), including, without limitation, with respect to voting and dispositive rights and provided such Affiliate is an Accredited Investor.

1.5.   **Commitment Fee**.   To compensate the Investors for the risk of their undertakings herein, the Company shall pay to the Investors, in the aggregate and in accordance with the terms of the Chapter 11 Plan, on the Effective Date, a commitment fee (the "<u>Commitment Fee</u>") in the form of 781,250 shares of New Common Stock (the "<u>Commitment Fee Shares</u>").  The Commitment Fee shall be paid to the Investors in accordance with the allocations thereof set forth on <u>Appendix 1</u>; <u>provided</u>, that any Investor, in its sole discretion, may designate that some or all of its Commitment Fee Shares be issued in the name of, and delivered to, one or more other Persons (including, for the avoidance of doubt, any other holder of Convertible Notes), provided such other Person is an Accredited Investor; <u>provided</u>, <u>further</u>, <u>however</u>, that, subject to <u>Section 1.3(b)</u>, the entire portion of the Commitment Fee payable to a Defaulting Investor shall be paid as an additional fee to each of the Non-Defaulting Investors on a pro rata basis based on the number of Defaulting Shares not purchased by the Defaulting Investor but purchased by each such Non-Defaulting Investor, and each Defaulting Investor hereby consents to such payment and waives any right or entitlement to receive any portion of the Commitment Fee.  The Commitment Fee shall be approved as part of the Chapter 11 Plan and paid at the Closing without any further action required of or entertained by the Bankruptcy Court.  The Commitment Fee shall be earned and payable without regard to whether the Rights Offering is fully subscribed.  For the avoidance of doubt, the Commitment Fee Shares shall be issued to the Investors in accordance with the terms of this <u>Section 1.5</u> and the Commitment Fee Shares shall, upon issuance thereof, be duly authorized, validly issued, fully paid and nonassessable, and free and clear of any Encumbrances, other than Encumbrances created by Legal Requirements, the New Stockholders Agreement or the Organizational Documents of the Company.

1.6.   **Transaction Expenses**.  The Company will be obligated to reimburse or pay the reasonable and documented fees, costs and expenses of the Investors (whether incurred prior to or after the date of this Agreement) and the Ad Hoc Counsel (but, with respect to the Ad Hoc Counsel, only to the

extent incurred after May 24, 2013 and subject to an aggregate cap of $150,000) in connection with (w) the exploration and discussion of the Original Agreement, the Amended Agreement, this Agreement, the Chapter 11 Plan, the Rights Offering and the Contemplated Transactions (including any expenses related to obtaining required consents of Governmental Bodies and other Persons), (x) any due diligence related to the Original Agreement, the Amended Agreement, this Agreement and the Contemplated Transactions, (y) the preparation and negotiation of the Original Agreement, the Amended Agreement, this Agreement, the Chapter 11 Plan (and related documents) and the proposed documentation of the Contemplated Transactions and (z) the implementation of the Contemplated Transactions (including any legal proceedings (A) in connection with the confirmation of the Chapter 11 Plan and approval of the Disclosure Statement, and objections thereto (other than objections of any Investor or any Affiliate of an Investor), and any other actions in the Chapter 11 Cases related thereto and (B) to enforce the Investors' rights against the Company (but not against any other Investor) under this Agreement, the Chapter 11 Plan and any other agreement or document entered into in connection with the Contemplated Transactions, including, without limitation, all reasonable fees and expenses of each legal counsel retained by any of the Investors, filing fees (if any) required by the Hart Scott Rodino Antitrust Improvements Act of 1976 (the "HSR Act") and any expenses relating thereto, and all Bankruptcy Court and other judicial and regulatory proceedings related to such transactions (collectively, "Transaction Expenses"). Transaction Expenses shall be paid by the Company at the Closing or as otherwise provided for in this Agreement, by wire transfer of immediately available funds to an account designated in the invoice relating thereto. The obligations of the Company under this Section 1.6 shall survive any termination or expiration of this Agreement. The obligation of the Company to pay Transaction Expenses shall not be conditioned or contingent upon the consummation of the Contemplated Transactions. The obligations set forth in this Section 1.6 are in addition to, and do not limit, the Company's obligations under Section 1.7. The provision for the payment of Transaction Expenses is (and the Agreement Order should so provide that payment of Transaction Expenses is) an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into this Agreement and such Transaction Expenses shall constitute an allowed administrative expense of the Company under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.

1.7.    **Interest; Costs and Expenses; Administrative Expense**.   Any amounts required to be paid by the Company pursuant to Section 1.6, if not paid on or before the date on which such amounts are required to be paid in accordance with the terms of Section 1.6 (the "Interest Commencement Date"), shall include interest on such amount from the Interest Commencement Date to the day such amount is paid, computed at an annual rate equal to the rate of interest which is identified as the "Prime Rate" and normally published in the Money Rates Section of The Wall Street Journal during such period. In addition, the Company shall pay all reasonable and documented costs and expenses (including the respective legal fees and expenses) incurred by the Investors in connection with any action or proceeding (including the filing of any lawsuit) taken by any of them to collect such unpaid amounts (including any interest accrued on such amounts under this Section 1.7). Amounts required to be paid by the Company pursuant to Section 1.6 (including any interest accrued on such amounts under this Section 1.7) shall constitute administrative expenses under the Bankruptcy Code. The obligations of the Company under this Section 1.7 shall survive any termination or expiration of this Agreement.

2.    **Representations and Warranties of the Company**. Except as disclosed in the Annual Report on Form 10-K of the Company for the fiscal year ended March 31, 2012 or in any document filed or furnished by the Company with the Commission after the date of such report and prior to the date hereof (but excluding any risk factor disclosure that is predictive, forward looking, non-specific or cautionary in nature, any disclosure included in any "forward-looking statements" disclaimer or other statements included therein that are predictive, forward-looking, non-specific or cautionary in nature), the Company represents and warrants to the Investors as set forth below. All references in this Section 2 to Schedules are references to the Company's Disclosure Schedule, a copy of which has been provided to

the Investors concurrently with the execution of this Agreement.   Except for representations and warranties that are expressly limited as to a particular date, each representation and warranty is made as of the date hereof and as of the Closing:

2.1.   **Organization of the Company**.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, with full corporate power and authority to conduct its business as it is now or currently proposed to be conducted, and to own or use the properties and assets that it purports to own or use.  The Company is duly qualified or registered to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which either the ownership or use of the properties and assets owned or used by it, or the nature of the activities conducted by it, requires such qualification or registration, except where the failure to do so has not been and would not reasonably be expected to be material to the Company or any of its Subsidiaries.

2.2.   **Capitalization of the Company**.  As of the Effective Date, the Company will be authorized to issue solely 25,000,000 shares of capital stock, of which 24,000,000 shares will be classified as New Common Stock, of which a total of 15,625,000 shares of New Common Stock will be issued and outstanding, and 1,000,000 shares will be classified as preferred stock, none of which will be issued or outstanding.  As of the Effective Date, the only shares of New Common Stock that shall be issued and outstanding shall be those shares of New Common Stock that shall have been issued in accordance with the Chapter 11 Plan and this Agreement.  Except as otherwise agreed by each of the Investors, as of the Closing, there will be no options, warrants, securities or rights that are or may become exercisable or exchangeable for, convertible into, or that otherwise give any Person any right to acquire, shares of capital stock or other securities of the Company or to receive payments based in whole or in part upon the value of the capital stock of the Company, whether pursuant to a phantom stock plan or otherwise.  As of the Closing, and except as provided hereunder or contemplated by the Chapter 11 Plan, there will be no Contracts relating to the issuance, grant, sale or transfer of any equity securities, options, warrants, convertible securities or other securities of the Company.  Except as contemplated by the Chapter 11 Plan, as of the Closing, there will be no Contracts of the Company to repurchase, redeem or otherwise acquire any of its equity securities, options, warrants, convertible securities or other securities and the Company will not have granted any registration rights with respect to any of its securities or any securities of any of the other Debtors.

2.3.   **Issuance**.  Subject to each of the Agreement Order and Confirmation Order having become a Final Order, the distribution of the Rights, the issuance of the Rights Offering Shares pursuant to the Rights Offering, and the issuance of the Shares to be issued by the Company to the Investors hereunder and pursuant to the Chapter 11 Plan, have been duly and validly authorized and, when (i) the Rights Offering Shares are issued and delivered against payment therefor in the Rights Offering, and (ii) the Shares are issued and delivered against payment therefor as provided herein, all such Rights Offering Shares and Shares will be duly and validly issued, fully paid and non-assessable, and free and clear of any Encumbrances, other than Encumbrances created by Legal Requirements, the New Stockholders Agreement or the Organizational Documents of the Company.

2.4.   **Organization and Capitalization of the Subsidiaries**.

(a)   Schedule 2.4(a) sets forth the name and jurisdiction of incorporation or organization (as applicable) of each Subsidiary of the Company.  Except as set forth on Schedule 2.4(a), the Company or one or more of its Subsidiaries, as the case may be, beneficially owns all of the outstanding shares of capital stock or other equity securities (or any securities convertible into or exercisable for any such securities) of each of its Subsidiaries.  Except for the Company's Subsidiaries, the Company does not have any direct or indirect equity or ownership interest in any corporation, partnership, limited liability company or other Person or

business.    Except as described on Schedule 2.4(a), neither the Company nor any of its Subsidiaries has any Contract to directly or indirectly acquire any equity or other ownership interest in any Person or business.

(b)    Each Subsidiary of the Company is a corporation, partnership or limited liability company (as applicable), duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization (as applicable), with full corporate, partnership or limited liability company (as applicable) power and authority to conduct its business as it is now or currently proposed to be conducted, and to own or use the properties and assets that it purports to own or use.    Each Subsidiary of the Company is duly qualified or registered to do business as a foreign corporation, partnership or limited liability company (as applicable) and is in good standing under the laws of each jurisdiction in which either the ownership or use of the properties and assets owned or used by it, or the nature of the activities conducted by it, requires such qualification or registration, except where the failure to do so has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    All of the outstanding capital stock or other securities of each Subsidiary directly or indirectly owned by the Company has been duly authorized and validly issued and is fully paid and nonassessable, and the Company has good and marketable title to such capital stock or other equity securities, free and clear of any Encumbrances (other than any Encumbrances arising in connection with the transactions contemplated by the Chapter 11 Plan, including entry into any exit financing facility or facilities contemplated thereby, or any Legal Requirement).    There are no: (i) options, warrants, securities or rights that are or may become exercisable or exchangeable for, convertible into, or that otherwise give any Person any right to acquire shares of capital stock or other securities of any Subsidiary or to receive payments based in whole or in part upon the value of the capital stock of any Subsidiary, whether pursuant to a phantom stock plan or otherwise; (ii) Contracts relating to the issuance, grant, sale or transfer of any equity securities, options, warrants, convertible securities or other securities of any Subsidiary; or (iii) outstanding Contracts of the Company or any Subsidiary to repurchase, redeem or otherwise acquire any equity securities, options, warrants, convertible securities or other securities of any Subsidiary and no Subsidiary has granted any registration rights with respect to any of its securities.

2.5.    **Authority; No Conflict**.

(a)    Subject to the entry of the Agreement Order, the Company has the requisite corporate power and authority (i) to enter into, execute and deliver this Agreement and the Chapter 11 Plan and (ii) subject to the Confirmation Order having become a Final Order, to consummate the Contemplated Transactions, and has taken all necessary corporate action required for the due authorization, execution and delivery of this Agreement and the Chapter 11 Plan and the consummation of the Contemplated Transactions, including without limitation the issuance of the Shares.    This Agreement has been duly executed and delivered by the Company, and, subject to the entry of the Agreement Order, this Agreement constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.    Subject to Bankruptcy Court Approval, the Chapter 11 Plan has been duly executed and delivered by the Company, and, subject to the entry of the Confirmation Order, the Chapter 11 Plan constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(b)      Except as set forth on <u>Schedule 2.5(b)</u> or permitted under the Chapter 11 Plan, neither the execution and delivery of this Agreement nor the consummation or performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time or both):  (i) contravene, conflict with, or result in a violation of (1) any provision of the Organizational Documents of the Company or any of its Subsidiaries, or (2) any resolution adopted by the board of directors (or similar governing body) or the stockholders of the Company or any of its Subsidiaries; (ii) subject to each of the Agreement Order and the Confirmation Order having become a Final Order, contravene, conflict with, or result in a violation of, or give any Governmental Body or other Person the right to challenge this Agreement or any of the Contemplated Transactions pursuant to, or to exercise any remedy or obtain any relief under, any pending, outstanding or existing Legal Requirement or Order to which the Company or any of its Subsidiaries, or any of the assets owned or used by the Company or any of its Subsidiaries, may be subject; or (iii) contravene, conflict with or result in a violation or breach of any provision of, or give rise to any right of termination, acceleration or cancellation under, any Contract to which the Company or any of its Subsidiaries is a party or which any of the Company's or any of its Subsidiaries' properties or assets are bound; except, in the case of the immediately preceding <u>clause</u> <u>(iii)</u>, where such occurrence, event or result would not reasonably be expected to have a Material Adverse Effect.

Except for (w) the Confirmation Order and the Agreement Order becoming Final Orders, (x) the filing of a Notice of Sale of Securities on Form D with the Commission under Regulation D of the Securities Act with respect to the Shares, (y) compliance with the applicable requirements of the HSR Act, if required, and (z) compliance with the DIP Credit Agreement (including receipt of any consents required thereunder), the Company is not and will not be required to give any notice to, make any filing with or obtain any Consent from, any Person in connection with the execution and delivery of this Agreement or the Chapter 11 Plan, or the consummation or performance of any of the Contemplated Transactions.

2.6.    **Legal Proceedings**.    Except as set forth on <u>Schedule 2.6</u>, there are no Proceedings pending or, to the knowledge of the Company, threatened (a) to which the Company or any of its Subsidiaries is a party or to which any property or asset of any of them is subject, except for (i) claims of creditors or other parties in the Chapter 11 Cases, and (ii) Proceedings that if adversely determined to the Company or any of its Subsidiaries would not reasonably be expected to have a Material Adverse Effect, or (b) that challenge the validity or enforcement of this Agreement or seek to enjoin or prohibit the Contemplated Transactions.

2.7.    **Exemption from Registration**.    Assuming the accuracy of the Investors' representations set forth in <u>Sections 3.5</u>, <u>3.6</u> and <u>3.11</u>, the offer, sale and issuance of the Shares by the Company in the manner contemplated by this Agreement will be exempt from the registration requirements of the Securities Act.

2.8.    **Title to Intellectual Property**.    The Debtors own or possess adequate rights to use all patents, trademarks, service marks, trade names, trade dress, internet domain names, copyrights, and all registrations, recordations and applications of the foregoing and know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures) and licenses related to any of the foregoing ("<u>IP Rights</u>") used in the conduct of their respective businesses ("<u>Company IP Rights</u>"), except where the failure to own or possess any such rights would not reasonably be expected to have a Material Adverse Effect; and the conduct of their respective businesses will not conflict in any material respect with any IP Rights of others.  The Company IP Rights comprise sufficient IP Rights to conduct the Debtors' respective businesses.

2.9.    **Licenses and Permits**.  The Debtors possess all licenses, certificates, permits and other authorizations issued by, have made all declarations and filings with, and have given all notices to, the appropriate Governmental Bodies that are necessary or required for the ownership or lease of their respective properties or assets, or the conduct of their respective businesses, except where the failure to possess, make or give the same would not reasonably be expected to have a Material Adverse Effect; none of the Debtors has received notice of any revocation or modification of any such license, certificate, permit or authorization or has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course except to the extent that any of the foregoing would not reasonably be expected to have a Material Adverse Effect.

2.10.    **Compliance With Laws**.  Except as set forth on Schedule 2.10, neither the Company nor any of its Subsidiaries (a) is in violation of its certificate of incorporation, bylaws or other organizational documents, or (b) is or has been at any time since January 1, 2010 in violation of any Legal Requirement or Order, except for any such violation that has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

2.11.    **Compliance With Environmental Laws**.  Except as otherwise set forth on Schedule 2.11, the Company and its Subsidiaries:  (i) are in compliance with any and all applicable Environmental Laws; (ii) have received and are in compliance with all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses; and (iii) have not received written notice of any actual or potential liability for the investigation or remediation of any disposal or release of hazardous or toxic substances or wastes, pollutants or contaminants, except, in the case of each of the clauses (i) and (ii) above, as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

2.12.    **Financial Statements**.  Each of (i) the audited consolidated financial statements of the Company, for the fiscal year ended March 31, 2012, consisting of a consolidated balance sheet and the related consolidated statements of operations, stockholders' equity (deficit) and cash flows for such fiscal year (the "Audited Financial Statements"), and (ii) consolidated financial statements of the Company for the nine month period ended December 31, 2012, consisting of a consolidated balance sheet and the related consolidated statements of operations, stockholders' equity (deficit) and cash flows for such nine month period then ended (the "Unaudited Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements"), (a) comply as to form in all material respects with applicable accounting requirements and published rules and regulations of the Commission with respect thereto; (b) have been prepared in accordance with GAAP, except where noted with respect to the Unaudited Financial Statements, applied on a consistent basis throughout the periods covered thereby (subject, in the case of the Unaudited Financial Statements to normal recurring year-end adjustments and other adjustments required by the Company's independent auditors (that will not be material in amount or effect), and the absence of all required footnotes thereto (that, if presented, would not differ materially from those included in the Audited Financial Statements)); and (c) fairly present in all material respects the consolidated financial condition, stockholders' equity and results of operations and cash flows (as applicable) of the Debtors as of the respective dates thereof and for the periods referred to therein.  True and correct copies of the Financial Statements have been made available to the Investors.

2.13.    **Title to Property; Leases**.  Subject to entry of the Agreement Order and the Confirmation Order, on the Effective Date, the Debtors will have good, valid and marketable title to or otherwise have the right to use their respective properties and assets that are material to the conduct of their business as conducted immediately prior to the date of this Agreement.  All leases that are material to the conduct of the business of the Debtors as conducted immediately prior to the date of this Agreement will be valid and subsisting and will be in full force and effect as of the Effective Date.

2.14.   **Brokers or Finders**.   Except as set forth on Schedule 2.14 hereto, neither the Debtors nor any of their respective agents has incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, the Chapter 11 Plan or the Contemplated Transactions.

2.15.   **Arm's Length.**   The Company acknowledges and agrees that (a) each of the Investors is acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the Contemplated Transactions (including in connection with any matters relating to the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, the Company or any of its Subsidiaries and (b) no Investor is advising the Company or any of its Subsidiaries as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.

2.16.   **Tax Matters.**

(a)   The Company has timely filed or caused to be timely filed (taking into account any applicable extension of time within which to file) with the appropriate taxing authorities all income and other material tax returns, statements, forms and reports (including elections, declarations, disclosures, schedules, estimates and information Tax Returns) for Taxes ("Tax Returns") that are required to be filed by, or with respect to, the Company and its Subsidiaries.  The Tax Returns reflect all material liability for Taxes of the Company and its Subsidiaries for the periods covered thereby.

(b)   All material Taxes and Tax liabilities due by or with respect to the income, assets or operations of the Company and its Subsidiaries for all taxable years or other taxable periods that end on or before the Effective Date have been paid in full or will be paid in full pursuant to the Chapter 11 Plan or, to the extent not yet due, accrued and fully provided for in accordance with GAAP on the financial statements of the Company.

(c)   Neither the Company nor any of its Subsidiaries has received any written notices from any taxing authority relating to any issue that could materially affect the Tax liability of the Company or any of its Subsidiaries.

(d)   All material Taxes that the Company and each of its Subsidiaries is (or was) required by any Legal Requirement to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid to the proper authorities to the extent due and payable.

(e)   Neither the Company nor any of its Subsidiaries has been included in any "consolidated," "unitary" or "combined" Tax Return provided for under any Legal Requirement with respect to Taxes for any taxable period for which the statute of limitations has not expired (other than a group of which the Company and/or its Subsidiaries are the only members).

(f)   There are no tax sharing, allocation, indemnification or similar agreements in effect as between the Company or any of its Subsidiaries or any predecessor or Affiliate thereof and any other party (including any predecessors or Affiliates thereof) under which the Company or any of its Subsidiaries could be liable for any material Taxes or other claims of any party.

-13-

(g)    The Company has not been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code at any time during the five (5)- year period ending on the date hereof.

(h)    Neither the Company nor any of its Subsidiaries is a party to any agreement that would require the Company or any of its Subsidiaries or any of their respective Affiliates to make any material payment that would constitute an "excess parachute payment" for purposes of Sections 280G and 4999 of the Code.

(i)    Neither the Company nor any of its Subsidiaries has (A) engaged in a "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4(b)(2) or (B) engaged in a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b) for tax years prior to 2013.

2.17.    **Takeover Statutes**.  The Company's board of directors has taken all such action necessary to render the restrictions contained in Section 203 of the General Corporation Law of the State of Delaware inapplicable to the sale and issuance of New Common Stock to the Investors in accordance with this Agreement and the Chapter 11 Plan.  Except for Section 203 of the General Corporation Law of the State of Delaware (which has been rendered inapplicable), no other "fair price", "moratorium", "control share acquisition", "business combination" or other similar anti-takeover statute or regulation is applicable to the Company, the New Common Stock, the Shares, or the sale and issuance of New Common Stock in accordance with this Agreement or the Chapter 11 Plan.

2.18.    **No Off-Balance Sheet Liabilities**.  Except for (i) liabilities incurred in the ordinary course of business, (ii) liabilities disclosed on Schedule 2.18, and (iii) other liabilities which would not reasonably be expected to have a Material Adverse Effect, since December 31, 2012, neither the Company nor any of its Subsidiaries has had any material off balance sheet liabilities.

2.19.    **Labor Relations; Employees**.

(a)    There is no labor or employment-related audit, inspection or Proceeding pending or threatened between the Company or any of its Subsidiaries and any of their respective employees or such employees' labor organization, workers' committee, union representatives or any other type of employees' representatives appointed for collective bargaining purposes (collectively "Employee Representatives") that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Neither the Company nor any of its Subsidiaries is a party to, or is bound by, any Collective Bargaining Agreement applicable to persons employed by the Company or any of its Subsidiaries, and to the Knowledge of the Company, no union organizing efforts or Employee Representatives' elections are underway with respect to any such employees.  There is no strike, slowdown, work stoppage, lockout or, to the Knowledge of the Company, threat thereof, by or with respect to any employees of the Company or any of its Subsidiaries.

(c)    The Company and each of its Subsidiaries has complied in all respects with its payment obligations to all employees of the Company and its Subsidiaries in respect of all wages, salaries, fees, commissions, bonuses, overtime pay, holiday pay, sick pay, benefits and all other compensation, remuneration and emoluments

-14-

due and payable to such employees under any Company or Subsidiary policy, practice, agreement, plan, program or any applicable Collective Bargaining Agreement or Legal Requirement, except to the extent that any noncompliance has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

2.20.    **Employee Benefit Plans**.

(a)      The Company has furnished the Investors with a true and complete list of each Employee Plan in existence immediately prior to the date of this Agreement. The Company and the other Debtors do not sponsor any Employee Plan other than bonus, commission or other compensation plans, programs or arrangements; vacation, holiday, leave and other paid time off policies; and the severance obligations and policies (collectively, the "Company Sponsored Plans") which are identified as such on such list.

(b)      Each Employee Plan that is intended to be qualified within the meaning of Section 401(a) of the Code has received a favorable determination letter as to its qualification, and nothing has occurred that could reasonably be expected to adversely affect such qualification.

2.21.    **Company SEC Documents and Disclosure Statement**.  Except as set forth on Schedule 2.21, since April 1, 2010, (a) the Company has filed all required reports, schedules, forms and statements with the Commission (the documents so filed, the "Company SEC Documents"), (b) as of their respective dates, and giving effect to any amendments, restatements or supplements thereto filed prior to the date of this Agreement, each of the Company SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act applicable to such Company SEC Documents; (c) the Company has filed with the Commission all "material contracts" (as such term is defined in Item 601(b)(10) of Regulation S-K under the Exchange Act) that are required to be filed as exhibits to the Company SEC Documents, and (d) no Company SEC Document, after giving effect to any amendments or supplements thereto, and to any subsequently filed Company SEC Documents, in each case filed prior to the date of this Agreement, at the time they were filed contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.  The Disclosure Statement conforms in all material respects to the requirements of the Bankruptcy Code and complies in all material respects with section 1125 of the Bankruptcy Code; provided, that any amendments, supplements, changes or modifications to the Disclosure Statement that are incorporated into the Disclosure Statement shall not, in and of themselves, constitute a presumption that the Disclosure Statement does not conform in all material respects to the requirements of the Bankruptcy Code or comply in all material respects with section 1125 of the Bankruptcy Code.  The Disclosure Statement, when submitted to the Bankruptcy Court, when approved thereby and upon confirmation and effectiveness, will conform in all material respects to the requirements of the Bankruptcy Code and will comply in all material respects with section 1125 of the Bankruptcy Code.

2.22.    **No Unlawful Payments**.  Since January 1, 2010, neither the Company nor any of its Subsidiaries nor any of their respective directors, officers or employees has:  (a) used any funds of the Company or any of its Subsidiaries for any unlawful contribution, gift, entertainment or other unlawful expense, in each case relating to political activity; (b) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (c) violated or is in violation of any provision of the Foreign Corrupt Practices Act; or (d) made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment.

2.23.  **Compliance with Money Laundering Laws**.  The operations of the Company and its Subsidiaries are, and since January 1, 2010 have been at all times, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the money laundering statutes of all jurisdictions, the rules and regulations thereunder and any related or similar Laws (collectively, the "Money Laundering Laws") and no Proceeding involving the Company or any of its Subsidiaries with respect to Money Laundering Laws is pending or, to the Knowledge of the Company, threatened.

2.24.  **Compliance with Sanctions Laws**.  Neither the Company nor any of its Subsidiaries nor any of their respective directors, officers or employees is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.  The Company will not directly or indirectly use the proceeds of the Rights Offering or the sale of the Shares, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, for the purpose of financing the activities of any Person that, to the Knowledge of the Company, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

2.25.  **Absence of Certain Changes**.  Since December 31, 2012, except for actions required to be taken by this Agreement or the Rights Offering Procedures:

(a)    no event or circumstance has occurred or exists which has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)    neither the Company nor any of its Subsidiaries has amended its certificate of incorporation, bylaws or comparable constituent documents;

(c)    the Company has not made any material changes with respect to its accounting policies or procedures, except as required by Legal Requirements or changes in GAAP;

(d)    neither the Company nor any of its Subsidiaries has (i) made, changed or revoked any material Tax election, (ii) entered into any settlement or compromise of any material Tax liability, (iii) filed any amended Tax Return with respect to any material Tax, (iv) changed any annual Tax accounting period, (v) entered into any closing agreement relating to any material Tax or (vi) made material changes to their Tax accounting methods or principles;

(e)    other than in the ordinary course of business in compliance with all applicable Legal Requirements, neither the Company nor any of its Subsidiaries has entered into any transaction or engaged in layoffs or employment terminations which would trigger application of the Worker Adjustment and Retraining Notification Act of 1988 (or any similar Legal Requirement) or would be considered as a collective dismissal, mass termination or reduction in force under applicable foreign Legal Requirements;

(f)    there has not been (i) any increase in the compensation payable or to become payable to any officer or employee of the Company or any of its Subsidiaries with annual base compensation in excess of one hundred fifty thousand dollars ($150,000) (except for compensation increases in the ordinary course of business and

consistent with past practice), (ii) except in the ordinary course of business, any establishment, adoption, renewal, entry into or material amendment or supplement of any bonus, profit sharing, thrift, compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of (A) any individual officer or employee with annual base compensation in excess of one hundred fifty thousand dollars ($150,000) or (B) any director, (iii) any establishment, adoption, renewal, entry into or material amendment or supplement of any Collective Bargaining Agreement or (iv) any grant of any award or other benefit under any plan; and

(g)      neither the Company nor any of its Subsidiaries have sold, transferred, leased, licensed or otherwise disposed of any assets or properties material to the Company and its Subsidiaries, taken as a whole, except for (i) sales of inventory in the ordinary course of business consistent with past practice and (ii) leases or licenses entered into in the ordinary course of business consistent with past practice and (iii) dispositions approved by the Bankruptcy Court or in which the aggregate consideration received did not exceed five hundred thousand dollars ($500,000).

2.26.   **Material Contracts**.  Other than as a result of the commencement of the Chapter 11 Cases: (a) all Contracts that are "material contracts" (as such term is defined in Item 601(b)(10) of Regulation S-K of the Commission as applied to the Company on a consolidated basis) to which the Company or any of its Subsidiaries is a party or is bound (the "Material Contracts") are valid, binding and enforceable by the Company or its relevant Subsidiary, except where the failure to be valid, binding or enforceable has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and no written notice to terminate, in whole or part, any Material Contract has been delivered to the Company or any of its Subsidiaries except where such termination has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and (b) neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Company, any other party to any Material Contract, is in default or breach under the terms thereof except, in each case, for such instances of default or breach that have not had and would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.  The Company and its Subsidiaries are not party to any agreement that prohibits or otherwise restricts any such entity from doing business in any territory or from carrying on any specific line of business.

2.27.   **Internal Control Over Financial Reporting**.  The Company maintains a system of internal control over financial reporting (as such term is defined in Rule 13a-15 under the Exchange Act) that (a) complies in all material respects with the requirements of the Exchange Act, (b) has been designed by the Company's principal executive officer and principal financial officer (or under their supervision) to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles, and (c) is effected by the Company's board of directors and the Company's management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.   As of the date hereof, the Company is not aware of any material weaknesses in its internal control over financial reporting.

2.28.   **Disclosure Controls and Procedures**.   The Company maintains disclosure controls and procedures required by Rule 13a-15(e) or 15d-15(e) under the Exchange Act.   Such disclosure controls and procedures have been designed to ensure that information required to be disclosed by the Company is recorded, processed, summarized and reported on a timely basis to the individuals

responsible for the preparation of the Company's filings with the SEC and other public disclosure documents..

    3.    **Representations and Warranties of the Investors**.  Each Investor, severally and not jointly, hereby represents and warrants to the Company and to each other Investor as to itself as set forth below.  Except for representations and warranties that are expressly limited as to a particular date, each representation and warranty is made as of the date hereof and as of the Effective Date:

    3.1.    **Organization of Such Investor**.  Such Investor is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization (as applicable), with full corporate, partnership or limited liability company (as applicable) power and authority to conduct its business as it is now or currently proposed to be conducted, and to own or use the properties and assets that it purports to own or use.

    3.2.    **Authority; No Conflict**.

    (a)    Such Investor has the requisite corporate, partnership or limited liability company (as applicable) power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby to be consummated by such Investor, and has taken all necessary corporate, partnership or limited liability company (as applicable) action required for the due authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby to be consummated by such Investor. This Agreement has been duly executed and delivered by such Investor, and this Agreement constitutes the legal, valid and binding obligation of such Investor, enforceable against such Investor in accordance with its terms.

    (b)    Except as set forth on <u>Schedule 3.2(b)</u>, neither the execution and delivery by such Investor of this Agreement nor the performance of its obligations hereunder nor the consummation on the part of such Investor of any of the transactions contemplated hereby will, directly or indirectly (with or without notice or lapse of time or both):  (i) contravene, conflict with, or result in a violation of (1) any provision of the Organizational Documents of such Investor, if applicable, or (2) any resolution adopted by the board of directors (or similar governing body) or the stockholders, members or partners (as applicable) of such Investor; (ii) contravene, conflict with, or result in a violation of, or give any Governmental Body or other Person the right to challenge this Agreement or any of the transactions contemplated hereby pursuant to, or to exercise any remedy or obtain any relief under, any pending, outstanding or existing Legal Requirement or Order to which such Investor, or any of the assets owned or used by such Investor, may be subject; or (iii) contravene, conflict with or result in a violation or breach of any provision of, or give rise to any right of termination, acceleration or cancellation under, any Contract to which such Investor is a party or which any of such Investor's properties or assets are bound; except, in the case of <u>clauses (ii)</u> and <u>(iii)</u> above, where such occurrence, event or results would not reasonably be expected to prohibit, materially delay or materially and adversely impact such Investor's performance of its obligations under this Agreement.

    (c)    Except (x) for Consents which have been obtained, notices which have been given and filings which have been made, (y) where the failure to give any notice, obtain any Consent or make any filing would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the consummation of any of the transactions contemplated by this Agreement and (z) for compliance with the applicable requirements of the HSR Act, if required, such Investor is not and will not be required to give any notice to, make any filing with or obtain any Consent from, any Person in connection with the execution and delivery by such Investor of

-18-

this Agreement or the consummation or performance by such Investor of any of the transactions contemplated hereby.

3.3. **Shares Not Registered**.  Such Investor understands that the Shares have not been registered under the Securities Act.  Such Investor also understands that the Shares are being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Investor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available.

3.4. **Legends**.  Such Investor agrees with the Company that the certificates evidencing the Shares acquired by such Investor will bear any legend required pursuant to the New Stockholders Agreement.

3.5. **Acquisition for Own Account**.  Such Investor is acquiring the Shares for its own account (or for the accounts for which it is acting as investment advisor or manager) for investment and not with a present view toward distribution, within the meaning of the Securities Act.

3.6. **Accredited Investor**.  Such Investor is an "accredited investor" as that term is defined in Regulation D promulgated under the Securities Act (an "Accredited Investor") and has such knowledge and experience in financial and business matters that such Investor is capable of evaluating the merits and risks of its investment.  Such Investor understands and is able to bear any economic risks with such investment.

3.7. Intentionally omitted.

3.8. **Brokers or Finders**.  Such Investor has not, and its agents have not, incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, for which the Company may be liable.

3.9. **Legal Proceedings**.  There is no pending or, to the knowledge of such Investor, threatened in writing, Proceeding against such Investor that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the transactions contemplated by this Agreement, which Proceeding, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of such Investor to consummate the transactions contemplated by this Agreement.

3.10. **Sufficiency of Funds; Allowed Convertible Subordinated Notes Claims**.

(a) As of the date hereof, such Investor either (i) has available funds and/or irrevocable capital commitments sufficient to pay the Total Investor Commitment Amount of such Investor as of the date hereof, or (ii) has delivered to the Company an unconditional and irrevocable guarantee of all of such Investor's obligations hereunder by an Affiliate of such Investor that has available funds and/or irrevocable capital commitments sufficient to pay the Total Investor Commitment Amount of such Investor as of the date hereof.  On the Effective Date, such Investor will have available funds sufficient to pay the aggregate Purchase Price for the Backstop Shares, if any, to be purchased by such Investor hereunder.

(b) Such Investor holds Allowed Convertible Subordinated Notes Claims sufficient to enable such Investor to exercise Rights to purchase such Investor's Rights Offering Shares set forth on Appendix 1.

-19-

3.11.  **Information**.   Such Investor acknowledges that it has been afforded the opportunity to ask questions and receive answers concerning the Company and its Subsidiaries and their respective financial conditions, results of operations, business properties, management and prospects and to obtain additional information that it has requested to verify the accuracy of the information contained herein.  Such Investor acknowledges that the Company's financial projections that are included in the Disclosure Statement are forward looking and based on certain forecasts, market assumptions and many other factors and, as such, may inherently be inaccurate.

3.12.  **Arm's Length**.   Such Investor acknowledges and agrees that the Company is acting solely in the capacity of an arm's length contractual counterparty to such Investor with respect to the acquisition of Shares hereunder.  Additionally, such Investor is not relying on the Company as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction with respect to the acquisition of Shares hereunder, except as set forth in this Agreement.  Such Investor shall consult with its own advisors concerning such matters referred to in the immediately preceding sentence and, subject to the right of such Investor to rely on the representations, warranties, covenants and agreements of the Company set forth in this Agreement, shall be responsible for making its own independent investigation and appraisal of the acquisition of the Shares hereunder.

4.  **Covenants of the Company**.  The Company hereby agrees with the Investors as set forth in this Section 4.

4.1.  **Agreement Motion and Agreement Order**.   On or prior to June 7, 2013, the Company shall file an executed copy of this Agreement, together with all of the exhibits hereto, with the Bankruptcy Court.  The Company agrees that it shall use its reasonable best efforts to (i) obtain a waiver of Bankruptcy Rule 6004(h) and request that the Agreement Order be effective immediately upon its entry by the Bankruptcy Court, which Agreement Order shall not be revised, modified, or amended by the Confirmation Order or any other further order of the Bankruptcy Court, (ii) fully support the Agreement Motion, and (iii) obtain approval of the Agreement Order on June 7, 2013.  The Agreement Order shall provide, among other things, that if the Company's board of directors has made a Determination with respect to a Regulatory Action pursuant to Section 7(a)(v) of this Agreement, (A) the Debtors shall not file any plan of reorganization that does not provide for the payment in full, in cash, of all holders of allowed general unsecured claims against the Debtors, including, but not limited to, holders of Convertible Notes, (B) if the Debtors have not consummated a plan of reorganization that provides for the payment in full, in cash, of all holders of allowed general unsecured claims against the Debtors, including, but not limited to, holders of Convertible Notes by January 14, 2014, the Debtors' exclusivity period shall irrevocably terminate without the requirement of any additional order of the Bankruptcy Court and (C) the Debtors shall not seek any order, or encourage any other party to seek any order, that impairs or modifies in any way either of such items.

4.2.  **Rights Offering**.   The Company shall file with the Bankruptcy Court, as an exhibit to the Disclosure Statement, a copy of the Rights Offering Procedures.  Subject to obtaining approval of the Agreement Order, the Company shall conduct and consummate the Rights Offering as provided herein and use its reasonable best efforts to seek entry of an order of the Bankruptcy Court (either in connection with the approval of the Disclosure Statement or otherwise), prior to the commencement of the Rights Offering, authorizing the Company to conduct the Rights Offering.

4.3.  **Conditions Precedent**.   The Company shall use its (and shall cause its Subsidiaries and Affiliates to use their) commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent set forth in Section 6.1 and Section 6.2 hereof (including, without limitation, procuring and obtaining all Consents, authorizations and waivers of, making all filings with, and giving

all notices to, third parties (including Governmental Bodies) which may be necessary or required on its part in order to effect the Contemplated Transactions).

4.4.    **Notification**.  The Company shall:  (i) on request by any of the Investors, notify all the Investors, or cause the subscription agent for the Rights Offering (the "<u>Subscription Agent</u>") to notify all the Investors, of the aggregate number of Rights known by the Company or the Subscription Agent to have been exercised pursuant to the Rights Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be, (ii) notify the Investors of any event, change or development that, individually or together with other events, changes or developments, causes any representation in <u>Section 2</u> to be inaccurate; and (iii) following the Rights Offering Deadline, timely comply with its obligations under <u>Section 1.1(e)</u>.

4.5.    **HSR Act**.    The Company shall promptly prepare and file all necessary documentation and effect all applications that are necessary under the HSR Act so that the applicable waiting period shall have expired or been terminated thereunder with respect to the purchase of Shares hereunder, and not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the Contemplated Transactions and shall reasonably cooperate with the Investors in respect of any filings or other requests required of the Investors pursuant to the HSR Act.  Without limiting the provisions of <u>Section 1.6</u>, the Company shall bear all costs and expenses of the Company and the Investors in connection with the preparation or the making of any filing under the HSR Act (including any filing fees thereunder).

4.6.    **New Registration Rights Agreement and New Stockholders Agreement**.  On the Effective Date, the Company shall execute and deliver to each of the Investors (a) the New Registration Rights Agreement in the form and substance of <u>Exhibit G</u> annexed hereto and (b) the New Stockholders Agreement in the form and substance of <u>Exhibit D</u> annexed hereto.

4.7.    **Conduct of the Business**.    Except as otherwise (v) required by law, (w) disclosed in the Disclosure Statement, (x) required by this Agreement or the Chapter 11 Plan or (y) consented to in writing by Requisite Investors (such consent not to be unreasonably withheld, delayed or conditioned), during the period from the date of this Agreement to the earlier of the Effective Date and the date on which this Agreement is terminated in accordance with its terms (the "<u>Pre-Closing Period</u>") (except as otherwise expressly provided or permitted by the terms of this Agreement), the Company and its Subsidiaries shall use their respective commercially reasonable efforts to (a) conduct their businesses in the ordinary course in all material respects as conducted at the date of this Agreement, and (b) to the extent consistent therewith, use commercially reasonable efforts to (i) keep available the services of their current executive officers, and (ii) preserve substantially intact the commercial relationships with customers, suppliers, distributors and others that are material to the Company or its Subsidiaries, consistent with past practice as conducted prior to the date of this Agreement.  Without limiting the generality of the foregoing, except (1) as otherwise expressly required or permitted by this Agreement, (2) as required by law, (3) for actions approved by the Requisite Investors in writing (which approval shall not be unreasonably withheld, conditioned or delayed), or (4) as set forth in <u>Schedule 4.7,</u> during the Pre-Closing Period, the Company shall not, and shall cause its Subsidiaries not to:

(a)    (i) declare, set aside or pay any dividends on, or make any other distributions in respect of, any of its capital stock other than dividends and distributions in respect of the capital stock of any wholly-owned direct or indirect Subsidiary of the Company to the Company or another wholly-owned Subsidiary not in excess of one hundred thousand dollars ($100,000) in the aggregate during the Pre-Closing Period or (ii) purchase, redeem or otherwise acquire, except in connection with the Chapter 11 Plan, any shares of capital stock of the

Company or any other securities thereof, or any rights, warrants or options to acquire any such shares or other securities;

(b)    issue, deliver, grant, sell, pledge, dispose of or otherwise encumber any of its capital stock or any securities convertible into, or any rights, warrants or options to acquire, any such capital stock at less than fair market value;

(c)    acquire or agree to acquire (i) by merging or consolidating with, or by purchasing a substantial portion of the stock, or other ownership interests in, or substantial portion of assets of, or by any other manner, any business or any corporation, partnership, association, joint venture, limited liability company or other entity or division thereof or (ii) any assets in excess of five hundred thousand dollars ($500,000) in any individual transaction or one million dollars ($1,000,000) in the aggregate during the Pre-Closing Period, except purchases of supplies, equipment and inventory in the ordinary course of business consistent with past practice;

(d)    (i) incur any indebtedness for borrowed money or guarantee any such indebtedness of another individual or entity, issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company, guarantee any debt securities of another individual or entity, enter into any "keep well" or other agreement to maintain any financial statement condition of another Person or enter into any arrangement having the economic effect of any of the foregoing, except for (A) borrowings and increases in letters of credit permitted under the DIP Credit Agreement and (B) indebtedness existing solely between the Company and its wholly owned Subsidiaries or between such Subsidiaries or (ii) make any loans, advances or capital contributions to, or investments in, any other individual or entity, except for (A) loans, advances or capital contributions (1) between the Company and its Subsidiaries and (2) between such Subsidiaries and (B) customary immaterial advances in the ordinary course of business consistent with past practice;

(e)    other than in connection with the repair or replacement of asset of the Company or its Subsidiaries in the ordinary course of business consistent with past practice, make or incur any capital expenditure involving the expenditure of no more than one hundred thousand dollars ($100,000) in any individual expenditure or two-hundred and fifty thousand dollars ($250,000) in the aggregate during the Pre-Closing Period;

(f)    make, change or rescind any material election relating to Taxes, settle or compromise any material Tax liability for an amount greater than the amount reserved for such liability on the most recent Financial Statements, or amend any material Tax Return;

(g)    adopt, or enter into any new, or renew, or materially amend or supplement any existing, Collective Bargaining Agreement;

(h)    (1) enter into any new, or amend or terminate (other than amendments required to maintain the tax qualified status of such plans under the Code in the ordinary course of business consistent with past practices) any existing, Company Plans, arrangements or programs, severance agreement, deferred compensation arrangement or employment agreement with any officers, directors or employees, (2) grant any increases in employee compensation, other than in the ordinary course or pursuant to promotions, in each case consistent with past practice (which shall include normal individual periodic performance reviews and related compensation and benefit increases and bonus payments consistent with past

practices), (3) grant any stock options or stock awards or (4) make any annual or long-term incentive awards; or

(i)    agree or otherwise commit to take any of the actions set forth in the foregoing subsections (a) through (h) of this Section 4.7.

4.8.    **Access to Information**.  Subject to applicable Legal Requirements and the terms and existence of confidentiality agreements between each of the Investors and the Company, upon reasonable notice, the Company shall, and shall cause its Subsidiaries to, afford the Investors and their legal advisors access, during normal business hours and without unreasonable disruption or interference with the Company's and its Subsidiaries' business or operations, throughout the Pre-Closing Period, to the Company's and its Subsidiaries' properties, offices and other facilities, books and records and, during the Pre-Closing Period, the Company shall (and shall cause its Subsidiaries to) furnish promptly to such parties available financial, operating and other data and information with respect to the Company's and its Subsidiaries' business, properties and personnel as may reasonably be requested by such party.  The Investors acknowledge and agree that any contact by with officers, employees, customers or agents of the Company and its Subsidiaries hereunder shall be arranged and supervised by executive officers of the Company or any designee thereof.  Notwithstanding anything to the contrary contained in this Agreement, the Company shall not be required (a) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company to violate any of its obligations with respect to confidentiality to a third party, (b) to disclose any legally privileged information of the Company or any of its Subsidiaries or (c) to violate any laws; provided, that the Company shall deliver to the Investors and their legal advisors a description of any information not provided pursuant to clauses (a) through (c) to the extent not prohibited from doing so.  In addition, notwithstanding anything contained in this Agreement to the contrary, no Investor or any representative thereof shall have any right to perform or conduct, or cause to be performed or conducted, any environmental sampling or testing at, in, on or underneath the real property owned or leased by the Company or its Subsidiaries.

4.9.    **Alternate Transaction Proposals**.

(a)    At all times during the Pre-Closing Period, the Company shall not, the Company shall cause its Subsidiaries and its and their respective officers and directors not to, and the Company shall instruct and use its reasonable best efforts to cause its representatives not to, (i) directly or indirectly solicit, initiate, knowingly facilitate or knowingly encourage any inquiries regarding, or the making of any proposal or offer that constitutes or would reasonably be expected to lead to, an Alternate Transaction Proposal, (ii) enter into or participate in any discussions or negotiations with any Person that has made an Alternate Transaction Proposal (other than to state that the Company is not permitted to have discussions), or furnish to any Person any information with respect to an Alternate Transaction Proposal or any inquiry or proposal that would reasonably be expected to lead to an Alternate Transaction Proposal, or (iii) execute or enter into any Alternate Transaction Agreement (other than an Acceptable Confidentiality Agreement); provided, however, any action or determination permitted under Section 4.9(b) or Section 4.9(d) shall not be deemed a breach of this Section 4.9(a).  Immediately after the execution of this Agreement, the Company shall, and shall cause its Subsidiaries and their respective officers, directors and representatives to immediately cease and cause to be terminated any existing activities, discussions or negotiations with any Persons conducted prior to the date hereof with respect to any Alternate Transaction Proposal (other than the Contemplated Transactions and this Agreement).

(b)    Notwithstanding Section 4.9(a), if at any time following the date of this Agreement and prior to, but not after, the entry of the Confirmation Order, (i) the

-23-

Company receives a bona fide written Alternate Transaction Proposal from a third party that did not result from a breach of Section 4.9(a), and (ii) the Company's board of directors determines in good faith (A) after consultation with its financial advisors and outside legal counsel, that such Alternate Transaction Proposal constitutes or would reasonably be expected to lead to a Superior Proposal and (B) after consultation with outside legal counsel, that the failure to take the actions set forth in clauses (1) and (2) below with respect to such Alternate Transaction Proposal would be inconsistent with its fiduciary duties under applicable Legal Requirements, then the Company and its representatives may, subject to providing prior notice to the Investors of its decision to take any such action, in response to such Alternate Transaction Proposal, (1) subject to execution by the Person who has made such Alternate Transaction Proposal of an Acceptable Confidentiality Agreement, furnish access and non-public information with respect to the Company and any of its Subsidiaries to such Person, so long as any such access or non-public information provided under this clause (1) has previously been provided to the Investors or is provided to the Investors substantially concurrently with the time it is provided to such Person and (2) engage in and participate in discussions and negotiations regarding such Alternate Transaction Proposal; provided, however, that after the occurrence of the Cleansing Date each Investor shall have the option to inform the Company that it does not wish to receive such access or non-public information under clause (1); provided further that, to the extent any Investor elects to receive such non-public information, the Company shall have no obligation to make public such non-public information.

(c)    From and after the date of this Agreement, the Company shall notify the Investors orally and in writing promptly, and in any event within twenty-four (24) hours, of the receipt by the Company or any of its Subsidiaries or any of their respective representatives, of any Alternate Transaction Proposal.  The written notice shall include the identity of the Person making such Alternate Transaction Proposal, the material terms and conditions of the Alternate Transaction Proposal and copies of any written communications and documents setting forth the material terms and conditions of such Alternate Transaction Proposal so received from the Person making such Alternate Transaction Proposal or its representatives or Affiliates, and the Company shall keep the Investors reasonably informed of the status and details of any such Alternate Transaction Proposal and any material developments with respect thereto on a prompt basis (and in any event within twenty-four (24) hours).

(d)    Notwithstanding anything to the contrary in this Agreement, at any time before the entry of the Confirmation Order and so long as the Company is in compliance with this Section 4.9, if the Company receives an Alternate Transaction Proposal which the Company's board of directors determines in good faith, after consultation with its financial advisors and outside legal counsel, constitutes a Superior Proposal and such Alternate Transaction Proposal has not been withdrawn, the Company's board of directors may terminate this Agreement in accordance with the terms of Section 7.1(d)(ii) to enter into an Alternate Transaction Agreement with respect to a Superior Proposal received after the date of this Agreement, but only if: (i) the Company shall have first provided prior written notice to the Investors that it is prepared to terminate this Agreement to enter into an Alternate Transaction Agreement with respect to a Superior Proposal, which notice shall include the material terms and conditions of the transaction that constitutes such Superior Proposal and the identity of the party making such Superior Proposal and attach a copy of the definitive agreement proposed to be entered into with respect to such Superior Proposal; (ii) the Company has negotiated in good faith with the Investors (including by making the Company's representatives reasonably available to negotiate) with respect to any changes to the terms of this Agreement proposed by the Investors for five (5) Business Days after the Investors' receipt of such notice (it being understood and agreed that any material change to the financial or other terms and conditions of such Superior

-24-

Proposal shall require an additional notice to the Investors and negotiations in good faith for an additional three (3) Business Days) (any such five (5) and three (3) Business Day periods collectively, the "Investor Notice Period"); (iii) the Company's board of directors determines in good faith, after taking into account the changes to the terms of this Agreement committed to by the Investors and after consultation with its financial advisors and outside legal counsel, that such Superior Proposal continues to meet the definition of the term "Superior Proposal" and that the failure by it to terminate this Agreement to enter into such Alternate Transaction Agreement would be inconsistent with its fiduciary duties under applicable Legal Requirements; and (iv) there shall have been no breach of this Section 4.9 by the Company with respect to any act or omission of the Company in relation to such Superior Proposal; provided, that the Company shall not terminate this Agreement pursuant to the foregoing, and any purported termination pursuant to the foregoing shall be void and of no force or effect, unless at or concurrently with such termination the Company pays the Alternate Transaction Damages and any outstanding Transaction Expenses in full in accordance with Section 7(e).

(e)    The parties hereto agree that any violation of the restrictions set forth in this Section 4.9 by any Subsidiary of the Company or any of the Company's or its Subsidiaries' officers, directors or representatives shall constitute a breach of this Section 4.9 by the Company.

(f)    For purposes of this Agreement, the following terms shall have the meanings assigned below:

(i)    "Acceptable Confidentiality Agreement" means a confidentiality agreement between the Company and a Person making an Alternate Transaction Proposal entered into after the date of this Agreement, on terms not materially less favorable in the aggregate to the Company than those contained in the confidentiality agreement(s) entered into with the Investors in the aggregate; provided, that such confidentiality agreement shall provide that nothing therein shall prevent or prohibit the Company from complying with its obligations under this Agreement, including with respect to the Company's disclosure obligations to the Investors under this Agreement with respect to any Alternate Transaction Proposal or Superior Proposal; provided, further, however, that the confidentiality agreement between the Company and Silver Point Finance, LLC in effect as of the date hereof shall be deemed an Acceptable Confidentiality Agreement upon the execution of an amendment thereto giving effect to the immediately preceding proviso.

(ii)    "Alternate Transaction Proposal" means any indication of interest, proposal or offer (whether or not in writing, and whether or not publicly announced) from any Person relating to any transaction or series of transactions that is inconsistent with the transactions contemplated by this Agreement or the Chapter 11 Plan, including (A) a merger, consolidation, spin-off, share exchange (including a split-off) or business combination involving the Company or any of its Subsidiaries, (B) a sale, lease, license, exchange, mortgage, transfer or other disposition, directly or indirectly, in a single transaction or series of related transactions (including by way of merger, consolidation, spin-off, share exchange (including a split-off), business combination, joint venture, sale of equity interests or other economic interests in the Company or any of its Subsidiaries), of assets of the Company and/or its Subsidiaries representing fifteen percent (15%) or more of the consolidated revenues, net income or assets of the Company and its Subsidiaries, taken as a whole, (C) an issuance, purchase, sale or other disposition, directly or indirectly, in a single transaction or series of related transactions

-25-

(including by way of a tender offer, exchange offer or other similar transaction), (1) of shares of capital stock or other securities representing fifteen percent (15%) or more of the voting power of the capital stock of the Company or (2) that, if consummated, would result in any Person or "group" (as defined in the Exchange Act) of Persons, directly or indirectly acquiring beneficial or record ownership of more than fifteen percent (15%) of the Company's common stock then outstanding, (D) a reorganization, recapitalization, liquidation or dissolution, or any financial restructuring or plan of reorganization, of the Company or any of its Subsidiaries, or (E) any combination of the foregoing or other transaction having a similar effect to those described in clauses (A) through (D).

(iii)    "Superior Proposal" means a bona fide written Alternate Transaction Proposal that the Company's board of directors determines in good faith (after consultation with its financial advisors and outside legal counsel and after taking into account any revisions to the terms of the transactions contemplated by this Agreement agreed to by the Investors pursuant to Section 4.9) (A) is at least as likely to be consummated (if accepted) in accordance with its terms, taking into account all legal, financial and regulatory aspects of the proposal and the Person making the Alternate Transaction Proposal, (B) would, if consummated, result in a transaction that is more favorable to the Company and its stakeholders from a financial point of view than the transactions contemplated by this Agreement, and (C) the failure of the Company's board of directors to identify as a Superior Proposal would be inconsistent with the Company's board of directors' fiduciary duties under applicable Legal Requirements.

4.10.    **Agreement to Support the Chapter 11 Plan**.  On or prior to June 21, 2013, the Company shall file the Chapter 11 Plan (in the form attached as Exhibit E to this Agreement) and the Disclosure Statement.  Prior to filing with the Bankruptcy Court any revision, supplement, modification or amendment to the Chapter 11 Plan or the Disclosure Statement, the Company shall provide to the Investors and their counsel a copy of any such filing, revision, modification, supplement or amendment and a reasonable opportunity to review and comment on such documents prior to being filed; provided that such review and comment shall not constitute a presumption or other determination that the documents constitute (and comply with the definition of) either a Chapter 11 Plan or a Disclosure Statement, as applicable nor shall any such review and comment be considered an acceptance or approval of such Chapter 11 Plan or Disclosure Statement by any Investor.  In addition, the Company shall provide to the Investors and their counsel a copy of a draft of the Confirmation Order and a reasonable opportunity to review and comment on such draft prior to such order being filed with the Bankruptcy Court.

4.11.    **Public Disclosure**.  No later than two (2) Business Days after the date that the Company's board of directors makes the written Determination as set forth in Section 7(a)(v) of this Agreement, the Company shall make a filing with the SEC on Form 8-K that shall disclose all Confidential Information (as defined in the applicable non-disclosure agreement between each Investor and the Company (each, an "NDA")) that, in the Company's commercially reasonable judgment, constitutes material non-public information for purposes of the United States securities laws (the "Securities Laws") or an appropriate summary thereof (any such summary shall be determined in the Company's reasonable discretion), and the Company shall provide the Investors one (1) Business Day to review and comment upon a draft of such Form 8-K (which shall be in substantially final form) prior to the filing thereof, which such comments shall be considered by the Company in its good faith reasonable judgment.  The date upon which such Form 8-K is filed with the SEC is referred to as the "Cleansing Date."

5.    **Covenants of the Investors**.  Each of the Investors hereby agrees, severally and not jointly, with the Company as set forth in this Section 5.

5.1.    **Conditions Precedent**.  During the Pre-Closing Period, each Investor shall use its commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent applicable to such Investor set forth in Section 6.2; provided, that no Investor shall be required to pay any third party to obtain in exchange for any Consent.

5.2.    **HSR Act**.  During the Pre-Closing Period, each Investor shall promptly prepare and file all necessary documentation and effect all applications that are necessary to be filed by such Investor under the HSR Act so that the applicable waiting period shall have expired or been terminated thereunder with respect to the purchase of Shares hereunder, and not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the Contemplated Transactions.  Each Investor shall reasonably cooperate with the Company in respect of any filings or other requests required of the Company pursuant to the HSR Act.  Anything herein to the contrary notwithstanding, none of the Investors (nor their respective ultimate parent entities, as such term is used in the HSR Act) shall be required to (i) disclose to any other party hereto any information contained in its HSR Notification and Report Form which such party, in its sole discretion, deems confidential, except as may be required by applicable Legal Requirements as a condition to the expiration or termination of the applicable waiting period under the HSR Act with respect to the purchase of the Shares hereunder, (ii) hold separate (including by trust or otherwise) or divest any of its businesses or assets or agree to any condition, restraint or limitation relating to its ability to freely own or operate all or a portion of its businesses or assets, (iii) to hold separate (including by trust or otherwise) or divest any assets of the Company or any of its Subsidiaries or (iv) respond to any request by any Governmental Body for any additional information or engage in any Proceeding in respect of this Agreement or the Contemplated Transactions.  Without limiting the provisions of Section 1.6, the Company shall bear all costs and expenses of the Company and the Investors in connection with the preparation or the making of any filing under the HSR Act (including any filing fees thereunder).

5.3.    **Information**.  During the Pre-Closing Period, each Investor shall provide the Company with such information as the Company reasonably requests regarding such Investor that is required to be included in the Disclosure Statement (to the extent applicable).

5.4.    **Agreement Order**.  During the Pre-Closing Period, each Investor shall use commercially reasonable efforts to facilitate the entry of the Agreement Order.

5.5.    **Agreement to Support the Chapter 11 Plan**.

(a)    Subject to the conditions contained in Section 5.5(b) below and provided that the Disclosure Statement is in form and substance reasonably acceptable to the Requisite Investors, each Investor holding claims arising under or in connection with the Convertible Notes, the Senior Notes and/or any other claims against one or more of the Debtors (collectively, the "Relevant Claims") agrees that, during the Pre-Closing Period, such Investor:

(i)    subject to the requirements of section 1125 of the Bankruptcy Code, including and only following the approval by the Bankruptcy Court of a Disclosure Statement which shall be consistent with the Chapter 11 Plan and its transmittal to creditors and other parties in interest, shall timely vote or cause to be voted all of its Relevant Claims to accept the Chapter 11 Plan (and it shall not thereafter withdraw or change such vote);

-27-

(ii)     shall timely vote (or cause to be voted) all Relevant Claims against, and not consent to, any other plan, sale, proposal, or offer of dissolution, winding up, liquidation, reorganization, merger, or restructuring of the Debtors that could reasonably be expected to prevent, delay, or impede the restructuring of the Debtors as contemplated by the Chapter 11 Plan or that is inconsistent with this Agreement or the Chapter 11 Plan (collectively, an "Alternate Transaction");

(iii)     shall not, directly or indirectly, seek, knowingly support, solicit, assist, knowingly encourage or participate in the formulation of any Alternate Transaction;

(iv)     shall not directly or indirectly (a) engage in, continue, or otherwise participate in any negotiations regarding any Alternate Transaction, (b) enter into a letter of intent, memorandum of understanding, agreement in principle, or other agreement relating to any Alternate Transaction or (c) withhold, withdraw, qualify, or modify its approval or recommendation of this Agreement or the Chapter 11 Plan; and

(v)     shall not (A) oppose or object to the approval of the Disclosure Statement, the Chapter 11 Plan, or the solicitation of the Chapter 11 Plan; (B) join in or support any objection to the Disclosure Statement, the Chapter 11 Plan, or the solicitation of the Chapter 11 Plan; or (C) take any other action to alter, delay, or impede the confirmation and consummation of the Chapter 11 Plan.

(b)     Rights of Investors Unaffected.  Nothing contained herein shall (i) limit (A) the ability of an Investor to consult with other Investors, the Committee or the Debtors or (B) the rights of an Investor under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated to appear and be heard, concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is not inconsistent with the Investors' obligations hereunder or under the terms of the Chapter 11 Plan and is not for the purpose of hindering, delaying or preventing the consummation of the Chapter 11 Plan; (ii) limit the ability of an Investor to sell or enter into any transactions in connection with the Convertible Notes or the Senior Notes or any other claims against or interests in the Debtors, subject to Section 5.6 below; or (iii) limit any rights of any Investor arising under the Convertible Notes Indenture or the Senior Notes Indenture, respectively, or constitute a waiver or amendment of any provision of such indentures.

5.6.     **Transfers**.  Each Investor holding Convertible Notes or Senior Notes agrees that so long as this Agreement has not been terminated such Investor shall not sell, transfer, loan, hypothecate, assign or otherwise dispose of (including by participation), in whole or in part, any of the Convertible Notes or Senior Notes or any option thereon or any right or interest therein (including the deposit of any Convertible Notes or Senior Notes into a voting trust or entry into a voting agreement with respect to any such Convertible Notes or Senior Notes), other than a transfer of Convertible Notes or Senior Notes to any other Investor party to this Agreement, unless the transferee thereof, prior to or concurrently with such transfer, agrees in writing to become an Investor and to be bound by all terms and provisions of this Agreement applicable to its transferor by executing and delivering a joinder agreement in a form reasonably acceptable to the Company and the Requisite Investors, in which event the transferee shall be deemed to be an Investor for all purposes of this Agreement to the extent of such transferred rights and obligations; provided, however, that notwithstanding the foregoing, no such sale, transfer, loan, hypothecation, assignment or other disposition by an Investor will relieve such Investor of its obligations under Sections 1.1 and 1.3 hereof if the assignee, transferee or other counterparty thereto fails to perform such obligations.  Each Investor holding Convertible Notes or Senior Notes agrees that any sale, transfer

-28-

or assignment of any Convertible Notes or Senior Notes that does not comply with the terms and procedures set forth herein shall be deemed void ab initio.

6.    **Conditions to Closing**.

6.1.    **Conditions Precedent to Obligations of the Investors**.  The obligations of each Investor to subscribe for and purchase Shares pursuant to their respective Commitments are subject only to the following conditions precedent, each of which may be waived as provided in Section 6.3:

(a)    Agreement Order.  The Agreement Order shall have been entered by the Bankruptcy Court in a form and substance reasonably satisfactory to the Requisite Investors, and the Agreement Order shall have become a Final Order.

(b)    Material Adverse Effect.  Since the date of this Agreement, there shall not have occurred or exist any changes, circumstances or events that have had or would reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.

(c)    Confirmation Order.  The Confirmation Order, in form and substance reasonably acceptable to the Requisite Investors, shall have been entered by the Bankruptcy Court and such order shall have become a Final Order.

(d)    Chapter 11 Plan.  The Chapter 11 Plan, as approved by the Bankruptcy Court, shall be in form and substance reasonably acceptable to all of the Investors (such acceptance not to be unreasonably withheld, delayed or conditioned), it being agreed that (i) the Chapter 11 Plan attached hereto as Exhibit E is acceptable to all of the Investors and (ii) it shall be reasonable for any Investor to withhold acceptance or consent if the Chapter 11 Plan differs in any substantive respect (adverse to such Investor) from the form annexed hereto as Exhibit E.

(e)    Disclosure Statement.  The Disclosure Statement, as approved by the Bankruptcy Court, shall be in form and substance reasonably acceptable to the Requisite Investors.

(f)    Conditions to Confirmation.  The conditions to confirmation and the conditions to the Effective Date set forth in the Chapter 11 Plan shall have been satisfied (or waived with the consent of the Investors) in accordance with the Chapter 11 Plan, and the Effective Date shall have occurred.

(g)    Rights Offering.  The Company shall have commenced the Rights Offering, the Rights Offering shall have been conducted in accordance with the Rights Offering Procedures and in accordance with this Agreement, and the Rights Offering Deadline shall have occurred.

(h)    Purchase Notice.  The Investors shall have received from the Company in accordance with Section 1.1(e) a Satisfaction Notice or a Purchase Notice certifying as to the number of Unsubscribed Shares to be purchased pursuant to Section 1.1(c), in each case, dated as of the Determination Date.

(i)    No Injunctions or Restraints; Illegality.  No temporary restraining order, preliminary or permanent injunction or other Order preventing the

consummation of the transactions contemplated hereby or any of the other Contemplated Transactions shall have been entered, issued, rendered or made, nor shall any Proceeding brought by a Governmental Body seeking any of the foregoing be pending; nor shall there be any Legal Requirement or Order promulgated, enacted, entered, enforced or deemed applicable to the parties hereto which makes the consummation of the transactions contemplated by this Agreement or any of the other Contemplated Transactions illegal, void or rescinded.

(j)     HSR Act.  If the acquisition of the Shares by the Investors pursuant to this Agreement and the Chapter 11 Plan is subject to the terms of the HSR Act, the applicable waiting period shall have expired or been terminated thereunder with respect to such purchase.

(k)     Notices and Consents.  All other governmental and third party notifications, filings, waivers, authorizations and Consents set forth on Schedule 6.1(k) shall have been made or received and shall be in full force and effect.

(l)     Representations and Warranties and Covenants.  (i) Each of (x) the representations and warranties of the Company set forth in Section 2.2, Section 2.3, Section 2.4(c) and Section 2.24(a) shall be true and correct in all respects, (y) the other representations and warranties of the Company in this Agreement that are not qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all material respects and (z) the representations and warranties of the Company in this Agreement that are qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects, in each case of clauses (x), (y) and (z), at and as of the date hereof and as of the Closing as if made at and as of the Closing (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date) and (ii) the Company shall have complied in all material respects with all covenants in this Agreement applicable to it.

(m)     Officer's Certificate.  The Investors shall have received on and as of the Closing a certificate of the chief financial officer or chief accounting officer of the Company confirming that the conditions set forth in Sections 6.1(b) and 6.1(l) hereof have been satisfied.

(n)     Exit Facility(ies).  The Company shall have entered into and consummated one or more (as necessary) exit financing facilities reasonably acceptable to each of the Investors, it being understood and agreed that the Contemplated Exit Facility shall be deemed to be reasonably acceptable to each of the Investors for the purposes of this Section 6.1(n).

(o)     Transaction Expenses.  The Company shall have paid all Transaction Expenses that have been invoiced to the Company by the Investors and the Ad Hoc Counsel and in each case, remain unpaid as of the Closing Date.

(p)     Commitment Fee.  The Company shall have issued the Commitment Fee Shares to the Non-Defaulting Investors in accordance with Section 1.5.

(q)     Operative Documents.  The New Stockholders Agreement in the form and substance annexed hereto as Exhibit D and the New Registration Rights Agreement in the form and substance annexed hereto as Exhibit G shall have been executed and delivered to the Investors by the Company.  The Company shall have adopted pursuant to the Chapter 11 Plan the New Charter and New Bylaws in the form and substance of the documents annexed hereto as Exhibits B and C, respectively.

-30-

(r)    Alternate Transaction; Change of Recommendation.  Neither the Company nor any of its Subsidiaries shall have entered into any contract, binding letter of intent, binding term sheet, or any other written agreement in principle providing for the consummation of any Alternate Transaction (an "Alternate Transaction Agreement") (or proposed or resolved to do so, which proposal or resolution has not been withdrawn or terminated) and there shall not have been a Change of Recommendation.  For the purpose of this Agreement, "Change of Recommendation" shall mean: (i) the Company or its board of directors or any committee thereof shall have withdrawn, qualified or modified, in a manner materially adverse to the Investors, its approval or recommendation of this Agreement or the Chapter 11 Plan or any of the Contemplated Transactions or (ii) the Company or its board of directors or any committee thereof shall have approved or recommended, or resolved to approve or recommend (including by filing any pleading or document with the Bankruptcy Court seeking Bankruptcy Court approval of) any Alternate Transaction or Alternate Transaction Agreement.

(s)    Makena®.    The United States Food and Drug Administration shall not have approved an Abbreviated New Drug Application (ANDA) with respect to a generic formulation of hydroxyprogesterone caproate injection that would reasonably be expected to have a material adverse effect on the financial condition or results of operations of the Company and its Subsidiaries, taken as a whole.

(t)    Other Investors.  The total proceeds paid to the Company at the Closing from the Rights Offering pursuant to Section 1.1 (including the participation in the Rights Offering of the Investors in accordance with Section 1.1) and the purchase of Direct Subscription Shares and Unsubscribed Shares pursuant to Section 1.2 and Section 1.3 shall equal at least the aggregate amount of all the Investors' Total Investor Commitment Amounts; provided, that any DIP Claims deemed surrendered pursuant to a Defaulting DIP Lender Exchange under Section 1.3(a) shall be deemed proceeds paid to the Company.

6.2.    **Conditions Precedent to Obligations of the Company**.  The obligations of the Company to issue and sell the Shares to each of the Investors pursuant to this Agreement are subject only to the following conditions precedent, each of which may be waived in writing by the Company:

(a)    Agreement Order.  The Agreement Order shall have been entered by the Bankruptcy Court and the Agreement Order shall have become a Final Order.

(b)    Confirmation Order.  The Confirmation Order shall have been entered by the Bankruptcy Court and such order shall have become a Final Order.

(c)    Conditions to Confirmation.  The conditions to confirmation and the conditions to the Effective Date set forth in the Chapter 11 Plan shall have been satisfied (or waived with the consent of the Requisite Investors) in accordance with the Chapter 11 Plan, and the Effective Date shall have occurred.

(d)    No Injunctions or Restraints; Illegality.  No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the transactions contemplated hereby or any of the other Contemplated Transactions shall have been entered, issued, rendered or made, nor shall any Proceeding brought by a Governmental Body seeking any of the foregoing be pending; nor shall there be any Legal Requirement or Order promulgated, enacted, entered, enforced or deemed applicable to the

parties hereto which makes the consummation of the transactions contemplated by this Agreement or any of the other Contemplated Transactions illegal, void or rescinded.

(e)   HSR Act.  If the acquisition of the Shares by the Investors pursuant to this Agreement and the Chapter 11 Plan is subject to the terms of the HSR Act, the applicable waiting period shall have expired or been terminated thereunder with respect to such purchase.

(f)   Representations and Warranties and Covenants.  (i) Each of (x) the representations and warranties of each Investor in this Agreement that are not qualified as to "materiality" or "material adverse effect" shall be true and correct in all material respects and (y) the representations and warranties of each Investor that are qualified as to "materiality" or "material adverse effect" shall be true and correct in all respects, in each case of clauses (x) and (y), at and as of the date hereof and as of the Closing as if made at and as of the Closing (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date) and (ii) each Investor shall have complied in all material respects with all covenants in this Agreement applicable to it, except, in each case, to the extent that Non-Defaulting Investors purchase any Defaulting Shares as a result of any breach of representations, warranties or covenants by a Defaulting Investor pursuant to Section 1.3(b) hereof.

6.3.   **Waiver of Conditions**.  The conditions set forth in Sections 6.1(b) and 6.1(s) may be waived only with the written approval of Investors whose Total Commitments exceed 33-1/3% of the Total Commitments of all Investors.  The conditions set forth in Sections 6.1(a), 6.1(c), 6.1(e), 6.1(g), 6.1(h) and 6.1(l) (to the extent it relates to the following Sections: 2.6; 2.8; 2.9; 2.10; 2.11; 2.13-2.16; 2.18-2.21; and 2.25-2.28) may be waived only with the written approval of the Requisite Investors.  The conditions set forth in Sections 6.1(d), 6.1(f), 6.1(i), 6.1(j), 6.1(k), 6.1(l) (to the extent it relates to the Sections other than those listed in the preceding sentence), 6.1(m), 6.1(n), 6.1(o), 6.1(p), 6.1(q) and 6.1(r) may be waived only with the written approval of all of the Investors.  The conditions set forth in Section 6.1(t) may be waived only with the written approval of all Investors other than the breaching Investors.

7.   **Termination**.

(a)   Except as set forth in Section 7(b), this Agreement (including the Commitments) may be terminated and the transactions contemplated hereby may be abandoned at any time by any Investor upon the occurrence of any of the following:

(i)   if the Company does not file an executed copy of this Agreement, together with all of the exhibits hereto, with the Bankruptcy Court on or prior to June 7, 2013;

(ii)   if the Bankruptcy Court does not enter the Agreement Order on or prior to June 7, 2013;

(iii)   at any time after June 21, 2013 if the Debtors have not filed with the Bankruptcy Court a motion to confirm the Chapter 11 Plan and a related motion to approve the Disclosure Statement on or prior to such date;

(iv)   at any time after July 31, 2013, if the Bankruptcy Court has not entered an order approving such Disclosure Statement on or prior to such date;

(v)   at any time after September 12, 2013 (the "Confirmation Order Date"), if

the Bankruptcy Court has not entered the Confirmation Order with respect to the
Chapter 11 Plan on or prior to such date; provided, that the Confirmation Order Date
may be extended by the Company on one occasion until the date that is no later than
October 12, 2013 (subject to the proviso in the last sentence below) solely in the
following circumstances:  (1) following the date the Bankruptcy Court has entered the
Agreement Order and prior to September 12, 2013, a Regulatory Action has occurred;
and (2) the Company's board of directors determines in good faith (A) (after
consultation with its financial advisors and outside legal counsel) that such Regulatory
Action has materially increased the prospects and enterprise value of the Company and
its subsidiaries taken as a whole in a manner that would reasonably be expected to lead
to a Superior Proposal that provides for the payment in full, in cash, of holders of
allowed general unsecured claims against the Company, including but not limited to
holders of Convertible Notes and (B) (after consultation with outside legal counsel) that
the failure to extend the Confirmation Order Date as permitted by this Section 7(a)(v)
would be inconsistent with its fiduciary duties under applicable Legal Requirements; for
purposes of this Section 7(a)(v) the term "Regulatory Action" means any governmental,
litigation, legislative or regulatory event or events that has materially limited or reduced,
or is reasonably likely to materially limit or reduce, the availability of compounded 17P
in the market; provided, that a bill or rule promulgated by a committee or subcommittee
of a house of Congress alone will not constitute a "Regulatory Action".  Upon a
determination by the Company's board of directors of the occurrence of (1) and (2) (a
"Determination"), the Company shall provide written notice of such Determination to
the Investors within twenty-four (24) hours of such Determination; provided, that,
notwithstanding anything to the contrary contained herein, during the period beginning
on the Cleansing Date and ending on the date that is thirty (30) days after the Cleansing
Date (exclusive of the Investor Notice Period, which shall be in addition to such thirty-
day period) (the "Go Shop End Date") the prohibitions contained in Section 4.9(a)(i)
and Section 4.9(a)(ii) shall not apply, but all other provisions of Section 4.9 (other than
Section 4.9(b), except (X) the requirement that the Company enter into an Acceptable
Confidentiality Agreement prior to furnishing access and non-public information to any
Person and (Y) the requirement that the Company have previously provided or
concurrently provides such access or non-public information to the Investors (other than
Investors that have informed the Company that they do not want such access or non-
public information), provided that, to the extent any Investor elects to receive such non-
public information, the Company shall have no obligation to make public such non-
public information) shall continue to be applicable, except that, if the Company elects to
extend the confirmation order date in accordance with this Section 7(a)(v), then the
definition of "Superior Proposal" contained in Section 4.9 shall be automatically
amended to add, as an additional requirement, that, to qualify as a superior proposal, an
Alternative Transaction Proposal must provide for the payment in full, in cash, of all
holders of allowed general unsecured claims against the Debtors, including but not
limited to, holders of Convertible Notes;

(vi)    at any time after the date that is thirty (30) calendar days after entry of
the Confirmation Order, if the Effective Date with respect to the Chapter 11 Plan has not
occurred on or prior to such date;

(vii)    if the Bankruptcy Court shall have entered an order denying confirmation
of the Chapter 11 Plan, the Chapter 11 Plan is terminated in accordance with its terms or
the Confirmation Order is vacated or reversed;

(viii)   if the Company shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, or if any representation or warranty of the Company in this Agreement shall have become untrue, in either case which breach, failure to perform or occurrence (x) would result in a failure of a condition set forth in Section 6.1 and (y) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (A) the End Date and (B) ten (10) Business Days after written notice of such breach, failure or occurrence is given to the Investors by the Company;

(ix)    upon the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code, or the filing by the Debtors of a motion or other pleading with the Bankruptcy Court seeking the dismissal or conversion of any of the Chapter 11 Cases;

(x)     if the Bankruptcy Court grants relief that is materially inconsistent with the Chapter 11 Plan;

(xi)    there shall have been a Change of Recommendation, or the Company shall have entered into an Alternate Transaction Agreement;

(xii)   if termination of this Agreement results from the operation of Sections 1.3(a) and/or Section 1.3(b); or

(xiii)  if the Closing shall not have occurred on or prior to October 12, 2013 (the "End Date"), provided, that if the Confirmation Order Date has been extended pursuant to Section 7(a)(v) of this Agreement to a date that is after September 12, 2013, then the "End Date" shall be thirty (30) days after the Go Shop End Date.

(b)     Any Investor may terminate this Agreement in the circumstances set forth in Section 7(a), by written notice to each other Investor and the Company; provided, that (i) in order to terminate this Agreement pursuant to Section 7(a)(i), 7(a)(ii), 7(a)(iii), 7(a)(iv), 7(a)(v) or 7(a)(vi) within the first thirty (30) days after such termination right arises, such written notice must be executed by the Requisite Investors and (ii) any termination of this Agreement pursuant to Section 7(a)(viii) will be of no force and effect if Investors who have the right hereunder to waive the condition giving rise to such termination notify all of the Investors in writing that they object to such termination; and provided, further, that such termination will be of full force and effect upon any rescission by such Investors of such objection.

(c)     This Agreement may be terminated at any time by written consent of the Company and the Requisite Investors.

(d)     This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time by the Company (i) if the Closing shall not have occurred on or prior to the End Date, (ii) in order to concurrently enter into an Alternate Transaction Agreement with respect to a Superior Proposal; provided, that (A) the Company has complied with the terms of Section 4.9 and (B) the Company pays in full the Alternate Transaction Damages and Transactions Expenses payable pursuant to Section 7(e) concurrently with such termination, or (iii) if any Investor shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, or if any representation or warranty of any Investor in this Agreement shall have become untrue, in either

-34-

case which breach, failure to perform or occurrence (x) would result in a failure of a condition set forth in <u>Section 6.2</u> and (y) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (A) the End Date and (B) ten (10) Business Days after written notice of such breach, failure or occurrence is given to the Investors by the Company.

(e)    In the event of termination of this Agreement in accordance with this <u>Section 7</u>, the provisions of this Agreement shall immediately become void and of no further force or effect (other than <u>Sections 1.6</u>, <u>1.7</u>, <u>7</u>, <u>8</u>, <u>10</u>, <u>11</u>, <u>12</u> and <u>13</u> hereof, and other than in respect of any liability of any party for any material breach of this Agreement prior to such termination, which shall in each case expressly survive any such termination). Notwithstanding the foregoing, (A) in the event that this Agreement is terminated pursuant to <u>Section 7(a)(xi)</u> or <u>Section 7(d)(ii)</u>, then the Company, subject to the approval of the Bankruptcy Court (which approval the Company shall seek at the earliest date following such termination if it has not already been obtained), shall pay liquidated damages in an amount equal to seven million five hundred thousand dollars ($7,500,000) (the "<u>Alternate Transaction Damages</u>") to the Investors in such proportions as each Investor's Total Investor Commitment Amount bears to the Total Investor Commitment Amounts of all of the Investors, and, in any case, the Company shall pay to the Investors any Transaction Expenses incurred prior to such termination that have not yet been paid and (B) if (i) this Agreement is terminated by the Investors pursuant to <u>Section 7(a)(viii)</u> or <u>Section 7(a)(xiii)</u> or by the Company pursuant to <u>Section 7(d)(i)</u> and (ii) the Company or any of its Subsidiaries subsequently consummates any Alternate Transaction or enters into any Alternate Transaction Agreement within twelve (12) months of such termination, then the Company shall pay the Alternate Transactions Damages (as liquidated damages) to the Investors in such proportions as each Investor's Total Investor Commitment Amount bears to the Total Investor Commitment Amounts of all of the Investors, and, in any case, the Company shall pay to the Investors any Transaction Expenses incurred prior to such termination that have not yet been paid. Payment of the Alternate Transaction Damages and Transactions Expenses due under this paragraph will be made (x) in the case of a termination pursuant to <u>Section 7(a)(xi)</u>, no later than the close of business on the next Business Day following the later of such termination or approval by the Bankruptcy Court of such payment, which approval shall be sought at the earliest date following such termination if it has not already been obtained, (y) in the case of a termination pursuant to <u>Section 7(d)(ii)</u>, concurrently with, and as a condition to the effectiveness of, such termination, and (z) in the case of a termination pursuant to <u>Section 7(a)(viii)</u>, <u>Section 7(a)(xiii)</u> or <u>Section 7(d)(i)</u>, on the earlier of the date of such Alternate Transaction is consummated or such Alternate Transaction Agreement is entered into. The provision for the payment of the Alternate Transaction Damages is an integral part of the transactions contemplated by this Agreement and without such provision the Investors would not have entered into this Agreement. The Alternate Transaction Damages shall, subject to Bankruptcy Court approval, and to the extent payable in accordance herewith, constitute an allowed administrative expense of the Company.

(f)    In the event that circumstances arise such that any Investor (each, a "<u>Terminating Investor</u>") has the right unilaterally to terminate this Agreement in accordance with <u>Section 7(b)</u> and notifies the Company and the Investors that it desires to do so, but Requisite Investors have not elected to terminate this Agreement, then this Agreement shall terminate automatically and immediately as to such Terminating Investor and, as to all other Investors and the Company, shall terminate at the close of business on the seventh (7th) Business Day after such written notice is received by the remaining Investors and the Company (or on such earlier date as all such other remaining Investors shall agree), unless, prior to 5:00 p.m., New York time, on such seventh (7th) Business Day (or prior to such earlier date agreed upon by all such other remaining Investors), one or more of the remaining Investors, in their sole discretion,

commits in writing to assume the Direct Commitment and Backstop Commitment of each Terminating Investor (on a pro rata basis in proportion to their respective Backstop Commitments or on such other basis as such remaining Investors may agree), whereupon the Terminating Investor shall cease to be an Investor hereunder as of the date of such Terminating Investor's termination notice and shall no longer have any rights (including any right to receive or retain the Commitment Fee) or obligations under this Agreement, but this Agreement shall continue in effect with respect to the remaining Investors and the Company. Notwithstanding any provision herein to the contrary, under the circumstances described by this Section 7(f), such remaining Investors' obligations under Section 1 of this Agreement shall be suspended unless and until one or more of the remaining Investors commits in writing to assume the Direct Commitment and Backstop Commitment of each Terminating Investor in accordance with this Section 7(f).

8.    **Indemnification.** The Indemnification Provisions are incorporated into this Agreement by reference and shall be effective upon the date of the Agreement Order.

9.    **Survival of Representations and Warranties**. Notwithstanding any investigation at any time made by or on behalf of any party hereto with respect to, or any knowledge acquired (or capable of being acquired) about, the accuracy or inaccuracy of or compliance with, any representation or warranty made by or on behalf of any party hereto, all representations and warranties contained in this Agreement shall survive the execution, delivery and performance of, and the Closing under, this Agreement.

10.    **Amendments and Waivers**.

(a)    Any term of this Agreement may be amended or modified and the compliance with any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only if such amendment, modification or waiver is signed, in the case of an amendment or modification, by the Investors by the Required Investor Vote (as defined below) and the Company, or in the case of a waiver, by the party waiving compliance (which shall be the Investors by the Required Investor Vote in the case of a waiver by the Investors); provided, however, that Appendix 1 hereto may be updated in accordance with the terms of Section 12.1 hereof.

(b)    The term "Required Investor Vote" shall mean a written instrument signed by the Requisite Investors; provided, however, that (i) in connection with any modification, amendment or extension of this Agreement (including any exhibit), the Chapter 11 Plan, the New Charter, the New By-laws, the New Stockholders Agreement or the New Registration Rights Agreement that would have the effect of increasing the amount of an Investor's Direct Commitment or Backstop Commitment as set forth in Appendix 1, the term "Required Investor Vote" shall mean the prior written consent of such Investor (as well as the consent of the Requisite Investors), (ii) in connection with any modification, amendment or extension of this Agreement (including any exhibit), the Chapter 11 Plan, the New Charter, the New By-laws, the New Stockholders Agreement or the New Registration Rights Agreement that (A) increases the aggregate number of Rights Offering Shares, (B) increases the Purchase Price, (C) modifies the indemnification obligations of the Company as set forth on Exhibit G, (D) decreases the Commitment Fee or (E) alters, amends or modifies Section 1.5 or Section 1.6, then the term "Required Investor Vote" shall, in each such case, mean the prior written consent of all the Investors, (iii) in connection with any modification, amendment or extension of any provision of this Agreement (including any exhibit), the Chapter 11 Plan, the New Charter, the New By-Laws, the New Stockholders Agreement or the New Registration Rights Agreement which provides any right to any individual Investor, acting alone, then the term "Required Investor

Vote" shall, in each such case, mean the prior written consent of each Investor and (iv) subject to Section 10(c), in connection with any modification, amendment or extension of this Agreement (including any exhibit), the Chapter 11 Plan, the New Charter, the New By-Laws, the New Stockholders Agreement or the New Registration Rights Agreement that would have the effect of modifying Section 6, Section 7, this Section 10 or Section 12.9, the term "Required Investor Vote" shall mean the prior written consent of all the Investors.

(c)    If, at the close of business on the third (3rd) business day following the receipt by any Investor (a "Non-Consenting Investor") of written notice of a proposed material modification of, or amendment or supplement to, this Agreement or the Chapter 11 Plan that requires the consent of each Investor under Section 10(b) and that has been approved by the Requisite Investors, and such Non-Consenting Investor has objected in writing (or failed to consent) to such modification, amendment or supplement, then one or more of the remaining Investors shall have the right, in their sole discretion, to commit in writing to assume the obligations of such Non-Consenting Investor (on a pro rata basis in proportion to their respective Total Investor Commitment Amounts or on such other basis as such remaining Investors may agree), in which event such modification, amendment or supplement shall be deemed to have become effective, the Non-Consenting Investor shall cease to be an Investor hereunder and shall no longer have any rights or obligations under this Agreement (other than the right to receive or retain the Commitment Fee), and this Agreement shall continue in effect with respect to the remaining Investors.

(d)    No delay on the part of any party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party of any right, power or privilege pursuant to this Agreement, or any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement. The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

(e)    Notwithstanding anything to the contrary contained in this Agreement and provided that the Creditors Committee supports the Chapter 11 Plan, in no event shall the distribution to each holder of an Allowed General Unsecured Claim (as defined in the Chapter 11 Plan) of the lesser of (i) such holder's Pro Rata Share (as defined in the Chapter 11 Plan) of $10.25 million and (ii) 100% of such Allowed General Unsecured Claim be amended or modified downward without the consent of the Creditors Committee, which consent shall not be unreasonably withheld. For the avoidance of doubt, the foregoing consent relates solely to the specific amounts of $10.25 million (or 100% as set forth above). The Creditors Committee shall be a third-party beneficiary to this Agreement solely with respect to the immediately preceding two sentences.

11.    **Notices, etc**. Except as otherwise provided in this Agreement, all notices, demands and other communications hereunder shall be in writing or by written telecommunication, and shall be deemed to have been duly given if delivered personally or if mailed by certified mail, return receipt requested, postage prepaid, or if sent by overnight courier, or sent by written telecommunication, as follows:

(a)    if to an Investor, to each of the counsel of the undersigned Investors at the address listed below:

If to Capital Ventures International,

-37-

c/o Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York 10020
Fax: (212) 262-7402
Attn: Gerald C. Bender, Esq.

If to Greywolf Capital Overseas Master Fund, Greywolf Capital Partners II LP or Greywolf Opportunities Fund LLC,

c/o Dechert LLP
1095 Avenue of the Americas
New York, New York 10036
Fax: (212) 698-3599
Attn: Michael J. Sage, Esq.

If to Kingdon Associates, Kingdon Credit Master Fund L.P., Kingdon Family Partnership, L.P., or M. Kingdon Offshore Master Fund L.P.,

c/o Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
Fax:  (212) 839-5599
Attention: Lee S. Attanasio, Esq.

If to Deutsche Bank Securities Inc.,

c/o White & Case LLP
Southeast Financial Center
Suite 4900
200 South Biscayne Boulevard
Miami, Florida 33131
Fax: (305) 358-5744
Attn: Thomas E Lauria, Esq.

(b)        If to the Company at:

K-V Pharmaceutical Company
16640 Chesterfield Grove, Suite 200
Chesterfield, MO 63005
Attn: Thomas S. McHugh
Fax:  (314) 646-3705

With a copy to

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention:        Paul V. Shalhoub, Esq.
                        and

-38-

Robin Spigel, Esq.
Fax:          (212) 728-8111

Any such notice, demand or other communication shall be effective (i) if delivered personally, when received, (ii) if sent by overnight courier, when receipted for, (iii) if mailed, three (3) days after being mailed as described above, and (iv) if sent by written telecommunication, when dispatched.

    12.    **Miscellaneous**.

    12.1.    **Assignment; Third Party Beneficiaries**.   This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns. This Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person other than the parties hereto any rights or remedies under this Agreement.   Neither this Agreement nor any of the rights, interests or obligations under this Agreement will be assigned by any of the parties (whether by operation of law or otherwise) without the prior written consent of the other parties.   Notwithstanding the previous sentence, any Investor's rights, obligations or interests hereunder, may be assigned, delegated or transferred, in whole or in part, by such Investor to (i) any other Investor or (ii) any Affiliate of an Investor over which such Investor or any of its Affiliates exercises investment authority (including any Related Fund of such Investor), including, without limitation, with respect to voting and dispositive rights; <u>provided</u> that any such assignee assumes the obligations of the assigning Investor hereunder and agrees in writing prior to such assignment to be bound by the terms of this Agreement in the same manner as the assigning Investor.   Following any assignment described in the immediately preceding sentence, <u>Appendix 1</u> hereto shall be updated by the Company (in consultation with the assigning Investor and the assignee) solely to reflect the name and address of the applicable assignee or assignees and the Backstop Commitment Percentage and the Total Investor Commitment Amount that shall apply to such assignee or assignees, and any changes to the Backstop Commitment Percentage and the Total Investor Commitment Amount applicable to the assigning Investor.   Any update to <u>Appendix 1</u> hereto described in the immediately preceding sentence shall not be deemed an amendment to this Agreement.   Notwithstanding the foregoing or any other provisions herein, no such assignment will relieve the assigning Investor of its obligations hereunder if any such assignee fails to perform such obligations.

    12.2.    **Severability**.     Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

    12.3.    **Entire Agreement**.   This Agreement supersedes all prior agreements between the parties with respect to its subject matter, other than the Chapter 11 Plan, and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter.

    12.4.    **Counterparts**.   This Agreement may be executed in any number of counterparts (including by facsimile or portable document format (PDF) signatures), each of which shall be an original but all of which together shall constitute one instrument.   Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, the parties hereto.

    12.5.    **Governing Law**.   This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving

effect to the conflicts of law principles thereof except Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York.

   12.6. **Submission to Jurisdiction**.  Each party to this Agreement irrevocably consents and agrees that any legal action or proceeding with respect to this Agreement and any action for enforcement of any judgment in respect thereof will be brought, (i) if prior to the closing of the Chapter 11 Cases, in the Bankruptcy Court and (ii) if on or after the closing of the Chapter 11 Cases, in the courts of the State of New York, County of New York or, if it has or can acquire jurisdiction, the United States District Court for the Southern District of New York, and, by execution and delivery of this Agreement, each party to this Agreement hereby submits to and accepts for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts and appellate courts from any appeal thereof.  Each party to this Agreement further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the delivery of copies thereof in the manner set forth in Section 11.  Each party to this Agreement hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.  Nothing in this Section 12.6 shall be deemed to constitute a submission to jurisdiction, consent or waiver with respect to any matter not specifically referred to herein.

   12.7. **Waiver of Trial by Jury**.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT OF TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY MATTER ARISING HEREUNDER.

   12.8. **Further Assurances**.  From time to time after the date of this Agreement, the parties hereto will execute, acknowledge and deliver to the other parties hereto such other documents, instruments and certificates, and will take such other actions, as any other party hereto may reasonably request in order to consummate the transactions contemplated by this Agreement.

   12.9. **No Specific Performance**.  Each party hereby agrees that:  (a) the sole and exclusive remedy available to any party against any other party for breach of this Agreement shall be to recover money damages for Losses; (b) in the event any provision of this Agreement is not performed by any party in accordance with its specific terms or is otherwise breached, (A) money damages for Losses will provide such party with an adequate remedy and (B) no person or entity or any of its affiliates shall have any right to enforce specifically with respect to any party the terms and provisions of this Agreement and shall not be entitled to an injunction, injunctions or any form of equitable relief to prevent breaches by any party of this Agreement.  Additionally, the aggregate liability of each Investor under this Agreement for any reason (under any legal theory), including for any willful breach, shall not exceed 120% of such Investor's Total Investor Commitment Amount calculated as of the date hereof.  "Loss" or "Losses" shall mean any and all liabilities, losses, costs or damages, including reasonable attorneys' fees and expenses, but excluding lost profits, lost revenues, lost opportunities, punitive damages and other special damages regardless of the legal theory.  In no event shall "Losses" be calculated based on any multiple of lost earnings or other similar methodology used to value the equity of the Company or any other person or entity.

   12.10. **Headings**.  The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

12.11. **Interpretation; Rules of Construction**.   When a reference is made in this Agreement to Section, Exhibit or Schedule, such reference shall be to a Section, Exhibit or Schedule, respectively, of or to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement; and (v) the words "include", "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation".  The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

12.12. **Non-Recourse**.   No past, present or future director, manager, officer, employee, incorporator, authorized representative, member, partner, stockholder, Affiliate, agent, attorney or representative of any party hereto shall have any liability for any obligations or liabilities of such party under this Agreement or in connection with any of the Contemplated Transactions, or for any claim based on, or in respect of, or by reason of, the transactions contemplated hereby or any of the other Contemplated Transactions.

12.13. **Several, Not Joint, Obligations**.   The agreements, representations and obligations of the Investors under this Agreement are, in all respects, several and not joint.

12.14. **Disclosure**.   Subject to the terms of Section 4.1 hereof, neither the Company nor any of the Investors shall, and the Company and each of the Investors shall cause their respective Affiliates not to, disclose or divulge to any Person any of the information set forth on Appendix 1 hereto, except for (i) disclosures required by applicable Legal Requirements, (ii) with respect to disclosures made by an Investor or any of its Affiliates, disclosures of information on Appendix 1 hereto that relate to such Investor, or (iii) disclosures to parties to this Agreement.

12.15. **Equity Commitment Agreement**.   The Company and the Investors acknowledge and agree that the Equity Commitment Agreement, dated as of April 17, 2013, by and among each of the Investors, was terminated as of the date of the Original Agreement and is of no further force or effect.

12.16. **Effectiveness**.   This Agreement shall be binding and enforceable on the Investors upon execution hereof by the Investors and shall be binding and enforceable on the Company upon Bankruptcy Court approval; provided, that Section 4.1 shall be binding and enforceable upon the Company upon execution and delivery of this Agreement by each of the Investors and the Company.

13.    **Definitions**.

13.1. **Certain Defined Terms**.  As used in this Agreement the following terms have the following respective meanings:

Action: has the meaning given to such term in Exhibit F hereto.

Acceptable Confidentiality Agreement: has the meaning given to such term in Section 4.9(f)(i) hereof.

Accredited Investor:  has the meaning given to such term in Section 3.6 hereof.

<u>Ad Hoc Counsel</u>:  means Brown Rudnick LLP, acting in its capacity as counsel to certain holders of the Convertible Notes collectively referred to as the "Ad Hoc Consortium of Independent Convertible Noteholders".

<u>Adjusted Commitment Percentage</u>:  means, with respect to any Non-Defaulting Investor a percentage expressed as a fraction, the numerator of which is the Total Investor Commitment Amount of such Non-Defaulting Investor and the denominator of which is the Total Investor Commitment Amount of all Non-Defaulting Investors.

<u>Affiliate</u>:  means, with respect to any Person, any other Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

<u>Agreement</u>:  has the meaning given to such term in the preamble hereof.

<u>Agreement Motion</u>:  has the meaning given to such term in the recitals hereof.

<u>Agreement Order</u>:  has the meaning given to such term in the recitals hereof.

<u>Allowed Convertible Subordinated Notes Claims</u>:  has the meaning given to such term in the Chapter 11 Plan.

<u>Alternate Transaction</u>:  has the meaning given to such term in <u>Section 5.5(a)</u> hereof.

<u>Alternate Transaction Agreement</u>:  has the meaning given to such term in <u>Section 6.1(r)</u> hereof.

<u>Alternate Transaction Damages</u>:  has the meaning given to such term in <u>Section 7(e)</u> hereof.

<u>Alternate Transaction Proposal</u>:  has the meaning given to such term in <u>Section 4.9(f)(ii)</u> hereof.

<u>Amended Agreement</u>:  has the meaning given to such term in the recitals hereof.

<u>Amended Certificate of Incorporation</u>:  has the meaning given to such term in the Chapter 11 Plan.

<u>Audited Financial Statements</u>:  has the meaning given to such term in <u>Section 2.12</u> hereof.

<u>Backstop Commitment</u>:  means, with respect to any Investor other than Kingdon, the commitment of such Investor, subject to the terms and conditions set forth in this Agreement, to purchase Backstop Shares pursuant to, and on the terms set forth in, <u>Sections 1.1(c)</u> and <u>1.3(a)</u> hereof.

<u>Backstop Commitment Percentage</u>:  means, with respect to any Investor, the percentage set forth opposite the name of such Investor under the heading "Backstop Commitment Percentage" on <u>Appendix 1</u> hereto.

Backstop Investor: means each Investor other than Kingdon.

Backstop Shares:  has the meaning given to such term in Section 1.3(a) hereof.

Bankruptcy Code:  has the meaning given to such term in the recitals hereof.

Bankruptcy Court:  has the meaning given to such term in the recitals of this Agreement.

Bankruptcy Rules:  means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases and/or the transactions contemplated by this Agreement, and any Local Rules of the Bankruptcy Court.

Business Day:  means any day other than a Saturday, Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

Change of Recommendation:   has the meaning given to such term in Section 6.1(r) hereof.

Chapter 11 Cases:  has the meaning given to such term in the recitals hereof.

Chapter 11 Plan:  means the chapter 11 plan of reorganization, including all exhibits, schedules and annexes, attached as Exhibit E hereto, with only such amendments, supplements (including any Chapter 11 Plan Supplement), changes and modifications that (i) if not adverse to any Investor, or if required by the Bankruptcy Court, are reasonably acceptable to Requisite Investors; and (ii) if adverse to any Investor, are reasonably acceptable to such Investor and to Requisite Investors (including the Investor as to which such amendment, supplement, change or modification is adverse); provided, that without limiting the rights and obligations of the Parties hereunder, it is acknowledged that nothing in this parenthetical shall derogate the Company's fiduciary obligations);

Chapter 11 Plan Supplement: has the meaning ascribed to the term "Plan Supplement" as such term is defined in the Chapter 11 Plan, and shall be reasonably acceptable to Requisite Investors. For the purposes of this Agreement, the term Chapter 11 Plan Supplement does not include any document attached as an Exhibit to this Agreement.

Cleansing Date:  has the meaning given to such term in Section 4.11 hereof.

Closing:  has the meaning given to such term in Section 1.4(a) hereof.

Code:   means the Internal Revenue Code of 1986, as amended, and the regulations promulgated and the rulings issued thereunder.

Collective Bargaining Agreements:  means any and all written agreements, memoranda of understanding, contracts, letters, side letters and contractual obligations of any kind, nature and description, that have been entered into between or that involve or apply to any employer and any Employee Representative.

Commission:  means the United States Securities and Exchange Commission.

Commitment:  means, with respect to any Investor, collectively, the Direct Commitment and the Backstop Commitment, if any, of such Investor.

Commitment Fee:  has the meaning given to such term in Section 1.5 hereof.

Commitment Fee Shares:  has the meaning given to such term in Section 1.5 hereof.

Company:  has the meaning given to such term in the preamble hereof.

Company IP Rights:  has the meaning given to such term in Section 2.8 hereof.

Company SEC Documents:  has the meaning given to such term in Section 2.21 hereof.

Confirmation Order:  means the order of the Bankruptcy Court confirming the Chapter 11 Plan pursuant to section 1129 of the Bankruptcy Code, in form and substance reasonably acceptable to the Requisite Investors.

Consent:  means any approval, consent, ratification, waiver or other authorization of any Person (including any Governmental Body).

Contemplated Exit Facility:  means the exit facility contemplated by that certain Commitment Letter, dated April 22, 2013, provided by certain of the Investors to the Company.

Contemplated Transactions:  means all transactions contemplated by this Agreement and the Chapter 11 Plan, including without limitation, the Rights Offering and the issuance of the Direct Subscription Shares, the Rights Offering Shares, the Backstop Shares and the Commitment Fee Shares.

Contract:  means any agreement, contract, obligation, promise or undertaking, whether written or oral.

Convertible Notes:  means the 2.5% Contingent Convertible Subordinated Notes due 2033 of the Company issued pursuant to certain Indenture (as amended, modified or supplemented), dated as of May 16, 2003, among the Company and Deutsche Bank Trust Company Americas, as indenture trustee,

Creditors' Committee:  means the statutory committee of unsecured creditors appointed, in the Chapter 11 Cases in accordance with section 1102 of the Bankruptcy Code, as the same may be reconstituted from time to time.

Debtors:  has the meaning given to such term in the recitals hereof.

Defaulting Investor:  has the meaning given to such term in Section 1.3(a) hereof.

Defaulting DIP Lender Exchange:  has the meaning given to such term in Section 1.3(a) hereof.

Defaulting Shares:  has the meaning given to such term in Section 1.3(a) hereof.

Determination: has the meaning given to such term in Section 7(a)(v) hereof.

Determination Date:  has the meaning given to such term in Section 1.1(e) hereof.

-44-

DIP Claims:  has the meaning given to such term in the Chapter 11 Plan.

DIP Credit Agreement: has the meaning given to such term in the Chapter 11 Plan.

Direct Commitment: means, with respect to any Investor, the commitment of such Investor, subject to the terms and conditions set forth in this Agreement, to purchase the Direct Subscription Shares as described herein.

Direct Subscription Shares:  has the meaning given to such term in the recitals hereof.

Disclosure Statement:  means the disclosure statement, in form and substance reasonably acceptable to the Requisite Investors, that relates to the Chapter 11 Plan, as such disclosure statement may be amended, modified or supplemented (including all exhibits and schedules annexed thereto or referred to therein).

Disclosure Statement Hearing:  means the hearing held by the Bankruptcy Court to consider approval of the Disclosure Statement as containing adequate information as required by section 1125 of the Bankruptcy Code, as the same may be adjourned or continued from time to time.

Effective Date:  means the Business Day on which all conditions to the "Effective Date" set forth in Section 11.2 of the Chapter 11 Plan have been satisfied or waived, and no stay of the Confirmation Order is in effect and the Chapter 11 Plan is substantially consummated.

Eligible Holders:  has the meaning given to such term in the recitals hereof.

Employee Plan:  means all written plans, practices and arrangements, formal or informal, whether applicable to a group of individuals or a single individual, and whether active, frozen or terminated, currently providing compensation (other than salary or wages) or other benefits of any type or nature with respect to the employees of the Company or any of its Subsidiaries, including but not limited to, all plans providing benefits for such employees that are employee benefit plans as defined in Section 3(3) of ERISA.

Employee Representatives:  has the meaning given to such term in Section 2.19(a) hereof.

Encumbrance:  means any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, subscription or similar right, pre-emptive right, Tax assessment or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

End Date:  has the meaning given to such term in Section 7(a) hereof.

Environmental Laws:  means all applicable Legal Requirements and Orders applicable to the Company or any of its Subsidiaries relating to pollution or the regulation and protection of human or animal health, safety, the environment or natural resources, including without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.); the Hazardous Materials Transportation Uniform Safety Act, as amended (49 U.S.C. 5101 et seq.); the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. § 136 et seq.); the Resource Conservation and Recovery Act, as amended (42 U.S.C. § 6901 et seq.); the Toxic Substances Control Act, as amended (15 U.S.C. § 2601 et seq.); the Clean Air Act, as amended (42 U.S.C. § 7401 et seq.); the Federal Water Pollution Control Act, as amended (33 U.S.C. § 1251 et seq.);

the Occupational Safety and Health Act, as amended (29 U.S.C. § 651 et seq.); the Safe Drinking Water Act, as amended (42 U.S.C. § 300f et seq.); and their state, municipal and local counterparts or equivalents and any transfer of ownership notification or approval statute, including the Industrial Site Recovery Act (N.J.S.A. §2013:1K-6 et seq.).

Equity Investor Shares:  has the meaning given to such term in Section 1.1(c) hereof.

Exchange Act:   means the Securities Exchange Act of 1934

Final Order:  means an order, ruling or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court) that:  (a) is in full force and effect; (b) is not stayed; and (c) is no longer subject to review, reversal, modification or amendment, by appeal or writ of certiorari; provided, however, that the possibility that a motion under Rule 50 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Civil Procedure or Bankruptcy Rules, may be filed relating to such order, ruling or judgment shall not cause such order, ruling or judgment not to be a Final Order.

Financial Statements:  has the meaning given to such term in Section 2.12 hereof.

GAAP:  means United States generally accepted accounting principles.

Go Shop End Date:  has the meaning given to such term in Section 7(a)(v) hereof.

Governmental Body:   means any federal, state, local or foreign government or any agency, bureau, board, commission, court, department, political subdivision, tribunal or other instrumentality thereof, or any federal, state, local or foreign court or arbitrator.

HSR Act:  has the meaning given to such term in Section 1.6 hereof.

Indemnifying Party:  has the meaning given to such term in Exhibit F hereto.

Indemnified Person:  has the meaning given to such term in Exhibit F hereto.

Indemnification Provisions: the indemnification provisions set forth in Exhibit F annexed hereto.

Interest Commencement Date:  has the meaning given to such term in Section 1.7 hereof.

Investor(s):  has the meaning given to such term in the preamble of this Agreement.

Investor Notice Period:  has the meaning given to such term in Section 4.9(d) hereof.

IP Rights:  has the meaning given to such term in Section 2.8 hereof.

Kingdon:  has the meaning given to such term in the recitals hereof.

Knowledge of the Company:  means the actual knowledge of the chief executive officer, chief financial officer and general counsel of the Company.

<u>Legal Requirement</u>:  means any federal, state, local, municipal, foreign, international, multinational or other statute, law (including common law), ordinance, rule, treaty, constitution, code or regulation.

<u>Loss or Losses</u>: has the meaning given to such term in <u>Section 12.9</u> hereof.

<u>Material Adverse Effect</u>:  means any event, change, effect, occurrence, development, circumstance or change of fact that has had, or would reasonably be expected to have, a material adverse effect on the business, results of operations or financial condition of the Company and its Subsidiaries taken as a whole; <u>provided</u>, <u>however</u>, that none of the following, or any state of facts, condition, change, event, occurrence or development resulting or arising from the following, shall constitute, or shall be considered in determining whether there has occurred or would reasonably be expected to occur, a "Material Adverse Effect":  (a) conditions or effects that generally affect the industries and markets in which the Company operates, (b) changes in general market or economic conditions in the industries in which the Company operates generally, (c) effects resulting from changes generally affecting financial, banking, credit, securities, or commodities markets, the economy in general, prevailing interest rates or general capital market conditions in the United States or those countries in which the Company operates, (d) any failure by the Company or any Subsidiary thereof to achieve any projections or forecasts in respect of revenues, earnings or other financial or operating metrics for any period (provided, that the underlying causes for such failure may be deemed to constitute, or be taken into account in determining whether there has been, a Material Adverse Effect unless such underlying cause is otherwise excluded pursuant to this definition), (e) changes in the Company's stock price or trading volume, or changes in the price of the Convertible Notes or Senior Notes (provided that the underlying causes of factors affecting the Company's stock price, trading volume or price of the Convertible Notes or the Senior Notes may be deemed to constitute, or be taken into account in determining whether there has been, a Material Adverse Effect unless such underlying cause is otherwise excluded pursuant to this definition), (f) a change in United States generally accepted accounting principles or regulatory accounting principles or interpretations thereof after the date hereof, (g) any state of facts, condition, change, event, occurrence or development relating to or resulting from the products or product candidates of any Person (other than the Company), including the entry into the market of products (including generic versions of products) competitive with any of the Company's products or product candidates, (h) the filing of the Chapter 11 Cases, actions taken in connection with the Chapter 11 Cases approved by the Bankruptcy Court (and in compliance with the requirements of the Bankruptcy Code), the announcement of the Contemplated Transactions, the pendency of the Contemplated Transactions, any actions or omissions taken with the consent of the Investors or compliance by any party with the covenants and agreements herein or in the Chapter 11 Plan, or (i) any natural disaster, weather-related events or other acts of God, acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreement; <u>provided further</u>, <u>however</u>, that any of the changes, events or effects referred to in clauses (a), (b) or (i) immediately above may be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur to the extent any such change, event or effect affects the Company or its Subsidiaries, taken as a whole, in a disproportionate manner when compared to the effect of such changes, events or effects on other Persons engaged in the industry in which the Company and/or its Subsidiaries operate.

<u>Material Contracts</u>:  has the meaning given to such term in <u>Section 2.26</u> hereof.

<u>NDA</u>:  has the meaning given to such term in <u>Section 4.11</u> hereof.

<u>New By-Laws</u>:  means the Amended and Restated By-laws in the form and substance of <u>Exhibit C</u> annexed hereto.

New Charter: means the Amended and Restated Certificate of Incorporation in the form and substance of Exhibit B annexed hereto.

New Common Stock: has the meaning given to such term in the recitals hereof.

New Registration Rights Agreement: means a registration rights agreement in the form and substance of Exhibit G annexed hereto.

New Stockholders Agreement:  means a stockholders agreement in the form and substance of Exhibit D annexed hereto.

Non-Consenting Investor:  has the meaning given to such term in Section 10(c) hereof.

Non-Defaulting Investor:  has the meaning given to such term in Section 1.3(a) hereof.

Order:  means any award, decision, injunction, judgment, order, ruling, subpoena or verdict entered, issued, made, or rendered by any court, administrative agency or other Governmental Body.

Organizational Documents:  means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability or members agreement).

Original Agreement:  has the meaning given to such term in the recitals hereof.

Original Papers: has the meaning given to such term in the recitals hereof.

Person:  means an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization or a government or any department or agency thereof.

Pre-Closing Period:  has the meaning given to such term in Section 4.7 hereof.

Pro Rata Share:  has the meaning given to such term in the Chapter 11 Plan.

Proceeding:  means any action, arbitration, audit, hearing, investigation, inquiry, proceeding, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

Purchase Notice:  has the meaning given to such term in Section 1.1(e) hereof.

Purchase Price:  has the meaning given to such term in the recitals hereof.

Regulatory Action: has the meaning given to such term in Section 7(a)(v) hereof.

Related Fund:  means, with respect to any Investor, any fund, account or investment vehicle that is controlled or managed by (i) such Investor, (ii) an Affiliate of such Investor, or (iii) the same investment manager or advisor as such Investor or an Affiliate of such investment manager or advisor.

-48-

Relevant Claims:  has the meaning given to such term in Section 5.5(a) hereof.

Remaining Rights Offering Shares, Direct Subscription Shares and/or Unsubscribed Shares: has the meaning given to such term in Section 1.3(b) hereof.

Required Investor Vote:  has the meaning given to such term in Section 10(b) hereof.

Requisite Investors means Investors whose Total Investor Commitment Amounts are equal to or greater than 66-2/3% of the Total Investor Commitment Amounts of all Investors; provided that any election, decision, determination, approval, consent, waiver or other action that this Agreement expressly requires to be taken or made by Requisite Investors that has, or would, if implemented, have an effect that is adverse to any Investor that is different from (other than in proportion to their respective economic interests under this Agreement) the manner in which it is adverse to any other Investor shall also require the approval of any such Investor so adversely affected in order to be approved by the "Requisite Investors".

Rights:  has the meaning given to such term in the recitals hereof.

Rights Offering:  has the meaning given to such term in the recitals hereof.

Rights Offering Deadline:  has the meaning given to such term on the Rights Offering Procedures.

Rights Offering Procedures:  means the rights offering procedures included as an exhibit to the Disclosure Statement.

Rights Offering Shares:  has the meaning given to such term in the recitals hereof.

Satisfaction Notice:  has the meaning given to such term in Section 1.1(e) hereof.

Securities Act:  means the Securities Act of 1933, as amended, and the rules promulgated pursuant thereto.

Securities Laws:  has the meaning given to such term in Section 4.11 hereof.

Senior Notes:  means the Company's 12% Senior Secured Notes due 2015 issued pursuant to that certain Indenture (as amended, modified or supplemented), dated as of March 17, 2011, among the Company, the guarantors named therein, and Wilmington Trust FSB, as indenture trustee.

Shares:  means, collectively, the Rights Offering Shares, the Direct Subscription Shares, the Backstop Shares and the Commitment Fee Shares.

Subsidiary:  means, with respect to any Person (the "Parent"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred), are held by the Parent or one or more of its Subsidiaries.  Unless otherwise qualified, all references to a "Subsidiary" in this Agreement shall refer to the Subsidiary of the Company.

Subscription Agent:  has the meaning given to such term in Section 4.4 hereof.

-49-

Superior Proposal: has the meaning given to such term in <u>Section 4.9(f)(iii)</u> hereof.

Tax Returns:  has the meaning given to such term in <u>Section 2.16(a)</u> hereof.

Taxes:  means all taxes, assessments, charges, duties, fees, levies or other governmental charges, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, license, payroll, social security, withholding and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest and shall include any liability for such amounts as a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation to indemnify any Person, and any liability therefor as a transferee, successor or otherwise.

Terminating Investor:  has the meaning given to such term in <u>Section 7(f)</u> hereof.

Third Party Investor: has the meaning given to such term in <u>Section 1.3(b)</u> hereof.

Total Investor Commitment Amount:  means, with respect to any Investor, the dollar amount set forth opposite the name of such Investor under the heading "Total Investor Commitment Amount" on <u>Appendix 1</u> hereto, as such amount may be modified from time to time in accordance with the terms of this Agreement.

Transaction Expenses:  has the meaning given to such term in <u>Section 1.6</u> hereof.

Unaudited Financial Statements:  has the meaning given to such term in <u>Section 2.12</u> hereof.

Unsubscribed Shares:  has the meaning given to such term in the recitals hereof.

Voting Record Date:  has the meaning given to such term in the Disclosure Statement.

Any of the above-defined terms may, unless the context otherwise requires, be used in the singular or plural depending on the reference.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**K-V PHARMACUETICAL COMPANY**

By: _____
Name: Thomas S. McChop
Title: CFO

**CAPITAL VENTURES INTERNATIONAL**

**By:  Susquehanna Advisors Group, Inc., its authorized agent**

By: _____

Name: Todd Silverberg

Title: Assistant Vice President

[Signature Page to Second Amended and Restated Stock Purchase and Backstop Agreement]

**GREYWOLF CAPITAL OVERSEAS MASTER FUND**
**By:  Greywolf Capital Management LP, its Investment Manager**

By: _____
Name:  William Troy
Title:  Authorized Signatory

**GREYWOLF CAPITAL PARTNERS II LP**
**By:  Greywolf Advisors LLC, its General Partner**

By: _____
Name:  William Troy
Title:  Authorized Signatory

**GREYWOLF OPPORTUNITIES FUND LLC**
**By:  Greywolf Capital Management LP, its Managing Member**

By: _____
Name:  William Troy
Title:  Authorized Signatory

[Signature Page to Second Amended and Restated Stock Purchase and Backstop Agreement]

**KINGDON ASSOCIATES**
**KINGDON CREDIT MASTER FUND L.P.**
**KINGDON FAMILY PARTNERSHIP, L.P.**
**M. KINGDON OFFSHORE MASTER FUND L.P.**

By:  Kingdon Capital Management, L.L.C., in its
capacity as agent and investment adviser

By: _____

Name: Alan Winters

Title: Chief Operating Officer

[Signature Page to Second Amended and Restated Stock Purchase and Backstop Agreement]

**DEUTSCHE BANK SECURITIES INC.**
(solely with respect to the Distressed Products Group)

By: _____

Name: _____

Title: _____

Shawn Faurot
Managing Director

By: _____

Name: _____

Title: _____

R Mikel Curreri
Managing Director

[Signature Page to Second Amended and Restated Stock Purchase and Backstop Agreement]

**Appendix 1**

**Investors**

| Investor | Rights Offering Shares | Direct Subscription Shares | Backstop Commitment Percentage | Number of Shares to be Received as a Commitment Fee | Total Investor Commitment Amount |
|---|---|---|---|---|---|
| Capital Ventures International | 2,945,250 | 491,620 | 24.846% | 254,262 | $89.50 million |
| Greywolf Capital Overseas Master Fund | 1,267,350 | 166,157 | 9.346% | 103,636 | $36.48 million |
| Greywolf Capital Partners II LP | 815,150 | 107,917 | 6.053% | 66,818 | $23.52 million |
| Greywolf Opportunities Fund LLC | 1,027,922 | 570,417 | 39.529% | 184,659 | $65.00 million |
| Deutsche Bank Securities Inc. (Solely with respect to the Distressed Products Group) | 476,000 | 342,593 | 20.137% | 94,318 | $33.20 million |
| Kingdon | 1,190,000 | 171,296 | 0.089% | 77,557 | $27.30 million |

.

## <u>EXHIBIT 7</u>

**Share Purchase Agreement**

**SHARE PURCHASE AGREEMENT**

This Share Purchase Agreement (this "<u>Agreement</u>") is dated as of the June 21, 2013, and is entered into by and among: (i) Capital Ventures International ("<u>CVI</u>"), (ii) (A) Greywolf Capital Overseas Master Fund, (B) Greywolf Capital Partners II LP, and (C) Greywolf Opportunities Fund LLC ("collectively, "<u>Greywolf</u>"), (iii) (A) Kingdon Associates, (B) Kingdon Credit Master Fund L.P., (C) Kingdon Family Partnership, L.P., and (D) M. Kingdon Offshore Master Fund L.P. (collectively, "<u>Kingdon</u>"), and (iv) Deutsche Bank Securities Inc. ("<u>Deutsche Bank</u>" together with CVI, Greywolf, and Kingdon, the "<u>Investors</u>"); Silver Point Finance, LLC, acting individually or through one or more of its affiliates or funds (the "<u>Assignee</u>"); and K-V Pharmaceutical Company (the "<u>Company</u>"). The Investors, the Assignee and the Company are collectively referred to herein as the "<u>Parties</u>" and individually as a "<u>Party</u>." Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the SPBA (defined below) receipt of a copy of which is hereby acknowledged by the Assignee.

WHEREAS, on August 4, 2012, each of the Company, K-V Discovery Solutions, Inc., DrugTech Corporation, FP1096, Inc., K-V Generic Pharmaceuticals, Inc., K-V Solutions USA, Inc., Ther-Rx Corporation and Zeratech Technologies USA, Inc. (collectively, the "<u>Debtors</u>") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq., before the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

WHEREAS, the Debtors and the Investors are seeking to implement a restructuring of the Company pursuant to the terms and conditions set forth in the Chapter 11 Plan and the SPBA;

WHEREAS, on June 6, 2013, the Company and the Investors entered into that certain Second Amended and Restated Stock Purchase and Backstop Agreement (as further amended, restated or otherwise modified from time to time, the "<u>SPBA</u>");

WHEREAS, pursuant to the Chapter 11 Plan and the SPBA, the Company will conduct the Rights Offering;

WHEREAS, in order to facilitate the Rights Offering, pursuant to the SPBA, and subject to the terms, conditions and limitations set forth therein, among other things, each Investor, severally and not jointly, committed to purchase in the Rights Offering such Investor's pro rata share of the Rights Offering Shares and in exchange for such commitments, among other things, the Company agreed, pursuant to the terms of the Chapter 11 Plan and the SPBA, to pay the Investors the Commitment Fee; and

WHEREAS, in exchange for the Assignee's agreement to support the Chapter 11 Plan and commitment to purchase Direct Subscription Shares and Unsubscribed Shares on the terms set forth herein, the Investors agree to reduce the Commitment Fee to which they are otherwise entitled under the SPBA and to permit the Company to issue Commitment Fee Shares to the Assignee, on the terms set forth herein.

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Purchase of Direct Subscription Shares and Unsubscribed Shares; Default</u>.

1.1    <u>Purchase of Direct Subscription Shares and Unsubscribed Shares</u>. Simultaneously with the Closing under the SPBA, each of the Parties agrees, notwithstanding anything to the contrary contained in the SPBA, that:

(a)    (i) the Company shall reduce the number of Direct Subscription Shares to be sold to each Investor pursuant to Section 1.2 of the SPBA by the number of Direct Subscription

Shares set forth below such Investor's name on the signature pages hereto, (ii) the Company shall, in lieu of selling the aggregate number of such Direct Subscription Shares as determined pursuant to the preceding clause (i) to the Investors, sell and deliver such Direct Subscription Shares to the Assignee on the same terms as such Direct Subscription Shares were to be sold and delivered to the Investors, and (iii) the Assignee shall purchase all such Direct Subscription Shares at a price per share equal to the Purchase Price; provided that to the extent that the aggregate number of Direct Subscription Shares changes, the number of Direct Subscription Shares to be sold and delivered to the Assignee under this Section 1.1(a) (as reflected on the signature pages hereto) shall automatically be adjusted to ensure that the Assignee maintains the same proportion of Direct Subscription Shares to be purchased hereunder;

(b)        if the Investors are required to purchase any Unsubscribed Shares pursuant to Section 1.1(c) of the SPBA, then (i) the Company shall reduce the number of Unsubscribed Shares to be sold to each Investor by the number (rounded to the nearest whole number) equal to the product of (A) the total number of Unsubscribed Shares and (B) the Backstop Commitment Percentage set forth below such Investor's name on the signature pages hereto, (ii) the Company shall, in lieu of selling the aggregate number of such Unsubscribed Shares as determined pursuant to the preceding clause (i) to the Investors, sell and deliver such Unsubscribed Shares to the Assignee on the same terms as such Unsubscribed Shares were to be sold and delivered to the Investors, and (iii) the Assignee shall purchase all such Unsubscribed Shares at a price per share equal to the Purchase Price; provided that in no event (X) shall the Assignee be required to purchase Unsubscribed Shares that consist of Rights Offering Shares that an Investor was obligated to purchase pursuant to Section 1.1(b) of the SPBA (as such Section 1.1(b) (including Appendix 1 referenced therein) is in effect as of the date hereof, without any subsequent amendment or modification thereto) or (Y) shall the Assignee be required to purchase Unsubscribed Shares under this Section 1.1(b) in an aggregate amount exceeding $66,700,000 (in which case, any excess Unsubscribed Shares shall be purchased by the Investors on a pro rata basis in accordance with the terms of the SBPA); and

(c)        if the Assignee complies with its obligations under this Section 1.1 and its obligation to support the Chapter 11 Plan, in each case, in all respects, then (i) the Company shall reduce the number of Commitment Fee Shares to be issued and delivered to each Investor by the number of Commitment Fee Shares set forth below such Investor's name on the signature pages hereto (and each Investor acknowledges and agrees that the Company shall no longer have any obligation under the SPBA to issue and deliver such Commitment Fee Shares to the Investors), and (ii) the Company shall, in lieu of issuing and delivering the aggregate number of such Commitment Fee Shares as determined pursuant to the preceding clause (i) to the Investors, issue and deliver such Commitment Fee Shares to the Assignee on the same terms as such Commitment Fee Shares were to be issued and delivered to the Investors; provided that to the extent that the aggregate number of Commitment Fee Shares changes, the number of Commitment Fee Shares to be issued and delivered to the Assignee under this Section 1.1(c) (as reflected on the signature pages hereto) shall automatically be adjusted to ensure that the Assignee maintains the same proportion of Commitment Fee Shares to be purchased hereunder.

1.2    Default.  If the Assignee should default in its obligation to purchase any Direct Subscription Shares or Unsubscribed Shares that it is agreeing to purchase pursuant to the provisions of Section 1.1 (the "Assignee Defaulted Shares"), the Parties agree that:

(a)        the Company shall reduce distributions under the Chapter 11 Plan to the Assignee in respect of the DIP Credit Agreement (as defined in the Chapter 11 Plan) in an amount equal to the aggregate purchase price of the Assignee Defaulted Shares, and if the amount of such distributions is less than the aggregate purchase price of the Assignee Defaulted Shares, then additionally, reduce distributions under the Chapter 11 Plan to the Assignee in respect of the Assignee's Senior Secured Notes Claim (as defined in the Chapter 11 Plan) such that the aggregate

amount so reduced equals the aggregate purchase price of the Assignee Defaulted Shares (an "Assignee Default Exchange") (and, for the avoidance of doubt, upon such reduction in distributions, the Company shall deliver to the Assignee the Assignee Defaulted Shares); and

(b)      in connection with any Assignee Default Exchange, the Assignee hereby constitutes and appoints the Company as the Assignee's true and lawful agent and attorney-in-fact, with full power and authority in the Assignee's name, place and stead, with full power of substitution, to execute (i) any agreements, instruments of conveyance and assignment as may be necessary, appropriate, proper, advisable, incidental or convenient to consummate such Assignee Default Exchange (including, without limitation, any amendment to the DIP Credit Agreement, if necessary), and (ii) such related instruments as may be necessary, appropriate, proper, advisable, incidental or convenient to evidence such consummation.

2.      Representations and Warranties.

2.1      Investors.   Each Investor represents and warrants that it has full power and authority, and has taken all action necessary, to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

2.2      Assignee.   The Assignee represents and warrants that (a) it has full power and authority, and has taken all action necessary, to execute and deliver this Agreement and to consummate the transactions contemplated hereby, (b) it is sophisticated with respect to decisions to acquire assets of the type represented by the shares to be purchased by the Assignee hereunder and either it, or the Person exercising discretion in making its decision to acquire the shares to be purchased by the Assignee hereunder, is experienced in acquiring assets of such type, (c) it has received a copy of the SPBA, and such other documents and information as it deems appropriate to make its own decision to enter into this Agreement and to acquire the shares to be purchased by the Assignee hereunder, (d) it has, independently and without reliance upon any Investor and based on such documents and information as it has deemed appropriate, made its own decision to enter into this Agreement and to acquire the shares to be purchased by the Assignee hereunder, (e) it is an Eligible Holder, and (f) it is an "accredited investor" as that term is defined in Regulation D promulgated under the Securities Act.

2.3      Company.   The Company represents and warrants that it has full power and authority, and has taken all action necessary, to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

3.      Certain Actions.   The Investors and the Company shall not (a) amend the SPBA, (b) waive any condition to the Chapter 11 Plan, or (c) consent to any amendment to the Chapter 11 Plan or the New First Lien Term Loan (as defined in the Chapter 11 Plan) in each case in a way that is materially adverse to the Assignee without the prior written consent of the Assignee.

4.      Transfers.   The Assignee agrees that, so long as this Agreement has not been terminated, the Assignee shall not sell, transfer, loan, hypothecate, assign or otherwise dispose of, in whole or in part, any of the DIP Claims or Senior Secured Notes Claims or any option thereon or any right or interest therein unless (a) prior to or concurrently with such transaction, the transferee thereof agrees in writing to support the Chapter 11 Plan and otherwise act consistent with the terms of the agreement related to matters of plan support as stated on the record of the Bankruptcy Court on June 7, 2013 and (b) if, as a result of such transaction, the Assignee would hold less than $70,000,000 of DIP Claims and Senior Secured Notes Claims, in the aggregate, then prior to or concurrently with such transaction, the transferee thereof agrees in writing to be bound by all terms and provisions of this Agreement applicable to the Assignee by executing and delivering a joinder agreement in a form reasonably acceptable to the Company and the Requisite Investors.   Notwithstanding the foregoing, no such sale, transfer, loan, hypothecation, assignment or other disposition by the Assignee will relieve the Assignee of its obligations under Section 1.1 hereof if the assignee, transferee or other counterparty thereto fails to perform such obligations.   The Assignee agrees

that any sale, transfer or assignment of any DIP Claims or Senior Secured Notes Claims that does not comply with the terms and procedures set forth herein shall be deemed void ab initio.

5.      Amendments and Waivers.    This Agreement may not be modified, amended or supplemented except in a writing signed by the duly authorized representative of each Party.

6.      GOVERNING LAW; JURISDICTION.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.    EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.    ALTERNATIVELY, IN THE EVENT THAT THE BANKRUPTCY COURT DENIES SUCH JURISDICTION, EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING BY IT OR AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, SHALL BE BROUGHT IN A FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK.    BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.

7.      WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

8.      Successors and Assigns; Severability; Several Obligations.    This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns.    Prior to the Closing, no Investor or the Assignee may sell, transfer or otherwise convey ("Transfer") any of its rights or obligations under this Agreement without the prior consent of (a) each Investor and the Company, in the case of a Transfer by the Assignee, and (b) the Assignee, in the case of a Transfer by any Investor, unless, in each case, the transferee thereof, prior to or concurrently with such Transfer, agrees in writing to become a party hereto and to be bound by all terms and provisions of this Agreement applicable to the transferee to the extent of such transferred rights and obligations; provided that notwithstanding the foregoing, no such Transfer will relieve any Investor or the Assignee of its obligations under Section 1.1 or Section 1.2, as applicable, if the transferee thereto fails to perform such obligations.    The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof.

9.      Counterparts.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement and may be delivered by facsimile transmission or by e-mail in portable document format (PDF).

10.    <u>Notices</u>.  All notices, demands and other communications hereunder shall be in writing or by written telecommunication, and shall be deemed to have been duly given if delivered personally or if mailed by certified mail, return receipt requested, postage prepaid, or if sent by overnight courier, or sent by written telecommunication, as follows:

If to Capital Ventures International, to its counsel at the address listed below:

c/o Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York 10020
Fax: (212) 262-7402
Attn: Gerald C. Bender, Esq.

If to Greywolf Capital Overseas Master Fund, Greywolf Capital Partners II LP or Greywolf Opportunities Fund LLC, to its counsel at the address listed below:

c/o Dechert LLP
1095 Avenue of the Americas
New York, New York 10036
Fax: (212) 698-3599
Attn: Michael J. Sage, Esq.

If to Kingdon Associates, Kingdon Credit Master Fund L.P., Kingdon Family Partnership, L.P., or M. Kingdon Offshore Master Fund L.P., to its counsel at the address listed below:

c/o Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
Fax:  (212) 839-5599
Attention: Lee S. Attanasio, Esq.

If to Deutsche Bank Securities Inc., to its counsel at the address listed below:

c/o White & Case LLP
Southeast Financial Center
Suite 4900
200 South Biscayane Boulevard
Miami, Florida 33131
Fax:  (305) 358-5744
Attn: Thomas E Lauria, Esq.

If to the Assignee, to its counsel at the address listed below:

c/o Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Fax:  (212)310-8007
Attention: Lori R. Fife, Esq.

- 5 -

If to the Company at, to its counsel at the address listed below:

    c/o Willkie Farr & Gallagher LLP
    787 Seventh Avenue
    New York, NY 10019
    Fax:  (212) 728-8111
    Attention: Paul V. Shalhoub, Esq. and Robin Spigel, Esq.

Notices mailed or transmitted in accordance with the foregoing shall be deemed to have been given upon receipt.

    11.    <u>Third Party Beneficiaries</u>.  Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than the Company, the Investors and the Assignee any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

    12.    <u>Relationship Among Parties</u>.  Notwithstanding anything herein to the contrary, the duties and obligations of the Parties under this Agreement shall be several, not joint.  No Party is a trustee or agent for any other Party, nor does any Party have any fiduciary obligations to any other Party.  This Agreement shall not be construed to create a partnership or joint venture among any of the Parties.

    **[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGES TO FOLLOW]**

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered as of the date first written above.

**CAPITAL VENTURES INTERNATIONAL**

By:    Susquehanna Advisors Group, Inc., its
        authorized agent

By:
Name: Todd Silverberg
Title: Assistant Vice President

| | |
|---|---|
| **Direct Subscription Shares:** | 35,211 |
| **Backstop Commitment Percentage:** | 24.846% |
| **Commitment Fee Shares:** | 49,071 |

[Signature Page to Share Purchase Agreement]

**GREYWOLF CAPITAL OVERSEAS MASTER FUND**

By:    **Greywolf Capital Management LP, its Investment Manager**

By:    _____
Name:    William Troy
Title:    Authorized Signatory

**Direct Subscription Shares:**        11,900
**Backstop Commitment Percentage:**    9.346%
**Commitment Fee Shares:**            18,382

**GREYWOLF CAPITAL PARTNERS II LP**

By:    Greywolf Advisors LLC, its General Partner

By:    _____
Name:    William Troy
Title:    Authorized Signatory

**Direct Subscription Shares:**        7,729
**Backstop Commitment Percentage:**    6.053%
**Commitment Fee Shares:**            11,907

**GREYWOLF OPPORTUNITIES FUND LLC**

By:    Greywolf Capital Management LP, its Managing Member

By:    _____
Name:    William Troy
Title:    Authorized Signatory

**Direct Subscription Shares:**        40,854
**Backstop Commitment Percentage:**    39.529%
**Commitment Fee Shares:**            77,210

[Signature Page to Share Purchase Agreement]

**KINGDON ASSOCIATES**
**KINGDON CREDIT MASTER FUND L.P.**
**KINGDON FAMILY PARTNERSHIP, L.P.**
**M. KINGDON OFFSHORE MASTER FUND**
**L.P.**

By:     Kingdon Capital Management, L.L.C., in
        its capacity as agent and investment adviser

By:     _____
Name:   Alan Winters
Title:  chief operating officer

| | |
|---|---|
| **Direct Subscription Shares:** | **12,269** |
| **Backstop Commitment Percentage:** | **0.089%** |
| **Commitment Fee Shares:** | **865** |

[Signature Page to Share Purchase Agreement]

**DEUTSCHE BANK SECURITIES INC.**
(solely with respect to the Distressed Products
Group)

By:
Name:
Title:    Shawn Faurot
         Managing Director

By:
Name:    Joanne Adkins
Title:    Managing Director

| | |
|---|---:|
| **Direct Subscription Shares:** | 24,537 |
| **Backstop Commitment Percentage:** | 20.137% |
| **Commitment Fee Shares:** | 39,545 |

[Signature Page to Share Purchase Agreement]

**SILVER POINT FINANCE, LLC**

By: _____

Name:

Title:    Michael A. Gatto
          Authorized Signatory

[Signature Page to Share Purchase Agreement]

**K-V PHARMACEUTICAL COMPANY**

By:

Name: Patrick J. Christmas

Title: General Counsel

[Signature Page to Share Purchase Agreement]

## EXHIBIT 8

***K-V Pharmaceutical Co. v. Hermelin***, **Case No. 11SL-CC04054, Amended Petition for Declaratory Judgment and Further Relief (dated November 28, 2011)**

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

K-V PHARMACEUTICAL COMPANY,   )
                                     )
      Plaintiff,                )
                                     )     Case. No. 11SL-CC04054
v.                                )
                                   )     Div. 9
MARC HERMELIN,             )
                                     )
      Defendant.            )

## AMENDED PETITION FOR
## DECLARATORY JUDGMENT & FURTHER RELIEF

Plaintiff K-V Pharmaceutical Company ("KV") brings this Petition against defendant Marc Hermelin ("Hermelin"), and states as follows:

*Summary of Case*:

This is a suit for the declaration of the rights of the parties to two agreements between KV and its former chief executive officer and board member. KV avers that Hermelin breached his fiduciary obligations to KV and its board, and willfully failed to perform the duties of his employment, while Hermelin denies that he has done so. Granting declaratory relief will terminate this controversy, and remove an uncertainty between the parties.

## PARTIES

1.     Plaintiff KV is a Delaware Corporation with its principal place of business in St. Louis, Missouri. KV was in the business of developing, manufacturing, acquiring, and marketing prescription pharmaceutical products. KV had three wholly owned subsidiaries through which it operated (1) ETHEX Corporation ("ETHEX"), which sold over 40 generic, non-branded drugs and accounted for 61% of KV's 2008 net revenues; (2) Ther-Rx Corporation

("Ther-Rx"), which sold over 11 branded drugs and accounted for 36% of KV's 2008 net

revenues, and (3) Particle Dynamics, Inc. which developed and markets specialty raw materials

and accounted for 3% of KV's 2008 net revenues.

2.    Defendant Hermelin is an individual with a residence in St. Louis County,

Missouri and in Jerusalem, Israel.

3.    Hermelin served as KV's Vice-Chairman of the Board and CEO from 1974 until

August 2006. In August 2006, Hermelin became Chairman of the Board in addition to CEO, and

continued in both positions until December of 2008, when his employment contract, and his

employment, were terminated, and he was removed as Chairman and CEO.

4.    All of the conduct relevant to this matter occurred in St. Louis County, Missouri;

until his termination in 2008, Hermelin resided in St. Louis County, Missouri.

## ADDITIONAL FACTS COMMON TO ALL COUNTS

*Hermelin's Control over KV and its Board of Directors*:

5.    Hermelin was KV's largest shareholder. He held the largest voting block of KV

stock. As of January 2010, Hermelin and his family held 11.4% of KV Class A stock and 70.2%

of KV's Class B stock. The Class B stock is entitled to one vote whereas the Class A stock is

entitled to 1/20th of a vote. KV had, as of January 2010, issued approximately 37.7 million

shares of Class A stock and 12.1 million shares of Class B stock. The Class A shares are entitled

to approximately 1.9 million votes, and the Class B shares to about 12.1 million votes. Thus, at

all relevant times Hermelin and his family had approximately 62.3% of the total voting power of

KV shareholders and held about 25.7% of the economic interest in the company. The remaining

74.3% of the economic interest was held by public shareholders. Both the Class A shares and

the Class B shares trade on the New York Stock Exchange.

2

6.     Therefore Hermelin controlled over 62% percent of the voting power of KV's stock, but only about 25% of the economic interest (with public shareholders holding the remainder). In short, Hermelin's voting power in KV was not proportional to his economic interest in the company.

*The Hermelin KV contracts*:

7.     In 1996, Hermelin executed an employment agreement with KV. The agreement has since been modified on several occasions. The agreement contains provisions which, depending on circumstances, provide for retirement payments to Hermelin, and again depending on various circumstances, call for various payments upon the termination of Hermelin's employment. In particular, the employment agreement could be terminated for cause if Hermelin breached a fiduciary obligation to KV or willfully failed to perform his duties to KV with knowledge of the pertinent facts, which conduct had a material and demonstrable adverse effect on KV.

*KV's Board learns of misconduct by Hermelin that damaged KV*:

8.     At all times relevant hereto, Hermelin knew that many of his actions were improper, and that they risked severe sanctions against KV -- sanctions so severe that they could end KV's ability to do business. He acted solely to protect his own interests and bonus, which was, by contract, calculated as a percent of KV's profit, so taking appropriate action would be costly to him.

9.     In December of 2008, KV terminated Hermelin's employment agreement, and his employment, for cause.

*Hermelin's misconduct was not minor or immaterial*:

3

10.    Hermelin's termination was based upon his breach of his fiduciary obligations to KV and his willful failure to perform his duties in the best interests of KV, all of which had a material and demonstrably adverse effect on KV. That misconduct included, but was not limited to, failure to take appropriate actions with respect to the FDA, multiple attempts to impede the work of those investigating matters at KV's facilities, and multiple efforts to conceal critical information with respect to KV's production facilities and processes from internal audit and quality personnel and KV's own board and its committees.. At all relevant times, Hermelin knew that his conduct was wrongful and inconsistent with his duties to KV, which was egregious. Pleading in the alternative, such conduct constituted gross negligence and indifference to his duties to KV.

11.    The effects of Hermelin's misconduct continued after Hermelin's termination, and in fact continue to this day. Key among them is the fact that, in 2009, KV and Ethex's pharmaceutical business was shut down by federal regulators largely because of Hermelin's misconduct. The effect of Hermelin's misconduct has been substantial harm to KV — including the complete shut down by regulators of KV's manufacturing operations for over a year and the felony criminal conviction and dissolution of KV's ETHEX subsidiary.

12.    Hermelin's conduct was not a matter of minor disagreements with procedures or small and harmless "cutting of corners." Instead, it was so severe that on October 29, 2010, after careful investigation, the Department of Health and Human Services, acting through its Office of Inspector General ("HHS OIG"), took the unusual step of barring Hermelin from participation in Medicare, Medicaid and all other Federal healthcare programs for a minimum of 20 years. This bars Hermelin from employment from, *inter alia*, any drug company manufacturing a product

4

ultimately paid for by Medicare, Medicaid or any other Federal healthcare program, which effectively means KV and every other pharmaceutical company.

13.    Thereafter, in March of 2011, Hermelin personally pleaded guilty in the United States District Court for the Eastern District of Missouri to two counts of introducing misbranded drugs into commerce, matters for which Hermelin had reasonable cause to believe that his conduct was unlawful.

*Before his conviction but after his termination, Hermelin inserts himself back into KV's management*:

14.    Despite the termination of Hermelin's employment and employment agreement Hermelin still controlled the majority of KV's voting stock, including through family trusts, and by that control, could control the election of KV's board.

15.    Consistent with that control, and despite clear knowledge that the consent decree entered between KV and the United States in March of 2009 barred KV from permitting Hermelin to have any role in the decision-making, management, or operation of KV that could affect KV's compliance with the Food, Drug, and Cosmetic Act, at the Annual Meeting of Stockholders held on June 10, 2010, Hermelin caused the re-election of himself to the board.

16.    On November 10, 2010, and at the demand of HHS OIG, Hermelin resigned from KV's board, and shortly thereafter Hermelin, KV and HHS OIG agreed that, *inter alia*, HHS OIG would refrain from exercising its right to exclude KV from federal healthcare programs so long as Hermelin divest ownership of KV voting stock, resign as a trustee of all family trusts holding KV stock, refrain from voting KV stock, and otherwise not seek to influence or be involved, in any manner, with the governance, management or operations of KV.

*Hermelin's Claims*:

5

17.    Despite these and other matters, Hermelin variously claims that he was not terminated but instead retired, or that any termination by KV occurred after he retired and is therefore of no effect. Hermelin further claims that as a result, he is owed both retirement and termination payments under his employment agreement, which payments he claims to have enormous value. KV disagrees, and avers that because of Hermelin's breach of his fiduciary duties which constitutes a willful breach of his employment agreement, it owes him nothing.

18.    Hermelin also claims that he is entitled to indemnification for certain expenses that he has incurred, largely with respect to the criminal proceedings referred to above, governmental investigations and certain lawsuits. He bases this claim on the indemnification agreement set out above. KV disagrees, and contends that Hermelin is not entitled to indemnification for any matters related to his conduct that was not in the best interests of KV or for which Hermelin had reasonable cause to believe were unlawful.

19.    As a result, there is a genuine dispute between KV and Hermelin over their respective rights and duties under Hermelin's employment agreement, including the question of whether or not it has been terminated and is at an end. KV therefore seeks a declaration of the rights of the parties, pursuant to Mo. Rev. Stat. Ann. §527.010 and Mo. R. Civ. P. 87.02, as well as damages.

## DECLARATORY JUDGMENT

20.    KV incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 21, inclusive, as if fully set forth herein.

21.    Hermelin claims entitlement to retirement and termination payments under his employment agreement, and that he is entitled to enormous payments by KV.

6

22.    KV denies that he is entitled to any such payments, by reason of the matters set out above, including his egregious conduct and/or gross negligence as aforesaid, his breaches of his fiduciary obligations and his willful breaches of his employment agreement, including his willful failure to perform that agreement as required, all of which led to a valid termination of his employment agreement and his employment.

23.    As a result, there is a genuine dispute between KV and Hermelin over their respective rights and duties under Hermelin's employment agreement, including the question of whether or not it has been terminated and is at an end. KV therefore seeks a declaration of the rights of the parties, pursuant to Mo. Rev. Stat. Ann. §527.010 and Mo. R. Civ. P. 87.02, as well as damages.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff KV respectfully requests that the Court enter a Judgment in favor of KV and against Hermelin:

24.    Declaring that Hermelin was properly terminated for cause by KV;

25.    Declaring that Hermelin's employment agreement was properly terminated for cause by KV;

26.    Declaring that by reason of Hermelin's material breaches of his employment agreement, and by reason of the breach of fiduciary duty complained of herein, the employment agreement is terminated and that Hermelin is not entitled to any compensation or other payments thereunder;

27.    Requiring Hermelin to repay to KV all compensation and the value of other remuneration of any kind paid to him during the time that he breached his fiduciary duty to KV;

7

28.    Directing Hermelin to make restitution to KV for all sums of money and other things of value by which he was enriched as a result of the wrongs he committed;

29.    Directing Hermelin to account to KV for all injuries sustained by KV by reason of his breach of fiduciary duty;

30.    Awarding KV the costs and disbursements of this action, including reasonable attorneys' fees and expenses and directing Hermelin to pay interest at the highest rate allowable by law on the amount of damages sustained by KV as a result of his culpable conduct and all other monetary relief awarded to KV; and

31.    Pursuant to Mo. R. Civ. P. 87.10, and after a determination granting the relief sought above, award such damages and other and further relief as the Court may deem just and proper.

Respectfully submitted,

SNR DENTON US LLP

By _____

Stephen H. Rovak - 22328
Stephen J. O'Brien - 43977
One Metropolitan Square, Suite 3000
St. Louis, MO  63102-2741
(314) 241-1800
(314) 259-5959 (fax)

*Attorneys for Plaintiff KV Pharmaceutical Company*

Dated: November 28, 2011

8

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that a true and complete copy of the foregoing has been served via electronic and first class U. S. mail, postage prepaid this 30th day of November 2011, upon the following:

James J. Virtel
Armstrong Teasdale LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, MO 63105
*jvirtel@armstrongteasdale.com*